Richard J. Cooper, Esq.
Luke A. Barefoot, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the Foreign Representative*
*of Odebrecht Engenharia e Construção S.A.*
*and affiliated debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| Odebrecht Engenharia e Construção S.A., *et al.*,[1] | Case No. 20-12741 |
| Debtors in a Foreign Proceeding | (Joint Administration Pending) |

### VERIFIED PETITION FOR RECOGNITION
### OF THE BRAZILIAN EJ PROCEEDING AND MOTION
### FOR ORDER GRANTING FINAL RELIEF PURSUANT TO
### 11 U.S.C. §§ 105(A), 1507, 1509(B), 1515, 1517, 1520(A) AND 1521

Adriana Henry Meirelles, the foreign representative ("Petitioner" or the "Foreign Representative") in the extrajudicial reorganization (*recuperação extrajudicial* or "EJ") proceeding (the "Brazilian EJ Proceeding") of Odebrecht Engenharia e Construção S.A. ("OEC") and its affiliated debtors CNO S.A. ("CNO") and OECI S.A. ("OECI") (collectively, the "Debtors") in the First São Paulo Bankruptcy and Reorganization Court of the Fórum Central Cível of the Appellate Court of the State of São Paulo (the "Brazilian Court") pursuant to Federal

---

[1]    The Debtors in these chapter 15 cases (the "Chapter 15 Cases") and the last four identifying digits of the tax number in the jurisdiction are: Odebrecht Engenharia e Construção S.A. (Brazil – 01-28); CNO S.A. (Brazil – 01-82); OECI S.A. (Brazil – 01-78).

Law 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative

Republic of Brazil ("Brazil"), by and through my undersigned counsel, respectfully submit this

*Verified Petition for Recognition of the Brazilian EJ Proceeding and Motion for Order Granting*

*Final Relief Pursuant to 11 U.S.C. §§ 105(a), 1507, 1509(b), 1515, 1517, 1520(a) and 1521* (the

"Verified Petition").  This Verified Petition is filed in furtherance of the *Official Form Petition*

(together with this Verified Petition, the "Petition") filed contemporaneously herewith and

hereby request that the Court enter an order substantially in the form annexed hereto as Exhibit A

(the "Proposed Order") pursuant to sections 105(a), 1507, 1509(b), 1515, 1517, 1520(a) and 1521

of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"): (i)

commencing a case for each Debtor under chapter 15 ancillary to the Brazilian EJ Proceeding

(the "Chapter 15 Cases"); (ii) granting recognition of the Brazilian EJ Proceeding pursuant to

section 1517 of the Bankruptcy Code as a "foreign main proceeding;" (as defined in section

1502(4) of the Bankruptcy Code) of each of the Debtors, and all relief included therewith as

provided in section 1520 of the Bankruptcy Code;[2] (iii) recognizing the Petitioner as the "foreign

representative" (as defined in section 101(24) of the Bankruptcy Code) of the Brazilian EJ

Proceeding for each Debtor for purposes of these Chapter 15 Cases; (iv) recognizing and

enforcing the Brazilian Reorganization Plan (as defined below) in the United States and giving

full force and effect to and granting comity in the United States to the Brazilian Confirmation

Order (as defined below); (v) directing the Trustee and authorizing the U.S. Intermediaries (as

defined below) to take any and all actions necessary to give effect to the terms of the Brazilian

---

[2]      Alternatively, should the Court decline to recognize the Brazilian EJ Proceeding as the foreign main proceeding for any
of the Debtors, the Petitioner respectfully requests that the Court recognize such proceeding as a foreign nonmain proceeding (as
defined in section 1502(5) of the Bankruptcy Code) of any such Debtor, and grant appropriate relief.

Reorganization Plan including, without limitation, the release and cancellation of the Guarantee

Obligations (as defined below) under the Existing Notes (as defined below) and the issuance

and distribution of the New Securities (as defined below), and any actions related thereto; (vi)

except as otherwise provided in the Proposed Order, permanently enjoining all parties from

commencing, continuing or taking any action in the United States to interfere with the Brazilian

EJ Proceeding or the Brazilian Reorganization Plan, including, without limitation, to obtain

possession of, exercise control over, or assert claims against the Debtors or their property; and

(vii) granting such other and further relief as the Court deems just and proper.

In support of this request, the Petitioner relies upon and incorporates by reference: (i) the

*Declaration of Adriana Henry Meirelles in Support of Verified Petition Under Chapter 15 for*

*an Order Granting Recognition and Final Relief in Aid of a Foreign Proceeding Pursuant to 11*

*U.S.C. §§ 105(A), 1507, 1515, 1517, 1520(A) AND 1521* (the "Foreign Representative

Declaration"); and (ii) the *Declaration of Felipe Ribeiro da Luz Camara in Support of Verified*

*Petition Under Chapter 15 for an Order Granting Recognition and Final Relief in Aid of a*

*Foreign Proceeding Pursuant to 11 U.S.C. §§ 105(A), 1515, 1517, 1520(A) AND 1521* (the

"Brazilian Counsel Declaration"); and (ii) the filed concurrently herewith.  In further support of

this Motion, the Petitioner respectfully represents to the Court as follows:

## PRELIMINARY STATEMENT

On August 26, 2019, Odebrecht S.A. – Em Recuperação Judicial ("ODB") and certain

affiliates (the "ODB Debtors") filed the Verified Petition for Recognition of the Brazilian RJ

Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517,

and 1520, In re Odebrecht, S.A., No. 19-12731 (SMB) (Bankr. S.D.N.Y. Aug. 26, 2019), ECF Nos.

2, 3 (the "ODB Petition") seeking recognition of the jointly-administered judicial reorganization proceeding (the "Brazilian RJ Proceeding") pending before the Brazilian Court pursuant to Brazilian Bankruptcy Law as the foreign main proceeding for all of the ODB Debtors pursuant to section 1517 of the Bankruptcy Code.  On September 18, 2019, this Court entered an order granting the relief sought in the ODB Petition and recognized the Brazilian RJ Proceeding as a foreign main proceeding for all the ODB Debtors (the "Initial Chapter 15 Cases").  Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Odebrecht, S.A., No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.  In the ODB Petition, ODB and its affiliated debtors explained that OEC was pursuing a separate restructuring, which is now the subject of this declaration.

The Debtors, along with other related entities and affiliates (the "OEC Group"), are part of the construction services arm of the ODB corporate group (the "ODB Group") and each Debtor is incorporated and has its center of main interests in Brazil.  The OEC Group maintains businesses in the fields of engineering, construction, and in the development and operation of infrastructure. As explained in the ODB Petition, the ODB Group is one of the largest private business conglomerates in Brazil, which was founded in 1944 as a construction company in the northeastern region of Brazil.  The OEC Group continues to be active in the segments of heavy civil construction and building, assembly and management of industrial ventures.

The OEC Group employs 8,615 people, the majority of which are Brazilian, and is one of the largest construction companies in the world.  As described in more detail below, the OEC Group grew rapidly over the past decade and its gross revenues grew to BRL58 billion

(approximately $10.54 billion) in 2015.[3]  This prosperity, combined with the nature of the construction sector, which requires large amounts of investments, led the OEC Group to turn to the U.S. capital markets to raise funds.  To take on additional projects, the ODB Group raised capital through a series of notes guaranteed by the Debtors between 2009 to 2014 in the U.S. capital markets as described in further detail below.

Following this period of growth, however, the macro-economic situation in Brazil drastically changed, and in mid-2014, the Brazilian economy entered a deep recession.  The recession put already contracted work on hold and the market for new contracts dried up.  From 2014 to 2019, the OEC Group lost approximately $11.2 billion in cancelled contracts and faced significant challenges in obtaining new projects due to lower demand for infrastructure projects in countries where the OEC Group operates.  As described more fully below, additional factors including a criminal investigation (known as "Operation *Lava-Jato*") deeply impacted the OEC Group.

Despite attempts to normalize and continue operating the business in the ordinary course, the OEC Group did not have the necessary liquidity to meet all its short- and medium-term financial obligations.  Specifically, the Debtors and the issuer, Odebrecht Finance Ltd. ("OFL"),[4] of the Existing Notes (defined below) have been unable to make interest payments on the Existing

---

[3]    Reference to USD conversion herein was calculated using a USD/BRL exchange rate $1 = BRL5.5006, the Federal Reserve USD/BRL rate as of November 13 ,2020.

[4]    OFL is part of the jointly-administered judicial reorganization (*recuperação judicial* or "RJ") proceeding (the "Brazilian RJ Proceeding") of Odebrecht S.A. – Em Recuperação Judicial and its affiliated debtors (collectively, the "RJ Debtors") which was recognized by this Court as a foreign main proceeding under Chapter 15 of the Bankruptcy Code for each of the RJ Debtors.  See In re Odebrecht, S.A., Case No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.  On November 11, 2020, the Brazilian RJ Court confirmed a plan of reorganization for OFL (the "OFL RJ Plan") and concurrently with the filing of this Verified Petition, on November 24, 2020 Marcelo Rossini, the foreign representative, will file a motion with this Court seeking enforcement of OFL RJ Plan.  Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 1507(a), 1521(a), and 1525(a) (i) Enforcing the Odebrecht Finance LTD. RJ Plan and (ii) Granting Related Relief, In re Odebrecht, S.A., No. 19-12731 (SMB).

Notes since October 2018 and are not able to meet present and future payments under their terms

and conditions of the Existing Notes.  In June of this year, the Debtors finalized the terms of an

agreed plan of reorganization to restructure the Existing Notes (the "Brazilian Reorganization

Plan") setting forth the restructuring contemplated transactions (the "Restructuring").  Having

received support from 73% of the aggregate claims in respect of the Existing Notes, on August 19,

2020 the Debtors jointly filed petitions for the commencement of the Brazilian EJ Proceeding with

the Brazilian Court after the Board of Directors of OEC unanimously resolved (the "Authorizing

Resolutions") to recommend the Brazilian EJ Proceeding to its shareholders in relation to each of

OEC, CNO and OECI.  Upon the recommendation of the Board of Directors, the shareholders of

each of OEC, CNO and OECI approved the commencement of the Brazilian EJ Proceeding.

Consistent with Brazilian Bankruptcy Law, the Debtors solicited support for the Brazilian

Reorganization Plan of holders of at least three-fifths of the outstanding amount of all claims

subject to the restructuring before commencing the Brazilian EJ Proceeding.

As of the commencement of the Brazilian EJ Proceeding, the Debtors' consolidated capital

structure included debt in the aggregate amount of $3.4 billion consisting of seven series of

unsecured notes.  As described in greater detail below, the Brazilian Reorganization Plan provides

that the $3.4 billion of Existing Notes will be exchanged for New Securities (defined below).

The Brazilian Reorganization Plan was submitted to the Brazilian Court for approval with

the support of 73% of the aggregate claims in respect of the Existing Notes concurrently with the

commencement of the Brazilian EJ Proceeding.  On October 26, 2020 the Brazilian Court issued

an order confirming the Brazilian Reorganization Plan (the "Brazilian Confirmation Order").  A

copy of the Brazilian Reorganization Plan, which was submitted to and approved by the Brazilian

Court in both Portuguese and English, is attached to the Foreign Representative Declaration as

Exhibit A.  Through the Brazilian EJ Proceeding, the OEC Group expects to be able to complete its Restructuring and de-lever its balance sheet to reflect current economic conditions.

The restructuring embodied by the Brazilian Reorganization Plan and approved by the Brazilian Court is a significant victory for the Debtors and their creditors.  It is a culmination of more than a year of intensive, good-faith negotiations between the Debtors and the Ad Hoc Group (as defined below) to develop a consensual, value-maximizing restructuring transaction for the Debtors and their business.  The Brazilian EJ Proceeding, much like a prepackaged case under U.S. Bankruptcy Law, allows for an expeditious and cost-effective reorganization process that will maximize the going concern value of the OEC Group.  Consummation of the Brazilian Reorganization Plan makes the Debtors well-positioned to preserve and build their businesses to re-establish a market leading position in what has been an unstable period for both Brazil and the construction sector.

Accordingly, the Petitioner, on behalf of the Debtors, commenced the Chapter 15 Cases to seek recognition of the Brazilian EJ Proceeding as a foreign main proceeding with respect to each of the Debtors and recognition and enforcement of the Brazilian Reorganization Plan and the Brazilian Confirmation Order and the other relief described in detail below.

## **BACKGROUND**

### A.    **General Background and History**

#### i.    *Overview*

1.       The Debtors are part of the OEC Group and the construction services arm of the ODB Group, with business in the fields of engineering, construction, industry, and in the development and operation of infrastructure projects.  As explained in the ODB Petition, the ODB Group is one of the largest private business conglomerates in Brazil which was founded in 1944 as

a construction company in the northeastern region of Brazil, and through the OEC Group has been involved in the construction of multiple projects such as (i) industrial plants, (ii) warehouses, (iii) small dams, (iv) highways, (v) airports, (vi) ports, (vii) hydroelectric plants, (viii) subways, (ix) buildings and (x) canals. The OEC Group continues to be active in the segments of heavy civil construction and building, assembly and management of industrial ventures.

2.       After its foundation, the OEC Group has expanded its operations throughout Brazil, executing a series of infrastructure projects fundamental for regional development including the construction of Brazil's first nuclear power plant, the Central Nuclear de Angra dos Reis in 1971; the Rio de Janeiro international airport in 1971 and the Rio de Janeiro State University in 1972. More recently, the OEC Group has been involved in some of the largest construction projects in Brazil's modern history including the giant Hydroelectric Dam of Belo Monte (which, by itself, employed approximately 30,000 employees in Brazil's developing Northern region), some stadiums for the 2014 World Cup and some of the main buildings used in the 2016 Olympics. Throughout its history, the OEC Group has been a leader in innovative engineering practices and sustainability.

3.       As noted above, the OEC Group is one of the largest construction companies in the world and employs over 8,615 people. The OEC Group's gross revenues more than tripled between 2008 and 2015 from BRL17 billion (approximately $3.09 billion) to BRL58 billion (approximately $10.54 billion). This prosperity combined with the nature of the construction sector, which requires large amounts of investments, led the ODB Group to turn to the U.S. capital markets to raise funds. As noted above, and described in more detail below, from 2009 to 2014 the ODB Group raised capital through a series of notes, of which $3.4 billion remains outstanding and is being restructured through the Restructuring.

4.      When the Brazilian economy entered a recession in mid-2014, the public sector, the main driver for civil construction and infrastructure works, drastically reduced its investment in the types of projects the OEC Group provides.  The recession and the impact of Operation *Lava-Jato* also put already contracted work on hold and from 2014 to 2019, OEC lost approximately $11.2 billion in cancelled contracts and faced significant challenges in obtaining new projects due to lower demand for infrastructure projects in countries where the OEC Group operates.

5.      Additionally, and at around the same time, the Federal Police of Brazil began a criminal investigation (known as "Operation *Lava-Jato*") into allegations of money laundering and corruption which implicated the ODB Group.  Operation *Lava-Jato* further increased the OEC Group's difficulty in accessing financing (both domestically and internationally), maintaining existing accounts and developing new business in Brazil and elsewhere.  In addition, certain business counter-parties terminated or suspended a number of contracts for infrastructure works abroad, large payments due to the OEC Group for completed projects were withheld, and various new projects were temporarily shut down.

6.      As discussed more fully below, despite attempts to normalize and continue operating the business in the ordinary course, due to the macro-environment in Brazil and the lingering impact of Operation *Lava-Jato*, the OEC Group did not have the necessary liquidity to meet all its short- and medium-term financial obligations.  The OEC Group focused on implementing changes to overcome this crisis including selling certain assets, deleveraging and engaging in discussions with its creditors to restructure liabilities.  Through the Brazilian EJ Proceeding, the OEC Group expects to be able to complete its restructuring process and de-lever its balance sheet to reflect current economic conditions.

