Richard J. Cooper, Esq.
Luke A. Barefoot, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the Foreign Representative*
*of Odebrecht Engenharia e Construção S.A.*
*and affiliated debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Odebrecht Engenharia e Construção S.A., *et al.*,[1]<br><br>Debtors in a Foreign Proceeding | Chapter 15<br><br>Case No. 20-12741<br><br>(Joint Administration Pending) |

**DECLARATION OF ADRIANA HENRY
MEIRELLES IN SUPPORT OF VERIFIED
PETITION UNDER CHAPTER 15 FOR AN ORDER
GRANTING RECOGNITION AND FINAL RELIEF IN AID OF A FOREIGN
<u>PROCEEDING PURSUANT TO 11 U.S.C. §§ 105(A), 1515, 1517, 1520(A) AND 1521</u>**

I, Adriana Henry Meirelles (the "<u>Petitioner</u>"), pursuant to 28 U.S.C. § 1746, hereby declare

under penalty of perjury under the laws of the United States of America as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in

this statement, except for those portions specified as being otherwise.

2.      I am the Investor Relations Officer at Odebrecht Engenharia e Construção S.A. and,

as set forth below, foreign representative appointed for the purposes of this Chapter 15 Case, which

---

[1]      The Debtors in these chapter 15 cases (the "<u>Chapter 15 Cases</u>") and the last four identifying digits of the tax number in the jurisdiction are: Odebrecht Engenharia e Construção S.A. (Brazil – 01-28); CNO S.A. (Brazil – 01-82); OECI S.A. (Brazil – 01-78).

is filed by Odebrecht Engenharia e Construção S.A. ("OEC") and its affiliated debtors, CNO S.A. ("CNO") and OECI S.A. ("OECI") (collectively, the "Debtors") in respect of the extrajudicial reorganization (*recuperação extrajudicial* or "EJ") proceeding (the "Brazilian EJ Proceeding") of the Debtors in the First São Paulo Bankruptcy and Reorganization Court of the Fórum Central Cível of the Appellate Court of the State of São Paulo (the "Brazilian Court") pursuant to Federal Law 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil"), filed before the Brazilian Court. The Debtors, along with other related entities and affiliates (the "OEC Group"), are part of a larger Brazilian corporate group.

3.       On August 26, 2019, Odebrecht S.A. – Em Recuperação Judicial ("ODB") and certain affiliates (the "ODB Debtors") filed the Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 1515, 1517, and 1520, No. 19-12731 (SMB) (Bankr. S.D.N.Y. Aug. 26, 2019), ECF Nos. 2, 3 (the "ODB Petition") seeking recognition of the jointly-administered judicial reorganization proceeding (the "Brazilian RJ Proceeding") in the Brazilian Court pursuant to Brazilian Bankruptcy Law as the foreign main proceeding for all of the ODB Debtors pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code").  On September 18, 2019, this Court entered an order granting the relief sought in the ODB Petition and recognized the Brazilian RJ Proceeding as a foreign main proceeding for all the ODB Debtors.  Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Odebrecht, S.A.,  No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.  In the ODB Petition, ODB and its affiliated debtors explained that OEC was pursuing a separate restructuring, which is now the subject of this declaration.

4.     I submit this declaration (the "Declaration") in support of the Verified Petition for

Recognition of the Brazilian EJ Proceeding and Motion for Order Granting Final Relief Pursuant

to 11 U.S.C. §§ 105(a), 1507, 1509(b), 1515, 1517, 1520(a) and 1521 (the "Verified Petition") and

together with the Official Form Petitions filed contemporaneously herewith, the "Petitions"),[2] the

Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order

Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related

Relief (the "Notice Procedures Motion") and the Motion for an Order Directing the Joint

Administration of the Chapter 15 Cases of Odebrecht Engenharia e Construção S.A. and its Debtor

Affiliates Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 1015(b) (collectively, the "First

Day Pleadings").

5.     I make this declaration on the basis of documentation I have reviewed and facts

known to me through my work as the Investor Relations Officer of OEC and foreign representative

of the Debtors.  Where relevant information has been provided to me by others, the information is

true to the best of my knowledge and belief.  If I were called upon to testify, I could and would

testify competently to the facts set forth herein.

## BACKGROUND

### A.     General Background and History

*i.     Overview*

6.     The Debtors are part of the OEC Group and the construction services arm of the

ODB corporate group (the "ODB Group"), with business in the fields of engineering, construction,

industry, and in the development and operation of infrastructure.  As explained in the ODB

Petition, the ODB Group is one of the largest private business conglomerates in Brazil, which was

---

[2]     All capitalized terms not otherwise defined herein have the meaning ascribed to them in the Petition.

founded in 1944 as a construction company in the northeastern region of Brazil, and through the

OEC Group has been involved in the construction of multiple projects such as (i) industrial plants,

(ii) warehouses, (iii) small dams, (iv) highways, (v) airports, (vi) ports, (vii) hydroelectric plants,

(viii) subways, (ix) buildings and (x) canals.   The OEC Group continues to be active in the

segments of heavy civil construction and building, assembly and management of industrial

ventures.

7.      After its foundation, the OEC Group has expanded its operations throughout Brazil,

executing a series of infrastructure projects fundamental for regional development including the

construction of Brazil's first nuclear power plant, the Central Nuclear de Angra dos Reis in 1971;

the Rio de Janeiro international airport in 1971 and the Rio de Janeiro State University in 1972.

More recently, the OEC Group has been involved in some of the largest construction projects in

Brazil's modern history including the giant Hydroelectric Dam of Belo Monte (which, by itself,

employed approximately 30,000 employees in Brazil's developing Northern region), some

stadiums for the 2014 World Cup and some of the main buildings used in the 2016 Olympics.

Throughout its history, the OEC Group has been a leader in innovative engineering practices and

sustainability.