> ii.    *The OEC Group's Corporate Structure and Offices*

7.    The OEC Group's operational and economic activities are primarily concentrated in Brazil.  The OEC Group is a leader in engineering & construction sector in Brazil.  The OEC Group's corporate structure reflects its history of financings, expansions, strategic investments, and acquisitions, as well as its corporate strategy of allocating specific operations to different corporate entities.   The chart below shows, in relevant part, a summary of the OEC Group's corporate structure as it pertains to the Debtors and charts the role of each Debtor and related affiliates in the OEC Group:



8.    As shown above, the Debtors and their key related affiliates are composed of:

a.  **The "<u>Holding Company</u>"** – Debtor OEC serves as the OEC Group's holding company and the entity that makes the strategic decisions for the OEC Group.

10

It is incorporated in Brazil, its registered office is in Brazil and its headquarters are located in São Paulo, São Paulo, Brazil. It coordinates activities, makes strategic decisions and fosters the development of the OEC Group.

b. **The "Operating Entities"** – Debtors CNO and OECI are Brazilian-incorporated companies which are the operating arms of OEC, coordinating operations of the most diverse engineering and construction projects in Brazil and abroad. Their registered offices are in Brazil and their headquarters are located in São Paulo, São Paulo, Brazil.

9.     As shown above, the OEC Group has operational activities principally focused on Brazil and subject to Brazilian laws and regulations. Indeed, the OEC Group's primary operational activities are in Brazil, as is its primary operational management center, located in São Paulo, Brazil (the "São Paulo Office"). OECI and CNO share the same officers, all of whom are Brazilian citizens, are based in São Paulo and hold Brazilian passports. The officers are: Jayme Gomes da Fonseca Júnior, Marco Siqueira Aurélio Benito Juarez Gimenes Siqueira and Raul Ribeiro Pereira Neto. OEC has two Brazilian officers, Jayme Gomes da Fonseca Júnior and Marco Siqueira Aurélio Benito Juarez Gimenes Siqueira. The São Paulo Office maintains staff in charge of operational matters, including senior management, as well as the OEC Group's legal, human resources, finance, and communication teams.

     *iii.   Chapter 15 Debtors*

     a.  OEC

10.     OEC is an entity organized under the laws of Brazil with its registered office in , São Paulo, Brazil. OEC is a privately held company and a subsidiary of ODB. OEC is a non-operational holding company for the OEC Group and participates in all of the OEC Group's business segments through one or more of its subsidiaries. OEC is also a guarantor of a significant portion of the OEC Group's indebtedness. All of OEC's directors and officers are based in Brazil

and all decisions are made in Brazil, where its board meetings are also held. The vast majority of its operating contracts are governed by Brazilian law. OEC files its taxes in Brazil.

b.   CNO

11.      CNO is an entity organized under the laws of Brazil with its registered office in São Paulo, Brazil. CNO is one of the operational entities of the OEC Group that primarily handles large-scale infrastructure construction projects, concentrates the operational assets, expertise, and technical capacities of the OEC Group, and acts as a member of construction consortia and as a qualified bidder (nationally or abroad). All of its officers are based in Brazil and all decisions are made in Brazil. Its board meetings are held in Brazil. CNO employs 2,249 employees, the majority of which are Brazilian. CNO files its taxes in Brazil.

c.   OECI

12.      OECI is an entity organized under the laws of Brazil with its registered office in São Paulo, Brazil. Similar to CNO, OECI is an operational entity of the OEC Group that primarily handles large-scale infrastructure construction projects, concentrates the operational assets, expertise, and technical capacities of the OEC Group, and acts as a member of construction consortia and as a qualified bidder (nationally or abroad). All of its officers are based in Brazil and all decisions are made in Brazil. Its board meetings are held in Brazil. OECI employs 1,606 employees, the majority of which are Brazilian. OECI files its taxes in Brazil.

B.      **The OEC Group's Operations and Capital Structure**

i.   *Debtors' Operations and Assets*

13.      The Debtors constitute the OEC Group's main business segment. OEC has been responsible for major construction projects in Brazil including a new São Paulo metro line, the Rio de Janeiro State University Campus, and the Baixo Igauçu Hydroelectric Plant. CNO and OECI

are the operating entities that bring together the operational assets, expertise, and technical capacities of the OEC Group to achieve some of the most complex engineering and construction projects in the world.

14.      In 2019, OEC's gross revenue, earned through the many subsidiaries controlled by OEC, totaled approximately BRL5.2 billion (approximately $945.35 million).  OEC's main assets are its backlog of construction contracts with projects to be completed in Angola, Brazil, Panama, and other countries.  It also holds equity in the OEC Group's subsidiaries which operate in a variety of segments such as those described above.  Nearly 100% of those direct equity interests are located in Brazil.

15.      CNO's main assets are also its backlog of construction contracts with projects to be completed in Angola, Brazil, Panama, and other countries.  OECI similarly holds backlogs of future projects to be completed in Brazil, the United States, and Angola.  As explained in further detail below, each of the Debtors also holds assets in the United States.  Both CNO and OEC are also defendants in two securities litigations in the Southern District of New York.

   *ii.      Debtors' Capital Structure*

16.      The OEC Group's controlling structure is composed of layers of different holding companies, culminating with members of the Odebrecht family, as well as a minority participation held by other shareholders, including an entity and individuals.  Specifically, OEC's shares are held almost entirely by ODB,[5] with ODBINV S.A. – Em Recuperação Judicial ("ODBINV") holding one share.  In turn, ODB's shares are held almost entirely by ODBINV, with another holding

---

[5]      ODB is a Brazilian company that this Court has determined has its center of main interest in Brazil.  See Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Odebrecht, S.A., Case No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.

company called Kieppe Participações e Administração Ltda. – Em Recuperação Judicial ("KIEPPE") holding one ODB share.  ODBINV's shares, for their part, have KIEPPE holding 79.68% of ODBINV stock, while a remaining 20.32% is held by minority shareholders.  KIEPPE is in turn controlled by yet another holding company (Kieppe Patrimonial S.A.), whose stock is divided among the holding companies of the members of the Odebrecht family.  This information is synthesized in the chart below:



17.    As of the commencement of the Brazilian EJ Proceeding, the Debtors' consolidated capital structure included the Existing Notes, loans and bank credit facilities.  On its most recent financial report, OEC disclosed an aggregate amount of indebtedness of approximately BRL3.03 billion (approximately $550.85 million) on its balance sheet as of December 31, 2019.  The

issuances of bonds are detailed below.  No indebtedness or claims other than the obligations detailed

herein were affected by the Brazilian Reorganization Plan.

18.      OFL, [6] issued US$72,726,000 of 7.00% Senior Notes due 2020 (the "2020 Senior

Notes") under an indenture dated October 21, 2009 which is guaranteed by OEC, CNO and OECI.

Bank of New York Mellon is the trustee (the "Trustee").  The total outstanding amount due in

connection with the principal and interest amortization related to the 2021 Notes is $82,919,761.[7]

19.      OFL issued US$143,020,000 of 5.125% Notes due 2022 (the "2022 Notes") under

the indenture dated June 26, 2012 by and among, OEC, CNO and OECI as guarantors, and the

Trustee.  The total outstanding amount due in connection with the principal and interest

amortization related to the 2022 Notes is $161,092,662.71.[8]

20.      OFL issued US$101,561,000 of 6.00% Notes due 2023 (the "2023 Notes") under

the indenture dated April 5, 2011 by and among, OEC, CNO and OECI as guarantors, and the

Trustee.  The total outstanding amount due in connection with the principal and interest

amortization related to the 2023 Notes is $114,258,946.14.[9]

21.      OFL issued US$518,600,000 of 4.375% Notes due 2025 (the "2025 Notes") under

the indenture dated April 25, 2013 by and among OEC, CNO and OECI as guarantors, and the

---

[6]      As noted previously, OFL is subject to a Chapter 15 case before this Court and this court has determined
that its center of main interest is in Brazil.  See Order Granting Recognition of Foreign Main Proceeding and Certain
Related Relief, In re Odebrecht, S.A., Case No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.
As part of the OFL RJ Plan that was approved by the Brazilian RJ Court, the Existing Notes will be cancelled.  As
noted previously, the foreign representative in OFL's chapter 15 case will file a motion with this Court seeking
enforcement of OFL RJ Plan.  Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 1507(a), 1521(a), and 1525(a) (i)
Enforcing the Odebrecht Finance LTD. RJ Plan and (ii) Granting Related Relief, In re Odebrecht, S.A., No. 19-
12731 (SMB).

[7]      Calculated as of August 18, 2020 (see Schedule H of the Brazilian Reorganization Plan).

[8]      Calculated as of August 18, 2020 (see Schedule H of the Brazilian Reorganization Plan).

[9]      Calculated as of August 18, 2020 (see Schedule H of the Brazilian Reorganization Plan).

Trustee. The total outstanding amount due in connection with the principal and interest amortization related to the 2025 Notes is $580,073,907.64.[10]

22. OFL issued US$500,000,000 of 5.25% Notes due 2029 (the "2029 Notes") under the indenture dated June 27, 2014 by and among OEC, CNO and OECI as guarantors, and the Trustee. The total outstanding amount due in connection with the principal and interest amortization related to the 2029 Notes is $564,010,416.67.[11]

23. OFL issued US$840,150,000 of 7.125% Notes due 2042 (the "2042 Notes") under the indenture dated June 26, 2012 by and among OEC, CNO and OECI as guarantors, and the Trustee. The total outstanding amount due in connection to the principal and interest amortization related to the 2042 Notes is $981,633,593.75.[12]

24. Additionally, US$750,000,000 of unsecured perpetual notes (the "Perpetual Notes" and, together with the 2020 Senior Notes, the 2022 Notes, the 2023 Notes, the 2025 Notes, the 2029 Notes, and the 2042 Notes, the "Existing Notes") were issued by OFL with OEC, CNO and OECI as guarantors and the Trustee under that certain indenture dated as of September 14, 2010. The Perpetual Notes are "perpetual" in nature with no fixed final maturity date or sinking fund provisions and bear an annual interest rate of 7.50%. The total outstanding amount due in connection with the principal and interest amortization related to the Perpetual Notes is US$870,395,833.33.[13]

---

[10]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

[11]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan). As explained in Schedule H, this amount includes BRL3,722,468.75 (approximately $676,738.67) of credits held by Worldwide Insurance Solutions Ltd., a subsidiary of ODB.

[12]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

[13]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

25.     Based on the offering documents, the Debtors believe that creditors of OEC, CNO and OECI have always been fully on notice that any restructuring of their obligations could take place in Brazil and their investment was made with the expectation their purchases would be repaid with revenues earned largely in Brazil from operations largely subject to Brazilian legal and regulatory regimes.   Additionally, OEC, CNO and OECI's obligations to creditors derive their creditworthiness and expectations of repayment from revenue earned largely in Brazil from Brazilian client groups.   The Existing Notes themselves consistently make reference to Brazilian rules, regulations, institutions and other Brazilian concepts.   Moreover, the definitions outlined in the Existing Notes' introductory clauses are filled with examples of Brazilian elements.   The definition of "Bankruptcy Law" in every note references Brazilian Bankruptcy Law as well as US and Cayman law.   "Reference Banks", for instance, means Brazilian banks.   The Brazilian Securities Commission (*Comissão de Valores Mobiliários*) is defined and with regard to noticing, the issuer is required to comply with applicable Brazilian law and regulations issued by the *Comissão de Valores Mobiliários*.   "Brazilian Corporate Law" is defined as Brazilian Federal Law No. 6.404/76, as amended.   The definition of "GAAP" in most Existing Notes references primarily Brazilian accounting rules.   Although, the Existing Notes are governed by New York law, New York is elected as a "non-exclusive" forum for dispute resolution.

**C.  Events Precipitating Commencement of the Brazilian EJ Proceeding**

*i.    General Economic Conditions in Brazil*

26.     Between 2008 and 2015, the gross revenues of the OEC Group jumped from BRL17 billion (approximately $3.09 billion) to BRL58 billion (approximately $10.54 billion).   As a result, the number of jobs generated by the larger ODB Group also increased, the number of

employees increased, reaching a peak of 125,000 in 2013.  A growth of this magnitude, in a short period of time, required raising significant capital.

27.     The ODB Group thus turned to the U.S. capital markets.  However, around mid-2014, the Brazilian economy entered a recession.  Consequently, the public sector and private sector severely reduced their demand for construction projects and infrastructure.  As a result, infrastructure investments, which averaged BRL967 billion between 2011 and 2014, plummeted substantially in the following years, to around BRL28 billion in 2018.  A combination of political instability, record governmental budget deficits, and a contracting economy chilled foreign investment in Brazil and froze the Brazilian capital markets.  Public financial institutions, which had been traditional financiers of infrastructure operations, reduced the availability of credit.  Similarly, private institutions were more conservative in their allocation of new financing.

       *ii.*     *Operation* Lava-Jato

28.     At the same time and as discussed above and in the ODB Petition, the Federal Police of Brazil began Operation *Lava-Jato*, investigating allegations of money laundering and corruption which led to increased difficulty in accessing financing and new business in Brazil and elsewhere.  In addition, counter-parties terminated or suspended a number of contracts for infrastructure works abroad, large payments due to the OEC Group for completed projects were withheld, and various new projects were temporarily shut down.

29.     Since the beginning of the investigation, the ODB Group, including the OEC Group, has made significant investments in the areas of compliance, employee training, and ethical development.  The ODB Group cooperated with the investigators and entered into numerous agreements with the Brazilian government and other regulatory bodies.  In December 2016, ODB signed a leniency agreement with the Federal Public Ministry ("MPF") of Brazil, the United States

Department of Justice ("DOJ") and the Swiss Attorney General's Office, under which the ODB Group agreed to pay an aggregate amount of BRL3.83 billion (approximately $696.29 million) over twenty three years (the "Global Agreement"). On August 8, 2019, the Global Agreement was amended and OEC became a joint guarantor for future payments due thereunder. As such, the Company has included such payments in its business plan. In connection with the Global Agreement, the MPF undertook (i) not to file any civil lawsuits or take any additional actions for purposes of the reimbursement of amounts due through Operation *Lava-Jato*, (ii) not to impose any administrative improbity sanctions on the ODB Group, and (iii) to work together with public authorities, state-owned companies and mixed capital companies in order to lift any restrictions (commercial or otherwise) in place against ODB, OEC and its subsidiaries.

30.     In July 2018, the ODB Group entered into a leniency agreement with the Attorney General's Office ("AGU"),   the Ministry of Transparency and the Brazilian Government Accountability Office under which it undertook to pay BRL2.72 billion (approximately $494.49 million) over twenty two years. These payments have already been partially made – for instance, the ODB Group already paid $93 million to satisfy the obligations undertaken before the DOJ and no further payments are owed to US authorities.

31.     In addition, other leniency agreements were entered into by ODB Group entities with the governments of Brazil,  Peru, Ecuador, Guatemala, Panama, the Dominican Republic and Switzerland. CNO also entered into a settlement agreement with the World Bank, which was announced in January 2019. Moreover, OEC and CNO entered into a settlement agreement with the Inter-American Development Bank announced in September 2019. Since the beginning of the Operation *Lava-Jato*, CNO has entered into 8 leniency agreements with the General Superintendence of the Brazilian antitrust agency ("CADE"). Furthermore, on November 22, 2018,

CADE's court ratified six instruments of commitment to cease property (both from CNO and individuals).

32.    Despite attempts to normalize and continue operating the business in the ordinary course, due to the recent political and financial crises and the consequences of Operation *Lava-Jato*, the OEC Group's liquidity and resources were severely strained.  The ODB Group, including the OEC Group, continued to experience difficulties in obtaining new financing, especially from public financial institutions.  The ever-increasing cost of credit and the load of relevant contingent liabilities, including due to Operation *Lava-Jato*, also made the OEC Group's access to private resources more restricted in the capital and financial markets.