8.      The OEC Group employs 8,615 people, the majority of which are Brazilian, and is

one of the largest construction companies in the world.   As described in more detail below, the

OEC Group's gross revenues more than tripled between 2008 and 2015 from BRL17 billion

(approximately $3.09 billion)[3] to BRL58 billion (approximately $10.54 billion).   This prosperity,

combined with the nature of the construction sector, which requires large amounts of investments,

---

[3]      Reference to USD conversion herein was calculated using a USD/BRL exchange rate $1 = BRL5.5006, the
Federal Reserve USD/BR rate as of November 13, 2020.

led the OEC Group to turn to the U.S. capital markets to raise funds. As described in more detail

below, from 2009 to 2014 the ODB Group raised capital through a series of notes guaranteed by

the Debtors, of which $3.4 billion remains outstanding and is being restructured through the

Restructuring (as defined below).

9.      When the Brazilian economy entered a recession in mid-2014, the public sector,

the main driver for civil construction and infrastructure works, drastically reduced its investment

in the types of projects the OEC Group provides. The recession and the impact of Operation *Lava-*

*Jato* also put already contracted work on hold and from 2014 to 2019, OEC lost approximately

$11.2 billion in cancelled contracts and faced significant challenges in obtaining new projects due

to lower demand for infrastructure projects in countries where the OEC Group operates.

10.     Additionally, and at around the same time, the Federal Police of Brazil began a

criminal investigation (known as "Operation *Lava-Jato*") into allegations of money laundering and

corruption which implicated the ODB Group. Operation *Lava-Jato* further increased the OEC

Group's difficulty in accessing financing (both domestically and internationally), maintaining

existing accounts and developing new business in Brazil and elsewhere. In addition, certain

business counter-parties terminated or suspended a number of contracts for infrastructure works

abroad, large payments due to the OEC Group for completed projects were withheld, and various

new projects were temporarily shut down.

11.     As discussed more fully below, despite attempts to normalize and continue

operating the business in the ordinary course, due to the macro-environment in Brazil and the

lingering impact of Operation *Lava-Jato*, the OEC Group did not have the necessary liquidity to

meet all its short- and medium-term financial obligations. The OEC Group focused on

implementing changes to overcome this crisis including selling certain assets, deleveraging and

engaging in discussions with its creditors to restructure liabilities.  Through the Brazilian EJ

Proceedings, the OEC Group expects to be able to complete its restructuring process and de-lever

its balance sheet to reflect current economic conditions.

> *ii.    The OEC Group's Corporate Structure and Offices*

12.    The OEC Group's operational and economic activities are primarily concentrated

in Brazil.  The OEC Group is a leader in engineering & construction sector in Brazil.  The OEC

Group's corporate structure reflects its history of financings, expansions, strategic investments,

and acquisitions, as well as its corporate strategy of allocating specific operations to different

corporate entities.  The chart below shows, in relevant part, a summary of the OEC Group's

corporate structure as it pertains to the Debtors and charts the role of each Debtor and related

affiliates in the OEC Group:



13.    As shown above, the Debtors and their key related affiliates are composed of:

a. **The "<u>Holding Company</u>"** – Debtor OEC serves as the OEC Group's holding company and the entity that makes the strategic decisions for the OEC Group. It is incorporated in Brazil, its registered office is in Brazil and its headquarters are located in São Paulo, São Paulo, Brazil. It coordinates activities, makes strategic decisions and fosters the development of the OEC Group.

b. **The "<u>Operating Entities</u>"** – Debtors CNO and OECI are Brazilian-incorporated companies which are the operating arms of OEC, coordinating operations of the most diverse engineering and construction projects in Brazil and abroad. Their registered offices are in Brazil and their headquarters are located in São Paulo, São Paulo, Brazil.

14.     As shown above, the OEC Group has operational activities principally focused on Brazil and subject to Brazilian laws and regulations. Indeed, the OEC Group's primary operational activities are in Brazil, as is its primary operational management center, located in São Paulo, Brazil (the "<u>São Paulo Office</u>"). OECI and CNO share the same officers, all of whom are Brazilian citizens, are based in São Paulo and hold Brazilian passports. The officers are: Jayme Gomes da Fonseca Júnior, Marco Siqueira Aurélio Benito Juarez Gimenes Siqueira and Raul Ribeiro Pereira Neto. OEC has two Brazilian officers, Jayme Gomes da Fonseca Júnior and Marco Siqueira Aurélio Benito Juarez Gimenes Siqueira. The São Paulo Office maintains staff in charge of operational matters, including senior management, as well as the OEC Group's legal, human resources, finance and communication teams.

     *iii.*    *Chapter 15 Debtors*

       a.  OEC

15.     OEC is an entity organized under the laws of Brazil with its registered office in São Paulo, Brazil. OEC is a privately held company and a subsidiary of ODB. OEC is a non-operational holding company for the OEC Group and participates in all of the OEC Group's business segments through one or more of its subsidiaries. OEC is also a guarantor of a significant portion of the OEC Group's indebtedness. All of OEC's directors and officers are based in Brazil

and all decisions are made in Brazil, where its board meetings are also held.  The vast majority of its operating contracts are governed by Brazilian law.  OEC files its taxes in Brazil.

b.  CNO

16.    CNO is an entity organized under the laws of Brazil with its registered office in São Paulo, Brazil.  CNO is one of the operational entities of the OEC Group that primarily handles large-scale infrastructure construction projects, concentrates the operational assets, expertise and technical capacities of the OEC Group and acts as a member of construction consortia and as a qualified bidder (nationally or abroad).  All of its officers are based in Brazil and all decisions are made in Brazil.  Its board meetings are held online with Brazilian directors generally participating from Brazil.  CNO employs 2,249 employees, the majority of which are Brazilian.  CNO files its taxes in Brazil.

c.  OECI

17.    OECI is an entity organized under the laws of Brazil with its registered office in São Paulo, Brazil.  Similar to CNO, OECI is an operational entity within the OEC Group that primarily handles large-scale infrastructure construction projects, concentrates the operational assets, expertise and technical capacities of the OEC Group, and acts as a member of construction consortia and as a qualified bidder (nationally or abroad).  All of its officers are based in Brazil and all decisions are made in Brazil.  Its board meetings are held online with Brazilian directors generally participating from Brazil.  OECI employs 1,606 employees, the majority of which are Brazilian.  OECI files its taxes in Brazil.