*iii.    Restructuring Underway and Future Outlook*

33.    Despite having valuable assets, the Debtors did not have the liquidity to meet all their short- and medium-term financial obligations.  In 2019, in an attempt to adapt to the difficult financial condition it was facing, the OEC Group adapted its operations by reducing its backlog to $3.4 billion from $8.0 billion in 2018.  The OEC Group attempted to resize its business to reflect operational reductions, lower production to meet customers' payment capacity and lower backlog additions due to low demands for infrastructure works in the countries where the OEC Group operates.  Despite these attempts to deleverage, OFL and the Debtors were unable to make any interest payments on the Existing Notes since October 2018 and did not expect to be able to meet future payment obligations on the Existing Notes under their terms and conditions.

34.    In response to this liquidity crisis, since late 2018, the OEC Group, with the assistance of their financial and legal advisors, Moelis & Company, Cleary Gottlieb Steen & Hamilton and E.Munhoz Advogados, entered into discussions with an ad hoc group of holders of

the Existing Notes (the "Ad Hoc Group"), which, after more than a year of negotiations, resulted

in an agreement on the Brazilian Reorganization Plan.

35.    The OEC Group expects that the engineering and construction sectors will recover

as Brazil is already seeing an increase in civil construction projects in large urban centers.  After

years of decline, the GDP of the construction section grew for the first time in 2019, with an

increase of 2% compared to the same period in 2018.  Furthermore, in the face of the COVID-19

pandemic, the Brazilian government has been discussing a national restructuring project, including

significant investments in public works and public infrastructure.  The government has shared an

intention to invest around BRL30 billion (approximately $5.45 billion) in the infrastructure over

the next three years.  Through the Brazilian EJ Proceeding, the OEC Group is fully convinced that

it will have the opportunity to participate in the government's competitive bidding process and

strengthen their position in the engineering and construction sectors.

C.    **The Brazilian EJ Proceeding and Brazilian Reorganization Plan**

i.    *Overview of Restructuring and Brazilian EJ Proceeding*

36.    As noted above, in June of this year, the Debtors finalized the terms of the Brazilian

Reorganization Plan to restructure the Existing Notes.  As set forth in greater detail below, under

the Restructuring, the obligations of OEC, CNO and OECI in their capacity as obligors under each

series of Existing Notes (the "Guarantee Obligations") will be released and cancelled, and the OEC

Group will issue to holders thereof their respective pro rata shares of (i) a new series of Senior

Unsecured Notes (the "New Notes"), in each case, in an aggregate principal amount equal to 45%

of the sum of outstanding principal and unpaid interest accrued under the corresponding series of

Existing Notes through the date on which all events listed as "Conditions for Effectiveness" of the

Brazilian Reorganization Plan shall have occurred or been waived with respect to the Restructuring

(the "Effective Date") and (ii) dollar denominated units of a participating debt instrument, in an aggregate principal amount equal to 55% of the sum of outstanding principal and unpaid interest accrued under the corresponding series of Existing Notes through the Effective Date, entitling holders thereof to a specified percentage of future distributions to be made by OEC S.A. ("New OEC") (the "Instrument", and together with the New Notes, the "New Securities"). Each series of New Notes shall be issued under a new indenture among OEC Finance Limited, a Cayman Islands corporation, as issuer (the "New Issuer"), New OEC, CNO, OECI, OENGER S.A. ("OENGER") as guarantors and any additional guarantors as defined in the Brazilian Reorganization Plan, The Bank of New York Mellon, as trustee, registrar and transfer agent (the "New Notes Trustee"), and the other parties thereto (collectively, the "New Notes Indentures"). The Instrument shall be issued under an indenture among Odebrecht HoldCo Finance Limited, a Cayman Islands corporation, as issuer (the "Instrument Issuer" and, together with the New Issuer, the "New Issuers") and The Bank of New York Mellon, as trustee (the "Instrument Trustee") (the "Instrument Indenture" and, together with the New Notes Indentures, the "New Indentures").

37.      On June 15, 2020, the OEC Group, with support of the Ad Hoc Group, sent a consent solicitation statement to all Noteholders (as defined below) (the "Consent Solicitation") seeking consents to the Restructuring. Having received support from 73% of the aggregate claims in respect of the Existing Notes on August 19, 2020 the Debtors jointly filed petitions for the commencement of the Brazilian EJ Proceeding with the Brazilian Court after the Board of Directors of OEC unanimously resolved through the Authorizing Resolutions to recommend the Brazilian EJ Proceeding related to OEC, CNO and OECI to its shareholders. Upon the recommendation of the Board of Directors, the shareholders of each of OEC, CNO and OECI approved the commencement of the Brazilian EJ Proceeding. Consistent with Brazilian

Bankruptcy Law, the Debtors submitted the Brazilian Reorganization Plan to the Brazilian Court concurrently with the commencement of the Brazilian EJ Proceeding.

38.     The day after the Debtors filed such petition, OEC issued a press release (the "OEC Press Release"), a copy of which was posted on its website, to provide public notice of the filing. A copy of the OEC Press Release in English is attached to the Foreign Representative Declaration as Exhibit B.  On September 1, 2020, the Brazilian Court entered an interlocutory order, accepting the filing of the Brazilian EJ Proceeding, granting the requested preliminary 180 day stay of all collection proceedings commenced by creditors subject to the Brazilian EJ Proceeding against the Debtors and ordering the publication of a public notice informing affected creditors of the filing of the Brazilian EJ Proceeding and the deadline to submit oppositions to OEC's proposed Brazilian Reorganization Plan (the "Initial Court Order").  A copy of the certified Initial Court Order and a notarized English translation thereof are attached to the Foreign Representative Declaration as Exhibit C.

39.     On September 10, 2020, OEC published a notice in the Official Court Gazette circulation newspaper (the "Court Gazette" and such notice, the "Publication Notice"), providing notice of the Brazilian Reorganization Plan to all of the creditors subject to the plan, notifying them of the opportunity to object during the 30-calendar-day objection period.  The Publication Notice was also published on the same date in *Valor Econômico*, a newspaper with nationwide coverage in Brazil.  Copies of the Publication Notices are attached to the Foreign Representative Declaration as Exhibit D.  The Debtors have also provided notice to the creditors subject to the Brazilian EJ Proceeding through letters and other communications addressed to the Trustee, as provided under the Brazilian Bankruptcy Law.

40.    The Brazilian EJ Proceeding is proceeding under the Brazilian Bankruptcy Law, which provides for a restructuring process known as a *recuperação extrajudicial*.  As described in more detail in the Brazilian Counsel Declaration, this proceeding functions similarly to a prepackaged chapter 11 proceeding under the Bankruptcy Code.  In an extrajudicial reorganization, the plan is presented for confirmation at the outset of the case with prearranged creditor support.  For the plan of reorganization to be approved under the Brazilian Bankruptcy Law, it must be accepted by more than 60% in amount of each group of impaired creditors subject to the plan.  After a debtor files a plan approved by a sufficient number of creditors, a Brazilian court must be satisfied that all applicable legal requirements, including the filing of financial statements, creditor lists and other documents, and the publication notices to affected creditors have been fulfilled.  Once the plan is approved by the Brazilian Court, it is binding on all affected creditors, including any dissenting creditors.

41.    On October 26, 2020, the Brazilian Court issued the Brazilian Confirmation Order.

*ii.*    *The Terms of the Restructuring*

42.    Under the Brazilian Reorganization Plan, holders of the Existing Notes will receive their respective pro rata shares of (i) the New Notes, in each case, in an aggregate principal amount equal to 45% of the sum of outstanding principal and unpaid interest accrued under the corresponding series of Existing Notes through the Effective Date, and (ii) dollar denominated units of the Instrument to be issued by the Instrument Issuer, in an aggregate principal amount equal to 55% of the sum of outstanding principal and unpaid interest accrued under the corresponding series of Existing Notes through the Effective Date.

43.    The New Notes will be issued in seven series, each of which will correspond to a

series of Existing Notes, subject to adjustments of interest rate, maturity[14] and other terms and

conditions discussed in the Brazilian Reorganization Plan.  The New Notes will be issued by the

New Issuer, a Cayman Islands corporation formed on December 19, 2019 for the sole purpose of

issuing the New Notes and the other limited transactions.  The New Notes will be fully guaranteed

by New OEC, CNO, OECI and OENGER (collectively, the "Initial Guarantors").  In addition, the

New Notes may benefit from additional guarantees from, direct or indirect, significant subsidiaries

of New OEC.  This is subject to carve-outs that permit New OEC to establish and maintain non-

guarantor subsidiaries to serve as project companies, members of construction consortia, qualified

bidders (nationally or abroad), holding shell companies and special purpose vehicles established

for tax structuring purposes, as well as companies whose equity capital is held by New OEC and

one or more unaffiliated third parties for the purpose of directly or indirectly bidding on new

projects (but not, for the avoidance of doubt, to enter into any liability management or other

extraordinary financing transactions that would have a layering or dilutive impact on the New

Notes, except as permitted under the Brazilian Reorganization Plan) (any such additional

guarantors, together with the Initial Guarantors, are referred to herein as the "Guarantors").

44.    Each series of New Notes will bear interest at a rate per annum equal to that of the

corresponding series of Existing Notes for which such series is being exchanged, subject to a PIK

premium if New OEC exercises its PIK Option (as defined below).  In accordance with the

---

[14]    New maturity dates for each series of New Notes are expected to be the following: (a) 7.000% Notes:
October 21, 2024 (original maturity date April 21, 2020); (b) 5.125% Notes: December 26, 2026 (original maturity
date June 26, 2022); (c) 6.000% Notes: October 5, 2027 (original maturity date April 5, 2023); (d) 4.375% Notes:
October 25, 2029 (original maturity date April 25, 2025); (e) 5.250% Notes: December 27, 2033 (original maturity
date June 27, 2029); (f) 7.125% Notes: December 26, 2046 (original maturity date June 26, 2042); and (g) 7.000%
Perpetual Notes: N/A.

schedule below, New OEC shall have the option, in its sole discretion, to either pay interest on each series of New Notes (i) in cash at the interest rate corresponding to such series of New Notes or (ii) in lieu of paying full cash interest, capitalize all or a portion of such interest by adding it to the principal amount of such New Notes on the applicable interest payment date (the "PIK Option").

| PIK Option Period | Minimum Share of Interest in Cash | Maximum Share of Interest as PIK | PIK Premium |
|---|---|---|---|
| From (and including) the Effective Date through (and including) the second-year anniversary of the Effective Date | 0.0% | 100.0% | 50% of applicable cash interest rate |
| From (but excluding) the second-year anniversary of the Effective Date through (and including) the third-year anniversary of the Effective Date | 7.5% | 92.5% | 50% of applicable cash interest rate |
| From (but excluding) the third-year anniversary of the Effective Date through (and including) the fourth-year anniversary of the Effective Date | 35.0% | 65.0% | 50% of applicable cash interest rate |
| From (but excluding) the fourth-year anniversary of the Effective Date through (and including) the fifth-year anniversary of the Effective Date | 70.0% | 30.0% | 75% of applicable cash interest rate |

45.    Subsequent to the fifth-year anniversary of the Effective Date, interest on each series of New Notes shall be paid only in cash at the corresponding cash interest rate. For each series of New Notes, the first interest payment shall be calculated based on the period from the Effective Date through the first interest payment date of such series. For each series of New Notes, the PIK Option terms set forth above shall apply to the portion of the interest period that falls within the applicable PIK Period. If New OEC fails to pay any interest on New Notes when it

becomes due and such nonpayment continues for a period of 30 days, New OEC shall pay, in addition to the unpaid defaulted interest, (i) interest on such defaulted interest at 1.5% in excess of the rate borne by the applicable series of New Notes and (ii) additional interest on the then outstanding principal of the applicable series of New Notes at 1.5%.

46.    In addition to the New Notes, holders of the Existing Notes will also receive the Instrument, which will be issued under the Instrument Indenture among the Instrument Issuer, and the Instrument Trustee.  The initial face amount of the Instrument will be equal to the difference between (i) the sum of the principal and accrued and unpaid interest (including default interest) of the Existing Notes, as of the Effective Date minus (ii) the face amount of the New Notes as of the Effective Date.  The Instrument will not bear interest and payments made to holders shall apply, on a dollar-for-dollar basis, to reduce the outstanding face amount of the Instrument, up to the full face amount of the Instrument unless earlier redeemed pursuant to the terms of the Instrument Indenture.  The Instrument will mature on September 10, 2058.

47.    The Brazilian Reorganization Plan provides for certain corporate governance provisions, including that the New OEC board of directors must be comprised of a minimum number of independent directors equivalent to the greater of (i) 20% of all members or (ii) two.  In addition, New OEC Board's finance and risk committee and integrity and audit committee must be comprised of at least one independent director and a majority of independent directors on an ongoing basis, respectively, pursuant to the terms of the Brazilian Reorganization Plan.  The independent directors shall be appointed by the shareholders and elected from time to time, and shall at all times meet the requirements of independence as provided in the Brazilian Reorganization Plan.  In the event the number of independent directors drops below the minimum threshold, the

New OEC board of directors and its committees will be subject to restrictions as to which matters

may be deliberated on until the required independent directors' thresholds are met.

48.      Pursuant to the Brazilian Reorganization Plan, supporting creditors have appointed

Pinheiro Neto Advogados (the "Creditor Representative") as their creditor representative with

powers to, among other matters (subject to the terms of the Brazilian Reorganization Plan): approve

certain documentation to implement the proposed Restructuring, including the New Indentures and

final Brazilian Reorganization Plan; appoint, consent to or not object to at least one independent

director to comprise the initial slate of independent directors as provided for in the Brazilian

Reorganization Plan; and waive any condition precedent to closing or early termination event,

among other matters.   Pursuant to the terms of the Brazilian Reorganization Plan, the Creditor

Representative was to act according to its sole discretion and judgment in seeking the confirmation

and implementation of the Brazilian Reorganization Plan for the benefit of the noteholders and

pursuant to the terms and conditions provided for in the Brazilian Reorganization Plan and its

schedules.   The Creditor Representative has no obligation, but is entitled to, at its sole discretion,

consult with and obtain instructions, formally or informally, from the noteholders or a subset thereof

in connection with any matters submitted to the Creditor Representative, pursuant to the terms of

the Brazilian Reorganization Plan.   The Creditor Representative has the right, but no obligation, to

take action or abstain from taking action pursuant to Brazilian Reorganization Plan if such Creditor

Representative is not properly indemnified and/or does not timely receive or receive contradictory

or inconsistent instructions from the noteholders or a subset thereof in connection with any matters

submitted to the Creditor Representative.   Noteholders representing more than 40% of the claims

subject to the Brazilian Reorganization Plan may, as provided in the Brazilian Reorganization Plan

and subject to certain conditions, override certain decisions taken by the Creditor Representative to

grant waivers, accept changes or extend the Drop-Dead Date (as defined in the Brazilian Reorganization Plan).

49.    The Brazilian Reorganization Plan is a significant step towards restructuring the OEC Group, and resolving the issues with its creditors and right-sizing the OEC Group's capital structure in order to provide an optimal competitive platform for its businesses.  Brazilian extrajudicial reorganization, like a prepackaged case under U.S. Bankruptcy Law, allows for an expeditious and cost-effective reorganization process that will maximize the OEC Group's going concern value, and consummation of the Brazilian Reorganization Plan offers the OEC Group and its creditors a clear path to a revitalized OEC Group, well-positioned to preserve and build its business.

50.    In the Brazilian EJ Proceeding, holders of the Existing Notes (the "Noteholders") representing 73% of the aggregate claims in respect of the Existing Notes voted to support the Brazilian Reorganization Plan.  No objections were filed in the Brazilian Court.

51.    The Debtors took all appropriate steps to ensure that all affected creditors were informed of their rights and obligations under the Brazilian Reorganization Plan in the Brazilian EJ Proceeding.  Also, as further explained in the Brazilian Counsel Declaration, after the publication of the Initial Court Order in the Publication Notice in the Court Gazette (which put all of the Debtors' creditors on notice), any party in interest could file an objection to the Brazilian Reorganization Plan within a 30-day period.  To consummate the Brazilian Reorganization Plan, the Debtors expect to issue a notice to the Noteholders through the legal noticing system of DTC (defined below), informing them of the imminent issuance of the New Notes.