**B.      The OEC Group's Operations and Capital Structure**

*i.    Debtors' Operations and Assets*

18.      The Debtors constitute the OEC Group's main business segment.  OEC has been
responsible for major construction projects in Brazil, including a new São Paulo metro line, the
Rio de Janeiro State University Campus, and the Baixo Igauçu Hydroelectric Plant.  CNO and
OECI are the operating entities that bring together the operational assets, expertise and technical
capacities of the OEC Group to achieve some of the most complex engineering and construction
projects in the world.

19.      In 2019, OEC's gross revenue, earned through the many subsidiaries controlled by
OEC, totaled approximately BRL5.2 billion (approximately $945.35 million).  OEC's main assets
are its backlog of construction contracts with projects to be completed in Angola, Brazil, Panama
and other countries.  It also holds equity in the OEC Group's subsidiaries which operate in a variety
of segments such as those described above.  Nearly 100% of those direct equity interests are
located in Brazil.

20.      CNO's main assets are also its backlog of construction contracts with projects to be
completed in Angola, Brazil, Panama and other countries.  OECI similarly holds backlogs of future
projects to be completed in Brazil, the United States and Angola.  As explained in further detail
below, each of the Debtors also holds assets in the United States.  Both CNO and OEC are also
defendants in two securities litigations in the Southern District of New York.

*ii.    Debtors' Capital Structure*

21.      The OEC Group's controlling structure is composed of layers of different holding
companies, culminating with members of the Odebrecht family, as well as a minority participation
held by other shareholders, including an entity and individuals.  Specifically, OEC's shares are

held almost entirely by ODB,[4] with ODBINV S.A. – Em Recuperação Judicial ("ODBINV") holding one share.  In turn, ODB's shares are held almost entirely by ODBINV, with another holding company called Kieppe Participações e Administração Ltda. – Em Recuperação Judicial ("KIEPPE") holding one ODB share.  ODBINV's shares, for their part, have KIEPPE holding 79.68% of ODBINV stock, while a remaining 20.32% is held by minority shareholders.  KIEPPE is in turn controlled by yet another holding company (Kieppe Patrimonial S.A.), whose stock is divided among the holding companies of the members of the Odebrecht family.  This information is synthesized in the chart below:



---

[4]      ODB is a Brazilian company that this Court has determined has its center of main interest in Brazil.  See Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Odebrecht, S.A., No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.

22.     As of the commencement of the Brazilian EJ Proceeding, the Debtors' consolidated capital structure included the Existing Notes (as defined below), loans and bank credit facilities. On its most recent financial report, OEC disclosed an aggregate amount of indebtedness of approximately BRL3.03 billion (approximately $550.85 million) on its balance sheet as of December 31, 2019.  The issuances of bonds are detailed below.  No indebtedness or claims other than the obligations detailed herein were affected by the Brazilian Reorganization Plan.

        *iii.     The Debtors' Bond Issuance*

23.     ODB Debtor, Odebrecht Finance Ltd. ("OFL"),[5] has issued US$72,726,000 of 7.00% Senior Notes due 2020 (the "2020 Senior Notes") under an indenture dated October 21, 2009, which is guaranteed by OEC, CNO, and OECI.  Bank of New York Mellon is the trustee (the "Trustee").  The total outstanding amount due in connection with the principal and interest amortization related to the 2021 Notes is $82,919,761.[6]

24.     OFL has issued US$143,020,000 of 5.125% Notes due 2022 (the "2022 Notes") under an indenture dated June 26, 2012 by and among OEC, CNO and OECI as guarantors, and the Trustee.  The total outstanding amount due in connection with the principal and interest amortization related to the 2022 Notes is $161,092,662.71.[7]

25.     OFL has issued US$101,561,000 of 6.00% Notes due 2023 (the "2023 Notes") under the indenture dated April 5, 2011 by and among OEC, CNO and OECI as guarantors, and

---

[5]     OFL is subject to a Chapter 15 case before this Court and this court has determined that its center of main interest is in Brazil.  See Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Odebrecht, S.A., No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 22.

[6]     Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

[7]     Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

the Trustee. The total outstanding amount due in connection with the principal and interest amortization related to the 2023 Notes is $114,258,946.14.[8]

26.    OFL has issued US$518,600,000 of 4.375% Notes due 2025 (the "2025 Notes") under the indenture dated April 25, 2013 by and among OEC, CNO and OECI as guarantors, and the Trustee.  The total outstanding amount due in connection with the principal and interest amortization related to the 2025 Notes is $580,073,907.64.[9]

27.    OFL has issued US$500,000,000 of 5.25% Notes due 2029 (the "2029 Notes") under the indenture dated June 27, 2014 by and among OEC, CNO and OECI as guarantors, and the Trustee.  The total outstanding amount due in connection with the principal and interest amortization related to the 2029 Notes is $564,010,416.67.[10]

28.    OFL has issued US$840,150,000 of 7.125% Notes due 2042 (the "2042 Notes") under the indenture dated June 26, 2012 by and among OEC, CNO and OECI as guarantors, and the Trustee. The total outstanding amount due in connection with the principal and interest amortization related to the 2042 Notes is $981,633,593.75.[11]

29.    Additionally, US$750,000,000 of unsecured perpetual notes (the "Perpetual Notes" and, together with the 2020 Senior Notes, the 2022 Notes, the 2023 Notes, the 2025 Notes, the 2029 Notes, and the 2042 Notes, the " Existing Notes") were issued by OFL with OEC, CNO and OECI as guarantors and the Trustee under that certain indenture dated as of September 14, 2010. The Perpetual Notes are "perpetual" in nature with no fixed final maturity date or sinking fund

---

[8]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

[9]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

[10]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).  As explained in Schedule H, this amount includes BRL3,722,468.75 (approximately $676,738.67) of credits held by Worldwide Insurance Solutions Ltd., a subsidiary of ODB.