52.    The Debtors have determined, in consultation with the Trustee and the Ad Hoc Group, that the Chapter 15 Cases are necessary to avoid potentially irreparable harm to the Debtors'

creditors and businesses and to facilitate the Brazilian EJ Proceeding by ensuring that creditors cannot attempt to circumvent the Brazilian EJ Proceeding by taking action against the Debtors in the United States.  In addition, in connection with negotiations regarding creditor support for the Brazilian Reorganization Plan, the Debtors' creditors required that consummation of the restructuring be conditioned upon an order of this Court recognizing the Brazilian EJ Proceeding and enforcing the Brazilian Reorganization Plan in the United States.  Accordingly, an order of the Bankruptcy Court recognizing the Brazilian EJ Proceeding and recognizing, enforcing, and giving full force and effect to the Brazilian Reorganization Plan is one of the conditions precedent to consummation of the Restructuring under the Brazilian Reorganization Plan.  The Petitioner requests an injunction against any potential proceedings that would challenge or undermine the Brazilian EJ Proceeding or would seek payment or other relief with respect to the Existing Notes, which are being compromised in the Brazilian Reorganization Plan, [15] and to obtain the cooperation of the Trustee and The Depository Trust Company ("DTC") in effecting the terms of the Brazilian Reorganization Plan in the United States by, *inter alia*, (a) obtaining the Court's recognition of the Brazilian EJ Proceeding as a foreign main proceeding, or in the alternative, recognition of the Brazilian EJ Proceeding as a foreign nonmain proceeding and (b) recognizing, enforcing and giving full force and effect to the Brazilian Reorganization Plan in the United States.

53.    Pursuant to the Resolutions of Appointment (the "Appointment Resolutions"), the Foreign Representative, with respect to each of the Debtors, has been (i) appointed to act as the foreign representative of the Brazilian EJ Proceeding for such Debtor for purposes of these Chapter

---

[15]    The Debtors are not seeking a stay under Section 1521 of the Bankruptcy Code of the two pending litigations, Washington State Investment Board v. Odebrecht S.A., (Case No. 17-08118) and DoubleLine Capital LLP et al. v. Odebrecht Finance Ltd. et al., (Case No. 17-04576), in the Southern District of New York (the "Excluded Litigations").

15 Cases and (ii) authorized to commence these Chapter 15 Cases with respect to such Debtor as the foreign representative of the OEC Group in connection with this Chapter 15 Case.  True and correct copies, including notarized English translations, of the Appointment Resolutions appointing the Foreign Representative are attached hereto as <u>Exhibit B</u>, <u>Exhibit C</u>, and <u>Exhibit D</u>.

**D.**    **Connections to the United States and this District**

54.    Each of the Debtors has property in the United States.  OECI and CNO hold property in the United States in the form of bank accounts and contracts with U.S. entities.  OECI also holds U.S. property in the form of vehicles.  Additionally, Cleary Gottlieb Steen & Hamilton LLP holds certain unused retainers from all the Debtors in a bank account in New York, New York in connection with certain legal services retained in respect of these Chapter 15 Cases.[16]  Davis Polk & Wardwell LLP also holds a certain unused retainer in the amount of approximately $250,000 from all the Debtors in a bank account in New York, New York in connection with certain legal services retained in respect of the Restructuring.  Lastly, both CNO and OEC are defendants in two securities litigations pending in the Southern District of New York.

## JURISDICTION AND VENUE

55.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 1501 as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, <u>In re Standing Order of Reference Re: Title  11,</u> 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "<u>Amended Standing Order</u>").

---

[16]    Cleary Gottlieb Steen & Hamilton LLP is in the process of transferring the retainer funds into segregated accounts for each of the Debtors.

56.    These Chapter 15 Cases have been properly commenced with respect to each of the

Debtors in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by the filing of the

Verified Petition.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

57.    Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) as each of the

Debtors has a significant portion of its U.S. assets located within New York County, and thus within

this District, in the form of retainer accounts held by Davis Polk & Wardwell LLP and Cleary

Gottlieb Steen & Hamilton LLP.  In addition, OEC and CNO are defendants in two federal

securities actions pending in this District.

## **REQUIRED DISCLOSURES**

58.    The Petitioner hereby provides the following disclosures in accordance with Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

- the following disclosure identifies for the Court any corporation, other than a
  governmental unit, that directly or indirectly owns 10% or more of any class of each
  of the Debtors' equity interests:

  a.  Approximately 100% of OEC's equity is owned by ODB, with ODBINV

      holding one share of OEC.

  b.  ODB's shares are held almost entirely by ODBINV, with one ODB share

      held by KIEPPE.

  c.  ODBINV is owned by the following entities in the percentages reflected:

      ▪  KIEPPE (79.68%)

      ▪  the remaining shares held by minority shareholders.

  d.  KIEPPE is 100% controlled by another holding (Kieppe Patrimonial S.A.),

      whose stock is divided among the holding companies of the members of the

32

Odebrecht family.  These entities along with their holdings in Kieppe
Patrimonial S.A are:

- Riocon Patrimonial (21.71%);

- NO. Jr. Patrimonial (21.87%);

- IPQ Patrimonial (21.87%);

- EAO Patrimonial (18.91%); and

- CAPE Patrimonial (15.64%)

e. 97.009% of CNO's equity is owned by OEC S.A.

f. Approximately 100% of the equity in OECI is owned by OEC S.A with one
OECI share held by ODB.

g. 100% of OEC S.A.'s equity is held by Odebrecht Holdco Finance Limited.

h. 100% of Odebrecht Holdco Finance Limited is held by OEC.

- Other than the Verified Petition, none of the Debtors have a pending petition with
this Court for relief under any chapter of the Bankruptcy Code.

- The Brazilian EJ Proceeding is the only foreign proceeding, as that term is defined
in section 101(23) of the Bankruptcy Code, of the Debtors presently open at the
time of commencement of these Chapter 15 Cases.

- Aside from the Petitioner with respect to these Chapter 15 Cases (and E.Munhoz
Advogados (the "<u>Brazilian Counsel</u>") with respect to the Brazilian EJ Proceeding),
no other persons are presently authorized to administer foreign proceedings of the
Debtors at this time.

## **<u>RELIEF REQUESTED</u>**

59.      By this Petition, the Petitioner, on behalf of the Debtors, seeks entry of the Proposed

Order, in the form attached hereto as <u>Exhibit A</u>, (i) granting the Petitions for Recognition in the

Chapter 15 Cases and recognizing the Brazilian EJ Proceeding as a foreign main proceeding for

each of the Debtors (or, in the alternative, a foreign nonmain proceeding) pursuant to section 1517

of the Bankruptcy Code; (ii) recognizing that the Petitioner is the duly appointed foreign representative of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Debtors in the Chapter 15 Cases; (iii) recognizing and enforcing the Brazilian Reorganization Plan in the United States and giving full force and effect to and granting comity in the United States to the Brazilian Confirmation Order; (iv) permanently enjoining all entities (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioner and her expressly authorized representatives and agents from (a) commencing execution against any of the Debtors' assets, (b) the direct or indirect commencement or continuation, including the issuance or employment of process or discovery, of a judicial, administrative, arbitral or other action or proceeding, or to recover a claim, which in  either case in any way relates to, or would interfere with, the administration of the Debtors' estates in the Brazilian EJ Proceeding or implementation of the Distribution Procedures, including, without limitation, any and all unpaid judgments, settlements, notes or otherwise against the Debtors in the United States, (c) taking or continuing any act to create, perfect or enforce a lien or other security interest, set off or other claim against the Debtors or any of their property, (d) transferring, relinquishing, disposing of any property of the Debtors to any entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioner and her authorized representatives and agents or in any way attempting to obtain possession or control over any property of the Debtors or (e) except for the Excluded Litigations, commencing or continuing an individual action or proceeding concerning the Debtors' property, assets, rights, obligations or liabilities to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code, *provided*, in each case, that such injunction shall be effective solely within the territorial jurisdiction of the United States; (v) granting the Debtors and each of their respective successors, agents, representatives, advisors

and counsel the protections contained in sections 306 and 1510 of the Bankruptcy Code;

(vi) permanently enjoining all entities (as that term is defined in section 101(15) of the Bankruptcy

Code) from taking any action within the territorial jurisdiction of the United States that is in

contravention of or that is inconsistent with the Brazilian Reorganization Plan; (vii) with respect to

claims based upon, concerning or relating in any way to the solicitation and/or implementation of

the Brazilian Reorganization Plan, permanently enjoining and restraining any person or entity (as

such terms are defined in sections 101(15) and (41) of the Bankruptcy Code) from taking any action

or asserting any claim (as such term is defined in section 101(5) of the Bankruptcy Code) relating

to the Existing Notes within the territorial jurisdiction of the United States (including, without

limitation, commencing or continuing any action or legal proceeding relating to the Existing Notes

(including, without limitation, bringing suit in any court, arbitration, mediation or any judicial or

quasi-judicial, administrative or regulatory action, proceeding or process whatsoever relating to the

Existing Notes), whether directly or by way of counterclaim (and from seeking discovery of any

nature related thereto)) that would interfere with or impede the administration, implementation

and/or consummation of the Brazilian Reorganization Plan and/or the terms of this Order against

the Debtors, the Petitioner and any of their successors or assigns; (viii) barring in the United States,

as of the Effective Date, the assertion of any claim against any person or entity released pursuant

to the Brazilian Reorganization Plan or the Brazilian EJ Proceeding (which includes the Debtors

and other released parties) with respect to any debt cancelled, discharged or restructured under the

Brazilian Reorganization Plan, Brazilian EJ Proceeding or as a result of Brazilian Bankruptcy Law

relating to the Brazilian EJ Proceeding in a manner inconsistent with the Brazilian Reorganization

Plan, the Brazilian EJ Proceeding or Brazilian Bankruptcy Law; (ix) directing the Trustee and

authorizing the U.S. Intermediaries to carry out any and all ministerial actions that are required of

them to effectuate the Brazilian Reorganization Plan, in accordance with the procedures attached to this Order, or that are otherwise necessary and appropriate to consummate the Brazilian Reorganization Plan, including the issuance and distribution of the New Securities; (x) automatically relieving the Trustee of any further obligations under or related to the guarantees provided by the Debtors under the Existing Notes (the "Guarantee Obligations") under the indentures of the Existing Notes and related documentation, upon the completion of the transactions necessary to consummate the distributions to the holders of Existing Notes pursuant to the terms of the Brazilian Reorganization Plan and the Distribution Procedures and the cancellation of the Guarantee Obligations under the Existing Notes and related documents; and (xi) granting such other and further relief as the Court deems just and proper

60.     In addition, the Petitioner requests relief from this Court pertaining to the actions necessary to give effect to the terms of the Brazilian Reorganization Plan, including, without limitation, the exchange of the Guarantee Obligations under the Existing Notes in consideration for the issuance of the New Securities (the "Distribution Procedures"), in the form of the Proposed Order, (i) authorizing and directing the Trustee to facilitate the distribution and authorizing DTC, the Financial Industry Regulatory Authority ("FINRA") (if applicable) and all DTC participants that hold the securities in "street names" on behalf of the beneficial owners of the Existing Notes (the "DTC Participants," together with the Trustee, DTC and FINRA, the "U.S. Intermediaries")[17] to carry out any and all ministerial actions that are required of them to effectuate the Brazilian Reorganization Plan, in accordance with the procedures attached to the Proposed Order, or that are otherwise necessary and appropriate to consummate the Brazilian Reorganization Plan, including

---

[17]     The U.S. Intermediaries are notice parties in the Chapter 15 Cases and will receive notice of this Petition.

the issuance and distribution of the New Securities and the release and cancellation of the Guarantee

Obligations under the Existing Notes and (ii) automatically relieving the Trustee of any further

obligations under and in relation to Guarantee Obligations, upon the completion of the relevant

transactions necessary to consummate the distributions to the relevant noteholders pursuant to the

terms of the Brazilian Reorganization Plan, the Distribution Procedures and the Proposed Order

and the release and cancellation of the Guarantee Obligations under the Existing Notes and related

documentation.  This relief is necessary because, among other reasons, the U.S. Intermediaries may

not be, or may not believe themselves to be, subject to the direct jurisdiction of the Brazilian Court

and therefore may be unable or unwilling to act in support of the Brazilian Reorganization Plan and

the Brazilian Confirmation Order without authorization and direction from, and limited protection

granted by, a United States Court in the form of entry of the Proposed Order.  Moreover, the

Distribution Procedures to facilitate the exchange of the Existing Notes is expressly authorized and

required by the Brazilian Reorganization Plan.

61.     Notwithstanding the foregoing, the Debtors are requesting that the relief requested

hereby and described in the foregoing paragraphs 59 and 60 and in the Proposed Order be qualified

and limited in order to, among other things, preserve and protect the rights of the holders and

beneficial owners of Existing Notes, the other Noteholder Representatives, the Ad Hoc Group, the

Creditor Representative and others to enforce all of their rights (whether in the United States or

otherwise) under and in connection with the New Securities, the Brazilian Reorganization Plan

(including agreements, instruments and other documents entered into, issued or executed in

connection therewith) and the EJ Proceeding notwithstanding any stay, release or injunction

otherwise ordered by this Court.  In addition, as further set forth in the Proposed Order, the Debtors

ask the Court to clarify that (a) any relief recognizing the Brazilian EJ Proceeding and enforcing

the terms of the Brazilian Reorganization Plan in the United States shall not be construed to limit,

modify or contravene the terms of the New Securities (or to recognize or enforce any purported

term or modification of the Brazilian Reorganization Plan or any other existing or future order of

the Brazilian Court or another court having jurisdiction over the Brazilian EJ Proceeding or the

relief granted thereby, to the extent any such modification or order purports to limit, modify or

contravene the terms of the New Securities) and (b) the New Securities and any amendments or

modifications thereof shall be governed by the terms and conditions of the applicable New

Securities and the governing law for the applicable New Securities.

### BASIS FOR RELIEF REQUESTED

62.        Chapter 15 of the Bankruptcy Code was specifically designed to assist foreign

representatives such as Petitioner in the performance of her duties in facilitating the restructuring

of a global enterprise such as the OEC Group.  The purpose of chapter 15 is to incorporate the

Model Law on Cross-Border Insolvency (1997) (the "Model Law") to provide effective

mechanisms to handle cross-border insolvencies.  See 11 U.S.C. § 1501(a).  Here, each of the

procedural requirements of section 1515 of the Bankruptcy Code are satisfied, as is set out in section

A below.  Notably, the Petitioner is the duly appointed "foreign representative" of the Brazilian EJ

Proceeding with respect to each of the Debtors, and it is well-established that Brazilian EJ

proceedings are considered "foreign proceedings" for the purposes of chapter 15.  The center of

main interest for each of the Debtors is Brazil.  Brazil is presumed to be the center of main interests

for each of the Debtors given that Brazil is the jurisdiction of incorporation for each Debtor.  See

11 U.S.C. § 1516(c).  Further, from a pragmatic perspective, Brazil is the sole jurisdiction in which

the Debtors' businesses can be comprehensively and efficiently restructured given that the vast

majority of the Debtors' operations have taken place and remain in Brazil. This court has already

found that OEC's immediate parent, ODB already has its center of main interest in Brazil.[18]

63.     In the alternative, while the Petitioner is confident that the Brazilian EJ Proceeding

is a foreign main proceeding within the definition of section 1502(4), if this Court declines to

recognize the Brazilian EJ Proceeding as the foreign main proceeding of any of the Debtors, those

Debtors are eligible for non-main recognition and relief, on the basis set out in section C below.