[11]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

provisions and bear an annual interest rate of 7.50%. The total outstanding amount due in connection with the principal and interest amortization related to the Perpetual Notes is US$870,395,833.33.[12]

30.    Based on the offering documents, the Debtors believe that creditors of OEC, CNO and OECI have always been fully on notice that any restructuring of their obligations could take place in Brazil and their investment was made with the expectation their purchases would be repaid with revenues earned largely in Brazil from operations largely subject to Brazilian legal and regulatory regimes. Additionally, OEC, CNO and OECI's obligations to creditors derive their creditworthiness and expectations of repayment from revenue earned largely in Brazil from Brazilian client groups. The Existing Notes themselves consistently make reference to Brazilian rules, regulations, institutions and other Brazilian concepts. Moreover, the definitions outlined in the Existing Notes' introductory clauses are filled with examples of Brazilian elements. The definition of "Bankruptcy Law" in every note references Brazilian Bankruptcy Law as well as United States and Cayman law. "Reference Banks", for instance, means Brazilian banks. The Brazilian Securities Commission (*Comissão de Valores Mobiliários*) is defined and, with regard to noticing, the issuer is required to comply with applicable Brazilian law and regulations issued by the *Comissão de Valores Mobiliários*. "Brazilian Corporate Law" is defined as Brazilian Federal Law No. 6.404/76, as amended. The definition of "GAAP" in most Existing Notes references primarily Brazilian accounting rules. Although the Existing Notes are governed by New York law, New York is elected as a "non-exclusive" forum for dispute resolution.

---

[12]    Calculated as of August 18, 2020 (*see* Schedule H of the Brazilian Reorganization Plan).

C.    **Events Precipitating Commencement of the Brazilian EJ Proceeding**

      i.    *General Economic Conditions in Brazil*

31.    Between 2008 and 2015, the gross revenue of the OEC Group jumped from BRL17 billion (approximately $3.09 billion) to BRL58 billion (approximately $10.54 billion).  As a result, the number of jobs generated by the larger ODB Group also increased, and the number of employees increased, reaching a peak of 125,000 in 2013.  A growth of this magnitude, in a short period of time, required raising significant capital.

32.    The ODB Group thus turned to the U.S. capital markets.  However, around mid-2014, the Brazilian economy entered a recession.  Consequently, the public sector and private sector severely reduced their demand for construction projects and infrastructure.  As a result, infrastructure investments, which averaged BRL967 billion between 2011 and 2014, plummeted substantially in the following years to around BRL28 billion in 2018.  A combination of political instability, record governmental budget deficits and a contracting economy chilled foreign investment in Brazil and froze the Brazilian capital markets.  Public financial institutions, which had been traditional financiers of infrastructure operations, reduced the availability of credit.  Similarly, private institutions were more conservative in their allocation of new financing.

      ii.    *Operation* Lava-Jato

33.    At the same time and as discussed in the ODB Petition, the Federal Police of Brazil began Operation *Lava-Jato*, investigating allegations of money laundering and corruption which led to increased difficulty in accessing financing and new business in Brazil and elsewhere.  In addition, counter-parties terminated or suspended a number of contracts for infrastructure works abroad, large payments due to the OEC Group for completed projects were withheld and various new projects were temporarily shut down.

34.    Since the beginning of the investigation, the ODB Group, including the OEC
Group, has made significant investments in the areas of compliance, employee training and ethical
development.    The ODB Group cooperated with the investigators and entered into numerous
agreements with the Brazilian government and other regulatory bodies.  In December 2016, ODB
signed a leniency agreement with the Federal Public Ministry ("MPF") of Brazil, the United States
Department of Justice ("DOJ") and the Swiss Attorney General's Office, under which the ODB
Group agreed to pay an aggregate amount of BRL3.83 billion (approximately $696.29 million)
over twenty-three years (the "Global Agreement").  On August 8, 2019, the Global Agreement
was amended and OEC became a joint guarantor for future payments due thereunder.  As such,
the Company has included such payments in its business plan.  In connection with the Global
Agreement, the MPF undertook (i) not to file any civil lawsuits or take any additional actions for
purposes of the reimbursement of amounts due through Operation *Lava-Jato*, (ii) not to impose
any administrative improbity sanctions on the ODB Group, and (iii) to work together with public
authorities, state-owned companies and mixed capital companies in order to lift any restrictions
(commercial or otherwise) in place against ODB, OEC and its subsidiaries.

35.    In July 2018, the ODB Group entered into a leniency agreement with the Attorney
General's Office ("AGU"),   the Ministry of Transparency and the Brazilian Government
Accountability Office under which it undertook to pay BRL2.72 billion (approximately $494.49
million) over twenty-two years.  These payments have already been partially made – for instance,
the ODB Group already paid $93 million to satisfy the obligations undertaken before the DOJ and
no further payments are owed to U.S. authorities.

36.    In addition, other leniency agreements were entered into by ODB Group entities
with the governments of Brazil, Peru, Ecuador, Guatemala, Panama, the Dominican Republic and

Switzerland.  CNO also entered into a settlement agreement with the World Bank, which was announced in January 2019.  Moreover, OEC and CNO entered into a settlement agreement with the Inter-American Development Bank announced in September 2019.  Since the beginning of the Operation *Lava-Jato*, CNO has entered into eight leniency agreements with the General Superintendence of the Brazilian antitrust agency ("CADE").  Furthermore, on November 22, 2018, CADE's court ratified six instruments of commitment to cease property (both from CNO and individuals).

37.    Despite attempts to normalize and continue operating the business in the ordinary course, due to the recent political and financial crises and the consequences of Operation *Lava-Jato*, the OEC Group's liquidity and resources were severely strained.  The ODB Group, including the OEC Group, continued to experience difficulties in obtaining new financing, especially from public financial institutions.  The ever-increasing cost of credit and the load of relevant contingent liabilities, including those due to Operation *Lava-Jato*, also made the OEC Group's access to private resources more restricted in the capital and financial markets.

iii.    *Restructuring Underway and Future Outlook*

38.    Despite having valuable assets, the Debtors did not have the liquidity to meet all their short- and medium-term financial obligations.  In 2019, in an attempt to adapt to the difficult financial condition it was facing, the OEC Group adapted its operations by reducing its backlog to $3.4 billion from $8.0 billion in 2018.  The OEC Group attempted to resize its business to reflect operational reductions, lower production to meet customers' payment capacity and lower backlog additions due to low demands for infrastructure works in the countries where the OEC Group operates.  Despite these attempts to deleverage, OFL and the Debtors were unable to make any

interest payments on the Existing Notes since October 2018 and did not expect to be able to meet future payment obligations on the Existing Notes under their terms and conditions.