**A. <u>The Brazilian EJ Proceeding is a Foreign Proceeding of each of the Debtors and the Petitioner is the Duly-Authorized Foreign Representative thereof and has Properly Petitioned This Court for Recognition</u>**

64.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing,

the Court shall enter an order recognizing a foreign proceeding if (i) the petition meets the

requirements of section 1515 of the Bankruptcy Code, (ii) the foreign representative applying for

recognition is a person or body, and (iii) such foreign proceeding is a foreign main proceeding or

non-main proceeding within the meaning of section 1502 of the Bankruptcy Code. <u>See</u> 11 U.S.C.

§ 1517(a); <u>In re Inversora Eléctrica de Buenos Aires S.A.</u>, 560 B.R. 650, 653 (Bankr. S.D.N.Y.

2016). These foregoing requirements are satisfied with respect to the Brazilian EJ Proceeding, the

Petitioner, and the Verified Petition with respect to each of the Debtors.

*i.     The Verified Petition satisfies the requirements of section 1515*

65.     Each of the procedural requirements of section 1515 of the Bankruptcy Code are

satisfied. First, the Petitioner properly commenced these Chapter 15 Cases with respect to each of

the Debtors in accordance with sections 1504 and 1509(a) by filing the Verified Petition under

section 1515. <u>See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.</u>,

---

[18]     <u>See</u> Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, See <u>In re Odebrecht, S.A.</u>, Case No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.

374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (hereinafter "Bear Stearns I"), aff'd, 389 B.R. 325 (S.D.N.Y. 2008) (hereinafter "Bear Stearns II").  Second, the Petitioner has submitted all documents and other information required by section 1515(b) regarding the Brazilian EJ Proceeding and the appointment of the Petitioner as foreign representative thereof with respect to each of the Debtors for purposes of these Chapter 15 Cases, together with English translations of the same where applicable, as required by section 1515(d).[19]  Finally, the Petitioner has submitted in this Verified Petition all information required by section 1515(c) (i.e., a statement by the Petitioner identifying any other foreign proceedings known to the Petitioner with respect to each of the Debtors), together with all other required disclosures regarding each of the Debtors in accordance with Bankruptcy Rules 1007(a)(4) and 7007.1.  See supra ¶ 58.

> ii.   The Petitioner is the duly-appointed "foreign representative" of the Brazilian EJ Proceeding for each of the Debtors

66.   Section 1517(a) of the Bankruptcy Code also requires that a foreign representative applying for recognition be a person or body.  See 11 U.S.C. § 1517(a)(2).  Here, the Petitioner is an individual, which is included in the term "person," 11 U.S.C. § 101(41), who, with respect to each of the Debtors has been duly (i) appointed to act as the foreign representative of the Brazilian EJ Proceeding for such Debtor for purposes of these Chapter 15 Cases and (ii) authorized to commence these Chapter 15 Cases with respect to such Debtor.  As explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Debtors to administer the reorganization of their assets and affairs and run its business during the course of the EJ proceeding. Brazilian Counsel Decl. ¶ 11.  Each of the Debtors' boards appointed the Petitioner in conjunction with the Brazilian EJ Proceeding for such Debtor, and thus sections 101(24) and 1517(a)(2) of the

---

[19]   The Appointment Resolutions for each debtor are attached hereto as Exhibit B, Exhibit C and Exhibit D.

Bankruptcy Code are satisfied.  See In re Serviços de Petróleo Constellation S.A., 600 B.R. 237,

270 (Bankr. S.D.N.Y. 2019) (finding a foreign representative appointed pursuant to resolution of

the Debtors' boards is a proper "foreign representative" within the meaning of section 101(24) and

thus meets 1517(a)(2)'s requirements); See In re Odebrecht, S.A., No. 19-12731 (SMB) (Bankr.

S.D.N.Y. Sept. 18, 2019), ECF No. 22; In re Oi S.A., No. 16-11791 (SHL) (Bankr. S.D.N.Y. July

22, 2016), ECF No. 38; In re OAS S.A., 533 B.R. 83, 93-95 (Bankr. S.D.N.Y 2015) (holding that

the Bankruptcy Code does not require the judicial authorization or appointment of the foreign

representative).[20]

### iii.    The Brazilian EJ Proceeding is a foreign proceeding

67.    The Brazilian EJ Proceeding is a "foreign proceeding" with respect to each of the

Debtors, as required under section 1517(a).  See 11 U.S.C. § 1517(a)(1) (requiring as a condition to

the entry of a recognition order, the Brazilian EJ Proceeding must be a foreign main proceeding or

nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code).  A "foreign

proceeding" is (1) a collective judicial or administrative proceeding under a law relating to

insolvency or adjustment of debt, (2) pending in a foreign country, (3) in which the assets and

affairs of the debtor are subject to control or supervision of a foreign court, and (4) for the purpose

of reorganization or liquidation.  See 11 U.S.C. § 101(23).  The Bankruptcy Code defines "foreign

court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  11

U.S.C. § 1502(3).  The Brazilian EJ Proceeding meets this definition.

---

[20]    See also In re Vitro, S.A.B. de C.V., 470 B.R. 408 (Bankr. N.D. Tex. 2012), aff'd, 701 F.3d 1031 (5th Cir.
2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a
Mexican concurso proceeding, which contemplates self-management by the debtor during the proceeding similar to
that of a debtor-in-possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative,"
and recognizing the individual as the foreign representative).

68.     First, as discussed in the Brazilian Counsel Declaration, the Brazilian Bankruptcy

Law establishes a framework comparable to chapter 11 of the Bankruptcy Code for controlled,

court-supervised and collective reorganization and restructuring of obligations of distressed

companies.  Such  proceedings fall within two categories: judicial reorganization and extrajudicial

reorganization.  Both are court-controlled and supervised, with the purpose of reorganization.  See

Brazilian Counsel Decl. ¶ 6.  The Brazilian EJ Proceeding is a "collective" proceeding in that it

involves the treatment of multiple creditors and claims together rather than attempting to resolve

two-party disputes.  See Brazilian Counsel Decl. ¶ 6.  An extrajudicial reorganization functions

similarly to a prepackaged chapter 11 proceeding under the Bankruptcy Code.  Id.  In an

extrajudicial reorganization, the plan is presented for confirmation at the outset of the case with

prearranged creditor support, whereas in a judicial reorganization, the plan is presented 60 days

after the formal commencement of the case.  Id.  An extrajudicial reorganization restructuring plan,

is intended to directly or indirectly benefit all creditors collectively and must be approved and

signed by creditors holding over three-fifths (60%) in principal amount of each group of claims

subject to the plan before the plan is filed with a Brazilian court.  Id. ¶ 15.  The Brazilian EJ

Proceeding is a proceeding pending in Brazil, a foreign country, where the assets and affairs of the

Debtors are subject to the control and supervision by the Brazilian EJ Court for purpose of

reorganization or liquidation.  See id. ¶¶ 6, 18.  Furthermore, it is well established by this Court that

both judicial reorganizations and extrajudicial reorganizations under the Brazilian Bankruptcy Law

(and other Brazilian restructuring laws) constitute "foreign proceedings."  See, e.g., Odebrecht Óleo

E Gás S.A., No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017), ECF No. 28 (recognizing an

extrajudicial reorganization proceeding under the Brazilian Bankruptcy Law); In re ITSA

Intercontinental Telecomunicações Ltda., No. 08-13927 (ALG) (Bankr. S.D.N.Y. Jan. 29, 2009),

ECF No. 16 (same); See In re Odebrecht, S.A., No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18,

2019), ECF No. 22 (recognizing a Brazilian judicial reorganization proceeding as a foreign main

proceeding); Serviços de Petróleo Constellation, 600 B.R. at 270 ("Courts in this Circuit have long

agreed that the Brazilian RJ process satisfies these standards"); In re Oi S.A., No. 16-11791 (SHL)

(Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; In re OAS S.A., No. 15- 10937 (SMB) (Bankr.

S.D.N.Y. Aug. 3, 2015), ECF No. 85. The same conclusion applies here.

### B.  The Court Should Find that the Brazilian EJ Proceeding Is a "Foreign Main Proceeding" with Respect to Each of the Debtors

69.    The Brazilian EJ Proceeding is the "foreign main proceeding" of each Debtor

because it is pending in Brazil, which is each Debtor's center of main interests ("COMI").  See 11

U.S.C. § 1502(4); 11 U.S.C. § 1517(b)(1) (a foreign main proceeding is the foreign proceeding

subject to the petition "pending in the country where the debtor has the center of its main interests").

> i.    *A COMI analysis under U.S. law focuses on where a debtor's business interests are principally centered*

70.    Neither the Bankruptcy Code nor the Model Law defines COMI.  However, absent

evidence to the contrary, a debtor's  registered  office is presumed to be its COMI.  See 11 U.S.C.

§ 1516(c); see also Bear Stearns I, 374 B.R. at 130.  Each of the Debtors are organized under the

laws of, and maintain their registered offices in, Brazil, creating a presumption that Brazil is the

COMI  for  each of the Debtors.  See 11  U.S.C. § 1516(c).  Although this presumption is rebuttable,

Serviços de Petróleo Constellation, 600 B.R. at 272 ("the COMI presumption is rebuttable where

other factors suggest that the true COMI of a debtor lies elsewhere"), all relevant factors also point

to Brazil as the COMI for each of the Debtors.

71.    A COMI analysis looks at the debtor's substantive "locus of operations"—the

center of its operations, purpose, function, and activities, among others.  See Phoenix Four, Inc. v.

Strategic Res. Corp., 446 F. Supp. 2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted). Some courts interpret COMI to mean "principal place of business" to guide their COMI analysis. See e.g., In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63 (Bankr. S.D.N.Y. 2011). However, the Second Circuit has noted "[g]iven Congress's choice to use COMI instead of "principal place of business," that concept [of principal place of business] does not control the analysis. But to the extent that the concepts are similar, a court may certainly consider a debtor's "nerve center," including from where the debtor's activities are directed and controlled." See In re Fairfield Sentry Ltd., 714 F.3d 127, 138 n.10 (2d Cir. 2013) (citation omitted). Additionally, a COMI analysis must be performed on an entity-by-entity basis. See In re Oi Brasil Holdings Coöperatief U.A, 578 B.R. 169, 206 (Bankr. S.D.N.Y. 2017) (noting that the chapter 15 regime "require[s] COMI inquiries for each debtor entity rather than for collective corporate groups."); Serviços de Petróleo Constellation, 600 B.R. at 279 ("COMI must be determined on a company-by-company basis").

72.     Courts in this Circuit employ a list of factors adopted from In re SPhinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) when determining a debtor's COMI where the "registered office" presumption does not govern. Here, these factors provide no support to rebut the "registered office" presumption and support a finding that the COMI of each of the Debtors is Brazil. These factors are nonexclusive and are not to be applied mechanically. Serviços de Petróleo Constellation, 600 B.R. at 273. They include:

> "[T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would

> apply to most disputes." . . . [the] "principal place of business" . . .
> [and] the expectations of third parties [as to the] debtor's COMI."

In re Fairfield Sentry Ltd., 2011 U.S. Dist. LEXIS 105770 at *10 (S.D.N.Y. Sept. 16, 2011) (citing

Bear Stearns II, 389 B.R. at 336); In re SPhinX, 351 B.R. at117.  The Second Circuit added as

additional possible factors "the location of headquarters, decision-makers, assets, creditors, and the

law applicable to most disputes."  Fairfield Sentry, 714 F.3d at 130.  These factors, the Second

Circuit reasoned, are "in the public domain" and thus "ascertainable [and] not easily subject to

tactical removal."  Id. at 136-38 (noting the "importance of factors that indicate regularity and

ascertainability."); see also In re Brit. Am. Ins. Co. Ltd., 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010)

(finding that the "location of a debtor's COMI should be readily ascertainable by third parties").

73.     While each of the Fairfield Sentry factors serves as a "helpful guide" in assessing

a debtor's COMI, no one factor is required or dispositive.  See Fairfield Sentry, 714 F.3d at 137

(noting that "[c]onsideration of these specific factors is neither required nor dispositive" and

warning against a mechanical application of the factors).  The factors should be applied in light of

pragmatic considerations for the "maximization of the debtor's value" and "the reasonable interests

of parties in interest," as well as creditors' support for or acquiescence to a proposed COMI

"[b]ecause their money is ultimately at stake."  SPhinX, 351 B.R. at 117.

### ii.     Each of the Debtors has its COMI in Brazil

74.     While the OEC Group, and the larger ODB Group, have expanded operations to

other jurisdictions, the principal economic activity of the OEC Group and each of the Debtors has

been and continues to be in Brazil.  Substantially all of the operations of OEC, OECI and CNO are

managed and directed from Brazil and performed primarily by Brazilian-citizens.  Brazil is the only

jurisdiction that is easily "ascertainable by third parties" as the COMI for each of the Debtors.  Bear

Stearns I, 374 B.R. at 129.  OEC, OECI and CNO are largely  organized under centralized senior

management in São Paulo, São Paulo, Brazil.  As such, the "nerve center" of their businesses is,

and has always been, located in  Brazil.  In re Fairfield Sentry Ltd., 440 B.R. 60, 64 (Bankr. S.D.N.Y.

2010), aff'd 2011 U.S. Dist. LEXIS 105770 (S.D.N.Y. Sept. 16, 2011).

75.     For instance, the São Paulo Office coordinates the operational management of the

OEC Group (including for OEC, OEIC, and CNO) with staff in charge of operations-related finances,

employees, investor relations, finance, legal and communications.  See supra ¶ 9.  The São Paulo

Office also coordinates the day-to-day activities of the OEC Group.  These activities speak to the

existence of a shared, centralized COMI for all of the Debtors as a part of their fully integrated,

shared activities.  See Brit. Am., 425 B.R. at 911 (the location of business functions such as

"financial, administrative, marketing, information technology, investment, and legal functions"

speak to the location of COMI).

76.     Based on the offering documents of the Existing Notes, the creditors of OEC, CNO

and OECI have always been fully on notice that any restructuring of their obligations could take

place in Brazil and their investment was made with the expectation their purchases would be repaid

with revenues earned largely in Brazil from operations largely subject to Brazilian legal and

regulatory regimes.  See supra ¶ 25.  Additionally, OEC, CNO and OECI's obligations to creditors

derive their creditworthiness and expectations of repayment from revenue earned largely in Brazil

from Brazilian client groups.  Id.

> iii.     *Entity-specific factors also show that each of the Debtors has its COMI in*
> *Brazil*

77.     OEC is the OEC Group's non-operational holding company and has its registered

office in Brazil and its headquarters in São Paulo, Brazil.  The "registered office" presumption

under 11 U.S.C. § 1516(c), provides that OEC's COMI is in Brazil based on the location of its registered office. There is no relevant evidence to rebut this presumption and an evaluation of the hallmark factors in a COMI analysis, as discussed above under In re SPhinX and Fairfield Sentry, further supports the presumption and a finding of OEC's COMI in Brazil. The location of those who actually manage OEC is Brazil. All of OEC's officers are located and work in Brazil. See supra ¶ 9, 10. Brazil is the jurisdiction whose law would apply to most disputes as OEC's operating contracts are mainly governed by Brazilian law. See supra ¶ 10. A significant portion of OEC's assets, including interests it holds in the OEC Group's subsidiaries, are located in Brazil. See supra ¶ 14. Additionally, OEC utilizes and benefits from the operational coordinating activities of the OEC Group's São Paulo Office and OEC is subject to Brazilian legal and regulatory regimes. See supra ¶ 8, 10.

78.    OEIC, has its registered office in Brazil and its headquarters are located in São Paulo, Brazil. The "registered office" presumption under 11 U.S.C. § 1516(c), provides that OECI's COMI is presumed to be Brazil and an analysis of the In re SPhinX and Fairfield Sentry factors relevant to a COMI determination further supports the presumption. There is no relevant evidence that OEIC's COMI is anywhere but Brazil. All of its officers are based in Brazil and all decisions with regard to OECI's management of corporate investments and information processing are made in Brazil. See supra ¶ 12. Additionally, OECI is subject to Brazilian legal and regulatory regimes. See supra ¶ 8, 12.