39.     In response to this liquidity crisis, since late 2018, the Debtors, with the assistance of their financial and legal advisors, Moelis & Company, Cleary Gottlieb Steen & Hamilton and E. Munhoz Advogados, took steps to restructure its liabilities through negotiations with the ad hoc group of holders of the Existing Notes (the "Ad Hoc Group").

40.     The OEC Group expects that the engineering and construction sectors will recover as Brazil is already seeing an increase in civil construction projects in large urban centers. After years of decline, the GDP of the construction section grew for the first time in 2019, with an increase of 2% compared to the same period in 2018. Furthermore, in the face of the COVID-19 pandemic, the Brazilian government has been discussing a national restructuring project, including significant investments in public works and public infrastructure. The government has shared an intention to invest around BRL30 billion (approximately $5.45 billion) in the infrastructure over the next three years. Through the Brazilian EJ Proceeding, the OEC Group is fully convinced that it will have the opportunity to participate in the government's competitive bidding process and strengthen their position in the engineering and construction sectors.

**D.      The Brazilian EJ Proceeding and Brazilian Reorganization Plan**

*i.      Overview of Restructuring and Brazilian EJ Proceeding*

41.     In June of this year, the Debtors finalized the terms of an agreed plan of reorganization to restructure the Existing Notes (the "Brazilian Restructuring Plan") setting forth the restructuring contemplated transactions (the "Restructuring"). A copy of the Brazilian Reorganization Plan, which was submitted to and approved by the Brazilian Court in both Portuguese and English, is attached hereto as Exhibit A. As set forth in greater detail below, under the Restructuring, the obligations of OEC, CNO and OECI in their capacity as obligors under each

series of Existing Notes (the "Guarantee Obligations") will be released and cancelled, and the OEC

Group will issue to holders thereof their respective pro rata shares of (i) a new series of Senior

Unsecured Notes (the "New Notes"), in each case, in an aggregate principal amount equal to 45%

of the sum of outstanding principal and unpaid interest accrued under the corresponding series of

Existing Notes through the date on which all events listed as "Conditions for Effectiveness" of the

Brazilian Reorganization Plan shall have occurred or been waived with respect to the Restructuring

(the "Effective Date") and (ii) dollar denominated units of a participating debt instrument, in an

aggregate principal amount equal to 55% of the sum of outstanding principal and unpaid interest

accrued under the corresponding series of Existing Notes through the Effective Date, entitling

holders thereof to a specified percentage of future distributions to be made by OEC S.A. ("New

OEC") (the "Instrument", and together with the New Notes, the "New Securities").  Each series of

New Notes shall be issued under a new indenture among OEC Finance Limited, a Cayman Islands

corporation, as issuer (the "New Issuer"), New OEC, CNO, OECI, OENGER S.A. ("OENGER")

as guarantors and any additional guarantors as defined in the Brazilian Reorganization Plan, The

Bank of New York Mellon, as trustee, registrar and transfer agent (the "New Notes Trustee"), and

the other parties thereto (collectively, the "New Notes Indentures").  The Instrument shall be issued

under an indenture among Odebrecht HoldCo Finance Limited, a Cayman Islands corporation, as

issuer (the "Instrument Issuer" and, together with the New Issuer, the "New Issuers") and The

Bank of New York Mellon, as trustee (the "Instrument Trustee") (the "Instrument Indenture" and,

together with the New Notes Indentures, the "New Indentures").

42.    On June 15, 2020, the OEC Group, with support of the Ad Hoc Group, sent a

consent solicitation statement to all holders of the Existing Notes (the "Consent Solicitation")

seeking consents to the Restructuring.  Having received support from 73% of the aggregate claims

in respect of the Existing Notes on August 19, 2020 the Debtors jointly filed petitions for the commencement of the Brazilian EJ Proceeding with the Brazilian Court after the Board of Directors of each of OEC unanimously resolved (the "Authorizing Resolutions") to recommend the Brazilian EJ Proceeding related to OEC, CNO and OECI to its shareholders.  Upon the recommendation of the Board of Directors, the shareholders of each of OEC, CNO and OECI approved the commencement of the Brazilian EJ Proceeding.  Consistent with Brazilian Bankruptcy Law, the Debtors submitted the Brazilian Reorganization Plan to the Brazilian Court concurrently with the commencement of the Brazilian EJ Proceeding.

43.    The day after the Debtors filed such petition, OEC issued a press release (the "OEC Press Release"), a copy of which was posted on its website, to provide public notice of the filing. A copy of the OEC Press Release in English is attached hereto as Exhibit B.  On September 1, 2020 the Brazilian Court entered an interlocutory order, accepting the filing of the Brazilian EJ Proceeding, granting the requested preliminary 180-day stay of all collection proceedings commenced by creditors subject to the Brazilian EJ Proceeding against the Debtors and ordering the publication of a public notice informing affected creditors of the filing of the Brazilian EJ Proceeding and the deadline to submit oppositions to OEC's proposed Brazilian Reorganization Plan (the "Initial Court Order").  A copy of the Initial Court Order and a certified English translation thereof are attached hereto as Exhibit C.

44.    On September 10, 2020, OEC published a notice in the Official Court Gazette circulation newspaper (the "Court Gazette" and such notice, the "Publication Notice"), providing notice of the Brazilian Reorganization Plan to all of the creditors subject to the plan, notifying them of the opportunity to object during the 30-calendar-day objection period.  The Publication Notice was also published on the same date in *Valor Econômico*, a newspaper with nationwide

coverage in Brazil.  Copies of the Publication Notice are attached hereto as <u>Exhibit D</u>.  The Debtors
have also provided notice to the creditors subject to the Brazilian EJ Proceeding through letters
and other communications addressed to the Trustee, as provided for under Brazilian Bankruptcy
Law.

45.     The Brazilian EJ Proceeding is proceeding under the Brazilian Bankruptcy Law,
which provides for a restructuring process known as a *recuperação extrajudicial*.  As described in
more detail in the Brazilian Counsel Declaration, this proceeding functions similarly to a
prepackaged chapter 11 proceeding under the Bankruptcy Code.   In an extrajudicial
reorganization, the plan is presented for confirmation at the outset of the case with prearranged
creditor support.  For the plan of reorganization to be approved under the Brazilian Bankruptcy
Law, it must be accepted by more than 60% in amount of each group of impaired creditors subject
to the plan.  After a debtor files a plan approved by a sufficient number of creditors, a Brazilian
court must be satisfied that all applicable legal requirements, including the filing of financial
statements, creditor lists and other documents, and the publication notices to affected creditors,
have been fulfilled.  Once the plan is approved by the Brazilian Court, it is binding on all affected
creditors, including any dissenting creditors.