79.    CNO, has its registered office in Brazil and its headquarters are located in São Paulo, Brazil. The "registered office" presumption under 11 U.S.C. § 1516(c), provides that CNO's COMI is presumed to be Brazil and an analysis of the In re SPhinX and Fairfield Sentry factors relevant to a COMI determination further supports the presumption. All of CNO's officers are based in

Brazil and all decisions are made in Brazil.  See supra ¶ 11.  Its board meetings are held in Brazil

with Brazilian directors.  Id.

**C.**  **In the Alternative, the Court Should Find that the Brazilian EJ Proceeding is at Least a
Foreign Nonmain Proceeding of each of the Debtors and Grant Discretionary Relief**

80.     As demonstrated above, the Brazilian EJ Proceeding should be recognized as the

"foreign main proceeding" of each of the Debtors.  Nevertheless, should this Court conclude that

the Brazilian EJ Proceeding is not the foreign main proceeding of any of the Debtors, the Foreign

Representative submits that, in the alternative, the Brazilian EJ Proceeding should be recognized as

a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtors

pursuant to section 1517(b)(2) of the Bankruptcy Code, and that discretionary relief should be

granted, namely, the application of a protective stay to the full extent set forth in section 362 with

respect to any such Debtor and its U.S.-located property.  11 U.S.C. §§ 1517(b)(2), 1521(a)(6).

*i.    The factors for recognition of foreign nonmain proceedings under U.S. law*

81.     Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if

the debtor has an "establishment" in the foreign country where the proceeding is pending.

Establishment is defined in Chapter 15 as "any place of operations where the debtor carries out a

nontransitory economic activity."  11 U.S.C. § 1502(2).  Unlike COMI, chapter 15 provides no

evidentiary presumption as to whether a debtor has an establishment in a particular jurisdiction.

Bear Stearns II, 389 B.R. at 338.  Thus, whether an establishment exists in a particular location is

"essentially a factual question," id. at 338, and the petitioner bears the burden of proof.  Brit. Am.,

425 B.R. at 915.

82.     The Bankruptcy Code does not define "nontransitory economic activity," and, as

this Court has noted, "[t]here is relatively little U.S. authority construing the term 'establishment' as

it is used in chapter 15." Millennium Glob., 458 B.R. at 84.  Courts have interpreted the meaning of

"establishment" in the context of the purpose of chapter 15 and the Model Law, and by looking to the

meaning ascribed to such term by foreign courts.  See, e.g., Millennium Glob., 458 B.R. at 84 n.49;

Bear Stearns I, 374 B.R. at 131 n.12.  The limited number of U.S. courts to consider the question have

determined a debtor has an "establishment" in a place where it has operations, conducts business, or

otherwise carries out a nontransitory economic activity in that jurisdiction.  See, e.g., Fairfield Sentry,

2011 U.S. Dist. LEXIS 105770 at *29-30 n.8 (describing an establishment as "a local place of

business"); Bear Stearns I, 374 B.R. at 131; In re Creative Fin. Ltd., 543 B.R. 498, 520 (Bankr.

S.D.N.Y. 2016); Brit. Am., 425 B.R. at 916   Several factors "contribute to identifying an

establishment: the economic impact of the debtor's operations on the market, the maintenance of a

'minimum level of organization' for a period of time, and the objective appearance to creditors

whether the debtor has a local presence." Millennium Glob., 458 B.R. at 85 (citation omitted).  A

showing of economic impact of the debtor's activities on the local market involves a "showing of a

local effect on the marketplace," Creative Fin., 543 B.R. at 520; British Am., 425 B.R. at 915 (same),

evidenced by, among other things, "engagement of local counsel and commitment of capital to local

banks." Millennium Glob., 458 B.R. at 85.

> ii.   *Each of the Debtors has an establishment in Brazil and therefore qualifies for foreign nonmain recognition*

83.   If the Court were to find that Brazil is not the COMI for any of

the Debtors, the Court should still find that such Debtor has an establishment in Brazil for purposes

of chapter 15 recognition.  The Petitioner submits that the foregoing evidence in support of finding

that the COMI of each of the Debtors is in Brazil also provides sufficient evidence that each of the

Debtors has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction.

> iii.    *The Court should grant the discretionary relief requested for any Debtor granted nonmain recognition*

84.    If the Court finds that the Brazilian EJ Proceeding is a nonmain proceeding with respect to any of the Debtors, then the Petitioner requests that the Court grant discretionary relief with respect to such Debtor and its U.S. located property pursuant to section 1521 of the Bankruptcy Code.  See Serviços de Petróleo Constellation, 600  B.R. at 293 ("Debtors who are recognized as participating in foreign nonmain proceedings may be afforded nearly identical relief as those recognized as operating in foreign main proceedings.").  The Petitioner submits that the foregoing evidence concerning the Debtors and their integral role within the OEC Group justifies such discretionary relief which is critical for the maintenance of the status quo and the preservation of the Debtors' going-concern value.

85.    To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).  Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H. Rep. No. 109-31, Pt. 1, at 116.  A determination of sufficient protection requires a balancing of the respective parties' interests.  See CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); see In re Toft, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.") (citation omitted).

86.     Here, the balance of interests weighs in favor of granting the relief requested.  First, recognition and the application of the stay will allow for the efficient and orderly administration of the Debtors' assets and affairs in a centralized, organized proceeding, thus protecting the interests of creditors and maximizing the value of assets.  Such relief will help ensure equitable distribution of assets and prevent certain opportunistic creditors from circumventing the Brazilian EJ Proceeding and commencing actions in the United States at the expense of the broader process.

87.     Furthermore, interested parties had the ability to participate in the Brazilian EJ Proceeding and assert their claims therein along with all similarly situated creditors.  As set forth in the Brazilian Counsel Declaration, the Brazilian EJ Proceeding includes a statutory 30-day objection period following publication of a notice to creditors and other stakeholders regarding the proposed plan and a 15-business-day deadline for filing appeal after the Brazilian court renders a decision.  See Brazilian Counsel Decl. ¶¶ 16-19.  The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian EJ Proceeding, as the time for creditors to object to the plan has passed.  Creditors still have the ability to appeal the Brazilian Court's decision until November 23, 2020, but any appeals that are filed do not automatically stay the proceeding or the consummation of an approved extrajudicial plan, making the plan fully effective in Brazil.  Nor will the requested stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for "cause."  See generally 11 U.S.C. § 362(d).  Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Brazilian EJ Proceeding. Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

**D.  Enforcement of the Brazilian Reorganization Plan and the Brazilian Confirmation
Order Is Necessary and Appropriate to Effectuate the Restructuring**

88.     As set forth in the Proposed Order, the Petitioner also seeks, upon recognition of

the Brazilian EJ Proceeding as a foreign main proceeding, entry of an order recognizing and

enforcing the Brazilian Reorganization Plan and the Brazilian Confirmation Order in the United

States pursuant to sections 1507, 1520, 1521, 1525, 1527 and 105 of the Bankruptcy Code.  For the

reasons set forth herein, recognition and enforcement of the Brazilian Reorganization Plan, the

Brazilian Confirmation Order and the Distribution Procedures as a required means of implementing

the Brazilian Reorganization Plan in the United States is critical to the Debtors' ability to

consummate the Brazilian Reorganization Plan.

89.     Upon the recognition of a foreign main proceeding and at the request of a foreign

representative, besides the automatic relief set forth in section 1520 of the Bankruptcy Code,

subsection 1521(a) of the Bankruptcy Code authorizes the Court, at the request of a recognized

foreign representative, to grant "any appropriate relief," which may include (i) staying the

commencement or continuation of individual actions concerning the debtor's assets, rights,

obligations or liabilities, (ii) staying execution against the debtor's assets, (iii) suspending the right

to transfer, encumber or otherwise dispose of any assets of the debtor and (iv) with limited

exceptions, granting any additional relief that may be available to a trustee.  *See* 11 U.S.C. § 1521(a).

In plenary chapter 11 proceedings, a trustee may obtain a court order directing any party to take

"any act . . . necessary for the consummation of the plan" (11 U.S.C. § 1142(b)), which can include

provisions for the "issuance of securities of the debtor, . . . in exchange for claims or interests . . . ."

11 U.S.C. § 1123(a)(5)(D).  Accordingly, this relief is available to chapter 15 debtors.  Enforcement

of the Brazilian Reorganization Plan and the Brazilian Confirmation Order and authorization of the

Distribution Procedures as a means of implementing the Brazilian Confirmation Order in the United

States is necessary for the consummation of the Brazilian Reorganization Plan and therefore relief

is available to the Debtors in these proceedings.

90.    Beyond the specific headings of subsection 1521, a court may grant additional

assistance "consistent with the principles of comity." 11 U.S.C. § 1507(b). And, as in any

bankruptcy case, a "court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title." 11 U.S.C. § 105(a).

91.    Enforcement of the Brazilian Reorganization Plan and Brazilian Confirmation

Order and the approval of the Distribution Procedures as a means to implement the Brazilian

Reorganization Plan are appropriate and necessary to  effectuate the purpose of chapter 15 and to

protect the interests of creditors by giving full effect to the relief granted by the Brazilian Court, a

competent foreign court exercising proper jurisdiction.  If the Petitioner and the Brazilian Court are

to implement the Brazilian Reorganization Plan in an orderly fashion, it is essential that this Court

extend comity within the United States to the acts of the Brazilian Court.  See Canada S. Ry. Co. v.

Gebhard, 109 U.S. 527, 539 (1883) ("Unless all parties . . . can be bound by the arrangement . . .

the scheme may fail. . . . Under these circumstances the true spirit of international comity requires

that schemes of this character, legalized at home, should be recognized . . . "); Victrix S.S. Co. v.

Salen Dry Cargo A.B., 825 F.2d 709, 713-14 (2d Cir. 1987) ("The equitable and orderly distribution

of a debtor's property requires assembling all claims against the limited assets in a single proceeding;

if all creditors could not be bound, a plan of reorganization would fail.") (citation omitted); Cunard

S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 458 (2d Cir. 1985).  Courts in this district have

previously held enforcement of Brazilian reorganization plans in similar cases as proper under

sections 1521 and 1507 of the Bankruptcy Code.  See e.g., In re Serviços de Petróleo Constellation

S.A., No. 18-13952 (MG) (Bankr. S.D.N.Y. Dec. 5, 2019), ECF No. 192 (enforcing a Brazilian

plan of reorganization pursuant to sections 1521 and 1507 of the Bankruptcy Code, including

authorizing and directing relevant indenture trustees and authorizing DTC to effect the plan in the

United States); In re Odebrecht Óleo E Gás S.A., No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13,

2017), ECF No. 28 (enforcing a Brazilian plan of reorganization pursuant to sections 1521 and 1507

of the Bankruptcy Code and authorizing DTC and FINRA, as applicable, to implement and give

effect to the plan); In re Rede Energia S.A., 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014); In re Centrais

Eletricas Do Para S.A., No. 12-14568 (SCC) (Bankr. S.D.N.Y. Dec. 12, 2012), ECF No. 19.

92.    In addition, courts have approved procedures similar to the Distribution Procedures

in other chapter 15 cases in order to facilitate the consummation of a foreign plan of reorganization.

For example, in In re Odebrecht Óleo E Gás S.A., No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13,

2017), ECF No. 28, this Court approved Brazilian EJ plans which included the cancellation and

replacement of certain existing notes with new securities and the Court directed certain

intermediaries in the U.S., such as the relevant trustees, DTC and FINRA and the holders of certain

financial claims in the case to comply with the plan.  In another case, in In re Landsbanki  Íslands

HF., No. 08-14921 (RDD) (Bankr. S.D.N.Y. Mar. 17, 2016), ECF No. 65, this Court again granted

similar relief to the relief sought in this Petition by ordering compliance with and enforcement of

exchange procedures in aid of implementation of an Icelandic plan of reorganization.  Courts in

other cases have also approved and enforced procedures that were necessary to implement such a

plan. See, e.g., In re Artic Glacier Int'l, Inc., No. 12-10605 (KG) (Bankr. D. Del. Dec. 12, 2012),

ECF No. 398 (approving and enforcing a set of tax liability procedures necessary to implement a

Canadian plan of reorganization in the United States); In re Allianz Glob. Corp. and Specialty

(France), No. 10-14990 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 20 (approving and

enforcing compliance with procedures in respect of drawdowns of letters of credit in a scheme of

arrangement). Accordingly, the Debtors seek approval of the Distribution Procedures to ensure that

the Debtors are able to consummate the Brazilian Reorganization Plan in a fair and efficient manner,

without unnecessarily expending time and resources.

93.　　By preventing any dissident creditors from seeking judgments or otherwise

interfering with the consummation of the Brazilian Reorganization Plan in the United States, the

Proposed Order will promote greater legal certainty for the Debtors, the U.S. Intermediaries and

their constituencies when the Debtors exit their global restructuring and emerge with a sustainable

capital structure. Moreover, the relief granted in respect of the U.S. Intermediaries is critical to

the implementation of the Brazilian Reorganization Plan. As discussed herein, the U.S.

Intermediaries may be unable or unwilling to act in support of the Brazilian Reorganization Plan

and the Brazilian Confirmation Order without authorization and direction from, and limited

protection granted by, a United States court in the form of entry of the Proposed Order approving

the Distribution Procedures as a means for facilitating the consummation of the Brazilian

Reorganization Plan. Participation of the U.S. Intermediaries will allow for the orderly distribution

of New Securities to holders of the Existing Notes in accordance with the Distribution Procedures

and as provided by the Brazilian Reorganization Plan.

> i.　　*Creditors and Other Parties in Interest Are Sufficiently Protected by
> Enforcement of the Brazilian Reorganization Plan and the Brazilian
> Confirmation Order*

94.　　A bankruptcy court may grant relief under section 1521 of the Bankruptcy Code

when "the interests of creditors and other interested entities, including the debtor, are sufficiently

protected." 11 U.S.C. § 1522(a). While the Bankruptcy Code does not explicitly define

"sufficiently protected," the legislative history indicates that additional relief should be granted

unless "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 11 (2005). As a result, courts have focused on the procedural fairness of the foreign proceeding in order to determine whether creditors are sufficiently protected. See, e.g., In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (examining whether the procedures utilized in the foreign proceeding accorded the American notions of fundamental fairness). Such procedural fairness is clearly demonstrated in the Brazilian Counsel Declaration. Particularly, the 60% claim majority requirement with respect to an EJ requires significant consensus and active participation of the creditors of each group of claims affected by the plan. Brazilian Counsel Decl. ¶ 24. Additionally, creditors may object to a debtor's proposed reorganization plan within 30 days of the publication of notice in the Court Official Gazette and in a major commercial newspaper with nationwide distribution in Brazil. Brazilian Counsel Decl. ¶ 25. Creditors may also seek reconsideration of approval of a reorganization plan by presenting a motion for clarification to the court within five (5) business days after notice that the court has confirmed a plan and filing an interlocutory appeal to be considered by the relevant State Court of Appeals within 15 business days after notice of plan confirmation. Brazilian Counsel Decl. ¶ 26. After the Court of Appeals issues its decision, creditors then have 15 days to file a special appeal to the Brazilian Superior Court of Justice (for violation of federal law) and an extraordinary appeal to the Brazilian Supreme Court (for violation of the Constitution, only if applicable). Brazilian Counsel Decl. ¶ 27.