46.     On October 26, 2020, the Brazilian Court issued an order confirming the Brazilian
Reorganization Plan (the "<u>Brazilian Confirmation Order</u>").  A copy of the Brazilian Confirmation
Order and a certified English translation thereof are attached hereto as <u>Exhibit E.</u>

        *ii.     The Terms of the Restructuring*

47.     Under the Brazilian Reorganization Plan, holders of the Existing Notes will receive
their respective pro rata shares of (i) the New Notes, in each case, in an aggregate principal amount
equal to 45% of the sum of outstanding principal and unpaid interest accrued under the

corresponding series of Existing Notes through the Effective Date, and (ii) dollar denominated units of the Instrument to be issued by the Instrument Issuer, in an aggregate principal amount equal to 55% of the sum of outstanding principal and unpaid interest accrued under the corresponding series of Existing Notes through the Effective Date.

48.      The New Notes will be issued in seven series, each of which will correspond to a series of Existing Notes, subject to adjustments of interest rate, maturity[13] and other terms and conditions discussed in the Brazilian Reorganization Plan.  The New Notes will be issued by the New Issuer, a Cayman Islands corporation formed on December 19, 2019 for the sole purpose of issuing the New Notes and the other limited transactions.  The New Notes will be fully guaranteed by New OEC, CNO, OECI and OENGER (collectively, the "Initial Guarantors").  In addition, the New Notes may benefit from additional guarantees from, direct or indirect, significant subsidiaries of New OEC.  This is subject to carve-outs that permit New OEC to establish and maintain non-guarantor subsidiaries to serve as project companies, members of construction consortia, qualified bidders (nationally or abroad), holding shell companies and special purpose vehicles established for tax structuring purposes, as well as companies whose equity capital is held by New OEC and one or more unaffiliated third parties for the purpose of directly or indirectly bidding on new projects (but not, for the avoidance of doubt, to enter into any liability management or other extraordinary financing transactions that would have a layering or dilutive impact on the New Notes, except as permitted under the Brazilian Reorganization Plan) (any such additional guarantors, together with the Initial Guarantors, are referred to herein as the "Guarantors").

---

[13]      New maturity dates for each series of New Notes are expected to be the following: (a) 7.000% Notes: October 21, 2024 (original maturity date April 21, 2020); (b) 5.125% Notes: December 26, 2026 (original maturity date June 26, 2022); (c) 6.000% Notes: October 5, 2027 (original maturity date April 5, 2023); (d) 4.375% Notes: October 25, 2029 (original maturity date April 25, 2025); (e) 5.250% Notes: December 27, 2033 (original maturity date June 27, 2029); (f) 7.125% Notes: December 26, 2046 (original maturity date June 26, 2042); and (g) 7.000% Perpetual Notes: N/A.

49.    Each series of New Notes will bear interest at a rate per annum equal to that of the corresponding series of Existing Notes for which such series is being exchanged, subject to a PIK premium if New OEC exercises its PIK Option (as defined below).   In accordance with the schedule below, New OEC shall have the option, in its sole discretion, to either pay interest on each series of New Notes (i) in cash at the interest rate corresponding to such series of New Notes or (ii) in lieu of paying full cash interest, capitalize all or a portion of such interest by adding it to the principal amount of such New Notes on the applicable interest payment date (the "PIK Option").

| PIK Option Period | Minimum Share of Interest in Cash | Maximum Share of Interest as PIK | PIK Premium |
|---|---|---|---|
| From (and including) the Effective Date through (and including) the second-year anniversary of the Effective Date | 0.0% | 100.0% | 50% of applicable cash interest rate |
| From (but excluding) the second-year anniversary of the Effective Date through (and including) the third-year anniversary of the Effective Date | 7.5% | 92.5% | 50% of applicable cash interest rate |
| From (but excluding) the third-year anniversary of the Effective Date through (and including) the fourth-year anniversary of the Effective Date | 35.0% | 65.0% | 50% of applicable cash interest rate |
| From (but excluding) the fourth-year anniversary of the Effective Date through (and including) the fifth-year anniversary of the Effective Date | 70.0% | 30.0% | 75% of applicable cash interest rate |

50.    Subsequent to the fifth-year anniversary of the Effective Date, interest on each series of New Notes shall be paid only in cash at the corresponding cash interest rate.   For each series of New Notes, the first interest payment shall be calculated based on the period from the

Effective Date through the first interest payment date of such series.  For each series of New Notes,

the PIK Option terms set forth above shall apply to the portion of the interest period that falls

within the applicable PIK Period.  If New OEC fails to pay any interest on New Notes when it

becomes due and such nonpayment continues for a period of 30 days, New OEC shall pay, in

addition to the unpaid defaulted interest, (i) interest on such defaulted interest at 1.5% in excess of

the rate borne by the applicable series of New Notes and (ii) additional interest on the then

outstanding principal of the applicable series of New Notes at 1.5%.

51.    In addition to the New Notes, holders of the Existing Notes will also receive the

Instrument, which will be issued under the Instrument Indenture among the Instrument Issuer and

the Instrument Trustee.  The initial face amount of the Instrument will be equal to the difference

between (i) the sum of the principal and accrued and unpaid interest (including default interest) of

the Existing Notes, as of the Effective Date minus (ii) the face amount of the New Notes as of the

Effective Date.  The Instrument will not bear interest and payments made to holders shall apply,

on a dollar-for-dollar basis, to reduce the outstanding face amount of the Instrument, up to the full

face amount of the Instrument unless earlier redeemed pursuant to the terms of the Instrument

Indenture.  The Instrument will mature on September 10, 2058.