95.     Also, a determination of sufficient protection "requires a balancing of the respective parties' interests." In re AJW Offshore, Ltd., 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing SNP Boat Serv. S.A. v. Hotel Le St. James, 483 B.R. 776, 784 (S.D. Fla. 2012); In re Qimonda AG Bankr. Litig., 433 B.R. 547, 556-58 (E.D. Va. 2010); and CT Inv. Mgmt. Co. v. Cozumel Caribe,

*S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012)); In re Tri-Cont'l Exch., 349 B.R. 627, 637

(citing Comm'n on Int'l Trade Law, Guide to Enactment of The UNCITRAL Model Law on Cross-

Border Insolvency,, U.N. Doc. A/CN.9/442 (1997) ("Standards that inform the analysis of § 1522

protective measures in connection with discretionary relief emphasize the need to tailor relief and

conditions so as to balance the relief granted to the foreign representative and the interests of those

affected by such relief, without unduly favoring one group of creditors over another.")); In re Sivec

SRL, 476 B.R. 310, 323 (Bankr. E.D. Okla. 2012).  Section 1522 of the Bankruptcy Code "[gives]

the bankruptcy court [] broad latitude to mold relief to meet specific circumstances."  In re Atlas

Shipping A/S, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) (citing Tri-Cont'l Exch., 349 B.R. at 636-

37).  In a similar Brazilian case in this District, after balancing the equities, the Court agreed that

creditors would be sufficiently protected by authorizations to the indenture trustee for outstanding

notes to take necessary actions to implement the plan of reorganization, because absent such

authorizations the trustee might not take those necessary actions, leading to harm to creditors.  Rede

Energia, 515 B.R. at 94.

96.      Here, the Debtors' creditors and the U.S. Intermediaries are "sufficiently

protected" by the treatment afforded to them under the Brazilian Reorganization Plan, the

implementation of the Brazilian Reorganization Plan as contemplated by the Distribution

Procedures and the process by which the Brazilian Reorganization Plan was approved in the

Brazilian EJ Proceeding, which was conducted in accordance with Brazilian Bankruptcy Law.

The Brazilian Reorganization Plan treats all similarly situated creditors equally and establishes

creditors' entitlements in a manner substantially similar to what might occur under U.S. law.

See Atlas Shipping, 404 B.R. at 740.  The relief requested herein "would [also] assist in the

efficient administration of this cross-border insolvency proceeding, and it would not harm the

interests of the debtors or their creditors." In re Grant Forest Prods., Inc., 440 B.R. 616, 621

(Bankr. D. Del. 2010).  As further described above, the U.S. Intermediaries may require an

order of this Court to be able to implement the Brazilian Reorganization Plan, and preventing

the consummation and implementation of the duly confirmed Brazilian Reorganization Plan

would be detrimental to the Noteholders and all other creditors of the Debtors.

97.    Moreover, all creditors will benefit from approval of the Distribution Procedures,

which provide a transparent process through which exchange of the Existing Notes for New

Securities will be completed and protect the interests of the applicable creditors in receiving the

consideration they are entitled to under the Brazilian Reorganization Plan.  The relief requested

herein will clarify the means by which creditors who are relying on the confirmed Brazilian

Reorganization Plan will receive timely distribution of such consideration in respect of their

holdings of the Existing Notes and aid the OEC Group in fulfilling the conditions of the Brazilian

Reorganization Plan.  The Distribution Procedures, developed in consultation with the Trustee as

required by the  Brazilian Reorganization Plan, will facilitate the steps necessary for the U.S.

Intermediaries and the Debtors to consummate the confirmed Brazilian Reorganization Plan and

effectuate the recoveries for creditors, many of whom actively supported the Brazilian

Reorganization Plan and the Brazilian EJ Proceeding, with the expectation that they would be

entitled to receive the New Securities in exchange for the release and cancellation of the Guarantee

Obligations under the Existing Notes pursuant to a confirmed Brazilian Reorganization Plan.  Here,

relief from the Court of the type sought hereby is an express condition to implementation of the

Brazilian Reorganization Plan, and if the relief requested is not granted, the Brazilian

Reorganization Plan might not be effectively consummated, which would result in significant harm

to the Debtors and their creditors, far outweighing any hardship, if any, which may be imposed by

granting the requested relief.  Therefore, the Distribution Procedures are an important element of the Brazilian Reorganization Plan and a fair, transparent and reasonable means of facilitating the effectuation of the terms of the Brazilian Reorganization Plan, and the consummation of the Brazilian Reorganization Plan and the Distribution Procedures are in the best interests of the Debtors and their creditors.

*ii.*    *Enforcement of the Brazilian Reorganization Plan and the Brazilian*
        *Confirmation Order Meets the Standards for Injunctive Relief*

98.    Pursuant to section 1521(e) of the Bankruptcy Code, the standard for injunctive relief under federal law applies in chapter 15 cases. 11 U.S.C. § 1521(e).  To obtain a permanent injunction, a movant must demonstrate that (i) an injunction is required to avoid irreparable harm and (ii) he succeeds on the merits.  See Clarkson v. Coughlin, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).

99.    This Court has been briefed on the merits of this Petition and the discretionary relief sought hereby.  Recognition will occur simultaneously with or prior to the granting of any discretionary relief to the Petitioner pursuant to section 1521 of the Bankruptcy Code.  Therefore, a court order recognizing the Brazilian EJ Proceeding and granting the requested discretionary relief would satisfy the requirement that the petition succeed on the merits.

100.    Irreparable harm exists where the orderly and equitable determination of claims and distribution of a debtor's assets could be disrupted absent injunctive relief. See e.g., Victrix,, 825 F.2d at 713-14 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); In re Petition of Garcia Avila, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003); In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("The guiding

principle of bankruptcy law is equality of distribution. . . . As a rule, therefore, irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors.") (citation omitted); In re Rubin, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) (quoting In re Lines, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.").

101.    Without an injunction barring creditors from seeking judgments in the United States in contravention of the Brazilian Reorganization Plan, certain creditors may attempt to assert discharged claims in United States courts.  Defending against such actions would deplete the restructured Debtors' assets and threaten their ability to operate as going concerns.  Any judgments awarded in any such litigation would lead to piecemeal distribution of the Debtors' assets and would disadvantage and discriminate against other uninvolved creditors.  For these reasons, allowing creditors to litigate discharged claims in the United States would threaten the success of the Brazilian Reorganization Plan and cause "irreparable harm" to the Debtors.  The granting of the requested relief, conversely, would protect the interests of all of the Debtors' creditors by maximizing the Debtors' going-concern value and ensuring that prepetition claims are determined and paid on a consistent, nondiscriminatory basis in accordance with the Brazilian Reorganization Plan and the Brazilian Confirmation Order.

102.    As addressed in the Brazilian Counsel Declaration, the Brazilian EJ Proceeding is a Brazilian extrajudicial reorganization proceeding, which is similar to a U.S. prepackaged case under chapter 11 of the Bankruptcy Code.  Just as in a U.S. prepackaged case, all creditors in the Brazilian EJ Proceeding have had both the opportunity to adhere to each of the Brazilian Reorganization Plan, as applicable, and notice and opportunity to be heard. In this regard, as is

explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law establishes fair and public proceedings to reorganize distressed companies. With respect to extrajudicial reorganizations, the Brazilian Bankruptcy Law provides for an objection period of 30 days,[21] that runs from the day that notice of the proposed plan, reasonably calculated to give notice to all affected creditors of their right to challenge the proposed plan, is published in the Court Gazette[22] within which any affected creditors could oppose the plan presented by the debtors. The Brazilian Court issued the Brazilian Confirmation Order, ultimately confirming the Brazilian Reorganization Plan. The relevant creditors have been given notice of the decision and are entitled to appeal such decision to the relevant State Court of Appeals within 15 business days following publication of the Brazilian Confirmation order in the Court Gazette. Such appeal cannot automatically stay the effects of the Brazilian Confirmation Order, as provided for in the Brazilian Bankruptcy Law. The appealing creditor can, however, request staying effects to the Brazilian Superior Court. If necessary, the relevant creditor can also submit a motion for clarification (*embargos de declaração*) within five business days of publication of the Brazilian Confirmation Order in the Court Gazette. Ultimately, the creditor is able to appeal to the Brazilian Superior Court of Justice and to the Brazilian Supreme Court, only if the appeal involves matters related, respectively, to a federal law or to the Brazilian federal constitution.

103.     Both prior to and since the enactment of Chapter 15, courts have readily granted permanent injunctive relief to enforce foreign restructuring plans and discharges.  In re Bd. of Dirs.

---

[21]     This period, in the Debtors' extrajudicial reorganization, has been counted in calendar days.

[22]     The notice of the proposed plan is also published in a major commercial newspaper with nationwide distribution.  In the Brazilian EJ Proceeding, the notice was published in Valor Econômico, a newspaper with nationwide coverage in Brazil.  The creditors were also notified through the transmission of letters and/or notices, via e-mail and/or through the DTC lens system.

of Telecom Arg., S.A., 528 F.3d 162 (2d Cir. 2008) (affirming bankruptcy court decision granting full force and effect to Argentine plan); Rede Energia, 515 B.R. at 93 ("The request by the Foreign Representative that the Court (i) enforce the Brazilian Reorganization Plan and the Confirmation Decision and (ii) enjoin acts in the U.S. in contravention of the Confirmation Decision is relief of a type that courts have previously granted under section 304 of the Bankruptcy Code and other applicable U.S. law.") (citing In re Bd. of Dirs. of Telecom Arg., S.A., 528 F.3d 162, 174-76 (2d Cir. 2008)); In re Sino-Forest Corp., 501 B.R. 665 (Bankr. S.D.N.Y. 2013) (granting permanent injunctive relief to enforce Canadian plan, including third-party releases); In re Metcalfe, 421 B.R. 685 (same).

104.    The injunctive relief sought herein would not cause undue hardship or prejudice to the rights of any U.S.-based creditors.  In fact, the Brazilian Reorganization Plan and the voting procedures applicable in the Brazilian EJ Proceeding set forth by Brazilian Bankruptcy Law are applied uniformly to all of the Debtors' creditors subject to such plan, wherever they reside.  In fact, many of the creditors subject to the Brazilian Reorganization Plan participated in the negotiations leading to the formulation of that plan, and creditors that were not signatories of the Brazilian Reorganization Plan at the outset of the case had the opportunity to adhere or to object to them, providing ample due process.  More than 60% of the creditors subject to the Brazilian Reorganization Plan decided to support such plan pursuant to the provisions of the Brazilian Bankruptcy Law. Furthermore, the Ad Hoc Group participated actively in the negotiations prior to the filing of the Brazilian EJ Proceeding and consisted of leading financial institutions and investors and was represented by sophisticated counsel, including Davis Polk & Wardwell LLP, and experienced financial advisors, including Rothschild & Co.  After hard fought, often taxing, negotiations, a significant portion of the noteholders and the Debtors came to an agreement that

they believe maximizes the value of a reorganized OEC Group, a goal that is in the best interests of

all parties, including the Debtors, their creditors and including, without limitation, the beneficial

owners of the Existing Notes and the New Securities and/or their nominees on their behalf

(collectively, the "Beneficial Owners").  In short, the injunctive relief sought herein seeks only to

give effect to the orderly and equitable implementation of the Brazilian Reorganization Plan and

Brazilian Confirmation Order in the United States.

> iii.    *Enforcement of the Brazilian Reorganization Plan and the Brazilian Confirmation Order Meets the Standards for Additional Assistance under Section 1507*

105.    Section 1507 of the Bankruptcy Code also supports granting discretionary relief.

The legislative history to section 1507 states that the section provides authority for "additional relief"

beyond that permitted under  section 1521 of the Bankruptcy Code.  H.R. Rep. No. 109-31, pt. I,

109th Cong., 1st Sess. 109 (2005).  In exercising discretion to grant relief under section 1507(a) of

the Bankruptcy Code, courts are guided by the standards set forth in section 1507(b) of the

Bankruptcy Code, which provide that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> > (1) just treatment of all holders of claims against or interests in the debtor's property;
> >
> > (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
> >
> > (3) prevention of preferential or fraudulent dispositions of property of the debtor;
> >
> > (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

> (5) if appropriate, the provision of an opportunity for a fresh start
> for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

106.    Subsection 1507(b) is clear that the principles of comity are key to a court's decision whether to grant additional assistance. See, e.g., In re Metcalfe, 421 B.R. at 696 ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative."); Atlas Shipping, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity") (quoting In re Bear Stearns II, 389 B.R. at 333).

107.    In general, a court may enforce a judgment rendered by a foreign court exercising proper jurisdiction under principles of comity unless enforcement would unfairly prejudice the rights of United States citizens or offend domestic policy.  See In re Sino-Forest Corp., 501 B.R. at 662.  The foreign court's judgment is "conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that by the principles of international law . . . it should not be given full credit and effect."  In re Aerovias Nacionales de Colombia S.A., 345 B.R. 120, 126 (Bankr. S.D.N.Y. 2006) (quoting Hilton v. Guyot, 159 U.S. 113, 159-60 (1895)).  In the context of bankruptcy law, the principles of comity apply with special force due to the need to bind all creditors to a single restructuring plan.  See Victrix, 825 F.2d at 713; Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods., N.V., 310 F.3d 118, 126 (3d Cir. 2002).  United States courts have previously found that Brazilian insolvency proceedings, in particular, are worthy of comity.  In re Serviços de Petróleo Constellation S.A., 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019); In re OAS S.A., 533 B.R.

83 (Bankr. S.D.N.Y. 2015); Rede Energia, 515 B.R. at 98 ("Brazilian bankruptcy law meets our

fundamental standards of fairness and accords with the course of civilized jurisprudence.").

108.    Beyond general principles of comity, each of the listed considerations at subsection

1507(b) favors discretionary relief.

> a.   Enforcement of the Brazilian Reorganization Plan and the Brazilian
> Confirmation Order Assures Just Treatment of All Holders of Claims
> Against or Interests in the Debtors' Property

109.    Both under section 1507(b) of the Bankruptcy Code and under former section 304(c)

of the Bankruptcy Code jurisprudence, courts have uniformly held that the requirement that the

additional assistance contemplated will reasonably assure "just treatment of all holders of claims

against or interests in the debtor's property" is satisfied where the foreign insolvency law provides

a comprehensive procedure for the orderly resolution of claims and the equitable distribution of

assets among all of the estate's creditors in one proceeding.  See, e.g., In re Bd. of Dirs. of Telecom

Arg., S.A., 528 F.3d at 170 ("The 'just treatment' factor is satisfied upon a showing that the

applicable law 'provides for a comprehensive procedure for the orderly and equitable distribution

of [the debtor]'s assets among all of its creditors.'") (citing In re Treco, 240 F.3d 148, 158 (2d

Cir. 2001)); Matter of Culmer, 25 B.R. 621, 629 (Bankr. S.D.N.Y. 1982).

110.    As described in greater detail in the Brazilian Counsel Declaration, the Brazilian

Bankruptcy Law provides for a comprehensive procedure for the orderly and fair resolution of

claims and the equitable distribution of assets among all of the estate's creditors subject to the

extrajudicial reorganization in a single proceeding.  Brazilian Counsel Decl. ¶¶ 24-27.  Extrajudicial

reorganization under chapter VI of the Brazilian Bankruptcy Law is analogous to a  prepackaged

plan of reorganization in the United States, or a scheme of arrangement in certain other jurisdictions.

In an extrajudicial proceeding, a debtor may negotiate a reorganization plan and then agree to such

a final form of plan with its creditors, such as the Brazilian Reorganization Plan, and then submit

the plan to a Brazilian court for confirmation.  Brazilian Counsel Decl. ¶ 6.  Pursuant to Article 163

of the Brazilian Bankruptcy Law, any claims against a debtor (other than labor claims, tax claims

and certain other claims that are not relevant in the Chapter 15 Cases), whether matured or

unmatured, that exist at the time that the extrajudicial reorganization plan is approved by a Brazilian

Court may be compromised thereunder.  An extrajudicial plan of reorganization may address  many

groups of claims against a debtor, or be limited to a single group of claims of the same nature and

subject to similar payment terms and conditions.  As set forth above and in the description of the

Brazilian Reorganization Plan in the Foreign Representative Declaration, the Brazilian

Reorganization Plan provides for the same treatment for each creditor as other creditors pertaining

to the same group of claims.  As set forth in the description of  the Brazilian Reorganization Plan

in the above, the Brazilian Reorganization Plan provide for the uniform treatment for each creditor

as other similarly situated creditors.