52.    The Brazilian Reorganization Plan provides for certain corporate governance

provisions, including that the New OEC board of directors must be comprised of a minimum

number of independent directors equivalent to the greater of (i) 20% of all members or (ii) two.  In

addition, New OEC Board's finance and risk committee and integrity and audit committee must

be comprised of at least one independent director  and a majority of independent directors on an

ongoing basis, respectively, pursuant to the terms of the Brazilian Reorganization Plan.  The

independent directors shall be appointed by the shareholders and elected from time to time, and

shall at all times meet the requirements of independence as provided in the Brazilian Reorganization Plan. In the event the number of independent directors drops below the minimum threshold, the New OEC board of directors and its committees will be subject to restrictions as to which matters may be deliberated on until the required independent directors' thresholds are met.

53.     Pursuant to the Brazilian Reorganization Plan, supporting creditors have appointed Pinheiro Neto Advogados (the "Creditor Representative") as their creditor representative with powers to, among other matters (subject to the terms of the Brazilian Reorganization Plan): approve certain documentation to implement the proposed Restructuring, including the New Indentures and final Brazilian Reorganization Plan; appoint, consent to or not object to at least one independent director to comprise the initial slate of independent directors as provided for in the Brazilian Reorganization Plan; and waive any condition precedent to closing or early termination event, among other matters. Pursuant to the terms of the Brazilian Reorganization Plan, the Creditor Representative was to act according to its sole discretion and judgment in seeking the confirmation and implementation of the Brazilian Reorganization Plan for the benefit of the noteholders and pursuant to the terms and conditions provided for in the Brazilian Reorganization Plan and its schedules. The Creditor Representative has no obligation, but is entitled to, at its sole discretion, consult with and obtain instructions, formally or informally, from the noteholders or a subset thereof in connection with any matters submitted to the Creditor Representative, pursuant to the terms of the Brazilian Reorganization Plan. The Creditor Representative has the right, but no obligation, to take action or abstain from taking action pursuant to Brazilian Reorganization Plan if such Creditor Representative is not properly indemnified and/or does not timely receive or receive contradictory or inconsistent instructions from the noteholders or a subset thereof in connection with any matters submitted to the Creditor Representative. Noteholders representing

more than 40% of the claims subject to the Brazilian Reorganization Plan may, as provided in the
Brazilian Reorganization Plan and subject to certain conditions, override certain decisions taken
by the Creditor Representative to grant waivers, accept changes or extend the Drop-Dead Date (as
defined in the Brazilian Reorganization Plan).

54.     The Brazilian Reorganization Plan is a significant step towards restructuring the
OEC Group, and resolving the issues with its creditors and right-sizing the OEC Group's capital
structure in order to provide an optimal competitive platform for its businesses. Brazilian
extrajudicial reorganization, like a prepackaged case under U.S. Bankruptcy Law, allows for an
expeditious and cost-effective reorganization process that will maximize the OEC Group's going
concern value, and consummation of the Brazilian Reorganization Plan offers the OEC Group and
its creditors a clear path to a revitalized OEC Group, well-positioned to preserve and build its
business.

55.     In the Brazilian EJ Proceeding, noteholders representing 73% of the aggregate
claims in respect of the Existing Notes voted to support the Brazilian Reorganization Plan.  No
objections were filed in the Brazilian Court.

56.     The Debtors took all appropriate steps to ensure that all affected creditors were
informed of their rights and obligations under the Brazilian Reorganization Plan in the Brazilian
EJ Proceeding.  Also, as further explained in the Brazilian Counsel Declaration, after the
publication of the Initial Court Order in the Publication Notice in the Court Gazette (which put all
of the Debtors' creditors on notice), any party in interest could file an objection to the Brazilian
Reorganization Plan within a 30-day period.  To consummate the Brazilian Reorganization Plan,
the Debtors expect to issue a notice to the Existing Noteholders through the DTC Lens system,
informing them of the imminent issuance of the New Notes.

57.     The Debtors have determined, in consultation with the Trustee and the Ad Hoc Group, that the Chapter 15 Cases are necessary to avoid potentially irreparable harm to the Debtors' creditors and businesses and to facilitate the Brazilian EJ Proceeding by ensuring that creditors cannot attempt to circumvent the Brazilian EJ Proceeding by taking action against the Debtors in the United States.  In addition, in connection with negotiations regarding creditor support for the Brazilian Reorganization Plan, the Debtors' creditors required that consummation of the restructuring be conditioned upon an order of this Court recognizing the Brazilian EJ Proceeding and enforcing the Brazilian Reorganization Plan in the United States.  As such, an order of the Bankruptcy Court recognizing the Brazilian EJ Proceeding and recognizing, enforcing and giving full force and effect to the Brazilian Reorganization Plan is one of the conditions precedent to consummation of the Restructuring under the Brazilian Reorganization Plan.  The Petitioner requests an injunction against any potential proceedings that would challenge or undermine the Brazilian EJ Proceeding or would seek payment or other relief with respect to the Existing Notes, which are being compromised in the Brazilian Reorganization Plan,[14] and to obtain the cooperation of the Trustee and the Depository Trust Company (the "DTC") in effecting the terms of the Brazilian Reorganization Plan in the United States by, inter alia, (a) obtaining the Court's recognition of the Brazilian EJ Proceeding as a foreign main proceeding, or in the alternative, recognition of the Brazilian EJ Proceeding as a foreign nonmain proceeding and (b) recognizing, enforcing and giving full force and effect to the Brazilian Reorganization Plan in the United States.

---

[14]     The Debtors are not seeking a stay under Section 1521 of the Bankruptcy Code of the two pending litigations, Washington State Investment Board v. Odebrecht S.A., (Case No. 17-08118) and DoubleLine Capital LLP et al. v. Odebrecht Finance Ltd. et al., (Case No. 17-04576), in the Southern District of New York.

58.    Pursuant to the Resolutions of Appointment (the "Appointment Resolutions"), the

Foreign Representative, with respect to each of the Debtors, has been (i) appointed to act as the

foreign representative of the Brazilian EJ Proceeding for such Subsequent Debtor for purposes of

these Chapter 15 Cases and (ii) authorized to commence these Chapter 15 Cases with respect to

such Subsequent Debtor as the foreign representative of the OEC Group in connection with this

Chapter 15 Case.  True and correct copies of the Resolutions appointing the Foreign Representative

are attached to the Verified Petition as Exhibit B, Exhibit C, and Exhibit D.