111.    The Court should also approve the Distribution Procedures as a means to implement

the Brazilian Reorganization Plan, and authorize and/or direct (as applicable) all parties, including,

without limitation, the OEC Group, the U.S. Intermediaries, each Noteholder to comply with the

provisions contained therein, under section 1507 of the Bankruptcy Code, because such relief

constitutes "additional assistance" and is consistent with, and will promote, the principles of comity

by ensuring that the Brazilian Reorganization Plan will be implemented in a manner consistent with

its terms and without unnecessary delay and costs.  The Debtors' creditors will be harmed if the

OEC Group, the U.S. Intermediaries fail to take the necessary steps to ensure that the exchange is

executed.  Accordingly, the relief requested herein will ensure the just treatment of holders of claims

against the Debtors, provide clarity and a means of effectuating the Brazilian Reorganization Plan

and that such U.S. creditors are protected against prejudice in processing and recovering on their

prepetition claims. *See* 11 U.S.C. §1507(b)(1)-(2).

112.    Moreover, the Brazilian Bankruptcy Law establishes that an extrajudicial plan of

reorganization must be approved and signed by creditors representing over three- fifths (60%) in

principal amount of each group of claims subject to the plan before the plan is filed with a Brazilian

court.  Brazilian Counsel Decl. ¶ 15.  Upon confirmation by the Brazilian Court, the Brazilian

Reorganization Plan had the support of creditors representing 73% of the aggregate claims in

respect of the Existing Notes.

113.    In addition, pursuant to Article 164 of the Brazilian Bankruptcy Law, upon the

receipt of a petition for confirmation of an extrajudicial reorganization plan, a court must order the

publication of a notice in the Court Gazette and in a newspaper with national circulation.  This

notice must be reasonably calculated to inform all affected creditors of their right to challenge the

proposed plan on various grounds within a statutory 30-day objection period.  Id. ¶ 16.  In the

Brazilian EJ Proceeding, after notice of filing was given, no creditors objected to the plan.

114.    On October 26, 2020, the Brazilian Court entered the Brazilian Confirmation Order

confirming the Brazilian Reorganization Plan. The Brazilian Court held that the Brazilian

Reorganization Plan was supported by the requisite majority of each group of affected creditors,

noting that no creditors have filed any objections against the Brazilian EJ Proceeding or the

Brazilian Reorganization Plan.  In addition, the Brazilian Court held that notice of the plan was

properly published and that all legal requirements pursuant to the Brazilian Bankruptcy Law were

complied with..

115.    Pursuant to Brazilian Bankruptcy Law, a Brazilian court's decision on confirmation

is subject to potential appeal, but any appeals that are filed generally do not stay the proceeding, or

the effectiveness of an approved extrajudicial plan. Id. ¶ 18. In the Brazilian EJ Proceeding, notice

of the Brazilian Confirmation Order was given to all parties in interest but no parties have appealed

as of the date hereof.[23]

116.    Hence, the Brazilian Confirmation Order is the result of a proceeding (the Brazilian

EJ Proceeding), in which all creditors were treated fairly and justly, in compliance with Brazilian

Bankruptcy Law and the Brazilian Federal Constitution.

> **b.**    Enforcement of the Brazilian Reorganization Plan and Brazilian
> Confirmation Order Will Protect Claim Holders in the United States
> Against Prejudice and Inconvenience in the Processing of Claims in the
> Brazilian EJ Proceeding

117.    The second factor requires "protection of claim holders in the United States against

prejudice and inconvenience in the processing of claims in such foreign proceeding." 11 U.S.C. §

1507(b)(2). This factor is satisfied where creditors are given adequate notice of timing and

procedures for filing claims, and such procedures do not create any additional burdens for a foreign

creditor to file a claim. See, e.g., In re Treco, 240 F.3d at 158; In re Petition of Hourani, 180 B.R.

58, 68 (Bankr. S.D.N.Y. 1995).

118.    As mentioned above, all of the creditors subject to the Brazilian EJ Proceeding were

treated equally and were given proper notice of every decision and other acts related thereto with

an opportunity to contest such actions. As addressed above and as fully explained in the Brazilian

Counsel Declaration, the foreign creditors have the same status as local creditors in the proceedings

and enjoy the same rights and protections under the Brazilian Bankruptcy Law and are also subject

to the same timing and procedures for filing their claims. Id. ¶ 29. In the Brazilian EJ Proceeding,

all creditors were given proper notice and opportunity to be fully heard by the court and to appeal

---

[23]    The Foreign Representative will file an update with the Court to the extent any objections are timely filed.

every decision rendered throughout the proceeding.  Moreover, the Brazilian Reorganization Plan does not convert claims referenced in foreign currency into Brazilian *reais* without the consent of the relevant creditors.  Therefore, the creditors holding claims in dollars are not subject to the currency exchange risk.

119.    Hence, the Brazilian EJ Proceeding did not prejudice foreign creditors as they had adequate notice of the timing and procedures for filing claims, were fully heard by the Brazilian Court and were even granted special protection against the conversion of their claim into Brazilian *reais*, avoiding currency exchange risks.

    c.   <u>Enforcement of the Brazilian Reorganization Plan and Brazilian Confirmation Order Will Prevent Preferential or Fraudulent Dispositions of Property to the Debtor</u>

120.    The third factor requires that the "additional assistance" being considered will reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor. Under the Brazilian Bankruptcy Law, in the case of a liquidation, any creditor, the Brazilian public attorney's office or the judicial administrator appointed by the court may bring actions to avoid transfers made to third parties in order to defraud creditors or damage the debtor's estate.  <u>Id.</u> ¶ 30.  In such a case, the plaintiff will have  to show that the following elements of fraud under Brazilian law are present: (i) a claim already existed when the transfer was made; (ii) the transfer left the debtor without sufficient assets to cover such claim; and (iii) the debtor and the third-party transferee acted in bad faith.  A transfer is presumed to have been made in "bad faith" where the debtor made gratuitous transfers, forgave debts, paid unsecured creditors before maturity date in detriment of higher-ranked creditors, granted collateral to creditors when the debtor was already insolvent, or where the transferee already knew that the debtor was insolvent when the transfer was made.  The court may also declare such transfers void *sua sponte* if the intent to defraud is not a

disputed question of fact.  Id.  Some pre- bankruptcy transfers are subject to avoidance as a matter

of law, in a bankruptcy liquidation proceeding, if they were made within 90 days before the petition

or the date of the first protest by a creditor on account of the debtor's default, during which such

transfers by the debtor are subject to scrutiny.  Such transfers include payments of debts not yet due,

payments of debts that were due but were enforceable in any way not provided for in the agreement

memorializing the debt, and the creation of liens or any other in rem property interest in connection

with a previously incurred debt.  Id. ¶ 31.

> d.  Enforcement of the Brazilian Reorganization Plan and Brazilian
>     Confirmation Order Will Reasonably Assure Distribution of Proceeds
>     Substantially in Accordance with the Bankruptcy Code

121.    The fourth factor requires that the distribution of the Debtor's property substantially

accords with the order of distribution available under the Bankruptcy Code.  See In re Gee, 53 B.R.

891, 904 (S.D.N.Y. 1985); see also Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007 (D.C. Cir.

1999) (Taiwanese distribution system was substantially in accordance with U.S. law because,

among other reasons, the priority accorded to claims  is similar to those accorded priority in the

United States).  The "substantially in accordance" factor does not require that the foreign

distribution be identical to United States Bankruptcy Law.  In re Ionica PLC, 241 B.R. 829, 836

(Bankr. S.D.N.Y. 1999) ("Section 304(c)(4) only requires that the foreign distribution scheme be

'substantially in accordance' with United States bankruptcy law; it does not have to mirror the

United States distribution rules.") (citations omitted).

122.    As described herein, Brazilian Law substantially compiles with the order of

distribution and priority under the Bankruptcy Code however, in this case all of the debt that is

being compromised through the Brazilian Reorganization Plan is comprised of various unsecured

financial debt.  The distribution scheme under the Brazilian Bankruptcy Law substantially accords

with the scheme under the Bankruptcy Code, including, most importantly, the priority for secured

claims over unsecured claims.  Brazilian Counsel Decl. ¶ 33.  First,  in a liquidation proceeding,

the secured creditors holding fiduciary assignment (alienação fiduciária) over assets of the estate

are entitled to retrieve such assets, sell them and pay their claims with the proceeds.  Such claims

are not subject to the waterfall provisions set forth by Brazilian Bankruptcy Law.

123.    Pursuant to Brazilian Bankruptcy Law, the first ranked claims are the various

postpetition administrative claims, followed by labor-related claims and then secured claims.  Id. ¶

35-36.  The secured creditors are paid with the proceeds of the collateral securing their claims that

remain after the payment of the higher ranked claims.   Any deficiency claim is automatically

considered an unsecured claim for the purposes of liquidation and paid along with the claims of

such class.  After the secured claims are paid, then tax claims exclusive of fines receive payment,

followed by other claims privileged under  non-bankruptcy law.  Id. ¶ 36.  Then, unsecured  claims

receive payment (including deficiency claims) and, finally, claims subordinated by contract or law

and claims by directors and shareholders not currently employed by the debtor receive lowest

priority.  Id.

124.    Section 1507(b)(5) of the Bankruptcy Code does not apply here because the OEC

Group consists of business entities. See In re Bd. of Dirs. of Telecom Arg., S.A., No. 05-17811

(BRL), 2006 WL 686867, *23 n.11 (Bankr. S.D.N.Y. Feb. 24, 2006) (The provision of an

opportunity for a fresh start factor only applies to individual debtors, not business  entities); In re

Culmer, 25 B.R. at 631 n.4 (The § 304(c)(6) factor "by its terms relates to individual debtors and

thus has no application" in the case of a business entity).

   *iv. Enforcement of the Brazilian Reorganization Plan and Brazilian Confirmation
     Order Is Not Manifestly Contrary to Public Policy*

125.    A bankruptcy court may refuse to grant relief under chapter 15 if the action "would

be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The legislative

history indicates that the "public policy" exception is narrow, applying only to the "most

fundamental policies of the United States." H. Rep. No. 109- 31, pt. 1, 109th Cong., 1st Sess. 109

(2005). Furthermore, courts have construed this free-floating public policy exception narrowly.

See Rede Energia, 515 B.R. at 92 ("the public policy exception is clearly drafted in narrow terms

and 'the few reported cases that have analyzed [section] 1506 at length recognize that it is to be

applied sparingly'") (citing In re Toft, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011)); In re Ashapura

Minechem Ltd., 480 B.R. 129, 139 (S.D.N.Y. 2012); In re ABC Learning Centres, 445 B.R. 318,

335 (Bankr. D. Del. 2010).

126.    Importantly, it is unnecessary that the result achieved in a foreign proceeding be

identical to what could be obtained in the United States. Rather, "[t]he key determination . . . is

whether the procedures used [in the foreign proceeding] meet our fundamental standards of

fairness." Rede Energia, 515 B.R. at 91 ("Of particular significance . . . is the well-established

principle that the relief granted in a foreign proceeding and the relief available in the United States

do not need to be identical.") (citing In re Metcalfe, 421 B.R. at 697); In re Metcalfe, 421 B.R. at

697; In re ABC Learning Centres, 728 F.3d 301, 309 (3d Cir. 2013). As such, a foreign

representative should not be denied comity simply because the relief obtained in the foreign

proceeding under the applicable law of that country would not be available in the United States.

See In re Condor Ins. Ltd., 601 F.3d 319, 327 (5th Cir. 2010).

127.    Here, the Brazilian EJ Proceeding and Brazilian Reorganization Plan are consistent

with the public policy of the United States. "Brazilian bankruptcy law meets our fundamental

standards of fairness and accords with the course of civilized jurisprudence." Rede Energia, 515

B.R. at 98.  Indeed, the relief obtained by the Debtors under the Brazilian Bankruptcy Law and now requested in the Chapter 15 Cases is nearly identical to the relief afforded to debtors in a prepackaged case under chapter 11 of the Bankruptcy Code.  In this regard, a court in this District has granted relief in Lupatech, in which the foreign proceeding was also a Brazilian extrajudicial reorganization proceeding.  In re Lupatech S.A., No. 14-11559 (SMB) (Bankr. S.D.N.Y. July 7, 2014), ECF No. 31.

128.     In addition, like a prepackaged case under chapter 11, the Brazilian extrajudicial reorganization proceeding provides for (i) a centralized process to assert and resolve claims against the estate that are subject to the Brazilian Reorganization Plan in one tribunal, the Brazilian Bankruptcy Court, and (ii) similar protections to different types of priority claims (e.g., secured claims and administrative expense claims).   See Brazilian Counsel Decl. ¶ 24.  Thus, as required by the Model Law (and as incorporated in chapter 15), granting the relief requested here would foster cooperation between courts in Brazil and the United States.  For instance, by granting the relief requested here, this Court would be assisting the Brazilian Bankruptcy Court in the orderly administration of the Debtors' assets by enjoining creditors subject to the Brazilian Reorganization Plan from commencing or continuing actions against the Debtors or their assets in the United States.  Moreover, as discussed herein, providing authority, direction and certain protections to U.S. Intermediaries in connection with their role in the orderly consummation of the Brazilian Reorganization Plan in accordance with the Distribution Procedures will be essential to implementing the Brazilian Reorganization Plan in respect of the Existing Notes and the New Securities.

129.    For these reasons, the Brazilian EJ Proceeding is patently fair and comports with the United States' standards of fundamental fairness and with United States public policy. Accordingly, the relief requested herein should be granted.

## NOTICE

130.    Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in Exhibit E annexed hereto (the "Notice List").  The Petitioner has filed an *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for an Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* concurrently with this Verified Petition and will provide such other or further notice as the Court directs in accordance with the order entered on that motion.

## NO PRIOR REQUEST

131.    No previous request for the relief requested herein has been made to this or any other court.

## CONCLUSION

132.    WHEREFORE, the Petitioner respectfully requests that the Court: (i) grant the Verified Petition and enter the Proposed Order annexed hereto as Exhibit A recognizing the Brazilian EJ Proceeding as the foreign main proceeding for each of the Debtors and granting the requested relief in connection therewith; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: November 24, 2020
      New York, New York

                      CLEARY GOTTLIEB STEEN & HAMILTON LLP


                      By: /s/ Luke A. Barefoot
                            Luke A. Barefoot

                      Richard J. Cooper, Esq.
                      Luke A. Barefoot, Esq.
                      CLEARY GOTTLIEB STEEN & HAMILTON LLP
                      One Liberty Plaza
                      New York, New York 10006
                      T: 212-225-2000
                      F: 212-225-3999
                      (lbarefoot@cgsh.com)

                      *Attorneys for the Foreign Representative of*
                      *Odebrecht Engenharia e Construção S.A. and its*
                      *affiliated debtors*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Adriana Henry Meirelles, declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of each of the Debtors with respect to the Brazilian EJ Proceeding for purposes of these Chapter 15 Cases. I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto, are true and accurate to the best of my knowledge, information and belief, and I respectfully represent as follows:

- I am the Investor Relations Officer at Odebrecht Engenharia e Construção S.A.

- On October 15, 2020, each of OEC, OEIC and CNO appointed me as the foreign representative of the Brazilian EJ Proceeding for such Debtor and authorized me to file the Verified Petition and to act on its behalf in these Chapter 15 Cases (each, a "<u>Appointment Resolution</u>"). Accordingly, I am fully authorized and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon: (a) my review of relevant information, data and documents (including oral information) furnished to me by the OEC Group (as defined above) and its legal advisors; (b) information supplied to me by the Debtors' officers, directors, employees and professionals; or (c) my analyses of the information I have received on the Debtors' operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including the OEC Group's primary financial creditors and its shareholders. I am an individual over the age of 18. If I am called to testify, I will do so competently and based on the facts set forth herein.

*[Remainder of Page Left Intentionally Blank; Signature Page to Follow]*

Dated: November 24, 2020

Respectfully Submitted,


/s/ Adriana Henry Meirelles
Adriana Henry Meirelles, Investor Relations
Officer and Authorized Foreign
Representative of the Debtors