**E.    Connections to the United States and this District**

59.    Each of the Debtors have property in the United States.  OECI and CNO hold

property in the United States in the form of bank accounts and contracts with U.S. entities.  OECI

also holds U.S. property in the form of vehicles.  Additionally, Cleary Gottlieb Steen & Hamilton

LLP holds certain unused retainers from all the Debtors in a bank account in New York, New York

in connection with certain legal services retained in respect of these Chapter 15 Cases.  Davis Polk

& Wardwell LLP also holds a certain unused retainer in the amount of approximately $250,000

from all the  Debtors in a bank account in New York, New York in connection with certain legal

services retained in respect of the Restructuring.   Lastly, both CNO and OEC are defendants in

two securities litigations pending in the Southern District of New York.

**REQUESTS FOR RECOGNITION AND RELATED RELIEF**

60.    In connection with the filing of this chapter 15 proceeding, the Debtors have

submitted the Motion.  The Motion seeks entry of an order that, *inter alia*: (a) grants the petitions

in the Chapter 15 Cases, including the Motion, and recognizes the Brazilian EJ Proceeding as a

foreign main proceeding for each of the Debtors (or, in the alternative, as a foreign nonmain

proceeding) pursuant to section 1517 of the Bankruptcy Code; (b) recognizes Adriana Henry

Meirelles as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code,

with respect to the Brazilian EJ Proceeding, entrusting him with the administration of the Debtor's assets within the territorial jurisdiction of the United States; (c) recognizes and enforces the Brazilian Reorganization Plan in the United States and gives full force and effect to and grants comity in the United States to the Brazilian Confirmation Order entered by the Brazilian Bankruptcy Court on October 26, 2020; (d) authorizes and directs the U.S. Intermediaries (as defined in the Motion) to take any and all actions necessary to give effect to the terms of the Brazilian Reorganization Plan including, without limitation, the release and cancellation of the Guarantee Obligations under the Existing Notes, as applicable, and the issuance and distribution of the New Securities, and any actions related thereto; (e) permanently enjoins all parties from commencing, continuing or taking any action in the United States to obtain possession of, exercise control over, or assert claims against the Debtors or their property; and (f) grants such other and further relief as the Court deems just and proper.

61.    I believe that the Brazilian EJ Proceeding is a "foreign proceeding" as I have been advised that term is defined in Bankruptcy Code section 101(23).  To the best of my knowledge, information and belief, the Brazilian EJ Proceeding is a collective judicial proceeding under a Brazilian law relating to insolvency or adjustment of debt in which the assets and affairs of the Debtors are subject to control or supervision by a Brazilian court, for the purposes of reorganization or liquidation.

62.    Additionally, I believe that the Brazilian EJ Proceeding is a "foreign main proceeding" as I have been advised that term is defined in Bankruptcy Code section 1502(4).  Each of the Debtors in these Chapter 15 Cases has its registered office in Brazil and has its center of main interests in Brazil.  The vast majority of the Debtors' operations have taken place in Brazil and are performed primarily in Brazil by Brazilian-citizen employees of a Brazilian Debtor.  Brazil,

where the Brazilian EJ Proceeding is occurring, is therefore the center of main interests of the OEC
Group within the meaning ascribed in Bankruptcy Code section 1516(c).

63.     In addition, I believe that the additional assistance requested from the Court is
appropriate.  The relief requested in the Motion will give clear direction and authority under United
States law to the Trustees and DTC to carry out the requirements of the Brazilian Reorganization
Plan in accordance with Brazilian law and the Brazilian Confirmation Order.

64.     My counsel has also advised me that the automatic stay is one of the most
fundamental protections provided by the Bankruptcy Code.  I have been advised that it halts all
collection efforts, harassment and foreclosure actions against debtors and provides them with the
necessary breathing room to step back from and attempt to resolve the financial pressures that
caused a bankruptcy filing.

65.     I believe that the Debtors may suffer irreparable harm if a stay of actions by
recalcitrant creditors in the United States is not granted by the Court.  The Brazilian Reorganization
Plan would be subject to early termination in accordance with its terms if the filing of adversary
proceedings or other enforcement actions in the United States by creditors were to cause a
materially adverse effect on the content, timing or implementation of the Brazilian Reorganization
Plan or the transactions contemplated thereby, or the business, operations, assets or financial
conditions of the Debtors.  I believe that any such filing would cause significant disruption to the
Debtors and their management during the implementation of the Brazilian Reorganization Plan.
Preventing any such filing or other enforcement action that could disrupt the Brazilian EJ
Proceeding or threaten the Debtors' foreign estates is necessary to ensure the success of the
Brazilian EJ Proceeding, which the Debtors anticipate will result in their successful reorganization
and a fair distribution to creditors, pursuant to orders of the Brazilian Court.

66.     I also believe that the Debtors' creditors and other stakeholders will suffer little, if any, harm as a result of the requested relief as it will merely preserve the status quo.  To the extent that any creditor wished to voice objections to the Brazilian Reorganization Plan, such objections were properly heard by the Brazilian Court, and, therefore, the Debtors' creditors will not be adversely affected by a stay in the United States.

67.     As the foreign representative of the Debtors, I have directed our United States counsel, Cleary Gottlieb Steen & Hamilton LLP, to (i) commence this Chapter 15 Case for the Debtors; (ii) seek recognition of the Brazilian EJ Proceeding as a "foreign main proceeding"; and (iii) seek recognition and enforcement of the Brazilian Reorganization Plan in the United States. All certified documents, statements, lists and documents required under chapter 15 of the Bankruptcy Code and the Bankruptcy Rules have been filed contemporaneously herewith.

## Conclusion

68.     Based on the foregoing, I believe that the relief being requested at the outset of the Chapter 15 Cases is well-justified, necessary under the circumstances, in the best interests of the Debtors and their creditors and should be granted.

*[Remainder of page left intentionally blank; signature page follows]*

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is, to the best of my knowledge, information and belief, complete, true and correct.


Executed on this 24th day of November, 2020
in São Paulo, State of São Paulo, Brazil.


/s/ Adriana Henry Meirelles
Adriana Henry Meirelles