## Exhibit A

**OEC Plan**

| **PLANO DE RECUPERAÇÃO EXTRAJUDICIAL** | **EXTRAJUDICIAL RESTRUCTURING PLAN** |
|---|---|
| celebrado por e entre, | executed by and between, |
| de um lado, conjuntamente como Devedoras, | on the one hand, jointly as Debtors, |
| **CNO S.A.** | **CNO S.A.** |
| **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.** | **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.** |
| **OECI S.A.** | **OECI S.A.** |
| como intervenientes anuentes, | as intervening consenting Parties, |
| **OENGER S.A.** | **OENGER S.A.** |
| **OEC FINANCE LIMITED** | **OEC FINANCE LIMITED** |
| **ODEBRECHT HOLDCO FINANCE LIMITED** | **ODEBRECHT HOLDCO FINANCE LIMITED** |
| **OEC S.A.** | **OEC S.A.** |
| e, de outro lado, conforme definido a seguir | and, on the other hand, as defined below |
| **CREDORES SIGNATÁRIOS** | **SIGNATORY CREDITORS** |
| São Paulo, 18 de Agosto de 2020 | São Paulo, August 18th, 2020 |

1

| PLANO DE RECUPERAÇÃO EXTRAJUDICIAL | EXTRAJUDICIAL RESTRUCTURING PLAN |
|---|---|
| Este Plano de Recuperação Extrajudicial ("Plano"), datado de 18 de Agosto de 2020 ("Data de Assinatura"), é celebrado, de um lado, conjuntamente por **CNO S.A.**, sociedade anônima de capital fechado com sede na Rua Lemos Monteiro nº 120, 7º andar, Parte 'E', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº 15.102.288/0001-82 ("CNO"); **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**, sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro nº 120, 14º andar, Parte 'J', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº 19.821.234/0001-28 ("OEC"); **OECI S.A.**, sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro nº 120, 12º andar, Parte 'H', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº. 10.220.039/0001-78 ("OECI" e em conjunto com CNO e OEC, "Devedoras"); como intervenientes anuentes, **OENGER S.A.**, sociedade anônima de capital fechado com sede na Rua Lemos Monteiro nº. 120, 10º andar, Parte 'C', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº 29.229.029/0001-21 ("OENGER"); **OEC FINANCE LIMITED**, sociedade de responsabilidade limitada, com sede em PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registrada sob o nº 358433 ("Emissora das Novas Notas"); **ODEBRECHT HOLDCO FINANCE LIMITED**, sociedade de responsabilidade limitada, com sede em PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registrada sob o nº 358435 ("Holdco"); e **OEC S.A.**, sociedade anônima de capital fechado, com | This Extrajudicial Restructuring Plan ("Plan"), dated August 18th, 2020 ("Signing Date") is executed, on the one hand, jointly by **CNO S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 7th floor, Part 'E', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 15.102.288/0001-82 ("CNO"); **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 14th floor, Part 'J', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 19.821.234/0001-28 ("OEC"); **OECI S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 12th floor, Part 'H', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 10.220.039/0001-78 ("OECI" and collectively with CNO and OEC "Debtors"); as intervening consenting parties, **OENGER S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 10th floor, Part 'C', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 29.229.029/0001-21 ("OENGER"); **OEC FINANCE LIMITED**, a limited liability company, with registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registered under the no. 358433 ("New Notes Issuer"); **ODEBRECHT HOLDCO FINANCE LIMITED**, a limited liability company, with registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registered under the no. 358435 ("Holdco"); and **OEC S.A.**, a privately held corporation with registered |

2

*L.B.*

| | |
|---|---|
| sede na Rua Lemos Monteiro, no. 120, 7 floor, Part 'L', Butantã, Zip Code 05501-050, cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº 33.950.222/0001-24 ("Nova OEC"); e, de outro lado, pelos **CREDORES SIGNATÁRIOS**, conforme listados e descritos no **Anexo A** deste Plano, neste ato representados pelo Agente Mandatário (conforme definido abaixo) ("Credores Signatários"); | office at Rua Lemos Monteiro, n 120, 7 andar, Parte 'L', Butantã, CEP 05501-050, in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 33.950.222/0001-24 ("New OEC"); and, on the other hand, by the **SIGNATORY CREDITORS**, as listed and described in **Schedule A** of this Plan hereby represented by the Proxy Agent (as defined below) ("Signatory Creditors"); |
| | |
| **CONSIDERANDOS** | **RECITALS** |
| **A.** Considerando que as Devedoras são parte do Grupo OEC (conforme definido abaixo), um grupo de Devedoras sob o Controle e gestão estratégica da OEC, que presta serviços relacionados aos segmentos de engenharia, infraestrutura e construção civil, entre outros, atendendo a clientes dos setores públicos e privados; | **A.** Whereas, the Debtors are part of the OEC Group (as defined below), a group of Debtors under Control of and strategically headed by OEC, which, among other things, renders services related to engineering, infrastructure and construction industries, serving public and private customers; |
| **B.** Considerando que a Emissora Original (conforme definida abaixo) emitiu as seguintes sete séries de notas, cada uma delas garantida por OEC, CNO e OECI, tendo o The Bank of New York Mellon ("Agente Fiduciário das Notas Existentes") como agente fiduciário (coletivamente, as "Notas Existentes"): (i) Notas seniores de 7,00% com vencimento em 2020 emitidas nos termos de escritura de emissão datada de 21 de outubro de 2009 ("Notas 2020"); (ii) Notas de 5,125% com vencimento em 2022 emitidas nos termos de escritura de emissão datada de 26 de junho de 2012 ("Notas 2022"); (iii) Notas de 6,00% com vencimento em 2023 emitidas nos termos de escritura de emissão datada de 5 de abril de 2011 ("Notas 2023"); (iv) Notas de 4,375% com vencimento em 2025 emitidas nos termos de escritura de emissão datada de 25 de abril de 2013 ("Notas 2025"); (v) Notas de 5,250% com vencimento em 2029 emitidas | **B.** Whereas, the Original Issuer (as defined below) issued the following seven series of notes, each of which are guaranteed by OEC, CNO and OECI, and having The Bank of New York Mellon ("Existing Notes Trustee") as trustee (jointly, the "Existing Notes"): (i) 7.00% Senior Notes due 2020 issued pursuant to an indenture dated October 21, 2009 (the "2020 Notes"); (ii) 5.125% Notes due 2022 issued pursuant to an indenture dated June 26, 2012 (the "2022 Notes"); (iii) 6.00% Notes due 2023 issued pursuant to an indenture dated April 5, 2011 (the "2023 Notes"); (iv) 4.375% Notes due 2025 issued pursuant to an indenture dated April 25, 2013 (the "2025 Notes"); (v) 5.250% Notes due 2029 issued pursuant to an indenture dated June 27, 2014 (the "2029 Notes"); (vi) 7.125% Notes due 2042 issued pursuant to an indenture dated June 26, 2012 (the "2042 Notes"); (vii) 7.500% Perpetual |

| | |
|---|---|
| nos termos de escritura de emissão datada de 27 de junho de 2014 ("Notas 2029"); (vi) Notas de 7,125% com vencimento em 2042 emitidas nos termos de escritura de emissão datada de 26 de junho de 2012 ("Notas 2042"); (vii) Notas Perpétuas de 7,500% emitidas nos termos de escritura de emissão datada de 14 de setembro de 2010 ("Notas Perpétuas"); | Notes issued pursuant to an indenture dated September 14, 2010 (the "Perpetual Notes"); |
| **C.** Considerando que, de acordo com os termos e condições estabelecidos em cada uma das Notas Existentes, as Devedoras são, cada qual, garantidoras plenas de cada série de Notas Existentes e, como tal, são solidariamente responsáveis por todos e quaisquer pagamentos devidos ou a se tornarem devidos em relação às Notas Existentes (tais obrigações, as "Garantias das Notas Existentes"); | **C.** Whereas, pursuant to the terms and conditions established in each of the Existing Notes, the Debtors are each full guarantors of each series of Existing Notes and, as such, are jointly and severally liable for any and all payments due or to be due in connection with the Existing Notes (such obligations, the "Existing Notes Guarantees"); |
| **D.** Considerando que o Grupo OEC enfrenta certas restrições financeiras e operacionais, devidas, entre outros fatores, à conjuntura macroeconômica negativa e aos desafios específicos enfrentados pelo setor da engenharia e construção no Brasil, incluindo a Operação *Lava-Jato*; | **D.** Whereas the OEC Group faces certain financial and operational constraints, due to, among other things, the negative macroeconomic environment and the particular challenges facing the engineering and construction industry in Brazil, including Operation Car Wash (*Operação Lava-Jato*); |
| **E.** Considerando que, à luz dos desafios financeiros acima descritos, a Emissora Original, OEC, CNO e OECI não efetuaram quaisquer pagamentos de juros sobre quaisquer das Notas Existentes desde outubro de 2018 e não são capazes de adimplir os pagamentos presentes e futuros das Notas Existentes nos termos e condições atuais; | **E.** Whereas, in light of the financial challenges described above, the Original Issuer, OEC, CNO and OECI have not made any interest payments on any of the Existing Notes since October 2018 and are not able to meet present and future payments on the Existing Notes under the current terms and conditions; |
| **F.** Considerando que as Devedoras e seus assessores, por um lado, e o Grupo Ad Hoc e os Assessores do Grupo Ad Hoc (ambos conforme abaixo definidos), por outro lado, têm despendido esforços e negociado intensamente os termos estabelecidos neste Plano para reestruturar o endividamento das Devedoras relacionado aos Créditos, de forma | **F.** Whereas, the Debtors and their advisors, on the one hand, and the Ad Hoc Group and the Ad Hoc Group Advisors (both as defined below) on the other hand, have expended efforts and intensely negotiated the terms set forth in this Plan to restructure the Debtors' indebtedness related to the Claims, in order to, among other things, provide the |

a, entre outras coisas, preservar o fluxo de caixa das Devedoras e reduzir o montante do endividamento de longo prazo na estrutura de capital das Devedoras;

**G.** Considerando que, em contrapartida às concessões significativas contempladas por este Plano, os titulares de Créditos (conforme definido abaixo) (os "Detentores de Notas") receberão (i) Novas Notas (conforme definidas abaixo) contendo determinados termos e em condições mais benéficas em comparação aos termos e condições das Notas Existentes e (ii) o Instrumento Holdco (conforme definido abaixo), conferindo aos seus titulares o direito a distribuições em dinheiro sob determinadas circunstâncias, sendo que as Novas Notas e o Instrumento Holdco terão os termos e condições estabelecidos, respectivamente, nas Escrituras de Emissão das Novas Notas e no Contrato do Instrumento Holdco (conforme definidos abaixo);

**H.** Considerando que, o montante total devido por cada uma das Devedoras na Data do Protocolo da RE, referente às obrigações de pagamento de principal, juros e penalidades contratuais aplicáveis nos termos das Notas Existentes, na Data de Assinatura, encontra-se descrito no **Anexo H**, sendo que as Devedoras pretendem reestruturar, de acordo com este Plano, todos os créditos contra as Devedoras relacionados ou resultantes das Notas Existentes, incluindo principal, juros, juros de mora, bem como quaisquer outros créditos derivados ou resultantes da emissão, oferta e subscrição das Notas Existentes, que não sejam montantes devidos ao Agente Fiduciário das Notas Existentes ("Créditos");

**I.** Considerando que, este Plano (i) foi assinado por certos Detentores de Notas, ora representados pelo Agente Mandatário (conforme definido abaixo), detentores de

---

Debtors with cash –flow relief and reduce the amount of long-term indebtedness in the Debtors' capital structure;

**G.** Whereas, in exchange for the significant compromises contemplated by this Plan, holders of the Claims (as defined below) related thereto (the "Noteholders") will receive (i) New Notes (as defined below) containing certain improved terms relative to the terms of the Existing Notes and (ii) the Holdco Instrument (as defined below) entitling the holders thereof to cash distributions under certain circumstances, and the New Notes and the Holdco Instrument shall have the terms and conditions set forth, respectively, in the New Notes Indentures and the Holdco Instrument Agreement (each as defined below);

**H.** Whereas, the total outstanding amount due by each Debtor as of the ER Filing Date in respect of its principal, interest and penalty obligations under the Existing Notes is set forth on **Schedule H** on the Signing Date and the Debtors intend to restructure, pursuant to this Plan, all claims against the Debtors in connection with or arising from the Existing Notes, including principal, interest, default penalties as well as any other claims under or arising from the issuance, offering and underwriting of the Existing Notes other than Existing Notes Trustee amounts ("Claims");

**I.** Whereas, this Plan (i) has been signed by certain Noteholders, hereby represented by the Proxy Agent (as defined below), holding more than 3/5 (three fifths) of all

5

L. D.

mais de 3/5 (três quintos) de todos os Créditos existentes, (ii) é justo e equitativo e (iii) portanto, cumpre devidamente com os requisitos legais previstos no art. 163 da LFR; e

existing Claims, (ii) is fair and equitable and (iii) therefore duly complies with the legal requirements provided for in the art. 163 of the Brazilian Bankruptcy Law; and

RESOLVEM as Devedoras e os Credores Signatários (doravante denominados "Partes" ou, individual e indistintamente, "Parte"), de comum acordo e por sua livre manifestação de vontade, celebrar o presente Plano, que estabelece os termos e condições para a reestruturação dos Créditos, nos termos do art. 163, *caput* e § 1º da LFR, a fim de implementar a reestruturação da dívida das Devedoras e a manutenção de suas atividades ("Recuperação Extrajudicial").

NOW, THEREFORE, the Debtors and the Signatory Creditors (herein referred to as "Parties" or individually and indistinctly, a "Party"), jointly and freely agree to execute this Plan, which sets the terms and conditions for the restructuring of the Claims, pursuant to art. 163, *caput* and § 1st of the Brazilian Bankruptcy Law, in order to implement the debt restructuring project related to the Debtors and the maintenance of their activities ("Extrajudicial Restructuring").

## 1. DEFINIÇÕES E REGRAS DE INTERPRETAÇÃO

## 1. DEFINITIONS AND RULES OF CONSTRUCTION

**1.1. Definições**. As seguintes palavras, expressões e abreviaturas iniciadas em letra maiúscula, no singular ou no plural, masculino ou feminino, utilizadas neste Plano, terão os significados atribuídos abaixo.

**1.1. Definitions**. The following capitalized words, expressions and abbreviations, either in singular or plural, masculine or feminine, in this Plan, shall have the meanings attributed below.

**1.1.1.** "Afiliada" significa, em relação a uma Pessoa, (i) qualquer outra Pessoa que, direta ou indiretamente, Controle, seja Controlada por, ou esteja sob Controle comum com tal Pessoa; e (ii) se tal Pessoa for uma pessoa física, o cônjuge, ascendente(s), descendente(s) ou parente até o quarto grau; (iii) bem como qualquer outra Pessoa que, direta ou indiretamente, seja Controlada por ou esteja sob Controle comum com qualquer uma das Pessoas mencionadas no item (ii) desta definição;

**1.1.1.** "Affiliate" means, with respect to a Person, (i) any other Person that, directly or indirectly, Controls, is Controlled by, or is under common Control with such Person; and (ii) if such Person is an individual, spouse, ascendant(s), descendant(s) or relative up to the fourth degree; (iii) as well as any other Person that, directly or indirectly, is Controlled by or is under common Control with any of such Persons mentioned in item (ii) of this definition;

**1.1.2.** "Agente Fiduciário das Notas Existentes" tem o significado estabelecido no Considerando B;

**1.1.2.** "Existing Notes Trustee" has the meaning established in Whereas Clause B;

6

L. B.

| | |
|---|---|
| **1.1.3.** "Agente Mandatário" significa Epiq Corporate Restructuring, LLC; | **1.1.3.** "Proxy Agent" means Epiq Corporate Restructuring, LLC; |
| **1.1.4.** "Assessores do Grupo Ad Hoc" significa, coletivamente, Davis Polk & Wardwell LLP, Pinheiro Neto Advogados, Rothschild & Co US Inc. e Rothschild & Co Brasil Limitada; | **1.1.4.** "Ad Hoc Group Advisors" means, collectively, Davis Polk & Wardwell LLP, Pinheiro Neto Advogados, Rothschild & Co US Inc. and Rothschild & Co Brasil Limitada; |
| **1.1.5.** "*Bankruptcy Code dos EUA*" significa o título 11 do *United States Code*, 11 U.S.C. §§ 101 e seguintes; | **1.1.5.** "U.S. Bankruptcy Code" means the title 11 of the United States Code. 11 U.S.C. §§ 101 et seq; |
| **1.1.6.** "*Cash Sweep*" significa os Pagamentos de Caixa Excedente (conforme estabelecido detalhadamente nas Escrituras de Emissão das Novas Notas e no Contrato do Instrumento Holdco, conforme aplicável), a serem feitos, conforme aplicável, durante o Período de Pagamento de Caixa Excedente, aos titulares das Novas Notas e aos titulares do Instrumento Holdco, mediante a ocorrência do Gatilho Dívida Líquida/EBITDA, de acordo com os termos e condições estabelecidos nas Escrituras de Emissão das Novas Notas e no Contrato do Instrumento Holdco, conforme aplicável; | **1.1.6.** "Cash Sweep" means the Excess Cash Payments (as described in detail in each of the New Notes Indentures and the Holdco Instrument Agreement, as applicable), if any, to be made, during the Excess Cash Sweep Period, to holders of the New Notes and to holders of the Holdco Instrument, upon the occurrence of the Net Debt/EBITDA Trigger, according to the terms and conditions set forth in the New Notes Indentures and the Holdco Instrument Agreement, as applicable; |
| **1.1.7.** "*Chapter 15*" significa um procedimento auxiliar de insolvência nos Estados Unidos, nos termos do *Chapter 15* do *Bankruptcy Code* dos EUA; | **1.1.7.** "Chapter 15" means an ancillary bankruptcy proceeding in the United States, pursuant to chapter 15 of the U.S. Bankruptcy Code; |
| **1.1.8.** "CNO" tem o significado estabelecido no Preâmbulo; | **1.1.8.** "CNO" has the meaning established in the Preamble; |
| **1.1.9.** "CNPJ/ME" significa o número de identificação no cadastro nacional de pessoas jurídicas do Ministério da Economia do Brasil; | **1.1.9.** "CNPJ/ME" means the national taxpayer register number of legal entities of the Brazilian Ministry of Economic Affairs; |
| **1.1.10.** "Código Civil Brasileiro" significa a Lei nº 10.406, de 10 de janeiro de 2002, conforme alterada de tempos em tempos; | **1.1.10.** "Brazilian Civil Code" means Law no. 10,406 of January 10, 2002, as amended from time to time; |
| **1.1.11.** "Comitê de Finanças e Riscos do Conselho da Nova OEC" significa o comitê | **1.1.11.** "New OEC Board's Finance and Risk Committee" means the New OEC |

7

Z.b.

| | |
|---|---|
| de finanças e riscos do Conselho da Nova OEC; | Board's finance and risk committee (*Comitê de Finanças e Riscos*); |
| **1.1.12.** "Comitê de Integridade e Auditoria do Conselho da Nova OEC" significa o comitê de integridade e auditoria do Conselho da Nova OEC; | **1.1.12.** "New OEC Board's Integrity and Audit Committee" means the New OEC Board's integrity and audit committee (*Comitê de Integridade e Auditoria*); |
| **1.1.13.** "Condições de Eficácia do Plano" tem o significado estabelecido na Cláusula 7.1; | **1.1.13.** "Conditions for Effectiveness of the Plan" has the meaning established in Clause 7.1; |
| **1.1.14.** "Conselheiro Independente" significa qualquer conselheiro que declare cumprir (no mínimo) os seguintes critérios: (i) (a) não ter vínculo relevante com o Grupo ODB, exceto participação acionária em nível que não comprometa sua independência; (b) não ser acionista controlador da Nova OEC, cônjuge ou parente até o segundo grau do acionista controlador da Nova OEC, ou, nos últimos 3 (três) anos, não ter tido relação com sociedade ou entidade vinculada ao acionista controlador da Nova OEC; (c) não ter sido, nos últimos três (3) anos, funcionário ou diretor da Nova OEC, da OEC, do acionista controlador do Grupo OEC ou de quaisquer Afiliadas do Grupo OEC; (d) não ser fornecedor ou comprador direto ou indireto de serviços e/ou produtos da Nova OEC em nível que possa comprometer a sua independência; (e) não ser empregado ou membro de um órgão de administração de uma empresa ou entidade que ofereça ou demande os serviços e/ou produtos da Nova OEC, em nível que possa comprometer a sua independência; (f) não ser cônjuge ou parente até o segundo grau de qualquer membro dos órgãos de administração da Nova OEC; (g) não receber qualquer remuneração da Nova OEC além da remuneração paga em relação à sua posição como conselheiro da Nova OEC, exceto em relação à participação acionária; e (h) não possuir conflito de interesses com o Grupo OEC; ou (ii) ser independente de acordo com (a) as regras emitidas ao longo do tempo pela | **1.1.14.** "Independent Director" means any director who declares that he or she meets (at a minimum) the following criteria: (i) (a) does not have a relevant connection with the ODB Group, except for equity participation in a level that does not compromise its independence; (b) is not the controlling shareholder of New OEC, spouse or relative to the second degree of the controlling shareholder of New OEC, or, in the last 3 (three) years, had no connection to a company or entity related to New OEC's controlling shareholder; (c) has not been, for the past three (3) years, an employee or officer, of New OEC, OEC, OEC Group's controlling shareholder or any New OEC's Affiliates; (d) is not a direct or indirect supplier or buyer of New OEC's services and/or products in an importance that might compromise its independence; (e) is not an employee or member of an administrative body of a company or entity that is offering or demanding New OEC's services and/or products, in a level that might compromise its independence; (f) is not a spouse or relative to the second degree of any member of New OEC's administrative bodies; (g) does not receive any compensation from New OEC in addition to the compensation paid in connection with its position as New OEC's director, except in connection with equity participation; and (h) has no conflict of interest with the OEC Group; or (ii) is independent under the (a) rules issued by the |

8

*L. b.*

*α*

| | |
|---|---|
| Comissão de Valores Mobiliários (CVM); ou (b) as regras de listagem do Novo Mercado da B3 S.A. - Brasil, Bolsa Balcão, conforme alteradas de tempos a tempos; | Brazilian Securities and Exchange Commission (*Comissão de Valores Mobiliários*) from time to time; or (b) the Novo Mercado listing rules of B3 S.A. – Brasil, Bolsa Balcão, as amended from time to time; |
| **1.1.15.** "Conselho da Nova OEC" tem o significado estabelecido na Cláusula 4.1.1; | **1.1.15.** "New OEC Board" has the meaning established in Clause 4.1.1; |
| **1.1.16.** "Contrato do Instrumento Holdco" tem o significado estabelecido na Cláusula 3.3; | **1.1.16.** "Holdco Instrument Agreement" has the meaning established in Clause 3.3; |
| **1.1.17.** "Controle" significa, conforme previsto no artigo 116 da Lei das S.A., em relação a uma determinada Pessoa, (i) o poder de eleger a maioria da administração de forma permanente, bem como de determinar e conduzir as políticas e a administração dessa Pessoa; ou (ii) a propriedade direta ou indireta de pelo menos 50% (cinquenta por cento) mais 1 (uma) ação/quota do capital votante total dessa Pessoa; em qualquer desses casos, por uma Pessoa ou conjunto de Pessoas vinculadas por acordo de voto ou sob Controle comum. Os termos relacionados à palavra Controle, tais como "Controlada", "Controladora" e "sob Controle comum", terão significados semelhantes ao de Controle; | **1.1.17.** "Control" means, as provided for in article 116 of the Brazilian Corporation Law, with respect to a given Person, (i) the power to elect the majority of the administration in a permanent manner, as well as to determine and conduct the policies and administration of such Person; or (ii) the direct or indirect ownership of at least fifty percent (50%) plus 1 (one) share/quota of the total voting capital of such Person; in any of such cases, by a Person or group of Persons bound by a voting agreement or under common Control. The terms related to the word Control, such as "Controlled Party", "Controlling Party" and "under common Control", shall have similar meanings to Control; |
| **1.1.18.** "Corte Norte-Americana de Falências" tem o significado estabelecido na Cláusula 2.4; e | **1.1.18.** "U.S. Bankruptcy Court" has the meaning established in Clause 2.4; and |
| **1.1.19.** "Créditos Ajustados" tem o significado estabelecido na Cláusula 3.1; | **1.1.19.** "Adjusted Claims" has the meaning established in Clause 3.1; |
| **1.1.20.** "Créditos *Intercompany*" significa todos os créditos existentes na Data do Protocolo da RE entre (i) a ODB e as suas Afiliadas (exceto a OEC e as suas Subsidiárias), por um lado, e (ii) a OEC e as suas Subsidiárias, por outro lado; | **1.1.20.** "Intercompany Claims" mean all claims existing as of the ER Filing Date between (i) ODB and its Affiliates (other than OEC and its Subsidiaries), on the one hand, and (ii) OEC and its Subsidiaries, on the other hand; |

9

| | |
|---|---|
| **1.1.21.** "Créditos" tem o significado estabelecido no Considerando H; | **1.1.21.** "Claims" has the meaning established in Whereas Clause H; |
| **1.1.22.** "Credores Aderentes" tem o significado estabelecido na Cláusula 6.2; | **1.1.22.** "Adhering Creditors" has the meaning established in Clause 6.2; |
| **1.1.23.** "Credores Apoiadores" tem o significado estabelecido na Cláusula 6.2; | **1.1.23.** "Supporting Creditors" has the meaning established in Clause 6.2; |
| **1.1.24.** "Credores Signatários" tem o significado estabelecido no Preâmbulo; | **1.1.24.** "Signatory Creditors" has the meaning established in the Preamble; |
| **1.1.25.** "Data da Sentença de Homologação do Plano" significa a data em que for publicada, no Diário de Justiça Eletrônico do Estado de São Paulo, a decisão de homologação deste Plano proferida pelo Juízo da RE; | **1.1.25.** "ER Confirmation Order Date" means the date in which the order providing for the judicial confirmation of this Plan by the ER Court is published in the São Paulo State Court's Official Gazette; |
| **1.1.26.** "Data de Assinatura" tem o significado estabelecido no Preâmbulo; | **1.1.26.** "Signing Date" has the meaning established in the Preamble; |
| **1.1.27.** "Data de Fechamento" tem o significado estabelecido na Cláusula 7.2; | **1.1.27.** "Closing Date" has the meaning established in Clause 7.2; |
| **1.1.28.** "Data do Protocolo da RE" significa a data em que a Recuperação Extrajudicial for protocolada perante o Juízo da RE; | **1.1.28.** "ER Filing Date" means the date on which the Extrajudicial Restructuring is filed before the ER Court; |
| **1.1.29.** "Decisão Norte-Americana de Reconhecimento da RE" tem o significado estabelecido na Cláusula 2.4. | **1.1.29.** "U.S. Recognition Order" has the meaning established in Clause 2.4. |
| **1.1.30.** "Detentor de Notas" significa qualquer detentor das Notas Existentes. | **1.1.30.** "Noteholder" means any holder of the Existing Notes. |
| **1.1.31.** "Devedoras" tem o significado estabelecido no Preâmbulo; | **1.1.31.** "Debtors" has the meaning established in the Preamble; |
| **1.1.32.** "Dias Úteis" significa qualquer dia, exceto dias em que os bancos comerciais estejam obrigados ou autorizados por lei a fechar na cidade de São Paulo, estado de São Paulo, na Cidade de Nova Iorque, estado de Nova Iorque, ou na cidade de Londres, no Reino Unido; | **1.1.32.** "Business Days" means any calendar day, except for any day on which commercial banks are required or authorized by Law to close in the City of São Paulo, State of São Paulo, in the City of New York, State of New York, or in the City of London, in the United Kingdom; |

| | |
|---|---|
| **1.1.33.** "Dívida Líquida" tem o significado estabelecido nas Escrituras de Emissão das Novas Notas; | **1.1.33.** "Net Debt" has the meaning set forth in the New Notes Indentures; |
| **1.1.34.** "Dólares" ou o símbolo "US$" significa a moeda livremente transferível e oficial dos Estados Unidos da América de tempos em tempos; | **1.1.34.** "Dollars" or the sign "US$" shall each mean the freely transferable, lawful money of the United States from time to time; |
| **1.1.35.** "DTC" significa Depository Trust Company ou seu sucessor; | **1.1.35.** "DTC" means Depository Trust Company or a successor thereto; |
| **1.1.36.** "EBITDA" tem o significado previsto nas Escrituras de Emissão das Novas Notas; | **1.1.36.** "EBITDA" has the meaning set forth in the New Notes Indentures; |
| **1.1.37.** "Emissora das Novas Notas" tem o significado estabelecido no Preâmbulo; | **1.1.37.** "New Notes Issuer" has the meaning established in the Preamble; |
| **1.1.38.** "Escrituras de Emissão das Novas Notas" tem o significado estabelecido na Cláusula 3.2; | **1.1.38.** "New Notes Indentures" has the meaning established in Clause 3.2; |
| **1.1.39.** "Eventos de Rescisão Antecipada do Plano" tem o significado estabelecido na Cláusula 8.1; | **1.1.39.** "Early Termination Events of the Plan" has the meaning established in Clause 8.1; |
| **1.1.40.** "Garantias das Notas Existentes" tem o significado estabelecido no Considerando C; | **1.1.40.** "Existing Notes Guarantees" has the meaning established in Whereas Clause C; |
| **1.1.41.** "Garantidores das Novas Notas" tem o significado estabelecido na Cláusula 3.2.2; | **1.1.41.** "New Notes Guarantors" has the meaning established in Clause 3.2.2; |
| **1.1.42.** "Gatilho Dívida Líquida/EBITDA" significa, durante o Período de Pagamento de Caixa Excedente, em um respectivo encerramento de exercício social, quando o Quociente de Dívida Líquida/EBITDA da Nova OEC exceder 3,00 para 1,00; | **1.1.42.** "Net Debt/EBITDA Trigger" means, during the Excess Cash Sweep Period, for any fiscal year-end, when New OEC's Net Debt/EBITDA Ratio exceeds 3.00 to 1.00; |
| **1.1.43.** "Grupo Ad Hoc" significa o grupo ad hoc de Detentores de Notas representado pelos Assessores do Grupo Ad Hoc; | **1.1.43.** "Ad Hoc Group" means the ad hoc group of Noteholders represented by the Ad Hoc Group Advisors; |
| **1.1.44.** "Grupo ODB" significa um grupo de sociedades sob o Controle e gestão estratégica da ODB; | **1.1.44.** "ODB Group" means a group of companies under the Control of and strategically headed by ODB; |

11

L. B.

| | |
|---|---|
| **1.1.45.** "Grupo OEC" significa, coletivamente, OEC e todas e quaisquer sociedades direta ou indiretamente Controladas pela OEC incluindo, mas não se limitando à CNO e OECI; | **1.1.45.** "OEC Group" means, collectively, OEC and any and all companies directly or indirectly Controlled by OEC, including but not limited to CNO and OECI; |
| **1.1.46.** "Holdco" tem o significado estabelecido no Prêmbulo; | **1.1.46.** "Holdco" has the meaning established in the Preamble; |
| **1.1.47.** "Instrumento Holdco" tem o significado estabelecido na Cláusula 3.1; | **1.1.47.** "Holdco Instrument" has the meaning established in Clause 3.1; |
| **1.1.48.** "Juízo da RE" tem o significado estabelecido na Cláusula 2.3; | **1.1.48.** "ER Court" has the meaning established in Clause 2.3; |
| **1.1.49.** "Lei das S.A." significa a Lei nº 6.404, de 15 de dezembro de 1976, conforme alterada de tempos em tempos; | **1.1.49.** "Brazilian Corporation Law" means Law no. 6,404 of December 15, 1976, as amended from time to time; |
| **1.1.50.** "Lei" significa qualquer lei federal, estadual ou municipal brasileira ou qualquer lei estrangeira (neste caso, lei escrita, a *common law* ou qualquer outra lei), constituição, tratado, convenção, portaria, código, regra, estatuto, decreto, regulamento, decisão, deliberação, instrução ou qualquer outra exigência editada, emitida, adotada, promulgada, posta em vigor ou aplicada por uma autoridade governamental brasileira ou estrangeira; | **1.1.50.** "Law" means any Brazilian federal, state or municipal law or any foreign law (in this case, statutory, common or any other law), constitution, treaty, convention, ordinance, code, rule, statute, decree, regulation, ruling, deliberation, instruction or any other requirement edited, issued adopted, enacted, placed or applied by a Brazilian or foreign governmental entity; |
| **1.1.51.** "LFR" significa a Lei nº 11.101, de 9 de fevereiro de 2005, conforme alterada de tempos em tempos; | **1.1.51.** "Brazilian Bankruptcy Law" means Law no. 11,101 of February 9, 2005, as amended from time to time; |
| **1.1.52.** "Multas" tem o significado estabelecido nas Escrituras de Emissão das Novas Notas; | **1.1.52.** "Fines" has the meaning established in the New Notes Indentures; |
| **1.1.53.** "Notas Existentes" tem o significado estabelecido no Considerando B; | **1.1.53.** "Existing Notes" has the meaning established in Whereas Clause B; |
| **1.1.54.** "Nova Estrutura Societária" significa uma estrutura na qual a Holdco é a proprietária de todas ou substancialmente todas as ações da Nova OEC; na qual a Nova OEC é proprietária de substancialmente todos | **1.1.54.** "New Corporate Structure" means a structure in which the Holdco is the owner of all or substantially all of the shares of New OEC; that New OEC is the owner of substantially all assets held by OEC on the ER |

| | |
|---|---|
| os ativos detidos pela OEC na Data do Protocolo da RE; e na qual a Nova OEC é a proprietária de todas ou substancialmente todas as ações da Emissora das Novas Notas; | Filing Date onwards; and that New OEC is the owner of all or substantially all of the shares of the New Notes Issuer; |
| **1.1.55.** "Nova OEC" tem o significado estabelecido no Preâmbulo; | **1.1.55.** "New OEC" has the meaning established in the Preamble; |
| **1.1.56.** "Novas Notas" tem o significado estabelecido na Cláusula 3.1; | **1.1.56.** "New Notes" has the meaning established in Clause 3.1; |
| **1.1.57.** "ODB" significa Odebrecht S.A. - Em Recuperação Judicial, sociedade anônima de capital fechado, com sede na Avenida Luis Viana, nº 2.841, Edifício Odebrecht, Paralela, CEP 41730-900, na cidade de Salvador, Estado da Bahia, Brasil, inscrita no CNPJ/ME sob o nº. 05.144.757/0001-72; | **1.1.57.** "ODB" means Odebrecht S.A. – Em Recuperação Judicial, a privately held corporation with registered office at Avenida Luis Viana, no. 2.841, Edifício Odebrecht, Paralela, Zip Code 41730-900 in the city of Salvador, State of Bahia, Brazil, enrolled in the CNPJ/ME under the no. 05.144.757/0001-72; |
| **1.1.58.** "OEC" tem o significado estabelecido no Preâmbulo; | **1.1.58.** "OEC" has the meaning established in the Preamble; |
| **1.1.59.** "OECI" tem o significado estabelecido no Preâmbulo; | **1.1.59.** "OECI" has the meaning established in the Preamble; |
| **1.1.60.** "OENGER" tem o significado estabelecido no Preâmbulo; | **1.1.60.** "OENGER" has the meaning established in the Preamble; |
| **1.1.61.** "OFL" ou "Emissora Original" significa Odebrecht Finance Ltd., empresa constituída segundo as Leis das Ilhas Cayman, com sede social em South Church Street, PO Box 309GT, Ugland House, George Town, Grand Cayman, Ilhas Cayman, registrada sob o nº. 181323; | **1.1.61.** "OFL" or "Original Issuer" means Odebrecht Finance Ltd., a company incorporated under the Laws of The Cayman Islands, with registered office at South Church Street, PO Box 309GT, Ugland House, George Town, Grand Cayman, Cayman Islands, registered under the no. 181323; |
| **1.1.62.** "Opção PIK" tem o significado estabelecido na Cláusula 3.2.3.3.1; | **1.1.62.** "PIK Option" has the meaning established in Clause 3.2.3.3.1; |
| **1.1.63.** "Partes Exoneradas" significa cada uma das seguintes pessoas, exclusivamente na sua qualidade de Partes Exoneradas: (a) os Detentores de Notas, (b) as Devedoras e suas Afiliadas, (c) a Nova OEC, (d) a Emissora das Novas Notas, (e) a Nova Holdco, (f) o | **1.1.63.** "Released Parties" means each of the following, solely in its capacity as such: (a) the Noteholders, (b) the Debtors and its Affiliates, (c) New OEC, (d) New Notes Issuer, (e) New Holdco, (f) the Creditor Representative, (g) the trustees and any |

13

Representante dos Credores, (g) o agente fiduciário e quaisquer agentes indicados (i) nas escrituras de emissão das Notas Existentes, (ii) nas Escrituras de Emissão das Novas Notas ou (iii) no Contrato do Instrumento Holdco, e (h) o Agente Mandatário; com relação a cada uma das partes acima mencionadas nos itens (a) até (h), cada uma das antecessoras atuais ou anteriores, sucessoras, coligadas (independentemente de tais participações serem detidas direta ou indiretamente), cessionárias, Subsidiárias, detentores de participação ou beneficiários diretos e indiretos, fundos, sociedades em carteira e sociedades administradoras; e com relação a cada uma das partes mencionadas nas cláusulas (a) a (h), cada um dos atuais e antigos conselheiros, diretores, membros, empregados, sócios, gerentes, sócios administradores, sócios investidores, sócios gestores, contratantes independentes, administradores fiduciários (*trustees*), agentes, representantes, dirigentes, profissionais, consultores, assessores financeiros, assessores legais, contadores, membros de bancos de investimento, membros do conselho consultivo, consultores ou sub-consultores de investimento e outros profissionais;

agents appointed under the (i) Existing Notes' indentures, (ii) New Notes Indentures or (iii) Holdco Instrument Agreement, and (h) the Proxy Agent; with respect to each of the foregoing parties in clauses (a) through (h), each of such party's current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), assigns, Subsidiaries, direct and indirect equity holders or beneficiaries, funds, portfolio companies, and management companies; and with respect to each of the foregoing parties in clauses (a) through (h), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, trustees, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub-advisors, and other professionals;

**1.1.64.** "Partes Exonerantes" significa cada uma das seguintes pessoas, exclusivamente na sua qualidade de Partes Exonerantes: (a) os Detentores de Notas, (b) as Devedoras e suas Afiliadas, (c) a Nova OEC, (d) a Emissora das Novas Notas, (e) a Nova Holdco e (f) o Representante dos Credores; (g) os agentes fiduciários (*trustees*) e quaisquer agentes indicados (i) nas escrituras de emissão das Notas Existentes, (ii) nas Escrituras de Emissão das Novas Notas ou (iii) no Contrato do Instrumento Holdco, e (h) o Agente Mandatário; com relação a cada uma das partes acima mencionadas nas cláusulas (a) a (h), cada uma das atuais e anteriores

**1.1.64.** "Releasing Parties" means each of the following, solely in its capacity as such: (a) the Noteholders, (b) the Debtors and its Affiliates, (c) New OEC, (d) New Notes Issuer, (e) New Holdco, (f) the Creditor Representative, (g) the trustees and any agents appointed under the (i) Existing Notes' indentures, (ii) New Notes Indentures or (iii) Holdco Instrument Agreement, and (h) the Proxy Agent; with respect to each of the foregoing parties in clauses (a) through (h), each of such party's current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), assigns, Subsidiaries,

14

| | |
|---|---|
| antecessoras, sucessoras, coligadas (independentemente de tais participações serem detidas direta ou indiretamente), cessionárias, Subsidiárias, detentores de participação ou beneficiários diretos e indiretos, fundos, sociedades em carteira e sociedades administradoras; e com relação a cada uma das partes mencionadas nas cláusulas (a) a (h), cada um dos atuais e antigos conselheiros, diretores, membros, empregados, sócios, gerentes, sócios administradores, sócios investidores, sócios gestores, contratantes independentes, administradores (*trustees*), agentes, representantes, dirigentes, profissionais, consultores, assessores financeiros, assessores legais, contadores, membros de bancos de investimento, membros do conselho consultivo, consultores ou sub-consultores de investimento e outros profissionais; | direct and indirect equity holders or beneficiaries, funds, portfolio companies, and management companies; and with respect to each of the foregoing parties in clauses (a) through (h), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, trustees, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub-advisors, and other professionals; |
| **1.1.65.** "Partes" ou "Parte" têm o significado estabelecido no Preâmbulo; | **1.1.65.** "Parties" or "Party" have the meaning established in the Preamble; |
| **1.1.66.** "Período de Pagamento de Caixa Excedente" tem o significado estabelecido nas Escrituras de Emissão das Novas Notas; | **1.1.66.** "Excess Cash Sweep Period" has the meaning set forth in the New Notes Indentures; |
| **1.1.67.** "Pessoa" significa qualquer indivíduo, sociedade, incluindo sociedades anônimas e de responsabilidade limitada, sociedades em parceria, joint venture, *trust*, associação, fundação, organização, entidade governamental ou outra entidade de qualquer tipo ou natureza; | **1.1.67.** "Person" means any individual, corporation, including joint-stock and limited companies, partnership, joint venture, trust, association, foundation, organization, governmental entity or another entity of any kind or nature; |
| **1.1.68.** "Plano" tem o significado estabelecido no Preâmbulo; | **1.1.68.** Plan has the meaning established in the Preamble; |
| **1.1.69.** "Prazo Limite" tem o significado estabelecido na Cláusula 7.4; | **1.1.69.** "Drop-Dead Date" has the meaning established in Clause 7.4; |
| **1.1.70.** "Quociente da Dívida Líquida/EBITDA" tem o significado previsto nas Escrituras de Emissão das Novas Notas; | **1.1.70.** "Net Debt/EBITDA Ratio" has the meaning set forth in the New Notes Indentures; |

| | |
|---|---|
| **1.1.71.** "Real", "Reais" ou "R$" significa a moeda oficial do Brasil de tempos em tempos; | **1.1.71.** "Real", "Reais" or "R$" means the legal currency of Brazil from time to time; |
| **1.1.72.** "Recuperação Extrajudicial" tem o significado estabelecido no Preâmbulo; | **1.1.72.** "Extrajudicial Restructuring" has the meaning established in the Preamble; |
| **1.1.73.** "Representante dos Credores" tem o significado estabelecido na Cláusula 5.1; | **1.1.73. 1.1.19.** "Creditor Representative" has the meaning established in Clause 5.1; |
| **1.1.74.** "RJ ODB/OFL" significa o processo de recuperação judicial (processo nº 1057756-77.2019.8.26.0100) ajuizado pela ODB, OFL e diversas outras afiliadas da ODB em 17 de junho de 2019 na Primeira Vara de Falências e Recuperações Judiciais de São Paulo; | **1.1.74.** "ODB/OFL RJ Proceeding" means the *recuperação judicial* proceedings (case no. 1057756-77.2019.8.26.0100) filed by ODB, OFL and various other affiliates of ODB on June 17, 2019 in the First Bankruptcy and Judicial Reorganization Court of São Paulo; |
| **1.1.75.** "Sentença de Homologação do Plano" tem o significado estabelecido na Cláusula 2.3; | **1.1.75.** "ER Confirmation Order" has the meaning established in Clause 2.3; |
| **1.1.76.** "Subsidiária" significa todas as subsidiárias diretas e indiretas de uma entidade, salvo estipulação em contrário ora especificada; | **1.1.76.** "Subsidiary" means all direct and indirect subsidiaries of an entity unless otherwise specified herein; |
| **1.1.77.** "Termo de Adesão" tem o significado estabelecido na Cláusula 6.2; | **1.1.77.** "Adhesion Form" has the meaning established in Clause 6.2; |
| **1.1.78.** "Transações com Partes Relacionadas" tem o significado previsto nas Escrituras de Emissão das Novas Notas. | **1.1.78.** "Related Party Transactions" has the meaning set forth in the New Notes Indentures. |
| **1.2.    Regras de Interpretação.** | **1.2.    Rules of Construction.** |
| **1.2.1.** Títulos e Cabeçalhos. Os títulos e cabeçalhos das Cláusulas deste Plano existem simplesmente para fins de referência, e não devem ser utilizados para interpretação ou análise das disposições deste instrumento. | **1.2.1.** Titles and Headings. The titles and headings of the Clauses set forth in this Plan are for reference purposes only, and shall not be used to construe or interpret the provisions hereof. |
| **1.2.2.** Seções, Cláusulas e Anexos. Todas as referências neste Plano a capítulos, cláusulas, itens, preâmbulo, anexos e apêndices devem ser considerados referências aos capítulos, cláusulas, itens, preâmbulo, anexos e apêndices deste Plano, a menos que o contexto exija de outro modo. | **1.2.2.** Sections, Clauses and Schedules. All references in this Plan to chapters, clauses, items, preamble, schedules and exhibits shall be considered references to the chapters, clauses, items, preamble, schedules and exhibits of this Plan, unless the context requires otherwise. |

16

| | |
|---|---|
| **1.2.3.** <u>Inclusive</u>. Os termos "incluindo", "inclusive" e "incluído", bem como termos semelhantes, devem ser interpretados como se estivessem acompanhados das expressões "mas não limitados a" e "entre outros". | **1.2.3.** <u>Inclusive</u>. The terms "including", "inclusive" and "included", as well as similar terms, shall be construed as if accompanied by the expressions "but not limited to" and "among others". |
| **1.2.4.** <u>Alterações</u>. Quaisquer referências a documentos ou instrumentos devem ser consideradas como incluindo todas as respectivas alterações ou substituições, a menos que de outro modo expressamente previsto ou de outra forma requerida pelo contexto. | **1.2.4.** <u>Amendments</u>. Any references to any documents or instruments shall be considered to include all of the respective amendments or replacements, unless otherwise expressly set forth or required by the context. |
| **1.2.5.** <u>Disposições legais</u>. As referências a disposições legais e a Leis devem ser interpretadas como referências a essas disposições legais e Leis tais como vigentes nesta data ou em data que seja especificamente determinada pelo contexto; | **1.2.5.** <u>Legal Provisions</u>. The references to legal provisions and Laws must be interpreted as references to these legal provisions and Laws as in force in this date or in a date specifically determined by the context; |
| **1.2.6.** <u>Sucessores</u>. Todas as referências a qualquer Pessoa devem incluir seus respectivos sucessores e cessionários autorizados, independentemente do tipo de sucessão envolvida. | **1.2.6.** <u>Successors</u>. All references to any Person shall include their respective successors and permitted assignees, regardless of the kind of succession involved. |
| **1.2.7.** <u>Prazos</u>. Todos os termos e prazos previstos neste Plano serão contados na forma prevista no Código Civil Brasileiro, desconsiderando-se o dia de início e incluindo-se o dia em que o prazo é alcançado. Quaisquer termos e prazos referidos neste Plano (contados em Dias Úteis ou não), cujo termo final caia em um dia em que não seja Dia Útil, serão automaticamente prorrogados para o primeiro Dia Útil imediatamente posterior. | **1.2.7.** <u>Deadlines</u>. All terms and deadlines foreseen in this Plan shall be counted as provided for in the Brazilian Civil Code, disregarding the immediate first day and including the day in which the deadline is reached. All terms and deadlines referred to in this Plan (whether counted in Business Days or not), in which the final day of the deadline corresponds to a day that is not a Business Day shall be automatically extended to the first following Business Day. |
| | |
| **2.   CONDIÇÕES GERAIS DA RECUPERAÇÃO EXTRAJUDICIAL** | **2.   GENERAL TERMS OF THE EXTRAJUDICIAL RESTRUCTURING** |
| **2.1.   Objetivo do Plano**. Este Plano estabelece os termos e condições da | **2.1.   Purpose of the Plan**. This Plan comprises the terms and conditions of the |

ℒ. 𝒟.

Recuperação Extrajudicial e tem como objetivo reestruturar os Créditos, em benefício dos Detentores de Notas e das Devedoras, de forma a reestruturar as obrigações das Devedoras relativamente aos Créditos. Tal objetivo será atingido por meio da novação dos Créditos relacionados às Garantias das Notas Existentes, que serão substituídas conforme previsto neste Plano e descrito na Cláusula 2.3 abaixo.

Extrajudicial Restructuring and aims to restructure the Claims, for the benefit of the Noteholders and the Debtors in order to restructure the Debtors' obligations relating to the Claims. This purpose shall be reached by the novation (*novação*) of the Claims related to the Existing Notes' Guarantees, which shall be replaced as provided under this Plan and described below in Clause 2.3.

**2.2.    Montante de Créditos Sujeitos ao Plano**. Os termos e condições deste Plano aplicam-se ao montante total dos Créditos, os quais serão reestruturados neste Plano, em virtude de sua natureza e condições de pagamento e amortização semelhantes, cujo montante agregado corresponde ao valor total descrito no **Anexo H**, conforme atualizado até a Data do Protocolo da RE.

**2.2.    Amount of Claims Subject to the Plan**. The terms and conditions of this Plan apply to the total amount of Claims which are restructured herein due to their similar nature, payment and amortization conditions, in the total amount described in **Schedule H**, as updated up to the ER Filing Date.

**2.3.    Meios de Reestruturação**. Após a satisfação ou renúncia de todas as Condições de Eficácia do Plano, conforme previstas na Cláusula 7 abaixo, inclusive a homologação judicial deste Plano pela Vara de Falências e Recuperações Judiciais de São Paulo, na qual a Recuperação Extrajudicial será protocolada, processada e analisada ("Sentença de Homologação do Plano" e "Juízo da RE", respectivamente), os Créditos e as Notas Existentes serão cancelados e novados, conforme previsto nos artigos 59 e 163, §6º, inciso III, da LFR e substituídos por (i) séries de Novas Notas aplicáveis, a serem distribuídas *pro rata* aos Créditos dos Detentores de Notas; e (ii) Instrumento Holdco a ser distribuído *pro rata* aos Créditos dos Detentores de Notas.

**2.3.    Means of Restructuring**. Upon satisfaction or waiver of all the Conditions for Effectiveness of the Plan, as set forth in Clause 7 below, including the judicial confirmation of this Plan by the Bankruptcy and Reorganization Court of São Paulo in which the Extrajudicial Restructuring shall be filed, processed and analyzed ("ER Confirmation Order" and "ER Court", respectively), the Claims and the Existing Notes shall be cancelled and novated (*novados*) as provided for in articles 59 and 163, §6º, item III of the Brazilian Bankruptcy Law and exchanged for (i) the applicable series of New Notes, to be distributed *pro rata* to the Claims of the Noteholders; and (ii) the Holdco Instrument, to be distributed *pro rata* to the Claims of the Noteholders.

**2.3.1.    As Novas Notas e o Instrumento Holdco estão sendo oferecidos para troca apenas (1) nos Estados Unidos, a "compradores institucionais qualificados", conforme definido na Regra 144A sob o *U.S. Securities Act* de 1933, em uma transação

**2.3.1.    The New Notes and the Holdco Instrument are being offered for exchange only (1) in the United States, to "qualified institutional buyers" as defined in Rule 144A under the U.S. Securities Act of 1933, in a private transaction in reliance upon the

18

*L. &.*

privada baseada na isenção dos requisitos de registro do *U.S. Securities Act* de 1933 previstos na Seção 4(a)(2) e (2) fora dos Estados Unidos a pessoas que não sejam "pessoas dos EUA", conforme definido na Regra 902 do *U.S. Securities Act* de 1933, sendo certo que qualquer detentor descrito no item (1) ou (2) acima que seja residente em um Estado Membro da Área Econômica da Europa deve também ser um investidor qualificado (dentro do significado da Regulação de Prospecto (EU) 2017/1129, conforme alterada, e da lei de Luxemburgo de 16 de Julho de 2019 sobre prospectos para valores mobiliários, conforme alterada). As Devedoras não apresentaram ofertas, ofereceram ou venderam, e não irão apresentar ofertas, ou oferecer ou vender, quaisquer valores mobiliários sob qualquer forma que envolva uma oferta pública dentro do significado atribuído na Seção 4(a)(2) do *U.S. Securities Act* de 1933.

exemption from the registration requirements of the U.S. Securities Act of 1933 provided by Section 4(a)(2) thereof and (2) outside the United States to persons other than "U.S. persons" as defined in Rule 902 under the U.S. Securities Act of 1933, provided that any holder described in clause (1) or (2) that is a resident in a Member State of the European Economic Area must also be a qualified investor (within the meaning of the Prospectus Regulation (EU) 2017/1129, as amended, and of the Luxembourg law of July 16, 2019 on prospectuses for securities, as amended). The Debtors have not solicited offers for, or offered or sold, and will not solicit offers for, or offer or sell, any securities in any manner involving a public offering within the meaning of Section 4(a)(2) of the U.S. Securities Act of 1933.

**2.4. Implementação do Plano no Exterior**. Após a submissão deste Plano perante o Juízo da RE e em consulta com o Representante dos Credores, independentemente de qualquer ato ou autorização dos Detentores de Notas, as Devedoras poderão, de boa-fé e de maneira consistente com este Plano, adotar todas as medidas necessárias para obter decisão fazendo-se cumprir o Plano e concedendo assistência adicional por meio de um procedimento de *Chapter 15*, por meio do qual as Devedoras deverão buscar uma ou mais decisões de um Tribunal de Falências dos Estados Unidos para o Distrito Sul de Nova Iorque ou outro tribunal de falências de jurisdição competente nos Estados Unidos da América (a "Corte Norte-Americana de Falências") (i) reconhecendo a Recuperação Extrajudicial como processo principal estrangeiro nos termos do *Bancruptcy Code* dos EUA; (ii) reconhecendo, aplicando e dando pleno vigor e eficácia a este Plano

**2.4. Implementation of the Plan Abroad**. Following submission of this Plan before the ER Court and in consultation with the Creditor Representative, regardless of any act or authorization of the Noteholders, the Debtors may, in good faith and consistently with this Plan, adopt all necessary measures to obtain orders enforcing the Plan and granting additional assistance through a Chapter 15 proceeding, pursuant to which the Debtors will seek the entry of one or more orders of the United States Bankruptcy Court for the Southern District of New York or another United States bankruptcy court of competent jurisdiction (the "U.S. Bankruptcy Court") (i) recognizing the Extrajudicial Restructuring as a foreign main proceeding under the U.S. Bankruptcy Code (ii) recognizing, enforcing and giving full force and effect to this Plan within the territorial jurisdiction of the United States of America, and (iii) authorizing and directing the relevant parties to take any and all actions necessary to

19

dentro da jurisdição territorial dos Estados Unidos da América; e (iii) autorizando e direcionando as respectivas partes a tomarem todas e quaisquer medidas necessárias para dar eficácia aos termos deste Plano, conforme homologado pelo Juízo da RE (tal decisão ou decisões, a "Decisão Norte-Americana de Reconhecimento da RE"). As Devedoras, após consulta ao Representante dos Credores, também poderão iniciar e/ou dar prosseguimento a outros procedimentos judiciais, extrajudiciais ou administrativos, relacionados ou não à insolvência, em jurisdições que não a República Federativa do Brasil ou os Estados Unidos da América, conforme necessário para a implementação deste Plano, e desde que os procedimentos acessórios iniciados no exterior não alterem os termos e condições deste Plano.

give effect to the terms of this Plan, as approved by the ER Court (such order or orders, the "U.S. Recognition Order"). The Debtors, after consultation with and as long as acceptable to the Creditor Representative in good faith, may also initiate and/or proceed with other judicial procedures, extrajudicial or administrative proceedings, whether related to insolvency or otherwise, in jurisdictions other than the Federative Republic of Brazil or the United States of America, as necessary, for the implementation of this Plan; *provided* that the ancillary proceedings initiated abroad shall not change the terms and conditions of this Plan.

## 3. CONDIÇÕES DE REESTRUTURAÇÃO DAS NOTAS EXISTENTES

## 3. RESTRUCTURING CONDITIONS OF EXISTING NOTES

**3.1. Condições Gerais de Reestruturação.** As Partes concordam irrevogavelmente que, por força e de acordo com os termos e condições estabelecidos neste Plano, mediante a Sentença de Homologação do Plano, cada US$ 1,00 em Créditos, conforme ajustado a partir da Data do Protocolo da RE até o Fechamento na forma prevista no **Anexo 3.1** ("Créditos Ajustados") será novado e substituído integralmente, para os fins dos Artigos 283 e 356 do Código Civil Brasileiro e da Lei de Nova York aplicável, por (a) US$ 0,45 em valor nominal de notas de séries denominadas em Dólares, seniores e quirografárias, as quais serão elegíveis para compensação por meio da DTC e sujeitas às restrições de transferência aplicáveis a instrumentos de dívida emitidos no âmbito das isenções de registro previstas na Regra 144A do

**3.1. General Restructuring Conditions.** The Parties irrevocably agree that, by operation and pursuant to the terms and conditions set forth in this Plan, upon the ER Confirmation Order, each US$ 1.00 in Claims, adjusted from the ER Filing Date until the Closing Date as provided for in **Schedule 3.1** ("Adjusted Claims"), shall be novated and substituted in full, for purposes of Sections 283 and 356 of the Brazilian Civil Code and applicable New York law, by (a) US$ 0.45 in face amount of Dollar denominated senior unsecured series of notes, which shall be eligible for clearance through DTC and subject to restrictions on transfer applicable to debt instruments issued pursuant to exemptions from registration under Rule 144A and Regulation S under the Securities Act ("New Notes"); and (b) US$ 0.55 in face amount of Dollar denominated

Regulamento S do U.S. Securities Act de 1933 ("Novas Notas"); e (b) US$ 0,55 em valor nominal de unidades denominadas em dólares de um novo instrumento emitido pela Holdco, que será registrado em nome da DTC ou de seu representante e elegível para compensação por meio da DTC ("Instrumento Holdco"), conforme descrito e detalhado abaixo.

units of a new instrument issued by Holdco, which will be registered in the name of DTC or its nominee and eligible for clearance through DTC ("Holdco Instrument"), as described and detailed below.

**3.1.1.**　　Reserva de Direitos. Até a completa implementação deste Plano, as Partes concordam irrevogavelmente que, nos termos do Artigo 49, §1º da LFR, nada neste Plano limitará, prejudicará ou impedirá qualquer direito de crédito dos Detentores de Notas contra a Emissora Original decorrente das Notas Existentes, sujeito aos termos e condições deste Plano.

**3.1.1.**　　Reservation of Rights: Until full implementation of this Plan, the Parties irrevocably agree that, pursuant to Article 49, § 1º of the Brazilian Bankruptcy Law, nothing in this Plan will limit, impair or prevent any of the Noteholders' credit rights against the Original Issuer arising from the Existing Notes, subject to the terms and conditions of this Plan.

**3.2.**　　**Novas notas.** As Notas Existentes serão parcial e obrigatoriamente substituídas pelas Novas Notas, que serão notas seniores quirografárias, denominadas em Dólares, a serem emitidas de acordo com certas escrituras de emissão regidas pelas Leis do Estado de Nova Iorque, Estados Unidos da América, devendo cada uma delas refletir materialmente os termos e condições descritos nas Escrituras de Emissão das Novas Notas constante do **Anexo 3.2**, cujos termos finais devem ser aceitáveis para os Credores Signatários em boa-fé, como confirmado à Companhia pelo Representante dos Credores ("Escrituras de Emissão das Novas Notas").

**3.2.**　　**New Notes.** The Existing Notes will be partially and mandatorily replaced by the New Notes, which will be Dollar denominated, senior unsecured notes, issued pursuant to certain indentures governed by the laws of the State of New York, United States of America, each of which shall materially reflect the terms and conditions outlined in the New Notes Indentures attached as **Schedule 3.2** hereto, which final terms shall be acceptable to the Signatory Creditors in good faith, as confirmed to the Company by the Creditor Representative (the "New Notes Indentures").

**3.2.1.**　　Emissora das Novas Notas. As Novas Notas serão emitidas pela Emissora das Novas Notas, uma nova subsidiária financeira de propósito específico da Nova OEC, incorporada sob as leis das Ilhas Cayman.

**3.2.1.**　　Issuer of the New Notes. The New Notes shall be issued by the New Notes Issuer, a newly formed special purpose finance subsidiary of New OEC organized in the Cayman Islands.

**3.2.2.**　　Garantidores das Novas Notas. As Novas Notas serão incondicional e

**3.2.2.**　　Guarantors of the New Notes. The New Notes will be unconditionally and

| | |
|---|---|
| irrevogavelmente garantidas, inicialmente, pela Nova OEC, CNO, OECI e OENGER e por outras Subsidiárias dessas sociedades, conforme previsto nas Escrituras de Emissão das Novas Notas (coletivamente, os "Garantidores das Novas Notas"). | irrevocably guaranteed by New OEC, CNO, OECI and OENGER, initially, and certain other Subsidiaries of the foregoing to the extent provided for under the New Notes Indentures (collectively, the "New Notes Guarantors"). |
| **3.2.3.** Condições de Pagamento das Novas Notas. Todas as condições de pagamento das Novas Notas, incluindo vencimento, amortização e taxas de juros aplicáveis, deverão ser consistentes com as Escrituras de Emissão das Novas Notas e com a tabela constante do **Anexo 3.2.3**, conforme aplicável. | **3.2.3.** Payment Conditions of the New Notes. All payment terms of the New Notes, including maturity, amortization and applicable interest rates shall be consistent with the New Notes Indentures and the table attached as **Schedule 3.2.3**, as applicable. |
| **3.2.3.1.** _Valor do Principal_. Cada série de Novas Notas será emitida em um valor inicial de principal equivalente a 45% (quarenta e cinco por cento) dos Créditos Ajustados em relação a cada série de Notas Existentes, distribuídas _pro rata_ entre os Detentores de Notas da série correspondente de Notas Existentes, conforme tabela constante do **Anexo 3.2.3**. | **3.2.3.1.** _Principal Amount_. Each series of New Notes shall be issued in an initial principal amount equal to 45% (forty five percent) of the Adjusted Claims in respect of such series of Existing Notes, distributed _pro rata_ among the Noteholders of the corresponding series of Existing Notes as set forth in the table attached as **Schedule 3.2.3**. |
| **3.2.3.2.** _Séries_. As Novas Notas serão emitidas em sete (7) séries, cada uma das quais corresponderá a uma série de Notas Existentes. | **3.2.3.2.** _Series_. The New Notes will be issued in seven (7) series, each of which will correspond to a series of the Existing Notes. |
| **3.2.3.3.** _Juros_. Cada série de Novas Notas terá juros a uma taxa anual equivalente a taxa de juros originalmente prevista em cada uma das séries de Notas Existentes, conforme indicadas na tabela constante do Anexo 3.2.3, e estarão sujeitas a juros de mora adicionais e ao Adicional PIK (conforme descrito no **Anexo 3.2.3**) nos termos e condições estabelecidos nas Escrituras de Emissão das Novas Notas. | **3.2.3.3.** _Interest_. Each series of New Notes shall bear interest at a rate _per annum_ equal to the interests originally contemplated in each corresponding series of Existing Notes, as indicated in the table attached as Schedule 3.2.3, and shall be subject to additional default interest and the PIK Premium (as described in **Schedule 3.2.3**) on the terms and conditions set forth in the New Notes Indentures. |
| **3.2.3.3.1.** _Opções de Pagamento de Juros_. Até o quinto aniversário da Data de Fechamento, e observados os demais termos e condições estabelecidos nas Escrituras de Emissão das Novas Notas, a Emissora das | **3.2.3.3.1.** _Interest Payment Options_. Until the fifth anniversary of the Closing Date, and subject to the other terms and conditions set forth in the New Notes Indentures, the New Notes Issuer shall in its |

Novas Notas terá, a seu critério exclusivo, a opção de, ao invés de pagar integralmente os juros em dinheiro, capitalizar a totalidade ou a parcela aplicável de tais juros prevista no **Anexo 3.2.3**, adicionando ao valor do principal em aberto das Novas Notas, na data de pagamento de juros aplicável, uma taxa equivalente à soma da taxa de juros mais o prêmio aplicável nos termos do **Anexo 3.2.3** (a "Opção PIK"). Após o quinto aniversário da Data de Fechamento, os juros de cada série de Novas Notas serão pagos apenas em dinheiro, segundo a taxa de juros correspondente.

sole discretion have the option to, in lieu of paying full cash interest, capitalize all or the applicable portion set forth on **Schedule 3.2.3** of such interest by adding a rate equal to the sum of the cash interest rate plus the applicable premium set forth on **Schedule 3.2.3** to the outstanding principal amount of the New Notes on the applicable interest payment date (the "PIK Option"). Subsequent to the fifth-year anniversary of the Closing Date, interest on each series of New Notes shall be paid only in cash at the corresponding cash interest rate.

**3.2.3.4.** *Datas de Pagamento de Juros*. Cada série de Novas Notas terá as mesmas datas de pagamento de juros originalmente programadas para cada série correspondente de Notas Existentes, e em cada caso previstas no **Anexo 3.2.3**.

**3.2.3.4.** *Interest Payment Dates*. Each series of New Notes shall be subject to the same interest payment dates as originally scheduled in each corresponding series of Existing Notes, in each case as set forth on **Schedule 3.2.3**.

**3.2.3.5.** *Amortização.* O valor de principal das Novas Notas será amortizado (i) mediante pagamento efetivo no vencimento de cada série de Novas Notas, na forma indicada na Cláusula 3.2.3.6 abaixo; e (ii) mediante ocorrência de qualquer pagamento de *Cash Sweep*, na forma indicada na Cláusula 3.2.3.7.

**3.2.3.5.** *Amortization*. The principal amount of the New Notes shall be amortized (i) upon effective payment at maturity of each series of New Notes, as indicated in Clause 3.2.3.6 below, and (ii) upon occurrence of any Cash Sweep payments, as indicated in Clause 3.2.3.7.

**3.2.3.6.** *Vencimento*. Cada série de Novas Notas terá uma data de vencimento de 4 (quatro) anos e 180 (cento e oitenta) dias posterior à data de vencimento original da série correspondente de Notas Existentes, em cada caso conforme previsto no Anexo 3.2.3; *sendo certo que* as Novas Notas emitidas em troca das Notas Existentes perpétuas continuem a ser perpétuas no vencimento.

**3.2.3.6.** *Maturity*. Each series of New Notes shall have a stated maturity that is four (4) years and 180 (one hundred and eighty) days later than the original maturity date of the corresponding series of Existing Notes, in each case as set forth on Schedule 3.2.3; *provided* that the New Notes issued in exchange for the perpetual Existing Notes shall continue to be perpetual in maturity.

**3.2.3.7.** Cash Sweep. Durante o Período de Pagamento de Caixa Excedente, as Novas Notas estarão sujeitas ao Cash Sweep nos termos e condições estabelecidos nas Escrituras de Emissão das Novas Notas constante do **Anexo 3.2**; *sendo certo que cada*

**3.2.3.7.** *Cash Sweep.* During the Excess Cash Sweep Period, the New Notes shall be subject to the Cash Sweep on the terms and conditions set forth in the New Notes Indentures attached hereto as **Schedule 3.2**; *provided* that each Cash Sweep payment shall

| | |
|---|---|
| pagamento de Cash Sweep será aplicado para reduzir o montante de principal em aberto das Novas Notas em base dólar-por-dólar. | be applied on a dollar-for-dollar basis to reduce the outstanding principal amount of the New Notes. |
| **3.2.4.** Outros compromissos, obrigações, termos e condições. As Novas Notas vincularão a Emissora das Novas Notas e os Garantidores das Novas Notas a acordos, compromissos, termos, condições e obrigações adicionais conforme estabelecidos nas Escrituras de Emissão das Novas Notas constantes do **Anexo 3.2**. | **3.2.4.** Other covenants, obligations, terms and conditions. The New Notes shall obligate the New Notes Issuer and the New Notes Guarantors to additional covenants, agreements, terms, conditions and obligations as set forth in the New Notes Indentures attached hereto as **Schedule 3.2**. |
| **3.2.5.** Prioridade. As Novas Notas constituirão obrigações seniores, incondicionais, não subordinadas e quirografárias da Emissora das Novas Notas e de cada um dos Garantidores das Novas Notas. Cada série de Novas Notas será igual em direito de pagamento a cada uma das demais séries de Novas Notas e com qualquer outra dívida preferencial quirografária e não subordinada da Emissora das Novas Notas e dos Garantidores das Novas Notas. | **3.2.5.** Ranking. The New Notes shall constitute senior, unconditional, unsubordinated, unsecured obligations of the New Notes Issuer and each of the New Notes Guarantors. Each series of New Notes shall be equal in right of payment with each other series of New Notes and with any other senior unsecured, unsubordinated indebtedness of the New Notes Issuer and the New Notes Guarantors. |
| **3.2.6.** Conflito. As Escrituras de Emissão das Novas Notas constantes do **Anexo 3.2** são integralmente incorporadas e parte integrante deste Plano. As Partes concordam expressa e irrevogavelmente que, em caso de conflito entre as Escrituras de Emissão das Novas Notas e qualquer outra seção, anexo ou disposição do Plano, os termos estabelecidos nas Escrituras de Emissão das Novas Notas prevalecerão sobre o Plano. | **3.2.6.** Conflict. The New Notes Indentures attached as **Schedule 3.2** are fully incorporated into and part of this Plan. The Parties hereby expressly and irrevocably agree that in case of conflict between the New Notes Indentures and any other section, schedule or provision of the Plan the terms set forth in the New Notes Indentures will prevail over the Plan. |
| **3.3. Instrumento Holdco.** As Notas Existentes serão parcial e obrigatoriamente substituídas pelo Instrumento Holdco, emitido nos termos de instrumento regido pelas leis do Estado de Nova Iorque, Estados Unidos da América, que deverá refletir materialmente os termos e condições do Contrato do Instrumento Holdco anexo como **Anexo 3.3** deste Plano, cuja forma final deverá ser aceitável para os Credores | **3.3. Holdco Instrument.** The Existing Notes will be partially and mandatorily replaced by the Holdco Instrument, issued pursuant to an indenture governed by the laws of the State of New York, United States of America, which shall materially reflect the terms and conditions of Holdco Instrument Agreement attached as **Schedule 3.3** hereto, which final form shall be acceptable to Signatory Creditors in good faith, as |

| | |
|---|---|
| Signatários, como confirmado à Companhia pelo Representante dos Credores ("Contrato do Instrumento Holdco"). | confirmed to the Company by the Creditor Representative (the "Holdco Instrument Agreement"). |
| **3.3.1.**    Emissor do Instrumento Holdco. O Instrumento Holdco será emitido pela Holdco, uma subsidiária indireta da ODB, incorporada sob as leis das Ilhas Cayman, que detém todo ou substancialmente todo o capital social da Nova OEC. | **3.3.1.**    Issuer of the Holdco Instrument. The Holdco Instrument shall be issued by Odebrecht Holdco Finance Limited, an entity organized in the Cayman Islands, which is an indirect subsidiary of ODB and hold all or substantially all of the equity of New OEC. |
| **3.3.2.**    Garantias do Instrumento Holdco. O Instrumento Holdco não será garantido por qualquer outra entidade. | **3.3.2.**    Guarantees of the Holdco Instrument. The Holdco Instrument shall not be guaranteed by any other entity. |
| **3.3.3.**    Condições de Pagamento do Instrumento Holdco. Todas as condições de pagamento do Instrumento Holdco deverão ser consistentes com o Contrato do Instrumento Holdco constante do **Anexo 3.3**. | **3.3.3.**    Payment Conditions of the Holdco Instrument. All payment terms in respect of the Holdco Instrument shall be consistent with the Holdco Instrument Agreement attached as **Schedule 3.3**. |
| **3.3.3.1.**        *Valor Nominal*. O Instrumento Holdco será emitido em valor nominal inicial igual a 55% (cinquenta e cinco por cento) dos Créditos Ajustados, e será distribuído *pro rata* entre os Detentores de Notas. | **3.3.3.1.** *Face Amount*. The Holdco Instrument shall be issued in an initial face amount equal to 55% (fifty five percent) of all Adjusted Claims and shall be distributed *pro rata* among the Noteholders. |
| **3.3.3.2.**        *Juros*. O Instrumento Holdco não comportará juros. | **3.3.3.2.** *Interest*. The Holdco Instrument will not bear interest. |
| **3.3.3.3.**        *Pagamentos*. Os detentores do Instrumento Holdco farão jus ao recebimento de pagamentos em conformidade com os termos e condições estabelecidos no Contrato do Instrumento Holdco, sendo que os pagamentos efetuados aos detentores do Instrumento Holdco serão aplicados, em base dólar-por-dólar, para reduzir o valor nominal em aberto do Instrumento Holdco, até o limite do valor nominal total do Instrumento Holdco, salvo se resgatado antecipadamente conforme os termos e condições estabelecidos no Contrato do Instrumento Holdco. | **3.3.3.3.** *Payments*. The holders of the Holdco Instrument shall be entitled to receive payments pursuant to the terms and conditions set forth in the Holdco Instrument Agreement, and such payments made to holders shall apply, on a dollar-for-dollar basis, to reduce the outstanding face amount of the Holdco Instrument, up to the full face amount of the Holdco Instrument unless earlier redeemed pursuant to the terms of the Holdco Instrument Agreement. |

| | |
|---|---|
| **3.3.3.3.1.** *Pagamentos durante o Período de Pagamento de Caixa Excedente*. Durante o Período de Pagamento de Caixa Excedente, os detentores do Instrumento Holdco farão jus a pagamentos, na medida em que aplicável, em 15 de maio de cada ano, de acordo com os termos do *Cash Sweep* estabelecidos no Contrato do Instrumento Holdco, observados os ajustes ali previstos. | **3.3.3.3.1.** *Payments during the Excess Cash Sweep Period*. During the Excess Cash Sweep Period, holders of the Holdco Instrument shall be entitled to receive payments, if applicable, on May 15 of every year pursuant to the Cash Sweep terms set forth in the Holdco Instrument Agreement and subject to any adjustments provided therein. |
| **3.3.3.3.2.** *Pagamentos fora do Período de Pagamento de Caixa Excedente*. Fora do Período de Pagamento de Caixa Excedente, os detentores do Instrumento Holdco farão jus ao recebimento de pagamentos de acordo com os termos e condições estabelecidos no Contrato do Instrumento Holdco, observados os ajustes ali previstos. | **3.3.3.3.2.** *Payments outside the Cash Sweep Period*. Outside the Excess Cash Sweep Period, holders of the Holdco Instrument shall be entitled to receive payments in accordance with the terms and conditions set forth in the Holdco Instrument Agreement and subject to any adjustments provided therein. |
| **3.3.3.4.** *Eventos de Pagamento Especiais*. Os detentores do Instrumento Holdco farão jus ao recebimento de pagamentos adicionais nos eventos e de acordo com os termos e condições detalhados no Contrato do Instrumento Holdco constante do **Anexo 3.3**. | **3.3.3.4.** *Specified Payment Events*. Holders of the Holdco Instrument shall be entitled to receive additional payments in the events and pursuant to the terms and conditions detailed in the Holdco Instrument Agreement attached as **Schedule 3.3**. |
| **3.3.3.5.** *Vencimento*. O Instrumento Holdco vencerá em 10 de setembro de 2058. | **3.3.3.5.** *Maturity*. The Holdco Instrument will mature on September 10, 2058. |
| **3.3.3.6.** *Resgate Opcional*. O Instrumento Holdco poderá ser resgatado a qualquer momento, no todo ou em parte, por 100% do valor nominal em aberto, sem incidência de prêmio ou qualquer penalidade, de acordo com os termos e condições estabelecidos no Contrato do Instrumento Holdco constante do **Anexo 3.3**. Qualquer parcela do Instrumento Holdco resgatada dessa forma será cancelada no momento do resgate. | **3.3.3.6.** *Optional Redemption*. The Holdco Instrument may be redeemed at any time, in whole or in part, for 100% of the face amount outstanding, without premium or penalty pursuant to the terms and conditions detailed in the Holdco Instrument Agreement attached as **Schedule 3.3**. Any portion of the Holdco Instrument so redeemed shall be canceled upon redemption. |
| **3.3.4.** *Outros compromissos e obrigações*. O Instrumento Holdco vinculará a Holdco a | **3.3.4.** *Other covenants and obligations*. The Holdco Instrument shall obligate the |

acordos, compromissos, termos, condições e obrigações adicionais conforme estabelecidos no Contrato do Instrumento Holdco constante do **Anexo 3.3**.

Holdco to additional covenants, agreements, terms, conditions and obligations as set forth in the Holdco Instrument Agreement attached hereto as **Schedule 3.3**.

**3.3.5.** Conflito. O Contrato do Instrumento Holdco constante do **Anexo 3.3** é integralmente incorporado e parte integrante deste Plano. As Partes concordam expressa e irrevogavelmente que, em caso de conflito entre o Contrato do Instrumento Holdco e qualquer outra seção, anexo ou disposição deste Plano, prevalecerão os termos estabelecidos no Contrato do Instrumento Holdco.

**3.3.5.** Conflict. The Holdco Instrument Agreement attached as the **Schedule 3.3** is fully incorporated into and part of this Plan. The Parties hereby expressly and irrevocably agree that in case of conflict between the Holdco Instrument Agreement and any other section, schedule or provision of the Plan, the terms set forth in the Holdco Instrument Agreement will prevail over the Plan.

## 4.    GOVERNANÇA CORPORATIVA

## 4.    CORPORATE GOVERNANCE

**4.1.** As Partes neste ato convencionam que a Nova OEC e suas Subsidiárias observarão, no curso de suas atividades, as melhores práticas de governança corporativa, incluindo a manutenção de todos os procedimentos de conformidade e melhorias de políticas em vigor na Data do Protocolo da RE, e cumprirão os termos e obrigações estabelecidos neste Plano. Os documentos societários da Nova OEC constantes do **Anexo 4.1** deste Plano e os estatutos sociais das Subsidiárias da Nova OEC permanecerão consistentes com este Plano sob todos os aspectos, a menos e até que sejam alterados pelos respectivos acionistas, desde que a maioria do Conselho da Nova OEC e a maioria dos Conselheiros Independentes também recomendem tal alteração, sendo certo que nenhuma alteração poderá modificar as obrigações assumidas nesta, ou violar os termos e condições desta Cláusula 4. Até a Data de Fechamento, a Nova OEC deverá estabelecer os seguintes termos e procedimentos de governança corporativa:

**4.1.** The Parties hereby agree that New OEC and its Subsidiaries shall observe, in the course of their business, the best practices of corporate governance, including the maintenance of all compliance procedures and policy improvements effective as of the ER Filing Date, and shall comply with the terms and obligations set forth in this Plan. The corporate documents of New OEC attached hereto as **Schedule 4.1** and the bylaws of New OEC's Subsidiaries shall remain consistent with this Plan in all respects unless and until amended by their respective shareholders, provided that a majority of the New OEC Board and the majority of Independent Directors must also recommend such amendment, provided that such amendment cannot modify the obligations undertaken in, or violate the terms and conditions of this Clause 4. By the Closing Date, New OEC will institute the following corporate governance terms and procedures:

| | |
|---|---|
| **4.1.1.      Conselheiros Independentes**. O conselho de administração da Nova OEC (o "Conselho da Nova OEC") deverá ser composto, de forma contínua, por ao menos um número de Conselheiros Independentes equivalente ao maior entre (i) 20% (vinte por cento) dos membros do Conselho da Nova OEC ou (ii) 2 (dois). Observados os termos deste Plano, os Conselheiros Independentes serão nomeados pelos acionistas e eleitos de tempos em tempos, devendo, a todo o tempo, satisfazer os requisitos de independência definidos na Cláusula 1.1.39. | **4.1.1.    Independent Directors**. On an ongoing basis, the board of directors of New OEC (the "New OEC Board") shall include at least a number of Independent Directors equivalent to the greater of (i) 20% (twenty percent) of the members of the New OEC Board or (ii) two (2). Subject to the terms hereof, the Independent Directors shall be appointed by the shareholders and elected from time to time, and shall at all times meet the requirements for independence defined in Clause 1.1.39. |
| **4.1.1.1.                Chapa Inicial de Conselheiros Independentes**. Exclusivamente para o primeiro mandato após a Data de Fechamento, o Conselho da Nova OEC incluirá, a partir da Data de Fechamento, ao menos um Conselheiro Independente indicado, consentido ou não objetado pelo Representante dos Credores e aceitável à ODB, e ao menos um Conselheiro Independente indicado pela ODB, observadas as disposições de substituição previstas na Cláusula 4.1.1.2. | **4.1.1.1.** Initial Slate of Independent Directors. Exclusively for the first term following the Closing Date, New OEC Board shall include, as of the Closing Date, at least one Independent Director appointed, consented or not objected by the Creditor Representative and acceptable to ODB, and at least one Independent Director appointed by ODB, subject to the replacement provisions provided in Clause 4.1.1.2. |
| **4.1.1.2.                Substituição de Conselheiros Independentes**. Em caso de morte, renúncia ou destituição de qualquer Conselheiro Independente, um Conselheiro Independente substituto, que atenda aos requisitos de independência definidos na Cláusula 1.1.39 deste Plano, deverá ser nomeado pelos demais membros do Conselho da Nova OEC, nos termos do artigo 150 da Lei das S.A., até a nomeação definitiva pelos acionistas da Nova OEC nos termos da Lei das S.A., conforme aplicável, com a maior brevidade possível, observado o quanto previsto nas Escrituras de Emissão das Novas Notas. | **4.1.1.2.** Replacement of Independent Directors. Upon the death, resignation or removal of any Independent Director, a replacement Independent Director, that meets the requirements for independence defined in Clause 1.1.39 of this Plan, shall be appointed by the remaining directors of New OEC Board, pursuant to article 150 of the Brazilian Corporation Law, until definitive appointment by the shareholders as per Brazilian Corporate Law as applicable, as promptly as possible, pursuant to the provisions of the New Notes Indentures. |
| **4.1.1.3.                Período de Vacância – Curso Normal dos Negócios**. Durante | **4.1.1.3.** Vacancy Period – Ordinary Course of Business. During any period in which the |

28

Z. b.

qualquer período em que o número de Conselheiros Independentes seja inferior ao mínimo previsto na Cláusula 4.1.1, o Conselho da Nova OEC somente poderá deliberar ou autorizar, a qualquer título, resoluções que compreendem atividades no curso normal dos negócios da Nova OEC e suas Subsidiárias, e, ademais, que sejam necessárias para evitar a ocorrência de um efeito negativo nas atividades e nos negócios da Nova OEC ou de suas Subsidiárias.

number of Independent Directors in the New OEC Board is lower than the minimum provided for in Clause 4.1.1, the New OEC Board shall only be permitted to deliberate or otherwise authorize resolutions involving matters that are within New OEC's or its Subsidiaries' ordinary course of business, and, furthermore, are necessary to avoid causing a negative effect on New OEC's or its Subsidiaries' activities and business..

**4.1.1.4.** Restrições Específicas durante Período de Vacância. As Devedoras reconhecem e concordam, de forma irrevogável, que durante qualquer período em que o número de Conselheiros Independentes esteja abaixo do mínimo previsto na Cláusula 4.1.1, o Conselho da Nova OEC não poderá deliberar, aprovar, proferir ou autorizar, a qualquer título, qualquer resolução relacionada a (a) qualquer Transação com Partes Relacionadas conforme prevista na Cláusula 4.1.5; (b) qualquer alienação de ativos feita pela Nova OEC e suas Subsidiárias, (b.1) de forma agregada, em montante superior a US$ 30.000.000,00 (trinta milhões de Dólares) para as vendas de ativos que sejam necessárias ao pagamento de Multas e sejam permitidas nos termos das Escrituras de Emissão das Novas Notas; (b.2) de forma agregada, em montante superior a US$ 20.000.000,00 (vinte milhões de Dólares), e individualmente, em montante superior a US$ 10.000.000,00 (dez milhões de Dólares), para quaisquer outras vendas de ativos, sendo certo que tais recursos também poderão ser aplicados no pagamento de Multas; (c) qualquer venda de ações existentes da Nova OEC ou de qualquer de suas Subsidiárias, emissão de novas ações e/ou aumento de capital no valor de pelo menos US$ 200.000.000,00 (duzentos milhões de Dólares) em valor considerado de forma agregada, exceto para emissões ou

**4.1.1.4.** Specific Restrictions during Vacancy Period. The Debtors irrevocably acknowledge and agree, that during any period in which the number of Independent Directors in the New OEC Board is lower than the minimum provided for in Clause 4.1.1, the New OEC Board shall not be permitted to deliberate on, approve, enact or otherwise authorize any resolution regarding (a) any Related Party Transactions provided under Clause 4.1.5; (b) any sale of assets by New OEC and its Subsidiaries (b.1) on an aggregate basis, in an amount exceeding US$ 30,000,000.00 (thirty million Dollars) solely with respect to asset sales that are necessary for the payment of Fines and are permitted under the terms of the New Notes Indentures; (b.2) on an aggregate basis, in an amount exceeding US$ 20,000,000.00 (twenty million Dollars) and individually, in an amount exceeding US$ 10,000,000.00 (ten million Dollars), with respect to any other sale of assets, provided that such amounts could also be applied for the payment of Fines; (c) any sale of New OEC's or any of its Subsidiaries' existing shares, issuance of new shares and/or capital raise in an amount of at least US$ 200,000,000 (two hundred million Dollars) in aggregate amount, except for issuance or sale of shares of any Subsidiary to New OEC or any Subsidiary thereof solely in connection with the management of the OEC Group's cash needs; (d) the payment, repayment, and/or repurchase of debts

29

transferências de ações de qualquer Subsidiária à Nova OEC ou a qualquer outra Subsidiária exclusivamente para fins de gestão e necessidade de caixa do Grupo OEC; (d) pagamento, reembolso e/ou recompra de dívidas contraídas e/ou garantidas pela Nova OEC ou por qualquer uma de suas Subsidiárias acima de US$ 10.000.000,00 (dez milhões de Dólares) de forma agregada em qualquer momento antes dos vencimentos dos respectivos instrumentos de dívida, exceto por pagamentos, reembolsos e/ou recompras que façam parte de transações de refinanciamento permitidas nos termos da Escritura de Emissão das Novas Notas; (e) qualquer acordo celebrado no contexto de qualquer processo judicial, arbitral ou administrativo com valor de liquidação superior a (e.1) US$ 25.000.000,00 (vinte e cinco milhões de Dólares) exclusivamente no que diz respeito a acordos referentes a demandas de clientes ou tributárias nos termos da Lei local aplicável, sendo certo que a Nova OEC ou suas Subsidiárias poderão participar e/ou aderir, a qualquer tempo, a qualquer programa de reperfilamento ou anistia de créditos tributários que possa ser promovido de tempos em tempos por autoridades Federais, Estaduais e/ou Municipais no Brasil (tais como o REFIS ou qualquer outro programa semelhante); e (e.2) US$ 5.000.000,00 (cinco milhões de Dólares) no que diz respeito a quaisquer outros acordos; ou (f) qualquer novo acordo de leniência (ou acordo semelhante com o objetivo de sanar matérias criminais, regulatórias, impedimentos de contratação ou que impliquem na aplicação de penalidades ou Multas a respeito das matérias acima descritas) e/ou aditamentos ou suplementos celebrados em relação a qualquer acordo de leniência ou acordo similar que tenham sido firmados previamente pelas Devedoras, pela Nova OEC ou suas Subsidiárias em montante superior a US$ 10.000.000,00 (dez milhões

incurred and/or guaranteed by New OEC or any of its Subsidiaries in excess of US$ 10,000,000 (ten million Dollars) on an aggregate basis at any time before the respective debt instruments become due, except for any payments, repayments, and/or repurchases that are part of refinancing transactions that are permitted under the New Notes Indentures; (e) any settlement agreement in the context of any judicial, arbitral or administrative proceedings with a settlement amount exceeding (e.1) US$25,000,000.00 (twenty five million Dollars) solely in respect of the settlement of customer claims or tax claims pursuant to applicable local Law, provided however that New OEC or its Subsidiaries shall be entitled to participate and/or adhere at any time to any amnesty or reprofiling program of tax claims which may be enacted from time to time by the Federal, State and/or Municipal authorities in Brazil (such as REFIS or other similar programs); and (e.2) US$ 5,000,000.00 (five million Dollars) in respect of any other settlement agreement; or (f) any new leniency agreements (or similar agreements to resolve criminal, regulatory, enforcement or debarment matters or incur an obligation to pay penalties or Fines in respect thereof) and/or amendments or supplements to any such existing leniency agreements or similar agreements previously executed by the Debtors, New OEC or any of its Subsidiaries, that exceeds US$ 10,000,000.00 (ten million Dollars). The basket amounts provided for in subclauses (b) and (d) in this Clause 4.1.1.4 are applicable on a consolidated basis to one or more transactions approved during all vacancy periods that occurred in the preceding 12 (twelve) months.

de Dólares). As limitações de valores estabelecidas nos subitens (b) e (d) nesta Cláusula 4.1.1.4 se aplicam de forma consolidada a uma ou mais transações aprovadas durante todos os períodos de vacância que ocorreram nos 12 (doze) meses anteriores.

**4.1.2.     Comitê de Finanças e Risco do Conselho da Nova OEC**. O Comitê de Finanças e Risco do Conselho da Nova OEC permanecerá ativo desde a Data do Protocolo da RE até a Data de Fechamento. A partir da Data de Fechamento, o Comitê de Finanças e Risco do Conselho da Nova OEC incluirá, de forma contínua, ao menos um Conselheiro Independente. Durante qualquer período em que o número de Conselheiros Independentes no Comitê de Finanças e Risco do Conselho da Nova OEC seja inferior ao mínimo previsto nesta Cláusula 4.1.2, e observada a Cláusula 4.1.1.2 deste Plano, o Comitê de Finanças e Risco do Conselho da Nova OEC (a) somente poderá recomendar resoluções que compreendem atividades no curso normal dos negócios da Nova OEC ou de suas Subsidiárias, e, ademais, que sejam necessárias para evitar a ocorrência de efeito negativo nas atividades ou negócios da Nova OEC ou suas Subsidiárias, de acordo com a Cláusula 4.1.1.3 deste Plano; e (b) não poderá recomendar, a qualquer título, qualquer matéria que se enquadre nas restrições previstas na Cláusula 4.1.1.4 deste Plano. Após o término de mandato sem que haja reeleição, os acionistas indicarão para a vaga um Conselheiro Independente que satisfaça os requisitos de independência definidos na Cláusula 1.1.39 deste Plano com a maior brevidade possível, observado o quanto previsto nas Escrituras de Emissão das Novas Notas.

**4.1.2.     New OEC Board's Finance and Risk Committee.** The New OEC Board's Finance and Risk Committee shall remain effective as of the ER Filing Date through the Closing Date. As of the Closing Date, the New OEC Board's Finance and Risk Committee shall include at least one Independent Director on an ongoing basis. During any period in which the number of Independent Directors of the New OEC Board's Finance and Risk Committee is lower than the minimum provided for in this Clause 4.1.2, and subject to Clause 4.1.1.2 of this Plan, the New OEC Board's Finance and Risk Committee shall (a) only be permitted to recommend resolutions involving matters that are within New OEC's or its Subsidiaries' ordinary course of business, and, furthermore, are necessary to avoid causing a negative effect on New OEC's or its Subsidiaries' business or activities, pursuant to Clause 4.1.1.3 of this Plan; and (b) not be permitted to recommend any resolution that falls into the restrictions set forth in Clause 4.1.1.4 of this Plan. Upon the end of term without reelection, the shareholders shall appoint a replacement Independent Director that meets the requirements for independence defined in Clause 1.1.39 of this Plan as promptly as possible, pursuant to the provisions of the New Notes Indentures.

**4.1.3.     Comitê de Integridade e Auditoria do Conselho da Nova OEC**. O Comitê de Integridade e Auditoria do

**4.1.3.     New OEC Board's Integrity and Audit Committee.** The New OEC Board's Integrity and Audit Committee shall remain

31

Conselho da Nova OEC permanecerá ativo desde a Data do Protocolo da RE até a Data de Fechamento. A partir da Data de Fechamento, o Comitê de Integridade e Auditoria do Conselho da Nova OEC será composto, de forma contínua, por uma maioria de Conselheiros Independentes. Durante qualquer período em que o Comitê de Integridade e Auditoria do Conselho da Nova OEC não seja composto por uma maioria de Conselheiros Independentes conforme previsto nesta Cláusula 4.1.3, e observada a Cláusula 4.1.1.2 deste Plano, o Comitê de Integridade e Auditoria do Conselho da Nova OEC (a) somente poderá recomendar, a qualquer título, resoluções que compreendem atividades no curso normal dos negócios da Nova OEC ou de suas Subsidiárias, e, ademais, que sejam necessários para evitar a ocorrência de efeito negativo nas atividades ou negócios da Nova OEC ou suas Subsidiárias, de acordo com a Cláusula 4.1.1.3 deste Plano; e (b) não poderá recomendar, a qualquer título, qualquer matéria que se enquadre nas restrições previstas na Cláusula 4.1.1.4 deste Plano. Após o término de mandato sem que haja reeleição, os acionistas indicarão para a vaga um Conselheiro Independente que satisfaça os requisitos de independência definidos na Cláusula 1.1.39 deste Plano com a maior brevidade possível, observado o quanto previsto nas Escrituras de Emissão das Novas Notas.

effective as of the ER Filing Date through the Closing Date. As of the Closing Date, the New OEC Board's Integrity and Audit Committee shall be formed by a majority of Independent Directors on an ongoing basis. During any period in which the New OEC Board's Integrity and Audit Committee is not formed by a majority of Independent Directors as provided for in this Clause 4.1.3, and subject to Clause 4.1.1.2 of this Plan, the New OEC Board's Integrity and Audit Committee shall (a) only be permitted to recommend resolutions involving matters that are within New OEC's or its Subsidiaries' ordinary course of business and, furthermore, are necessary to avoid causing a negative effect on New OEC's or its Subsidiaries' activities, pursuant to Clause 4.1.1.3 of this Plan; and (b) not be permitted to recommend any resolution that falls into the restrictions set forth in Clause 4.1.1.4 of this Plan. Upon the end of term without reelection shareholders shall appoint a replacement Independent Director that meets the requirements for independence defined in Clause 1.1.39 of this Plan as promptly as possible, pursuant to the provisions of the New Notes Indentures.

**4.1.4.    Simplificação da Estrutura de Governança**. O Conselho da Nova OEC e os acionistas da Nova OEC poderão alterar o estatuto social da Nova OEC para fundir o Comitê Financeiro e de Risco do Conselho da Nova OEC e o Comitê de Integridade e Auditoria do Conselho da Nova OEC, caso em que o comitê do Conselho da Nova OEC resultante dessa fusão deverá ser constituído, de forma contínua, por maioria de Conselheiros Independentes.    Durante

**4.1.4.    Governance    Structure Simplification**. New OEC Board and New OEC shareholders may amend New OEC's bylaws to merge the New OEC Board's Finance and Risk Committee and the New OEC Board's Integrity and Audit Committee, in which case the resulting committee of New OEC Board shall be formed by a majority of Independent Directors on an ongoing basis. During any period in which the resulting committee is not formed by a majority of

32

qualquer período em que o comitê resultante dessa fusão não seja composto por maioria de Conselheiros Independentes, conforme previsto nesta Cláusula 4.1.4, e observada a Cláusula 4.1.1.2 deste Plano, o comitê resultante desta fusão (a) somente poderá recomendar resoluções que compreendem atividades no curso normal dos negócios da Nova OEC ou de suas Subsidiárias, e, ademais, que sejam necessários para evitar a ocorrência de efeito negativo nas atividades ou negócios da Nova OEC ou suas Subsidiárias, de acordo com a Cláusula 4.1.1.3 deste Plano; e (b) não poderá recomendar, a qualquer título, qualquer matéria que se enquadre nas restrições previstas na Cláusula 4.1.1.4 deste Plano. Após o término de mandato sem que haja reeleição, os acionistas indicarão para a vaga um Conselheiro Independente que satisfaça os requisitos de independência definidos na Cláusula 1.1.39 deste Plano com a maior brevidade possível, observado o quanto previsto nas Escrituras de Emissão das Novas Notas.

Independent Directors as provided for in this Clause 4.1.4, and subject to Clause 4.1.1.2 of this Plan, the resulting committee of New OEC Board shall (a) only be permitted to recommend resolutions involving matters that are within New OEC's or its Subsidiaries' ordinary course of business and, furthermore, are necessary to avoid causing a negative effect on New OEC's or its Subsidiaries' activities, pursuant to Clause 4.1.1.3 of this Plan; and (b) not be permitted to recommend any resolution that falls into the restrictions set forth in Clause 4.1.1.4 of this Plan. Upon the end of term without reelection shareholders shall appoint a replacement Independent Director that meets the requirements for independence defined in Clause 1.1.39 of this Plan as promptly as possible, pursuant to the provisions of the New Notes Indentures.

**4.1.5.    Transações com Partes Relacionadas**. Para que qualquer Operação com Partes Relacionadas (i) em um valor que exceda US$ 1.000.000,00 (um milhão de Dólares) por operação ou (ii) que faça com que o valor total das Transações com Partes Relacionadas em um período de 12 (doze) meses consecutivos exceda US$ 2.000.000,00 (dois milhões de Dólares) seja concluída, tal Operação com Partes Relacionadas deve ser recomendada para aprovação pelo Comitê de Integridade e Auditoria do Conselho da Nova OEC e aprovada pela maioria dos membros do Conselho da Nova OEC, e desde que a maioria de todos os Conselheiros Independentes votantes também aprove tal Operação com Partes Relacionadas.

**4.1.5.    Related Party Transactions.** In order for any Related Party Transaction (i) in an amount that exceeds US$ 1,000,000.00 (one million dollars) per transaction or (ii) that causes the aggregate amount of Related Party Transactions in a consecutive twelve (12) month period to exceed US$ 2,000,000.00 (two million dollars) to be consummated, such Related Party Transaction must be recommended for approval by the New OEC Board's Integrity and Audit Committee and be approved by a majority of the members of the New OEC Board, provided that the majority of all voting Independent Directors must also approve such Related Party Transaction.

**4.1.6. Término das Disposições acerca da Governança Corporativa**. Não obstante o disposto acima, as disposições e obrigações a respeito da governança corporativa previstas nesta Cláusula 4 deixarão de ser aplicáveis em (i) 10 de setembro de 2058; ou (ii) quando deixar de haver Novas Notas em aberto, o que ocorrer primeiro.

**4.1.6. Termination of Corporate Governance Provisions**. Notwithstanding the above, the corporate governance provisions and obligations set forth in this Clause 4 shall cease to apply upon the earlier of (i) September 10, 2058; (ii) such time as there are no New Notes outstanding.

## 5. REPRESENTANTE DOS CREDORES

## 5. CREDITOR REPRESENTATIVE

**5.1. Nomeação do Representante dos Credores**. Os Detentores de Notas neste ato nomeiam, em caráter irrevogável e irretratável, o Pinheiro Neto Advogados como seu representante ("Representante dos Credores"), com poderes específicos para praticar todos os atos atribuídos ao Representante dos Credores previstos neste Plano a partir da Data do Protocolo da RE, conforme instrumento de mandato constante do **Anexo 5.1**.

**5.1. Appointment of Creditor Representative**. The Noteholders hereby irrevocably and irreversibly appoint Pinheiro Neto Advogados as their representative (the "Creditor Representative"), as of the ER Filing Date, with specific powers to perform all acts attributed to the Creditor Representative described in this Plan, according to the power of attorney attached as **Schedule 5.1**.

**5.1.1. Instruções e Consulta**. O Representante dos Credores atuará segundo seu exclusivo juízo e discricionariedade, ao visar à homologação e implementação do Plano, em benefício dos Detentores de Notas e de acordo com os termos e condições previstos neste Plano e em seus Anexos. O Representante dos Credores não tem qualquer obrigação, mas terá o direito de, a seu exclusivo critério, consultar-se com e obter instruções, formal ou informalmente, dos Credores Apoiadores, ou de um subgrupo destes, com relação a quaisquer matérias submetidas ao Representante dos Credores. Adicionalmente, o Representante dos Credores pode, de boa-fé, consultar e confiar totalmente nas opiniões e

**5.1.1. Instructions and Consultation**. The Creditor Representative shall act according to its sole discretion and judgment, in seeking the confirmation and implementation of the Plan for the benefit of the Noteholders and pursuant to the terms and conditions provided for in this Plan and its Schedules. The Creditor Representative has no obligation whatsoever but is entitled to, at its sole discretion, consult with and obtain instructions, formally or informally, from the Supporting Creditors or a subset thereof in connection with any matters submitted to the Creditor Representative. Additionally, the Creditor Representative may in good-faith consult with and fully rely on the opinions and recommendations of the Ad Hoc Group Advisors in

recomendações dos Assessores do Grupo Ad Hoc em relação a qualquer assunto submetido ao Representante dos Credores, principalmente questões e documentos regidos por leis estrangeiras. O Representante dos Credores tem o direito, mas não a obrigação de agir ou abster-se de tomar medidas nos termos do Plano se não for devidamente assegurado quanto à eventual indenização e/ou não receber tempestivamente ou receber instruções contraditórias ou inconsistentes dos Credores Apoiadores ou de um subgrupo destes em relação a quaisquer questões submetidas ao Representante dos Credores.

connection with any matters submitted to the Creditor Representative, notably issues and documents governed by foreign law. The Creditor Representative has the right but no obligation whatsoever to take action or abstain from taking action pursuant to this Plan if it is not properly indemnified and/or does not timely receive or receive contradictory or inconsistent instructions from the Supporting Creditors or a subset thereof in connection with any matters submitted to the Creditor Representative.

**5.1.1.1.** *Reversão de Atos do Representante dos Credores.* Os Detentores de Notas que detenham, pelo menos, 40% (quarenta por cento) dos Créditos podem revogar quaisquer aprovações, autorizações, renúncias ou prorrogações concedidas pelo Representante dos Credores sob as Cláusulas 7.3, 7.4.1.2, 8.5, ou 11.4.2 mediante notificação por escrito às Devedoras dentro de 10 (dez) dias a partir da divulgação da referida renúncia ou prorrogação via comunicado à imprensa ou nos autos do processo de Recuperação Extrajudicial.

**5.1.1.1.** *Creditor Representative Override.* Noteholders holding at least 40% (forty percent) of the Claims may rescind any approvals, authorizations, waivers or extensions granted by the Creditor Representative under Clauses 7.3, 7.4.1.2, 8.5 or 11.4.2 by providing written notice to the Debtors within 10 (ten) days of disclosure of the waiver or extension via press release or on the records of the Extrajudicial Restructuring proceeding.

**5.1.2.** Pagamento de Honorários e Despesas. Os honorários e despesas razoáveis incorridas pelo Representante dos Credores em relação aos deveres e serviços prestados enquanto Representante dos Credores deverão ser pagos pelas Devedoras, pela Nova OEC ou qualquer de suas Subsidiárias. Ademais, o Representante dos Credores deverá ser integralmente remunerado por cada uma das Devedoras, e terá o direito a receber pagamento direto e/ou reembolso por quaisquer custos incorridos em virtude de ações adotadas em sua capacidade de Representante dos Credores e nos termos

**5.1.2.** Payment of Fees and Expenses. The reasonable fees and expenses incurred by the Creditor Representative in connection with the duties and services rendered as Creditor Representative must be paid by the Debtors, New OEC or any of its Subsidiaries. In addition, the Creditor Representative shall be fully indemnified by each of the Debtors in connection with, and entitled to direct payment and/or reimbursement of any costs incurred, for actions in its capacity as Creditor Representative and according to this Plan, except for liabilities resulting from fraud, willful misconduct or gross negligence of

deste Plano, exceto por responsabilidades resultantes de fraude, conduta dolosa ou negligência grave do Representante dos Credores ou de seus profissionais.

the Creditor Representative or its professionals.

**5.1.3.** <u>Duração e Prazo</u>. Os poderes conferidos ao Representante dos Credores nesta Cláusula 5 expirarão após o cumprimento de todas as obrigações do Representante dos Credores previstas neste Plano ou na Data de Fechamento, o que ocorrer primeiro.

**5.1.3.** <u>Duration and Term</u>. The powers granted to the Creditor Representative in this Clause 5 will expire upon the earliest of the fulfillment of all obligations of the Creditor Representative provided for in this Plan or the Closing Date.

## 6.    ADESÃO AO PLANO

## 6.    ADHESION TO THE PLAN

**6.1.    Credores Signatários**. O presente Plano, desde a Data de Assinatura, conta com a adesão expressa dos, e foi subscrito por Detentores de Notas, representados pelo Agente Mandatário, que detêm R$ [•] ([*por extenso*]) em Créditos, atingindo montante superior a 3/5 (três quintos) do valor total dos Créditos, conforme listados no **Anexo A**

**6.1.    Signatory Creditors**. This Plan, since the Signing Date, has been expressly adhered to and signed by Noteholders, as represented by the Proxy Agent, holding R$ [•] ([*in full*]) in Claims, reaching an amount greater than 3/5 (three fifths) of the total amount of the Claims, as listed in **Schedule A**.

**6.2.    Adesão**. Todos os Detentores de Notas que não são Credores Signatários estão autorizados a aderir aos termos e condições estabelecidos neste Plano, de forma expressa, por sua livre manifestação de vontade, até a Data da Sentença de Homologação do Plano, desde que manifestem sua intenção de aderir ao Plano por escrito, na forma do modelo de termo de adesão e de declaração de propriedade constantes do **Anexo 6.2** ou outra correspondência escrita de conteúdo substancialmente similar ("Termo de Adesão") ("Credores Aderentes" e, em conjunto com os Credores Signatários, "Credores Apoiadores").

**6.2.    Adhesion**. All Noteholders that are not Signatory Creditors, are allowed to adhere to the terms and conditions set forth in this Plan, expressly, by their free expression of will, until the ER Confirmation Order Date, provided that they expressly confirm their intention to adhere to the Plan in writing, in accordance with the adhesion form and the form of certificate of holder attached hereto in **Schedule 6.2** or another written correspondence of substantially similar content (the "<u>Adhesion Form</u>") ("<u>Adhering Creditors</u>" and together with the Signatory Creditors, "<u>Supporting Creditors</u>").

**6.2.1.**    Os Detentores de Notas que não sejam Credores Signatários mas que desejarem aderir aos seus termos e condições deverão apresentar: (i) o Termo de Adesão conforme o modelo constante do **Anexo 6.2.A**; (ii) cópia de uma "Declaração de Propriedade" que certifique a propriedade

**6.2.1.**    The Noteholders that are not Signatory Creditors but wish to adhere to its terms and conditions, must submit: (i) the Adhesion Form in the form attached hereto as **Schedule 6.2.A**; (ii) a copy of a "Certificate of Holder" that certifies the property of the notes held by each of the Noteholders who

*L. D.*

das notas detidas por cada um dos Detentores de Notas que desejem aderir aos termos e condições deste Plano, assinado pelo respectivo Detentor de Notas ou por um representante devidamente constituído para estes fins, na forma do **Anexo 6.2.B**; (iii) certificado, declaração ou cópia da página digital de uma base de dados de corretora registada que contenha o registo das notas detidas pelos Detentores de Notas e que evidencie a titularidade das notas pela Pessoa indicada na "Declaração de Propriedade"; e (iv) qualquer outro documento que possa ser exigido pelo Juízo da RE na análise da adesão dos Detentores de Notas.

wish to adhere to the terms and conditions of this Plan, signed by the respective Noteholder or by a duly appointed representative for these purposes, in the form attached hereto as **Schedule 6.2.B**; (iii) a certificate, statement or screen shot from a registered broker data base that holds the registration for the notes held by the Noteholders and that evidences the ownership of the notes by the Person indicated in the "Certificate of Holder"; and (iv) any other document that may be required by the ER Court in the analysis of the adhesion of Noteholders.

**6.3. Vinculação ao Plano**. Este Plano, bem como todos os atos praticados pelas Partes, serão válidos e vinculantes a partir (i) da Data do Protocolo da RE, para todos os Credores Signatários; (ii) da data em que cada Credor Aderente apresentar seu respectivo Termo de Adesão ao Juízo da RE nos termos da Cláusula 6.2, para os Credores Aderentes; e (iii) da Data da Sentença de Homologação do Plano, para todos os demais Detentores de Notas, voluntariamente aderentes ou não a este Plano.

**6.3. Enforceability of the Plan**. This Plan, as well as all acts performed by the Parties hereto, shall be valid and binding as from (i) the ER Filing Date, for all Signatory Creditors; (ii) the date in which each Adhering Creditor has submitted its respective Adhesion Form before the ER Court in accordance with Clause 6.2; and (iii) the ER Confirmation Order Date as to all other Noteholders, whether voluntarily adhering or not adhering to this Plan.

**7. CONDIÇÕES DE EFICÁCIA DO PLANO**

**7. CONDITIONS FOR EFFECTIVENESS OF THE PLAN**

**7.1. Condições de Eficácia**. As condições de reestruturação previstas neste Plano nas Cláusulas 2, 3 e 4 serão consideradas plenamente eficazes a partir da verificação ou renúncia, conforme estabelecido abaixo, das seguintes condições suspensivas (cada uma dessas, uma "Condição de Eficácia do Plano"):

**7.1. Conditions for Effectiveness**. The restructuring conditions provided for in this Plan on Clauses 2, 3 and 4, shall be deemed to be fully effective upon verification or waiver, as set forth below, of the following conditions precedent (*condições suspensivas*) (each, a "Condition for Effectiveness of the Plan"):

**7.1.1.** Decisão proferida pelo Juízo da RE que homologue este Plano, e inexistência de decisão liminar proferida por qualquer

**7.1.1.** A decision rendered by the ER Court confirming this Plan, and the nonexistence of an injunction from any court

| | |
|---|---|
| tribunal de jurisdição competente, incluindo o Tribunal de Justiça do Estado de São Paulo e o Superior Tribunal de Justiça, que significativamente suspenda ou proíba a implementação deste Plano, desde que o prazo para interposição de recurso contra a decisão do Juízo da RE tenha expirado; | of competent jurisdiction, including the Court of Appeals of São Paulo (*Tribunal de Justiça de São Paulo*) and the Superior Court of Justice (*Superior Tribunal de Justiça*), materially suspending or prohibiting the implementation of this Plan, and the time for filing an appeal of the decision of the ER Court has lapsed; |
| **7.1.2.** Decisão Norte-Americana de Reconhecimento da RE, proferida pela Corte Norte-Americana de Falências, e não sujeita a suspensão; | **7.1.2.** The U.S. Recognition Order shall have been entered by the U.S. Bankruptcy Court and shall not be subject to a stay; |
| **7.1.3.** Implementação, pela Nova OEC, dos termos e procedimentos de governança corporativa previstos na Cláusula 4, nos termos ali previstos ou de outra forma e substância aceitável ao Representante dos Credores, incluindo, mas não se limitando a, implementação e o protocolo do estatuto social da Nova OEC perante a Junta Comercial do Estado de São Paulo, refletindo os termos e condições previstos na Cláusula 4, ou de outra forma aceitável ao Representante dos Credores; | **7.1.3.** The corporate governance terms and procedures contemplated in Clause 4 have been implemented by New OEC as provided therein or otherwise if in form and substance acceptable to the Creditor Representative, including, but not limited to, the implementation and filing of New OEC's bylaws with Junta Comercial do Estado de São Paulo reflecting the terms and procedures contemplated in Clause 4 or otherwise if in form and substance acceptable to the Creditor Representative; |
| **7.1.4.** Nenhum Evento de Rescisão Antecipada do Plano tenha ocorrido e não tenha sido renunciado nos termos da Cláusula 8; | **7.1.4.** No Early Termination Event of the Plan has occurred and not been waived as provided for in Clause 8; |
| **7.1.5.** Implementação da Nova Estrutura Societária, na forma prevista neste Plano, ou de outra forma e substância aceitáveis ao Representante dos Credores; | **7.1.5.** The New Corporate Structure has been implemented as provided under this Plan or otherwise if in form and substance acceptable to the Creditor Representative; |
| **7.1.6.** Emissão das Novas Notas e do Instrumento Holdco, de forma consistente com os termos das escrituras e demais documentos consistentes com as Escrituras de Emissão das Novas Notas, o Contrato do Instrumento Holdco e este Plano, ou de outra forma e substância aceitáveis, sob todos os aspectos, ao Representante dos Credores, inclusive no que diz respeito à validade das | **7.1.6.** The New Notes and the Holdco Instrument have been issued subject to the terms of the indentures and other documentation consistent with the New Notes Indentures, the Holdco Instrument Agreement and this Plan, or otherwise if in form and substance acceptable in all respects to the Creditor Representative, including with respect to the validity of the New Notes Guarantors' guarantees; |

38

ℒ. ♭.

| | |
|---|---|
| garantias dos Garantidores das Novas Notas; e | |
| **7.1.7.** Pagamento e efetivo recebimento pelos Assessores do Grupo Ad Hoc de todos os honorários e despesas documentadas dos Assessores do Grupo Ad Hoc que tenham sido faturadas a qualquer uma das Devedoras, de acordo com os termos de suas respectivas propostas de honorários, ou de forma diversa, conforme acordado entre as Devedoras, a Nova OEC e qualquer de suas Subsidiárias e os Assessores do Grupo Ad Hoc; | **7.1.7.** All documented fees and expenses of the Ad Hoc Group Advisors that have been invoiced to any of the Debtors shall have been paid and actually received by such advisors in accordance with the terms of their respective engagement letters or otherwise as agreed upon between the Debtors, New OEC or any of its Subsidiaries and the Ad Hoc Group Advisors; |
| **7.1.8.** Desde a Data do Protocolo da RE, não deverá haver nenhuma decisão ou decreto em qualquer novo litígio, processo, ação regulatória ou outro processo pendente contra qualquer uma das Devedoras ou qualquer outra Subsidiária da OEC que poderia razoavelmente provocar um efeito material adverso sobre (i) o conteúdo, prazo ou implementação deste Plano; ou (ii) os negócios, operações, ativos ou condição financeira da OEC e de suas Subsidiárias de forma consolidada, em cada caso em comparação com esses negócios, operações, ativos, passivos (atuais ou contingentes) ou condição financeira na Data do Protocolo da RE; e se os efeitos de tal decisão ou decreto permanecerem eficazes por 20 (vinte) Dias Úteis; desde que, para evitar dúvidas, esta Cláusula 7.1.8 não se aplique a qualquer ação expressamente referenciada na *Revised Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* Docket No. 27, inserida no caso denominado *In re Odebrecht, SA et al.*, Número 19-12731 (Bankr. S.D.N.Y. October 4, 2019); | **7.1.8.** Since the ER Filing Date, there shall not be any judgement or decree on any new litigation, adversary proceeding, regulatory action or other proceeding pending against any of the Debtors or any other Subsidiary of OEC that could be reasonably expected to have a material adverse effect on either (i) the content, timing or implementation of this Plan; or (ii) the business, operations, assets or financial condition of OEC and its Subsidiaries on a consolidated basis, in each case as compared to such business, operations, assets, liabilities (actual or contingent) or financial condition as of the ER Filing Date, and if the effects of such judgement or decree remains unstayed for 20 (twenty) Business Days; *provided* that for the avoidance of doubt, this Clause 7.1.8 shall not apply to any action expressly referenced in the *Revised Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* Docket No. 27 entered in the case captioned *In re Odebrecht, S.A. et al.*, No. 19-12731 (Bankr. S.D.N.Y. October 4, 2019); |
| **7.1.9.** A partir da Data do Protocolo da RE, não deverá ter ocorrido qualquer novo evento ou condição, que tenha ou que seria esperado que tivesse, individualmente ou em conjunto, efeito material adverso sobre os | **7.1.9.** Since the ER Filing Date, there shall not have occurred any new event or condition, that has had or would be reasonably expected to have, either individually or in the aggregate, a materially |

39

| | |
|---|---|
| negócios, operações, ativos, passivos (atuais ou contingentes) ou condições financeiras da OEC e de suas Subsidiárias, de forma consolidada, em cada caso, em comparação com esses negócios, operações, ativos, passivos ou condições financeiras na Data do Protocolo da RE, ou a validade ou exequibilidade das Novas Notas ou do Contrato do Instrumento Holdco; | adverse effect on the business, operations, assets, liabilities (actual or contingent) or financial condition of OEC and its Subsidiaries, on a consolidated basis, in each case as compared to such business, operations, assets, liabilities or financial condition as of the ER Filing Date, or the validity or enforceability of the New Notes or the Holdco Instrument Agreement; |
| **7.1.10.**   As Devedoras tenham entregado ao Representante dos Credores uma certificação assinada por diretor autorizado declarando que nenhum Evento de Rescisão Antecipada do Plano ocorreu e as Condições de Efetividade do Plano foram totalmente satisfeitas ou renunciadas, conforme aplicável; e | **7.1.10.**   The Debtors have delivered to the Creditor Representative an authorized officer's certificate stating that no Early Termination Events of the Plan has occurred and the Conditions for Effectiveness of the Plan have been fully satisfied or waived, as applicable; and |
| **7.1.11.**   Todos os honorários e despesas documentados do Agente Fiduciário das Notas Existentes e de seus advogados que tenham sido faturadas a qualquer uma das Devedoras devem ter sido pagas e efetivamente recebidas pelo Agente Fiduciário das Notas Existentes e/ou por seus advogados. | **7.1.11.**   All documented fees and expenses of the Existing Notes Trustee and its counsel that have been invoiced to any of the Debtors shall have been paid and actually received by the Existing Notes Trustee and/or its counsel. |
| **7.2.   Data de Fechamento**. Para todos os fins e efeitos, todos os eventos indicados como Condições de Eficácia do Plano na Cláusula 7.1 acima serão considerados como se tivessem ocorrido concomitantemente na data em que o último dos eventos acima mencionados ocorra ou seja renunciado (sendo essa a "<u>Data de Fechamento</u>"). | **7.2.   Closing Date**. For all means and effects, all events listed as Conditions for Effectiveness of the Plan pursuant to Clause 7.1 above shall be considered as if occurred on the date in which the last of the above referenced events has occurred or has been waived (and this date, the "<u>Closing Date</u>"). |
| **7.3.   Renúncia de Condições de Eficácia do Plano**. O Representante dos Credores poderá, a seu critério e por escrito, renunciar a qualquer uma das Condições de Eficácia do Plano, sujeito às disposições estabelecidas na Cláusula 5.1.1.1. | **7.3.   Waiver   of   Conditions   for Effectiveness of the Plan**. The Creditor Representative may, at its discretion and in writing, waive any of the Conditions of Effectiveness of the Plan, subject to the provisions contemplated on Clause 5.1.1.1. |
| **7.4.   Prazo Limite.** Caso (i) este Plano não seja aprovado e homologado dentro de 180 (cento e oitenta) dias contados da Data do | **7.4.   Drop-Dead Date.** In case (i) this Plan is not approved and confirmed within 180 (one hundred and eighty) days counted |

Z. D.

Protocolo da RE; (ii) após a Data da Sentença de Homologação do Plano, todas as Condições de Eficácia do Plano não tenham sido cumpridas ou renunciadas dentro de 90 (noventa) dias contados da Data da Sentença de Homologação do Plano, ou outra data em razão de prorrogação conforme prevista na Cláusula 7.4.1 (cada data indicada em (i) e (ii), o "Prazo Limite"), este Plano será prontamente considerado rescindido, e não vinculará ou produzirá quaisquer efeitos sobre as Devedoras, a Emissora das Novas Notas, a Holdco, a Nova OEC, os Credores Signatários, os Credores Aderentes ou qualquer Detentor de Notas, independentemente de qualquer outra ação, sendo certo que as Partes retornarão prontamente à condição anterior à assinatura deste Plano com relação aos termos, condições, direitos e prerrogativas relativos aos Créditos, conforme convencionado nos documentos originais correspondentes, que serão considerados imediatamente restabelecidos.

from the ER Filing date; (ii) after the ER Confirmation Order Date, all the Conditions for Effectiveness of the Plan have not been satisfied or waived within 90 (ninety) days counted from the ER Confirmation Order Date, or another date pursuant to an extension as provided in Clause 7.4.1, (each date indicated on (i) and (ii), the "Drop-Dead Date"), this Plan shall be promptly considered terminated, and will not bind or produce any effects on the Debtors, New Notes Issuer, Holdco or New OEC, the Signing Creditors, the Adhering Creditors or any Noteholders independently of any further action, and the Parties shall promptly return to the condition prior to the execution of this Plan with respect to the terms, conditions, rights and prerogatives relating to the Claims, as agreed in the corresponding original documents which shall be deemed to be immediately reinstated.

**7.4.1.** Prorrogação do Prazo Limite. O Prazo Limite previsto na Cláusula 7.4 acima poderá ser prorrogado de acordo com os seguintes termos e condições:

**7.4.1.** Postponement of the Drop-Dead Date. The Drop-Dead Date set forth in Clause 7.4 above can be postponed in accordance with the following terms and conditions:

**7.4.1.1.** *Primeira Prorrogação*. O Prazo Limite poderá ser prorrogado uma vez, automaticamente, (i) por 60 (sessenta) dias no caso do Prazo Limite mencionado na Cláusula 7.4(i), e (ii) por 60 (sessenta) dias no caso do Prazo Limite mencionado na Cláusula 7.4(ii); *desde que*, em ambos os casos, Detentores de Notas que detenham, pelo menos, 40% (quarenta por cento) dos Créditos não se oponham a tal adiamento, por meio de notificação escrita às Devedoras, enviada em até 15 (quinze) dias antes do fim dos prazos originais previstos na Cláusula 7.4.

**7.4.1.1.** *First Postponement*. The Drop-Dead Date can be postponed once, automatically, (i) for 60 (sixty) days in case of the Drop-Dead Date mentioned in Clause 7.4(i), and (ii) for 60 (sixty) days in case of the Drop-Dead Date mentioned in Clause 7.4(ii); *provided* that, in both cases, Noteholders holding at least 40% (forty percent) of the Claims, within no less than 15 (fifteen) days before the original deadlines provided for in Clause 7.4, have not opposed to such postponement by providing written notice to the Debtors.

**7.4.1.2.** *Prorrogações Adicionais*. O Representante dos Credores poderá, a seu

**7.4.1.2.** *Additional Postponements*. The Creditor Representative may, at its own

| | |
|---|---|
| exclusivo critério, autorizar prorrogações adicionais do Prazo Limite por períodos adicionais de 30 (trinta) dias, sujeitos às disposições estabelecidas na Cláusula 5.1.1.1. | discretion, authorize the further postponement of the Drop-Dead Date for additional 30 (thirty) - day periods, subject to the provisions contemplated on Clause 5.1.1.1. |
| | |
| **8.    EVENTOS DE RESCISÃO ANTECIPADA** | **8.    EARLY TERMINATION EVENTS** |
| **8.1.    Rescisão Antecipada**. Os termos e condições deste Plano serão considerados rescindidos e extintos mediante a ocorrência e continuidade de quaisquer dos seguintes eventos ("Eventos de Rescisão Antecipada do Plano") antes da Data de Fechamento: | **8.1.    Early Termination**. The terms and conditions of this Plan shall be considered terminated and extinct upon the occurrence and continuance of any of the following events ("Early Termination Events of the Plan") before the Closing Date: |
| **8.1.1.**    Qualquer uma das Devedoras (i) tenha sido declarada falida por juízo competente, e tal decisão não tenha sido suspensa pelo tribunal competente dentro do período de 15 (quinze) Dias Úteis contados a partir da publicação; (ii) se declare falida ou apresente pedido de autofalência; (iii) seja sujeita a um pedido de falência apresentado por qualquer outra Pessoa e tal procedimento de falência não tenha sido contestado, elidido ou evitado no prazo legal; ou (iv) apresente pedido de recuperação judicial ou outro pedido semelhante, *sendo certo que, entretanto*, esta Cláusula 8.1.1 não se aplicará a qualquer procedimento de reestruturação apresentado de acordo com os termos deste Plano; | **8.1.1.**    Any of the Debtors (i) have been declared bankrupt (*falido*) by a court of competent jurisdiction and such decision has not been fully stayed by the applicable court of appeals within 15 (fifteen) Business Days of publication; (ii) declares itself bankrupt or voluntarily files for bankruptcy liquidations (*falência*); (iii) is subject to a request for bankruptcy filed by any other Person, and the bankruptcy procedure has not been contested, avoided, delayed or released within the relevant legal term; or (iv) files for a judicial reorganization proceeding (*recuperação judicial*) or other similar procedure; *provided, however*, that this Clause 8.1.1 does not apply to the commencement of any restructuring proceeding in accordance with the terms hereof; |
| **8.1.2.**    Este Plano (i) seja rejeitado pelo Juízo da RE e tal rejeição não tenha sido suspensa pelo tribunal superior competente dentro de 20 (vinte) Dias Úteis contados a partir da publicação; ou (ii) tenha disposições materiais rejeitadas pelo Juízo da RE e tal rejeição não seja suspensa ou revertida pelo tribunal superior competente dentro de 20 (vinte) Dias Úteis após a notificação mencionada na Cláusula 8.3; | **8.1.2.**    This Plan (i) is rejected by the ER Court and the rejection is not stayed by the court of appeals (*Tribunal de Justiça*) within 20 (twenty) Business Days of publication; or (ii) has material provisions rejected by the ER Court, and the rejection of material provisions is not stayed or otherwise reversed by the competent court of appeals within 20 (twenty) Business Days of the notice mentioned in Clause 8.3; |

| | |
|---|---|
| **8.1.3.** A Sentença de Homologação do Plano seja (i) revogada por qualquer tribunal recursal (Tribunal de Justiça ou Superior Tribunal de Justiça) ou (ii) seja materialmente suspensa pelo Tribunal de Justiça ou pelo Superior Tribunal de Justiça e tal suspensão não seja revertida dentro de 20 (vinte) Dias Úteis após a notificação mencionada na Cláusula 8.3; | **8.1.3.** The ER Confirmation Order is (i) reversed by any court of appeals (*Tribunal de Justiça* or *Superior Tribunal de Justiça*), (ii) or materially stayed by any court of appeals (*Tribunal de Justiça* or *Superior Tribunal de Justiça*), and such stay is not reversed within 20 (twenty) Business Days of the notice mentioned in Clause 8.3; |
| **8.1.4.** Uma decisão com relação às Devedoras tenha sido proferida por uma Corte Norte-Americana de jurisdição competente negando o reconhecimento ou execução deste Plano ou da Recuperação Extrajudicial no âmbito do o *Chapter 15* do *Bankruptcy Code* dos EUA; | **8.1.4.** The entry of an order with respect to the Debtors by a United States court of competent jurisdiction denying recognition or enforcement of this Plan or the Extrajudicial Restructuring under Chapter 15 of the U.S. Bankruptcy Code; |
| **8.1.5.** Qualquer uma das Condições de Eficácia do Plano não seja renunciada ou satisfeita antes do Prazo Limite; | **8.1.5.** Any of the Conditions for Effectiveness of the Plan has not been waived or satisfied before the Drop-Dead Date; |
| **8.1.6.** Após a Data do Protocolo da RE, caso se verifique qualquer novo evento ou condição, incluindo uma sentença, julgamento ou decisão desfavorável, relacionado à OEC ou a alguma de suas Subsidiárias, e que seja razoavelmente esperado que tal evento, isoladamente ou em conjunto com demais eventos, acarrete um efeito material adverso sobre (i) os negócios, operações, ativos, passivos (atuais ou contingentes) ou sobre a situação financeira da OEC e suas Subsidiárias em base consolidada, em cada caso e mediante comparação com os negócios, operações, ativos, passivos ou situação financeira na Data de Assinatura; ou (ii) a validade, conteúdo, prazo, exequibilidade ou capacidade de emitir ou implementar, conforme aplicáveis, os Créditos, este Plano, as Novas Notas ou o Instrumento Holdco; e, em ambos os casos, esse novo evento ou condição não seja curado dentro de 20 (vinte) Dias Úteis a partir da notificação mencionada na Cláusula 8.3; e | **8.1.6.** After the ER Filing Date, any new event or condition, including an adverse judgment, ruling or other decision, relating to OEC or any of its Subsidiaries, occurs that has or would be reasonably expected to have, either individually or in the aggregate, a materially adverse effect on (i) the business, operations, assets, liabilities (actual or contingent) or financial condition of OEC and its Subsidiaries, on a consolidated basis, in each case as compared to such business, operations, assets, liabilities or financial condition as of the Signing Date, or (ii) the validity, content, timing, enforceability or ability to issue or implement, as applicable, the Claims, this Plan, the New Notes or the Holdco Instrument; and, in both cases, such new event or condition is not cured within 20 (twenty) Business Days of the notice mentioned in Clause 8.3.; and |

L. B.

**8.1.7.** O inadimplemento do Devedor em cumprir com qualquer uma de suas obrigações ou disposições estabelecidas neste Plano, incluindo, entre outras, governança, compromissos e obrigações relacionadas ao Período de Transição, e tal falha não seja sanada dentro de 20 (vinte) Dias Úteis do aviso mencionado na Cláusula 8.3.

**8.2.    Eventos de Rescisão Antecipada Automática.** Na hipótese de um ou mais Eventos de Rescisão Antecipada do Plano mencionados nas Cláusulas 8.1.1, 8.1.2(i), 8.1.3(i), 8.1.4 ou 8.1.5 ocorrerem e perdurarem, este Plano será considerado automaticamente rescindido.

**8.3.    Eventos de Rescisão Antecipada Não Automática.** O Representante dos Credores ou os Detentores de Notas que detenham, pelo menos, 40% (quarenta por cento) dos Créditos poderão enviar notificação escrita às Devedoras acerca da ocorrência de um ou mais Eventos de Rescisão Antecipada do Plano mencionados nas Cláusulas 8.1.2(ii), 8.1.3(ii) ou 8.1.6. Caso o Evento de Rescisão Antecipada do Plano mencionado nessa notificação não tenha sido sanado dentro do prazo de cura pertinente, conforme possa ser estendido nos termos da Cláusula 8.5, este Plano será considerado automaticamente rescindido.

**8.4.    Consequências da Rescisão Antecipada do Plano.** Na ocorrência da rescisão do Plano segundo o disposto nas Cláusulas 8.2 e 8.3, as Partes retornarão prontamente ao estado anterior à assinatura deste Plano no que diz respeito aos termos, condições, direitos e prerrogativas relativos aos Créditos, conforme o convencionado nos documentos originais correspondentes, os quais serão considerados imediatamente restabelecidos, independentemente de qualquer ato posterior.

**8.1.7.** The Debtors' failure to comply with any of their obligations or provisions established in this Plan, including, but no limited to, governance, covenants and Transitory Period's related obligations, and such failure is not cured within 20 (twenty) Business Days of the notice mentioned in Clause 8.3.

**8.2.    Automatic    Early    Termination Events.** In the event one or more Early Termination Events of the Plan mentioned in Clauses 8.1.1, 8.1.2(i), 8.1.3(i), 8.1.4 or 8.1.5 occurs and continues, this Plan shall be deemed to be automatically terminated.

**8.3.    Non-automatic Early Termination Events.** The Creditor Representative or Noteholders holding at least 40% (forty percent) of the Claims may provide written notice to the Debtors of the occurrence of one or more Early Termination Events of the Plan mentioned in Clauses 8.1.2(ii), 8.1.3(ii), 8.1.6 or 8.1.7. If the Early Termination Event of the Plan referred to in such notice has not been cured within the relevant cure period, as may be extended pursuant to Clause 8.5, this Plan shall be deemed to be automatically terminated.

**8.4.    Consequences    of    Early Termination of the Plan.** Upon termination of the Plan pursuant to Clauses 8.2 or 8.3 the Parties shall promptly return to the condition prior to the execution of this Plan with respect to the terms, conditions, rights and prerogatives relating to the Claims, as agreed in the corresponding original documents which shall be deemed to be immediately reinstated, regardless of any further action.

| | |
|---|---|
| **8.5.    Renúncia ou Extensão dos Eventos de Rescisão Antecipada do Plano**. O Representante dos Credores poderá, a seu exclusivo critério e por escrito, renunciar a ocorrência de qualquer Evento de Rescisão Antecipada, estabelecer um prazo de cura ou estender prazos de cura previstos em relação a qualquer Evento de Rescisão Antecipada do Plano, sujeito às disposições contempladas na Cláusula 5.1.1.1. | **8.5.    Waiver or Extension of Early Termination Events of the Plan**. The Creditor Representative may, at its sole discretion and in writing, waive the occurrence of any Early Termination Event, provide for a cure period or extend the cure periods provided in connection with any Early Termination Event of the Plan, subject to the provisions contemplated on Clause 5.1.1.1 |
| | |
| **9.    OBRIGAÇÕES** | **9.    COVENANTS** |
| **9.1.    Obrigações das Devedoras**. As Devedoras se comprometem e concordam, na Data do Protocolo da RE, em: | **9.1.    Debtors' Covenants**. As from the ER Filing Date, the Debtors covenant and agree to: |
| **9.1.1.**  Praticar todos os atos, fornecer todas as informações e tomar todas as medidas para implementar e cumprir com as disposições deste Plano, dentro dos prazos e segundo as condições estabelecidos neste Plano; | **9.1.1.**  Perform all acts, provide all information and take all measures to implement and comply with the provisions of this Plan, within the terms and conditions established in this Plan; |
| **9.1.2.**  Cumprir toda a legislação aplicável que seja materialmente relevante para a condução de seus negócios (incluindo toda e qualquer legislação trabalhista, ambiental, tributária e social), pertinente às suas atividades e à manutenção de seus bens e propriedades; | **9.1.2.**  Comply with all applicable legislation that is materially relevant to the conduct of its business (including any and all labor, environmental, tax and social legislation), applicable to its activities and to the maintenance of its assets and property; |
| **9.1.3.**  Manter todas as aprovações, licenças, permissões e autorizações relevantes necessárias para conduzir seus negócios, exceto na medida em que a falha em manter tais aprovações, licenças, permissões e autorizações relevantes não tenha um efeito material adverso sobre a capacidade das Devedoras de conduzir seus negócios; | **9.1.3.**  Maintain all approvals, licenses, permissions and relevant authorizations required to conduct its business, except to the extent that the failure to maintain such approvals, licenses, permissions and relevant authorizations would not have a material adverse effect on the ability of the Debtors to conduct its business; |
| **9.1.4.**  Fornecer toda e qualquer documentação que seja razoavelmente solicitada pelo Representante dos Credores | **9.1.4.**  Provide any and all documentation that is reasonably requested by the Creditor Representative and ensure that the Creditor |

45

| | |
|---|---|
| e assegurar que o Representante dos Credores seja informado de todos os procedimentos, desenvolvimentos e outras informações relacionadas com a Recuperação Extrajudicial e sua implementação; | Representative is informed of all procedures, developments and other information related to the Extrajudicial Restructuring and its implementation; |
| **9.1.5.** Reportar ao Representante dos Credores a ocorrência de qualquer evento que possa resultar em um Evento de Vencimento Antecipado do Plano, no prazo de 2 (dois) Dias Úteis contados a partir da data em que os diretores estatutários da OEC tomarem ciência de tal evento. | **9.1.5.** Report to the Creditor Representative the occurrence of any event that may entail an Early Termination Event of the Plan in no later than 2 (two) Business Days counted as of the date in which the statutory officers (*diretores estatutários*) of OEC became aware of such event; |
| **9.1.6.** Buscar e obter a liberação dos Créditos *Intercompany*, ou subordinar o pagamento dos Créditos *Intercompany* ao pagamento de Novas Notas e do Instrumento Holdco, da forma mais eficiente e efetiva às Devedoras, e sujeita ao cumprimento de quaisquer Leis aplicáveis, incluindo requisitos tributários e regulatórios. | **9.1.6.** Seek and obtain the release of the Intercompany Claims, or subordinate the payment of the Intercompany Claims to the payment of the New Notes and Holdco Instrument, in the most effective and efficient manner to the Debtors and subject to compliance with any applicable Laws, including tax and regulatory requirements; |
| **9.1.7.** Adotar e tomar todas as medidas razoavelmente necessárias para, assim que razoavelmente praticável, obter a Sentença de Homologação do Plano, a Decisão Norte-Americana de Reconhecimento da RE e implementar este Plano, dar prosseguimento e contestar quaisquer recursos relacionados com a Sentença de Homologação do Plano ou a Decisão Norte-Americana de Reconhecimento da RE, e apoiar e consumar as transações contempladas por este Plano, incluindo a execução de quaisquer outros acordos razoavelmente necessários para dar eficácia a e consumar este Plano; | **9.1.7.** Pursue and take all steps reasonably necessary to, as soon as reasonably practicable, obtain the ER Confirmation Order and the U.S. Recognition Order and implement this Plan, prosecute and defend any appeals related to the ER Confirmation Order or the U.S. Recognition Order, and support and consummate the transactions contemplated by this Plan, including the execution and delivery of any other reasonably required agreements to effectuate and consummate this Plan; |
| **9.1.8.** Usar seus melhores esforços, observados os termos e condições ora estabelecidos, a fim de obter a Sentença de Homologação do Plano e implementar este Plano e, caso as Devedoras decidam pleitear | **9.1.8.** Use its best efforts observing the terms and conditions set forth herein, in order to obtain the ER Confirmation Order, and implement this Plan, and, if a decision is made by the Debtors to seek a U.S. |

| | |
|---|---|
| uma Decisão Norte-Americana de Reconhecimento da RE, nos termos da Cláusula 2.4 deste documento, usar seus melhores esforços para obter tal ordem de reconhecimento; em cada caso, tão prontamente quanto possível; e | Recognition Order in accordance with Clause 2.4 herein, to obtain such recognition order, in each case, as promptly as practicable; and |
| **9.1.9.** Continuar pagando prontamente todos os honorários e despesas razoáveis e documentadas (incluindo por meio do reestabelecimento de *retainers*, conforme aplicável de acordo com os termos das respectivas propostas de honorários com as Devedoras aplicáveis) dos Assessores do Grupo Ad Hoc e de qualquer outro assessor contratado pelo Grupo Ad Hoc, de acordo com os termos de suas respectivas propostas de honorários com as Devedoras aplicáveis ou de outra forma conforme acordado entre as Devedoras e os Assessores do Grupo Ad Hoc. | **9.1.9.** Continue to promptly pay all reasonable and documented fees and expenses (including through the replenishment of retainers, as applicable in accordance with the terms of their respective engagement letters with the applicable Debtors) of the Ad Hoc Group Advisors and any other advisor retained by the Ad Hoc Group, in accordance with the terms of their respective engagement letters with the applicable Debtors or otherwise as agreed upon among the Debtors and the Ad Hoc Group Advisors. |
| **9.2.    Compromissos dos Credores Apoiadores**. Cada Credor Apoiador se compromete e a concorda em: | **9.2.    Supporting Creditors' Covenants**. Each Supporting Creditor covenants and agrees to: |
| **9.2.1.** Apoiar, não se opor e aprovar expressamente (i) a homologação deste Plano e da Recuperação Extrajudicial perante o Juízo da RE ou qualquer instância recursal; (ii) a homologação deste Plano e da Recuperação Extrajudicial nos Estados Unidos da América; (iii) outro provimento que venha a ser solicitado pelas Devedoras na República Federativa do Brasil ou nos Estados Unidos da América, de forma a resguardar ou implementar esse Plano; ou (iv) a homologação deste Plano e da Recuperação Extrajudicial em quaisquer jurisdições que não a República Federativa do Brasil e os Estados Unidos da América, caso tal homologação tenha sido consentida pelo Representante dos Credores. | **9.2.1.** Support, not oppose and expressly approve (i) the confirmation of this Plan and the Extrajudicial Restructuring before the ER Court or any court of appeals; (ii) the recognition of this Plan and the Extrajudicial Restructuring in the United States of the America; (iii) other relief that may be requested by the Debtors in the Federative Republic of Brazil or the United States of America in order to safeguard or implement this Plan; or (iv) recognition of this Plan and the Extrajudicial Restructuring in any jurisdictions other than the Federative Republic of Brazil and the United States of America, if such recognition is agreed to by the Creditor Representative. |

| | |
|---|---|
| **9.2.2.** Utilizar esforços comercialmente razoáveis para obter, unicamente em relação a si próprio e não em relação a qualquer outro Credor Apoiador, todas as aprovações que forem necessárias para a implementação deste Plano, incluindo, mas não limitado a aprovações aplicáveis relacionadas à Legislação tributária, requisitos fiscais e regulamentares. | **9.2.2.** Use commercially reasonable efforts to obtain, solely as to itself and not with respect to any other Supporting Creditor, all approvals that are necessary for implementation of this Plan, including but not limited to, applicable approvals related to tax Law and fiscal and regulatory requirements. |
| **9.3. Obrigação Geral**. As Devedoras e o Representante dos Credores se comprometem e concordam em negociar de boa-fé as minutas finais das Escrituras de Emissão das Novas Notas, do Contrato do Instrumento Holdco, dos documentos de governança novos e/ou alterados e atualizados para a Nova OEC e de qualquer outro documento necessário para consumar a Recuperação Extrajudicial, dentro de 20 (vinte) Dias Úteis a partir da Data do Protocolo da RE, cujos termos finais serão aceitáveis de boa-fé pelas Devedoras e pelo Representante dos Credores. | **9.3. General Covenant**. Debtors and Creditor Representative covenant and agree to negotiate in good faith the final forms of the New Notes Indentures, the Holdco Instrument Agreement, the new and/or amended and restated governance documents for the New OEC, and any other document required to consummate the Extrajudicial Restructuring, within 20 (twenty) Business Days as of the ER Filing Date, which final terms shall be acceptable to the Debtors and the Creditor Representative in good faith. |
| | |
| **10. DECLARAÇÕES E GARANTIAS** | **10. REPRESENTATIONS AND WARRANTIES** |
| **10.1. Declarações dos Credores Apoiadores**. Cada um dos Credores Apoiadores declara e garante às Devedoras, isoladamente e não solidariamente, que: | **10.1. Representations of the Supporting Creditors**. Each of the Supporting Creditors hereby represents and warrants to the Debtors, severally, and not jointly, that: |
| **10.1.1.** Tal Credor Apoiador, na medida aplicável, tem pleno poder e autoridade para agir por conta e ordem de votar e consentir a matérias relativas aos seus respectivos Créditos e assumir as suas obrigações no âmbito deste Plano; | **10.1.1.** Such Supporting Creditor, to the extent applicable, has the full power and authority to act on behalf of, vote and consent to the matters concerning its respective Claims and to undertake its obligations under this Plan; |
| **10.1.2.** Tal Credor Signatário concedeu poderes para (incluindo poderes para liquidar e novar) e instruiu o Agente Mandatário a assinar este Plano em nome de tal Credor Signatário, e outorgou poderes ao | **10.1.2.** Such Signatory Creditor has granted powers (including powers to settle and novate) to the Proxy Agent to execute and has instructed such Proxy Agent to execute this Plan on such Signatory |

| | |
|---|---|
| Representante dos Credores para atuar por sua conta e ordem em todas as questões pertinentes previstas neste Plano e na Recuperação Judicial, em conformidade com os termos e condições estabelecidos na Cláusula 5 acima e neste Plano; e | Creditor's behalf, and has granted powers to the Creditor Representative to act on its behalf on all matters contemplated under this Plan and the Extrajudicial Restructuring, pursuant to the terms and conditions contemplated in Clause 5 above and elsewhere in this Plan; and |
| **10.1.3.** Tal Credor Apoiador reconhece que o OFL e algumas outras entidades do Grupo ODB apresentaram, em 17 de junho de 2019, um pedido de recuperação judicial, sujeito à LFR (a "<u>RJ ODB/OFL</u>"), que ainda está em curso. | **10.1.3.** Such Supporting Creditor acknowledges that OFL and certain other entities of the ODB Group have filed, on June 17, 2019 a request for a judicial reorganization proceeding, subject to the Brazilian Bankruptcy Law (the "<u>ODB/OFL RJ Proceedings</u>"), which is still pending. |
| **10.2.   Declarações e Garantias das Devedoras.** As Devedoras declaram e garantem aos Detentores de Notas, que: | **10.2.   Debtors Representations and Warranties.** The Debtors represent and warrant to the Noteholders, that: |
| **10.2.1.** Todas as Devedoras são sociedades devidamente constituídas e existentes nos termos das respectivas Leis e as Devedoras são sociedades devidamente autorizadas a conduzir os seus negócios e manter os seus ativos; | **10.2.1.** All Debtors are companies duly organized and existing under the respective governing Laws and the Debtors are companies duly authorized to conduct their business and maintain their assets; |
| **10.2.2.** Todas as Devedoras possuem todas as autorizações necessárias para assumir suas respectivas obrigações conforme previstas neste Plano, e cumpriram todas as obrigações legais e outras obrigações necessárias para este Plano e, exceto conforme aqui descrito, nenhuma autorização governamental ou de terceiros é necessária para a celebração deste Plano; | **10.2.2.** All Debtors possess all necessary authorizations to undertake their respective obligations as provided for in this Plan, and have carried out all legal and other obligations necessary for this Plan, and, except as described herein, no governmental or third-party authorizations are necessary for this Plan; |
| **10.2.3.** Todas as Devedoras e suas Subsidiárias estão cumprindo as Leis relevantes aplicáveis aos seus negócios e ativos e não estão em violação de qualquer decisão de qualquer tribunal judicial ou arbitral ou qualquer regulamento ou ordem emitida por qualquer agência governamental aplicável aos seus negócios e ativos, e que tenha um efeito material | **10.2.3.** All Debtors and their Subsidiaries are in compliance with the relevant Laws applicable to their businesses and assets and are not in violation of any decision of any court or arbitral tribunal or of any regulation or order issued by any governmental agency applicable to their businesses and assets, and which has a material adverse effect on this Extrajudicial Restructuring; |

| | |
|---|---|
| adverso sobre esta Recuperação Extrajudicial; | |
| **10.2.4.** A celebração deste Plano está em conformidade com as Leis aplicáveis aos negócios e ativos das Devedoras, não violando qualquer decisão de qualquer tribunal judicial ou arbitral ou qualquer regulamento ou ordem emitida por qualquer órgão governamental aplicável aos negócios e bens das Devedoras, e que tenha um efeito material adverso sobre esta Recuperação Extrajudicial; e | **10.2.4.** The execution of this Plan complies with the relevant Laws applicable to the Debtors' business and assets, and does not violate any decision of any court or arbitral tribunal or any regulation or order issued by any governmental agency applicable to the Debtors' businesses and assets, and which has a material adverse effect on this Extrajudicial Restructuring; and |
| **10.2.5.** Todas as informações fornecidas pelas Devedoras são completas, atualizadas, consistentes e verdadeiras e as Devedoras não forneceram quaisquer declarações ou informações que sejam falsas ou enganosas, ou omitiram qualquer informação considerada relevante. | **10.2.5.** All information provided by the Debtors is complete, up to date, consistent and true and the Debtors have not provided any statements or information that are untrue or misleading, or omitted any information deemed relevant. |
| **10.3.    Reconhecimento**. As Partes reconhecem e concordam que este Plano não modifica, prejudica ou afeta, sob qualquer aspecto, todas e quaisquer obrigações, compromissos ou acordos assumidos pelas Devedoras com seus fornecedores, parceiros comerciais, clientes e quaisquer outros credores que não sejam detentores dos Créditos reestruturados no presente instrumento. | **10.3.    Acknowledgement**. The Parties acknowledge and agree that this Plan does not modify, impair or affect, in any way, any and all obligations, covenants or agreements undertaken by the Debtors towards its suppliers, business partners, customers and any other creditors that are not holders of the Claims restructured hereto. |
| | |
| **11.    PERÍODO DE TRANSIÇÃO** | **11.    TRANSITORY PERIOD** |
| **11.1.    Suspensão dos Pagamentos.** A partir da Data do Protocolo da RE até o que ocorrer primeiro entre (i) à Data de Fechamento ou (ii) a rescisão deste Plano nos termos de um Evento de Rescisão Antecipada do Plano que não tenha sido renunciado ou sanado conforme previsto na Cláusula 8.4 ("Período de Transição"), não serão efetuados pagamentos pelas Devedoras em relação a quaisquer dos Créditos *sendo certo que os* | **11.1.    Suspension of Payments.** From the ER Filing Date through the earlier of (i) the Closing Date or (ii) the termination of this Plan pursuant to an Early Termination Event of the Plan that has not been waived or cured as provided for in Clause 8.4 ("Transitory Period"), no payments shall be made by the Debtors in connection with any of the Claims *provided that* the amounts of such Claims shall continue to accrue in full (including in |

encargos contratuais aplicáveis a tais Créditos continuarão a incidir integralmente (incluindo em relação aos juros de mora aplicáveis e nos termos deste Plano).

**11.2.   Suspensão dos Direitos de Execução.** Cada (i) Credor Signatário, a partir da Data do Protocolo da RE; (ii) Credor Aderente, a partir da apresentação do respectivo Termo de Adesão perante o Juízo da RE, nos termos da Cláusula 6 acima; e (iii) todos os Detentores de Notas não incluídos entre os Credores Apoiadores, a partir da Data da Sentença de Homologação do Plano; concordam em abster-se de executar ou a causar a execução, excutir ou causar a excussão de qualquer garantia ou valor em relação aos Créditos, devidos ou não, durante o Período de Transição; *sendo certo que*, quaisquer juros de mora aplicáveis em relação às Notas Existentes continuarão a incidir durante o Período de Transição. Não obstante o exposto acima, os períodos de cura ou de carência aplicáveis a qualquer descumprimento ou hipótese de descumprimento em relação às Notas Existentes não serão suspensos durante o Período de Transição. Para que não haja dúvidas, a suspensão de direitos prevista nesta Cláusula 11.2 cessará imediatamente após o término do Período de Transição.

**11.3.** Durante o Período de Transição, as Devedoras cumprirão todas as obrigações deste Plano e:

**11.3.1.** Na medida em que surgir qualquer impedimento legal ou estrutural que possa impedir, atrapalhar ou atrasar qualquer fase da tramitação ou consumação da Recuperação Extrajudicial contemplada neste documento, apoiarão e tomarão todas as medidas razoavelmente necessárias e desejáveis para resolver qualquer impedimento.

respect of interest at the applicable default rates and pursuant to this Plan).

**11.2.   Suspension of Enforcement Rights.** Each (i) Signatory Creditor, as from the ER Filing Date; (ii) Adhering Creditor, as from the submission of the respective Adhesion Form before the ER Court in accordance with Clause 6 above; and (iii) other Noteholders not included among the Supporting Creditors, as of the ER Confirmation Order Date, agrees to forebear from enforcing or causing to be enforced, drawing or causing to be drawn any guarantee or amount related to the Claims, whether due or not, during the Transitory Period; *provided*, that any applicable default interest in respect of the Existing Notes shall continue to accrue during the Transitory Period. Notwithstanding the foregoing, any applicable cure or grace periods applicable to any such default or event of default with respect to the Existing Notes will not be tolled during the Transitory Period.   For the avoidance of doubt, the suspension of rights contemplated by this Clause 11.2 shall terminate immediately upon the expiration of the Transitory Period.

**11.3.** During the Transitory Period, the Debtors shall comply with all covenants of this Plan and:

**11.3.1.** To the extent any legal or structural impediment arises that would prevent, hinder, or delay any phase of the prosecution or consummation of the Extrajudicial Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment.

| | |
|---|---|
| **11.3.2.** Usarão todos os esforços razoáveis para se opor ativamente e objetar aos esforços de qualquer pessoa que pretenda contestar, atrasar, impedir ou tomar qualquer outra ação para interferir na aceitação, processamento, implementação ou consumação da Recuperação Extrajudicial, na medida em que tal oposição ou objeção seja razoavelmente necessária ou desejável para facilitar a recuperação extrajudicial; | **11.3.2.** Use all reasonable efforts to actively oppose and object to the efforts of any person seeking to challenge, delay, impede or take any other action to interfere with the acceptance, prosecution, implementation, or consummation of the Extrajudicial Restructuring to the extent such opposition or objection is reasonably necessary or desirable to facilitate the Extrajudicial Restructuring; |
| **11.3.3.** Utilizarão todos os esforços razoáveis para operar seus negócios no curso normal, levando em consideração a Recuperação Extrajudicial ou de maneira consistente com o plano de negócios da Companhia divulgado nos documentos de solicitação de consentimento; | **11.3.3.** Use all reasonable efforts to operate its business in the ordinary course, taking into account the Extrajudicial Restructuring, or in a manner consistent with the Company's business plan disclosed in the consent solicitation documents; |
| **11.3.4.** Fornecerão ao Representante dos Credores cópias de todos os documentos que qualquer devedor pretenda apresentar ao Juízo da RE pelo menos 2 (dois) Dias Úteis (ou assim que possível em caso de protocolo de natureza urgente) antes de fazer tal protocolo e incorporar comentários de boa-fé; e | **11.3.4.** Provide the Creditor Representative draft copies of all documents that any Debtor intends to file with the ER Court at least 2 (two) Business Days (or as soon as practicable in case of filing of an urgent nature) prior to making such filing, and to incorporate comments therefrom in good faith; and |
| **11.3.5.** Cumprirão todas as obrigações de reportes financeiros das Notas Existentes e fornecer ao Representante dos Credores uma versão em inglês das demonstrações financeiras consolidadas auditadas anuais da OEC e, juntamente com essas demonstrações financeiras, um relatório da administração, com os mesmos requisitos e sob os mesmos termos que previsto na Seção 6(u)(i) das Escrituras de Emissão das Novas Notas. | **11.3.5.** Comply with all financial reporting obligations under the Existing Notes, and provide the Creditor Representative with an English language version of OEC's annual audited consolidated financial statements and, together with such financial statements, a management report, with the same requirements and under the same terms as provided for in Section 6(u)(i) of the New Notes Indentures. |
| **11.4.** Durante o Período de Transição, as Devedoras não devem: | **11.4.** During the Transitory Period, the Debtors shall not: |
| **11.4.1.** Tomar qualquer ação que seja inconsistente em qualquer aspecto substancial com, ou que pretenda atrasar, | **11.4.1.** Take any action that is inconsistent in any material respect with, or is intended to delay, frustrate or impede approval, |

52

ꮓ.ꓐ.

| | |
|---|---|
| frustrar ou impedir a aprovação, implementação e consumação da Recuperação Extrajudicial; ou | implementation and consummation of the Extrajudicial Restructuring; or |
| **11.4.2.** Envolver-se em qualquer fusão, consolidação, venda de qualquer ativo substancial ou participação acionária relevante, dividendo, ocorrência de dívida ou outra transação similar fora do curso normal dos negócios que não estejam contempladas neste Plano, exceto na medida em que seja consistente com o plano de negócios da Companhia divulgado nos documentos de solicitação de consentimento ou conforme expressamente consentido por escrito pelo Representante dos Credores. Para que não haja dúvidas, as Devedoras podem se envolver em qualquer fusão, consolidação, venda de ativos, participação societária, dividendos e aumento de dívidas ou outras transações semelhantes permitidas nas Escrituras de Emissão das Novas Notas. | **11.4.2.** Engage in any material merger, consolidation, sale of any substantial asset or relevant capital stock, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the transactions contemplated herein, except to the extent consistent with the Company's business plan disclosed in the consent solicitation documents or as otherwise expressly consented to in writing by the Creditor Representative. For avoidance of doubt, Debtors are allowed to engage in any merger, consolidation, sale of asset, share capital, dividend, and incurrence of indebtedness or other similar transaction permitted under the New Notes Indentures. |
| **11.4.2.1.** O Representante dos Credores poderá, a seu critério, concordar com as Devedoras para aditar qualquer documento relacionado a esta Recuperação Extrajudicial, inclusive as Escrituras de Emissão das Novas Notas e o Contrato do Instrumento Holdco, para permitir a ocorrência ou consumação das transações autorizadas nos termos da Cláusula 11.4.2 acima. | **11.4.2.1.** The Creditor Representative may, at its discretion, agree with the Debtors to amend any document related to this Extrajudicial Restructuring, including the New Notes Indentures and the Holdco Instrument Agreement, in order to permit the occurrence or consummation of transactions authorized pursuant to Clause 11.4.2 above. |
| | |
| **12. DISPOSIÇÕES DIVERSAS** | **12. MISCELLANEOUS** |
| **12.1. Implementação.** As Devedoras deverão tomar quaisquer medidas e celebrar quaisquer acordos e outros documentos que, em forma e substância, possam ser necessários ou adequados para dar eficácia aos termos e condições deste Plano. | **12.1. Implementation.** The Debtors may take any actions and execute any agreements and other documents that, in form and substance, may be necessary or appropriate to effectuate the terms and conditions of this Plan. |

**12.2.    Acordo Integral**. Este Plano e seus anexos constituem o completo entendimento entre as Partes com relação aos assuntos nele previstos, e cancelam e substituem qualquer outro entendimento, acordo, contrato ou compromisso, verbal ou escrito, que tenha sido previamente celebrado e que trate das matérias aqui contempladas.

**12.2.    Entire Agreement**. This Plan and its schedules constitute the full understanding of the Parties with respect to the matters set forth therein, and supersede any other understanding, agreement, contract or covenant, whether verbal or written, that has been previously performed and which deals with the matters contemplated herein.

**12.3.    Cessão e Negociação de Notas Existentes**. Não obstante o protocolo da presente Recuperação Extrajudicial, as Notas Existentes poderão ser negociadas, cedidas ou transferidas a outros credores sem a necessidade de prévio consentimento das Devedoras.

**12.3.    Assignment and Trading of Existing Notes**. Notwithstanding the filing of this Extrajudicial Restructuring, the Existing Notes can be traded, assigned or transferred to other creditors without the need for prior consent of the Debtors.

**12.3.1.** Efeitos da negociação de Notas Existentes. Qualquer comprador ou cessionário que adquira ou receba uma Nota Existente de um Credor Apoiador será considerado, para todos os fins e efeitos, independentemente de qualquer outra ação, como Credor Apoiador, sujeito a todos os termos e condições presentes e decorrentes deste Plano, independentemente da apresentação de qualquer Termo de Adesão, substituindo integralmente o antigo Detentor de Notas nos direitos, deveres e obrigações relacionados aos e decorrentes dos Créditos cedidos, de acordo com os arts. 346, 349 e 350 do Código Civil Brasileiro.

**12.3.1.** Effects of the trading of Existing Notes. Any purchaser, assignee, or transferee who acquires or receives an Existing Note from a Supporting Creditor shall be deemed, for all purposes and effects, regardless of any further action, to be a Supporting Creditor, subject to all terms and conditions present and arising from this Plan, regardless of the submission of any Adhesion Form, fully substituting the former Noteholder in the rights, duties and obligations related to and arising from the assigned Claims, in accordance with arts. 346, 349 and 350 of the Brazilian Civil Code.

**12.4.    Sucessor**. Todas as referências a qualquer Pessoa ou Parte incluirão seus respectivos sucessores e cessionários, independentemente do tipo de sucessão envolvida.

**12.4.    Successor**. All references to any Person or Party shall include their respective successors and assignees, regardless of the kind of succession involved.

**12.5.    Exoneração**. A partir da Data de Fechamento, cada uma e todas as Partes Exonerantes (independentemente de uma Parte Exonerante ser também uma Parte Exonerada) em caráter incondicional e irrevogavelmente exoneram e liberam (e cada Pessoa assim exonerada e liberada será

**12.5.    Release**. As of the Closing Date, each and all of the Releasing Parties (regardless of whether a Releasing Party is also a Released Party) unconditionally and irrevocably discharges and releases (and each Person so discharged and released shall be deemed discharged and released by the Releasing

54

considerada exonerada e liberada pelas Partes Exonerantes) cada uma e todas as Partes Exoneradas e suas respectivas propriedades sobre todos e quaisquer créditos, juros, obrigações, direitos, ações, indenizações, causas de ação, recursos e passivos de qualquer natureza, sejam eles conhecidos ou desconhecidos, líquidos ou ilíquidos, fixados ou contingentes, vencidos ou não vencidos, contestados ou incontroversos, existentes ou daqui decorrentes, que tal Pessoa tenha sido legalmente autorizada a reivindicar ou a se beneficiar (seja individual ou coletivamente), em cada caso com base nos ou relacionado aos, ou de qualquer forma decorrente (i) dos Créditos, incluindo as Garantias das Notas Existentes, (ii) qualquer potencial crédito derivado ou resultante da emissão, oferta ou subscrição das Notas Existentes ou outros créditos sob as leis de valores mobiliários aplicáveis ou (iii) das negociações, formulações, conteúdo e implementação da Recuperação Extrajudicial ou quaisquer ações ou omissões em conexão com a Recuperação Extrajudicial antes da Data de Assinatura até a Data de Fechamento.

Parties) each and all of the Released Parties and their respective property from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, existing or hereinafter arising, that such Person would have been legally entitled to assert or benefit from (whether individually or collectively), in each case based on or relating to, or in any manner arising from (i) the Claims, including the Existing Notes Guarantees, (ii) any potential claims related to or arising from the issuance, offering or underwriting of the Existing Notes or other claims under applicable securities laws or (iii) the negotiations, formulation, content or implementation of the Extrajudicial Restructuring or any actions or omissions taken in connection with the Extrajudicial Restructuring prior to the Signing Date until the Closing Date.

**12.5.1.** Não obstante qualquer disposição em contrário contida no Plano, a "Exoneração" mencionada na Cláusula 12.5 não liberará quaisquer créditos, interesses, juros, direitos, ações, indenizações, causas da ação, tutelas ou passivos (1) de qualquer Parte no âmbito deste Plano, ou relacionados à sua implementação após a Data de Assinatura, na medida em que sejam inconsistentes com o Plano, ou no âmbito de ou em relação a qualquer documento, instrumento, garantia ou acordo celebrado ou emitido com relação à implementação de qualquer parte deste Plano, (2) contra qualquer Parte Exonerada resultante de fraude, conduta dolosa ou negligência grave de tal Parte Exonerada, ou (3) dos agentes fiduciários contra as Devedoras em virtude das obrigações de

**12.5.1.** Notwithstanding anything to the contrary in the Plan, the "Release" referred to in Clause 12.5 shall not release any claims, interests, obligations, rights, suits, damages, causes of action, remedies or liabilities (1) of any Party under this Plan, or in connection with the implementation thereof after the Signing Date to the extent inconsistent with the Plan, or under or in relation to any document, instrument, security or agreement executed or issued in connection with the implementation of any of this Plan, (2) against any Released Party resulting from fraud, willful misconduct or gross negligence of such Released Party, or (3) of the trustees against the Debtors on account of the indemnity obligations under the indentures for the Existing Notes.

| | |
|---|---|
| indenização previstas nas escrituras de emissão das Notas Existentes. | |
| **12.6. Divisibilidade**. Qualquer invalidade ou anulação de qualquer disposição deste Plano não causará a anulação ou invalidade das demais disposições válidas do Plano, cada uma das quais permanecerá em pleno vigor e efeito na forma convencionada. | **12.6. Severability**. Any invalidity or annulment of any provision of this Plan will not cause the annulment or invalidity of the valid provisions of the Plan, each of which shall remain in full force and effect as agreed. |
| **12.7. Tributos.** Exceto conforme estabelecido nas Escrituras de Emissão das Novas Notas e no Contrato do Instrumento Holdco, cada uma das Partes será responsável por quaisquer Tributos dos quais tal Parte seja contribuinte ou responsável de acordo com as Leis Aplicáveis, decorrentes ou relacionados ao cumprimento dos termos e condições deste Plano. | **12.7. Taxes.** Except as set forth in the New Notes Indentures and the Holdco Instrument Agreement, each Party shall be responsible for any Taxes to which such Party is the taxpayer or the responsible in accordance with Applicable Laws arising out of or in connection with compliance with the terms and conditions of this Plan. |
| **12.8. Notificações.** Todas as notificações, requerimentos, pedidos e outras comunicações às Devedoras, para serem consideradas eficazes, deverão ser feitas por escrito e serão consideradas realizadas quando enviadas (i) por carta registada, com aviso de recebimento ou *courier*; ou (ii) por e-mail quando efetivamente entregues, sendo o aviso de leitura válido como prova de entrega e recebimento da mensagem, obrigando-se as Devedoras a verificar as suas mensagens periodicamente. Todas as comunicações devem ser enviadas para os seguintes endereços, salvo se houver alterações nos termos da Cláusula 12.8.1 abaixo:<br>(a) Se às Devedoras:<br>Odebrecht Engenharia e Construção S.A.<br>Av. Lemos Monteiro 120, 7º andar<br>São Paulo – SP Brazil 05501-050<br>Attention: CFO; fjens@oec-eng.com<br><br>Com cópia para:<br>E.Munhoz Advogados<br>Av. Pres. Juscelino Kubitschek, 1600, 2º andar<br>São Paulo – SP Brazil 04543-000 | **12.8. Notices.** All notices, requests, orders and other communications to the Debtors, in order to be considered effective, must be made in writing and shall be deemed to have been made when sent (i) by registered correspondence, with notice of receipt, or courier; or (ii) by e-mail when actually delivered, the reading notice being valid as proof of delivery and receipt of the message, requiring the Debtors to check their messages periodically. All communications must be sent to the following addresses, unless there are changes under the terms of Clause 12.8.1 below:<br>(a) If to the Debtors:<br>Odebrecht Engenharia e Construção S.A.<br>Av. Lemos Monteiro 120, 7º andar<br>São Paulo – SP Brazil 05501-050<br>Attention: CFO; fjens@oec-eng.com<br><br>with a copy to:<br><br>E.Munhoz Advogados<br>Av. Pres. Juscelino Kubitschek, 1600, 2º andar<br>São Paulo – SP Brazil 04543-000 |

| | |
|---|---|
| Att: Eduardo Secchi Munhoz; eduardo@emunhoz.com.br | Attention: Eduardo Secchi Munhoz; eduardo@emunhoz.com.br |
| Att: Felipe Ribeiro da Luz Camara; felipe@emunhoz.com.br | Attention: Felipe Ribeiro da Luz Camara; felipe@emunhoz.com.br |
| Att: Ana Elisa Laquimia de Souza; alaquimia@emunhoz.com.br | Attention: Ana Elisa Laquimia de Souza; alaquimia@emunhoz.com.br |
| -e- | -and- |
| Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza New York, NY 10006 | Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza New York, NY 10006 |
| Att: Francisco L Cestero; fcestero@cgsh.com Att: Richard J. Cooper; rcooper@cgsh.com | Attention: Francisco L Cestero; fcestero@cgsh.com Attention: Richard J. Cooper; rcooper@cgsh.com |
| (b) Se ao Representante dos Credores | (b) If to the Creditor Representative: |
| Pinheiro Neto Advogados Rua Hungria, 1100 São Paulo - SP Brasil 01455-906 | Pinheiro Neto Advogados Rua Hungria, 1100 São Paulo – SP Brazil 01455-906 |
| At.: Giuliano Colombo; gcolombo@pn.com.br At.: Thiago Braga Junqueira; tjunqueira@pn.com.br | Attention: Giuliano Colombo; gcolombo@pn.com.br Attention: Thiago Braga Junqueira; tjunqueira@pn.com.br |
| Com cópia para | with a copy to: |
| Davis Polk & Wardwell LLP 450 Avenida Lexington Nova Iorque, NY 10017 | Davis Polk & Wardwell LLP 450 Lexington Avenue New York, NY 10017 |
| At.: Timothy Graulich; timothy.graulich@davispolk.com At.: Manuel Garciadiaz; manuel.garciadiaz@davispolk.com At.: David Schiff; david.schiff@davispolk.com | Attention: Timothy Graulich; timothy.graulich@davispolk.com Attention: Manuel Garciadiaz; manuel.garciadiaz@davispolk.com Attention: David Schiff; david.schiff@davispolk.com |
| **12.8.1.** Caso qualquer das Devedoras deseje alterar as informações de contato contidas nos itens da Cláusula 12.8, a respectiva Parte comunicará imediatamente o novo endereço a todas as demais Partes. | **12.8.1.** In the event that any of the Debtors wishes to change its contact information contained in the items of Clause 12.8, the respective Party shall immediately communicate the new address to all other Parties. |

**12.8.2.** Até que, de acordo com a Cláusula 12.8.1, seja comunicada a mudança de endereço, as comunicações e notificações enviadas para o endereço indicado na Cláusula 12.8, ou para o último informado de acordo com a Cláusula 12.8.1, serão consideradas plenamente válidas e eficazes.

**12.9. Título Executivo.** Este Plano devidamente celebrado por todas as Partes e a Sentença de Homologação do Plano, são títulos executivos nos termos da Lei, e constituem uma obrigação válida, vinculante e exequível para as Devedoras e para os Detentores de Notas, podendo ser executados, nos seus próprios termos e condições, em conjunto ou não com as Escrituras de Emissão das Novas Notas e/ou com o Contrato do Instrumento Holdco contra as Devedoras ou contra os Detentores de Notas, conforme necessário e aplicável, nos termos dos artigos 783 *et seq.* e 513 *et seq.* do Código de Processo Civil Brasileiro.

12.9.1. **Legitimidade.** As Partes reconhecem e concordam de forma irrevogável que as Devedoras e os Detentores de Notas ou qualquer titular das Novas Notas e/ou do Instrumento Holdco possuem legitimidade para exercer e executar todos os direitos, obrigações e remédios estabelecidos e contratados neste Plano, independentemente da novação e substituição dos Créditos causada por força deste Plano.

**12.10. Irrevogabilidade ou Irretratabilidade.** Observadas as Condições de Eficácia do Plano e os Eventos de Rescisão Antecipada do Plano, este Plano é celebrado pelas Partes de forma irrevogável e irretratável, representando um instrumento válido e vinculante em relação às Partes e seus respectivos sucessores, a qualquer título.

**12.11. Lei Aplicável.** Os direitos, deveres e obrigações decorrentes deste Plano deverão

**12.8.2.** Until, in accordance with Clause 12.8.1, notice is given regarding the change of address, communications and notifications sent to the address in Clause 12.8, or to the last one informed in accordance with Clause 12.8.1, shall be considered fully valid and effective.

**12.9. Enforcement Instrument.** This Plan duly executed by all the Parties and the ER Confirmation Order, are enforcement instruments (*títulos executivos*) under the terms of the Law and constitutes a valid, binding and enforceable obligation for the Debtors and the Noteholders and may be enforced, in its own terms and conditions, jointly or not with the New Notes Indentures and/or with the Holdco Instrument Agreement against the Debtors or against the Noteholders, as required and applicable, pursuant to article 783 *et seq.* and articles 513 *et seq.* of the Brazilian Code of Civil Procedure.

**12.9.1. Standing.** The Parties irrevocably acknowledge and agree that the Debtors and the existing Noteholders or any holder of the New Notes and/or the Holdco Instrument shall have standing to exercise and enforce any and all rights, obligations and remedies set forth under this Plan, irrespective of the novation and substitution of the Claims caused by operation of this Plan.

**12.10. Irrevocability or Irreversibility.** Subject to the Conditions for Effectiveness of the Plan and the Early Termination Events of the Plan, this Plan is entered into by the Parties in an irrevocable and irreversible manner, representing a valid and binding instrument in relation to the Parties and their respective successors in any capacity.

**12.11. Applicable Law.** The rights, duties and obligations arising from this Plan shall be

| | |
|---|---|
| ser regidos, interpretados e executados de acordo com as Leis do Brasil. | governed by, construed and enforced in accordance with, the Laws of Brazil. |
| **12.12. Jurisdição e Foro.** Todas as controvérsias decorrentes e/ou relacionadas ao presente Plano, sua celebração, interpretação ou execução, assim como a sua validade, eficácia e disposições vinculativas correlatas serão resolvidos pelo Juízo da RE, até a Data de Homologação da RE. Após a Data da Sentença de Homologação do Plano, as Partes elegem o foro da cidade de São Paulo, estado de São Paulo, como autoridade exclusiva para resolver quaisquer disputas ou conflitos surgidos entre as Partes em decorrência deste Plano. | **12.12. Jurisdiction and Forum.** All disputes arising from and/or related to this Plan, its conclusion, interpretation or execution, as well as its validity, effectiveness and binding related provisions, shall be settled by the ER Court, until the ER Confirmation Order Date. After the ER Confirmation Order Date, the Parties elect the jurisdiction of the City of São Paulo, State of São Paulo, as sole authority to resolve any disputes or conflicts arising between the Parties as a result of this Plan. |
| **12.13. Conflito.** Este Plano é celebrado em versões em inglês e português. Em caso de conflito de redação entre as versões em português e em inglês, prevalecerá a versão em português. | **12.13. Conflict.** This Plan is executed in both English and Portuguese versions. In the event of any conflict between the wordings of the Portuguese and the English versions, the Portuguese version shall prevail. |
| E, por estarem justas e contratadas, as Partes celebram este Plano em 3 (três) vias de igual forma e teor, para uma única finalidade e efeito nos termos da Lei, na presença de 2 (duas) testemunhas. | And, in witness whereof, the Parties execute this Plan in 3 (three) copies of equal form and content, for a single purpose and effect under the Law, in the presence of two (2) witnesses. |

| **Lista de Anexos** | **Schedules' List** |
|---|---|

| **Referência** | **Documento** | **Schedule** | **Document** |
|---|---|---|---|
| **Anexo A** | Credores Signatários | **Schedule A** | Signatory Creditors |
| **Anexo H** | Lista de Créditos | **Schedule H** | List of Claims |
| **Anexo 3.1** | Condições de Atualização dos Créditos até da Data de Fechamento | **Schedule 3.1** | Conditions for Adjustment of the Claims until the Closing Date |
| **Anexo 3.2** | Escrituras de Emissão das Novas Notas | **Schedule 3.2** | New Notes Indentures |
| **Anexo 3.2.3** | Condições referentes a Principal, Juros, Pagamentos e Vencimento das Novas Notas | **Schedule 3.2.3** | Principal, Interest, Payments and Maturity conditions under the New Notes |
| **Anexo 3.3** | Contrato do Instrumento Holdco | **Schedule 3.3** | Holdco Instrument Agreement |
| **Anexo 4.1** | Documentos Societários da Nova OEC | **Schedule 4.1** | Corporate Documents of New OEC |
| **Anexo 5.1** | Instrumento de Mandato outorgado ao Representante dos Credores | **Schedule 5.1** | Power of Attorney granted to the Creditor Representative |
| **Anexo 6.2.A** | Termo de Adesão | **Schedule 6.2.A** | Adhesion Form |
| **Anexo 6.2.B** | Modelo de Declaração de Propriedade | **Schedule 6.2.B** | Form of Certificate of Holder |

*Página de Assinatura do Plano de Recuperação Extrajudicial datado de 18 de Agosto de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.*

*Signature Page of the Extrajudicial Restructuring Plan dated August 18, 2020 filed by Odebrecht Engenharia e Construção S.A. and Others.*

**EPIQ CORPORATE RESTRUCTURING, LLC**

*Jane Sull.*

Nome: JANE SULLIVAN

Cargo: VICE PRESIDENTE EXECUTIVA

**EPIQ CORPORATE RESTRUCTURING, LLC**

*Jane Sull.*

Name: JANE SULLIVAN

Position: EXECUTIVE VICE PRESIDENT

Nome:

Cargo:

Name:

Position:

*Diane M. S*

DIANE M. STREANY
Notary Public, State of New York
No. 01ST5003825
Qualified in Westchester County
Commission Expires November 2, 2022

| | |
|---|---|
| *Página de Assinatura do Plano de Recuperação Extrajudicial datado de __18__ de __AGOSTO__ de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.* | *Signature Page of the Extrajudicial Restructuring Plan dated __AUGUST__ __18TH__ 2020 filed by Odebrecht Engenharia e Construção S.A. and Others.* |

**ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**

Nome: Felipe Montoro Jens
Cargo: Diretor

Nome: Adriana Henry Meirelles
Cargo: Representante Legal

**ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**

Name: Felipe Montoro Jens
Position: Director

Name: Adriana Henry Meirelles
Position: Legal Representative

*Página de Assinatura do Plano de Recuperação Extrajudicial datado de* ___18___ *de* ___AGOSTO___ *de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.*

*Signature Page of the Extrajudicial Restructuring Plan dated* ___AUGUST___ ___18TH___, *2020 filed by Odebrecht Engenharia e Construção S.A. and Others.*

CNO S.A.

Nome: Felipe Montoro Jens
Cargo: Representante Legal

Nome: ADRIANA HENRY MEIRELLES
Cargo: Representante Legal

CNO S.A.

Name: Felipe Montoro Jens
Position: Representante Legal

Name: ADRIANA HENRY MEIRELLES
Position: Legal Representative

*Página de Assinatura do Plano de Recuperação Extrajudicial datado de ⎯18 de ⎯AGOSTO⎯ de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.*

*Signature Page of the Extrajudicial Restructuring Plan dated AUGUST 18TH, 2020 filed by Odebrecht Engenharia e Construção S.A. and Others.*

**OECI S.A.**

Nome: Felipe Montoro Jens
Cargo: Representante legal

Name: Felipe Montoro Jens
Position: legal Representative

Nome: ADRIANA HENRY MEIRELLES
Cargo: Representante Legal

Name: ADRIANA Henry Meirelles
Position: Legal Representative

*Página de Assinatura do Plano de Recuperação Extrajudicial datado de* 18 *de* AGOSTO *de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.*

*Signature Page of the Extrajudicial Restructuring Plan dated* AUGUST 18TH*, 2020 filed by Odebrecht Engenharia e Construção S.A. and Others.*

Na qualidade de interveniente anuente,

As intervening consenting party,

**OEC S.A.**

Nome: Felipe Montoro Jens
Cargo: Diretor

**OEC S.A.**

Name: Felipe Montoro Jens
Position: Diretor

Nome: ADRIANA HENRY MEIRELLES
Cargo: Representante Legal

Name: ADRIANA HENRY MEIRELLES
Position: Legal Representative

*Página de Assinatura do Plano de Recuperação Extrajudicial datado de ___18___ de ___AGOSTO___ de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.*

Na qualidade de interveniente anuente,

**OEC FINANCE LIMITED**

Nome: Felipe Montoro Jens

Cargo: Diretor

Nome: Adriana Henry Meirelles

Cargo: Representante Legal

---

*Signature Page of the Extrajudicial Restructuring Plan dated ___AUGUST___ ___18TH___, 2020 filed by Odebrecht Engenharia e Construção S.A. and Others.*

As intervening consenting party,

**OEC FINANCE LIMITED**

Name: Felipe Montoro Jens

Position: Director

Name: Adriana Henry Meirelles

Position: Legal Representative

| | |
|---|---|
| *Página de Assinatura do Plano de Recuperação Extrajudicial datado de* <u>18</u> *de* <u>AGOSTO</u> *de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.* | *Signature Page of the Extrajudicial Restructuring Plan dated* <u>AUGUST</u> <u>18ᵀʰ</u>, *2020 filed by Odebrecht Engenharia e Construção S.A. and Others.* |
| Na qualidade de interveniente anuente, | As intervening consenting party, |
| **ODEBRECHT HOLDCO FINANCE LIMITED** | **ODEBRECHT HOLDCO FINANCE LIMITED** |
| Nome: Felipe Montoro Jens<br>Cargo: Director | Name: Felipe Montoro Jens<br>Position: Director |
| Nome: ADRIANA HENRY MEIRELLES<br>Cargo: Representante Legal | Name: ADRIANA HENRY MEIRELLES<br>Position: Legal Representative |

*Página de Assinatura do Plano de Recuperação Extrajudicial datado de* 18 *de* AGOSTO *de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.*

Na qualidade de interveniente anuente,

**OENGER S.A.**

Nome: Felipe Montoro Jens

Cargo: Representante Legal

Nome: ADRIANA HENRY MEIRELLES

Cargo: Representante Legal

*Signature Page of the Extrajudicial Restructuring Plan dated* AUGUST 18Th, *2020 filed by Odebrecht Engenharia e Construção S.A. and Others.*

As intervening consenting party,

**OENGER S.A.**

Name: Felipe Montoro Jens

Position: Legal Representative

Name: ADRIANA HENRY MEIRELLES

Position: Legal Representative

| | |
|---|---|
| *Página de Assinatura do Plano de Recuperação Extrajudicial datado de* \_18\_ *de* \_\_AGOSTO\_\_ *de 2020, protocolado por Odebrecht Engenharia e Construção S.A. e Outras.* | *Signature Page of the Extrajudicial Restructuring Plan dated* \_AUGUST\_ \_18TH\_, *2020 filed by Odebrecht Engenharia e Construção S.A. and Others.* |
| **Testemunhas:** | **Witnesses:** |

_Marina de Freitas Andrade_

Nome: _____

CPF:   **Marina de Freitas Andrade**
       **CPF: 442.624.578-85**
       **RG: 43.552.785-X/SSP-SP**

Nome: marcia Elisabeth S. Florman

CPF: 125.568.088-10

---

_Marina de Freitas Andrade_

Name: _____

CPF:   **Marina de Freitas Andrade**
       **CPF: 442.624.578-85**
       **RG: 43.552.785-X/SSP-SP**

Name: Marcia Elisabeth S. Florman

CPF: 125.568.088-10

| AUTORIZAÇÃO PARA RUBRICA | AUTHORIZATION FOR INITIALS |
|---|---|
| **EPIQ CORPORATE RESTRUCTURING, LLC**, sociedade de responsabilidade limitada, com sede na Third Avenue, nº 777, 12º andar, Nova Iorque, Nova Iorque, 10017-1302, Estados Unidos da América ("Epiq"), autoriza o indivíduo identificado a seguir ("Pessoa Autorizada") a rubricar, individualmente, em nome da Epiq, a consumação da transação contemplada no Plano de Recuperação Extrajudicial celebrado por certos detentores de notas emitidas pela Odebrecht Finance Ltd. de um lado, e CNO S.A., Odebrecht Engenharia e Construção S.A. e OECI S.A., de outro, figurando como como intervenientes anuentes, OENGER S.A., OEC Finance Limited, Odebrecht Holdco Finance Limited e OEC S.A. | **EPIQ CORPORATE RESTRUCTURING, LLC**, a limited liability corporation with registered office at 777 Third Avenue, 12th Floor, New York, New York, 10017-1302, United States of America ("Epiq"), hereby authorizes the individual identified below ("Authorized Individual") to initialize (*rubricar*), individually, on behalf of Epiq, the consummation of the transaction contemplated under the Extrajudicial Restructuring Plan entered by certain holders of notes issued by Odebrecht Finance Ltd., on one side, and by CNO S.A., Odebrecht Engenharia e Construção S.A. and OECI S.A., on the other side, and, as intervening consenting parties, OENGER S.A., OEC Finance Limited, Odebrecht Holdco Finance Limited and OEC S.A. |

| Parte | Pessoa Autorizada | Rubrica |
|---|---|---|
| Epiq Corporate Restructuring, LLC | Laís Dumitrescu Dias | |

| Party | Authorized Individual | Initial |
|---|---|---|
| Epiq Corporate Restructuring, LLC | Laís Dumitrescu Dias | |

Nova Iorque, 8 de Agosto de 2020

New York, August 8, 2020

**EP1Q CORPORATE
RESTRUCTURING, LLC**

*Jane Sull*

Nome:   JANE SULLIVAN

Cargo:   VICE PRESIDENTE
EXECUTIVA

Nome:

Cargo:

**EPIQ CORPORATE
RESTRUCTURING, LLC**

*Jane Sull*

Name:   JANE SULLIVAN

Position:   EXECUTIVE VICE
PRESIDENT

Name: DIANE M. STREANY

Position:   NOTARY PUBLIC

*Diane M. Strea*

**DIANE M. STREANY**
Notary Public, State of New York
No. 01ST5003825
Qualified in Westchester County
Commission Expires November 2, 2022

| AUTORIZAÇÃO PARA RUBRICA | AUTHORIZATION FOR INITIALS |
|---|---|
| **CNO S.A.**, sociedade anônima de capital fechado com sede na Rua Lemos Monteiro n° 120, 7° andar, Parte 'E', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o n° 15.102.288/0001-82 ("<u>CNO</u>"); **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**, sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro n° 120, 14° andar, Parte 'J', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o n° 19.821.234/0001-28 ("<u>OEC</u>"); **OECI S.A.**, sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro n° 120, 12° andar, Parte 'H', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o n°. 10.220.039/0001-78; e, como intervenientes anuentes, **OENGER S.A.**, sociedade anônima de capital fechado com sede na Rua Lemos Monteiro n°. 120, 10° andar, Parte 'C', Butantã, CEP 05501-050 na cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o n° 29.229.029/0001-21 ("<u>OENGER</u>"); **OEC FINANCE LIMITED**, sociedade de responsabilidade limitada, com sede em PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registrada sob o n° 358433 ("<u>Emissora das Novas Notas</u>"); **ODEBRECHT HOLDCO FINANCE LIMITED**, sociedade de responsabilidade limitada, com sede em PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registrada sob o n° 358435 ("<u>Holdco</u>"); e OEC S.A., sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro, no. 120, 7 floor, Part 'L', Butantã, Zip Code 05501-050, cidade de São Paulo, estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o n° 33.950.222/0001-24 | **CNO S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 7th floor, Part 'E', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 15.102.288/0001-82 ("<u>CNO</u>"); **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 14th floor, Part 'J', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 19.821.234/0001-28 ("<u>OEC</u>"); **OECI S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 12th floor, Part 'H', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 10.220.039/0001-78; and, as intervening consenting parties, **OENGER S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 10th floor, Part 'C', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 29.229.029/0001-21 ("<u>OENGER</u>"); **OEC FINANCE LIMITED**, a limited liability company, with registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registered under the no. 358433 ("<u>New Notes Issuer</u>"); **ODEBRECHT HOLDCO FINANCE LIMITED**, a limited liability company, with registered office at PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, registered under the no. 358435 ("<u>Holdco</u>"); and **OEC S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro, n 120, 7 andar, Parte 'L', Butantã, CEP 05501-050, in the city of São Paulo, State of São Paulo, Brazil, enrolled in |



("Nova OEC" e, em conjunto com CNO, OEC, OECI, OENGER, Emissora das Novas Notas, Holdco, "Partes OEC"), autorizam o indivíduo identificado a seguir ("Pessoa Autorizada") a rubricar, individualmente, em nome das Partes OEC, a consumação da transação contemplada no Plano de Recuperação Extrajudicial celebrado pelas Partes OEC e por certos detentores de notas emitidas pela Odebrecht Finance Ltd.

the CNPJ/ME under the no. 33.950.222/0001-24 ("New OEC" and collectively with CNO, OEC, OECI, OENGER, New Notes Issuer, Holdco, "OEC Parties"), hereby authorize the individual identified below ("Authorized Individual") to initialize (*rubricar*), individually, on behalf of OEC Parties, the consummation of the transaction contemplated under the Extrajudicial Restructuring Plan entered by the OEC Parties and certain holders of notes issued by Odebrecht Finance Ltd.



| Parte | Pessoa Autorizada | Rubrica |
|-------|-------------------|---------|
| CNO S.A. | Teresa Genta Lotufo | |
| Odebrecht Engenharia e Construção S.A. | Teresa Genta Lotufo | |
| OECI S.A. | Teresa Genta Lotufo | |
| OENGER S.A. | Teresa Genta Lotufo | |
| OEC Finance Limited | Teresa Genta Lotufo | |
| Odebrecht Holdco Finance Limited | Teresa Genta Lotufo | |
| OEC S.A. | Teresa Genta Lotufo | |

São Paulo, 18 de AGOSTO de 2020

| Party | Authorized Individual | Initial |
|-------|-----------------------|---------|
| CNO S.A. | Teresa Genta Lotufo | |
| Odebrecht Engenharia e Construção S.A. | Teresa Genta Lotufo | |
| OECI S.A. | Teresa Genta Lotufo | |
| OENGER S.A. | Teresa Genta Lotufo | |
| OEC Finance Limited | Teresa Genta Lotufo | |
| Odebrecht Holdco Finance Limited | Teresa Genta Lotufo | |
| OEC S.A. | Teresa Genta Lotufo | |

São Paulo, 18 de AGOSTO de 2020



## ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.

Nome:

Cargo:

Nome:

Cargo:

## OECI S.A.

Nome:

Cargo:

Nome:

Cargo:

## CNO S.A.

Nome:

Cargo:

Nome:

Cargo:

## ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.

Name:

Position:

Name:

Position:

## OECI S.A.

Name:

Position:

Name:

Position:

## CNO S.A.

Name:

Position:

Name:

Position:

E, na qualidade de intervenientes anuentes:

**OEC S.A.**

Nome:
Cargo:

Nome:
Cargo:

**OEC FINANCE LIMITED**

Nome:
Cargo:

Nome:
Cargo:

**ODEBRECHT HOLDCO FINANCE LIMITED**

Nome:
Cargo:

Nome:
Cargo:

**OENGER S.A.**

Nome:
Cargo:

Nome:
Cargo:

And, as intervening consenting parties:

**OEC S.A.**

Name:
Position:

Name:
Position:

**OEC FINANCE LIMITED**

Name:
Position:

Name:
Position:

**ODEBRECHT HOLDCO FINANCE LIMITED**

Name:
Position:

Name:
Position:

**OENGER S.A.**

Name:
Position:

Name:
Position:



| **Anexo A** | **Schedule A** |
|---|---|
| **Credores Signatários** | **Signatory Creditors** |

**Lista de Credores Signatários/ Signatory Creditors' List - ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A. (OEC), CNO S.A. (CNO) AND OECI S.A. (OECI)**

| Número de Registro do Participante do DTC/ DTC Participant Number | Nome do Participante do DTC/ DTC Participant Name | Valor do Principal/ Principal Amount | Valor Total dos Créditos (Principal + Juros)/ Total Amount of Claims (Principal + Interest) | Moeda Original/ Original Currency | Valor em R$/ Amount in R$[1] | % do Total/ % of Total | Emissão Original das Notas/ Original Bond Issuance | No. do Registro Contábil/ Accounting Register no. | Data Original de Vencimento/ Original Maturity Date |
|---|---|---|---|---|---|---|---|---|---|
| 158 | APEX CLEARING CORPORATION | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 4057 | BETA CAPITAL SECURITIES LLC | $1,850,000.00 | 2,161,545.14 | USD | R$11,779,772.54 | 0.06% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 2510 | BNYMELLON/RE THE PRUDENTIAL INVESTMENT | $1,850,000.00 | 2,161,545.14 | USD | R$11,779,772.54 | 0.06% | 7.125% Notes due 2042 | 67573EAJ5 | 6/26/2042 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,690,000.00 | 1,926,883.67 | USD | R$10,500,937.02 | 0.06% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $3,505,000.00 | 4,067,649.86 | USD | R$22,167,471.45 | 0.12% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,550,000.00 | 1,743,793.06 | USD | R$9,503,149.01 | 0.05% | 6.00% Notes due 2023 | G6708EAG5 | 4/5/2023 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,325,000.00 | 1,548,133.68 | USD | R$8,436,864.12 | 0.05% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,365,000.00 | 1,524,567.56 | USD | R$8,308,435.83 | 0.05% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $3,050,000.00 | 3,440,463.54 | USD | R$18,749,494.16 | 0.10% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $6,405,000.00 | 7,433,180.42 | USD | R$40,508,603.32 | 0.22% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $68,502,000.00 | 80,037,927.08 | USD | R$436,182,691.23 | 2.39% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $18,768,000.00 | 20,992,734.83 | USD | R$114,404,052.52 | 0.63% | 4.375% Notes due 2025 | 67575BAL0 | 4/25/2025 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $12,265,000.00 | 13,835,175.52 | USD | R$75,397,556.04 | 0.41% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $2,900,000.00 | 3,365,530.56 | USD | R$18,341,131.87 | 0.10% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $892,000.00 | 1,003,524.78 | USD | R$5,468,908.98 | 0.03% | 6.00% Notes due 2023 | G6708EAG5 | 4/5/2023 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $5,450,000.00 | 6,367,795.14 | USD | R$34,702,573.17 | 0.19% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $1,835,000.00 | 2,052,517.59 | USD | R$11,185,605.09 | 0.06% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $14,305,000.00 | 16,136,358.02 | USD | R$87,938,201.31 | 0.48% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 794 | CF SECURED, LLC | $4,699,000.00 | 5,357,643.17 | USD | R$29,197,547.97 | 0.16% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 794 | CF SECURED, LLC | $25,599,000.00 | 28,799,586.08 | USD | R$156,949,104.28 | 0.86% | 6.00% Notes due 2023 | G6708EAG5 | 4/5/2023 |
| 794 | CF SECURED, LLC | $49,486,000.00 | 55,739,277.77 | USD | R$303,762,342.67 | 1.66% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 794 | CF SECURED, LLC | $107,591,000.00 | 125,709,623.26 | USD | R$685,079,733.90 | 3.75% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 794 | CF SECURED, LLC | $175,312,000.00 | 196,093,167.94 | USD | R$1,068,648,937.35 | 5.85% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 794 | CF SECURED, LLC | $115,298,000.00 | 130,058,546.04 | USD | R$708,780,058.36 | 3.88% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 908 | CITIBANK, N.A. | $4,365,000.00 | 5,065,703.75 | USD | R$27,606,565.73 | 0.15% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 908 | CITIBANK, N.A. | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | 67575BAH9 | 6/26/2022 |
| 908 | CITIBANK, N.A. | $3,310,000.00 | 3,867,413.19 | USD | R$21,076,241.69 | 0.05% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 908 | CITIBANK, N.A. | $7,474,000.00 | 8,359,954.47 | USD | R$45,559,243.85 | 0.25% | 4.375% Notes due 2025 | 67575BAL0 | 4/25/2025 |
| 908 | CITIBANK, N.A. | $6,800,000.00 | 7,670,541.67 | USD | R$41,802,150.92 | 0.23% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 908 | CITIBANK, N.A. | $4,907,000.00 | 5,594,797.83 | USD | R$30,489,969.75 | 0.17% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 908 | CITIBANK, N.A. | $98,568,000.00 | 114,390,902.00 | USD | R$623,396,098.63 | 3.41% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 908 | CITIBANK, N.A. | $1,750,000.00 | 1,968,798.63 | USD | R$10,729,361.79 | 0.06% | 6.00% Notes due 2023 | G6708EAG5 | 4/5/2023 |
| 908 | CITIBANK, N.A. | $16,205,000.00 | 18,252,738.07 | USD | R$99,471,946.68 | 0.54% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 908 | CITIBANK, N.A. | $129,860,000.00 | 151,728,784.72 | USD | R$826,876,358.10 | 4.52% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 908 | CITIBANK, N.A. | $77,983,000.00 | 87,226,964.02 | USD | R$475,360,785.81 | 2.60% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 908 | CITIBANK, N.A. | $101,843,000.00 | 114,881,025.73 | USD | R$626,067,125.92 | 3.42% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 1970 | EUROCLEAR BANK SA/NV | $725,000.00 | 841,382.64 | USD | R$4,585,282.97 | 0.02% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 1970 | EUROCLEAR BANK SA/NV | $9,990,000.00 | 11,390,265.00 | USD | R$62,073,527.17 | 0.34% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 1970 | EUROCLEAR BANK SA/NV | $177,433,000.00 | 205,915,925.19 | USD | R$1,122,180,017.53 | 6.14% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 1970 | EUROCLEAR BANK SA/NV | $2,926,000.00 | 3,291,831.28 | USD | R$17,939,492.91 | 0.10% | 6.00% Notes due 2023 | G6708EAG5 | 4/5/2023 |
| 1970 | EUROCLEAR BANK SA/NV | $9,545,000.00 | 10,751,149.95 | USD | R$58,590,541.87 | 0.32% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 1970 | EUROCLEAR BANK SA/NV | $171,986,000.00 | 200,948,920.14 | USD | R$1,095,111,530.08 | 5.99% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 1970 | EUROCLEAR BANK SA/NV | $58,097,000.00 | 64,985,713.48 | USD | R$354,141,743.37 | 1.94% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 1970 | EUROCLEAR BANK SA/NV | $80,123,000.00 | 90,380,413.23 | USD | R$492,546,137.97 | 2.69% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 4818 | FIDUCIE DESJARDINS INC.** | $5,180,000.00 | 6,052,326.39 | USD | R$32,983,563.12 | 0.18% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 5 | GOLDMAN SACHS & CO. LLC | $6,400,000.00 | 7,158,644.44 | USD | R$39,012,464.63 | 0.21% | 4.375% Notes due 2025 | 67575BAL0 | 4/25/2025 |
| 8396 | HSBC BANK USA, NA/CLEARING | $1,360,000.00 | 1,578,317.78 | USD | R$8,603,358.39 | 0.05% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 534 | INTERACTIVE BROKERS RETAIL EQUITY CLEARING | $91,000.00 | 103,755.17 | USD | R$565,434.53 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 534 | INTERACTIVE BROKERS RETAIL EQUITY CLEARING | $1,200,000.00 | 1,402,083.33 | USD | R$7,640,933.54 | 0.04% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 534 | INTERACTIVE BROKERS RETAIL EQUITY CLEARING | $1,300,000.00 | 1,466,427.08 | USD | R$7,991,587.68 | 0.04% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 756 | INTL FCSTONE FINANCIAL INC. | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 756 | INTL FCSTONE FINANCIAL INC. | $1,215,000.00 | 1,410,041.25 | USD | R$7,684,301.80 | 0.04% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 756 | INTL FCSTONE FINANCIAL INC. | $915,000.00 | 1,069,088.54 | USD | R$5,826,231.83 | 0.03% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 756 | INTL FCSTONE FINANCIAL INC. | $100,000.00 | 111,853.82 | USD | R$609,569.76 | 0.00% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 756 | INTL FCSTONE FINANCIAL INC. | $150,000.00 | 169,203.13 | USD | R$922,106.27 | 0.01% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $672,000.00 | 766,192.00 | USD | R$4,175,534.54 | 0.02% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $190,000.00 | 116,052.78 | USD | R$632,452.82 | 0.00% | 7.500% Perpetual Notes | G6708EAF7 | N/A |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $1,083,000.00 | 1,218,405.08 | USD | R$6,639,942.18 | 0.04% | 6.00% Notes due 2023 | G6708EAG5 | 4/5/2023 |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $200,000.00 | 223,707.64 | USD | R$1,219,139.52 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $42,705,000.00 | 49,560,338.75 | USD | R$270,088,978.09 | 1.48% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $39,593,000.00 | 46,026,890.63 | USD | R$250,832,745.04 | 1.37% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $25,670,000.00 | 28,712,875.45 | USD | R$156,476,557.35 | 0.86% | 4.375% Notes due 2025 | 67575BAL0 | 4/25/2025 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $11,391,000.00 | 12,849,285.31 | USD | R$70,024,750.17 | 0.38% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $11,538,000.00 | 13,481,031.25 | USD | R$73,467,576.00 | 0.40% | 7.125% Notes due 2042 | G6710EAA6 | 6/26/2042 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $6,215,000.00 | 6,951,714.88 | USD | R$37,884,760.57 | 0.21% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |

| Número de Registro do Participante do DTC/ DTC Participant Number | Nome do Participante do DTC/ DTC Participant Name | Valor do Principal/ Principal Amount | Valor Total dos Créditos (Principal + Juros)/ Total Amount of Claims (Principal + Interest) | Moeda Original/ Original Currency | Valor em R$/ Amount in R$[1] | % do Total/ % of Total | Emissão Original das Notas/ Original Bond Issuance | No. do Registro Contábil/ Accounting Register no. | Data Original de Vencimento/ Original Maturity Date |
|---|---|---|---|---|---|---|---|---|---|
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $400,000.00 | 451,208.33 | USD | R$2,458,950.05 | 0.01% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $11,660,000.00 | 13,531,753.89 | USD | R$73,743,999.17 | 0.40% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $5,845,000.00 | 6,829,314.24 | USD | R$37,217,715.79 | 0.20% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $2,200,000.00 | 2,460,784.03 | USD | R$13,410,534.72 | 0.07% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $1,575,000.00 | 1,795,762.50 | USD | R$9,786,366.90 | 0.05% | 5.250% Notes due 2029 | G6710EAD2 | 10/21/2020 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $15,468,000.00 | 17,951,043.67 | USD | R$97,827,802.61 | 0.54% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $600,000.00 | 675,016.67 | USD | R$3,678,638.33 | 0.02% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $2,790,000.00 | 3,142,557.19 | USD | R$17,125,993.90 | 0.09% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $8,045,000.00 | 9,399,800.35 | USD | R$51,226,091.95 | 0.28% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $4,615,000.00 | 5,162,053.77 | USD | R$28,131,644.42 | 0.15% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $2,280,000.00 | 2,571,887.50 | USD | R$14,016,035.31 | 0.08% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 226 | NATIONAL FINANCIAL SERVICES LLC | $300,000.00 | 350,520.83 | USD | R$1,910,233.39 | 0.01% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 226 | NATIONAL FINANCIAL SERVICES LLC | $3,100,000.00 | 3,597,636.11 | USD | R$19,606,037.51 | 0.11% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 226 | NATIONAL FINANCIAL SERVICES LLC | $5,199,000.00 | 6,074,526.04 | USD | R$33,104,344.57 | 0.18% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 571 | OPPENHEIMER & CO. INC. | $200,000.00 | 233,680.56 | USD | R$1,273,488.92 | 0.01% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 443 | PERSHING LLC | $10,750,000.00 | 12,256,791.67 | USD | R$66,795,837.55 | 0.37% | 7.00% Senior Notes due 2020 | 67575BAC0 | 10/21/2020 |
| 443 | PERSHING LLC | $720,000.00 | 820,920.00 | USD | R$4,473,767.72 | 0.02% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 443 | PERSHING LLC | $3,680,000.00 | 4,270,742.22 | USD | R$23,274,263.89 | 0.13% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 443 | PERSHING LLC | $8,125,000.00 | 9,145,350.83 | USD | R$49,839,418.29 | 0.27% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 443 | PERSHING LLC | $5,470,000.00 | 6,161,214.27 | USD | R$33,576,769.41 | 0.18% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 443 | PERSHING LLC | $20,797,000.00 | 24,299,272.57 | USD | R$132,423,745.72 | 0.72% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 443 | PERSHING LLC | $12,348,999.58 | 13,812,827.69 | USD | R$75,275,767.08 | 0.41% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 443 | PERSHING LLC | $33,478,000.00 | 37,763,881.44 | USD | R$205,801,824.78 | 1.13% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 725 | RAYMOND JAMES & ASSOCIATES, INC. | $1,385,000.00 | 1,607,330.97 | USD | R$8,759,471.60 | 0.05% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 725 | RAYMOND JAMES & ASSOCIATES, INC. | $500,000.00 | 563,182.29 | USD | R$3,069,174.53 | 0.02% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 725 | RAYMOND JAMES & ASSOCIATES, INC. | $1,225,000.00 | 1,431,293.40 | USD | R$7,800,119.66 | 0.04% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 4801 | RBC DOMINION SECURITIES INC./CDS** | $250,000.00 | 290,131.94 | USD | R$1,581,332.06 | 0.01% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 8457 | SAFRA SECURITIES LLC | $200,000.00 | 228,033.33 | USD | R$1,242,713.26 | 0.01% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 8457 | SAFRA SECURITIES LLC | $9,938,000.00 | 11,533,325.06 | USD | R$62,853,161.56 | 0.34% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 8457 | SAFRA SECURITIES LLC | $400,000.00 | 450,011.11 | USD | R$2,452,425.53 | 0.01% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 8457 | SAFRA SECURITIES LLC | $400,000.00 | 450,545.83 | USD | R$2,455,339.63 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 8457 | SAFRA SECURITIES LLC | $750,000.00 | 876,302.08 | USD | R$4,775,583.46 | 0.03% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 8457 | SAFRA SECURITIES LLC | $250,000.00 | 279,634.55 | USD | R$1,523,924.40 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 8457 | SAFRA SECURITIES LLC | $1,850,000.00 | 2,086,858.54 | USD | R$11,372,644.00 | 0.06% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 5011 | SCOTIA CAPITAL INC./CDS** | $92,000.00 | 106,768.56 | USD | R$581,856.60 | 0.00% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 5011 | SCOTIA CAPITAL INC./CDS** | $8,600,000.00 | 10,048,263.89 | USD | R$54,740,023.72 | 0.30% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 5011 | SCOTIA CAPITAL INC./CDS** | $200,000.00 | 223,707.64 | USD | R$1,219,159.52 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 2665 | SEI PRIVATE TRUST COMPANY/GO GNP | $400,000.00 | 464,231.11 | USD | R$2,529,811.29 | 0.01% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 2665 | SEI PRIVATE TRUST COMPANY/GO GNP | $200,000.00 | 233,680.56 | USD | R$1,273,488.92 | 0.01% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 2665 | SEI PRIVATE TRUST COMPANY/GO GNP | $200,000.00 | 223,707.64 | USD | R$1,219,159.52 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 2665 | SEI PRIVATE TRUST COMPANY/GO GNP | $200,000.00 | 225,604.17 | USD | R$1,229,475.03 | 0.01% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $740,000.00 | 773,640.00 | USD | R$1,491,255.91 | 0.01% | 7.00% Senior Notes due 2020 | 67575BAC0 | 10/21/2020 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $7,055,000.00 | 8,187,523.47 | USD | R$44,619,546.67 | 0.24% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 997 | STATE STREET BANK AND TRUST COMPANY | $14,873,000.00 | 16,732,538.14 | USD | R$91,187,333.10 | 0.50% | 6.00% Notes due 2023 | 67575BAG1 | 4/5/2023 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $5,000,000.00 | 5,631,822.92 | USD | R$30,691,745.35 | 0.17% | 5.125% Notes due 2022 | 67575BAH9 | 6/26/2022 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $16,988,000.00 | 19,848,826.39 | USD | R$108,170,149.17 | 0.59% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $8,290,000.00 | 9,272,681.63 | USD | R$50,533,333.09 | 0.28% | 4.375% Notes due 2025 | 67575BAL0 | 4/25/2025 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $9,592,000.00 | 10,594,371.67 | USD | R$57,736,147.57 | 0.32% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $500,000.00 | 570,083.33 | USD | R$3,106,783.14 | 0.02% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $525,000.00 | 577,171.53 | USD | R$2,055,471.67 | 0.01% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 997 | STATE STREET BANK AND TRUST COMPANY | $11,672,000.00 | 13,131,324.22 | USD | R$71,563,777.61 | 0.39% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $5,730,000.00 | 6,454,069.06 | USD | R$35,172,740.17 | 0.19% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $20,961,000.00 | 24,499,890.63 | USD | R$133,468,006.64 | 0.73% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $14,724,000.00 | 16,469,356.38 | USD | R$89,753,051.44 | 0.49% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $11,659,000.00 | 13,151,594.90 | USD | R$71,672,246.70 | 0.39% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 2399 | STATE STREET BANK AND TRUST | $40,000.00 | 46,421.11 | USD | R$252,981.13 | 0.00% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 901 | THE BANK OF NEW YORK MELLON | $2,000,000.00 | 2,252,729.17 | USD | R$12,276,698.14 | 0.07% | 5.125% Notes due 2022 | 67575BAH9 | 6/26/2022 |
| 901 | THE BANK OF NEW YORK MELLON | $3,063,000.00 | 1,242,012.15 | USD | R$6,768,593.63 | 0.04% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 901 | THE BANK OF NEW YORK MELLON | $232,000.00 | 259,500.86 | USD | R$1,414,201.84 | 0.01% | 4.375% Notes due 2025 | 67575BAL0 | 4/25/2025 |
| 901 | THE BANK OF NEW YORK MELLON | $586,000.00 | 661,020.21 | USD | R$3,602,361.83 | 0.02% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 901 | THE BANK OF NEW YORK MELLON | $800,000.00 | 901,091.67 | USD | R$4,910,679.26 | 0.03% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 901 | THE BANK OF NEW YORK MELLON | $8,285,000.00 | 9,680,217.01 | USD | R$52,754,278.66 | 0.29% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 901 | THE BANK OF NEW YORK MELLON | $11,275,000.00 | 12,611,518.14 | USD | R$68,728,990.42 | 0.38% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 901 | THE BANK OF NEW YORK MELLON/MELLON TRUST OF | $920,000.00 | 1,037,779.31 | USD | R$5,655,585.12 | 0.03% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 954 | THE NORTHERN TRUST COMPANY | $1,253,000.00 | 1,464,008.68 | USD | R$7,978,408.31 | 0.04% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 2669 | THE NORTHERN TRUST COMPANY | $4,030,000.00 | 4,676,926.94 | USD | R$25,487,848.77 | 0.14% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 2669 | THE NORTHERN TRUST COMPANY | $1,765,000.00 | 1,985,674.03 | USD | R$10,821,327.75 | 0.06% | 6.00% Notes due 2023 | 67575BAG1 | 4/5/2023 |
| 2669 | THE NORTHERN TRUST COMPANY | $4,151,000.00 | 4,850,039.93 | USD | R$26,431,262.61 | 0.14% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |

| Número de Registro do Participante do DTC/ DTC Participant Number | Nome do Participante do DTC/ DTC Participant Name | Valor do Principal/ Principal Amount | Valor Total dos Créditos (Principal + Juros) / Total Amount of Claims (Principal + Interest) | Moeda Original/ Original Currency | Valor em R$/ Amount in R$[1] | % do Total/ % of Total | Emissão Original das Notas/ Original Bond Issuance | No. do Registro Contábil/ Accounting Register no. | Data Original de Vencimento/ Original Maturity Dante |
|---|---|---|---|---|---|---|---|---|---|
| 2669 | THE NORTHERN TRUST COMPANY | $2,500,000.00 | 2,796,345.49 | USD | R$15,239,244.00 | 0.08% | 4.375% Notes due 2025 | 67575BA10 | 4/25/2025 |
| 2669 | THE NORTHERN TRUST COMPANY | $2,000,000.00 | 2,256,043.67 | USD | R$12,294,750.27 | 0.07% | 5.250% Notes due 2029 | 67575BAN8 | 6/27/2029 |
| 2669 | THE NORTHERN TRUST COMPANY | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 2669 | THE NORTHERN TRUST COMPANY | $420,000.00 | 472,531.67 | USD | R$2,575,046.83 | 0.01% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 2669 | THE NORTHERN TRUST COMPANY | $645,000.00 | 726,505.16 | USD | R$3,959,235.15 | 0.02% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 2669 | THE NORTHERN TRUST COMPANY | $12,311,000.00 | 14,384,206.60 | USD | R$78,389,610.69 | 0.43% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 2669 | THE NORTHERN TRUST COMPANY | $3,578,000.00 | 4,002,129.66 | USD | R$21,810,406.01 | 0.12% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 2669 | THE NORTHERN TRUST COMPANY | $3,194,000.00 | 3,602,898.54 | USD | R$19,634,716.18 | 0.11% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 2803 | IZA BANK N.A. | $5,000,000.00 | 5,842,013.89 | USD | R$31,837,223.09 | 0.17% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 221 | UBS FINANCIAL SERVICES INC. | $1,285,000.00 | 1,465,114.17 | USD | R$7,984,432.67 | 0.04% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 221 | UBS FINANCIAL SERVICES INC. | $12,615,000.00 | 14,640,057.92 | USD | R$79,783,923.63 | 0.44% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 221 | UBS FINANCIAL SERVICES INC. | $445,000.00 | 500,637.36 | USD | R$2,728,323.43 | 0.01% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 221 | UBS FINANCIAL SERVICES INC. | $14,875,000.00 | 17,579,991.32 | USD | R$94,715,738.69 | 0.52% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 221 | UBS FINANCIAL SERVICES INC. | $1,200,000.00 | 1,342,245.83 | USD | R$7,514,837.12 | 0.04% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 221 | UBS FINANCIAL SERVICES INC. | $3,360,000.00 | 3,677,347.92 | USD | R$20,040,442.94 | 0.11% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $200,000.00 | 228,033.33 | USD | R$1,242,733.26 | 0.01% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $3,953,000.00 | 4,587,566.31 | USD | R$25,000,860.59 | 0.14% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $400,000.00 | 450,545.83 | USD | R$2,455,339.63 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $500,000.00 | 550,520.83 | USD | R$1,910,233.39 | 0.01% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $500,000.00 | 559,269.10 | USD | R$3,047,848.80 | 0.02% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| | | **$2,166,637,999.58** | **$2,481,053,690.78** | | **$13,520,998,299.66** | **73.96%** | | | |

(1) Taxa de Câmbio utilizada para conversão de R$5.4497/US$ (Câmbio de 17/08/2020) /Exchange rate utilized for conversion of BRL 5.4497 /USD (PTAX from 08/17/2020)

| **Anexo H** | **Schedule H** |
|:---:|:---:|
| **Lista de Créditos** | **List of Claims** |

Lista de Créditos - ODEBRECHT ENGENHARIA E CONSTRUÇÃO (OEC), CNO S.A. (CNO) E OECI S.A. (OECI)

| Credor[1] | Saldo Atualizado do Crédito na Moeda Original[2] | Moeda Original | Valor em R$[3] | % Total | Origem do Crédito | Montante Original do Principal | Registro Contábil (144A) | Registro Contábil (REG S) | Data de Emissão | Data de Vencimento |
|---|---|---|---|---|---|---|---|---|---|---|
| BNY Mellon | $82,919,761.00 | USD | R$451,887,821.52 | 2% | 7.00% Senior Notes due 2020 | $72,726,000.00 | ISIN: USG6710EAD25 CUSIP: G6710E-AD-2 | ISIN: US675758AC09 CUSIP: 675758AC0 | 21/10/2009 | 21/04/2020 |
| BNY Mellon | $161,092,662.71 | USD | R$877,906,683.96 | 5% | 5.125% Notes due 2022 | $143,020,000.00 | ISIN: USG6710EAK67 CUSIP: G6710E-AK-6 | ISIN: US675758AH95 CUSIP: 675758AH9 | 26/06/2012 | 26/06/2022 |
| BNY Mellon | $114,258,946.14 | USD | R$622,676,978.77 | 3% | 6.00% Notes due 2023 | $101,561,000.00 | ISIN: USG6710EAG55 CUSIP: G6710E-AG-5 | ISIN: US675758AG13 CUSIP: 675758AG1 | 05/04/2011 | 05/04/2023 |
| BNY Mellon | $580,073,907.64 | USD | R$3,161,228,774.46 | 17% | 4.375% Notes due 2025 | $518,600,000.00 | ISIN: USG6710EAP54 CUSIP: G6710E-AP-5 | ISIN: US675758AL08 CUSIP: 675758AL0 | 25/04/2013 | 25/04/2025 |
| BNY Mellon[4] | $564,010,416.67 | USD | R$3,073,687,567.71 | 17% | 5.250% Notes due 2029 | $500,000,000.00 | ISIN: USG6710EAQ38 CUSIP: G6710E-AQ-3 | ISIN: US675758AM80 CUSIP: 675758AM8 | 27/06/2014 | 27/06/2029 |
| BNY Mellon | $981,633,593.75 | USD | R$5,349,608,595.86 | 29% | 7.125% Notes due 2042 | $840,150,000.00 | ISIN: USG6710EAL41 CUSIP: G6710E-AL-4 | ISIN: US675758AJ51 CUSIP: 675758AJ5 | 26/06/2012 | 26/06/2042 |
| BNY Mellon | $870,395,833.33 | USD | R$4,743,396,172.92 | 26% | 7.500% Perpetual Notes | $750,000,000.00 | ISIN: USG6710EAF72 CUSIP: G6710E-AF-7 | ISIN: US675758AF30 CUSIP: 675758AF3 | 14/09/2010 | Perpetual |
| Total | $3,354,385,121.24 | | R$18,280,392,595.20 | 100% | | | | | | |

(1) Na qualidade de Trustee, como agente representante dos credores

(2) Créditos em 18/08/2020

(3) Taxa de Câmbio utilizada para conversão de R$5,4497/US$ (Câmbio de 17/08/2020)

(4) Valor inclui R$ 3,722,468.75 de créditos detidos pela Worldwide Insurance Solutions LTD., controlada da Odebrecht S.A., que não devem ser considerados para fins de quórum nos termos do artigo 163, §2° inc. II da LFR

Credit List - ODEBRECHT ENGENHARIA E CONSTRUÇÃO (OEC), CNO S.A. (CNO) AND OECI S.A. (OECI)

| Creditor[1] | Net Amount in Original Currency[2] | Original Currency | Net Amount in BRL[3] | % Total | Credit Origin | Original Principal Amount | Accounting ID (144A) | Accounting ID (REG S) | Issuance Date | Maturity Date |
|---|---|---|---|---|---|---|---|---|---|---|
| BNY Mellon | $82,919,761.00 | USD | R$451,887,821.52 | 2% | 7.00% Senior Notes due 2020 | $72,726,000.00 | ISIN: USG6710EAD25 CUSIP: G6710E-AD-2 | ISIN: US675758AC09 CUSIP: 675758AC0 | 10/21/2009 | 4/21/2020 |
| BNY Mellon | $161,092,662.71 | USD | R$877,906,683.96 | 5% | 5.125% Notes due 2022 | $143,020,000.00 | ISIN: USG6710EAK67 CUSIP: G6710E-AK-6 | ISIN: US675758AH95 CUSIP: 675758AH9 | 6/26/2012 | 6/26/2022 |
| BNY Mellon | $114,258,946.14 | USD | R$622,676,978.77 | 3% | 6.00% Notes due 2023 | $101,561,000.00 | ISIN: USG6710EAG55 CUSIP: G6710E-AG-5 | ISIN: US675758AG13 CUSIP: 675758AG1 | 4/5/2011 | 4/5/2023 |
| BNY Mellon | $580,073,907.64 | USD | R$3,161,228,774.46 | 17% | 4.375% Notes due 2025 | $518,600,000.00 | ISIN: USG6710EAP54 CUSIP: G6710E-AP-5 | ISIN: US675758AL08 CUSIP: 675758AL0 | 4/25/2013 | 4/25/2025 |
| BNY Mellon[4] | $564,010,416.67 | USD | R$3,073,687,567.71 | 17% | 5.250% Notes due 2029 | $500,000,000.00 | ISIN: USG6710EAQ38 CUSIP: G6710E-AQ-3 | ISIN: US675758AM80 CUSIP: 675758AM8 | 6/27/2014 | 6/27/2029 |
| BNY Mellon | $981,633,593.75 | USD | R$5,349,608,595.86 | 29% | 7.125% Notes due 2042 | $840,150,000.00 | ISIN: USG6710EAL41 CUSIP: G6710E-AL-4 | ISIN: US675758AJ51 CUSIP: 675758AJ5 | 6/26/2012 | 6/26/2042 |
| BNY Mellon | $870,395,833.33 | USD | R$4,743,396,172.92 | 26% | 7.500% Perpetual Notes | $750,000,000.00 | ISIN: USG6710EAF72 CUSIP: G6710E-AF-7 | ISIN: US675758AF30 CUSIP: 675758AF3 | 9/14/2010 | Perpetual |
| Total | $3,354,385,121.24 | | R$18,280,392,595.20 | 100% | | | | | | |

(1) In its capacity of Trustee, as representative of the creditors

(2) Claims as of 08/18/2020

(3) Exchange rate utilized for conversion of BRL 5.4497 /USD (PTAX from 08/17/2020)

(4) Amount includes R$3,722,468.75 of credits held by Worldwide Insurance Solutions LTD., a subsidiary of Odebrecht S.A., which should not be considered for quorum purposes under the terms of article 163, paragraph 2, item II of the Brazilian Bankruptcy Law

| **Anexo 3.1.I** | **Schedule 3.1.I** |
| --- | --- |
| **Condições de Atualização dos Créditos até a Data de Fechamento \| Português** | **Conditions for Adjustment of the Claims until de Closing Date \| Portuguese** |

Desde a Data do Protocolo da RE até a Data de Fechamento, o valor dos Créditos será ajustado pela taxa de juros do cupom de cada uma das Notas Existentes, acrescida de uma taxa de inadimplência de 1% (um por cento) ao ano, como segue: o produto (A) do valor de Créditos de cada uma das Notas Existentes e (B) um (1) somado ao produto (i) da soma da taxa de juros do cupom aplicada a cada Nota Existente e 1% (um por cento) de taxa de inadimplência e (ii) o Fator Temporal: o fator temporal, de base anual, entre a Data do Protocolo da RE e a Data de Fechamento.

| Emissão | Créditos na Data de Assinatura[1] | Taxa de Juros do Cupom | Taxa de Inadimplência | Fator Temporal | Data do Cupom | Inadimplemento (após período de carência) | Cupom Pago | Créditos Ajustados |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (a) | (b) | (c) | (d) | | | | |
| 2020 | 82,9 | 7,00% | 1,00% | Dias entre a Data do Protocolo da RE e a Data de Fechamento divididos por 360 | Abr-18 | Mai-19 | Out-18 | (a)*(1.0 + (b)*(d) + (c)*(d)) |
| 2022 | 161,1 | 5,13% | 1,00% | | Dez-18 | Jan-19 | Jun-18 | |
| 2023 | 114,3 | 6,00% | 1,00% | | Abr-18 | Mai-19 | Out-18 | |
| 2025 | 580,1 | 4,38% | 1,00% | | Out-18 | Nov-18 | Abr-18 | |
| 2029 | 564,0 | 5,25% | 1,00% | | Dez-18 | Jan-19 | Jun-18 | |
| 2042 | 981,6 | 7,13% | 1,00% | | Dez-18 | Jan-19 | Jun-18 | |
| PERP | 870,4 | 7,50% | 1.00% | | Dez-18 | Jan-19 | Set-18 | |

[1] A tabela apresenta os valores na Data de Assinatura. Valores serão atualizados, segundo as condições originais, até a Data do Protocolo da RE.

| **Anexo 3.1.II** | **Schedule 3.1.II** |
|---|---|
| **Condições de Atualização dos Créditos até a Data de Fechamento \| Inglês** | **Conditions for Adjustment of the Claims until the Closing Date \| English** |

Upon the ER Filing Date until the Closing Date the amount of Claims shall be adjusted by the coupon interest rate under each of the Existing Notes plus a penalty default rate of 1% (one percent) per year, as follows: the product of (A) the amount of Claims under each of the Existing Notes and (B) one (1) plus the product of (i) the sum of the coupon rate applied for each Existing Notes and 1% (one percent) penalty default rate and (ii) the Time Factor: the time factor on an annual basis between the ER Filing Date and the Closing Date.

| Issue | Claims as of the Signing Date[2] | Coupon Interest Rate | Penalty Default Rate | Time Factor | Coupon Date | Default (post grace period) | Coupon Paid | Adjusted Claims |
|---|---|---|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | | | | |
| 2020 | 82.9 | 7.00% | 1.00% | | Apr-18 | May-19 | Oct-18 | |
| 2022 | 161.1 | 5.13% | 1.00% | Days between ER Filing Date and Closing Date divided by 360 | Dec-18 | Jan-19 | Jun-18 | |
| 2023 | 114.3 | 6.00% | 1.00% | | Apr-18 | May-19 | Oct-18 | (a)*(1.0 + (b)*(d) + (c)*(d)) |
| 2025 | 580.1 | 4.38% | 1.00% | | Oct-18 | Nov-18 | Apr-18 | |
| 2029 | 564.0 | 5.25% | 1.00% | | Dec-18 | Jan-19 | Jun-18 | |
| 2042 | 981.6 | 7.13% | 1.00% | | Dec-18 | Jan-19 | Jun-18 | |
| PERP | 870.4 | 7.50% | 1.00% | | Dec-18 | Jan-19 | Sep-18 | |

---

[2] The table shows the amounts on the Signing Date. Amount to be updated, according to the original conditions, until the ER Filing Date.

| **Anexo 3.2** | **Schedule 3.2** |
|---|---|
| **Escrituras de Emissão das Novas Notas Português e Inglês** | **New Notes Indentures \| Portuguese and English** |



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01        Livro nº LIV                          fls. 2

Certifico e dou fé para os devidos fins que, nesta data, me foi apresentado um documento no idioma inglês identificado como "*INDENTURE - OEC FINANCE LIMITED*" sendo que traduzo no vernáculo o teor em idioma estrangeiro conforme segue:

OEC FINANCE LIMITED

como Emissor

Os GARANTIDORES como parte deste instrumento

THE BANK OF NEW YORK MELLON,
Como Agente Fiduciário, Agente de Pagamentos, Oficial de Registro e Agente de Transferência

**ESCRITURA**[1]
Datado de [-] de 2020

[-]% Notas Sênior com Vencimento [-]

**ÍNDICE**

|  |  | Página |
|---|---|---|
| ARTIGO 1 DEFINIÇÕES E OUTRAS DISPOSIÇÕES DE APLICAÇÃO GERAL | | 1 |
| Seção 1.01. | Definições | 1 |
| Seção 1.02. | Regras de Interpretação | 25 |
| Seção 1.03. | Índice; Títulos | 25 |
| Seção 1.04. | Forma dos Documentos Entregues ao Agente Fiduciário | 25 |
| Seção 1.05. | Atos dos Titulares | 26 |
| ARTIGO 2 AS NOTAS | | 27 |
| Seção 2.01. | Geral e Garantia | 27 |
| Seção 2.02. | Forma e Data | 27 |
| Seção 2.03. | Assinatura, Autenticação e Entrega | 27 |
| Seção 2.04. | Agente de Transferência, Oficial de Registro e Agente de Pagamentos | 28 |
| Seção 2.05. | Agente de Pagamentos para Reter o Dinheiro em Garantia | 29 |
| Seção 2.06. | Principal, Vencimento e Juros | 29 |
| Seção 2.07. | Pagamento de Excesso de *Cash Sweep* | 31 |

---

[1] NTD: Modelo de escritura a ser ajustado para Notas Perpétuas, conforme aplicável. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 3

| | | |
|---|---|---|
| Seção 2.08. | Pagamento do Principal e Juros | 31 |
| Seção 2.09. | Principal e Direitos de Juros Preservados | 33 |
| Seção 2.10. | Listas de Titularidade | 34 |
| Seção 2.11. | Transferência e Troca | 34 |
| Seção 2.12. | Substituição de Notas | 36 |
| Seção 2.13. | Notas Temporárias | 36 |
| Seção 2.14. | Cancelamento | 36 |
| Seção 2.15. | Juros de Mora | 36 |
| Seção 2.16. | Números CUSIP e ISIN | 37 |
| Seção 2.17. | Recompra | 38 |
| | | |
| ARTIGO 3 RESGATE | | 38 |
| Seção 3.01. | Resgate Opcional | 38 |
| Seção 3.02. | Resgate por Motivos de Tributação | 38 |
| Seção 3.03. | Aplicabilidade do Artigo | 39 |
| Seção 3.04. | Eleição de Resgate; Notificação ao Agente Fiduciário | 39 |
| Seção 3.05. | Notificação de Resgate pelo Emissor | 39 |
| Seção 3.06. | Depósito do Preço de Resgate | 40 |
| Seção 3.07. | Efeito da Notificação de Resgate | 40 |
| Seção 3.08. | Escolha das Notas a serem Resgatadas Parcialmente | 40 |
| | | |
| ARTIGO 4 OBRIGAÇÕES | | 40 |
| Seção 4.01. | Pagamentos do Principal e Juros nos termos das Notas | 40 |
| Seção 4.02. | Manutenção de Escritório ou Agência | 40 |
| Seção 4.03. | Quantia para Pagamentos das Notas a ser Mantida como Garantia | 41 |
| Seção 4.04. | Manutenção da Existência Societária | 42 |
| Seção 4.05. | Manutenção de Seguros | 42 |
| Seção 4.06. | Classificações | 42 |
| Seção 4.07. | Cumprimento das Leis | 42 |
| Seção 4.08. | Pagamento de Impostos e Créditos | 42 |
| Seção 4.09. | Manutenção de Bens | 43 |
| Seção 4.10. | Pagamentos de Montantes Adicionais | 43 |
| Seção 4.11. | Informação Disponível | 45 |
| Seção 4.12. | Limitações de Pagamentos Restritos | 45 |
| Seção 4.13. | Limitação de Endividamento | 46 |
| Seção 4.14. | Limitações de Ônus | 48 |
| Seção 4.15. | Limitação de Operações com Afiliadas | 48 |
| Seção 4.16. | Limitação sobre *Leasing* de Retorno | 49 |
| Seção 4.17. | Limitação de Contratos que Restringem Pagamentos de Dividendos | 50 |
| Seção 4.18. | Limitação na Venda de Ativos | 50 |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 4

| | | |
|---|---|---:|
| Seção 4.19. | Limitação de Fusão, Incorporação ou Transferência de Ativos | 52 |
| Seção 4.20. | Recompra das Notas mediante uma Mudança de Controle | 53 |
| Seção 4.21. | Requisitos de Relatório | 54 |
| Seção 4.22. | Garantias Adicionais | 55 |
| Seção 4.23. | Suspensão de Obrigação | 55 |
| Seção 4.24. | Limitações e Restrições ao Emissor | 56 |
| Seção 4.25. | Limitações e Restrições das Subsidiárias Qualificadas | 57 |
| Seção 4.26. | Cumprimento do Plano de Recuperação | 58 |
| Seção 4.27. | Garantidores Adicionais | 58 |
| | | |
| **ARTIGO 5 SUBSTITUIÇÃO DO EMISSOR** | | 58 |
| | | |
| **ARTIGO 6 EVENTOS DE INADIMPLEMENTO E RECURSOS** | | 59 |
| Seção 6.01. | Eventos de Inadimplemento | 59 |
| Seção 6.02. | Notificação de Evento de Inadimplemento; Adiantamento | 62 |
| Seção 6.03. | Outros Recursos | 63 |
| Seção 6.04. | Controle pela Maioria | 63 |
| Seção 6.05. | Limitação sobre Ações | 63 |
| Seção 6.06. | Direitos dos Titulares de Receber pagamento | 64 |
| Seção 6.07. | Ação de Cobrança do Agente Fiduciário | 64 |
| Seção 6.08. | Agente Fiduciário Pode Apresentar Declarações de Crédito | 64 |
| Seção 6.09. | Prioridades | 65 |
| | | |
| **ARTIGO 7 AGENTE FIDUCIÁRIO E AGENTE DE PAGAMENTOS** | | 65 |
| Seção 7.01. | Deveres do Agente Fiduciário e Agente de Pagamentos | 65 |
| Seção 7.02. | Direitos do Agente Fiduciário | 66 |
| Seção 7.03. | Direitos Individuais do Agente Fiduciário | 67 |
| Seção 7.04. | Termo de Responsabilidade do Agente Fiduciário | 68 |
| Seção 7.05. | Notificações de Inadimplemento e Eventos de Inadimplemento | 68 |
| Seção 7.06. | Remuneração e Indenização | 68 |
| Seção 7.07. | Substituição do Agente Fiduciário | 69 |
| Seção 7.08. | Agente Fiduciário Sucessor por Incorporação | 70 |
| Seção 7.09. | Elegibilidade; Desqualificação | 70 |
| | | |
| **ARTIGO 8 QUITAÇÃO DA ESCRITURA; NULIDADE** | | 70 |
| Seção 8.01. | Quitação de Responsabilidade sobre as Notas | 70 |
| Seção 8.02. | Condições para Nulidade | 71 |
| Seção 8.03. | Aplicação do Dinheiro em Garantia | 72 |
| Seção 8.04. | Pagamento para o Emissor | 73 |
| Seção 8.05. | Indenização por Obrigações do Governo dos EUA | 73 |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 5

| | | |
|---|---|---|
| Seção 8.06. | Reintegração | 73 |
| **ARTIGO 9 ADITAMENTOS** | | 73 |
| Seção 9.01. | Modificação e Renúncia | 73 |
| Seção 9.02. | O Agente Fiduciário Assinará Aditamentos | 75 |
| **ARTIGO 10 GARANTIA** | | 75 |
| Seção 10.01. | A Garantia | 75 |
| Seção 10.02. | Garantia Incondicional | 75 |
| Seção 10.03. | Quitação; Reintegração | 76 |
| Seção 10.04. | Renúncia pelos Garantidores | 76 |
| Seção 10.05. | Sub-rogação e Contribuição | 76 |
| Seção 10.06. | Suspensão de Vencimento Antecipado | 76 |
| Seção 10.07. | Limitação sobre o Montante da Garantia | 76 |
| Seção 10.08. | Assinatura e Formalização da garantia | 77 |
| Seção 10.09. | Liberação da Garantia | 77 |
| **ARTIGO 11 SUBSTITUIÇÃO DAS NOTAS** | | 77 |
| Seção 11.01. | Substituição de Notas | 77 |
| **ARTIGO 12 INEXISTÊNCIA DE RESPONSABILIDADE PESSOAL DE CONSELHEIROS, DIRETORES, FUNCIONÁRIOS E ACIONISTAS** | | 77 |
| Seção 12.01. | Inexistência de Responsabilidade Pessoal | 77 |
| **ARTIGO 13 DISPOSIÇÕES GERAIS** | | 77 |
| Seção 13.01. | Disposições de Escritura e Notas para Benefício Exclusivo das Partes e Titulares das Notas | 77 |
| Seção 13.02. | Notificações | 78 |
| Seção 13.03. | Certificado dos Diretores e Parecer do Advogado quanto às Condições Precedentes | 78 |
| Seção 13.04. | Declarações Necessárias no Certificado dos Diretores ou Parecer do Advogado | 79 |
| Seção 13.05. | Regras do Agente Fiduciário, Oficial de Registro, Agente de Pagamentos e Agente de Transferência | 79 |
| Seção 13.06. | Indenização de Câmbio | 79 |
| Seção 13.07. | Inexistência de Direito de Regresso Contra Outros | 80 |
| Seção 13.08. | Feriados Legais | 80 |
| Seção 13.09. | Lei Aplicável; Renúncia a Julgamento por Júri | 80 |
| Seção 13.10. | Consentimento à Jurisdição; Renúncia de Imunidade | 80 |
| Seção 13.11. | Sucessores e Cessionários | 81 |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 6

| | | |
|---|---|---|
| Seção 13.12. | Múltiplos Originais | 81 |
| Seção 13.13. | Cláusulas Independentes | 81 |
| Seção 13.14. | Força Maior | 81 |
| Seção 13.15. | Prescrição | 81 |

ANEXOS:

ANEXO A - Modelo de Nota

ANEXO B - Modelo de Escritura Complementar

ANEXO C - Modelo de Notificação de Transferência

ANEXO D - Modelo de Certificado para Transferência de Nota Global Restrita ou Nota Certificada com Legenda da Lei de Valores Mobiliários para Nota Global Conforme o Regulamento S ou Nota Certificada sem Legenda da Lei de Valores Mobiliários

ANEXO E - Modelo de Certificado de Transferência para Transferência de Nota Global Conforme o Regulamento S ou Nota Certificada sem Legenda da Lei de Valores Mobiliários para Nota Global Restrita ou Nota Certificada com Legenda da Lei de Valores Mobiliários

ANEXO F - Modelo de Certificado para Remoção da Legenda da Lei de Valores Mobiliários de uma Nota Certificada

ANEXO G – Seções Específicas das Notas Perpétuas

ESCRITURA, datada de [-] de 2020, entre OEC FINANCE LIMITED, uma sociedade isenta de responsabilidade limitada constituída nos termos das leis das Ilhas Cayman, como o Emissor, os GARANTIDORES parte deste instrumento e THE BANK OF NEW YORK, MELLON, como Agente Fiduciário, Agente de Pagamentos, Oficial de Registro e Agente de Transferência.

## CONSIDERANDOS[2]

O Emissor autorizou devidamente a emissão de [-]% Notas Sênior com Vencimento em [-] (as "Notas") inicialmente no montante principal total de US$ [-] e autorizou devidamente a formalização desta Escritura.

---

[2] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 7

Efetuou-se tudo que é necessário para fazer das Notas, quando assinadas e autenticadas e entregues e devidamente emitidas, as obrigações válidas do Emissor, e fazer desta Escritura um acordo válido do Emissor.

Além disso, os Garantidores parte deste instrumento autorizaram devidamente a formalização desta Escritura como garantidores das Notas.

Os Garantidores fizeram todo o necessário para fazer da Garantia, quando as Notas são assinadas pelo Emissor e autenticadas e entregues pelo Agente Fiduciário e devidamente emitidas pelo Emissor, as obrigações válidas dos Garantidores, e para fazer desta Escritura um acordo válido dos Garantidores.

### ASSIM SENDO, PELA PRESENTE ESCRITURA:

Em consideração das premissas e da compra das Notas pelo seus Titulares, fica acordado o seguinte, em benefício proporcional de todos os Titulares:

ARTIGO 1º
DEFINIÇÕES E OUTRAS DISPOSIÇÕES DE APLICAÇÃO GERAL

Seção 1.01.    *Definições.*

"**Lei**", quando usado a respeito de qualquer Titular, tem o significado especificado na Seção 1.05.

"**Montantes Adicionais**" tem o significado especificado na Seção 4.10.

"**Garantidores Adicionais**" possui o significado fornecido a esse termo na definição de "Garantidor".

"**Afiliada**" significa, em relação a qualquer Pessoa especificada, (1) qualquer outra Pessoa que, direta ou indiretamente, esteja no controle, seja controlada ou esteja sob controle comum com tal Pessoa especificada ou (2) qualquer outra Pessoa que seja conselheiro ou diretor (a) da Pessoa especificada, (b) de qualquer subsidiária da Pessoa especificada ou (c) de qualquer Pessoa descrita na cláusula (1) acima. Para os fins desta definição, "controle" de uma Pessoa significa o poder, direto ou indireto, de dirigir ou causar a direção da administração e políticas de tal Pessoa, seja por contrato ou de outra forma, e os termos "controle" e "controlada" têm significados correlatos ao precedente e, para evitar dúvidas, não se aplicarão a qualquer instituição financeira ou sociedade truste que, na data do arquivamento da RJ ODB, seja um credor de qualquer Parte da RJ ODB e tenha recebido ou receberá valores mobiliários em conexão com a RJ ODB.

"**Operação com Afiliada**" tem o significado especificado na Seção 4.15.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 8

"**Porcentagem Aplicável**" significa a porcentagem do montante do principal em aberto total de todas as séries das Novas Notas representadas pelo montante do principal em aberto das Notas, a partir do encerramento dos negócios no 15º dia (seja ou não um Dia Útil) antes da Data de Pagamento programada de Excesso de Caixa correspondente.

"**Procedimentos Aplicáveis**" significa os procedimentos aplicáveis da DTC, Euroclear e Clearstream Banking, em cada caso, na medida cabível.

"**Alienação de Ativos**" significa qualquer venda, arrendamento, transferência ou outra alienação (ou uma série de vendas, arrendamentos, transferências ou alienações relacionadas) de ações do Capital Social de uma Subsidiária (exceto as ações qualificadas dos diretores executivos), bens ou outros ativos (cada, a "alienação") pelo Garantidor ou de qualquer de suas Subsidiárias, incluindo qualquer alienação por meio de incorporação, fusão ou operação similar, exceto (1) alienação de bens ou ativos pelo Valor de Mercado no curso normal dos negócios, (2) alienação pela Sociedade ou pela Subsidiária a outra Subsidiária ou Sociedade e (3) alienação de ativos obsoletos no curso normal dos negócios.

"**Venda de Ativos**" significa qualquer venda, alienação, emissão, transmissão, transferência, arrendamento (exceto os arrendamentos operacionais celebrados no curso normal dos negócios), cessão ou outra transferência (cada, para os fins desta definição, a "alienação"), pela Sociedade ou qualquer Subsidiária de (i) qualquer Capital Social de qualquer Subsidiária (exceto as ações qualificadas dos conselheiros executivos); ou (ii) quaisquer bens ou ativos (exceto caixa, equivalentes de caixa ou Capital Social) da Sociedade ou de qualquer Subsidiária.

Não obstante o anterior, os seguintes itens não serão considerados Vendas de Ativos:

(a)       a alienação feita de acordo com o Acordos entre Sociedades;

(b)       a alienação de todos ou substancialmente todos os ativos da Sociedade e de suas Subsidiárias, conforme autorizado por esta Escritura ou qualquer alienação que constitua uma Mudança de Controle;

(c)       a alienação de ações de qualquer Subsidiária da Sociedade a uma Pessoa para constituir uma Sociedade Joint Venture;

(d)       qualquer alienação realizada durante os primeiros quatro anos após a Data de Emissão *ressalvado*, que no final de tal período, após efetivar a aplicação de todo ou parte do Rendimento de Caixa Líquido total resultante de todas essas alienações durante tal período para (1) o pagamento de quaisquer Multas, (2) o pagamento de montantes devidos nos termos das Novas Notas e outros Endividamentos Permitidos, (3) aumento do saldo de caixa e investimentos de curto prazo da Sociedade

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 9

e de suas Subsidiárias até o Limite de Caixa Mínimo, (4) qualquer outro uso em favor de um Negócio Autorizado e (5) o pagamento de taxas e despesas incorridas em conexão com a implantação do Plano de Recuperação, restando quaisquer Rendimentos de Caixa Líquido que excedam o Limite de Caixa Mínimo, então tais Rendimentos de Caixa Líquido restantes serão considerados "**Rendimentos Superiores**" nos termos da Escritura, e o Emissor fará com que todos esses Rendimentos Superiores sejam aplicados de acordo com o segundo e terceiro parágrafos completos da Seção 4.18, exceto que a Oferta de Venda de Ativo descrita nos termos daquele instrumento deverá ser feita até a data que ocorrer 10 Dias Úteis após o quarto aniversário da Data de Emissão.

(e)      qualquer operação ou séries de operações relacionadas que envolvam ativos com um Valor de Mercado não superior a US$ 10.000.000,00;

(f)      a alienação de bens imóveis, bens ou equipamentos de capital, inventário, direito de uso inalienável, contas a receber, serviços ou outros ativos no curso normal dos negócios;

(g)      qualquer alienação de recebíveis e ativos relacionados (incluindo créditos em face de clientes);

(h)      qualquer alienação de ativos não exigidos nos Negócios Autorizados da Sociedade, de qualquer Subsidiária ou outros ativos não essenciais (conforme determinado pela Sociedade de boa-fé);

(i)      qualquer alienação de recebíveis e ativos ou interesses relacionados ao acordo, liquidação ou cobrança dos mesmos no curso normal dos negócios, ou em processos de falência ou similares (inclusive nos termos de qualquer Lei de Falências) e excluídos de factoring ou acordos similares;

(j)      qualquer alienação realizada durante o período que inicia imediatamente após o período estabelecido na cláusula (d) acima e termina antes do aniversário de 10 (dez) anos da Data de Emissão, cuja totalidade do rendimento líquido será utilizada para o pagamento de qualquer Autoridade Pública ou como de outra forma permitido, de acordo com a Seção 4.18; *ressalvado* que, desde a Data de Ajuizamento do Plano de Recuperação, os ativos alienados tenham sido, antes de tal alienação, localizados na mesma jurisdição em que tais Multas são pagas e não tenham sido movidos para a jurisdição aplicável ou alienados, transmitidos, emitidos, cedidos ou de outra forma transferidos, inclusive pelo Emissor, pela Sociedade, uma Subsidiária ou Afiliada à Sociedade ou outra Subsidiária ou Afiliada;

(k)      a venda de bens que, na determinação razoável da Sociedade, tenham se desgastado, tornaram-se obsoletos, não econômicos ou danificadas ou, de outra forma, inadequados para uso em conexão com qualquer Negócio Autorizado;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 10

(l)      (i) alienações de bens, na medida em que tais bens sejam trocados por crédito em face do preço de compra de bens de reposição similar que sejam imediatamente comprados, (ii) alienações de bens, na medida em que o rendimento de tal alienação seja imediatamente aplicado ao preço de compra de tais bens de reposição (bens de reposição estes realmente imediatamente comprados) e (iii) qualquer troca de bens similares para uso em um Negócio Autorizado;

(m)     a resolução, acordo, liberação, extinção ou desistência de qualquer ação ou reivindicação em face de qualquer Pessoa;

(n)     qualquer alienação de investimentos em uma Sociedade Joint Venture na medida exigida, ou feita nos termos de acordos de compra e venda habituais entre as partes da joint venture, estabelecidos nos contratos de joint venture e acordos vinculantes similares;

(o)     a realização de um Pagamento Restrito permitido nos termos da Seção 4.12 e qualquer Investimento Permitido;

(p)     exceto disposição em contrário da cláusula (j) deste documento, uma alienação do Emissor, da Sociedade ou de uma Subsidiária da Sociedade ou de outra Subsidiária, incluindo uma Pessoa que é ou se tornará Subsidiária imediatamente após a alienação;

(q)     qualquer Emissão de Ações Desqualificadas de outra forma permitida nos termos da Seção 4.12;

(r)     uma Operação de *Leasing* de Retorno de outra forma permitida nos termos da Seção 4.16; e

(s)     alienações em conexão com um Ônus Permitido.

"**Oferta de Venda de Ativos**" tem o significado especificado na Seção 4.18.

"**Tempo Médio**" significa, quando aplicado a qualquer Endividamento no momento da determinação, o número de anos obtidos dividindo (a) o produto obtido pela multiplicação (i) do total de todas as parcelas remanescentes ou outros pagamentos exigidos do principal, incluindo o pagamento no vencimento final, em relação ao mesmo, pelo (ii) número de anos (calculado até um décimo segundo mais próximo) que decorrerá entre tal data e a efetivação de tal pagamento pelo (b) montante do principal então em aberto desse Endividamento.

"**Agente de Autenticação**" tem o significado especificado na Seção 2.03.

"**Denominação Autorizada**" tem o significado especificado na Seção 2.03.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 11

"**Lei de Falências**" significa (a) o Título 11, do United States Code ou qualquer lei federal ou estadual similar dos EUA para alívio de devedores, ajuste de dívida ou administração ou liquidação dos bens de devedores em benefício de seus credores e (b) a Lei de Falências brasileira ou qualquer outra lei federal ou estadual das Ilhas Cayman, brasileira ou outra lei aplicável similar para alívio de devedores, ajuste de dívida ou administração ou liquidação de bens de devedores em benefício de seus credores; e para evitar dúvidas, qualquer esquema de acordo apresentado à justiça ou recuperação extrajudicial ou judicial será considerado realizado nos termos da Lei de Falências para todos os fins desta Escritura.

"**Sociedade Licitante**" significa uma Subsidiária da Sociedade, cujo capital é propriedade da Sociedade e qualquer outra Pessoa ou Pessoas que não sejam Afiliadas da Sociedade, com o único objetivo de licitar direta ou indiretamente em projetos de construção.

"**Conselho de Administração**" significa, conforme o caso, o Conselho de Administração do Emissor ou qualquer comitê do mesmo devidamente autorizado para atuar em nome desse Conselho de Administração.

"**Deliberação do Conselho**" significa uma cópia de uma deliberação certificada pelo secretário, secretário adjunto ou outro Diretor ou advogado que desempenha funções societárias secretariais do Emissor a ter sido devidamente aprovada pelo Conselho de Administração e a entrar em vigor na data da certificação e de entrega ao Agente Fiduciário.

"**Brasil**" significa a República Federativa do Brasil.

"**Lei Brasileira de Sociedades**" significa a Lei Federal Brasileira nº 6.404/76, conforme aditada pela Lei Brasileira nº 9.457/97, Lei Brasileira nº 10.303/01, Lei Brasileira nº 11.638/07 e pela Medida Provisória nº 449/08, em cada caso, conforme aditada.

"**Lei Brasileira de Falências**" significa a Lei Federal Brasileira nº 11.101, de 9 de fevereiro de 2005, conforme aditada de tempos em tempos.

"**GAAP Brasileiro**" significa, coletivamente, os princípios contábeis prescritos pela Lei Brasileira de Sociedades, as normas e regulamentos emitidos pelos reguladores aplicáveis, incluindo a CVM, bem como as liberações técnicas emitidas pelo Instituto Brasileiro de Contadores, conforme o caso, em vigor de tempos em tempos.

"**Dia Útil**" significa qualquer dia, exceto sábado, domingo ou feriado ou um dia no qual instituições bancárias ou sociedades trustes estejam autorizadas ou obrigadas por lei a fechar na Cidade de Nova Iorque ou São Paulo, Brasil.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 12

"**Plano de Negócios**" significa o plano de negócios aprovado pelo conselho de administração da Sociedade antes da Data de Emissão e descrito de forma sintética na Declaração de Solicitação de Consentimento.

"**Capital Social**" significa, conforme aplicado a qualquer Pessoa, todas e quaisquer ações, participações, direito de compra, bônus de subscrição, opções ou outros equivalentes ou participações (independentemente de como sejam designados), incluindo qualquer Ação Preferencial, mas excluindo quaisquer títulos de dívida conversíveis ou permutáveis por tal patrimônio.

"**Taxa de Juros**" possui o significado especificado na Seção 2.06.

"**Ilhas Cayman**" significa as Ilhas Cayman, um território do Reino Unido da Grã-Bretanha e Irlanda do Norte.

"**Nota Certificada**" tem o significado especificado na Seção 2.02.

"**Mudança de Controle**" significa a ocorrência de qualquer hipótese abaixo:

(a)      qualquer "pessoa" ou "grupo" (conforme tais termos são usados para os fins das Seções 13(d) e 14(d) da Exchange Act, outros Titulares Autorizados) que é ou se torna o "beneficiário efetivo" (conforme tal termo é usado nas Regras 13d3 da Exchange Act), direta ou indiretamente, de mais de 50% do poder total de voto das Ações com Direito a Voto da Sociedade, inclusive como resultado de qualquer operação de incorporação ou fusão, incluindo a Sociedade;

(b)      qualquer "pessoa" ou "grupo", exceto o Titular Autorizado que adquire a capacidade de eleger a maioria do conselho de administração da Sociedade;

(c)      qualquer Titular Autorizado, direta ou indiretamente, que deixa de ter o poder de dirigir ou causar a direção da administração e políticas da Sociedade, seja através da propriedade de valores mobiliários com direito a voto, por contrato ou de outra forma; ou

(d)      mais de 50% do poder total de voto das Ações com Direito a Voto da Sociedade que foram vendidos ou emitidos como resultado de uma operação, exceto para um Titular Autorizado.

"**Clearstream Banking**" significa a Clearstream Bankin, *société anonyme*.

"**Data de Fechamento**" significa [-] de 20[-], ou tal data posterior na qual as Notas serão emitidas nos termos deste documento.

"**Sociedade**" possui o significado fornecido a esse termo na definição de "Garantidor".

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 13

"**Acionista da Sociedade**" significa o beneficiário legal e efetivo de 100% do capital social emitido da OEC.

"**Declaração da Solicitação de Consentimento**" significa a declaração de solicitação de consentimento emitida em 15 de junho de 2020 pela Odebrecht Engenharia e Construção S.A., entre outros.

"**Obrigação Contingente**" significa qualquer obrigação, contingente ou não, de qualquer Pessoa, direta ou indiretamente, garantindo qualquer Endividamento ou outra obrigação de qualquer Pessoa e qualquer obrigação, direta ou indireta, contingente ou não, de tal Pessoa (a) de comprar ou pagar (ou adiantar ou fornecer recursos para a compra ou pagamento de) tal Endividamento ou outra obrigação de tal Pessoa (decorrente de acordos de parceria ou de acordo, para comprar ativos, bens, valores mobiliários ou serviços, aceitar ou pagar, ou para manter as condições das demonstrações financeiras ou de outra forma) ou (b) celebradas para assegurar de qualquer outra maneira, o credor de tal Endividamento ou outra obrigação do pagamento do mesmo, ou para proteger tal credor contra perdas em relação a mesma (no todo ou em parte); *ressalvado*, *no entanto*, que o termo "Obrigações Contingentes" não inclua endossos para cobrança ou depósito no curso normal dos negócios ou qualquer operação similar.

"**Escritório do Truste Corporativo**" significa o escritório do Agente Fiduciário no qual, em qualquer momento em particular, seu truste corporativo será essencialmente administrado (escritório este que, na data desta Escritura, está localizado em 240 Greenwich Street, 7º Andar Leste, Nova York, Nova York 10286).

"**Opção de Nulidade de Obrigação**" tem o significado especificado na Seção 8.01.

"**Evento de Suspensão do Acordo**" tem o significado especificado na Seção 4.23.

"**CVM**" significa a Comissão de Valores Mobiliários do Brasil.

"**Devedor**" possui o significado fornecido a esse termo na definição de "Endividamento".

"**Inadimplemento**" significa qualquer evento que é, ou após notificação ou passagem do tempo ou ambos, seria um Evento de Inadimplemento.

"**Taxa de Mora**" tem o significado especificado na Seção 2.15.

"**Juros de Mora**" tem o significado especificado na Seção 2.15.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 14

"**Truste de Nulidade**" tem o significado especificado na Seção 8.02.

"**Moeda de Denominação**" possui o significado atribuído a este termo na Seção 13.06.

"**Contas de Depósito**" tem o significado atribuído a esse termo na definição de "Investimentos Temporários em Caixa".

"**Depositário**" significa a DTC ou qualquer depositário sucessor para as Notas.

"**Projeto de Desenvolvimento**" significa qualquer projeto de construção, desenvolvimento ou infraestrutura, incluindo, sem limitação, projetos *greenfield* e *brownfield*, nos quais a Sociedade ou qualquer uma de suas Subsidiárias participa ou detém, direta ou indiretamente, uma participação ou licitação em qualquer um desses projetos.

"**Ação Desqualificada**" significa, em relação a qualquer Pessoa, qualquer Capital Social que, por seus termos (ou pelos termos de qualquer valor mobiliário em que seja conversível ou para o qual seja permutável ou exercível) ou na ocorrência de qualquer evento:

(a)     vence ou é obrigatoriamente resgatável de acordo com uma obrigação de fundo de amortização ou de outra forma;

(b)     é conversível ou permutável por Endividamento ou Ação Desqualificada; ou

(c)     é resgatável por opção do titular do mesmo, no todo ou em parte,

conforme o caso, até o 91º dia após o Vencimento Indicado das Notas; *ressalvado*, *no entanto*, que qualquer Capital Social que não constitua Ação Desqualificada, mas para as provisões do mesmo, dê aos seus titulares o direito de exigir que tal Pessoa recompre ou resgate tal Capital Social mediante a ocorrência de uma "venda de ativos" ou "mudança de controle" antes do 91º dia após o Vencimento Indicado das Notas, não constituirá Ação Desqualificada se tais provisões de "venda de ativos" ou "mudança de controle" não forem mais favoráveis aos titulares de tal Capital Social do que as disposições comparáveis desta Escritura.[3]

"**Dólares**" e o símbolo "**US$**" significam, cada um, dinheiro imediatamente transferível e legal dos Estados Unidos.

"**DTC**" significa Depository Trust Company.

---

[3] NTD: Definição a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 15

"**EBITDA**" significa, para qualquer período, para a Sociedade e suas Subsidiárias em uma base consolidada, a Receita Líquida, menos (i) custo de vendas e serviços prestados, (ii) despesas gerais e administrativas, mais qualquer depreciação ou amortização incluída no custo de vendas e serviços prestados ou despesas gerais e administrativas e (iii) pagamentos efetuados pela Sociedade ou por suas Subsidiárias, tomadas como um todo em relação à Multas.

"**Decisão Transitada em Julgado Executável**" significa (i) uma decisão transitada em julgado pelo pagamento em dinheiro por qualquer tribunal do Brasil (ou qualquer estado, distrito federal, município ou subdivisão do mesmo) ou qualquer outra jurisdição na qual o Garantidor ou Subsidiária Significativa relevante possua ativos relevantes ou (ii) uma autorização para cumprimento transitada em julgado, reconhecimento ou redomiciliação que imponha uma decisão transitada em julgado estrangeira para o pagamento em dinheiro no Brasil, de acordo com a seção 960 e seg. do Código de Processo Civil Brasileiro (Lei nº 13.105/15), ou qualquer decisão em processo similar em qualquer outra jurisdição na qual o Garantidor ou Subsidiária Significativa relevante possua ativos relevantes.

"**Participações Societárias**" significa todo o Capital Social e todos os bônus de subscrição ou opções relacionados a, ou outros direitos de compra, Capital Social, mas excluindo Endividamento conversível em patrimônio.

"**Euroclear**" significa Euroclear Bank S.A./N.V.

"**Evento de Inadimplemento**" tem o significado que lhe é atribuído na Seção 6.01.

"**Montante de Excesso de Caixa**" significa, a partir de qualquer Data de Medição de Excesso de Caixa, (a) o montante total de Caixa Irrestrito, menos (b) a soma (i) do Limite de Caixa Mínimo aplicável correspondente a tal Data de Medição de Excesso de Caixa, (ii) do montante total dos pagamentos programados devidos pela OEC e suas Subsidiárias, tomados como um todo, de acordo com (x) as Novas Notas e (y) qualquer outro Endividamento Permitido, conforme o caso, no período subsequente de 12 (doze) meses, (iii) despesas projetadas para o Emissor para conduzir suas operações durante o período subsequente de 12 (doze) meses, incluindo quaisquer despesas de conversão de moeda estrangeira, e (iv) para qualquer Data de Medição de Excedente de Caixa até (e inclusive) 31 de dezembro de 2024, quaisquer Multas devidas pela OEC e suas subsidiárias pelo período subsequente de 12 (doze) meses, menos (c) o montante igual ao Ajuste do Valor Bruto Necessário; *ressalvado*, que quaisquer itens já deduzidos do caixa e dos investimentos de curto prazo da OEC e de suas Subsidiárias para fins de determinação do Caixa Irrestrito não sejam deduzidos novamente para fins de determinação do Montante de Excesso de Caixa.

"**Montante de Excesso de Caixa Disponível**" o montante em Dólares pelo qual o Montante de Excesso de Caixa, em qualquer Data de Medição de Excesso de Caixa, excede zero, se houver.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 16

"**Data de Medição de Excesso de Caixa**" significa o final de cada ano fiscal, enquanto as Notas estiverem em circulação, com início em 31 de dezembro de 2020.

"**Pagamentos de Excesso de Caixa**" significa quaisquer pagamentos feitos aos Titulares em relação aos Montantes de Excesso de Caixa Disponíveis, durante o Período de Excesso de *Cash Sweep*.

"**Data de Pagamento de Excesso de Caixa**" significa 15 de maio de cada ano fiscal no qual é realizado o Pagamento de Excesso de Caixa.

"**Período de Excesso de *Cash Sweep***" significa, a partir de 1º de janeiro de 2021, cada ano fiscal no qual o Índice de Dívida Líquida para EBITDA for igual ou superior a 3,00 para 1,00, a partir da Data de Medição de Excesso de Caixa imediatamente anterior e finalizado na Data de Medição de Excesso de Caixa, 12 (doze) meses antes de um Evento de Encerramento de Excesso de *Cash Sweep*.

"**Evento de Encerramento de Excesso de *Cash Sweep***" significa a primeira Data de Medição de Excesso de Caixa em relação à qual o Índice de Dívida Líquida para EBITDA é inferior a 3,00 para 1,00.

"**Rendimentos Superiores**" possui o significado fornecido a esse termo na definição de "Venda de Ativos".

"**Exchange Act**" significa o U.S. Securities Exchange Act de 1934, conforme aditado.

"**Data de Validade**" tem o significado especificado na Seção 4.20.

"**Evento de Expropriação**" tem o significado especificado na Seção 6.01.

"**Valor Justo de Mercado**" significa, em relação a qualquer Pessoa, o valor que seria pago por um comprador disposto a um vendedor disposto não afiliado, conforme determinado de boa-fé a preço de mercado (1) para qualquer montante da operação superior a US$ 25.000.000,00, a diretoria ou conselho de administração, conforme o caso, ou (2) de outra forma, por um diretor autorizado, conforme o caso, dessa Pessoa.

"**Multas**" significa todo e qualquer montante devido (diretamente ou por meio de garantias) pela OEC ou por qualquer uma de suas Subsidiárias por multas, penalidades, sentenças ou pagamentos de liquidação impostos por, ou acordados, com qualquer Autoridade Pública ou instituição financeira multilateral e bancos de desenvolvimento, como resultado de qualquer conduta real ou supostamente ilegal da OEC ou de qualquer de suas Afiliadas ou de seus respectivos conselheiros, funcionários, agentes ou representantes anteriores ou atuais.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 17

"**Fitch**" significa a Fitch Rating Service, Inc. e seus sucessores.

"**Nota Global**" significa uma nota global que representa as Notas substancialmente na forma anexada aqui como Anexo A.

"**garantia**" significa qualquer obrigação, contingente ou não, de qualquer Pessoa, direta ou indiretamente, garantindo qualquer Endividamento ou outra obrigação de qualquer Pessoa e qualquer obrigação, direta ou indireta, contingente ou não, de tal Pessoa (i) de comprar ou pagar (ou adiantar ou fornecer recursos para a compra ou pagamento de) tal Endividamento ou outra obrigação de tal Pessoa (decorrente de acordos de parceria ou de acordo, para comprar ativos, bens, valores mobiliários ou serviços, aceitar ou pagar, ou para manter as condições das demonstrações financeiras ou de outra forma) ou (ii) celebradas para assegurar de qualquer outra maneira, o credor de tal Endividamento ou outra obrigação do pagamento do mesmo, ou para proteger tal credor contra perdas em relação a mesma (no todo ou em parte); *ressalvado*, no entanto, que o termo "garantia" não inclua endossos para cobrança ou depósito no curso normal dos negócios. O termo "garantir" tem significado correspondente.

"**Garantia**" possui o significado fornecido a esse termo na Seção 2.01.

"**Garantidor**" significa a OEC S.A. ("OEC" ou "Sociedade"), CNO S.A., OECI S.A. e OENGER S.A. (os "Garantidores Iniciais") e qualquer Subsidiária Qualificada que, de tempos em tempos, se torne uma Subsidiária Significativa ("Garantidores Adicionais" e, juntamente com os Garantidores Iniciais, os "Garantidores"); *ressalvado*, que a qualquer momento em que tal Garantidor Adicional deixar de ser uma Subsidiária Significativa, esse Garantidor Adicional seja liberado automaticamente da Garantia nos termos deste instrumento.

"**Autoridade Pública**" significa qualquer governo, departamento governamental, comissão, conselho, escritório, agência, autoridade reguladora, órgão judicial ou administrativo, nacional ou estrangeira, federal, estadual ou local, com jurisdição sobre o assunto ou assuntos em questão, incluindo sem limitação, no Brasil e nos Estados Unidos. Para evitar dúvidas, a Petrobrás não será considerada uma Autoridade Pública.

"**Contrato de Hedge**" significa (i) qualquer contrato de swap de taxa de juros, contrato de teto de taxa de juros ou outro contrato destinado à proteção contra variações nas taxas de juros, (ii) qualquer contrato de câmbio a termo, contrato de swap de moeda ou outro destinado à proteção contra variações nas taxas de câmbio ou (iii) qualquer contrato futuro de commodities ou matéria-prima ou qualquer outro contrato destinado à proteção contra variações nos preços de matérias-primas.

"**Obrigações de Hedge**" de qualquer Pessoa significa as obrigações de tal Pessoa de acordo com qualquer contrato de swap de taxa de juros, contrato de câmbio de moeda estrangeira, contrato do teto

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 18

da taxa de juros, contrato de opção ou futuros ou outro contrato ou acordo similar elaborado para proteger tal Pessoa contra alterações nas taxas de juros ou taxas de câmbio.

"**Titular**" ou "**Titular da Nota**" significa a Pessoa em cujo nome a Nota está registrada nos livros do Oficial de Registro.

"**Veículo de Holding**" significa qualquer Subsidiária da Sociedade criada exclusivamente com a finalidade de possuir, direta ou indiretamente, Participações Societárias em uma ou mais Sociedades Joint Venture, Sociedade de Projetos, Sociedade Operadoras Locais ou Sociedade Licitantes.

"**IFRS**" tem o significado que lhe é atribuído na Seção 4.21.

"**Endividamento**" significa, com relação a qualquer Pessoa (o "Devedor") em qualquer data de determinação (sem duplicação):

(a)      o principal em relação ao endividamento dessa Pessoa por dinheiro emprestado;

(b)      o principal e o prêmio, se houver, em relação às obrigações de tal Pessoa comprovados por títulos, debêntures, notas ou outros instrumentos similares;

(c)      todas as obrigações de tal Pessoa de pagar o preço de compra diferido e não integralizado dos bens (exceto contas a pagar e obrigações Contingentes de pagamento de *earn-outs*), cujo preço de compra é devido mais de seis meses após a data de colocação dos Bens em serviço ou entrega e seu título;

(d)      todas as obrigações de reembolso de tal Pessoa em relação ao valor nominal de cartas de crédito ou outros instrumentos similares (exceto obrigações relativas a obrigações de garantia de cartas de crédito (exceto as descritas nas cláusulas (a) a (c) acima) celebradas no curso normal dos negócios dessa Pessoa, como créditos tributários de importação e operações de importação, na medida em que tais cartas de crédito não sejam utilizadas ou, se e na medida em que forem utilizadas, esse saque será reembolsado até o terceiro dia útil seguinte ao recebimento por tal Pessoa de uma solicitação de reembolso após o pagamento na carta de crédito);

(e)      todo o endividamento de outras Pessoas garantidas por um Ônus sobre qualquer ativo de tal Pessoa, independentemente de tal endividamento ser assumido ou não por tal Pessoa; *ressalvado, no entanto*, que o montante de endividamento de tal Pessoa seja o menor: (a) do Valor de Mercado de tal ativo na data da determinação; e (b) do montante de tal endividamento dessas outras Pessoas;

(f)      na medida em que não esteja de outra forma incluído nesta definição, todas as Obrigações de Hedge de tal Pessoa;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 19

(g)      todas as obrigações de arrendamento capitalizadas de tal Pessoa; e

(h)      todas as obrigações do tipo referido nas cláusulas (a) a (g) acima de outras Pessoas que sejam garantidas por tal Pessoa, conforme o caso, se e na medida em que algum dos itens anteriores apareceria como um passivo em um balanço patrimonial não consolidado da Pessoa especificada, elaborado de acordo com o GAAP brasileiro.

Não obstante qualquer disposição em contrário neste documento, e para evitar dúvidas, o Endividamento não incluirá contas a pagar decorrentes do curso normal dos negócios, desde que tais contas a pagar sejam devidas no prazo de 180 dias corridos a partir da data em que as respectivas mercadorias forem entregues ou os respectivos serviços forem prestados e não vencidos, nem quaisquer obrigações para com qualquer Pessoa em relação a qualquer contrato de pagamento de imposto celebrado com qualquer Autoridade Pública.

"**Escritura**" significa esta Escritura, conforme aditada ou complementada de tempos em tempos de acordo com as disposições deste instrumento.

"**Data de Ausência do Conselheiro Independente**" significa a data em que qualquer conselheiro ou diretor executivo do Emissor ou da Sociedade tomar conhecimento de que o conselho de administração da Sociedade deixa de incluir o número de conselheiros independentes exigidos de acordo com o Plano de Recuperação.

"**Período de Ausência de Conselheiro Independente**" significa qualquer período desde a Data de Ausência do Conselheiro Independente até, mas excluindo, a data seguinte na qual o conselho de administração da Sociedade inclui novamente o número de conselheiros independentes exigidos de acordo com o Plano de Recuperação.

"**Garantidores Iniciais**" possui o significado fornecido a esse termo na definição de "Garantidor".

"**Juros sobre o Capital**" significa juros sobre o capital próprio pagos conforme a Lei brasileira nº 9249/95, conforme possa ser aditada ou substituída.

"**Investimento**" significa, em relação a qualquer Pessoa, todos os investimentos diretos ou indiretos por tal Pessoa em outras Pessoas (incluindo Afiliadas) na forma de adiantamentos, empréstimos ou outras prorrogações de crédito, incluindo por meio de garantia ou acordos similares (exceto adiantamentos), para clientes ou fornecedores, no curso normal dos negócios e de acordo com práticas anteriores, registrados como contas a receber, despesas ou depósitos pré-pagos no balanço patrimonial do credor) ou contribuição de capital (por meio de qualquer transferência em dinheiro ou outros bens para terceiros ou qualquer pagamento por bens ou serviços por conta ou uso de terceiros), despesas de

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 20

capital ou ocorrência da garantia de qualquer obrigação, ou compra ou aquisição de Capital Social, Endividamento ou outros instrumentos similares emitidos por tais Pessoas e todos os outros itens que são ou seriam classificados como investimentos em um balanço patrimonial elaborado com base no GAAP brasileiro. Se o Emissor, a Sociedade ou qualquer Subsidiária emitir, vender ou de outra forma alienar qualquer Capital Social de uma Pessoa que seja Subsidiária, de tal modo que, após dar efeito, tal Pessoa deixe de ser Subsidiária da Sociedade ou de qualquer de suas Subsidiárias, qualquer Investimento do Emissor ou de qualquer Subsidiária em tal Pessoa que permanecer após dar efeito será considerado um novo Investimento nesse momento.

"**Grau de investimento**" significa BBB - ou superior pela Standard & Poor's, Baa3 ou superior pela Moody's ou BBB - ou superior pela Fitch, ou o equivalente a tais classificações globais pela Standard & Poor's, Moody's ou Fitch.

"**Acordo Entre Sociedades**" significa o acordo a respeito do tratamento de certos saldos entre sociedades existentes celebrado em 11 de junho de 2020, entre ODBINV S.A. - Em Recuperação Judicial, Odebrecht S.A. - Em Recuperação Judicial e Odebrecht Engenharia e Construção S.A., conforme descrito de forma geral e resumido em "A Restruturação – Tratamento das Reivindicações Entre Sociedades" da Declaração de Solicitação de Consentimento.

"**Data de Pagamento de Juros**" e "Datas de Pagamento de Juros" significa a(s) Data(s) de Pagamento de uma parcela de juros sobre as Notas, veja Seção 2.06.

"**Período de Juros**" significa o período que começa na Data de Pagamento de Juros inclusive, e termina no dia imediatamente anterior à próxima Data de Pagamento de Juros inclusive, com exceção de que o primeiro Período de Juros começará em [-] e terminará no dia anterior à primeira Data de Pagamento de Juros.

"**Emissão**" significa emitir, assumir, garantir, incorrer ou de outra forma tornar-se responsável, *ressalvado, no entanto*, que qualquer Endividamento ou Capital Social de uma Pessoa existente no momento em que tal Pessoa se torna uma Subsidiária (seja por incorporação, fusão, aquisição ou de outra forma) será considerado emitido por essa Subsidiária no momento em que se tornar Subsidiária; o termo "emissão" tem significado correspondente.

"**Data de Emissão**" significa [-] de 2020.

"**Emissor**" significa a OEC Finance Limited, uma sociedade de responsabilidade limitada isenta constituída nos termos das leis das Ilhas Cayman, até ser substituto por um sucessor seu, e, após então, inclui o sucessor para fins de qualquer disposição contida neste instrumento.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº    2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01            Livro nº LIV            fls. 21

"**Ordem do Emissor**" significa uma ordem escrita assinada em nome da Sociedade pelo diretor executivo, pelo diretor financeiro ou por qualquer outro diretor do Emissor.

"**Documentos de Substituição do Emissor**" tem o significado especificado no Artigo 5.

"**Sociedade Joint Venture**" significa qualquer Subsidiária da Sociedade ou qualquer outra Pessoa da qual 50% ou menos de 50% das Ações com Direito a Voto em circulação ou participação sejam detidas pela Sociedade ou por suas Subsidiárias, cuja Participação Societária seja detida direta ou indiretamente pela Sociedade e um ou mais terceiros que não são Afiliadas da Sociedade, com o objetivo de licitar direta ou indiretamente novos projetos, incluindo Subsidiárias ou Pessoas da Sociedade cujas atividades são regidas por um contrato de joint venture com um ou mais terceiros que não são Afiliadas da Sociedade.

"**Moeda para Execução de Decisão Judicial**" possui o significado atribuído a este termo na Seção 13.06.

"**Opção de Nulidade legal**" tem o significado que lhe é atribuído na Seção 7.01.

"**Ônus**" significa qualquer hipoteca, penhor, garantia real, oneração, penhor ou ônus de qualquer espécie (incluindo alienação fiduciária, cessão fiduciária, hipoteca, penhor e anticrese, venda condicional ou outro contrato de retenção de título ou arrendamento na natureza do mesmo).

"**Sociedade Operadora Local**" significa uma Subsidiária da Sociedade com o objetivo principal de licitar em projetos de construção ou gerenciar e financiar tais projetos de construção.

"**Efeito Adverso Material**" significa um efeito adverso material sobre (i) os ativos, a situação comercial ou financeira da Sociedade e de suas Subsidiárias (tomadas como um todo), (ii) a capacidade do Emissor e dos Garantidores, coletivamente, de efetuar pagamentos em tempo hábil do principal e juros sobre as Notas, e de outra forma cumprir com suas obrigações relevantes de acordo com as Notas e a Escritura, ou (iii) a legalidade, validade ou exequibilidade de qualquer pagamento ou outra obrigação relevante do Emissor ou de qualquer Garantidor nos termos desta Escritura ou das Notas.

"**Vencimento**" significa a data na qual o principal e o prêmio, se houver, das Notas vencem integralmente de acordo com esta Escritura, seja na Data de Vencimento Indicado, ou mais cedo no resgate, por declaração de vencimento antecipado ou de outra forma.[4]

"**Limite de Caixa Mínimo**" significa (a) qualquer Data de Medição de Excedente de Caixa que ocorra até a data em que as demonstrações financeiras auditadas da OEC para o ano fiscal de 2024 forem

---

[4] NTD: Definição a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 22

emitidas, US$ 200.000.000,00 e (b) para qualquer Data de Medição de Excesso de Caixa ocorrendo após a data em que as demonstrações financeiras auditadas anuais da OEC para o ano fiscal de 2024 forem emitidas, o montante estabelecido na coluna da tabela abaixo denominada "Limite Mínimo de Caixa" correspondente ao montante aplicável (conforme estabelecido na coluna na tabela abaixo denominada "Receita Líquida") da Receita Líquida acumulada pela Nova OEC e suas Subsidiárias em uma base consolidada durante o último ano fiscal concluído mais recentemente para o qual tais demonstrações financeiras foram emitidas:

| Receita Líquida | Limite de Caixa Mínimo |
|---|---|
| Menos de US$ 5.000.000.000,00 | US$ 200.000.000,00 |
| Pelo menos US$ 5.000.000.000,00, mas menos que US$ 6.000.000.000,00 | US$ 225.000.000,00 |
| Pelo menos US$ 6.000.000.000,00, mas menos que US$ 7.000.000.000,00 | US$ 250.000.000,00 |
| Pelo menos US$ 7.000.000.000,00, mas menos que US$ 7.000.000.000,00 | US$ 275.000.000,00 |
| US$ 8.000.000.000,00 ou mais | US$ 300.000.000,00 |

"**Moody's**" significa a Moody´s Investors Service, Inc. e seus sucessores.

"**Rendimentos de Caixa Líquido**" significa, em relação a qualquer emissão ou venda de Capital Social, ou Venda de Ativos ou venda ou outra alienação de qualquer Investimento, conforme aplicável, o rendimento de caixa recebido de tal emissão ou venda (incluindo, conforme aplicável, quaisquer pagamentos em dinheiro recebidos por meio de pagamento diferido do principal de acordo com uma nota promissória ou parcelamento a receber ou de outra forma, e os rendimentos líquidos da venda ou outra alienação de quaisquer valores mobiliários recebidos como contraprestação, mas apenas como e quando recebidos, mas excluindo qualquer outra contraprestação recebida na forma de assunção pela pessoa que adquiriu de Endividamento ou outras obrigações relacionadas aos bens ou ativos que são objeto de tal venda ou recebidas em qualquer outra forma que não seja em dinheiro), conforme o caso, líquido de:

(a)        todas as despesas legais, contábeis, bancárias de investimento, tributárias de títulos e registros, comissões e outras taxas e despesas incorridas e todos os impostos pagos, razoavelmente estimados como sendo efetivamente devidos ou acumulados como passivo de acordo com o GAAP brasileiro (incluindo, para evitar dúvidas, quaisquer rendas, impostos retidos na fonte e outros impostos devidos como resultado da distribuição de tais rendimentos à Sociedade ou suas Subsidiárias, e depois

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 23

de levar em consideração quaisquer créditos ou deduções tributárias disponíveis e quaisquer acordos de partilha fiscal), como consequência de tal emissão ou venda; e

(b)      todos os pagamentos feitos sobre qualquer Endividamento garantido por quaisquer ativos sujeitos a tal venda, de acordo com os termos de qualquer Ônus sobre tais ativos ou que, pela lei aplicável, esteja sendo pago a partir dos recursos provenientes de tal venda.

"**Dívida Líquida**" significa, a partir de qualquer data de determinação, o montante total de Endividamento (exceto o Endividamento entre companhias, entre a Sociedade e suas Subsidiárias) da Sociedade e suas subsidiárias, mais quaisquer pagamentos programados devidos pela Sociedade ou suas Subsidiárias para Multas, menos a soma de caixa e equivalentes de caixa, incluindo valores mobiliários negociáveis.

"**Índice da Dívida Líquida para EBITDA**" significa o índice de Dívida Líquida para EBITDA referente ao ano fiscal mais recentemente concluído, sujeito a ajustes para Alienações de Ativos e investimentos realizados durante o período.

"**Receita Líquida**" significa por qualquer período, todas as receitas líquidas e outras rendas operacionais da Sociedade e de suas Subsidiárias em uma base consolidada.

"**Novas Notas**" significa, em conjunto, cada uma das seguintes séries de novas Notas do Emissor a serem emitidas conforme o Plano de Recuperação: (a) 7,000% das Notas com vencimento em 21 de outubro de 2024 (data de vencimento original em 21 de abril de 2020); (b) 5,125% das Notas com vencimento em 26 de dezembro de 2026 (data de vencimento original em 26 de junho de 2022); (c) 6,000% das Notas com vencimento em 5 de outubro de 2027 (data de vencimento original em 5 de abril de 2023); (d) 4,375% das Notas com vencimento em 25 de outubro de 2029 (data de vencimento original em 25 de abril de 2025); (e) 5,250% das Notas com vencimento em 27 de dezembro de 2033 (data de vencimento original em 27 de junho de 2029); (f) 7,125% das Notas com vencimento em 26 de dezembro de 2046 (data de vencimento original em 26 de junho de 2042); e (g) 7,000% das Notas Perpétuas.

"**Devedor Sem Direito de Regresso**" possui o significado fornecido a esse termo na definição de "Endividamento Sem Direito de Regresso".

"**Endividamento Sem Direito de Regresso**" significa o Endividamento (ou qualquer parte do mesmo) de uma Subsidiária da Sociedade (o "Devedor Sem Direito de Regresso") usado para financiar (i) a criação, desenvolvimento, construção ou aquisição de projetos, bens ou ativos e quaisquer aumentos ou prorrogações, renovações ou refinanciamentos de tais Endividamentos ou (ii) as operações de projetos, bens ou ativos de tal Devedor Sem Direito de Regresso ou de suas Subsidiárias; *ressalvado* que o regresso do credor (incluindo qualquer agente, Agente Fiduciário, depositário judicial ou outra Pessoa atuando em nome de tal pessoa jurídica) em relação a tal Endividamento seja limitado (exceto em relação

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 24

ao Montante de Regresso da OEC (conforme definido abaixo)) ao Devedor Sem Direito de Regresso, quaisquer títulos de dívida emitidos pelo Devedor Sem Direito de Regresso, o Capital Social do Devedor Sem Direito de Regresso e quaisquer ativos, contas a receber, inventário, equipamentos, bens móveis, contratos, intangíveis, direitos e quaisquer outros ativos de tal Devedor Sem Direito de Regresso e suas Subsidiárias, relacionados aos projetos, bens ou ativos criados, desenvolvidos, construídos, aprimorados, adquiridos ou operados, conforme o caso, em relação aos quais tais Endividamentos tenham sido incorridos; *ressalvado, ainda*, que se tal credor possui direito de regresso contratual em relação à Sociedade ou qualquer Subsidiária da Sociedade (exceto o Devedor Sem Direito de Regresso e suas Subsidiárias) para o pagamento de qualquer parte de tal Endividamento (tal parte, o "**Montante de Regresso da OEC**"), então o Montante de Regresso da OEC não constituirá Endividamento Sem Direito de Regresso e se considerará que a Sociedade incorreu em um montante do principal total igual ao Montante de Regresso da OEC.

"**Titular de Nota**" possui o significado fornecido a esse termo na definição de "Titular".

"**Notas**" tem o significado especificado no primeiro parágrafo do Preâmbulo desta Escritura e serão no modelo de Nota previsto no Anexo A.

"**RJ ODB**" significa a recuperação judicial da Odebrecht S.A - Em Recuperação Judicial e de algumas de suas Subsidiárias e Afiliadas (cada, uma "**Parte da RJ ODB**").

"**Parte da RJ ODB**" possui o significado fornecido a esse termo na definição de "RJ ODB".

"**OEC**" possui o significado fornecido a esse termo na definição de "Garantidor".

"**Montante de Regresso**" possui o significado fornecido a esse termo na definição de "Endividamento Sem Direito de Regresso".

"**Diretor**" significa o presidente ou diretor-presidente, qualquer vice-presidente, o diretor financeiro, o tesoureiro ou qualquer tesoureiro adjunto, ou o secretário ou secretário adjunto do Emissor ou qualquer outra Pessoa devidamente nomeada pelos acionistas do Emissor ou Conselho de Administração para desempenhar funções societárias, incluindo, sem limitação, qualquer Conselheiro do Emissor.

"**Certificado do Diretor**" significa, a respeito do Emissor, um certificado assinado por quaisquer dois Diretores do Emissor (um dos quais será o diretor-presidente, diretor financeiro ou diretor de operações do Emissor) e a respeito de qualquer Garantidor, um certificado assinado por quaisquer dois Diretores desse Garantidor aplicável (um dos quais será o diretor-presidente, diretor financeiro ou diretor de operações desse Garantidor), e em cada caso, entregue ao Agente Fiduciário, conforme aplicável.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 25

"**Notas Antigas**" significa, coletivamente, as 7,00% Notas Sênior com vencimento em 2020; 5,125% Notas com vencimento em 2022; 6,00% Notas com vencimento em 2023; 4,375% Notas com vencimento em 2025; 5,250% Notas com vencimento em 2029; 7,125% Notas com vencimento em 2042; 7,500% Notas Perpétuas, conforme o caso emitidas pela Odebrecht Finance Ltd. e garantidas por alguns dos Garantidores.

"**Parecer do Advogado**" significa um parecer por escrito de advogado de reputação reconhecida (o qual pode ser um funcionário do Emissor ou advogado deste) e que será aceitável para o Agente Fiduciário, cujo parecer seja satisfatório para o Agente Fiduciário.

"**Em Circulação**" significa, quando usada em relação às Notas, na data de determinação, todas as Notas autenticadas e entregues nos termos desta Escritura, exceto:

(i)      Notas canceladas pelo Agente Fiduciário ou entregues ao Agente Fiduciário para cancelamento;

(ii)     Notas para as quais o valor de pagamento ou resgate na quantia necessária foi depositado com o Agente Fiduciário ou qualquer Agente de Pagamentos (exceto o Emissor) em truste ou separado em truste pelo Emissor (se um Emissor agir como seu próprio Agente de Pagamentos) para os Titulares dessas Notas; ressalvado que, se essas Notas forem resgatadas conforme a Seção 3.01, uma notificação desse resgate tenha sido devidamente enviada conforme esta Escritura ou disposição para isso, satisfatória para o Agente Fiduciário tenha sido feita;

(iii)    Notas, exceto na medida *prevista* nas Seções 8.01 e 8.02, a respeito das quais o Emissor efetuou nulidade legal e/ou de Obrigações, *conforme previsto* no Artigo 8; e

(iv)    Notas em troca das quais outras Notas foram autenticadas e entregues conforme esta Escritura, exceto tais Notas a respeito das quais terão sido apresentadas aos Agente Fiduciário provas satisfatórias para ele de que tais Notas são de propriedade de um comprador protegido nas mãos de quem essas Notas são obrigações válidas do Emissor;

*ressalvado, contudo*, que ao determinar se os Titulares do montante principal necessário das Notas Em Circulação fizeram qualquer solicitação, pedido, autorização, orientação, consentimento, notificação ou renúncia nos termos deste instrumento, as Notas de propriedade do Emissor ou qualquer de suas Afiliadas serão desconsideradas como Em Circulação, exceto que, ao determinar se o Agente Fiduciário será protegido ao se basear em tal solicitação, pedido, autorização, orientação, consentimento, notificação ou renúncia, somente as Notas de que um Diretor Responsável do Agente Fiduciário recebeu notificação escrita de serem assim detidas, em seu endereço especificado neste instrumento, serão assim desconsideradas. Notas detidas dessa forma que foram penhoradas de boa-fé poderão ser consideradas como Em Circulação se o credor pignoratício estabelecer, para satisfação do Agente Fiduciário, os

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 26

direitos do credor pignoratício de agir assim a respeito de tais Notas e que o credor pignoratício não é o Emissor, ou qualquer outro devedor sobre as Notas ou qualquer de suas Afiliadas ou tal outro devedor.

"**Agente de Pagamentos**" significa The Bank of New York Mellon ou qualquer outra Pessoa autorizada pelo Emissor a pagar o principal ou juros de quaisquer Notas em nome do Emissor e inclui tal significado especificado na Seção 2.04.

"**Data de Pagamento**" significa a data em que o pagamento de juros e/ou principal das Notas é devido.

"**Negócio Autorizado**" significa a engenharia, aquisição ou construção de projetos, quaisquer outros negócios ou atividades conduzidas pela Sociedade ou qualquer de suas Subsidiárias na Data de Emissão, e quaisquer negócios ou atividades que sejam razoavelmente relacionadas, acessórias ou complementares a quaisquer dos itens acima, e extensões, desenvolvimentos ou expansões razoáveis de tais negócios ou atividades.

"**Titular Autorizado**" significa a Odebrecht S.A. - Em Recuperação Judicial ou um sucessor da mesma.

"**Endividamento Autorizado**" possui o significado especificado na Seção 4.13.

"**Investimento Permitido**" significa todos e quaisquer dos seguintes:

(a)       um Investimento da Sociedade ou de qualquer Subsidiária na Sociedade ou de qualquer Subsidiária, conforme o caso para os fins ou relativo ao envolvimento em um Negócio Autorizado ou de acordo com o Contratos entre Sociedades;

(b)       um Investimento da Sociedade ou de qualquer Subsidiária em outra Pessoa se, como resultado de tal Investimento, essa outra Pessoa for incorporada, fundida, ou transferir ou transmitir todos ou substancialmente todos os seus ativos para a Sociedade ou uma Subsidiária, ou se tornar uma Subsidiária;

(c)       Investimentos Temporários em Caixa;

(d)       qualquer Investimento adquirido de uma Pessoa que seja incorporada à Sociedade ou a qualquer Subsidiária, ou qualquer Investimento de qualquer Pessoa existente no momento em que tal Pessoa se torne uma Subsidiária e, em ambos os casos, não seja criado como resultado ou em conexão com ou em antecipação a qualquer operação;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                      CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                         INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 27

(e)     qualquer Investimento existente, ou nos termos de contratos escritos existentes na Data de Emissão, ou um Investimento consistindo em uma prorrogação, modificação ou renovação de qualquer Investimento existente na Data de Emissão; ressalvado que tal investimento não aumente o montante total do investimento então prorrogado, modificado ou renovado, exceto por um montante igual a qualquer prêmio ou outro montante razoável pago em relação às obrigações subjacentes, taxas e despesas incorridas em conexão com tal substituição, refinanciamento ou reembolso;

(f)     qualquer Investimento que constitua Endividamento Permitido;

(g)     qualquer aquisição e posse de (i) créditos tributários federais e estaduais brasileiros adquiridos apenas para pagar montantes devidos pela Sociedade ou por qualquer Subsidiária para as autoridades tributárias e (ii) obrigações descontadas de qualquer Autoridade Pública adquiridas apenas para pagar montantes fiscais devidos pela Sociedade para tal Autoridade Pública;

(h)     contas a receber devidas à Sociedade ou qualquer de suas Subsidiárias, se criadas no curso normal dos negócios e devidas ou quitáveis de acordo com os termos comerciais habituais; ressalvado que tais termos comerciais possam incluir os termos comerciais que a Sociedade ou sua Subsidiária considerar razoáveis nas circunstâncias;

(i)     qualquer adiantamento, empréstimo ou prorrogação de crédito decorrente de compra de inventário, equipamentos ou suprimentos no curso normal dos negócios;

(j)     empréstimos e adiantamentos de acordo com planos de remuneração ou benefício de funcionários, diretores ou conselheiros, indenizações ou acordos habituais celebrados no curso normal dos negócios, em um montante do principal total que não deve exceder US$ 1,0 milhão ao mesmo tempo em aberto; ressalvado, no entanto, que qualquer Investimento feito em conexão com qualquer remuneração de funcionários ou esquema de participação nos lucros de funcionário, conforme o caso, geralmente aplicável a todos os funcionários em qualquer categoria de funcionários, seja permitido nos termos deste instrumento e não seja contabilizado para tal limite de US$ 1,0 milhão;

(k)     Investimentos em conexão com penhores, depósitos, pagamentos ou garantia contratual realizados ou cedidos no curso normal dos negócios, relacionados com ou para garantir obrigações legais, regulamentares ou similares, incluindo obrigações decorrentes de obrigações de saúde, segurança ou ambientais;

(l)     recompras ou resgates das Notas;

(m)     Investimentos em qualquer Sociedade Joint Venture;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 28

(n)    Investimentos adicionais da Sociedade ou de suas Subsidiárias com Valor Justo de Mercado total, tomados em conjunto com todos os outros Investimentos feitos de acordo com esta cláusula durante a vigência das Notas, não excedendo US$ 20 milhões no momento de tal Investimento (com o Valor Justo de Mercado de cada Investimento sendo mensurado no momento da realização e sem efetivar alterações subsequentes no valor).

"**Ônus Permitidos**" significa, em relação a qualquer Pessoa:

(a)    qualquer Ônus existente na Data de Emissão das Notas, e qualquer prorrogação, renovação ou substituição do mesmo ou de qualquer Ônus referido nas cláusulas (b) e (c) abaixo; *ressalvado, no entanto*, que o montante total do Endividamento garantido não seja aumentado, exceto por qualquer aumento que reflita prêmios, taxas e despesas relacionados a tal prorrogação, renovação ou substituição;

(b)    Qualquer Ônus sobre quaisquer bens ou ativos (incluindo o Capital Social de qualquer Pessoa) (1) que seja concedido a um comprador em conexão com qualquer venda de bens ou ativos permitida ou efetuada de acordo com a Seção 4.18, na medida em que tais Ônus se estendem exclusivamente aos bens ou ativos sujeitos a tal venda; ou (2) garantindo Endividamento incorrido apenas para financiar a aquisição, construção, desenvolvimento ou melhoria de tais bens ou ativos, incluindo taxas e despesas relacionadas à operação (ou garantindo Endividamento incorrido para refinanciar um financiamento ponte ou outro intermediário inicialmente incorrido para financiar a aquisição, construção, desenvolvimento ou melhoria de tais bens ou ativos, incluindo taxas e despesas de operação relacionadas) após a data desta Escritura e celebrada no curso normal dos negócios; *ressalvado* que (i) o montante do principal total de Endividamento garantido pelo Ônus não exceda (mas possa ser menor que) o custo (isto é, preço de compra) dos bens ou ativos assim adquiridos, construídos, desenvolvidos ou aprimorados de tal aquisição, construção, desenvolvimento ou melhoria, e não onerem quaisquer outros bens ou ativos da Sociedade ou de qualquer Subsidiária; *e ressalvado, ainda*, que na medida em que os bens ou ativos adquiridos forem Capital Social, o Ônus também poderá onerar outros bens ou ativos da Pessoa assim adquiridos; e (ii) qualquer Ônus poderá incorrer no Capital Social de qualquer Pessoa que seja Endividamento Sem Direito de Regresso e incorrido para financiar a aquisição, construção ou desenvolvimento de quaisquer bens ou ativos de tal Pessoa;

(c)    qualquer Ônus (x) que garanta o Endividamento para financiar todo ou parte do custo de aquisição, construção ou desenvolvimento de um projeto; *ressalvado* que o Ônus relativo a tal Endividamento seja limitado a ativos (incluindo o Capital Social da pessoa jurídica do projeto), direitos e/ou receitas de tal projeto; *e ressalvado, ainda*, que o Ônus tenha ocorrido antes ou no prazo de 365 dias corridos após a conclusão da aquisição, construção ou desenvolvimento, e não se aplique a quaisquer outros bens ou ativos da Sociedade ou a qualquer Subsidiária; e (y) qualquer Ônus existente sobre quaisquer bens ou ativos de qualquer Pessoa antes da aquisição, incorporação ou fusão de tal Pessoa com a Sociedade ou qualquer Subsidiária após a Data de Emissão; *ressalvado* que (i) o Ônus não

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 29

seja criado considerando ou em conexão com tal aquisição, incorporação ou fusão, (ii) o Endividamento garantido pelo Ônus não poderá exceder o Endividamento garantido na data de tal aquisição, incorporação ou fusão, (iii) o Ônus não se aplicará a quaisquer outros bens ou ativos da Sociedade ou de suas Subsidiárias e (iv) o Ônus garantirá apenas o Endividamento garantido na data de tal aquisição, incorporação ou fusão;

(d)      qualquer Ônus imposto por lei que tenha sido incorrido no curso normal dos negócios, incluindo, sem limitação, ônus de transportadoras, armazéns e mecânicos e outras onerações similares que surjam no curso normal dos negócios, conforme o caso, por valores ainda não devidos ou não contestados de boa-fé pelos processos adequados;

(e)      qualquer penhor ou depósito feito em conexão com a remuneração dos trabalhadores, seguro-desemprego ou outra lei de previdência social similar, qualquer depósito para garantir a apelação em processos contestados de boa-fé nos quais os Garantidores ou qualquer Subsidiária sejam parte, depósitos de boa-fé em conexão com licitações, propostas, contratos (exceto para o pagamento de Endividamento) ou arrendamentos nos quais os Garantidores ou qualquer Subsidiária são parte ou depósitos para pagamento de aluguel, conforme o caso, realizados no curso normal dos negócios;

(f)      qualquer Ônus a favor de emissores de títulos ou cartas de crédito emitidas de acordo com a solicitação e por conta dos Garantidores ou de qualquer Subsidiária no curso normal dos negócios;

(g)      qualquer Ônus que garanta impostos, autos de infração e outros processos judiciais ou administrativos, ou outros encargos governamentais, cujo pagamento ainda não é devido (ou estão sendo contestados de boa-fé por processos adequados e para os quais tais reservas ou outras disposições apropriadas, se houver, foram estabelecidas conforme exigido pelo GAAP brasileiro);

(h)      qualquer Ônus que (x) seja concedido sobre quaisquer bens ou ativos para garantir pagamentos de Multa a qualquer Autoridade Pública, na medida em que tal Ônus se estendam exclusivamente a bens ou ativos localizados e, se aplicável, gerados, na mesma jurisdição onde tais Multas são pagas e que, desde a Data de Ajuizamento do Plano de Recuperação, não foram movidas para a jurisdição aplicável ou alienadas, transmitidas, emitidas, cedidas ou de outra forma transferidas, inclusive pelo Emissor, pela Sociedade, por uma Subsidiária ou Afiliada para a Sociedade ou outra Subsidiária ou Afiliada e (y) ocorrer (i) a qualquer momento durante os primeiros cinco anos após a Data de Emissão, desde que tais Multas sejam contempladas pelo Plano de Negócios e devidas em relação a qualquer país no qual a Sociedade ou qualquer uma de suas Subsidiárias planejam manter operações durante tal período de cinco anos, de acordo com o Plano de Negócios; ou (ii) a qualquer momento durante os primeiros dez anos após a Data de Emissão, desde que tais Multas sejam devidas em relação a qualquer país onde os Garantidores Existentes planejem restabelecer as operações nos termos do Plano de Negócios;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 30

(i)      defeitos menores, servidões, direitos de passagem, restrições e outras onerações similares incorridas no curso normal dos negócios, e onerações que consistem em restrições de zoneamento, licenças, restrições ao uso de bens ou ativos, ou pequenas imperfeições no título que não prejudiquem substancialmente o valor ou uso de bens ou ativos afetados pelas mesmas, e quaisquer arrendamentos e subarrendamentos de bens imóveis que não interfiram no curso normal dos negócios dos Garantidores ou de qualquer Subsidiária, e que sejam feitos nos termos habituais e comuns aplicáveis a bens similares;

(j)      quaisquer direitos de compensação de qualquer Pessoa em relação a qualquer conta de depósito dos Garantidores ou de qualquer Subsidiária que surja no curso normal dos negócios;

(k)      qualquer Ônus concedido para garantir empréstimos diretos ou indiretos, (i) do Banco Nacional de Desenvolvimento Econômico e Social - BNDES (incluindo empréstimos da Financiadora de Estudos e Projetos - FINEP), do Banco do Nordeste do Brasil S.A. ou qualquer outro banco ou agência de crédito federal, regional ou estadual do governo brasileiro, ou (ii) de qualquer banco internacional ou multilateral de desenvolvimento, agência patrocinada pelo governo, banco ou agência de importação-exportação ou seguradora de crédito oficial à exportação-importação;

(l)      qualquer Ônus que garanta as Obrigações de Hedge nos termos de Contratos de Hedge para fins não especulativos;

(m)      qualquer Ônus sobre o inventário ou contas a receber e ativos relacionados (incluindo crédito em face de clientes) dos Garantidores ou de qualquer Subsidiária, que assegure as obrigações de tal Pessoa ou de suas subsidiárias sob quaisquer linhas de crédito ou empréstimo de capital de giro, ou em conexão com qualquer financiamento estruturado de exportação ou importação ou outra operação comercial, exclusivamente na medida em que tais linhas de crédito, empréstimo de capital de giro, financiamento estruturado de exportação ou importação ou outra operação comercial sejam incorridos de acordo com a cláusula (c), (h) ou (l) da definição de Endividamento Permitido";

(n)      Ônus que garante obrigações devidas por qualquer Subsidiária à Sociedade ou qualquer outra Subsidiária ou pela Sociedade a qualquer Subsidiária; e

(o)      além do Ônus mencionado anteriormente nas cláusulas (a) a (n) acima, o Ônus que garante o Endividamento dos Garantidores (incluindo, sem limitação, garantias dos Garantidores), com um montante principal total em aberto, a qualquer momento da determinação, não superior a US\$ 100.000.000,00.

"**Pessoa**" significa qualquer pessoa física, sociedade, parceria, joint venture, sociedade truste de responsabilidade limitada, organização sem personalidade jurídica, governo ou qualquer agência ou subdivisão política do mesmo.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 31

"**Juros PIK**" tem o significado especificado na Seção 2.06.

"**Notas PIK**" tem o significado especificado na Seção 2.08.

"**Opção PIK**" tem o significado especificado na Seção 2.06.

"**Período de Opção PIK**" tem o significado especificado na Seção 2.06.

"**Pagamento PIK**" tem o significado que lhe é atribuído na Seção 2.06.

"**Ações Preferenciais**" significa, conforme aplicado ao Capital Social de qualquer sociedade, Capital Social de qualquer classe ou classes (independentemente de como sejam designadas) que seja preferencial quanto ao pagamento de dividendos, ou à distribuição de ativos mediante liquidação voluntária ou involuntária ou dissolução de tal sociedade, sobre ações do Capital Social de qualquer outra classe de tal sociedade.

"**principal**" de uma Nota significa o montante do principal dessa Nota (incluindo quaisquer Montantes Adicionais a pagar pelo Emissor em relação a esse principal).

"**Sociedade do Projeto**" significa qualquer Subsidiária da Sociedade, cujas atividades envolvem substancialmente qualquer projeto de construção, desenvolvimento ou infraestrutura, incluindo, sem limitação, projetos *greenfield* e *brownfield*, nos quais a Sociedade ou qualquer uma de suas Subsidiárias participa ou detém, direta ou indiretamente, uma participação, incluindo qualquer Subsidiária que seja membro de consórcios de construção ou licitante qualificado no Brasil ou em outra jurisdição estrangeira.

"**Data de Compra**" tem o significado especificado na Seção 4.20.

"**Investidor Qualificado**" significa, em relação a qualquer operação que constitua uma Mudança de Controle, qualquer Pessoa ou grupo que (i) possua um endividamento não garantido que seja, no momento de tal Mudança de Controle, classificado com ou acima do Grau de Investimento (ou qualquer pessoa jurídica ou pessoas jurídicas de propósito específico que sejam diretamente controladas por tal Pessoa ou grupo e criadas ou usadas exclusivamente para adquirir o controle da Sociedade); ou (ii) resulte na classificação corporativa da Sociedade imediatamente após efetivar a Mudança de Controle como sendo (A) igual ou superior à classificação corporativa imediatamente anterior à Mudança de Controle e (B) em qualquer caso, pelo menos B pela Standard & Poor's ou B3 pela Moody's ou Fitch, confirmado previamente por duas Agências de Classificação.

"**Subsidiária Qualificada**" significa qualquer Subsidiária da Sociedade que (i) não seja o Emissor ou um Garantidor Inicial e (ii) no momento da determinação, não seja uma Sociedade Joint

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº    2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 32

Venture, uma Sociedade de Projeto, uma Sociedade Operadora Local, uma Sociedade Licitante ou um Veículo de Holding.

"**Agência de Classificação**" significa a (i) Standard & Poor's, (ii) Moody's ou (iii) Fitch (conforme o caso, ou qualquer um dos seus sucessores).

"**Data de Registro**" significa, a respeito dos juros sobre as Notas devidos em qualquer Data de Pagamento dos Juros, 6 de outubro e 6 de abril (sendo ou não um Dia Útil), conforme o caso, imediatamente anterior a tal Data de Pagamento de Juros.

"**Data de Resgate**" significa, quando usada em relação a qualquer Nota a ser resgatada, de acordo com o Artigo 3, a data fixada para tal resgate por ou de acordo com esta Escritura.

"**Preço de Resgate**" significa, quando usada em relação a qualquer Nota a ser resgatada, de acordo com a Seção 3.01, o preço ao qual ela deve ser resgatada conforme esta Escritura.

"**Registro**" tem o significado especificado na Seção 2.04.

"**Titular Registrado**" significa, (1) a DTC, se a Nota for uma Nota Global depositada junto ao custodiante e registrada em nome de um nomeado pela DTC e (2) a Euroclear e/ou Clearstream Banking, se a Nota for uma Nota Global depositada junto ao depositário comum e registrada em nome de um nomeado para a Euroclear e/ou Clearstream Banking.

"**Oficial de Registro**" significa The Bank of New York Mellon, até um Oficial de Registro sucessor se tornar tal conforme as disposições aplicáveis desta Escritura e, após isso, "Oficial de Registro" significará esse Oficial de Registro sucessor, e inclui tal significado especificado na Seção 2.04.

"**Data de Registro Regular**" tem o significado especificado na Seção 2.08.

"**Regulamento S**" significa o Regulamento S nos termos da Lei de Valores Mobiliários, em vigor de tempos em tempos.

"**Nota Global Conforme o Regulamento S**" significa uma ou mais Notas Globais permanentes integralmente em forma registrada sem cupons que representam Notas vendidas fora dos Estados Unidos, conforme o Regulamento S.

"**Notificação de Deliberação Relevante**" tem o significado especificado na Seção 4.21.

"**Impostos Retidos Relevantes**" tem o significado especificado na Seção 4.10.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº 2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 33

"**Diretor Responsável**" significa qualquer diretor do Agente Fiduciário com responsabilidade direta pela administração desta Escritura.

"**Nota Global Restrita**" significa uma ou mais Notas Globais permanentes integralmente em forma registrada em cupons vendidas para "compradores institucionais qualificados" (tal termo é definido na Regra 144a) conforme a Regra 144A.

"**Pagamento Restrito**" tem o significado especificado na Seção 4.12.

"**Plano de Recuperação**" significa o plano de recuperação extrajudicial, instaurado nas Varas de Falência e Recuperação em [•] de 2020 (a "Data de Ajuizamento do Plano de Recuperação"), determinando a emissão dos Valores Mobiliários e das Novas Notas em troca da recuperação de várias dívidas financeiras da OEC e de algumas de suas Afiliadas, conforme devidamente aditado de tempos em tempos.

"**Data de Ajuizamento do Plano de Recuperação**" terá o significado estabelecido na definição de "Plano de Recuperação".

"**Ajuste do Valor Bruto Necessário**" significa a soma de (A) quaisquer Montantes Adicionais devidos em relação ao pagamento aplicável de Montantes de Excesso de Caixa Disponíveis nos termos das Novas Notas e Valores Mobiliários e (B) quaisquer impostos retidos na fonte ou similares devidos pela Sociedade ou pelo Emissor de Valores Mobiliários em relação às distribuições de Montantes de Excesso de Caixa Disponíveis para o Emissor de Valores Mobiliários ou ao Acionista da Sociedade.

"**Titulares das Novas Notas Necessária**s" tem o significado especificado na Seção 6.01.

"**Titulares das Notas Necessárias**" tem o significado especificado na Seção 6.01.

"**Data de Reversão**" tem o significado especificado na Seção 4.23.

"**Regra 144A**" significa a Regra 144A nos termos da Lei de Valores Mobiliários, em vigor de tempos em tempos.

"**S&P**" significa o Grupo de Classificação Standard & Poor's, uma divisão de The McGraw-Hill Inc., e seus sucessores.

"**Operação de *Leasing* de Retorno**" significa qualquer acordo com qualquer Pessoa (exceto a Sociedade ou qualquer de suas Subsidiárias), ou da qual tal Pessoa seja parte, fornecendo o arrendamento à Sociedade ou suas Subsidiárias por um período de mais de 3 (três) anos de quaisquer bens ou ativos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 34

que tenham sido ou devam ser vendidos ou transferidos pela Sociedade ou por tal Subsidiária para tal Pessoa, ou para qualquer outra Pessoa (exceto a Sociedade ou uma Subsidiária) à qual os fundos foram ou devem ser adiantados por tal Pessoa sobre a garantia dos bens ou ativos arrendados.

"**Segunda Data de Medição**" tem o significado especificado na Seção 2.07.

"**Lei de Valores Mobiliários**" significa o U.S. Lei de Valores Mobiliários de 1933, conforme aditado.

"**Legenda da Lei de Valores Mobiliários**" significa a seguinte Legenda, impressa em letras maiúsculas:

ESTA NOTA NÃO FOI REGISTRADA NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS DE 1933, CONFORME ADITADA (A "LEI DE VALORES MOBILIÁRIOS") E NÃO PODE SER OFERECIDA, VENDIDA, PENHORADA OU ENTÃO TRANSFERIDA, EXCETO DE ACORDO COM A FRASE A SEGUIR. PELA SUA AQUISIÇÃO OU DE UMA PARTICIPAÇÃO BENÉFICA NESTE INSTRUMENTO, O ADQUIRENTE

(1) DECLARA QUE

(A) ELE E POR CONTA DE QUEM ELE AGE É UM "COMPRADOR INSTITUCIONAL QUALIFICADO" (NA ACEPÇÃO DA REGRA 144A NA LEI DE VALORES MOBILIÁRIOS) E QUE EXERCE CRITÉRIOS EXCLUSIVOS DE INVESTIMENTO A RESPEITO DE CADA CONTA OU

(B) ELE NÃO É UM CIDADÃO NORTE-AMERICANO (NA ACEPÇÃO DO REGULAMENTO S DA LEI DE VALORES MOBILIÁRIOS) E

(2) CONCORDA, EM BENEFÍCIO DA SOCIEDADE, QUE NÃO IRÁ OFERECER, VENDER, PENHORAR OU ENTÃO TRANSFERIR ESTA NOTA OU QUALQUER PARTICIPAÇÃO BENÉFICA NELA, EXCETO DE ACORDO COM A LEI DE VALORES MOBILIÁRIOS E LEIS APLICÁVEIS DE VALORES MOBILIÁRIOS DE QUALQUER ESTADO DOS ESTADOS UNIDOS E APENAS

(A) PARA O EMISSOR,

(B) CONFORME UMA DECLARAÇÃO DE REGISTRO QUE ENTROU EM VIGOR NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS,

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 35

(c) PARA UM COMPRADOR INSTITUCIONAL QUALIFICADO EM CONFORMIDADE COM REGRA 144A DA LEI DE VALORES MOBILIÁRIOS,

(D) EM UMA OPERAÇÃO NO EXTERIOR EM CONFORMIDADE COM A REGRA 904 DO REGULAMENTO S DA LEI DE VALORES MOBILIÁRIOS, OU

(E) CONFORME UMA ISENÇÃO DE REGISTRO PREVISTA PELA REGRA 144 DA LEI DE VALORES MOBILIÁRIOS OU QUALQUER OUTRA ISENÇÃO DISPONÍVEL DOS REQUISITOS DE REGISTRO DA LEI DE VALORES MOBILIÁRIOS.

ANTES DO REGISTRO DE QUALQUER TRANSFERÊNCIA DE ACORDO COM 2(E) ACIMA, A SOCIEDADE SE RESERVA O DIREITO DE EXIGIR A ENTREGA DE PARECERES LEGAIS, CERTIFICAÇÕES OU OUTRAS PROVAS QUE POSSAM SER SOLICITADAS PARA DETERMINAR QUE A TRANSFERÊNCIA PROPOSTA É FEITA EM CONFORMIDADE COM A LEI DE VALORES MOBILIÁRIOS E LEIS DE VALORES MOBILIÁRIOS ESTADUAIS APLICÁVEIS. NÃO SE FAZ NENHUMA DECLARAÇÃO QUANTO À DISPONIBILIDADE DE QUALQUER ISENÇÃO DOS REQUISITOS DE REGISTRO NOS TERMOS DA REGRA 144 DA LEI DE VALORES MOBILIÁRIOS.

"**Valores Mobiliários**" significa os títulos com vencimento em 2058, emitidos pelo Emissor de Valores Mobiliários, conforme o Plano de Recuperação e nos termos da escritura relevante (a "**Escritura de Valores Mobiliários**").

"**Escritura de Valores Mobiliários**" possui o significado fornecido a esse termo na definição de "Valores Mobiliários".

"**Emissor de Valores Mobiliários**" significa a Odebrecht HoldCo Finance Limited, uma sociedade das Ilhas Cayman.

"**Taxa de Liquidação**" significa a taxa que é igual à taxa comercial em reais/dólar dos EUA, expressa como o montante em reais por um dólar dos EUA, como divulgado pelo Banco Central do Brasil (o "Banco Central") no Sistema de Dados do SISBACEN e em seu site (que, na presente data, está localizado em http://bcb.gov.br) sob o código de operação PTAX800 ("Consultas de Câmbio") Opção 5, "Venda" ("Cotações para Contabilidade") (ou qualquer tela substituta estabelecida pelo Banco Central).

"**Subsidiária Significativa**" significa qualquer Subsidiária da Sociedade que:

(A) seja constituída no Brasil e tenha, no momento relevante de decisão, junto com suas Subsidiárias, ou (i) ativos que, a partir da data do mais recente balanço patrimonial consolidado anual

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 36

da Sociedade (e após as eliminações entre companhias), constituir, pelo menos, 10% dos total de ativos da Sociedade em uma base consolidada a partir dessa data ou (ii) rendas do período de doze meses que encerra na data da mais recente demonstração consolidada de resultados anuais da Sociedade, que constituir, pelo menos, 10% das rendas totais da Sociedade em uma base consolidada desse período; e

(B)      até que os juros vencidos em todas as séries das Novas Notas sejam pagos na íntegra, em espécie (sem qualquer Pagamento PIK) por quatro trimestres consecutivos, seja constituída fora do Brasil e tenha, no momento relevante de decisão, junto com suas Subsidiárias, ou (i) ativos que, a partir da data do mais recente balanço patrimonial consolidado anual da OEC (e após as eliminações entre companhias), constituir, pelo menos, 20% dos total de ativos da OEC em uma base consolidada a partir dessa data ou (ii) rendas do período de doze meses que encerra na data da mais recente demonstração consolidada de resultados anuais da OEC, que constituir, pelo menos, 20% das rendas totais da OEC em uma base consolidada desse período; ou

(C) a partir de então, seja constituída fora do Brasil e tenha, no momento relevante de decisão, junto com suas Subsidiárias, ou (i) ativos que, a partir da data do mais recente balanço patrimonial consolidado anual da OEC (e após as eliminações entre companhias), constituir, pelo menos, 25% dos total de ativos da OEC em uma base consolidada a partir dessa data ou (ii) rendas do período de doze meses que encerra na data da mais recente demonstração consolidada de resultados anuais da OEC, que constituir, pelo menos, 25% das rendas totais da OEC em uma base consolidada desse período

"**Data de Registro Especial**" tem o significado especificado na Seção 2.15.

"**Vencimento Indicado**" significa (i) a respeito de qualquer Endividamento, a data especificada como a data fixa em que a parcela final do principal desse endividamento for devida ou (ii) a respeito de qualquer parcela programada do principal ou de juros de qualquer Endividamento, a data especificada como a data fixa em que essa parcela for devida, conforme previsto na documentação que rege esse Endividamento, não incluindo qualquer obrigação contingente de pagar, resgatar ou recomprar antes da data regularmente programada para pagamento.[5]

"**Data de Vencimento Indicado**" tem o significado especificado na Seção 2.06.[6]

"**Standard & Poor's**" significa o Grupo de Classificação Standard & Poor's, uma divisão de The McGraw-Hill Companies, Inc., e seus sucessores.

---

[5] NTD: Definição a ser removida para Notas Perpétuas. Ver Anexo G.
[6] NTD: Definição a ser removida para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 37

"**Endividamento Subordinado**" significa qualquer Endividamento da Sociedade ou de qualquer Subsidiária que seja por seus termos subordinados no direito do pagamento das Notas ou da Garantia, conforme aplicável.

"**Subsidiária**" significa, em relação a qualquer Pessoa, em qualquer data, qualquer sociedade, sociedade de responsabilidade limitada, parceria, associação ou outras contas de instituições das quais mais de 50% das Ações com Direito a Voto em circulação pertença, direta ou indiretamente, a tal Pessoa e a uma ou mais Subsidiárias de tal Pessoa (ou uma combinação da mesma).

"**Subsidiária Substancialmente Integral**" significa, em relação a qualquer Subsidiária, uma Subsidiária de, pelo menos, 90% do Capital Social em circulação (exceto as ações qualificadas pelo conselheiro) que é detido por qualquer Garantidor ou uma ou mais Subsidiárias Integrais (ou uma combinação das mesmas) de qualquer Garantidor.

"**Devedor Substituto**" tem o significado especificado no Artigo 5.

"**Obrigações Suspensas**" tem o significado especificado na Seção 4.23.

"**Data de Suspensão**" tem o significado especificado na Seção 4.23.

"**Período de Suspensão**" tem o significado especificado na Seção 4.23.

"**Jurisdição Tributária**" tem o significado especificado na Seção 4.10.

"**Investimentos Temporários em Caixa**" significa qualquer um dos seguintes:

(a)      quaisquer investimentos nas obrigações diretas do Brasil, dos Estados Unidos ou qualquer agência dos mesmos ou obrigações garantidas pelo Brasil, pelos Estados Unidos ou por qualquer agência dos mesmos;

(b)      investimentos em contas de depósito a prazo, certificados de depósito e depósitos do mercado monetário (coletivamente, "**Contas de Depósito**") emitidos por um banco ou sociedade truste que está constituída nos termos das leis dos Estados Unidos, qualquer estado de lá, do Brasil ou de qualquer país estrangeiro reconhecido pelos Estados Unidos com capital, superávit e lucros não divididos que totalizem além de US$ 500 milhões (ou a moeda estrangeira equivalente disso) e cuja dívida a longo prazo seja classificada como "A" (ou essa classificação equivalente, inclusive classificações equivalentes em países estrangeiros) ou superior por, pelo menos, uma organização de classificação de estatística reconhecida nacionalmente (conforme definido na Regra 436, nos termos da Lei de Valores Mobiliários);

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 38

(c)      obrigações de recompra com um prazo não superior a 30 dias corridos para valores mobiliários subjacentes dos tipos descritos na cláusula (a) acima celebradas com um banco que atenda às qualificações descritas na cláusula (b) acima;

(d)      investimentos em título de crédito que vencem em até 90 dias corridos após a data de aquisição emitido por uma sociedade (exceto uma Afiliada da Sociedade) constituída e existente nos termos das leis dos Estados Unidos, do Brasil ou de qualquer outro país estrangeiro reconhecido pelos Estados Unidos com uma classificação, no momento da qual qualquer investimento seja feito de "P-1" (ou superior) de acordo com a Moody's ou "A-1" (ou superior), de acordo com a S&P (ou essa classificação equivalente semelhante, inclusive classificações equivalentes semelhantes em países estrangeiros);

(e)      investimentos em valores mobiliários com vencimentos de 12 (doze) meses ou menos a partir da data de aquisição emitidos ou garantidos completamente por qualquer estado, commonwealth ou território dos Estados Unidos ou por qualquer subdivisão política ou autoridade tributária dos mesmos e classificados, pelo menos, com "A" pela S&P ou com "A" pela Moody's (ou essa classificação equivalente semelhante);

(f)      certificados de depósito, aceites bancários e depósitos a prazo emitidos ou garantidos por ou inseridos com e contas de depósito do mercado monetário emitidos ou oferecidos por qualquer escritório dos Estados Unidos de qualquer instituição financeira internacional em situação regular; e

(g)      investimentos em fundos do mercado monetário substancialmente todos os ativos dos quais são compostos de investimentos dos tipos descritos nas cláusulas (a) a (f) acima.

"**Agente de Transferência**" significa The Bank of New York Mellon e qualquer outra Pessoa autorizada pelo Emissor a pagar o principal ou juros de quaisquer Notas em nome do Emissor e inclui tal significado especificado na Seção 2.04.

"**Inadimplemento Desencadeador**" tem o significado especificado na Seção 6.01.

"**Agente Fiduciário**" significa The Bank of New York Mellon, até um Agente Fiduciário sucessor se tornar tal conforme as disposições aplicáveis desta Escritura e, após isso, "Agente Fiduciário" significará esse Agente Fiduciário sucessor.

"**Estados Unidos**" e "**EUA**" significam os Estados Unidos da América (incluindo os Estados e o Distrito de Colúmbia) e seus territórios, possessões e outras áreas sujeitas à sua jurisdição.

"**Dólares dos EUA**" e "**US$**" significam a moeda corrente dos Estados Unidos.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 39

"**Obrigações do Governo dos EUA**" significa obrigações diretas (ou certificados que representem uma participação nessas obrigações) dos Estados Unidos (inclusive qualquer agência ou órgão governamental dos mesmos) pelo pagamento das quais a fé integral e o crédito dos Estados Unidos sejam garantidos e não sejam passíveis de chamadas ou resgatáveis, a critério do emissor.

"**Caixa Irrestrito**" significa, a partir de qualquer data de determinação, em relação à OEC e suas Subsidiárias em uma base consolidada, todo o caixa e investimentos de curto prazo de tais Pessoas (i) não adiantados por um cliente à OEC ou para qualquer uma de suas Subsidiárias ou qualquer uma de suas respectivas Sociedades de Projeto para fins de financiamento de projetos de construção ou para a licitação de novos projetos de construção; (ii) não detidos pela OEC ou por qualquer Subsidiária, ou qualquer de suas respectivas Sociedades de Projeto para fins de financiamento de capital de giro ou necessidades operacionais para Projetos de Desenvolvimento ou Sociedades Licitantes, conforme razoavelmente determinado pela administração, com base em um processo consistente com suas práticas anteriores e aprovado pelo conselho de administração da OEC; (iii) não depositados em nenhuma conta de reserva de serviço de dívida penhorada, de tempos em tempos, a qualquer credor para cobrir déficits nos montantes disponíveis para o serviço de dívida; (iv) não penhorados como garantia de desempenho ou garantia de oferta pública; (v) não depositados em nenhuma outra conta que, na data de tal determinação, esteja bloqueada e não seja acessível à OEC ou a qualquer uma de suas Subsidiárias, após a ocorrência de um evento de inadimplemento ou outra ação de execução, nos termos de qualquer documento de financiamento ou garantia na qual a OEC ou tal Subsidiária seja parte; (vi) não recebidos em conexão com (A) um Evento de Distribuição Específica (conforme esse termo está definido na Escritura de Valores Mobiliários), (B) qualquer emissão de ações da OEC ou qualquer de suas Subsidiárias, incluindo uma oferta públicas inicial de, pelo menos, 15% de todo o Capital Social em circulação da OEC, (C) a ocorrência de Endividamento permitido nos termos do presente, ou (D) qualquer Venda de Ativos; ou (vii) sem contagem dupla, que não se qualificariam, na data de tal determinação, como "restrito" em um balanço patrimonial consolidado. A conformidade do montante de caixa e investimentos de curto prazo mantidos para fins de financiamento de capital de giro ou necessidades operacionais, conforme contemplado na cláusula (ii) acima, com os requisitos de tal cláusula será certificada anualmente pelo diretor financeiro ou pelo diretor contábil da OEC, e uma cópia de tal certificação será disponibilizada aos Titulares, simultaneamente e de acordo com os requisitos para distribuição das demonstrações financeiras consolidadas auditadas anuais da Sociedade.

"**Ações com Direito a Voto**" significa, em relação a qualquer Pessoa, o Capital Social de qualquer classe ou espécie normalmente com poder para votar na eleição de conselheiros, gerentes ou outros membros votantes do órgão dirigente de tal Pessoa.

"**Subsidiária Integral**" significa a Subsidiária cujo capital social em circulação (exceto as ações qualificadas pelo conselheiro) é detido pela Sociedade ou uma ou mais Subsidiárias Integrais (ou uma combinação das mesmas) da Sociedade.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 40

Seção 1.02.    *Regras de Interpretação*

(a)    Para todos os efeitos dessa Escritura, exceto conforme previsto expressamente ou a menos que o contexto exija o contrário:

(i)    os termos definidos neste Artigo têm os significados que lhes são atribuídos neste Artigo e inclui o plural, bem como o singular;

(ii)    as palavras "aqui", "deste instrumento", "nos termos deste instrumento" e outras palavras de significado semelhante se referem a esta Escritura como um todo e não a qualquer Artigo, Seção ou outra subdivisão específica;

(iii)    "ou" não é exclusivo; e

(iv)    "incluindo" significa incluindo, sem limitação;

(v)    qualquer referência a um "Artigo", uma "Seção" ou um "Anexo" se refere a um Artigo, uma Seção ou um Anexo, conforme o caso, dessa Escritura.

(b)    Todos os termos contábeis não definidos, de outra forma, aqui, terão os significados que lhes são atribuídos de acordo com o GAAP brasileiro.

(c)    Para efeitos das definições estabelecidas no Artigo 1º e nessa Escritura, em geral, todos os cálculos e decisões serão feitos de acordo com o GAAP brasileiro e serão com base nas demonstrações financeiras consolidadas de cada Garantidor e de suas Subsidiárias elaboradas de acordo com o GAAP brasileiro.

Seção 1.03.    *Índice; Títulos*. O índice e os títulos dos Artigos e Seções dessa Escritura foram inseridos somente para conveniência de referência, não são destinados a serem considerados como parte deste instrumento e não modificarão ou restringirão quaisquer termos ou disposições deste instrumento.

Seção 1.04. *Forma dos Documentos Entregues ao Agente Fiduciário*. Em qualquer caso em que vários assuntos devam ser certificados por, ou cobertos por um parecer de qualquer Pessoa específica, não é necessário que todos esses assuntos sejam certificados por, ou cobertos pelo parecer de, apenas uma dessas Pessoas, ou que sejam certificados ou cobertos por apenas um documento, mas uma dessas Pessoas pode certificar ou dar um parecer em relação a alguns assuntos e uma ou mais dessas Pessoas a respeito de outros assuntos, e qualquer uma dessas Pessoas pode certificar ou dar uma opinião a respeito de tais assuntos em um ou mais documentos.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº    2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 41

Qualquer certificado ou parecer de um Diretor do Emissor poderá ser baseado, na medida em que estiver relacionado a assuntos jurídicos, mediante um certificado ou parecer ou declarações pelo advogado, a menos que esse Diretor saiba, ou no exercício do cuidado razoável deveria saber, que o certificado ou o parecer ou as declarações em relação aos assuntos nos quais seu certificado ou parecer é baseado sejam errôneos. Qualquer certificado ou Parecer do Advogado poderá ser baseado, na medida em que estiver relacionado aos assuntos, de fato, mediante um certificado ou parecer ou declarações por um Diretor ou Diretores do Emissor declarando que as informações em relação aos assuntos, de fato, estejam na posse do Emissor, a menos que esse advogado saiba, ou no exercício do cuidado razoável deveria saber, que o certificado ou o parecer ou as declarações em relação aos assuntos que são errôneos.

Se qualquer Pessoa for obrigada a fazer, dar ou assinar dois ou mais pedidos, solicitações, consentimentos, certificados, declarações, pareceres ou outros instrumentos nos termos dessa Escritura, podem, mas não precisam, ser consolidados e formar um instrumento.

Seção 1.05.    *Atos dos Titulares.*

(a)    Qualquer solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outra medida prevista nesta Escritura a ser entregue ou tomada pelos Titulares poderá ser incorporada e comprovada por um ou mais instrumentos de conteúdo substancialmente semelhante assinado por esses Titulares em Pessoa ou pelos agentes devidamente nomeados por escrito; e, exceto conforme previsto, de outra forma, expressamente aqui, essa medida entrará em vigor quando esse instrumento ou instrumentos for(em) entregue(s) para o Agente Fiduciário e, se for expressamente necessário, para o Emissor. Esse instrumento ou instrumentos (e a medida incorporada ali e comprovada lá) são denominados aqui como "**Ato**" dos Titulares que assinam esse instrumento ou instrumentos. A prova de assinatura de qualquer instrumento ou de um documento que nomear qualquer agente será suficiente para qualquer efeito dessa Escritura e conclusivo em favor do Agente Fiduciário e do Emissor, se for feito na forma prevista nessa 0.

(b)    O fato e a data da assinatura por qualquer Pessoa de tal instrumento ou documento pode ser provado pela declaração legal de uma testemunha de tal assinatura ou por um certificado de um notário público ou outro diretor autorizado por lei a tomar conhecimento de escrituras, certificando que o indivíduo que assina tal instrumento ou documento lhe reconheceu a assinatura do mesmo. Quando tal assinatura for feita por um signatário atuando em uma qualidade diferente de sua qualidade individual, tal certificado ou declaração legal também constituirá prova suficiente de sua autoridade. O fato e a data da assinatura de qualquer instrumento ou documento, ou a autoridade da Pessoa que o assina, também podem ser provados de qualquer outra forma que o Agente Fiduciário que revisar tal instrumento ou documento considerar suficiente.

(c)    A quantia principal e os números de série das Notas mantidas por qualquer Pessoa, e a data de posse das mesmas, deverão ser comprovados pelo Registro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº 2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 42

(d)      Se o Emissor solicitar aos Titulares das Notas qualquer solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato, o Emissor poderá, a seu critério, por ou de acordo com uma Deliberação do Conselho, fixar antecipadamente uma data de registro para a determinação dos Titulares habilitados a dar tal solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato, mas o Emissor não terá qualquer obrigação de fazê-lo. Tal data de registro será a data de registro especificada na ou de acordo com essa Deliberação do Conselho, que será uma data não anterior à data de trinta dias corridos antes da primeira solicitação dos Titulares, em geral, em relação à mesma e não posterior à data em que tal solicitação for concluída. Se tal data de registro for fixada, tal solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato pode ser dado antes ou depois de tal data de registro, mas somente os Titulares de registro no fechamento do negócio em tal data de registro serão considerados como Titulares para fins de determinar se os Titulares da proporção necessária de Notas em Aberto autorizaram ou concordaram ou consentiram com tal solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato, e para esse fim as Notas em Aberto serão calculadas a partir de tal data de registro; *desde* que tal autorização, acordo ou consentimento por parte dos Titulares em tal data de registro não seja considerado em vigor a menos que entre em vigor de acordo com as disposições desta Escritura o mais tardar onze meses após a data de registro.

(e)      Qualquer solicitação, exigência, autorização, direção, notificação, consentimento, renúncia ou outro ato do Titular de qualquer Nota deverá vincular todo futuro Titular da mesma Nota e o Titular de cada Nota emitida no registro da transferência da mesma ou em troca ou em lugar dela, com relação a qualquer coisa feita, omitida ou sofrida a ser feita pelo Agente Fiduciário ou pelo Emissor se baseando na mesma, seja ou não feita a anotação de tal ação sobre tal Nota.

ARTIGO 2
AS NOTAS

Seção 2.01.      *Geral e Garantia*. As Notas constituem uma obrigação direta, incondicional, não subordinada e sem garantia do Emissor e a classificação *pari passu* com todas as demais obrigações, presentes e futuras não subordinadas e sem garantia do Emissor, exceto conforme o exposto possa estar limitado por falência, insolvência, recuperação, moratória ou outras leis semelhantes relativas ou que afetem a exequibilidade dos direitos dos credores em geral, ou por princípios iguais gerais (independentemente de a exequibilidade ser considerada em um processo em equidade ou em lei).

As Notas serão garantidas incondicional e irrevogavelmente pelos Garantidores Iniciais; *desde* que, a qualquer momento, qualquer Garantidor Adicional deixar de ser uma Subsidiária Significativa, esse Garantidor Adicional será automaticamente liberado da Garantia, nos termos deste instrumento.

A Garantia constituirá a obrigação sênior direta, geral e incondicional dos Garantidores e, a todo momento, serão classificadas pelo menos igualmente com todas as outras obrigações seniores não garantidas, presentes ou futuras, de cada Garantidor, exceto conforme o exposto possa estar limitado por

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 43

falência, insolvência, recuperação, moratória ou outras leis similares relativas ou que afetem a exequibilidade dos direitos dos credores, em geral, ou por princípios iguais gerais (independentemente de a exequibilidade ser considerada em um processo em equidade ou em lei).

Seção 2.02.    *Forma e Data.*

As Notas e o certificado de autenticação do Agente Fiduciário deverão ser substancialmente na forma da Nota estabelecida no Anexo A, que é aqui integrado e expressamente feito como parte desta Escritura. As Notas podem ter inserções, omissões, substituições e outras variações apropriadas conforme exigido ou permitido por esta Escritura e podem ter letras, números ou outras marcas de identificação e notações, legendas ou endossos que possam ser necessários para cumprir qualquer lei, regra da bolsa de valores, acordo ao qual o Emissor está sujeito, se houver, ou uso, desde que qualquer notação, legenda ou endosso esteja em uma forma aceitável para o Emissor.

Cada Nota Global será datada como a Data de Encerramento. Cada Nota certificada definitiva (**"Nota Certificada"**) será datada com a data de sua autenticação.

As Notas serão impressas, litografadas ou gravadas ou produzidas por qualquer combinação destes métodos ou podem ser produzidas de qualquer outra forma permitida pelas regras de qualquer bolsa de valores na qual as Notas possam ser listadas, se houver, tudo conforme determinado pelos diretores que assinam tais Notas, conforme comprovado por sua assinatura de tais Notas.

Seção 2.03.    *Assinatura, Autenticação e Entrega.*

(a)    Dois Diretores do Emissor deverão assinar as Notas para o Emissor por assinatura manual ou fac-símile.

(i)    Se um Diretor cuja assinatura estiver em uma Nota não mais ocupar esse cargo no momento em que o Agente Fiduciário autenticar a Nota, a Nota será válida mesmo assim.

(ii)    Uma Nota não será válida até que um signatário autorizado do Agente Fiduciário ou um agente de autenticação assine o certificado de autenticação na Nota por assinatura manual, por fac-símile ou eletrônica por Ordem do Emissor. Tal assinatura deverá ser prova conclusiva de que a Nota foi autenticada nos termos desta Escritura. Tal Ordem do Emissor deverá especificar a quantidade das Notas a serem autenticadas e a data na qual a emissão original das Notas deverá ser autenticada.

(iii)    O Agente Fiduciário ou um agente de autenticação deverá inicialmente autenticar e entregar as Notas em um montante principal total de até US$ [·].

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 44

(iv)      O Emissor pode, de tempos em tempos, sem o consentimento dos Titulares, criar e emitir Notas adicionais com os mesmos termos e condições que as Notas em todos os aspectos, exceto para a data de emissão, preço de emissão e o primeiro pagamento de juros sobre as mesmas. As Notas Adicionais emitidas desta forma serão consolidadas com e formarão uma série única com as Notas anteriormente em aberto.

(v)      As Notas deverão ser emitidas na forma totalmente registrada sem cupons anexados em denominações mínimas de US$ 10.000,00 e em múltiplos integrais de US$ 1,00 excedente (cada uma, uma "**Denominação Autorizada**").

(b)      O Agente Fiduciário pode nomear um agente de autenticação, com uma cópia de tal nomeação ao Emissor, para autenticar as Notas (o "**Agente de Autenticação**"). A menos que limitado pelos termos de tal nomeação, um Agente de Autenticação pode autenticar as Notas sempre que o Agente Fiduciário o fizer. Cada referência nesta Escritura à autenticação pelo Agente Fiduciário inclui a autenticação por um Agente de Autenticação. Um Agente de Autenticação tem os mesmos direitos que o Oficial de Registro ou qualquer Agente de Transferência ou Agente de Pagamentos ou agente de citações e demandas.

(i)      Qualquer sociedade anônima na qual qualquer Agente de Autenticação possa ser incorporado ou convertido ou com a qual possa ser fundido, ou qualquer sociedade anônima resultante de qualquer incorporação, fusão ou conversão na qual qualquer Agente de Autenticação deva ser parte, ou qualquer sociedade anônima que suceder em todo ou substancialmente aos negócios de truste corporativos de qualquer Agente de Autenticação, deverá ser a sucessora de tal Agente de Autenticação nos termos deste documento, sem a assinatura ou arquivamento de qualquer ato adicional por parte das partes aqui presentes ou tal Agente de Autenticação ou tal sociedade anônima sucessora.

(ii)      Qualquer Agente de Autenticação poderá, a qualquer momento, renunciar, notificando por escrito a renúncia ao Agente Fiduciário e ao Emissor. O Agente Fiduciário pode, a qualquer momento, encerrar a agência de qualquer Agente de Autenticação, notificando por escrito o encerramento de tal Agente de Autenticação e o Emissor. Ao receber tal notificação de renúncia ou de encerramento, o Agente Fiduciário poderá nomear um Agente de Autenticação sucessor razoavelmente aceitável para o Emissor e deverá notificar por escrito tal nomeação ao Emissor.

(iii)      O Emissor concorda em pagar a cada Agente de Autenticação, de tempos em tempos, uma remuneração razoável por seus serviços e reembolso de suas despesas razoáveis relacionadas a eles.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                         fls. 45

(c)      O Emissor inicialmente nomeia a DTC para atuar como Depositário em relação às Notas Global. O Agente Fiduciário, como custodiante, atuará como custodiante das Notas Global para DTC ou nomeará um subcustodiante para agir nessa capacidade.

Seção 2.04.      *Agente de Transferência, Oficial de Registro e Agente de Pagamentos.*

(a)      Sujeitos aos regulamentos razoáveis que o Emissor possa estabelecer, os livros do Emissor para a troca, registro e registro de transferência das Notas serão mantidos no escritório do Oficial de Registro (tais livros mantidos nesse escritório e em qualquer outro escritório ou agência designada para esse efeito, sendo aqui denominados como o "**Registro**"). O Emissor também providenciará para que o Agente Fiduciário mantenha livros para a troca, registro e registro de transferência das Notas. O Agente Fiduciário deverá notificar o Oficial de Registro e o Oficial de Registro deverá notificar o Oficial de Registro, quando necessário, em qualquer troca, registro ou registro de transferência de quaisquer Notas e deverá providenciar para que seus respectivos livros sejam alterados de acordo. O Emissor poderá ter um ou mais Oficiais de Registro conjuntos e um ou mais Agentes de Transferência ou Agentes Pagadores adicionais. Os termos "**Agente de Transferência**" e "**Agente de Pagamentos**" incluem qualquer Agente de Transferência ou Agente de Pagamentos adicional, conforme o caso. O termo "**Oficial de Registro**" inclui qualquer Oficial de Registro conjunto.

O Emissor deverá celebrar quaisquer contratos de agência apropriados com qualquer Oficial de Registro, Agente de Transferência ou Agente de Pagamentos que não seja parte desta Escritura, os quais deverão implementar as disposições desta Escritura que se relacionam a tal agente. O Emissor deverá notificar o Agente Fiduciário sobre o nome e endereço de qualquer um desses agentes. Se o Emissor deixar de manter um Oficial de Registro ou o Agente de Pagamentos, o Agente Fiduciário agirá como tal e terá direito a uma remuneração apropriada de acordo com a Seção 7.07. O Emissor inicialmente nomeia o Agente Fiduciário como Agente de Pagamentos, Oficial de Registro e Agente de Transferência em relação às Notas.

(b)      O Agente Fiduciário manterá um registro de todas as Notas e disponibilizará tal registro durante o horário comercial regular para inspeção mediante solicitação do Emissor, desde que haja um tempo razoável antes de tal inspeção. Tais livros e registros deverão incluir anotações sobre se tais Notas foram resgatadas, ou pagas ou canceladas e, no caso de Notas mutiladas, destruídas, deformadas, roubadas ou perdidas, se tais Notas foram substituídas. No caso de substituição de qualquer uma das Notas, o Agente Fiduciário deverá manter um registro da Nota assim substituída e das Notas emitidas em substituição às mesmas. No caso do cancelamento de qualquer uma das Notas, o Agente Fiduciário deverá manter um registro da Nota assim cancelada e a data em que tal Nota foi cancelada. Cada Agente de Transferência deverá notificar o Agente Fiduciário sobre quaisquer transferências ou trocas de Notas efetuadas por ele. O Agente Fiduciário não será obrigado a registrar a transferência ou troca de Notas

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 46

Certificadas por um período de quinze dias corridos antes de qualquer data de seleção de Notas para resgate, ou registrar a transferência ou troca de quaisquer Notas Certificadas previamente convocadas para resgate.

(c)      Todas as Notas entregues para pagamento, resgate, registro de transferência ou troca serão cancelados pelo Agente de Transferência ou ao Agente de Pagamentos ou ao Agente Fiduciário relevante, conforme o caso. Cada Oficial de Registro e Agente de Transferência deverá notificar o Agente Fiduciário sobre a entrega e cancelamento de tais Notas e deverá entregar tais Notas ao Agente Fiduciário. O Agente Fiduciário poderá destruir ou causar a destruição de todas essas Notas entregues para pagamento, resgate, registro de transferência ou troca e, se assim forem destruídas, deverá entregar prontamente um certificado de destruição ao Emissor.

(d)      O Agente de Pagamentos deverá cumprir os requisitos aplicáveis de retenção de imposto na fonte e de relatório de informações segundo o Código da Receita Federal dos Estados Unidos de 1986, conforme alterado, e os Regulamentos do Tesouro dos Estados Unidos promulgados, nos termos daquele instrumento, em relação aos pagamentos efetuados nos termos das Notas (incluindo, na medida do necessário, a cobrança dos Formulários W-8 e W-9 da Receita Federal dos Estados Unidos e a apresentação dos Formulários 1099 e 1096 da Receita Federal dos Estados Unidos).

Seção 2.05.      *Agente de Pagamentos para Reter o Dinheiro em Garantia.* Até às 10h00, horário de Nova Iorque, no máximo um dia útil antes de cada data de pagamento em qualquer nota, o Emissor deverá depositar junto ao Agente de Pagamentos, em fundos imediatamente disponíveis, uma quantia suficiente para pagar tal principal e juros quando assim for devido (incluindo quaisquer quantias nos termos da 0). O Emissor deverá solicitar que o banco através do qual tal pagamento deverá ser feito concorde em fornecer ao Agente de Pagamentos até às 10h00 (horário de Nova Iorque) dois Dias Úteis antes da data de vencimento de qualquer um desses pagamentos uma confirmação irrevogável (por telex testado) de sua intenção de efetuar tal pagamento. O Emissor exigirá que cada Agente de Pagamentos (que não seja o Agente Fiduciário) concordar por escrito que tal Agente de Pagamentos deverá reter em garantia, em benefício dos Titulares ou do Agente Fiduciário, todo o dinheiro detido por tal Agente de Pagamentos para o pagamento de principal e juros sobre as Notas e deverá notificar o Agente Fiduciário de qualquer inadimplemento do Emissor ao efetuar tal pagamento. O Emissor, a qualquer momento, poderá exigir que um Agente de Pagamentos pague todo o dinheiro detido por ele ao Agente Fiduciário e contabilize quaisquer fundos por ele desembolsados. Ao cumprir esta 0, o Agente de Pagamentos não terá mais nenhuma responsabilidade pelo dinheiro entregue ao Agente Fiduciário.

Cada pagamento completo de principal, valor de resgate, Montantes Adicionais e/ou juros a pagar nos termos das Notas e esta Escritura em relação a qualquer Obrigação feita pelo Emissor ou em nome do Emissor para ou à ordem do Agente de Pagamentos na forma aqui especificada ou nas



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 47

Obrigações na data de vencimento será válida e eficaz para satisfazer e cumprir a obrigação do Emissor de efetuar o pagamento do principal, valor de resgate, Montantes Adicionais e/ou juros a pagar nos termos do presente instrumento e das Notas em tal data, *desde que*, *entretanto*, a responsabilidade do Agente de Pagamentos, nos termos deste instrumento, não exceda quaisquer valores pagos a ele pelo Emissor, ou detidos por ele, em nome dos Titulares nos termos deste instrumento; e *desde que*, no caso de haver um inadimplemento por parte do Agente de Pagamentos em qualquer pagamento de principal, valor de resgate, Montantes Adicionais e/ou juros em relação a qualquer Nota de acordo com os termos aqui estabelecidos, o Emissor pagará, sob demanda, os Montantes Adicionais que resultarão no recebimento pelo Titular dos valores que teria recebido se não tivesse ocorrido tal inadimplemento.

Seção 2.06.    *Principal, Vencimento e Juros.*[7]

(a)    *Vencimento e Juros.* As Notas serão emitidas em um montante do principal total inicial de US$ [·] e vencerão em [·] (a "**Data de Vencimento Indicado**"). O montante então em aberto do principal das Notas será devido integralmente no Vencimento.

(b)    *Juros.* Sobre as Notas incidirão juros de [·]% ao ano (a "**Taxa de Juros**"), sujeitos à Opção PIK, conforme descrito abaixo, a partir da Data de Emissão até que o principal seja pago ou disponibilizado para pagamento. Os juros (exceto os Juros PIK, conforme descrito abaixo) serão pagos em atraso, em Dólares, em cada Data de Pagamento de Juros (conforme definido abaixo).

Em relação a todos ou parte dos juros acumulados a partir da data anterior a cada Data de Pagamento de Juros, ocorridos até o aniversário de 5 (cinco) anos da Data de Emissão (o "**Período da Opção PIK**"), as Notas terão juros, a critério exclusivo do Emissor e sem o consentimento dos Titulares (e sem considerar as restrições ou limitações estabelecidas no 0), à (i) Taxa de Juros ao ano devida em dinheiro ou (ii) sujeita às limitações sobre os montantes estabelecidos abaixo, uma taxa igual à soma da Taxa de Juros mais o prêmio aplicável, estabelecido na tabela abaixo, ao ano devido pelo aumento do montante do principal em aberto das Notas ou, em relação às Notas Certificadas, emitindo notas adicionais ("**Juros PIK**" e tal pagamento dos Juros PIK doravante denominado como "**Pagamento PIK**").

O pagamento dos juros ocorrerá [semestralmente em 21 de abril e 21 de outubro][8] de cada [·] (juntamente com a data de Vencimento, as "**Datas de Pagamento de Juros**" e cada, a "**Data de Pagamento de Juros**"). Se qualquer Data de Pagamento de Juros cair em um dia que não seja Dia Útil, os pagamentos exigidos do principal, prêmio, se houver, e juros, se houver, em relação às Notas serão realizados no próximo Dia Útil seguinte, como se fossem realizados na data em que o pagamento era

---

[7] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.
[8] NTD: Para as Notas Perpétuas, o pagamento de juros deverá ocorrer trimestralmente.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº    2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 48

devido, e nenhum pagamento será acrescido de juros pelo período a partir da Data de Pagamento de Juros, conforme o caso, até a data de tal pagamento no próximo Dia Útil seguinte.

Os juros serão calculados com base em um ano de 360 dias, composto por doze meses de trinta dias corridos cada e, no caso de um mês incompleto, o número de dias decorridos.

(c)     *Opção PIK.* A capacidade do Emissor de efetuar Pagamentos PIK em relação às Notas em vez do pagamento de juros em dinheiro, conforme estabelecido acima (a "**Opção PIK**") pode ser exercida apenas em relação a qualquer Período de Juros durante o Período da Opção PIK, até o proporção do montante total de juros devidos em tal período, conforme estabelecido na tabela abaixo:

| Período da Opção PIK | Parte Máxima de Juros como PIK | Prêmio PIK |
|---|---|---|
| Desde (e incluindo) a Data de Emissão até (e incluindo) [*o segundo aniversário da Data de Emissão*] | 100% | 50% da Taxa de Juros |
| Desde (mas excluindo) [*o segundo aniversário da Data de Emissão*] até (e incluindo) [*o terceiro aniversário da Data de Emissão*] | 92,5% | 50% da Taxa de Juros |
| Desde (mas excluindo) [*o terceiro aniversário da Data de Emissão*] até (e incluindo) [*o quarto aniversário da Data de Emissão*] | 65% | 50% da Taxa de Juros |
| Desde (mas excluindo) [*o quarto aniversário da Data de Emissão*] até (e incluindo) [*o quinto aniversário da Data de Emissão*] | 30% | 75% da Taxa de Juros |

Caso o Emissor determine pagar Juros PIK a respeito de qualquer Período de Juros, o Emissor enviará uma notificação (uma "*Notificação PIK*") ao Agente Fiduciário no máximo até o 15º dia corrido imediatamente anterior ao primeiro dia desse Período de Juros, notificação esta que informará o montante total de juros a serem pagos na Data de Pagamento de Juros a respeito desse Período de Juros e o montante desses juros a ser pago a título de Juros PIK de acordo com os termos das notas, *ressalvado, contudo*, que a respeito e para os fins do primeiro período de Juros, o Emissor entregará uma Notificação PIK ao Agente Fiduciário dentro de 15 Dias Úteis após a Data de Emissão. O Agente Fiduciário, em nome do Emissor, imediatamente após o recebimento da Notificação PIK, e em nenhuma hipótese após o 10º dia corrido imediatamente anterior ao primeiro dia desse Período de Juros, enviará uma notificação correspondente aos Titulares. Juros sobre as Notas a Respeito de qualquer Período de Juro pelo qual uma Notificação PIK não for enviada de acordo com a primeira frase deste parágrafo deverá ser pago inteiramente à vista.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                                    fls. 49

Seção 2.07.    *Pagamento de Excesso de Cash Sweep.* Até a ocorrência do Evento de Encerramento de Excesso de *Cash Sweep*, até a Data de Pagamento de Excesso de Caixa, se o Montante de Excesso de Caixa exceder zero em uma Data de Medição de Excesso de Caixa, o Emissor efetuará pagamentos nos termos das Notas aos Titulares iguais a uma porcentagem Montante de Excesso de Caixa Disponível aplicável, de acordo com os termos e condições estabelecidos abaixo.

(a)    O Montante de Excesso de Caixa será distribuído a para os Titulares conforme a seguir:

(i)    para a primeira Data de Medição de Excedente de Caixa, para a qual exista um Montante de Excesso de Caixa Disponível (a "**Segunda Data de Medição**"), um montante em Dólares em dinheiro igual (A) à Porcentagem Aplicável *multiplicada por* (B) 90% do Montante de Excesso de Caixa Disponível;

(ii)    para a segunda Data de Medição de Excedente de Caixa, para a qual exista um Montante de Excesso de Caixa Disponível, um montante em Dólares em dinheiro (A) igual à Porcentagem Aplicável *multiplicada por* (B) 80% do Montante de Excesso de Caixa Disponível será devido em dinheiro aos Titulares;

(iii)    para cada Data de Medição de Excesso de Caixa subsequente, em relação à qual exista um Montante de Excesso de Caixa Disponível, até 2021:

(1)    se os juros com vencimento em todas as séries das Novas Notas tiverem sido pagos integralmente, em espécie (sem qualquer Pagamento PIK) dos 12 (doze) meses consecutivos: um montante em Dólares em dinheiro igual à Porcentagem Aplicável de 70% do Montante de Excesso de Caixa Disponível será a pagar em dinheiro para os Titulares;

(2)    Se os juros com vencimento em todas as séries das Novas Notas não tiverem sido pagos integralmente, em espécie dos 12 (doze) meses consecutivos: um montante em Dólares em dinheiro igual à Porcentagem Aplicável de 80% do Montante de Excesso de Caixa Disponível será a pagar em dinheiro para os Titulares;

(iv)    Para qualquer Data de Medição de Excedente de Caixa subsequente à Segunda Data de Medição em relação à qual exista um Montante de Excesso de Caixa Disponível, começando em 31 de dezembro de 2032, um montante em Dólares em dinheiro igual à Porcentagem Aplicável de 80% do Montante de Excesso de Caixa Disponível será devido em dinheiro aos Titulares.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 50

(b)    Pagamentos de Excesso de Caixa devido aos Titulares serão aplicados, com base no dólar por dólar, para reduzir o montante do principal em aberto das Notas, de acordo com a 0 abaixo.

Os Pagamentos de Excesso de Caixa serão efetuados em Dólares dos EUA. Se qualquer Pagamento de Excesso de Caixa precisar ser convertido em Dólares dos EUA, ele será convertido na Taxa de Liquidação na data que ocorrer dois Dias Úteis antes da Data de Pagamento de Excesso de Caixa.

Seção 2.08.    *Pagamento do Principal e Juros*[9]

Os pagamentos de juros e do principal serão feitos ao Titular no endereço do Titular indicado no Registro (conforme definido nesta Escritura), no encerramento dos negócios no 15º dia (Dia Útil ou não) antes de qualquer data de vencimento para o pagamento de tal Nota (a "**Data de Registro Regular**"), (i) no caso das Notas Globais, por um Agente de Pagamentos por transferência bancária de fundos imediatamente disponíveis para os Titulares para uma conta em um banco localizado nos Estados Unidos, conforme designado por cada Titular, pelo menos, quinze dias corridos antes da data de pagamento aplicável, e (ii) no caso de Notas Certificadas, por um Agente de Pagamentos, enviando um cheque para o Titular no endereço do mesmo; *ressalvado*, *no entanto*, que (a) os juros devidos em qualquer data de vencimento sejam devidos à Pessoa para quem o principal será devido e (b) o primeiro pagamento dos juros de qualquer Nota originalmente emitida entre uma Data de Registro Regular para tal Nota e a Data de Pagamento de Juros subsequente será feita na Data de Pagamento de Juros após a Data de Registro Regular subsequente para tal Nota do Titular. Para quaisquer Nota Certificada, o Titular de US$ 1.000.000,00 ou mais no montante do principal total pode solicitar o pagamento por transferência bancária, mas somente se as instruções de pagamento apropriadas tiverem sido recebidas por escrito por qualquer Agente de Pagamentos em relação a tal Nota, não menos de quinze dias corridos antes da data de pagamento aplicável. Caso o pagamento seja feito de acordo com as instruções do Titular, tal transferência bancária será considerada como constituindo o pagamento integral e completo de tal principal, prêmio e/ou juros das Notas.

O pagamento do principal, prêmio, se houver, e dos juros devidos em relação a qualquer Nota Certificada em qualquer Data de Vencimento será feito em fundos imediatamente disponíveis, mediante a entrega de tal Nota no escritório especificado de qualquer Agente de Pagamentos em relação a tal Nota e acompanhado de instruções de transferência bancária; *ressalvado*, que a Nota Certificada seja apresentada a tal Agente de Pagamentos em tempo hábil para que tal Agente de Pagamentos efetue tais pagamentos nesses fundos, de acordo com seus procedimentos normais.

O Emissor pagará quaisquer custos administrativos impostos pelos bancos, em conexão com pagamentos por transferência bancária, mas qualquer imposto, taxa ou encargo governamental aplicado

---

[9] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 51

sobre pagamentos será suportado pelos Titulares, a respeito dos quais tais pagamentos são feitos, salvo disposição em contrário neste documento.

Não obstante qualquer disposição em contrário neste 0, se a Nota for uma Nota Global depositada junto ao custodiante e registrada em nome de um nomeado da The Depository Trust Company ("**DTC**"), os pagamentos do principal e juros na Nota serão entregues à DTC, como Titular Registrado da Nota, de acordo com os procedimentos aplicáveis da DTC. As Notas serão emitidas na forma de certificado em troca de uma Nota Global somente se (i) a DTC notificar o Emissor que não está disposto ou incapaz de continuar como depositário de tal Nota Global, ou a DTC deixar de ser uma "agência de compensação" inscrita nos termos da Lei da Bolsa de Valores e um depositário sucessor não ser nomeado pelo Emissor em até noventa dias corridos, ou (ii) um Evento de Inadimplemento ocorreu e continua em relação a tais Notas e os Titulares fizeram um pedido à DTC para troca de tal Nota Global para Notas Certificadas, *ressalvado* que cada transferência ou troca seja feita de acordo com as disposições desta Escritura e com os procedimentos aplicáveis da DTC.

Os Juros PIK serão devidos (x) em relação às Notas representadas por uma ou mais Notas Globais registradas em nome ou detidas pela DTC ou seu nomeado na data de registro relevante, aumentando o montante principal da Nota Global em circulação em um montante igual ao montante do Pagamento PIK para o Período de Juros aplicável (arredondado para o dólar inteiro mais próximo) (entendendo-se que os pagamentos de juros subsequentes nas Notas serão calculados com base no aumento do montante principal) e (y) em relação às Notas representadas pelas Notas Certificadas, emitindo Notas Certificadas adicionais ("**Notas PIK**") na forma certificada aos Titulares das Notas subjacentes no montante do principal total, igual ao montante do Pagamento PIK para o Período de Juros aplicável (arredondado para o Dólar inteiro mais próximo). O Agente Fiduciário autenticará e entregará tais Notas PIK na forma certificada para emissão original aos Titulares das mesmas na data de registro relevante, conforme indicado no registro desses Titulares. Após o aumento no montante do principal das Notas Globais em circulação como resultado do Pagamento PIK, as Notas Globais incidirão juros sobre tal aumento do montante do principal a partir da Data de Pagamento de Juros, a respeito do qual tal Pagamento PIK foi efetuado. Quaisquer Notas PIK emitidas na forma certificada serão datadas a partir da Data de Pagamento de Juros aplicável e sobre elas incidirão juros a partir de tal data.

Os Pagamentos de Excesso de Caixa efetuados aos Titulares serão aplicados com base no dólar por dólar, para reduzir o montante do principal em aberto das Notas em um montante total que não exceda o montante do principal total das Notas. Cada Nota Global deverá incluir um cronograma no qual reduza no montante do principal correspondente resultante dos Pagamentos de Excesso de Caixa efetuados, de acordo com os termos dessa Escritura que serão registrados.

Todas as Notas emitidas de acordo com o Pagamento PIK vencerão na Data de Vencimento Indicado e serão regidas e sujeitas aos termos, disposições e condições dessa Escritura e terão os mesmos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 52

direitos e benefícios que as Notas emitidas na Data de Emissão. Quaisquer Notas PIK certificadas serão emitidas com a descrição "PIK" na face de tal Nota PIK.

Se o Emissor ou os Garantidores (x) deixarem de pagar juros sobre as Notas ou (y) deixarem de pagar o principal devido no Vencimento das Notas, o Emissor ou os Garantidores, conforme o caso, pagarão os Juros de Mora (conforme definido abaixo), de acordo com os procedimentos estabelecidos abaixo ou de qualquer maneira legal que não seja inconsistente com os requisitos de qualquer bolsa de valores na qual as Notas possam estar listadas e mediante a notificação exigida por tal bolsa.

Seção 2.09.     *Principal e Direitos de Juros Preservados*

(a)     Salvo disposição em contrário aqui prevista para o resgate das Notas, o pagamento do principal ou juros sobre as Notas será alocado proporcionalmente entre todas as Notas em aberto, sem preferência ou prioridade de qualquer tipo entre as Notas.

(b)     Os pagamentos finais referentes a qualquer Nota (seja no resgate, declaração de vencimento antecipado ou de outra forma) serão feitos somente contra a apresentação e entrega de tal Nota no Corporate Trust Office, nos escritórios do Agente Fiduciário e, sujeitos a quaisquer leis e regulamentos fiscais ou outros aplicáveis, nos escritórios especificados de qualquer outro Agente de Pagamentos nomeado pelo Emissor.

(c)     O pagamento de qualquer principal de qualquer Nota em uma Data de Pagamento relevante será efetuado para a Pessoa cujo nome essa Nota está registrada no Registro no encerramento dos negócios no décimo quinto dia (seja ou não um Dia Útil) imediatamente anterior a tal Data de Pagamento, por um cheque sacado em Dólares dos EUA em um banco na Cidade de Nova Iorque e enviado por correio à Pessoa com direito a tal, em seu endereço constante do Registro, ou por transferência bancária para uma conta em Dólares dos EUA mantida pelo beneficiário em um banco na Cidade de Nova Iorque, *desde que* tal Titular assim o escolha, mediante notificação por escrito para tal efeito designando tal conta, mediante solicitação ao Agente Fiduciário, pelo menos, quinze dias corridos antes dessa Data de Pagamento.

(d)     O pagamento de juros em cada Data de Pagamento de Juros em relação a qualquer Nota será efetuado para a Pessoa cujo nome essa Nota está registrada na Data de Registro imediatamente anterior a essa Data de Pagamento de Juros por um cheque sacado em Dólares dos EUA em um banco na Cidade de Nova Iorque e enviado por correio à Pessoa com direito a tal, em seu endereço constante do Registro, ou por transferência bancária para uma conta em Dólares dos EUA mantida pelo beneficiário em um banco na Cidade de Nova Iorque, *desde que* o Titular assim o escolha, mediante notificação por escrito para tal efeito designando tal conta, que é recebida pelo Agente Fiduciário ou por um Agente de Pagamentos, impreterivelmente até a Data de Registro imediatamente anterior a essa Data de Pagamento de Juros. A menos que essa designação seja revogada, qualquer designação feita por essa

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 53

Titular em relação a essa Nota não permanecerá em vigor em relação a quaisquer pagamentos futuros em relação à Nota a pagar a esse Titular. O Emissor deverá pagar quaisquer custos administrativos impostos por bancos em relação a fazer pagamentos por transferência bancária.

Se a Data de Pagamento em relação a qualquer Nota não for um Dia Útil no local em que for apresentada para pagamento, o Titular da mesma não terá direito ao pagamento da quantia devida até o próximo Dia Útil no local e não terá direito a quaisquer juros posteriores ou outro pagamento em relação a qualquer atraso.

Não obstante as disposições dessa 0, os pagamentos sobre as Notas registradas em nome da DTC ou de sua nomeada serão efetuados de acordo com os Procedimentos Aplicáveis.

Seção 2.10.    *Listas de Titularidade*. O Agente Fiduciário deverá preservar de forma tão atual quanto for razoavelmente possível, a lista mais recente disponível dos nomes e endereços dos Titulares. Se o Agente Fiduciário não for o Oficial de Registro, o Emissor deverá fornecer ao Agente Fiduciário por escrito, pelo menos, dez Dias Úteis antes de cada Datas de Pagamento de Juros e essas outras vezes, conforme o Agente Fiduciário poderá solicitar por escrito, uma lista nessa forma e a partir de tal data, conforme o Agente Fiduciário poderá solicitar razoavelmente os nomes e endereços dos Titulares.

Seção 2.11.    *Transferência e Troca*

(a)    As participações na Nota Global conforme o Regulamento S e a Nota Global Restrita serão somente passíveis de troca ou transferíveis, conforme o caso, para a entrega física de Notas Certificadas se (i) a DTC notificar o Emissor que não está disposto ou incapaz de continuar como depositário dessa Nota Global ou a DTC deixar de ser uma "agência de compensação" inscrita nos termos da Lei da Bolsa de Valores e um depositário sucessor não ser nomeado pelo Emissor em até noventa dias corridos, ou (ii) um Evento de Inadimplemento ter ocorrido e persistir em relação a essas Notas, *desde que* essa transferência ou troca seja feita de acordo com o disposto dessa Escritura e dos Procedimentos Aplicáveis.

Ao receber a notificação da DTC ou do Agente Fiduciário, conforme o caso, em relação a ocorrência de qualquer um dos eventos descritos no parágrafo anterior, o Emissor envidará seus melhores esforços para fazer acordos com a DTC para a troca de participações nas Notas Globais por Notas Certificadas individuais, e providenciar para que as Notas Certificadas individuais solicitadas sejam assinadas e entregues ao Agente Fiduciário em quantidades suficientes e autenticadas pelo Agente Fiduciário para entrega aos Titulares. No caso de Notas Certificadas emitidas em troca da Nota Global Restrita, tais Notas Certificadas devem conter a Legenda da Lei de Valores Mobiliários. Após o registro da transferência, troca ou substituição de Notas com tal Legenda da Lei de Valores Mobiliários, ou mediante solicitação específica de remoção da Legenda da Lei de Valores Mobiliários em uma Nota, o Emissor deverá entregar apenas Notas com tal Legenda da Lei de Valores Mobiliários, ou deverá recusar-se a remover tal Legenda da Lei de Valores Mobiliários, conforme o caso, a menos que seja

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 54

entregue ao Emissor um certificado na forma do Anexo D ou do Anexo F, conforme o caso, ou provas satisfatórias que possam ser razoavelmente exigidas pelo Emissor, que podem incluir um Parecer do Advogado, de que nem a Lenda da Lei de Valores Mobiliários nem as restrições de transferência estabelecidas nela são necessárias para garantir o cumprimento das disposições da Lei de Valores Mobiliários. O Agente Fiduciário trocará uma Nota contendo a Legenda da Lei de Valores Mobiliários por uma Nota que não contém tal Legenda da Lei de Valores Mobiliários somente se tiver sido instruído por escrito pelo Emissor, em cuja orientação poderá se basear de forma conclusiva.

(b)      Em ou antes do 40º dia após a Data de Encerramento, transferências por um proprietário de uma participação benéfica na Nota Global conforme o Regulamento S para um cessionário que receber tal participação através da Nota Global Restrita serão feitas somente em restrições em Denominações Autorizadas de acordo com os Procedimentos Aplicáveis e após o recebimento pelo Agente Fiduciário ou pelo Agente de Transferência de um certificado escrito do cedente da participação benéfica na forma do Anexo E no sentido de que tal transferência está sendo feita a uma Pessoa que o cedente razoavelmente acredita ser um "comprador institucional qualificado" no sentido da Regra 144A em uma operação que atende aos requisitos da Regra 144A e de acordo com quaisquer leis de valores mobiliários aplicáveis de qualquer estado dos Estados Unidos ou de qualquer outra jurisdição. Após esse 40º dia, tal exigência de certificação não se aplicará mais a tais transferências.

(c)      As transferências por um proprietário de uma Nota Certificada contendo a Legenda da Lei de Valores Mobiliários ou de uma participação benéfica na Nota Global Restrita para um cessionário que receber tal participação através da Nota Global conforme o Regulamento S ou na forma de uma Nota Certificada não contendo a Legenda da Lei de Valores Mobiliários deverão ser feitas somente em Denominações Autorizadas após o recebimento pelo Agente Fiduciário ou pelo Agente de Transferência de uma certificação escrita do cedente na forma do Anexo D, no sentido de que tal transferência está sendo feita de acordo com o Regulamento S.

As participações benéficas nas Notas Globais serão apresentadas e as transferências das mesmas serão feitas somente por meio dos registros mantidos pela DTC e seus participantes, diretos e indiretos, inclusive a Euroclear e a Clearstream Banking.

As transferências entre participantes na DTC serão efetuadas de acordo com os Procedimentos Aplicáveis e serão liquidadas no *Sistema de Liquidação de Fundos do Mesmo Dia* da DTC e a atividade de negociação no mercado secundário de tais Notas deverá, portanto, ser liquidada em fundos imediatamente disponíveis. Não pode haver garantia quanto ao efeito, se houver, de liquidações em fundos imediatamente disponíveis na atividade de negociação das Notas. As transferências entre participantes da Euroclear e da Clearstream Banking serão efetuadas de acordo com os Procedimentos Aplicáveis.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 55

(d)      As Notas Certificadas podem ser trocadas ou transferidas, no todo ou em parte, no montante principal das Denominações Autorizadas mediante a entrega de tais Notas Certificadas no escritório do Agente Fiduciário ou de qualquer Agente de Transferência com um instrumento escrito de transferência conforme previsto nesta Escritura no formulário anexado ao presente documento, devidamente assinado pelo seu Titular ou seu advogado devidamente autorizado por escrito.

Em troca de qualquer Nota Certificada devidamente apresentada para transferência, o Agente Fiduciário deverá imediatamente autenticar e entregar ou providenciar para que seja autenticada e entregue no Corporate Trust Office, ao cessionário, ou enviar pelo correio (por conta e risco do cessionário) ao endereço que o cessionário possa solicitar, uma Nota ou Notas Certificadas, conforme o caso, registradas em nome de tal cessionário, pelo mesmo valor principal total que foi transferido. No caso da transferência de qualquer Nota Certificada em parte, o Agente Fiduciário também deverá imediatamente autenticar e entregar ou providenciar para que seja autenticada e entregue ao Corporate Trust Office, ao cedente, ou enviar pelo correio (por risco do cedente) para o endereço que o cedente possa solicitar, uma Nota ou Notas Certificadas, conforme o caso, registradas em nome de tal cedente, pelo valor principal total que não foi transferido. Nenhuma transferência de qualquer Nota deverá ser feita a menos que a solicitação de tal transferência seja feita pelo Titular registrado ou seu advogado devidamente autorizado por escrito no Corporate Trust Office e seja acompanhada de um instrumento de transferência preenchido na forma do Anexo C anexado à Nota apresentada para transferência.

(e)      A transferência, registro e troca de qualquer Nota ou Notas será permitida e assinada conforme previsto nesta 0 sem qualquer custo para o Titular de qualquer Nota ou Notas que não sejam impostos ou encargos governamentais ou encargos de seguro pagáveis em transferências ou quaisquer despesas de entrega por outro meio que não o correio normal, mas sujeito a regulamentos razoáveis conforme o Emissor, o Oficial de Registro e o Agente Fiduciário podem estabelecer.

Os custos e despesas de efetuar qualquer troca ou registro de transferência de acordo com as disposições acima, exceto as despesas de entrega por outro meio que não o correio comum (se houver) e exceto o pagamento de uma quantia suficiente para cobrir quaisquer impostos ou outros encargos governamentais ou encargos de seguro que possam ser impostos em relação a eles, serão arcados pelo Emissor.

Todas as Notas Certificadas emitidas em qualquer troca ou registro de transferência de Notas serão obrigações válidas do Emissor, evidenciando a mesma dívida, e com direito aos mesmos benefícios, que as Notas entregues em troca ou registro de transferência.

(f)      O Agente Fiduciário ou o Agente de Transferência deverá efetuar transferências de Notas Globais e Notas Certificadas. Além disso, o Oficial de Registro deverá manter o Registro para a propriedade, troca e transferência de quaisquer Notas. O Agente de Transferência deverá notificar imediatamente o Oficial de Registro e o Oficial de Registro deverá igualmente notificar imediatamente o Agente Fiduciário sobre qualquer troca ou transferência de tais Notas. Nem o Agente Fiduciário nem

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 56

qualquer Agente de Transferência deverá registrar a troca ou a transferência de participações durante o período de quinze dias corridos, começando na Data de Registro e encerrando na Data de Pagamento. O Agente Fiduciário deverá notificar imediatamente o Emissor sobre qualquer substituição, transferência, cancelamento ou destruição das Notas.

(g)      Em qualquer troca de toda ou parte de qualquer Nota Global por uma Nota Certificada ou uma participação em uma Nota Global Restrita ou uma Nota Global conforme o Regulamento S, a Nota Global a ser trocada deverá ser marcada para refletir a redução de seu valor principal pelo valor principal total de tal Nota Certificada ou a participação a ser trocada por uma participação em uma Nota Global conforme o Regulamento S ou uma Nota Global Restrita, conforme o caso. Até que seja trocada na íntegra, a Nota terá, em todos os aspectos, os mesmos benefícios nos termos desta Escritura que as Notas autenticadas e entregues de acordo com o presente documento.

Seção 2.12.      *Substituição de Notas*. As Notas que forem mutiladas, destruídas, roubadas ou perdidas serão substituídas mediante entrega da mesma ao Agente Fiduciário, ou entrega ao Emissor e ao Agente Fiduciário de prova satisfatória da perda, roubo ou destruição das mesmas para o Emissor e Agente Fiduciário. No caso de uma Nota perdida, roubada ou destruída, pode ser exigida uma indenização satisfatória para o Agente Fiduciário e o Emissor às custas do Titular de tal Nota antes que a Nota substituta seja emitida. Após a emissão de qualquer nova Nota, o Emissor pode exigir o pagamento de uma quantia suficiente para cobrir qualquer encargo governamental que possa ser aplicado em relação àquela e quaisquer outras despesas (incluindo os honorários e as despesas do Agente Fiduciário, seus advogados e seus agentes) conectadas com a mesma.

Seção 2.13.      *Notas Temporárias*. Sujeito às disposições da (a) até que as Notas Certificadas estejam prontas para entrega, o Emissor poderá elaborar e o Agente Fiduciário deverá autenticar as Notas temporárias. As Notas Temporárias deverão ser substancialmente na forma de Notas Certificadas, mas podem ter variações que o Emissor considerar apropriadas para Notas temporárias. Conforme necessário, o Emissor deverá elaborar e o Agente Fiduciário deverá autenticar as Notas Certificadas e entregá-las em troca de Notas temporárias no escritório ou agência do Emissor ou do Agente Fiduciário sem cobranças para o Titular. Até que sejam trocadas, as Notas temporárias terão direito aos mesmos benefícios, nos termos desta Escritura, que as Notas Certificadas.

Seção 2.14.      *Cancelamento*. O Emissor pode, a qualquer momento, entregar Notas ao Agente Fiduciário para cancelamento. Os Agentes de Transferência e os Agentes Pagadores deverão encaminhar ao Agente Fiduciário quaisquer Notas entregues a eles para transferência, troca ou pagamento. O Agente Fiduciário ou um Agente de Pagamentos e ninguém mais poderá cancelar e o Agente Fiduciário destruirá, de acordo com seus procedimentos habituais (sujeito aos requisitos de conservação de registros da Lei da Bolsa de Valores), todas as Obrigações entregues para transferência, troca, pagamento ou cancelamento e, se assim for destruído, entregará um certificado de tal destruição ao Emissor, a menos que o Emissor instrua o Agente Fiduciário por escrito a entregar as Notas canceladas ao Emissor. O

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 57

Emissor não poderá emitir novas Notas para substituir as Notas que resgatou, pagou ou entregou ao Agente Fiduciário para cancelamento.

Seção 2.15.    *Juros de Mora*

(a)    Quaisquer juros sobre qualquer Nota são devidos, mas não são pagos quando o mesmo se tornar vencido e tal não pagamento continuar por um período de trinta dias corridos, deixarão de ser devidos imediatamente ao Titular na Data de Registro Regular, e (i) tais juros de mora, (ii) (na medida do lícito) juros sobre tais juros de mora a 1,50% acima da taxa suportada pelas Notas (tal taxa a "**Taxa de Mora**") e (iii) (na medida do lícito) juros adicionais sobre o principal então em aberto a 1,50% (juntamente com os juros de mora e juros sobre tais juros de mora, "**Juros de Mora**") serão pagos pelo Emissor aos Titulares em cujos nomes as Notas são registradas no encerramento dos negócios em uma data de registro especial para o pagamento de tais Juros de Mora (a "**Data de Registro Especial**"), que será fixada da seguinte maneira.

(b)    O Emissor notificará o Agente Fiduciário por escrito do montante dos Juros de Mora propostos para pagamento e a data do pagamento proposto e, ao mesmo tempo, o Emissor depositará junto ao Agente Fiduciário um montante em dinheiro igual ao montante total proposto para pagamento em relação a tais Juros de Mora, ou tomará as providências necessárias para o Agente Fiduciário em relação a tal depósito antes da data do pagamento proposto, tal dinheiro quando depositado será feito em garantia, em benefício dos Titulares com direito a tais Juros de Mora, conforme previsto neste 0, inclusive Juros de Mora, deixarão de serem acumulados sobre o pagamento de mora a partir desse depósito. Logo, o Agente Fiduciário fixará e notificará o Emissor da Data Especial de Registro para o pagamento de tais Juros de Mora, que não deverá exceder quinze dias corridos e não menos que cinco dias corridos antes da data do pagamento proposto. O Agente Fiduciário notificará cada Titular do pagamento proposto de tais Juros de Mora e da Data Especial de Registro, portanto, não menos do que dez dias corridos antes dessa Data Especial de Registro. Tais Juros de Mora serão então pagos aos Titulares em cujos nomes as Notas estão registradas no fechamento dos negócios na Data Especial de Registro.

Seção 2.16.    *Números CUSIP e ISIN*O Emissor ao emitir as Notas poderá utilizar números CUSIP e ISIN (se então geralmente em uso) e, se assim for, o Agente Fiduciário deverá utilizar números CUSIP e ISIN em notificações como uma conveniência para os Titulares; *desde que*, *no entanto*, qualquer notificação possa declarar que nenhuma declaração seja feita quanto à exatidão de tais números, seja como impresso nas Notas ou como contido em qualquer notificação, e que o fundamento poderá ser colocado somente nos outros números de identificação impressos nas Notas, e qualquer notificação não será afetada por qualquer defeito ou omissão de tais números. O Emissor deverá notificar imediatamente o Agente Fiduciário por escrito sobre qualquer alteração nos números CUSIP ou ISIN.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 58

       Seção 2.17.     *Recompra*. Após Evento de Encerramento do Excesso de *Cash Sweep*, o Emissor ou qualquer uma de suas Subsidiárias poderá, a qualquer momento, adquirir Notas a qualquer preço ou preços no mercado aberto; *ressalvado* que, antes e depois do Evento de Encerramento do Excesso de *Cash Sweep*, a Sociedade e suas Subsidiárias possam comprar Notas de acordo com uma oferta pública disponibilizada a todos os Titulares, exceto quando não for possível fazê-lo devido à falta de qualificação para isenções de ofertas de restrições impostas por qualquer jurisdição de acordo com a lei aplicável ou conforme permitido nos termos dessa Escritura. As Notas resgatadas de acordo com os termos dessa Escritura ou então compradas serão entregues ao Agente Fiduciário para cancelamento. Nada nesta Escritura restringe a capacidade das Afiliadas da Sociedade (exceto a Sociedade e suas Subsidiárias, conforme estabelecido acima) de adquirir Notas no mercado aberto ou, de outra forma, a qualquer preço acordado. Todas essas Notas assim adquiridas pelas Afiliadas podem ser revendidas ou, a critério das Afiliadas, entregues ao Agente Fiduciário para cancelamento.

ARTIGO 3
RESGATE

       Seção 3.01.     *Resgate Opcional*. O Emissor terá o direito, a seu critério, de resgatar qualquer uma das Notas, no todo ou em parte, a qualquer momento e de tempos em tempos a um preço de resgate igual a 100,5% do montante principal dessas Notas; mais quaisquer juros acumulados e não pagos sobre o montante principal de tais Notas e quaisquer Montantes Adicionais até, mas excluindo, a data de resgate. Para evitar dúvidas, o exposto não afetará os direitos de cada Titular, em qualquer Data de Pagamento de Juros relevante que ocorrer antes de tal data de resgate, de receber juros devidos na Data de Pagamento de Juros relevante).

       Seção 3.02.     *Resgate por Motivos de Tributação*. As Notas serão resgatáveis, por opção do Emissor ou de qualquer Garantidor, no todo, mas não em parte, mediante aviso prévio não inferior a trinta nem superior a sessenta dias corridos aos Titulares, com cópia para o Agente Fiduciário (que será irrevogável) a 100% do montante do principal, mais juros acumulados e quaisquer Montantes Adicionais devidos em relação ao mesmo, somente se o Emissor ou qualquer Garantidor tiver sido ou for obrigado a pagar Montantes Adicionais 24. em relação a tais Notas, como resultado de qualquer alteração ou aditamento de leis, tratados ou regulamentos das Ilhas Cayman ou do Brasil, ou qualquer Autoridade Pública com poderes para tributar, ou fazer qualquer alteração na aplicação ou interpretação oficial de tais leis, tratados ou regulamentos, ou 25. em relação à Garantia, além dos Montantes Adicionais que um Garantidor pagaria, se os pagamentos estivessem sujeitos a dedução ou retenção a uma taxa de 15% ou 25% no caso de beneficiários localizados em jurisdições de paraísos fiscais para fins da lei tributária brasileira, conforme o caso determinado sem consideração a juros, taxas, multas ou outras adições similares ao imposto, como resultado de qualquer alteração ou aditamento de leis, tratados ou regulamentos das Ilhas Cayman, Brasil ou qualquer Autoridade Pública ou com poderes fiscais, ou qualquer alteração na aplicação ou interpretação oficial de tais leis, tratados ou regulamentos cuja alteração ou aditamento (na cláusula 24 ou 25) ocorrer após a data de emissão das Notas.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 59

Nenhuma notificação de resgate será entregue antes dos sessenta dias corridos anteriores à data mais antiga na qual o Emissor ou um Garantidor seriam obrigados a pagar tais Montantes Adicionais, se um pagamento referente a tais Notas ou à Garantia fosse devida. Antes da publicação ou envio por correio de qualquer notificação de resgate das Notas, conforme descrito acima, o Emissor ou um Garantidor deverá entregar ao Agente Fiduciário o parecer de um consultor jurídico independente de reputação reconhecida, declarando que o Emissor ou um Garantidor seriam obrigados a pagar Montantes Adicionais devido a alterações nas leis, tratados ou regulamentos tributários ou na aplicação ou interpretação oficial dos mesmos. O Agente Fiduciário aceitará tal parecer como prova suficiente do cumprimento das condições precedentes estabelecidas acima, caso em que será conclusivo e vinculante para os Titulares.

Seção 3.03.    *Aplicabilidade do Artigo*. O resgate de Notas, a critério do Emissor, conforme permitido pela 0 ou exigido por qualquer disposição desta Escritura, deverá ser feito de acordo com tal disposição e este 0.

Seção 3.04.    *Eleição de Resgate; Notificação ao Agente Fiduciário*. A eleição do Emissor para resgatar as Notas de acordo com a 0 ou a 24 deverá ser comprovada por uma Deliberação do Conselho. No caso de qualquer resgate de Notas, a critério do Emissor, o Emissor deverá, pelo menos, setenta dias corridos antes da Data de Resgate fixada pelo Emissor (a menos que uma notificação mais curta seja satisfatória para o Agente Fiduciário), notificar o Agente Fiduciário por escrito de tal Data de Resgate.

Seção 3.05.    *Notificação de Resgate pelo Emissor*. No caso de resgate de Notas conforme a 0 ou a 24, a notificação de resgate deverá ser enviada, pelo menos, trinta, mas não mais de sessenta dias corridos antes da Data de Resgate para cada Titular de qualquer Nota a ser resgatada por correio de primeira classe em seu endereço registrado e tal notificação deverá ser irrevogável.

A notificação deverá indicar:

(a)    a Data de Resgate;

(b)    o Preço de Resgate;

(c)    o nome e endereço dos Agentes Pagadores;

(d)    que as Notas chamadas para resgate devem ser entregues a um Agente de Pagamentos para cobrar o Preço de Resgate;

(e)    que, a menos que o Emissor não faça tal pagamento de resgate ou o Agente de Pagamentos esteja proibido de fazer tal pagamento de acordo com os termos desta Escritura, os juros sobre as Notas chamadas para resgate deixam de se acumular na e após a Data de Resgate;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 60

(f)      o parágrafo das Notas de acordo com o qual as Notas pediram resgate estão sendo resgatadas;

(g)      o número CUSIP ou ISIN, se houver; e

(h)      que nenhuma declaração é feita quanto à exatidão ou precisão do número CUSIP ou ISIN, se houver, listado em tal notificação ou impresso nas Notas.

A critério do Emissor e a seu pedido, feito por escrito ao Agente Fiduciário, pelo menos, sessenta dias corridos antes da data de resgate das Obrigações, o Agente Fiduciário deverá enviar a notificação de resgate em nome do Emissor e às custas do Emissor; *desde* que o Emissor entregue ao Agente Fiduciário, pelo menos, setenta dias corridos antes da Data de Resgate, um Certificado dos Diretores solicitando que o Agente Fiduciário envie tal notificação e estabelecendo as informações a serem declaradas em tal notificação, conforme previsto no parágrafo anterior.

Seção 3.06.      *Depósito do Preço de Resgate*. Até às 10h00, horário da Cidade de Nova Iorque, no máximo, um Dia Útil antes da Data de Resgate, o Emissor deverá depositar junto ao Agente de Pagamentos a quantia suficiente para pagar o Preço de Resgate das Notas e os juros acumulados sobre as Notas, exceto as que tenham sido entregues pelo Emissor ao Agente Fiduciário, pelo menos, quinze dias corridos antes da Data de Resgate para cancelamento. O Emissor deverá solicitar que o banco através do qual tal pagamento deverá ser feito concorde em fornecer ao Agente de Pagamentos até às 10h00 (horário de Nova Iorque) dois Dias Úteis antes da data de vencimento de qualquer um desses pagamentos uma confirmação irrevogável (por telex testado) de sua intenção de efetuar tal pagamento.

Seção 3.07.      *Efeito da Notificação de Resgate*. A notificação de resgate tendo sido entregue conforme supramencionado, as Notas deverão, na Data de Resgate, tornar-se vencidas e a pagar pelo Preço de Resgate aplicável (juntamente com os juros acumulados, se houver, à Data de Resgate), e a partir e após tal data (exceto no caso de inadimplemento no pagamento do Preço de Resgate e dos juros acumulados) tais Notas deixarão de produzir juros. Após o resgate de qualquer Nota para resgate de acordo com tal notificação, tal Nota será paga pelo Emissor pelo Preço de Resgate, juntamente com os juros acumulados, se houver, à Data de Resgate; *desde que, entretanto*, as prestações de juros cuja Data de Pagamento seja na ou antes da Data de Resgate sejam a pagar aos Titulares de tais Notas registradas como tais no encerramento dos negócios nas Datas de Registro relevantes, de acordo com seus termos.

Se qualquer Nota a ser resgatada não for paga no momento da sua entrega, de acordo com as instruções de resgate do Emissor, o principal, até que seja pago, produzirá juros a partir da Data de Resgate à taxa suportada pelas Notas. Após o resgate ao Agente de Pagamentos, tais Notas serão pagas pelo Emissor no Preço de Resgate aplicável, mais os juros acumulados, à Data de Resgate; *desde que, entretanto*, as prestações de juros a pagar sejam na ou antes da Data de Resgate sejam a pagar aos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021                                                                      CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                                          INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 61

Titulares de tais Notas registradas como tais no encerramento dos negócios na Data de Registro relevante, de acordo com seus termos.

Seção 3.08. Escolha das Notas a Serem Resgatadas Parcialmente. Se o Emissor não resgatar todas as Notas em circulação, o Agente Fiduciário escolherá as Notas a serem resgatadas em conformidade com os requisitos da bolsa ou mercado de valores principal, se houver, no qual as Notas estão listadas ou, se as Notas não estiverem listadas em uma bolsa de valores ou mercado, de forma pro rata, ou por qualquer outro método que o Agente Fiduciário considerar junto e apropriado (sujeito aos procedimentos de qualquer sistema de compensação aplicável, incluindo DTC).

ARTIGO 4
OBRIGAÇÕES

Seção 4.01.    *Pagamento do Principal e Juros nos termos das Notas.* O Emissor pagará pontualmente o principal e os juros (incluindo os Juros de Mora, se houver) das Notas nas datas e da maneira prevista nos Parágrafos 2 e 3 das Notas. Um Dia Útil antes de qualquer data de Vencimento Indicado (que, para evitar dúvidas, incluirá qualquer Data de Pagamento de Juros), o Emissor depositará irrevogavelmente junto ao Agente Fiduciário ou aos outros Agentes Pagadores a quantia suficiente para pagar tal capital e juros. Não serão pagos juros acima da taxa máxima permitida pela lei aplicável.[10]

Seção 4.02.    *Manutenção de Escritório ou Agência.* O Emissor e cada um dos Garantidores deverão manter um escritório ou agência no Distrito de Manhattan, Cidade de Nova Iorque, onde as notificações e demandas mediante o Emissor e cada um dos Garantidores em relação à Escritura e às Notas poderão ser apresentadas. Inicialmente este escritório será nos escritórios da Cogency Global Inc. localizado em 22 East 42nd Street, 18th Floor, 115 Nova York, NY, 10168, e o Emissor e cada um dos Garantidores não concordarão em alterar a designação desse escritório sem aviso prévio ao Agente Fiduciário de um escritório substituto no Distrito de Manhattan, Cidade de Nova Iorque.

Seção 4.03.    *Quantia para Pagamentos das Notas a ser Mantida como Garantia.* Caso o Emissor ou cada um dos Garantidores, a qualquer momento, for agir como seu próprio Agente de Pagamentos, ele deverá, na ou antes de cada data de vencimento do principal de, prêmio, se houver sobre ou juros sobre quaisquer Notas, segregar e manter como garantia em benefício das Pessoas com direito aos mesmos uma quantia suficiente para pagar o principal, o prêmio, se houver, ou juros que se tornem devidos até que essas quantias sejam pagas para essas Pessoas ou, de outra forma, alienados conforme previsto aqui e notificará o Agente Fiduciário de sua ação ou impossibilidade de agir dessa forma.

Sempre que o Emissor ou cada um dos Garantidores tiver um ou mais Agentes Pagadores das Notas, ele deverá, na ou antes de cada data de vencimento do principal, prêmio, se houver, sobre ou

---

[10] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 62

juros sobre quaisquer Notas, depositar irrevogavelmente junto a um Agente de Pagamentos uma quantia suficiente para pagar o principal, prêmio, se houver, ou juros que se tornem devidos, tal quantia deve ser mantida em garantia em benefício das Pessoas com direito a tal principal ou juros e (a menos que tal Agente de Pagamentos seja o Agente Fiduciário) o Emissor ou cada um dos Garantidores notificará imediatamente o Agente Fiduciário de tal ação ou de qualquer impossibilidade de agir dessa forma.

Cada Agente de Pagamentos, sujeito às disposições dessa 4.03, irá:

(a)      manter todas as quantias mantidas por ele para o pagamento do principal de ou juros sobre as Notas em garantia, em benefício das Pessoas com direito às mesmas até que todas as quantias sejam pagas para essas Pessoas ou, alienadas, de outra forma, conforme previsto aqui;

(b)      entregar ao Agente Fiduciário uma notificação de qualquer inadimplemento por parte do Emissor ou de cada um dos Garantidores (ou qualquer outro devedor mediante as Notas) na realização de qualquer pagamento do principal ou dos juros; e

(c)      a qualquer momento, durante a continuação de qualquer inadimplemento, mediante a solicitação por escrito do Agente Fiduciário, pagar imediatamente ao Agente Fiduciário todas as quantias assim mantidas em garantia por esse Agente de Pagamentos.

O Emissor ou cada um dos Garantidores providenciará para que cada Agente de Pagamentos que não faz parte desta Escritura assine e entregue um instrumento no qual esse Agente de Pagamentos deverá concordar com o Agente Fiduciário para atuar como Agente de Pagamentos de acordo com essa 4.03.

O Emissor ou cada um dos Garantidores podem, a qualquer momento, com o propósito de obter a satisfação e quitação das Notas ou para qualquer outro propósito, pagar, ou por Ordem do Emissor direcionar qualquer Agente de Pagamentos a pagar, ao Agente Fiduciário todas as quantias mantidas em garantia pelo Emissor ou por cada um dos Garantidores ou tal Agente de Pagamentos, tais quantias a serem mantidas em garantia pelo Emissor ou por cada um dos Garantidores ou Agente de Pagamentos; tais quantias a serem mantidas pelo Agente Fiduciário nas mesmas garantias que aquelas sob as quais tais quantias foram mantidas pelo Emissor ou por cada um dos Garantidores ou tal Agente de Pagamentos; e, após tal pagamento por qualquer Agente de Pagamentos ao Agente Fiduciário, tal Agente de Pagamentos será liberado de qualquer outra responsabilidade com relação a tais quantias.

Qualquer quantia depositada junto ao Agente Fiduciário ou qualquer Agente de Pagamentos, ou então mantida pelo Emissor ou por cada um dos Garantidores, em garantia para o pagamento do principal ou juros sobre qualquer Nota e que permanecer não reivindicada por dois anos após esse principal ou juros ter se tornado vencido e a pagar será pago para o Emissor ou para cada um dos Garantidores, a pedido por escrito do Emissor ou cada um dos Garantidores ou (se, então, mantido em garantia pelo Emissor ou por cada um dos Garantidores) será quitado dessa garantia; e o Titular dessa Nota, a partir

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.
Este documento foi assinado digitalmente por Ieda Maria Monteiro.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 63

de então, como um credor geral sem garantia, somente irá procurar o Emissor ou cada um dos Garantidores como Agente Fiduciário do mesmo, deixará de suspender; *desde que*, *entretanto*, o Agente Fiduciário ou esse Agente de Pagamentos, antes de ser solicitado a fazer qualquer pagamento, deverá, mediante solicitação e às custas do Emissor ou de cada um dos Garantidores, providenciar para que seja publicada uma vez, em um jornal publicado na língua inglesa, publicada normalmente em cada Dia Útil e de circulação geral (i) no Distrito de Manhattan, Cidade de Nova Iorque e (ii) contanto que essas Notas estejam listadas em qualquer bolsa de valores, mediante a publicação em inglês em um jornal líder de circulação geral no país em que essa bolsa de valores está localizada, observe que tal quantia permanece não reivindicada e que, após a data especificada, que não será inferior a trinta dias corridos a partir da data de tal publicação, qualquer saldo não reivindicado de tal quantia então remanescente será reembolsado ao Emissor ou a cada um dos Garantidores.

Seção 4.04.     *Manutenção da Existência Societária*. O Emissor e cada um dos Garantidores irão, e providenciarão para que cada uma de suas Subsidiárias a. mantenham em vigor sua existência societária e todos os registros necessários para esse efeito; *desde que* essas restrições não proíbam quaisquer operações permitidas pela Seção 4.14 ou a incorporação de qualquer Subsidiárias ou Afiliada com ou em um Garantidor ou com ou em qualquer outra Subsidiária de cada um dos Garantidores; e b. tomem todas as medidas razoáveis para manter todos os direitos, privilégios, títulos a bens, franquias e afins necessários ou desejáveis no curso normal dos negócios, atividades ou operações; *ressalvado*, no entanto, que no caso das cláusulas a e b, nem qualquer Garantidor tampouco suas Subsidiárias estarão impedidas de descontinuar aquelas operações ou de suspender a manutenção desses bens ou a existência dessa Subsidiária que, na decisão razoável desse Garantidor, conforme comprovada por uma deliberação do conselho de administração da OEC, não são mais necessárias no curso dos negócios do Garantidor ou de suas Subsidiárias; e, ressalvado, *ainda*, que essa descontinuação de operações, manutenção ou existência não terá um Efeito Adverso Material.

Seção 4.05.     *Manutenção de Seguros*. Na medida em que for permitido por lei aplicável e disponível em termos comercialmente razoáveis, o Emissor e os Garantidores deverão manter ou providenciar para que sejam mantidos, em cada caso, na medida em que forem necessários pelo cliente ou contraparte relevante, os seguros de seguradoras sólidas financeiramente e de reputação em relação ao seus bens e negócios em face do prejuízo ou de danos afins e em tais montantes, conforme garantido habitualmente pelas Pessoas contratadas nos mesmos negócios ou semelhantes, geralmente consistentes com as normas aplicadas pelas empresas de construção multinacionais que trabalham mundialmente

Seção 4.06.     *Classificações*. A Sociedade envidará seus melhores esforços comercialmente razoáveis para obter classificações societárias por, pelo menos, 2 (duas) Agências de Classificação até 1º de janeiro de 2021 e continuará a ter classificações societárias por, pelo menos, 2 (duas) Agências de Classificação, a partir de então.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 64

Seção 4.07.    *Cumprimento das Leis.* A Sociedade deverá e providenciará para que suas Subsidiárias conduzam seus negócios em conformidade com todos os requisitos da lei aplicável, exceto se qualquer falha em cumprir não fosse esperada, individualmente ou no total, resultar em um Efeito Adverso Material; *desde* que a Sociedade ou suas Subsidiárias poderão, às suas custas, debater, por processos apropriados conduzidos de boa-fé, a validez ou aplicação de qualquer requisito da Lei aplicável, contanto que (a) nenhum dos Titulares ou o Agente Fiduciário estejam sujeitos a qualquer responsabilidade pelo descumprimento com os mesmos e (b) a instituição desses processos não fosse esperada resultar em um Efeito Adverso Material.

Seção 4.08.    *Pagamento de Impostos e Créditos.* O Emissor e a Sociedade pagarão, e providenciarão para que cada uma de suas respectivas Subsidiárias paguem todos os impostos, contribuições e outros encargos governamentais impostos a ela ou a qualquer um de seus bens e ativos em relação a qualquer uma de suas franquias, negócios, renda ou lucros antes que qualquer multa ou juros se acumulem, e pagarão todas as indenizações (incluindo indenizações por trabalho, serviços, materiais e fornecimentos) por quantias que se tornaram devidas e a pagar e que, por lei, tenham ou possam vir a se tornar um Ônus sobre seus bens e ativos; desde que, entretanto, qualquer pagamento desse tipo não seja exigido na medida em que (i) a falta de tal pagamento não tenha um Efeito Adverso Material; ou (ii) qualquer um dos Emissores, a Sociedade ou suas respectivas Subsidiárias poderá contestar de boa-fé qualquer imposto, contribuição, encargo, crédito ou obrigação e, nesse caso, poderá permitir que o imposto, contribuição, encargo, crédito ou obrigação permaneçam não pagos durante qualquer período, inclusive recursos, quando o Emissor, a Sociedade ou tal Subsidiária estiverem de boa-fé contestando os mesmos através de processos adequados, desde que (x) tenham sido estabelecidas reservas adequadas de acordo com o GAAP brasileiro com relação a qualquer imposto, contribuição, encargo, crédito ou obrigação, juros acumulados e multas potenciais ou outros custos relacionados a eles, ou outras provisões adequadas para pagamento dos mesmos, e (y) não seja razoável esperar que tal disputa resulte em um Efeito Adverso Material.

Seção 4.09.    *Manutenção de Bens.* A Sociedade irá, e providenciará para que cada uma de suas Subsidiárias mantenham, preservem e protejam todos o seu ativo imobilizado relevante e necessário na operação de seus principais negócios em boas condições, sujeitos ao desgaste natural no curso normal dos negócios, exceto na medida em que qualquer descumprimento de manter ou de preservar não seja razoável esperar resultar, individualmente ou no total, em um Efeito Adverso Material.

Seção 4.10.    *Pagamentos de Montantes Adicionais.*[11]

(a)        Todos os pagamentos pelo Emissor ou pelos Garantidores em relação às Notas e à Garantia serão feitos sem retenção ou dedução para ou por conta de quaisquer impostos, tributos, contribuições, taxas ou outros encargos governamentais presentes ou futuros de qualquer natureza (e quaisquer multas ou juros relacionados aos mesmos) impostos ou cobrados

---

[11] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G..

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01            Livro nº LIV                              fls. 65

por ou em nome das Ilhas Cayman ou do Brasil ou, após qualquer incorporação, fusão, transferência, dissolução ou assunção de obrigações aqui permitidas, a jurisdição na qual a Pessoa resultante, sobrevivente ou cessionária é constituída, residente para fins tributários ou tratada como tendo negócios, ou, em cada caso, qualquer subdivisão política da mesma ou autoridade tributária (cada uma, uma "**Jurisdição Tributária**"), a menos que tal retenção ou dedução seja exigida por lei. Nesse caso, o Emissor ou um Garantidor pagará a cada Titular os montantes adicionais ("**Montantes Adicionais**") que forem necessários para que cada pagamento líquido feito pelo Emissor ou por um Garantidor sobre cada Nota após dedução ou retenção para ou por conta de qualquer imposto, multa, tributo, contribuição ou outro encargo governamental presente ou futuro que teria sido imposto ou como resultado de tal pagamento pela Jurisdição Tributária não seja inferior ao montante então devido e a pagar sobre tal Nota. A obrigação supramencionada de pagar Montantes Adicionais, no entanto, não se aplica a:

(i)        qualquer imposto, contribuição ou outro encargo governamental que não teria sido aplicado, mas pela existência de qualquer ligação presente ou anterior entre esse Titular (ou entre um fiduciário, um instituidor, um beneficiário, um sócio ou um acionista de tal Titular, se tal Titular for um patrimônio, um truste, uma parceria ou uma sociedade) ou um beneficiário efetivo, por um lado, e a Jurisdição Tributária, por outro lado, incluindo, sem limitação, tal Titular (ou tal fiduciário, instituidor, beneficiário, sócio ou acionista) ou o beneficiário efetivo sendo ou tendo sido cidadão ou residente da mesma ou estando ou tendo estado envolvido em um comércio ou negócio ou presente na mesma ou tendo, ou tendo tido, um estabelecimento permanente na mesma, mas não incluindo o simples recebimento de tal pagamento ou a titularidade ou detenção de tal Nota;

(ii)        qualquer imposto, contribuição ou outro encargo governamental que não teria sido aplicado, mas para a apresentação por tal Titular para pagamento (quando a apresentação for exigida) em data superior a trinta dias corridos após a data em que tal pagamento vencido e a pagar ou a data em que o pagamento estiver devidamente previsto o que ocorrer mais tarde;

(iii)        à medida em que os impostos, tributos, contribuições ou outros encargos governamentais não teriam sido aplicados, mas pelo não cumprimento pontual por parte do Titular ou do beneficiário efetivo de qualquer certificação, identificação ou outros requisitos de declaração relativos à nacionalidade, residência, identidade ou conexão com a Jurisdição Tributária do Titular se (a) tal cumprimento for exigido ou imposto por lei, regulamento ou outra lei aplicável de tal Jurisdição Tributária como condição prévia à isenção total ou parcial desse imposto, tributo, contribuição ou outro encargo governamental e (b) pelo menos trinta dias corridos antes da data em que o Emissor ou [cada um dos] Garantidores aplicar esta cláusula (iii) o Emissor ou esse Garantidor tiver

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 66

notificado a todos os Titulares que alguns ou todos os Titulares serão obrigados a cumprir tal requisito;

(iv)    Qualquer imposto sobre patrimônio, herança, doação, venda, transferência ou bens móveis ou imposto semelhante;

(v)    qualquer imposto, contribuição ou encargo governamental a pagar a não ser por dedução ou retenção de pagamentos de principal ou de juros sobre as Notas; ou

(vi)    qualquer combinação dos itens (i) até (v) acima.

(b)    O Emissor ou os Garantidores também pagarão quaisquer impostos sobre carimbos, judiciais ou documentais presentes ou futuros ou quaisquer outros impostos sobre a produção, venda ou consumo de bens, encargos ou tributos semelhantes que surgirem em qualquer jurisdição da realização, entrega, registro ou realização de pagamentos em relação às Notas, excluindo quaisquer impostos, encargos ou tributos semelhantes aplicados por qualquer jurisdição fora de qualquer Jurisdição Tributária, exceto aqueles resultantes da, ou necessários para que sejam pagos em relação à, exequibilidade das Notas após a ocorrência de qualquer Inadimplemento ou Evento de Inadimplemento (cada um, conforme definido abaixo).

(c)    Nenhum Montante Adicional será pago em relação a um pagamento sobre uma Nota ou conforme a Garantia a um Titular que for um fiduciário ou parceria ou além do beneficiário efetivo único desse pagamento na medida em que um beneficiário ou instituidor em relação a esse fiduciário ou sócio dessa parceria ou beneficiário efetivo não teria direito de receber pagamentos dos Montantes Adicionais se o beneficiário, instituidor, sócio ou beneficiário efetivo fosse o Titular.

(d)    O Emissor ou os Garantidores fornecerão ao Agente Fiduciário o reconhecimento oficial da autoridade fiscal competente (ou, se tal reconhecimento não estiver disponível, uma cópia autenticada do mesmo, se disponível) comprovando o pagamento de impostos em qualquer Jurisdição Tributária em relação à qual o Emissor ou um Garantidor pagou quaisquer Montantes Adicionais. Cópias de tal documentação serão disponibilizadas aos Titulares ou aos Agentes Pagadores, conforme o caso, mediante solicitação dos mesmos.

(e)    O Emissor ou os Garantidores irão:

(i)    pelo menos dez Dias Úteis antes da primeira Data de Pagamento de Juros de quaisquer Notas (e, pelo menos, dez Dias Úteis antes de cada Data de Pagamento de Juros seguinte ou de qualquer Data de Resgate ou Data de Vencimento Indicado, caso tenha havido qualquer alteração com relação aos assuntos estabelecidos no Certificado

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 67

do Diretor abaixo mencionado), entregar ao Agente Fiduciário e a cada Agente de Pagamentos um Certificado do Diretor (i) especificando o montante, se houver, dos impostos descritos nesta 0 aplicados ou cobrados por ou em nome de qualquer Jurisdição Tributária (os "**Impostos Relevantes Retidos na Fonte**") exigidos a serem deduzidos ou retidos no pagamento de principal ou juros sobre as Notas aos Titulares e os Montantes Adicionais, se houver, devidos aos Titulares em relação a tal pagamento, e (ii) certificando que o Emissor ou qualquer Garantidor pagará tal dedução ou retenção;

(ii)        antes da data de vencimento para o seu pagamento, pagará qualquer Imposto Relevante Retido na Fonte, juntamente com quaisquer multas ou juros aplicáveis;

(iii)        dentro de trinta dias corridos após o pagamento do Imposto Relevante Retido na Fonte, entregar ao Agente Fiduciário e ao Agente de Pagamentos o comprovante de tal pagamento e do envio do mesmo à autoridade tributária relevante ou outra autoridade, conforme descrito nesta 4.10; e

(iv)        pagar ao Agente Fiduciário quaisquer Montantes Adicionais devidos aos Titulares em qualquer Data de Pagamento de Juros, Data de Resgate ou Data de Vencimento Indicado, de acordo com o disposto nesta 4.10.

(f)        Qualquer Certificado de Diretor necessário por essa 4.10 a ser fornecido pelo Agente Fiduciário e cada Agente de Pagamentos será considerado ser devidamente fornecido se for enviado por pdf ou fac-símile ao Agente Fiduciário e a cada Agente de Pagamentos.

(g)        Todas as referências nessa Escritura ao principal e dos juros aqui incluirão quaisquer Montantes Adicionais a pagar pelo Emissor ou por um Garantidor em relação a esse principal e esses juros.

Seção 4.11.    *Informação Disponível*. Enquanto as Notas forem "valores mobiliários restritos" na acepção da Regra 144(a)(3) da Lei de Valores Mobiliários, o Emissor, na medida do necessário, fornecerá a qualquer Titular com participação na Nota Global restrita, ou a qualquer potencial comprador designado por tal Titular, mediante solicitação desse Titular, informações financeiras e outras descritas no parágrafo (d)(4) da Regra 144A em relação ao Emissor, na medida do necessário, para permitir que tal Titular cumpra a Regra 144A em relação a qualquer revenda de sua Nota, a menos que, durante esse período, o Emissor ou cada um dos Garantidores esteja sujeito aos requisitos de comunicação da Seção 13 ou 15(d) da Lei da Bolsa de Valores, ou esteja isento de comunicar de acordo com a Regra 12g3-2(b) de acordo com a Lei da Bolsa de Valores e nenhuma outra informação sobre o Emissor é de outra forma exigida nos termos da Regra 144A.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                                        INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01                    Livro nº LIV                                    fls. 68

Seção 4.12.    *Limitações de Pagamentos Restritos*

(a)    A Sociedade não deverá e não permitirá que qualquer Subsidiária, direta ou indiretamente:

(i)    declare ou pague qualquer dividendo ou efetue qualquer pagamento ou distribuição por conta das Participações Societárias da Sociedade ou dessa Subsidiária (incluindo, sem limitação, qualquer pagamento em relação a qualquer incorporação ou fusão envolvendo a Sociedade ou essa Subsidiária) ou aos titulares, diretos ou indiretos, das Participações Societárias da Sociedade ou dessa Subsidiária na sua qualidade como tal, exceto, em cada caso, (i) dividendos ou distribuições a pagar em Participações Societárias (exceto Ação Desqualificada) da Sociedade ou dessa Subsidiária, (ii) dividendos ou distribuições a pagar à Sociedade ou a qualquer Subsidiária ou (iii) dividendos ou distribuições a pagar aos titulares das Participações Societárias de qualquer Subsidiária, contanto que declaradas ou pagas *pro rata* com distribuições ou dividendos a pagar à Sociedade ou suas outras Subsidiárias em relação a suas Participações Societárias nessa Subsidiária;

(ii)    compre, resgate ou, de outra forma, adquira ou retire o valor (incluindo, sem limitação, em relação a qualquer incorporação ou fusão envolvendo a Sociedade ou essa Subsidiária) de quaisquer Participações Societárias da Sociedade ou dessa Subsidiária ou qualquer uma de suas respectivas controladoras, diretas ou indiretas, exceto na medida em que constituir um Investimento Permitido;

(iii)    efetue qualquer pagamento ou em relação à compra, ao resgate, nulidade ou, de outra forma, adquira ou retire o valor, qualquer Endividamento da Sociedade ou dessa Subsidiária que estiver subordinada contratualmente às Notas ou à Garantia, exceto (i) somente com os rendimentos do Endividamento Subordinado e (ii) o retirada do valor do Endividamento Subordinado incorrido pela Sociedade ou por qualquer Subsidiária para compensar ou reduzir o montante do Endividamento Subordinado a ser incorrido pela Sociedade ou por qualquer Subsidiária; ou

(iv)    efetue qualquer Investimento, exceto um Investimento Permitido (todos os pagamentos e outras medidas estabelecidas nessas cláusulas (i) a (iv) acima sendo denominados, em conjunto, "**Pagamentos Restritos**").

(b)    As disposições da cláusula (a) acima não proibirão a declaração ou o pagamento de: (1) dividendos ou outras distribuições diretamente ao Emissor dos Valores Mobiliários ou a qualquer comprador ou subscritor de ações da Sociedade após a Data de Emissão em uma operação permitida, segundo este instrumento, nos termos da Escritura de Valores Mobiliários e

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Esse documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 69

o Plano de Recuperação, *pro rata* com qualquer dividendo ou distribuição ao Emissor dos Valores Mobiliários, em cada caso, (x) em um montante que não exceda os Montantes de Excesso de Caixa Disponíveis (se houver, e exceto quando exigido de outra forma para ser usado para pagamento nos termos das Novas Notas) em relação a qualquer Data de Medição de Excesso de Caixa ou (y) na medida necessária, em relação a qualquer pagamento de distribuição especificada ou como, de outra forma, nos termos da Escritura de Valores Mobiliários; (2) dividendos ou outras distribuições feitas para fins de pagamento de Multas, mas somente na medida em que tais Multas não possam ser pagas diretamente pela Sociedade; ou (3) os dividendos mínimos exigidos pela lei aplicável.

Seção 4.13.    *Limitação de Endividamento*. A Sociedade não irá e não permitirá que qualquer Subsidiária incorra, direta ou indiretamente, qualquer Endividamento a menos que o Índice de Dívida Líquida/EBITDA *pro forma* na data dessa incorrência seja inferior a 3,00 a 1,00.

Não obstante o parágrafo anterior, a Sociedade ou qualquer Subsidiária poderá emitir o seguinte Endividamento ("**Endividamento Permitido**"):

(a)    as Notas e a Garantia, inclusive quaisquer Notas PIK emitidas em relação a qualquer Pagamento PIK;

(b)    Endividamento em aberto na Data de Emissão, inclusive nos termos de todas as séries das Novas Notas emitidas pelo Emissor e quaisquer notas emitidas em relação aos juros de PIK de acordo com os termos das mesmas;

(c)    Endividamento, cujo rendimento é usado para refinanciar qualquer Endividamento permitido pelas cláusulas (i) ou (ii) acima, ou pelas cláusulas (g), (h) ou (l) abaixo ou permitido pela parte (i) acima; *ressalvado, no entanto,* que (A) o montante principal do Endividamento assim emitido não exceda o montante principal do Endividamento assim refinanciado, exceto para quaisquer aumentos que reflitam prêmios, taxas e despesas relacionadas com tal refinanciamento e (B) o Endividamento assim emitido (x) não vencer antes do vencimento indicado do Endividamento assim refinanciado, (y) tenha um Tempo Médio igual ou maior que o Tempo Médio restante do Endividamento assim refinanciado e (z) é *pari passu* ou subordinado em direito de pagamento ao Endividamento assim refinanciado;

(d)    O Endividamento detido e mantido por: (i) uma Subsidiária Integral ou uma Subsidiária Substancialmente Integral; *ressalvado, no entanto*, que qualquer emissão ou transferência subsequente de qualquer Capital Social que resulte em tal Subsidiária Integral ou tal Subsidiária Substancialmente Integral deixe de ser uma

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 70

Subsidiária Integral ou uma Subsidiária Substancialmente Integral ou qualquer transferência de tal Endividamento (que não para uma Subsidiária Integral ou uma Subsidiária Substancialmente Integral, conforme o caso) será considerada, em cada caso, como constituindo a emissão de tal Endividamento pela Sociedade; e (ii) qualquer Subsidiária na medida em que tal Endividamento seja Endividamento Subordinado;

(e)      Endividamento da Sociedade ou de uma Subsidiária devido ou detido pela Sociedade ou por uma Subsidiária;

(f)      Endividamento da Sociedade ou de qualquer Subsidiária de acordo com (a) *swap* de taxas de juros ou acordos semelhantes destinados a proteger a Sociedade ou tal Subsidiária contra flutuações nas taxas de juros ou índices de taxas de juros em relação ao Endividamento da Sociedade ou de tal Subsidiária na medida em que o montante do principal nocional de tal obrigação não exceda o montante do principal total do Endividamento ao qual tais contratos de taxa de juros se refiram e (b) *hedge* cambial ou de *commodity*, acordos de câmbio ou semelhantes destinados a proteger a Sociedade ou tal Subsidiária contra flutuações nas taxas de câmbio de moeda estrangeira ou preços de *commodities* em relação à exposição a moedas estrangeiras ou *commodities* incorridas pela Sociedade ou tal Subsidiária, *ressalvado que* em cada caso tais operações sejam realizadas no curso normal dos negócios para fins não especulativos;

(g)      Endividamento da Sociedade ou de qualquer Subsidiária incorrido para pagar a totalidade ou parte do preço de compra da aquisição ou aluguel de equipamentos, veículos e serviços usados no curso normal dos negócios da Sociedade ou de suas Subsidiárias; *ressalvado que* (A) tal Endividamento seja incorrido dentro de 360 dias corridos antes ou depois de qualquer aquisição ou aluguel e (B) em cada caso, tal Endividamento seja incorrido, e a compra ou aluguel em relação ao qual tal Endividamento seja incorrido seja celebrado, no curso normal dos negócios;

(h)      Endividamento da Sociedade ou de qualquer Subsidiária incorrido com a finalidade de financiar total ou parcialmente os custos de aquisição, construção ou desenvolvimento de um projeto, desde que esta cláusula possa ser usada para a parcela de tal Endividamento para a qual os credores em relação a tal Endividamento concordem em limitar seu recurso em relação a tal Endividamento a ativos (inclusive participações societárias e contratos) e/ou receitas de tal projeto, e qualquer parte de tal Endividamento para o qual os Credores exijam o direito de regresso à Sociedade deve ser permitida, de outra forma, de acordo com uma ou mais das outras cláusulas nos termos desta Seção 4.13;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                          CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                            INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01            Livro nº LIV                    fls. 71

(i)        Endividamento da Sociedade ou de qualquer Subsidiária em relação a aceitações bancárias, depósitos, notas promissórias, cartas de crédito, obrigações de autosseguro, garantias de conclusão, cumprimento, fiança, recurso ou títulos semelhantes e garantias fornecidas pela Sociedade ou qualquer Subsidiária no curso normal de seus negócios ou Endividamento em relação a obrigações do tipo reembolso relativas a pedidos de indenização de trabalhadores;

(j)        Endividamento da Sociedade ou de quaisquer Subsidiárias na medida em que os rendimentos líquidos sejam prontamente depositados para anular completamente ou para satisfazer completamente e quitar as Notas de acordo com esta Escritura;

(k)        Endividamento da Sociedade ou de quaisquer Subsidiárias que consistem em (i) financiamento de prêmios de seguro ou (ii) assumir ou pagar obrigações contidas em contratos de fornecimento no curso normal dos negócios;

(l)        Endividamento da Sociedade ou de qualquer Subsidiária incorrido na Data de Emissão, ou após a mesma, conforme quaisquer linhas de crédito ou outros acordos de financiamento firmados com o propósito de financiar as necessidades de capital de giro da Sociedade ou de tal Subsidiária ou de suas respectivas subsidiárias, unicamente na medida em que tal Endividamento seja incorrido com o propósito de financiar capital de giro para qualquer Projeto de Desenvolvimento ou Sociedades Licitantes;

(m)        Endividamento da Sociedade ou de quaisquer Subsidiárias devido a quaisquer Afiliadas da mesma (ou consórcios nos quais uma Afiliada participa) incorridos em conexão com a recuperação do Endividamento devido a Afiliadas da Sociedade na Data de Emissão, conforme o caso, de acordo com o Contrato entre Sociedades; e

(n)        além do Endividamento supramencionado nos termos das cláusulas (a) a (l), o Endividamento da Sociedade ou de qualquer outro Garantidor (mas não, para evitar dúvidas, incorrido (inclusive através de uma obrigação de garantia) por qualquer outra Subsidiária) que seja incorrido na ou após a Data de Emissão no montante principal total de até os US$ 100.000.000,00 a qualquer momento pendente, ficando entendido que, se garantido, o Endividamento incorrido de acordo com este item (n) somente será garantido por Ônus permitidos de acordo com, e tais Ônus deverão ser categorizados como, para todos os fins, incluindo a determinação do montante de Ônus pendentes a qualquer momento, de acordo com, item (o) da definição de "Ônus Permitidos".

Para fins de determinar o cumprimento desta Obrigação:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 72

(a)     caso um item de Endividamento atenda aos critérios de mais de um dos tipos de Endividamento descritos acima, incluindo o primeiro parágrafo acima, a Sociedade, a seu exclusivo critério, poderá classificar, e, de tempos em tempos, poderá reclassificar, tal item de Endividamento, de qualquer forma que esteja de acordo com esta Obrigação; e

(b)     O Endividamento permitido por esta Obrigação (incluindo o primeiro parágrafo acima), não precisa ser permitido somente por referência a uma disposição que permita tal Endividamento, mas pode ser permitido em parte por uma dessas disposições e em parte por uma ou mais outras disposições desta Obrigação que permitam tal Endividamento.

Para fins de determinar o cumprimento de qualquer restrição denominada em Dólar sobre a ocorrência de Endividamento, o montante do principal equivalente em Dólar do Endividamento denominado em moeda estrangeira deverá ser calculado com base na taxa de câmbio da moeda relevante determinada na data da ocorrência, no caso de Endividamento a prazo, ou primeiramente comprometido, no caso de Endividamento de crédito rotativo. Não obstante qualquer outra disposição desta Obrigação, nem a Sociedade nem qualquer Subsidiária será considerada em violação a esta Obrigação, com relação a qualquer Endividamento pendente incorrido, somente como resultado de flutuações nas taxas de câmbio de moedas.

O acúmulo de juros, o acréscimo ou amortização do desconto de emissão original, ou o pagamento de juros regularmente programados na forma de Endividamento adicional do mesmo instrumento não será considerado uma incursão de Endividamento para fins desta Obrigação.

Seção 4.14.     *Limitações de Ônus*. Os Garantidores não criarão, nem permitirão que qualquer Subsidiária crie, incorra, assuma ou permita a existência de qualquer Ônus sobre quaisquer bens ou ativos agora possuídos ou adquiridos posteriormente por cada Garantidor ou cada Subsidiária (inclusive qualquer Capital Social ou Endividamento de qualquer Garantidor ou qualquer Subsidiária), exceto para (i) os Ônus Permitidos ou (ii) na medida em que, contemporaneamente, sejam feitas disposições para assegurar as Notas de forma igual e proporcional com a obrigação que é assegurada por qualquer Ônus enquanto tal obrigação for assegurada.

Seção 4.15.     *Limitação de Operações com Afiliadas*. A Sociedade não deverá, e não permitirá que nenhuma Subsidiária faça qualquer pagamento ou venda, arrendamento, transferência ou alienação de qualquer um de seus bens ou ativos para, ou compre quaisquer bens ou ativos de, ou celebre, ou faça ou altere qualquer operação, contrato, acordo, entendimento, mútuo, adiantamento ou garantia envolvendo um montante total superior a US$ 1.000.000,00 (ou o equivalente em outras moedas) por operação ou acima de US$ 2.000.000,00 (ou o equivalente em outras moedas) dentro de qualquer período de 12 (doze) meses, com, ou em benefício de, qualquer Afiliada (cada uma, uma "**Operação com Afiliada**"), a menos que:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 73

(a)     a Operação com Afiliada esteja em termos que não sejam menos favoráveis à Sociedade ou à Subsidiária relevante do que aqueles que teriam sido obtidos em uma operação comparável pela Sociedade ou por tal Subsidiária com uma Pessoa não relacionada (conforme determinado de boa-fé por um diretor financeiro ou contábil responsável da Sociedade); e

(b)     a Sociedade entregar ao Agente Fiduciário uma deliberação do conselho de administração da Sociedade, conforme aplicável, estabelecida em um Certificado do Diretor autorizado da Sociedade certificando que tal Operação com Afiliada está em conformidade com esta seção e que tal Operação com Afiliada foi (A) recomendada pelo comitê de compliance e auditoria do conselho de administração da Sociedade (tendo tal comitê de compliance e auditoria, antes de 10 de setembro de 2058, conselheiros independentes como maioria de seus membros) e (B) aprovados pela maioria dos membros do conselho de administração da Sociedade (cuja maioria deverá, antes de 10 de setembro de 2058, incluir a maioria dos membros independentes do conselho de administração da Sociedade).

Os seguintes itens não serão considerados como Operações com Afiliada e, portanto, não estarão sujeitos às disposições do parágrafo anterior:

(i)     Operações com Afiliada celebradas de acordo com o Contrato entre Sociedades;

(ii)    Operações com Afiliada com ou entre o Emissor, a Sociedade ou qualquer Subsidiária;

(iii)   o pagamento de honorários regulares razoáveis e habituais aos conselheiros da Sociedade ou de qualquer Subsidiária;

(iv)    operações ou pagamentos (inclusive mútuos e adiantamentos) de acordo com quaisquer planos de remuneração ou benefícios de funcionários, diretores ou conselheiros, indenizações habituais ou acordos firmados no curso normal dos negócios com ou para o benefício de funcionários, diretores ou conselheiros da Sociedade ou de suas Subsidiárias;

(v)     Operações com Afiliada realizadas de acordo com (A) quaisquer obrigações ou direitos contratuais existentes na Data de Emissão, (B) qualquer obrigação contratual de qualquer Subsidiária ou de qualquer Pessoa que seja incorporada à Sociedade ou a qualquer Subsidiária na data em que tal Pessoa se tornar uma Subsidiária ou for incorporada à Sociedade ou a qualquer Subsidiária e (C) qualquer aditamento ou contrato de substituição das obrigações e direitos descritos nas cláusulas (A) e (B), desde que tal aditamento ou contrato de substituição não seja mais desvantajoso para os Titulares em qualquer aspecto relevante, tomado como um todo, do que o contrato original;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                          CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                             INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 74

(vi)    qualquer prestação de quaisquer serviços administrativos a qualquer Sociedade *Joint Venture* nos mesmos termos fornecidos à ou pela Sociedade ou por suas Subsidiárias; e

(vii)    quaisquer (A) Pagamentos Restritos especificados na Seção 4.12; e (B) Pagamentos Restritos realizados em conformidade com a Seção 4.12, na medida em que tais Pagamentos Restritos sejam realizados conforme exigido pelos (ou de acordo com uma eleição especificamente contemplada pelos) termos dos contratos que: não sejam considerados como "Operações com Afiliada", de acordo com as cláusulas (a) a (v) acima, ou de outra forma permitido de acordo com os termos do parágrafo anterior desta Seção 4.15(b)(vii).

Seção 4.16.    *Limitação sobre Leasing de Retorno.* A Sociedade não fará e não permitirá que nenhuma de suas Subsidiárias façam qualquer operação de *Leasing* de Retorno; *ressalvado, no entanto*, a Sociedade ou qualquer uma de suas Subsidiárias possa fazer uma operação de *Leasing* de Retorno se:

(a)    a Sociedade ou tal Subsidiária, conforme o caso, teria o direito, de acordo com as disposições da Obrigação descrita na Seção 4.14, de incorrer em um Ônus para assegurar o Endividamento em um montante principal igual ou superior ao Endividamento incorrido em relação a tal operação de *Leasing* de Retorno;

(b)    os rendimentos brutos em dinheiro ou o Valor de Mercado de quaisquer bens recebidos em relação a tal operação de *Leasing* de Retorno for, pelo menos, igual ao Valor de Mercado dos bens que são objetos de tal operação; e

(c)    tal operação de *Leasing* de Retorno for feita no curso normal dos negócios.

Seção 4.17.    *Limitação de Contratos que Restringem Pagamentos de Dividendos.* A Sociedade não deverá e não permitirá que qualquer Subsidiária, direta ou indiretamente, celebre ou permita a existência de qualquer contrato ou outro acordo que proíba, restrinja ou imponha qualquer condição à capacidade de qualquer Subsidiária de pagar dividendos ou outras distribuições com relação a quaisquer ações de seu Capital Social ou de fazer ou reembolsar mútuos ou adiantamentos à Sociedade ou qualquer outra Subsidiária de acordo com seus respectivos termos; *ressalvado que* o acima exposto não se aplique a:

(a)    restrições e condições contidas desta Escritura ou nos termos da Escritura que rejam qualquer outra série de Novas Notas emitidas pelo Emissor na Data de Emissão;

(b)    restrições e condições impostas pela lei aplicável;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01        Livro nº LIV        fls. 75

(c)      restrições e condições existentes na data desta Escritura e aplicar-se-á a qualquer prorrogação ou renovação de, ou qualquer aditamento ou modificação que amplie o escopo de, qualquer restrição ou condição desse tipo;

(d)      restrições e condições habituais contidas nos contratos relativos à venda de uma Subsidiária enquanto essa venda estiver pendente; *desde que* essas restrições e condições se apliquem somente à Subsidiária que será vendida e que a venda seja permitida nesta Escritura;

(e)      restrições e condições impostas a qualquer Subsidiária em documentação de mútuo assinada em relação a qualquer Ônus Permitido com a finalidade de financiar, total ou parcialmente, o custo de aquisição, construção ou desenvolvimento de um projeto que limite a capacidade de tal Subsidiária de efetuar um Pagamento Restrito à Sociedade ou a qualquer outra Subsidiária;

(f)      restrições existentes com relação a qualquer Pessoa, ou aos bens ou ativos de qualquer Pessoa, no momento em que a Pessoa for adquirida pela Sociedade ou por qualquer Subsidiária, cujas onerações ou restrições: (A) não são aplicáveis a qualquer outra Pessoa ou aos bens ou ativos de qualquer outra Pessoa; e (B) não foram colocados em prática em antecipação a tal evento (exceto em relação ao financiamento para a aquisição de tal Pessoa), e quaisquer prorrogações, renovações, substituições ou refinanciamentos de qualquer uma das anteriores;

(g)      restrições com relação a qualquer Subsidiária e impostas de acordo com uma disposição comum em uma *joint venture* ou outro contrato semelhante com relação a tal Subsidiária que tenha sido celebrado no curso normal dos negócios;

(h)      restrições impostas a qualquer Subsidiária contidas em contratos celebrados com Autoridades Públicas em relação ao pagamento, comprometimento ou liquidação de Multas; e

(i)      restrições impostas pela documentação padrão de mútuo em relação a quaisquer mútuos a qualquer Subsidiária em relação a qualquer Projeto de Desenvolvimento do (i) Banco Nacional de Desenvolvimento Econômico e Social - BNDES, ou qualquer outro banco de desenvolvimento ou agência de crédito do governo brasileiro ou (ii) qualquer banco de desenvolvimento internacional ou multilateral, agência patrocinada pelo governo, banco de exportação-importação ou seguradora de crédito oficial de exportação-importação.

Seção 14.18.   *Limitação na Venda de Ativos.* A Sociedade não deverá e não permitirá que qualquer Subsidiária faça qualquer Venda de Ativos, a menos que:

(a)      a Sociedade ou essa Subsidiária, conforme o caso, receba contraprestação (inclusive a título de redução de ou por qualquer outra Pessoa assumindo responsabilidade por

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 76

passivos, contingentes ou não), pelo menos, igual ao Valor de Mercado, conforme determinado no momento do acordo contratual em relação a essa Venda de Ativos, conforme determinado de boa-fé por maioria dos membros do conselho de administração da Sociedade, dos ativos sujeitos a essa Venda de Ativos;

(b)      em qualquer Venda de Ativos ou série de Venda de Ativos relacionados, pelo menos, 75% da contraprestação dessa Venda de Ativos na forma de caixa ou equivalentes de caixa; e

(c)      um montante igual a 100% dos Rendimentos de Caixa Líquido dessa Venda de Ativos ser aplicado (seja pela eleição ou, conforme exigido pelos termos de qualquer Endividamento) para: (A) pagar antecipadamente, reembolsar ou comprar qualquer Endividamento de uma Subsidiária (em cada caso, exceto o Endividamento devido ao Emissor ou à Sociedade); *ressalvado, no entanto*, que em relação a qualquer pagamento antecipado, reembolso ou compra de Endividamento, o Emissor ou a Sociedade deverá retirar esse Endividamento e providenciará para que o compromisso relacionado (se houver) a ser reduzido em um montante igual ao montante do principal seja pago antecipado, reembolsado ou comprado; (B) pagar quaisquer montantes devidos nos termos das Novas Notas; (C) aumentar o saldo do caixa e dos equivalentes de caixa da Sociedade até o Limite de Caixa Mínimo; ou (D) (x) comprar ou celebrar um contrato vinculante de compra (desde que essa compra seja consumada no prazo de 365 dias corridos, a partir desses ativos da Venda de Ativos (exceto os ativos atuais, conforme determinado pelo GAAP brasileiro ou o Capital Social) ou (y) fazer despesas de capital (inclusive despesas para remodelações, consertos ou melhorias dos bens ou ativos existentes), em cada caso, a serem usadas pela Sociedade ou por qualquer Subsidiária em Negócios Autorizados.

No 366º dia após uma Venda de Ativos, se o montante total dos Proventos Superiores ultrapassar US$ 25 milhões, o Emissor será, dentro de 10 Dias Úteis, obrigado a fazer uma oferta ("**Oferta da Venda de Ativos**") para todos os titulares das Novas Notas para comprar o montante principal máximo das Novas Notas que possam ser compradas além dos Proventos Superiores, em um preço de oferta em relação às Novas Notas em um montante igual a 100% do montante do principal das Novas Notas a serem compradas, mais os juros acumulados e não pagos, se houver, mas não incluindo, a data de compra, de acordo com os procedimentos estabelecidos nesta Escritura em denominações mínimas de US$ 10.000,00 e em múltiplos integrais de US$ 1,00 superior dos mesmos. O Emissor deverá entregar a notificação dessa Venda de Ativos oferecendo a recompra das Novas Notas pelo preço de compra específico, na data específica na notificação, cuja data será, impreterivelmente, em até cinco Dias Úteis após o vencimento do período de oferta aplicável, segundo os procedimentos necessários nesta Escritura e descritos nessa notificação. O Emissor poderá atender às obrigações anteriores em relação a quaisquer Rendimentos de Caixa Líquido de uma Venda de Ativos fazendo uma Oferta da Venda de Ativos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 77

em relação aos Rendimentos de Caixa Líquido antes do vencimento dos 365 dias corridos relevantes (ou desse período maior previsto acima) ou em relação a quaisquer Rendimentos Superiores não aplicados.

Na medida em que o montante do principal total das Novas Notas assim oferecido validamente e não retirado adequadamente, segundo uma Oferta da Venda de Ativos for inferior aos Rendimentos Superiores, o Emissor poderá usar quaisquer Rendimentos Superiores para qualquer efeito não proibido nesta Escritura (e, para evitar dúvidas, não limitando, de qualquer forma, qualquer obrigação para efetuar Pagamentos de Excesso de Caixa). Se o montante do principal total das Novas Notas entregue em qualquer Oferta da Venda de Ativos pelos Titulares ultrapassar o montante dos Rendimentos Superiores, o Emissor deverá alocar os Rendimentos Superiores entre as Novas Notas a serem compradas em uma base *pro rata*, com base no montante do principal total de Novas Notas oferecidas; *desde que* nenhuma Nova Nota seja selecionada e comprada em uma denominação não autorizada. Mediante a conclusão de qualquer Oferta da Venda de Ativos, o montante dos Rendimentos Superiores será zerado. Além disso, o Emissor poderá, a seu critério, fazer uma Oferta da Venda de Ativos usando os rendimentos de qualquer Venda de Ativos a qualquer momento após a conclusão dessa Venda de Ativos. Na medida em que qualquer parte dos Rendimentos de Caixa Líquido a pagar em relação às Novas Notas seja denominada em uma moeda que não o Dólar, o montante da mesma a pagar em relação às Novas Notas não deverá ultrapassar o montante líquido dos fundos em Dólares que é recebido, de verdade, pelo Emissor mediante a conversão dessa parte em Dólares.

Apenas para fins da cláusula (b) acima, o seguinte será considerado como "caixa ou equivalentes de caixa": (i) a presunção por parte do cessionário do Endividamento ou outros passivos contingentes ou não, da Sociedade ou de qualquer Subsidiária (exceto o endividamento subordinado) e a liberação da Sociedade ou dessa Subsidiária de todos os passivos nesse Endividamento ou outros passivos em relação a essa Venda de Ativos; (ii) valores mobiliários, notas ou outras obrigações recebidas pela Sociedade ou por qualquer Subsidiária do cessionário que são convertidas pela Sociedade ou essa Subsidiária em caixa ou equivalentes de caixa no prazo de 90 dias corridos após o encerramento dessa Venda de Ativos; e (iii) Endividamento de qualquer Subsidiária que não é mais uma Subsidiária como resultado dessa Venda de Ativos, na medida em que a Sociedade e essas Subsidiárias forem liberadas de qualquer garantia de pagamento desse Endividamento em relação a essa Venda de Ativos.

Seção 14.19.   *Limitação de Fusão, Incorporação ou Transferência de Ativos.*

        (a)    Nem a Sociedade tampouco qualquer Garantidor deverá fundir ou unir ou incorporar com ou liquidar (independentemente de o Emissor ser a Pessoa sobrevivente) ou transmitir vender, ceder, transferir ou arrendar ou, de outra forma, alienar todos ou substancialmente todos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01                 Livro nº LIV                                 fls. 78

os bens ou ativos (em uma base consolidada), em uma ou mais operações relacionadas, a qualquer Pessoa, a menos que:

(i)      a Pessoa resultante, sobrevivente ou cessionária (se não for a Sociedade) seja uma Pessoa constituída e existente nos termos das leis das Ilhas Cayman, do Brasil ou dos Estados Unidos da América, de qualquer Estado dos mesmos ou do Distrito de Colúmbia ou qualquer outro país que for um país-membro da União Europeia ou da Organização para a Cooperação e o Desenvolvimento Econômico ou qualquer outro país cuja dívida em moeda estrangeira de longo prazo tenha uma classificação de Grau de Investimento ou da S&P ou da Moody's a partir da data de entrada em vigor dessa operação e essa Pessoa deverá assumir expressamente, por um complemento a esta Escritura, todas as obrigações nos termos da Garantia e desta Escritura assinadas e formalizadas ao Agente Fiduciário;

(ii)      imediatamente após produzir efeitos a essa operação (e tratar qualquer Endividamento que se tornar uma obrigação da Pessoa resultante, sobrevivente ou cessionária como resultado dessa operação como tendo sido incorrida por essa Pessoa no momento dessa operação), nenhum Evento de Inadimplemento tiver ocorrido e persistir; e

(iii)      se for solicitado pelo Agente Fiduciário, a Sociedade deve ter entregue um Certificado do Diretor autorizado da Sociedade e um parecer do advogado, cada um declarando que essa fusão, incorporação ou transferência e esse complemento a esta Escritura, se houver, cumpram as Notas e esta Escritura, cujo Agente Fiduciário terá direito a se basear, de forma conclusiva, e irá aceitar como prova suficiente do atendimento das condições precedentes, nesse caso será conclusivo e vinculante para os Titulares.

(b)      Mediante a fusão ou incorporação, ou qualquer venda, cessão, transmissão, transferência, arrendamento ou alienação de todos ou substancialmente todos os bens e ativos dos Garantidores de acordo com a cláusula (i) acima nos quais um Garantidor não seja o devedor contínuo nos termos da Garantia e desta Escritura, a Pessoa sobrevivente ou cedente irá suceder e será substituída e poderá exercer todo direito e poder desse Garantidor nos termos da Garantia e desta Escritura com o mesmo efeito se esse sucessor fosse nomeado como Garantidor aqui e ali. Quando um sucessor assume todas as obrigações de seu antecessor, nos termos da Garantia e desta Escritura, o antecessor será liberado daquelas obrigações; *ressalvado* que no caso de uma transferência por arrendamento, o antecessor não será liberado do pagamento do principal e juros sobre a Garantia.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                               fls. 79

Se, mediante qualquer fusão de qualquer Garantidor com ou incorporação desse Garantidor em qualquer outra sociedade, ou mediante qualquer transferência, arrendamento ou transferência dos bens desse Garantidor substancialmente como um todo para qualquer outra Pessoa, quaisquer bens ou ativos desse Garantidor se tornar sujeito a qualquer Ônus, então a menos que esse Ônus pudesse ser constituído segundo a Seção 4.14 sem garantir igualmente e de forma proporcional as Notas, esse Garantidor, antes ou simultaneamente com essa fusão, incorporação, transferência, arrendamento ou transferência, irá quanto a esses bens ou ativos, garantir as Notas em aberto (juntamente com, se esse Garantidor assim determinar, qualquer outro Endividamento desse Garantidor, existente agora ou constituído depois que não for subordinado no direito de pagamento das Notas) igual e proporcionalmente com (ou antes do) Endividamento que mediante essa fusão, incorporação, transmissão, arrendamento ou transferência se tornar garantida quanto a esses bens ou ativos por esse Ônus.

Seção 4.20.      *Recompra das Notas mediante uma Mudança de Controle.* Em até trinta dias corridos após uma Mudança de Controle, o Emissor ou a Sociedade ou qualquer Garantidor irá fazer uma Oferta para Comprar todas as Notas em aberto por um preço de compra igual a 101% do montante do principal das Notas recompradas mais os juros acumulados e não pagos sobre essas Notas, mas excluindo a data de compra; *ressalvado que*, nenhuma Oferta de Compra seja necessária na medida em que a Pessoa ou o grupo que adquirir o controle nessa operação de Mudança de Controle seja um Investidor Qualificado.

Uma "Oferta de Compra" deve ser feita pela oferta escrita (com uma cópia para o Agente Fiduciário), que irá especificar o montante do principal das Notas sujeitas à oferta e ao preço de compra. A oferta deve especificar uma data de validade (a "**Data de Validade**") não inferior a trinta dias corridos ou mais de sessenta dias corridos após a data da oferta e uma data de liquidação para compra (a "**Data de Compra**") não superior a cinco Dias Úteis após a data de validade. A oferta deve incluir informações sobre os negócios da Sociedade e de suas Subsidiárias que razoavelmente seria esperado permitir que os Titulares tomassem uma decisão informada em relação à Oferta de Compra. A oferta também irá conter instruções e materiais necessários para permitir que os Titulares ofereçam as Notas, segundo a oferta. O Emissor ou a Sociedade lançando a Oferta de Compra irá cumprir a Regra 14e1 nos termos da Lei da Bolsa de Valores (na medida em que for aplicável) e todas as demais leis aplicáveis ao fazer qualquer Oferta de Compra e os procedimentos acima será considerada como modificada, conforme for necessário para permitir esse cumprimento.

Um Titular poderá oferecer toda ou qualquer parte de suas Notas, segundo uma Oferta de Compra, sujeito ao requisito que qualquer parte de uma Nota oferecida deve ser em um múltiplo de US$ 1,00 do montante do principal e que a participação mínima de qualquer Titular não deve ser inferior a US$ 10.000,00. Os Titulares terão direito às Notas retiradas oferecidas até o encerramento dos negócios na Data de Validade. Na Data de Compra, o preço de compra se tornará vencido e a pagar em cada Nota aceita para compra, segundo a Oferta de Compra e os juros sobre as Notas compradas deixarão de ser acumulados na e após a Data de Compra.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 80

Não obstante o exposto, nem o Emissor tampouco a Sociedade serão obrigados a fazer uma Oferta de Compra mediante uma Mudança de Controle se (1) um terceiro fizer uma Oferta de Compra na forma, nos momentos e, de outra forma, em conformidade com os requisitos estabelecidos nesta Escritura aplicável a uma Oferta de Compra feita pelo Emissor ou pela Sociedade e comprar todas as Notas oferecidas adequadamente e não retiradas nos termos da Oferta de Compra ou (2) a notificação de resgate para todas as Notas em aberto foi entregue segundo esta Escritura, conforme descrito acima na Seção 3.05, a menos que e até que haja um inadimplemento no pagamento do preço de resgate aplicável.

Caso os Titulares de não menos de 90% do montante do principal total das Notas em aberto aceitem uma Oferta de Compra e o Emissor, a Sociedade (ou uma de suas Afiliadas) ou um terceiro adquirir todas as Notas detidas por tais Titulares, o Emissor e a Sociedade terão o direito, em não menos de trinta ou mais de sessenta dias corridos de aviso prévio (com cópia para o Agente Fiduciário), dado não mais de 30 trinta dias corridos após a compra, de acordo com a oferta de Mudança de Controle descrita acima, para resgatar todas as Notas que permanecerem em aberto após tal compra pelo preço de compra igual ao da Oferta de Compra mais, na medida em que não estejam incluídas no pagamento da Oferta de Compra, juros acumulados e não pagos e montantes adicionais, se houver, sobre as Notas que permanecerem em aberto, até a data do resgate.

Não obstante qualquer disposição em contrário contida aqui, uma Oferta de Compra poderá ser feita antecipadamente de uma Mudança de Controle condicionada mediante a conclusão dessa Mudança de Controle, se um acordo definitivo estiver em vigor para a Mudança de Controle quando a Oferta de Compra for feita.

A Sociedade concorda em obter todos os consentimentos e aprovações necessárias do Banco Central do Brasil para qualquer remessa de fundos fora do Brasil antes de fazer qualquer Oferta de Compra, se for necessário.

Seção 4.21.    *Requisitos de Relatório.*

(a)    A Sociedade irá fornecer ao Agente Fiduciário (para distribuição aos Titulares) os seguintes relatórios:

(i)    (A) uma versão em inglês das demonstrações financeiras consolidadas anuais auditadas da Sociedade, elaboradas de acordo com o GAAP brasileiro ou as Normas Internacionais de Relatório Financeiro ("IFRS"), prontamente após tais demonstrações estarem disponíveis, mas não depois de 120 dias corridos após o encerramento de seu ano fiscal, acompanhadas do parecer de uma firma de auditoria independente de reconhecido prestígio internacional, cujo parecer deverá declarar que tais demonstrações financeiras apresentam

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 81

justamente a condição financeira e os resultados das operações da Sociedade e não deverão, em nenhuma hipótese, incluir qualificação com relação a desvios dos GAAP ou inadequação de divulgação e (B) e, juntamente com tais demonstrações financeiras, um relatório administrativo discutindo (quantitativa e qualitativamente), em escopo e forma coerentes com as práticas de divulgação de emissores privados estrangeiros e na medida em que não estejam já incluídas nas demonstrações financeiras: (1) Ônus Permitidos previstos nas cláusulas (b), (c), (f), (h), (k), (m) ou (o) da definição de "Ônus Permitidos"; (2) Operações com Afiliadas; (3) Investimentos que são ou seriam classificados como investimentos em um balanço patrimonial elaborado de acordo com o GAAP brasileiro; (4) acordos que restringem o pagamento de dividendos por ou a qualquer Garantidor; e (5) Endividamento; em cada caso, na medida do razoavelmente esperado que seja relevante para um investidor comum em relação a uma decisão de investimento na Sociedade, no momento relevante da decisão, desde que nada neste documento exija que a Sociedade divulgue qualquer informação comercialmente sensível, informação sujeita a restrições confidenciais com terceiros nem qualquer informação que possa ser razoavelmente esperada que prejudique a Sociedade, se for divulgada publicamente; e

(ii)    uma versão em inglês das demonstrações financeiras trimestrais consolidadas não auditadas da Sociedade (incluindo as notas) elaboradas de acordo com o GAAP brasileiro ou IFRS, prontamente após tais demonstrações estarem disponíveis, mas não depois de (i) setenta e cinco dias corridos após o final de cada um dos três primeiros trimestres fiscais de cada ano fiscal, começando com o primeiro trimestre fiscal terminando em uma data ocorrida após a Data de Emissão e antes (mas não incluindo) o primeiro trimestre fiscal terminando após o segundo aniversário da Data de Emissão, e (ii) começando com o primeiro trimestre fiscal terminando após o segundo aniversário da Data de Emissão, sessenta dias corridos após o final de cada um dos três primeiros trimestres fiscais de cada ano fiscal.

Simultaneamente à entrega de cada conjunto de demonstrações financeiras referidas nas cláusulas (i) e (ii) acima, a Sociedade entregará ao Agente Fiduciário um Certificado do Diretor declarando (a) se existe um Evento de Inadimplemento ou Inadimplemento na data de tal certificado e se existe um Evento de Inadimplemento ou Inadimplemento, (b) se nenhum Evento de Encerramento de Excesso de *Cash Sweep* tiver ocorrido, o montante das Multas estimadas a serem pagas pela Sociedade e suas Subsidiárias durante o período de 12 meses a partir da próxima Data de Medição de Excesso de Caixa.

(b)    A Sociedade irá entregar ao Agente Fiduciário, em cada caso, assim que possível e em qualquer hipótese:

(i) dentro de dez dias corridos após qualquer conselheiro ou diretor do Emissor ou da Sociedade tomar conhecimento da existência de um Evento de Inadimplemento ou Inadimplemento, um Certificado

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 82

do Diretor estabelecendo os detalhes do mesmo e que ação o Emissor se propõe a tomar com relação a ele;

(ii) durante qualquer Período de Ausência do Conselheiro Independente, dentro de cinco dias corridos após o conselho de administração da Sociedade aprovar, promulgar ou autorizar qualquer deliberação sobre uma matéria coberta pelas subcláusulas (a) a (f) da Cláusula 4.1.1.4 do Plano de Recuperação, uma notificação escrita assinada por um conselheiro ou diretor executivo da Sociedade (uma "**Notificação de Deliberação Relevante**"), cuja Notificação de Deliberação Relevante deverá declarar se tal deliberação está em conformidade com a Obrigação descrita na Seção 4.26 e deverá anexar uma transcrição do que foi aprovado, promulgado ou autorizado pelo conselho de administração com relação a tal questão e certificar que tal transcrição anexa reflete com exatidão tal matéria, sujeita à ressalva abaixo; desde que tal transcrição anexa redija, e nada aqui deverá exigir que a Sociedade divulgue, de outra forma, qualquer informação comercialmente sensível, informações sujeitas a restrições confidenciais com terceiros ou qualquer informação que resultar em violação da lei aplicável se for assim divulgada; e

(iii) dentro de dez dias corridos após o final de cada trimestre fiscal, começando com o primeiro trimestre fiscal encerrando em uma data ocorrida após a Data de Emissão, um certificado de diretor (o "Certificado do Diretor Independente") (A) estabelecendo (1) a composição do conselho de administração da Sociedade a partir da data do Certificado de Conselheiro Independente, incluindo os nomes de cada membro do conselho de administração e uma designação dos membros independentes, (2) quaisquer mudanças na composição do conselho de administração da Sociedade desde a data do último Certificado de Conselheiro Independente e a data de tais mudanças, (3) se aplicável, a data na qual o aniversário de 5 (cinco) meses da Data de Ausência do Conselheiro Independente ocorrerá se não for remediado, e (B) declarando que, desde a data do último Certificado de Conselheiro Independente, a Sociedade forneceu ao Agente Fiduciário cada Notificação de Deliberação Relevante exigida de acordo com a cláusula (ii) acima.

A entrega de tais relatórios, informações e documentos ao Agente Fiduciário é apenas para fins informativos e o recebimento de tais relatórios pelo Agente Fiduciário não constituirá uma notificação construtivo de qualquer informação neles contida ou determinável a partir das informações neles contidas, inclusive o cumprimento por parte do Emissor ou da Sociedade de qualquer uma de suas Obrigações aqui estabelecidas (sobre as quais o Agente Fiduciário tem o direito de se basear exclusivamente nos certificados dos diretores).

Se a Sociedade tornar os relatórios descritos no primeiro parágrafo desta Seção 4.21 disponíveis em seu site público livremente acessível a todos os Titulares, será considerado que satisfez a exigência de relatório estabelecida em tal parágrafo a respeito dos Titulares.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 83

Seção 4.22.    *Garantias Adicionais.* O Emissor irá assinar e formalizar esses instrumentos adicionais e tomar outra medida razoável, conforme possa ser razoavelmente necessária para realizar os objetivos das Notas e desta Escritura. Além disso, o Emissor envidará seus melhores esforços para obter quaisquer autorizações necessárias, de tempos em tempos, nos termos da lei ou do regulamento aplicável (inclusive do Banco Central do Brasil e da CVM em relação às Notas ou a esta Escritura).

Seção 4.23.    *Suspensão de Obrigação.* Durante qualquer período de tempo em que (i) as Notas tenham classificação de Grau de investimento de, pelo menos, 2 (duas) Agências de Classificação e (ii) nenhum Inadimplemento tenha ocorrido e persistir nos termos desta Escritura (a ocorrência dos eventos descritos nas cláusulas anteriores (i) e (ii) sendo coletivamente denominada "**Evento de Suspensão da Obrigação**" e a data da mesma sendo denominada "**Data de Suspensão**"), as Obrigações especificamente listadas na Seção 4.12, Seção 4.13, Seção 4.15, Seção 4.16 e Seção 4.17, não serão aplicáveis às Notas (coletivamente, as "**Obrigações Suspensas**"), ressalvado, no entanto, que em hipótese alguma, com a Obrigação mencionada na Seção 4.15 deixa de ser aplicável antes de 1º de janeiro de 2030.

Caso a Sociedade e suas Subsidiárias não estejam sujeitas às Obrigações Suspensas por qualquer período como resultado do exposto e em qualquer data posterior (a "**Data de Reversão**") as Notas deixam de ter uma classificação do Grau de Investimento de 2 (duas) quaisquer Agências de Classificação, então a Sociedade e suas Subsidiárias irão, a partir de então, novamente estar sujeitas às Obrigações Suspensas. O período entre a Data de Suspensão e a Data de Reversão denominado aqui é o "**Período de Suspensão**".

Não obstante o exposto, nenhuma medida tomada ou omitida a ser tomada pela Sociedade ou por qualquer uma de suas Subsidiárias ou eventos ocorrerem durante um Período de Suspensão coberto pelas Obrigações Suspensas irão originar um Inadimplemento ou um Evento de Inadimplemento nos termos desta Escritura em relação às Notas; *ressalvado* que,

(1)    em relação aos Pagamentos Restritos efetuados após a Data de Reversão aplicável, o montante disponível a ser feito como Pagamentos Restritos será calculado como se a Obrigação descrita na Seção 4.12 estivesse em vigor antes, mas não durante o Período de Suspensão;

(2)    na Data de Reversão, qualquer Endividamento incorrido durante o Período de Suspensão será classificado como tendo sido incorrido conforme o primeiro parágrafo da Seção 4.13 ou uma das cláusulas estabelecidas nos itens (a) a (n) nos termos da Seção 4.13 (na medida em que tal Endividamento poderia ser incorrido a partir da Data de Reversão e após produzir efeitos ao Endividamento incorrido antes do Período de Suspensão e em aberto na Data de Reversão), e na medida em que tal Endividamento não seria permitido nos termos da Seção 4.13, tal Endividamento será considerado como em

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01         Livro nº LIV                    fls. 84

aberto na Data de Emissão, de modo que seja classificado como permitido na cláusula (2) da Seção 4.13; e

(3)   qualquer Operação com Afiliada celebrada após a Data de Reversão, segundo um contrato celebrado durante qualquer Período de Suspensão será considerada como permitida, conforme a cláusula (iv) do parágrafo segundo da Obrigação descrita na Seção 4.15.

Na e após cada Data de Reversão, a Sociedade e suas Subsidiárias estarão autorizadas a concluir as operações previstas em qualquer contrato ou compromisso celebrado durante o Período de Suspensão relevante, contanto que esse contrato ou compromisso e essa conclusão teriam sido autorizados durante esse Período de Suspensão.

O Emissor ou a Sociedade deverá entregar ao Agente Fiduciário uma notificação por escrita pronta de qualquer ocorrência de uma Suspensão de Obrigação e em qualquer hipótese, impreterivelmente até cinco Dias Úteis após a ocorrência dessa Suspensão de Obrigação. Na ausência dessa notificação, o Agente Fiduciário assumirá as Obrigações Suspensas que se aplicam e estão em pleno vigor e efeito. O Emissor ou a Sociedade deverá entregar ao Agente Fiduciário uma notificação por escrita pronta de qualquer ocorrência de uma Data de Reversão, impreterivelmente até cinco Dias Úteis após essa Data de Reversão. Após qualquer notificação da ocorrência de uma Data de Reversão, o Agente Fiduciário assumirá que as Obrigações Suspensas que se aplicam e estão em pleno vigor e efeito.

Não pode haver nenhuma garantia de que as Notas atingirão ou manterão as classificações de Grau de Investimento. O Agente Fiduciário não terá nenhuma função de monitorar as classificações das Notas, determinar se um Evento de Suspensão de Obrigação ou a Data de Reversão ocorreu ou notificar os Titulares das mesmas.

Seção 4.24.     *Limitações e Restrições ao Emissor.*

(a)   O Emissor não se envolverá em qualquer negócio ou participará, ou será parte de qualquer operação ou contrato, ou fará qualquer transferência, exceto em conexão com (A) a emissão, venda, resgate ou recompra das Notas e das outras Novas Notas e atividades incidentalmente relacionadas a elas; (B) a celebração de Obrigações de Hedge, exclusivamente em bases não especulativas com a finalidade de se proteger e/ou os Garantidores contra flutuações de taxas de juros e moedas em relação às Novas Notas; (C) as atividades descritas em seus atos constitutivos; (D) a capacidade do Emissor de fazer remessas ao Brasil; (E) a celebração de qualquer mútuo, operação corporativa ou financeira (ou série de operações relacionadas) celebrada com a finalidade de realizar funções financeiras ou outras funções de gestão de caixa pelo Emissor com a Sociedade e suas Subsidiárias; e (F) conforme exigido pela Lei aplicável;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 85

     (b)    O Emissor não deverá criar, incorrer, assumir ou sofrer a existência de qualquer Endividamento que não seja qualquer Endividamento (A) incorrido exclusivamente com a finalidade de cumprir suas obrigações nos termos das Notas e das outras Novas Notas, ou (B) para a emissão de notas adicionais autorizadas nos termos desta Escritura e das escrituras em relação às outras Novas Notas;

     (c)    O Emissor não deverá criar, supor, incorrer ou sofrer a existência de qualquer Ônus sobre ou com relação a qualquer uma de seus bens ou ativos, exceto para Ônus Permitidos do tipo descrito nas cláusulas (a), (g), (i), (j) e (k) da definição dos mesmos);

     (d)    O Emissor não entrará em nenhuma fusão, incorporação, união, *joint venture* ou outra forma de combinação com qualquer Pessoa, e não venderá, arrendará, transmitirá ou, de outra forma, alienará nenhum de seus ativos ou recebíveis, a menos que:

     (i)    a Pessoa resultante, sobrevivente ou cessionária (se não for o Emissor) seja uma Pessoa constituída e existente nos termos das leis das Ilhas Cayman ou dos Estados Unidos, de qualquer Estado dos mesmos ou do Distrito de Colúmbia ou qualquer outro país que for um país da União Europeia e essa Pessoa deverá assumir expressamente, por um complemento a esta Escritura, todas as obrigações nos termos das Notas e desta Escritura assinadas e formalizadas ao Agente Fiduciário;

     (ii)    imediatamente após produzir efeitos a essa operação (e tratar qualquer Endividamento que se tornar uma obrigação da Pessoa resultante, sobrevivente ou cessionária como resultado dessa operação como tendo sido incorrida por essa Pessoa no momento dessa operação), nenhum Inadimplemento tiver ocorrido e persistir; e

     (iii)    o Emissor tenha entregado ao Agente Fiduciário um Certificado dos Diretores e um parecer do advogado independente de prestígio reconhecido, cada um declarando que essa fusão, incorporação ou transferência e esse complemento desta Escritura, se houver, cumprem as Notas e esta Escritura.

O Agente Fiduciário aceitará tais certificado e parecer como prova suficiente do cumprimento das condições precedentes estabelecidas na cláusula (iii) acima, caso em que serão conclusivos e vinculantes para os Titulares; e

     (e)    O Emissor não irá aditar, complementar, renunciar ou modificar ou consentir a qualquer aditamento, complemento, renúncia ou modificação de atos constitutivos sem o consentimento por escrito dos Titulares de uma maioria no montante do principal total das Notas se esse aditamento, complemento, renúncia ou modificação afetasse adversamente os direitos dos Titulares.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                              CCM nº    2.968.720-9
C.P.F. nº 077.542.738-10                                                INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 86

Seção 4.25.    *Limitações e Restrições das Subsidiárias Qualificadas.*

(a)    Nenhuma Subsidiária que constituir uma Sociedade *Joint Venture*, Sociedade do Projeto, Sociedade Operacional Local ou Sociedade Licitante irá se envolver em quaisquer negócios ou celebrar ou se tornar parte de qualquer operação ou contrato, exceto em relação a (A) um Negócio Autorizado e (B) conforme exigido pela lei aplicável;

(b)    Nenhum Veículo de *Holding* irá se envolver em qualquer atividade e será constituída somente com a finalidade de possuir, direta ou indiretamente, Participações Societárias em uma ou mais Sociedades *Joint Venture*, Sociedades do Projeto, Sociedades Operacionais Locais ou Sociedades Licitantes.

Seção 4.26.    *Cumprimento do Plano de Recuperação.*

Para qualquer período de tempo a partir da Data de Ausência de um Conselheiro Independente até a data em que o conselho de administração da Sociedade incluir novamente, pelo menos, o número de membros independentes do conselho de administração exigido pelo Plano de Recuperação, e de acordo com este, o conselho de administração da Sociedade não aprovará, promulgará ou autorizará qualquer deliberação que não cumpra a Cláusula 4.1.1.4 do Plano de Recuperação.

Seção 4.27.    *Garantidores Adicionais.*

Se e quando qualquer Subsidiária Qualificada se tornar uma Subsidiária Significativa, o Emissor no prazo de quarenta e cinco dias corridos após a Subsidiária Qualificada se tornar uma Subsidiária Significativa, fará com que tal Subsidiária se torne um Garantidor nos termos deste instrumento, através da celebração e formalização de uma Escritura complementar para o Agente Fiduciário, na forma do Anexo B deste documento, e tomando todas as medidas previstas no mesmo. Em relação a cada Subsidiária Qualificada, o Emissor também entregará imediatamente ou fará com que seja entregue ao Agente Fiduciário uma notificação por escrito indicando a data na qual ela se tornou uma Subsidiária Significativa.

### ARTIGO 5
#### Substituição do Emissor

Não obstante qualquer outra disposição contida nesta Escritura, o Emissor pode, sem o consentimento dos Titulares, ser substituído por qualquer Subsidiária Integral da Sociedade como devedor principal (nessa qualidade, o **"Devedor Substituto"**) em relação às Notas, *ressalvado que*:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 87

(i)      tal Devedor Substituto seja uma Pessoa constituída e existente nos termos das leis das Ilhas Cayman ou dos Estados Unidos, de qualquer Estado dos mesmos ou do Distrito de Colúmbia ou de qualquer outro país que seja membro da União Europeia;

(ii)      tais documentos deverão ser assinados pelo Devedor Substituto, pela Sociedade e pelo Agente Fiduciário, conforme necessário para dar pleno vigor à substituição, inclusive uma Escritura complementar na forma do **Anexo B** deste documento, pela qual o Devedor Substituto assume todas as obrigações do Emissor nos termos desta Escritura e das Notas (juntos, os "**Documentos de Substituição do Emissor**");

(iii)      se o Devedor Substituto estiver constituído em uma jurisdição diferente das Ilhas Cayman, os Documentos de Substituição do Emissor conterão Obrigações (1) para assegurar que cada Titular das Notas tenha o benefício de uma Obrigação em termos correspondentes às obrigações do Emissor em relação ao pagamento de Montantes Adicionais e (2) para indenizar cada Titular e beneficiário efetivo das Notas contra todos os impostos ou direitos na medida em que tais impostos ou direitos (a) surjam devido a uma lei ou regulamento em vigor ou previstos na data de entrada em vigor da substituição (b) sejam impostos a tal Titular ou beneficiário efetivo das Notas por qualquer subdivisão política ou autoridade tributária de tal jurisdição que não é as Ilhas Cayman e (c) não teriam sido impostos se a substituição não tivesse sido feita, sujeitos a exceções semelhantes estabelecidas na Seção 4.10(a)(ii) até a Seção 4.10(a)(vi), *mutatis mutandis*; *ressalvado*, que qualquer titular que faça uma reivindicação com relação a tal indenização fiscal que deverá notificar o Emissor sobre tal reivindicação, juntamente com documentação comprobatória, dentro de quatro semanas após o anúncio da substituição do Devedor Substituto como emissor;

(iv)      o Emissor deverá ter entregue, ou obtido a entrega ao Agente Fiduciário de, um parecer do advogado no sentido de que os Documentos de Substituição do Emissor constituem obrigações válidas e vinculantes do Devedor Substituto; o Devedor Substituto deverá ter nomeado um agente de citação no Município de Manhattan, na Cidade de Nova Iorque, para receber citações em seu nome em relação a qualquer ação judicial ou processo decorrente de ou em relação aos Documentos de Substituição do Emissor;

(v)      nenhum Inadimplemento ou Evento de Inadimplemento tenha ocorrido e persistir;

(vi)      a substituição irá cumprir todos os requisitos aplicáveis nos termos das leis do país de constituição do Devedor Substituto, Nova Iorque e Brasil; e

(vii)      o Emissor entregará ao Agente Fiduciário um Certificado do Diretor certificando o cumprimento das condições previstas neste Artigo 5.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 88

Mediante a assinatura dos Documentos de Substituição do Emissor, conforme referido no parágrafo (i) acima, o Devedor Substituto será considerado como nomeado nas Notas como o Devedor principal no lugar do Emissor (ou de qualquer substituto anterior nos termos destas disposições) e as Notas serão então consideradas como alteradas para produzir efeitos à substituição. Exceto conforme estabelecido acima, a assinatura dos Documentos de Substituição do Emissor deverá operar para liberar o Emissor (ou o substituto anterior, conforme supramencionado) de todas as suas obrigações em relação às Notas e sua obrigação de indenizar o Agente Fiduciário nos termos desta Escritura. Ao assinar os Documentos de Substituição do Emissor conforme referido no parágrafo (i) acima, o Emissor e o Devedor Substituto não estarão sujeitos às disposições da Obrigação descrita acima, conforme a Seção 4.24.

### ARTIGO 6
#### EVENTOS DE INADIMPLEMENTO E RECURSOS

Seção 6.01.    *Eventos de Inadimplemento.* O termo "**Evento de Inadimplemento**" significa, quando usado neste documento, qualquer um dos seguintes eventos:[12]

(a)       o Emissor ou os Garantidores não pagarem qualquer montante do (i) principal em relação às Notas quando o mesmo se tornar devido e pagável no resgate, na declaração ou no Vencimento; (ii) juros (quando e se forem devidos de acordo com os termos desta Escritura) em relação às Notas e tal falha no pagamento de juros continuar por um período de 30 dias corridos; ou (iii) qualquer Pagamento de Excesso de Caixa (quando e se for devido de acordo com os termos desta Escritura) com relação às Notas e tal falta de Pagamento de Excesso de Caixa continua por um período de dez dias corridos;

(b)       o Emissor ou os Garantidores inadimplentes no desempenho ou no cumprimento de quaisquer de suas obrigações nos termos da (i) Seção 4.18, conforme o caso, apenas como resultado da falha na realização de uma Oferta de Venda de Ativos quando e se exigido nos termos da Seção 4.18 ou de acordo com a cláusula (c) da definição de Venda de Ativos, (ii) Seção 4.19, (iii) Seção 4.20, conforme o caso, apenas como resultado da falha na realização de uma Oferta de Compra na ocorrência de uma Mudança de Controle ou (iv) Seção 4.26, apenas como resultado da aprovação, promulgação ou outra autorização de qualquer deliberação que não cumprir a mesma e tal deliberação não tenha sido rescindida ou de outra forma cancelada pelo conselho de administração da Sociedade antes da implementação da mesma (ou qualquer declaração de antecipação do vencimento do principal pelos Titulares de pelo menos 25% em montante principal das Notas em Circulação de acordo com esta Escritura em consequência das mesmas, se antecipadamente) e no caso desta clausula (iv), envia-se notificação escrita especificando esse Inadimplemento para o Emissor, Garantidores e Agente Fiduciário em

---

[12] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 89

conjunto (x) pelos Titulares de pelo menos 25% em montante principal das Notas em Circulação e (y) titulares de pelo menos 25% em montante principal total em aberto de todas as séries de Novas Notas (tais Titulares das Notas (os "**Titulares das Notas Necessárias**") e titulares de outras séries de Novas Notas em (i) e (ii), juntos, os "**Titulares das Novas Notas Necessárias**");

(c)      o Emissor ou os Garantidores não cumprirem ou cumprirem qualquer uma de suas outras obrigações nos termos das ou em relação às Notas ou à Garantia (exceto aquelas mencionadas nas cláusulas (a) e (b) desta Seção 6.1) e tal descumprimento permanecer sem solução por trinta dias corridos após notificação por escrito especificando tal descumprimento é entregue à Sociedade pelo Agente Fiduciário ou à Sociedade e ao Agente Fiduciário pelos Titulares de, pelo menos, 25% no montante do principal total das Notas em Circulação;

(d)      o Emissor ou qualquer Garantidor ou Subsidiária Significativa inadimplir nos termos de qualquer hipoteca, escritura ou instrumento nos termos do qual possa ser emitido ou pelo qual possa haver garantia ou evidência de qualquer Endividamento por dinheiro emprestado pelo Emissor ou por qualquer Garantidor ou Subsidiária Significativa do mesmo (ou cujo pagamento seja garantido pelo Emissor ou por qualquer Garantidor ou Subsidiária do mesmo), se tal Endividamento (incluindo, para evitar dúvidas, qualquer garantia) existir agora ou for criado após a data desta Escritura, que o inadimplemento (i) é causado pela falta de pagamento do principal, se houver, ou dos juros sobre tal Endividamento, após produzir efeitos em qualquer período de carência previsto em tal Endividamento em relação a tal inadimplemento (um "**Inadimplemento Desencadeador**"), ou (ii) resultar no adiantamento de tal Endividamento antes de seu vencimento expresso e, exceto no caso de um Inadimplemento Desencadeador ou no adiantamento do vencimento do Endividamento que consiste em Novas Notas, em cada caso o montante do principal em aberto de qualquer Endividamento, juntamente com o montante do principal pendente de qualquer outro Endividamento nos termos do qual tenha havido um Inadimplemento Desencadeador ou cujo vencimento tenha sido tão adiantado, totalizar, pelo menos, (A) US$ 25.000.000,00 (ou o equivalente no momento da decisão) com relação a cada ano fiscal até que a Receita Líquida atinja US$ 6.250.000.000,00 ao acima para o ano fiscal imediatamente anterior, quer ocorra antes ou depois do Evento de Encerramento do Excesso de Cash Sweep, ou (B) US$ 50.000.000,00 (ou o equivalente no momento da decisão) com relação ao primeiro ano fiscal no qual a Receita Líquida para o ano fiscal imediatamente anterior esteja em ou acima de US$ 6.250.000.000,00 e qualquer ano fiscal seguinte; *ressalvado que*, sem prejuízo de quaisquer direitos que qualquer parte possa ter nos termos desta Escritura, no caso de qualquer Evento de Inadimplemento especificado nesta cláusula (d), esse Evento de Inadimplemento será automaticamente rescindido ou anulado se o Inadimplemento Desencadeador ou o adiantamento do vencimento do Endividamento a que se refere esta cláusula for resolvido, curado ou renunciado pelos titulares aplicáveis de tal Endividamento;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 90

(e)       uma ou mais decisões ou sentenças transitadas em julgado para o pagamento em dinheiro superior a US$ 50.000.000,00 (ou o equivalente no momento da determinação) (exceto decisões cobertas por apólices de seguro exequíveis, emitidas por seguradoras respeitáveis e solventes) no total forem proferidas contra o Emissor, qualquer um dos Garantidores ou qualquer Subsidiária Significativa das mesmas e não forem pagas (integralmente ou em parcelas, de acordo com os termos da decisão) ou de outra forma forem extintas e, no caso de tal decisão ou sentença transitada em julgado, (i) um processo de execução foi iniciado por qualquer credor mediante tal decisão ou sentença, e não for indeferido ou de outra forma suspenso no prazo de quarenta e cinco dias corridos após a data em que o Emissor, qualquer Garantidor ou qualquer Subsidiária Significativa tiver sido citada ou, de outra forma, intimada a pagar ou garantir o pagamento dos montantes devidos sob tal processo de execução por decisão do tribunal com jurisdição competente ou (ii) houver um período de sessenta dias corridos após a decisão ou sentença transitada em julgado durante o qual tal decisão ou sentença não seja extinta, renunciada ou suspensa sua execução; *ressalvado que*, qualquer decisão ou sentença transitada em julgado resultante de ou, de outra forma, relacionada a créditos de valores mobiliários em relação a quaisquer Notas Antigas não constituam um Evento de Inadimplemento (nem contar rumo ao limite do Dólar estabelecido aqui), a menos que essa decisão ou sentença transitada em julgado também constitua uma Decisão Transitada em Julgado Executável;

(f)       qualquer caso involuntário, petição, reivindicação ou outro processo ser iniciado ou instaurado contra o Emissor, qualquer Garantidor ou qualquer Subsidiária Significativa dos mesmos nos termos de qualquer Lei de Falência ou qualquer outra lei de falência, insolvência, recuperação judicial ou extrajudicial ou outra lei semelhante em vigor agora ou no futuro, incluindo, mas não se limitando a, qualquer processo que busque a nomeação de um Agente Fiduciário, depositário, Agente Fiduciário judicial, liquidante, inventariante, custodiante, cessionário, interventor judicial ou outra autoridade semelhante dos mesmos ou qualquer parte substancial de seus ativos, ou a liquidação do Emissor, de qualquer um dos Garantidores ou de qualquer Subsidiária Significativa dos mesmos, e tal caso involuntário ou outro processo permanecer não arquivado e não suspenso por um período de sessenta dias corridos; ou uma ordem final não passível de recurso contra tal instituição nos termos das leis de falência relevantes, como em vigor agora ou no futuro;

(g)       o Emissor, qualquer Garantidor ou qualquer Subsidiária Significativa dos mesmos (i) apresentar uma petição ou reivindicação e/ou iniciar um caso voluntário ou outro processo buscando ser declarado falido ou insolvente ou buscando liquidação, recuperação, falência, recuperação judicial ou extrajudicial ou outras medidas nos termos de qualquer Lei de Falências aplicável ou qualquer outra lei de falências, insolvência ou outra lei semelhante em vigor agora ou no futuro; (ii) consentir com a instituição de falência, insolvência, liquidação ou processo contra ele (incluindo a abertura de uma ordem contra ele em um caso involuntário) ou a apresentação por ele (ou contra ele) de uma petição, resposta, consentimento ou qualquer outro

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 91

documento que busque recuperação ou recurso nos termos de qualquer Lei de Falências; (iii) consentir na nomeação ou tomada de posse por um depositário, Agente Fiduciário judicial, liquidante, inventariante, cessionário, custodiante, Agente Fiduciário, interventor judicial ou autoridade semelhante do Emissor, de qualquer Garantidor ou de qualquer Subsidiária Significativa dos mesmos para todos ou substancialmente todos os ativos da instituição; (iv) efetuar qualquer cessão geral em benefício dos credores; ou (v) em geral, não ser capaz de pagar suas dívidas na medida em que elas forem vencendo;

(h)      qualquer Garantia por um Garantidor deixar de estar em pleno vigor e efeito, exceto de acordo com os termos desta Escritura ou qualquer Garantidor negar ou não afirmar suas obrigações nos termos da Garantia;

(i)      todos ou substancialmente todos os ativos e rendas de qualquer Garantidor ou quaisquer Subsidiárias Significativas forem condenadas, apreendidas ou, de outra forma, apropriadas por qualquer Pessoa agindo segundo a autoridade de qualquer governo nacional, regional ou local ou qualquer Garantidor ou Subsidiária Significativa da Sociedade for impedida por qualquer Pessoa por um período de 60 dias consecutivos ou mais de exercer o controle normal de todos ou substancialmente todos os ativos e rendas (um "**Evento de Expropriação**"), *ressalvado que* qualquer Evento de Expropriação não constitua um Evento de Inadimplemento a menos que os ativos ou rendas sujeitas a esse evento superem 20% dos ativos consolidados ou rendas da Sociedade e de suas Subsidiárias, tomadas como um todo e, *ressalvado, ainda*, para evitar dúvidas, que um Evento de Expropriação não deverá cobrir quaisquer litígios relacionados ou o cancelamento ou a rescisão antecipada de quaisquer contratos de construção;

(j)      o conselho de administração da Sociedade deixar de incluir o número mínimo de membros independentes do conselho necessários por, e de acordo com o Plano de Recuperação por um período de, pelo menos, cinco meses consecutivos iniciando a partir da Data de Ausência do Conselheiro Independente e essa falha contínua permanecer não solucionada por um período de trinta dias corridos após a notificação por escrito especificando que essa falha contínua seja entregue para a Sociedade pelo Agente Fiduciário ou para a Sociedade e o Agente Fiduciário pelos Titulares de, pelo menos, 25% no montante do principal total das Notas em Circulação;

(k)      uma ou mais ações de execução forem começadas, retomadas ou redirecionadas para ou contra o Emissor, qualquer Garantidor ou qualquer Subsidiária Significativa das mesmas que busque o pagamento da quantia superior a US$ 50.000.000,00 (ou o equivalente disso no momento da apresentação) (exceto a ação de execução coberta por apólices de seguro exequíveis emitidas por seguradoras respeitáveis e solventes) no total e ou (i) os respectivos montantes não forem pagos (seja na íntegra ou em parcelas) ou quitados dentro do prazo estabelecido pela decisão de um tribunal competente ou (ii) a(s) ação(ões) de execução não for(em) indeferida(s) ou suspensas dentro de quarenta e cinco dias corridos após a data em que o Emissor, qualquer

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 92

Garantidor ou qualquer Subsidiária Significativa tiver sido citada ou, de outra forma, intimada a pagar ou garantir o pagamento dos montantes devidos nos termos de tal(is) processo(s) de execução por decisão do tribunal com jurisdição competente; e

(l)      uma decisão ou sentença transitada em julgado que reverta a recuperação societária contemplada nas Cláusulas 1.1.46 e 7.15 do Plano de Recuperação e essa decisão ou sentença transitada não seja cumprida, renunciada ou a execução da mesma permaneça suspensa no prazo de trinta Dias Úteis após essa decisão ou sentença transitada.

Seção 6.02.      *Notificação de Evento de Inadimplemento; Adiantamento.*

Se um Evento de Inadimplemento (exceto o Evento de Inadimplemento especificado na Seção 6.01(b)(iv), (f) e (g) acima) ocorrer e continuar, o Agente Fiduciário ou os Titulares de, pelo menos, 25% no principal montante das Notas em Circulação poderão declarar todo o principal não pago e os juros acumulados sobre todas as Notas a vencer imediatamente, enviando uma notificação por escrito ao Emissor e aos Garantidores e, mediante tal declaração, tais montantes vencerão imediatamente. Se um Evento de Inadimplemento especificado nas cláusulas (f) ou (g) acima ocorrer, então o principal e os juros acumulados sobre todas as Notas em aberto vencerão imediatamente sem nenhuma declaração ou outra medida pelo Agente Fiduciário ou qualquer Titular.

Se um Evento de Inadimplemento especificado na Seção 6.01(b)(iv) ocorreu e persiste, os Titulares de, no mínimo, 25% do montante principal das Notas em Circulação ou o Agente Fiduciário (atuando conforme instrução desses Titulares) poderá declarar todo o principal não pago e os juros acumulados sobre todas as Notas a vencer imediatamente, enviando uma notificação por escrito ao Emissor e aos Garantidores e mediante qualquer declaração, esses montantes vencerão imediatamente, *ressalvado* que, (A) para evitar dúvidas, a notificação entregue para declarar o Evento de Inadimplemento possa ser fornecida simultaneamente com e no mesmo documento, conforme a notificação declarar todo o principal não pago e os juros acumulados sobre todas as Notas a vencer e (B) a notificação entregue para declarar o Evento de Inadimplemento e a notificação para declarar todo o principal não pago e os juros acumulados sobre todas as Notas a vencer deve ser entregue impreterivelmente até 9 (nove) meses após a data da Notificação de Deliberação Relevante (a menos que seja prorrogada por escrito pela Sociedade) ou, de outra forma, será considerada inválida para todos os efeitos.

A qualquer momento após uma declaração de adiantamento ter sido feita e antes de uma decisão ou sentença para pagamento do valor devido ter sido obtida por qualquer Titular, os Titulares da maioria do montante do principal das Notas em Circulação mediante notificação por escrito ao Emissor poderão rescindir ou anular tal declaração se:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



**IEDA MARIA MONTEIRO**
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 93

(a)      o Emissor pagou ou depositou junto ao Agente Fiduciário e aos outros Agentes Pagadores uma quantia suficiente para pagar (i) todos os juros vencidos (inclusive quaisquer Montantes Adicionais) nas Notas em aberto; (ii) todo o principal não pago das Notas que venceu, exceto por essa declaração de adiantamento, na medida em que esse pagamento desses juros (inclusive quaisquer Montantes Adicionais) seja legal, os juros sobre esses juros vencidos (inclusive quaisquer Montantes Adicionais) conforme previsto aqui; e (iii) todas as quantias pagas ou adiantadas pelo Agente Fiduciário e a indenização, despesas, desembolsos e adiantamentos razoáveis e devidamente documentados do Agente Fiduciário, seus agentes e advogados; e

(b)      todos os Eventos de Inadimplemento foram sanados ou renunciados, conforme previsto nessa Seção 6.02, exceto o não pagamento do principal que venceu apenas devido ao adiantamento.

Nenhuma rescisão afetará qualquer Inadimplemento ou Evento de Inadimplemento subsequente ou prejudicará qualquer direito consequente daquele.

Sujeito às disposições desta Escritura relativa aos deveres do Agente Fiduciário, no caso de um Evento de Inadimplemento ocorrer e continuar, o Agente Fiduciário não terá nenhuma obrigação de exercer quaisquer de seus direitos ou poderes nos termos desta Escritura, a pedido ou orientação de qualquer um dos Titulares, a menos que tais titulares tenham oferecido indenização satisfatória para o Agente Fiduciário Sujeito a tal disposição para a indenização do Agente Fiduciário e certas outras condições estabelecidas nesta Escritura, os titulares da maioria no montante do principal total das Notas em Circulação terão o direito de determinar o tempo, o método e o local da realização de qualquer processo para qualquer solução disponível para o Agente Fiduciário ou exercer qualquer fideicomisso ou poder conferido ao Agente Fiduciário.

O Agente Fiduciário não deve ser responsabilizado pelo conhecimento de qualquer Inadimplemento ou Evento de Inadimplemento, ou pelo conhecimento de qualquer solução de qualquer Inadimplemento ou Evento de Inadimplemento, salvo se (i) o diretor autorizado ou agente do Agente Fiduciário com responsabilidade direta pela administração da Escritura tiver conhecimento real de tal Inadimplemento ou Evento de Inadimplemento ou (ii) a notificação por escrito desse Inadimplemento ou Evento de Inadimplemento tiver sido entregue pelo Emissor, pelos Garantidores ou por qualquer Titular a tal diretor autorizado do Agente Fiduciário.

Seção 6.03.    *Outros Recursos.*

(a)      Se um Evento de Inadimplemento ocorrer e continuar, o Agente Fiduciário poderá buscar quaisquer recursos disponível, através de um processo em equidade ou em lei para cobrar

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 94

o pagamento do principal ou dos juros sobre as Notas ou para garantir o cumprimento de qualquer disposição das Notas ou desta Escritura.

(b)     O Agente Fiduciário pode manter um processo, mesmo que não possua nenhuma das Notas ou não as produza no processo. Na medida máxima permitida pela lei aplicável, o atraso ou omissão do Agente Fiduciário ou de qualquer Titular no exercício de qualquer direito ou recurso resultante de um Evento de Inadimplemento não prejudicará o direito, recurso ou constituirá uma renúncia ou concordância com o Inadimplemento, nenhum recurso é exclusivo de qualquer outro recurso e todos os recursos disponíveis são cumulativos dentro dos limites permitidos pela lei aplicável.

Seção 6.04.     *Controle pela Maioria.*

(a)     Os Titulares da maioria no montante do principal das Notas em Circulação podem determinar o período, o método e o local da realização de qualquer processo para qualquer recurso disponível para o Agente Fiduciário ou para exercer qualquer fideicomisso ou poder conferido ao Agente Fiduciário. Sujeito à Seção 7.01, no entanto, o Agente Fiduciário pode se recusar a seguir qualquer orientação que conflite com qualquer lei ou esta Escritura, que o Agente Fiduciário determine poder ser indevidamente prejudicial aos direitos de qualquer outro Titular, ou que possa envolver o Agente Fiduciário em responsabilidade pessoal; *ressalvado* que o Agente Fiduciário possa tomar qualquer outra medida considerada adequada pelo Agente Fiduciário que não seja inconsistente com tal orientação.

(b)     Se o Agente Fiduciário tomar alguma medida ou seguir qualquer orientação de acordo com esta Escritura, o Agente Fiduciário terá direito a indenização ou garantia satisfatória a seu critério exclusivo contra qualquer prejuízo ou despesa causada por tomar ou não tomar tal medida ou seguir tal orientação.

Seção 6.05.     *Limitação sobre Ações.*

(a)     Exceto para fazer cumprir o direito de receber pagamento do principal, prêmio, se houver, ou juros não pagos quando devidos, nenhum Titular poderá buscar qualquer recurso em relação a esta Escritura ou às Notas, a menos que:

(i)     tal Titular notificou previamente por escrito o Agente Fiduciário que um Evento de Inadimplemento continua;

(ii)     os Titulares de pelo menos 30% do montante do principal das Notas em Circulação solicitaram ao Agente Fiduciário, por escrito, que prosseguissem com o recurso;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01                    Livro nº LIV                    fls. 95

(iii)    tais Titulares ofereceram ao Agente Fiduciário garantia ou indenização satisfatórias contra qualquer prejuízo, passivo ou despesa;

(iv)    o Agente Fiduciário não atendeu tal solicitação no prazo de sessenta dias após o recebimento da mesma e a oferta de garantia ou indenização; e

(v)    Os Titulares da maioria no montante do principal das Notas em Circulação não deram ao Agente Fiduciário uma orientação por escrito inconsistente com tal solicitação no prazo de sessenta dias.

(b)    O Titular não pode usar esta Escritura para afetar, perturbar ou prejudicar os direitos de outro Titular ou para obter uma preferência ou prioridade sobre esse outro Titular (entendendo-se que o Agente Fiduciário não tem o dever positivo de verificar se tais ações ou liberalidade prejudicam indevidamente tais Titulares).

Seção 6.06.    *Direitos dos Titulares de Receber pagamento.*

Não obstante qualquer outra disposição nesta Escritura, o direito de qualquer Titular de receber o pagamento do principal e dos juros sobre uma Nota, a partir das respectivas datas de vencimento expressas em tal Nota, ou de propor uma ação para a execução de qualquer pagamento a partir dessas datas respectivas, não será prejudicado ou afetado sem o consentimento do Titular.

Seção 6.07.    *Ação de Cobrança do Agente Fiduciário.* Se o Inadimplemento no pagamento do principal ou juros especificado na Seção 6.01(a)(i) ou na Seção 6.01(a)(ii) ocorrer e continuar, o Agente Fiduciário poderá obter sentença favorável em nome próprio e como Agente Fiduciário de um fideicomisso expresso contra a Sociedade ou qualquer outro devedor das Notas para o montante total do principal e juros acumulados restantes não pagos, juntamente com os juros do principal vencido e, na medida em que o pagamento de tais juros seja legal, juros vencidos, conforme o caso, à taxa anual suportada pelas Notas e tal montante adicional conforme suficiente para cobrir os custos e despesas de cobrança, incluindo indenização, despesas, desembolsos e adiantamentos razoáveis do Agente Fiduciário, de seus agentes e advogado.

Seção 6.08.    *Agente Fiduciário Pode Apresentar Declarações de Crédito.* O Agente Fiduciário pode apresentar tais declarações de crédito e outros papéis ou documentos que sejam necessários ou convenientes para obter os créditos do Agente Fiduciário (incluindo qualquer crédito por indenização, despesas, desembolsos e adiantamentos do Agente Fiduciário, seus agentes e advogado) e os Titulares autorizados em qualquer processo judicial relacionado ao Emissor, à Sociedade, aos Garantidores, seus credores ou seus bens, e terá o direito e o poder de cobrar e receber quaisquer quantias ou outros bens

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 96

devidos ou produto derivado de tais créditos e distribuí-los, e qualquer custodiante em qualquer processo judicial está autorizado por cada Titular a realizar tais pagamentos ao Agente Fiduciário e, no caso de o Agente Fiduciário consentir em realizar tais pagamentos diretamente aos Titulares, pagar ao Agente Fiduciário qualquer montante devido pela indenização, despesas, desembolsos e adiantamentos do Agente Fiduciário, seu agente e advogado, e quaisquer outros montantes devidos ao Agente Fiduciário nos termos da Seção 7.06. Nada no presente documento será considerado como uma autorização para o Agente Fiduciário autorizar, consentir, aceitar ou aprovar em nome de qualquer Titular qualquer plano de recuperação, acordo, ajuste ou solução que afete as Notas ou os direitos de qualquer titular das mesmas, [ou autorização para o Agente Fiduciário votar em relação ao crédito de qualquer Titular em tal processo][13]. O Agente Fiduciário terá o direito de participar em questões que considerar necessário ou aconselhável, a seu exclusivo critério, inclusive como membro de qualquer comitê oficial de credores.

Seção 6.09.    *Prioridades*. Se o Agente Fiduciário cobrar qualquer valor ou bem conforme este Artigo 6, ele pagará o valor ou bem na seguinte ordem:

(i) *Primeiro:* ao Agente Fiduciário e Agente de Pagamentos e seus respectivos representantes e advogados por valores devidos nos termos da Seção 7.06, incluindo pagamento de toda remuneração, despesas e passivos incorridos, e todos os adiantamentos feitos pelo Agente Fiduciário e Agente de Pagamentos, e os custos e despesas da cobrança;

(ii) *Segundo*: aos Titulares por valores devidos e não pagos sobre as Notas por principal, prêmio, se houver, e juros, de forma proporcional, sem qualquer tipo de preferência ou prioridade, de acordo com os montantes devidos e exigíveis sobre as Notas para principal, prêmio, se houver, e juros, respectivamente; e

(iii) *Terceiro*: ao Emissor ou a tal parte que o foro de jurisdição competente orientar.

O Agente Fiduciário poderá fixar uma data de registro e data de pagamento para qualquer pagamento aos Titulares conforme esta 6.09 e notificará imediatamente o Emissor sobre isso. Pelo menos 15 dias corridos antes dessa data de registro, o Emissor enviará a cada Titular e ao Agente Fiduciário uma notificação que declare a data de registro, data de pagamento e montante a ser pago.

## ARTIGO 7
### AGENTE FIDUCIÁRIO E AGENTE DE PAGAMENTOS

Seção 7.01.    *Deveres do Agente Fiduciário e do Agente de Pagamentos.*

(a)    Se um Evento de Inadimplemento ocorreu e continua, e um Diretor Responsável tem conhecimento concreto do mesmo, o Agente Fiduciário deve exercer os direitos e poderes que lhe são conferidos por esta Escritura e usar o mesmo grau de cuidado e habilidade em seu

---

[13] **NTD**: A ser discutido pela BNYM se for apropriado para o processo brasileiro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 97

exercício como uma Pessoa prudente exerceria ou usaria sob tais circunstâncias na condução de seus próprios assuntos.

(b)     Exceto durante a continuação de um Evento de Inadimplemento, (i) o Agente Fiduciário e o Agente de Pagamentos comprometem-se em cumprir tais obrigações e somente as obrigações especificamente estabelecidas nesta Escritura, e nenhuma Obrigação ou obrigação implícita será interpretada nesta Escritura contra o Agente Fiduciário ou o Agente de Pagamentos; e (ii) na ausência de má-fé por parte do Agente Fiduciário ou do Agente de Pagamentos, o Agente Fiduciário ou o Agente de Pagamentos pode confiar, quanto à verdade das declarações e à exatidão dos pareceres expressos na mesma, sobre os certificados ou pareceres fornecidos ao Agente Fiduciário ou ao Agente de Pagamentos e em conformidade com os requisitos desta Escritura. No entanto, se quaisquer certificados ou pareceres que, por qualquer disposição deste documento, forem especificamente exigidos pelo Agente Fiduciário ou Agente de Pagamentos, o Agente Fiduciário e o Agente de Pagamentos examinarão os certificados e pareceres para determinar se estão ou não em conformidade com o requisitos desta Escritura (mas não precisam confirmar ou investigar a precisão dos cálculos matemáticos ou outros fatos declarados naqueles documentos).

(c)     O Agente Fiduciário não pode ser exonerado de sua responsabilidade por negligência grave, má-fé ou dolo, exceto que:

(i)     esta Seção 7.01(c) não limite o efeito da Seção 7.01(b);

(ii)     o Agente Fiduciário e o Agente de Pagamentos não forem responsáveis por qualquer erro de julgamento cometido de boa-fé por um Diretor Responsável, a menos que seja provado que o Agente Fiduciário ou o Agente de Pagamentos foi totalmente negligente na apuração dos fatos pertinentes; e

(iii)     o Agente Fiduciário e o Agente de Pagamentos não forem responsáveis em relação a qualquer medida que tomar ou se omitir de boa-fé, de acordo com a orientação recebida por ele de acordo com a Seção 4.19 ou exercer qualquer fideicomisso ou poder conferido ao Agente Fiduciário ou ao Agente de Pagamentos, nos termos desta Escritura.

(d)     O Agente Fiduciário e o Agente de Pagamentos não serão responsáveis pelos juros de qualquer valor recebido por eles, exceto se o Agente Fiduciário e o Agente de Pagamentos concordarem por escrito com o Emissor.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 98

     (e)    O valor depositado em garantia pelo Agente Fiduciário ou por qualquer Agente de Pagamentos não precisa ser segregado de outros recursos, exceto dentro dos limites exigidos por lei.

     (f)    Nenhuma disposição desta Escritura exigirá que o Agente Fiduciário ou o Agente de Pagamentos gaste ou arrisque seus próprios recursos ou incorra em responsabilidade financeira pessoal no desempenho de qualquer de seus deveres ou no exercício de qualquer de seus direitos ou poderes, se tiver motivos razoáveis para acreditar que o pagamento de tais recursos e/ou indenização adequada em face de tal risco ou responsabilidade não lhe sejam satisfatoriamente garantidos.

     (g)    Toda disposição desta Escritura relacionada à conduta ou que afete a responsabilidade ou garantia de proteção do Agente Fiduciário e do Agente de Pagamentos estará sujeita às disposições desta Seção 7.01.

Seção 7.02.    *Direitos do Agente Fiduciário.* (a) O Agente Fiduciário e o Agente de Pagamentos podem confiar e devem ser protegidos ao agir ou abster-se de agir com base em qualquer documento que acreditem ser autêntico e que tenha sido assinado ou apresentado pela Pessoa adequada. O Agente Fiduciário e o Agente de Pagamentos não precisam investigar nenhum fato ou assunto declarado em tal documento.

     (b)    Antes de o Agente Fiduciário agir ou abster-se de agir, ele pode exigir um Certificado dos Diretores, o parecer por escrito de um especialista tributário qualificado ou Parecer do Conselho. O Agente Fiduciário não será responsável por qualquer medida que tome ou se omita de boa-fé, com base no Certificado dos Diretores, no parecer por escrito de especialista tributário qualificado ou no Parecer do Conselho.

     (c)    O Agente Fiduciário pode agir através de agentes e não será responsável pelo dolo ou negligência grave de qualquer agente nomeado com a diligência necessária.

     (d)    Qualquer solicitação, orientação, ordem ou demanda do Emissor mencionada neste documento deve ser suficientemente comprovada por um Certificado dos Diretores do Emissor (a menos que outras provas a respeito sejam especificamente previstas neste documento); e qualquer deliberação do Conselho de Administração do Emissor pode ser comprovada para o Agente Fiduciário ou Agente de Pagamentos através de cópias das mesmas, certificadas pelo Secretário ou por um Secretário Adjunto (ou Diretor equivalente) do Emissor.

     (e)    O Agente Fiduciário e o Agente de Pagamentos não terão nenhuma obrigação de exercer quaisquer dos fideicomissos ou poderes que lhe são conferidos por esta Escritura, a pedido, ordem ou orientação de qualquer dos Titulares, de acordo com as disposições desta

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 99

Escritura, a menos que tais Titulares tenham oferecido ao Agente Fiduciário ou ao Agente de Pagamentos garantia ou indenização satisfatória para o Agente Fiduciário em face dos custos, despesas e passivos que possam ser incorridos por meio disso.

(f)     O Agente Fiduciário e o Agente de Pagamentos não serão responsáveis por nenhuma ação adotada ou omitida de boa-fé e acreditada ser autorizada ou dentro do critério, direitos ou poderes conferidos por esta Escritura.

(g)     O Agente Fiduciário e o Agente de Pagamentos não serão responsáveis por qualquer ação que adotarem ou omitirem em boa-fé a qual acreditem estar autorizada ou dentro de seus direitos ou poderes; desde que a conduta do Agente Fiduciário ou do Agente de Pagamentos não constitua conduta dolosa, negligência grave ou má-fé.

(h)     O Agente Fiduciário e o Agente de Pagamentos podem consultar um advogado, e o conselho ou opinião do advogado quanto à questões legais relacionadas a esta Escritura e as Notas deverão ter plena e completa autorização e proteção contra responsabilidade em relação a qualquer ação adotada, omitida ou sofrida de boa-fé e de acordo com o conselho ou opinião desse advogado.

(i)     O Agente Fiduciário e o Agente de Pagamentos não serão obrigados a realizar qualquer investigação sobre os fatos ou assuntos declarados em qualquer resolução, certificado, declaração, instrumento, opinião, relatório, notificação, solicitação, orientação, consentimento, pedido, título, debênture, nota, outros comprovantes de endividamento ou outro papel ou documento, a menos que solicitado por escrito pelos Titulares com pelo menos uma maioria do montante total do principal das Notas em Circulação; desde que, caso o pagamento dentro de um prazo razoável ao Agente Fiduciário dos custos, despesas ou passivos que pode incorrer na realização dessa investigação não seja, na opinião do Agente Fiduciário, assegurado satisfatoriamente pela garantia oferecida nos termos desta Escritura, o Agente Fiduciário possa exigir dos Titulares sua indenização satisfatória quanto a essas despesas ou responsabilidades como condição para o processo; as despesas razoáveis de cada investigação serão pagas pelo Emissor ou, se pagas pelo Agente Fiduciário, serão reembolsadas pelo Emissor mediante solicitação.

(j)     Nem o Agente Fiduciário nem qualquer Agente de Pagamentos deverão investir, ou terão qualquer responsabilidade quanto aos juros, em quaisquer valores, a qualquer momento, recebidos de acordo com qualquer uma das disposições desta Escritura ou das Notas, exceto conforme acordado de outra forma pelo Agente Fiduciário ou qualquer Agente de Pagamentos com o Emissor. Esses valores não precisam ser segregados de outros fundos, exceto na extensão exigida pelas disposições legais.

(k)     Em nenhum caso o Agente Fiduciário ou o Agente de Pagamentos será responsável por perdas ou danos especiais, indiretos ou consequenciais de qualquer espécie (incluindo, entre outros,

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 100

perdas de lucros), ainda que o Agente Fiduciário tenha sido avisado da probabilidade dessas perdas ou danos e independentemente da forma de ação.

(l)      Os direitos permissivos do Agente Fiduciário enumerados neste documento não devem ser interpretados como seus deveres.

(m)     O Agente Fiduciário pode solicitar que o Emissor ou qualquer Garantidor entregue um Certificado dos Diretores estabelecendo os nomes de indivíduos e/ou cargos de diretores autorizados nesse momento a realizar as ações especificadas de acordo com esta Escritura, que Certificado dos Diretores pode ser assinado por qualquer pessoa autorizada a assinar um Certificado dos Diretores, incluindo qualquer pessoa especificada como assim autorizada em qualquer certificado entregue anteriormente e não substituído.

(n)     O Agente Fiduciário não deverá ser considerado como tendo notificação de qualquer Inadimplemento ou Evento de Inadimplemento, a menos que um Diretor Responsável do Agente Fiduciário tenha conhecimento real ou a menos que uma notificação por escrito de qualquer evento, sendo de fato um inadimplemento, seja recebida por um Diretor Responsável do Agente Fiduciário em seu Escritório de Truste Corporativo, e essa notificação refira-se às Notas e a esta Escritura.

(o)     Os direitos, privilégios, proteções, imunidades e beneficios concedidos ao Agente Fiduciário, incluindo, sem limitação, o seu direito a ser indenizado, são estendidos e devem ser aplicados pelo Agente Fiduciário em cada uma de suas capacidades no presente e a cada agente, custodiante e outra Pessoa empregada para atuar nos termos deste instrumento.

Seção 7.03.     *Direitos Individuais do Agente Fiduciário*. O Agente Fiduciário e qualquer Agente de Pagamentos, Oficial de Registro ou substituto ou qualquer outro agente do Emissor ou do Agente Fiduciário, em sua capacidade individual ou qualquer outra, podem se tornar o titular ou credor pignoratício das Notas e, de outra forma, lidar com o Emissor ou suas Afiliadas com os mesmos direitos que teria se não fosse Agente Fiduciário, Agente de Pagamentos, Oficial de Registro ou outro agente.

Seção 7.04.     *Isenção de Responsabilidade do Agente Fiduciário*. O Agente Fiduciário não será responsável e não fará qualquer declaração quanto à validade ou adequação desta Escritura ou das Notas, não será responsável pelo uso do Emissor dos rendimentos provenientes das Notas e não será responsável por qualquer declaração do Emissor nesta Escritura ou em qualquer documento emitido em relação à venda das Notas ou nas Notas que não sejam o certificado de autenticação do Agente Fiduciário.

Seção 7.05.     *Notificação de Inadimplemento e Eventos de Inadimplemento*. Se um Inadimplemento ou Evento de Inadimplemento ocorrer e continuar, e se for conhecido pelo Diretor Responsável, o Agente Fiduciário enviará a cada Titular uma notificação do Inadimplemento ou Evento de Inadimplemento dentro de 90 dias após o Diretor Responsável adquirir conhecimento real do

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 101

Inadimplemento ou Evento de Inadimplemento. Exceto no caso de Inadimplemento ou Evento de Inadimplemento no pagamento do principal ou juros sobre qualquer Nota, o Agente Fiduciário poderá reter a notificação e estará protegido quanto a retenção da notificação se e enquanto o Agente Fiduciário de boa-fé determinar que a retenção da notificação é do interesse dos Titulares. Para todos os fins desta Escritura e das Notas, o Agente Fiduciário não será considerado como tendo conhecimento de um Inadimplemento ou Evento de Inadimplemento, a menos que um Diretor Responsável do Agente Fiduciário tenha conhecimento real do mesmo.

Seção 7.06.    *Remuneração e Indenização.* O Emissor e os Garantidores, solidariamente, concordam em pagar ao Agente Fiduciário e ao Agente de Pagamentos periodicamente a remuneração que será acordada por escrito por seus serviços. A remuneração do Agente Fiduciário não deve ser limitada por qualquer lei referente à remuneração de um Agente Fiduciário de um truste. O Emissor e os Garantidores, solidariamente, concordam em reembolsar prontamente o Agente Fiduciário e o Agente de Pagamentos, mediante solicitação, por todas as despesas razoáveis incorridas ou efetuadas, incluindo custos de cobrança, além da remuneração por seus serviços. Essas despesas incluirão remunerações e despesas razoáveis, desembolsos e adiantamentos dos agentes, advogados, contadores e especialistas do Agente Fiduciário e do Agente de Pagamentos. Os pagamentos dessas despesas pelo Emissor ao Agente Fiduciário ou ao Agente de Pagamentos, conforme o caso, serão efetuados livres e desembaraçados e sem retenções ou deduções, por ou devido a quaisquer impostos, incumbências, avaliações, taxas presentes ou futuras ou outras cobranças governamentais de qualquer natureza (e multas, sanções ou juros relacionados) impostas ou cobradas por ou em nome do Brasil ou qualquer subdivisão política ou autoridade deste ou com poder para tributar, a menos que essa retenção ou dedução seja exigida por lei. Nesse caso, o Emissor pagará ao Agente Fiduciário ou ao Agente de Pagamentos, conforme o caso, os montantes adicionais que forem necessários para que todo pagamento líquido efetuado pelo Emissor ao Agente Fiduciário e ao Agente de Pagamentos, conforme o caso, após dedução ou retenção por ou devido a qualquer imposto, penalidade, multa, incumbência, avaliação ou outro encargo governamental presente ou futuro imposto sobre ou como resultado desse pagamento pelo Brasil ou qualquer subdivisão política ou autoridade tributária do mesmo ou não deve ser inferior ao montante devido e à pagar ao Agente Fiduciário ou ao Agente de Pagamentos, conforme o caso. O Emissor e os Garantidores, solidariamente, indenizarão o Agente Fiduciário e o Agente de Pagamentos contra todo e qualquer prejuízo, passivo ou despesa (incluindo honorários e despesas advocatícias razoáveis) incorrida por eles, sem negligência grave ou má-fé de sua parte e em conexão com a administração desta Escritura e com o desempenho de suas respectivas funções nos termos deste instrumento, incluindo, sem limitação, os custos e despesas de defesa contra qualquer reivindicação ou responsabilidade, e de cumprir com qualquer citação entregue a eles ou qualquer de seus diretores em conexão com o exercício ou desempenho de qualquer de seus poderes ou funções nos termos desta Escritura. O Emissor e os Garantidores, solidariamente, comprometem-se a indenizar cada um dos Agentes Pagadores e suas afiliadas por todos os prejuízos, passivos, incluindo toda e qualquer obrigação tributária, que, para evitar dúvidas, incluirão ambos impostos brasileiros e multas, custos, reivindicações, ações, danos, despesas ou demandas associadas a qualquer um deles ou que possam ser feitas contra qualquer um deles como resultado ou em conexão

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 102

com a nomeação ou o exercício dos poderes e funções por qualquer Agente de Pagamentos ou suas afiliadas de acordo com esta Escritura, exceto como resultado de seu próprio inadimplemento, negligência grave ou má-fé ou de seus conselheiros, diretores ou funcionários ou qualquer um deles, ou sua violação dos termos desta Escritura. O Agente Fiduciário notificará imediatamente o Emissor de qualquer reivindicação pela qual possa solicitar indenização. A falha do Agente Fiduciário em notificar o Emissor não isenta o Emissor de suas obrigações nos termos deste documento. O Emissor tem o direito de participar na defesa da reivindicação do Agente Fiduciário e o Agente Fiduciário pode ter um advogado separado e o Emissor pagará os honorários e despesas de tal advogado.

Para garantir as obrigações de pagamento do Emissor nesta Seção 7.06, o Agente Fiduciário terá uma garantia prioritária das Notas sobre todo o dinheiro ou bens mantidos ou cobrados pelo Agente Fiduciário ou pelo Agente de Pagamentos, exceto aqueles mantidos em garantia para pagar o principal e juros sobre Notas específicas.

As obrigações do Emissor e dos Garantidores de acordo com esta Seção 7.06 sobreviverão à renúncia ou destituição do Agente Fiduciário e à satisfação e quitação desta Escritura. Quando o Agente Fiduciário ou o Agente de Pagamentos incorre em despesas após a ocorrência de um Inadimplemento ou Evento de Inadimplemento especificado na Seção 6.01(g), as despesas destinam-se a constituir despesas de administração de acordo com a Lei de Falências.

O Emissor reconhece que o Agente de Pagamentos não faz declarações quanto à interpretação ou qualificação das operações assumidas neste documento para efeitos tributários ou qualquer outro propósito, em qualquer jurisdição. O Emissor declara que ele próprio cumpriu plenamente qualquer impacto tributário desta Escritura antes de concordar com os termos deste documento, e é responsável por toda e qualquer imposto federal, estadual, local, renda, franquia, retenção, valor agregado, vendas, uso, transferência, carimbo ou outros em qualquer jurisdição em relação a esta Escritura.

O Emitente concorda em pagar todo e qualquer imposto de selo e outros impostos ou taxas documentais que possam ser devidos em conexão com a celebração, formalização, desempenho e execução desta Escritura pelos Agentes Pagadores.

Seção 7.07.    *Substituição do Agente Fiduciário.* O Agente Fiduciário pode renunciar a qualquer momento, notificando o Emissor por escrito. Os Titulares da maioria no montante do principal das Notas podem destituir o Agente Fiduciário, notificando-o por escrito e podem nomear um Agente Fiduciário sucessor. O Emissor destituirá o Agente Fiduciário se:

(a)      o Agente Fiduciário não cumprir a Seção 7.09;

(b)      o Agente Fiduciário for declarado falido ou insolvente;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                        fls. 103

(c)      o depositário judicial ou outro funcionário público se encarrega do Agente Fiduciário ou de seus bens; ou

(d)      o Agente Fiduciário se torna incapaz de agir.

Se o Agente Fiduciário se demitir ou for destituído, ou se existir uma vaga no cargo de Agente Fiduciário por qualquer motivo (o Agente Fiduciário, nesse caso, referido neste documento como o Agente Fiduciário que se retira), o Emissor imediatamente nomeará um Agente Fiduciário sucessor.

O Agente Fiduciário sucessor deve entregar uma aceitação por escrito de sua nomeação ao Agente Fiduciário que se retira e ao Emissor. Assim, a renúncia ou destituição do Agente Fiduciário que se retira entrará em vigor, e o Agente Fiduciário sucessor terá todos os direitos, poderes e deveres do Agente Fiduciário de acordo com esta Escritura. O Agente Fiduciário sucessor deve enviar uma notificação de sua sucessão aos Titulares. O Agente Fiduciário que se retira deve transferir imediatamente todos os bens em sua posse como Agente Fiduciário para o Agente Fiduciário sucessor, sujeito à garantia prevista na Seção 7.06.

Se o Agente Fiduciário sucessor não tomar posse no prazo de 60 dias corridos após a renúncia ou destituição do Agente Fiduciário que se retira, o Agente Fiduciário que se retira, o Emissor ou os Titulares da maioria no montante do principal das Notas poderão, às custas do Emissor, requerer para qualquer tribunal de jurisdição competente a nomeação de um Agente Fiduciário sucessor.

Se o Agente Fiduciário não cumprir a Seção 7.09, qualquer Titular poderá requerer a qualquer tribunal de jurisdição competente a destituição do Agente Fiduciário e a nomeação de um Agente Fiduciário sucessor.

Não obstante a substituição do Agente Fiduciário de acordo com esta Seção 7.07, a obrigação do Emissor nos termos da Seção 7.06 continuará em benefício do Agente Fiduciário que se retira.

Seção 7.08.      *Agente Fiduciário Sucessor por Incorporação.* Se o Agente Fiduciário se fundir, incorporar ou transformar, ou transferir todos ou substancialmente todos os seus negócios ou ativos de truste corporativa para outra sociedade ou associação bancária, a sociedade resultante, sobrevivente ou aceitante sem nenhum outro ato será o Agente Fiduciário sucessor.

Se, no momento em que tal sucessor ou sucessores por incorporação, transformação ou fusão no Agente Fiduciário suceder aos fideicomissos criados por esta Escritura qualquer uma das Notas tenha sido autenticada, mas não formalizada, qualquer tal sucessor ao Agente Fiduciário poderá aprovar o certificado de autenticação de qualquer Agente Fiduciário antecessor e entregar tais Notas autenticadas e se, naquele momento, qualquer uma das Notas não tenha sido autenticada, qualquer sucessor do Agente Fiduciário poderá autenticá-las, quer em nome de qualquer antecessor nos termos deste documento ou

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### – Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 104

em nome do sucessor do Agente Fiduciário; e em todos esses casos, tais certificados aprovados terão o pleno vigor de todas as disposições contidas nas Notas ou nesta Escritura relacionadas ao certificado do Agente Fiduciário.

Seção 7.09.    *Elegibilidade; Desqualificação.* O Agente Fiduciário nos termos deste instrumento deve sempre ser uma sociedade, banco ou sociedade truste constituída e negociando de acordo com as leis dos Estados Unidos ou qualquer outro estado do mesmo (i) autorizado por tais leis a exercer o poder de truste corporativa, (ii) está sujeito a supervisão ou exame das autoridades públicas, (iii) terá sempre um capital e um excedente combinados de pelo menos US$ 50.000.000,00, conforme estabelecido em seu mais recente relatório anual de situação publicado e (iv) terá seu Escritório de Truste Corporativa no Cidade de Nova Iorque. Se a qualquer momento o Agente Fiduciário deixar de ser elegível de acordo com as disposições desta Seção 7.09, deverá renunciar imediatamente da maneira e com o efeito especificado na Seção 7.07.

### ARTIGO 8
#### QUITAÇÃO DA ESCRITURA; NULIDADE

Seção 8.01.    *Quitação de Responsabilidade sobre as Notas.*[14]

(a)    Quando (i) o Emissor entregar para o Agente Fiduciário todas as Notas em Aberto (exceto as Notas substituídas nos termos da Seção 2.11) para cancelamento ou (ii) todas as Notas em Aberto tiverem vencido e o Emissor depositar em garantia, em benefício dos Titulares, com o Agente Fiduciário, finalmente arrecadaram recursos suficientes para pagar no Vencimento todas as Notas em Aberto e juros sobre as mesmas (exceto as Notas substituídas de acordo com a Seção 2.11), e se, em qualquer caso, o Emissor pagar todos os outros valores devidos nos termos deste instrumento pelo Emissor, então esta Escritura, e as obrigações do Emissor e de qualquer Garantidor nos termos deste instrumento, deixarão de produzir efeitos adicionais, de acordo com as Seções 8.01(c) e 8.06. O Agente Fiduciário reconhecerá a satisfação e a quitação desta Escritura mediante solicitação do Emissor, acompanhada de um Certificado de Diretores e um Parecer do Advogado (cada um declarando que todas as condições precedentes fornecidas nesse documento relacionadas à satisfação e quitação desta Escritura foram cumpridas) e às custas e despesas do Emissor.

(b)    Sujeito às Seções 8.01(c), 8.02 e 8.06, o Emissor poderá, a qualquer momento, rescindir (i) todas as suas obrigações nos termos desta Escritura e as Notas ("**Opção de Nulidade Legal**") ou (ii) as obrigações dos Garantidores de acordo com a Seção 4.13 - Seção 4.15, Seção 4.17 e Seção 4.19 a Seção 4.23 e a operação das Seções 6.01(a), 6.01(b), 6.01(c), 6.01(d) 6.01(e) e 6.01(h) ("**Opção de Nulidade de Obrigação**"). A opção de nulidade legal pode ser exercida, não obstante qualquer exercício prévio da opção de nulidade de Obrigação. Mediante o exercício, pelo Emissor, da opção de nulidade

---

[14] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 105

legal ou da opção de nulidade de Obrigação, as obrigações dos Garantidores nos termos da Garantia serão rescindidas.

Se a opção de nulidade legal for exercida, o pagamento das Notas não poderá ser adiantado devido a um Evento de Inadimplemento em relação as mesmas. Se a opção de nulidade de Obrigação for exercida, o pagamento das Notas não poderá ser adiantado devido a um Evento de Inadimplemento especificado nas Seções 6.01(a), 6.01(b), 6.01(c), 6.01(d), 6.01(e) e 6.0 (h).

Mediante o cumprimento das condições estabelecidas neste documento e mediante solicitação do Emissor, o Agente Fiduciário deverá reconhecer por escrito a quitação das obrigações do Emissor neste documento, exceto as especificadas na Seção 8.01(c).

(c)     Não obstante a Seção 8.01(b), as obrigações do Emissor de acordo com as Seções 2.04, 2.05, 2.06, 2.07, 2.08, 2.09 e 4.04 sobreviverão até que as Notas sejam pagas integralmente. Posteriormente, as obrigações do Emissor de acordo com as Seções 7.06, 7.07, 8.04 e 8.05 deverão sobreviver. Além disso, as obrigações dos Garantidores de pagar integral e pontualmente todos os montantes devidos pelo Emissor ao Agente Fiduciário de acordo com esta Escritura deverão sobreviver.

Seção 8.02.     *Condições para Nulidade.* O Emissor poderá exercer a opção de nulidade legal ou a opção de nulidade de Obrigação somente se:

(a)     O Emissor, irrevogavelmente, depositar ou fizer com que seja depositado junto ao Agente Fiduciário como fundos em fideicomisso, especificamente penhorados como garantia, e exclusivamente em benefício dos Titulares (o "**fideicomisso de nulidade**") de acordo com um fundo irrevogável e contrato de garantia em forma e conteúdo satisfatório para o Agente Fiduciário, dinheiro ou Obrigações do Governo dos EUA, ou uma combinação dos mesmos, suficiente para o pagamento do principal e dos juros de todas as Notas até o Vencimento ou resgate[15];

(b)     O Emissor entrega ao Agente Fiduciário o certificado de uma empresa internacionalmente reconhecida de contadores independentes, expressando seu parecer de que os pagamentos do principal e dos juros das Notas quando vencidos e sem reinvestimento nas Obrigações depositadas do Governo dos EUA, mais qualquer valor depositado sem investimento e após pagamento de todos os impostos federais, estaduais e locais ou outros encargos ou apurações em relação aos mesmos devidos pelo Agente Fiduciário, fornecerão dinheiro nos momentos e nos montantes que forem suficientes para pagar o principal e os juros de todas as Notas no Vencimento ou no resgate, conforme o caso[16];

---

[15] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.
[16] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                         fls. 106

(c)     123 dias corridos após o depósito ser realizado de acordo com os termos da Seção 8.02(a) e durante esse período de 123 dias, não ocorrer o Inadimplemento ou o Evento de Inadimplemento especificado na Seção 6.01(g) que continua no final do período;

(d)     nenhum Inadimplemento ou Evento de Inadimplemento ocorreu e continua na data de tal depósito e após a sua efetivação;

(e)     o depósito não constituir um inadimplemento ou evento de inadimplemento nos termos de qualquer outro contrato vinculante para o Emissor;

(f)     O Emissor entregar ao Agente Fiduciário um Parecer do Advogado no sentido de que o truste resultante do depósito não constitui ou não é qualificado como uma sociedade de investimento regulamentada nos termos da Lei de Sociedades de Investimento dos EUA de 1940, conforme aditada;

(g)     O Emissor entregar ao Agente Fiduciário Pareceres de Advogados declarando que, de acordo com a lei brasileira, os Titulares (exceto brasileiros) não reconhecerão ganhos para fins tributários brasileiros e os pagamentos do fideicomisso de nulidade a qualquer um desses Titulares não estarão sujeitos a pagamentos retidos de acordo com as leis brasileiras;

(h)     no caso da opção de nulidade legal, o Emissor entregar ao Agente Fiduciário um Parecer de Advogado de reputação reconhecida em relação a questões de imposto de renda federal dos EUA, declarando que (i) o Emissor recebeu ou teve disponibilizado pela Receita Federal dos EUA uma decisão, ou (ii) desde a data desta Escritura houve uma alteração na lei federal de imposto de renda aplicável nos EUA, em ambos os casos no sentido de que, e com base na mesma, o Parecer do Advogado confirmará que, os Titulares não reconhecerão receita, ganho ou prejuízo para fins de imposto de renda federal dos EUA como resultado de tal depósito e nulidade e estarão sujeitos ao imposto de renda federal dos EUA sobre os mesmos montantes, da mesma maneira e nos mesmos períodos como teria sido o caso se tal depósito e nulidade não tivessem ocorrido;

(i)     no caso da opção de nulidade de Obrigação, o Emissor entregar ao Agente Fiduciário um Parecer de Advogado de reputação reconhecida em relação a questões de imposto de renda federal dos EUA, no sentido de que os Titulares não reconheçam receita, ganho ou prejuízo para fins de imposto de renda federal dos EUA como resultado de tal nulidade de Obrigação e estará sujeito ao imposto de renda federal dos EUA sobre os mesmos valores, da mesma maneira e nos mesmos períodos como teria sido o caso tal nulidade de Obrigação não tivesse ocorrido;

(j)     o Emissor entregar ao Agente Fiduciário um Parecer de Advogado, na forma e conteúdo razoavelmente satisfatório para o Agente Fiduciário, no sentido de que, após a passagem de 123 dias corridos após o depósito, os fundos em fideicomisso não estiverem sujeitos a qualquer falência, insolvência, recuperação ou lei similar aplicável que afete os direitos dos credores em geral; e

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 107

(k)       o Emissor entrega ao Agente Fiduciário um Certificado de Diretores e um Parecer de Advogado, cada um declarando que foram cumpridas todas as condições precedentes à nulidade e quitação das Notas conforme contemplado por este Artigo 8.

Antes ou depois de um depósito, o Emissor pode fazer acordos satisfatórios para o Agente Fiduciário para o resgate de Notas em uma data futura, de acordo com o Artigo 3.

Seção 8.03.       *Aplicação do Dinheiro em Garantia.* O Agente Fiduciário manterá dinheiro ou Obrigações depositadas do Governo dos EUA em garantia de acordo com a Seção 8.02. Ele aplicará o dinheiro depositado e o dinheiro das Obrigações do Governo dos EUA através do Agente de Pagamentos ou dos Agentes Pagadores e de acordo com esta Escritura para o pagamento do principal e dos juros das Notas.

Seção 8.04.       *Pagamento para o Emissor.* Após o término do fideicomisso estabelecido de acordo com a Seção 8.02, o Agente Fiduciário e cada Agente de Pagamentos pagarão imediatamente ao Emissor, mediante solicitação, qualquer excedente em dinheiro ou Obrigações do Governo dos EUA por eles detidas.

Sujeito a qualquer direito de bens abandonados aplicável, o Agente Fiduciário e cada Agente de Pagamentos pagarão ao Emissor, mediante solicitação, qualquer dinheiro retido por eles para pagamento do principal ou juros sobre as Notas que permanecerem não reclamados por 2 (dois) anos após a data de vencimento do pagamento do principal ou dos juros e, a partir de então, o Agente Fiduciário e cada Agente de Pagamentos, conforme o caso, não serão responsáveis pelo pagamento de tais montantes nos termos deste Contrato, e os Titulares terão direito a recuperação de tais quantias apenas do Emissor.

Seção 8.05.       *Indenização por Obrigações do Governo dos EUA.* O Emissor pagará e indenizará o Agente Fiduciário por qualquer imposto, taxa ou outro encargo incidente ou cobrado sobre as Obrigações do Governo dos EUA depositadas ou o principal e os juros recebidos por tais Obrigações do Governo dos EUA.

Seção 8.06.       *Reintegração.* Se o Agente Fiduciário ou qualquer Agente de Pagamentos for incapaz de aplicar dinheiro ou Obrigações do Governo dos EUA de acordo com este Artigo 8, em razão de qualquer processo legal ou de qualquer decisão ou sentença de qualquer tribunal ou Autoridade Pública que exija, restrinja ou proíba de outra forma tal aplicação, as obrigações do Emissor e de cada Garantidor nos termos desta Escritura, as Notas e a Garantia serão revividas e reintegradas como se nenhum depósito tivesse ocorrido nos termos deste Artigo 8 até o momento em que o Agente Fiduciário ou o Agente de Pagamentos tiver permissão para aplicar todo esse dinheiro ou Obrigações do Governo dos EUA de acordo com este artigo 8; ressalvado, no entanto, que se o Emissor ou cada Garantidor tiver efetuado qualquer pagamento de principal ou juros sobre quaisquer Notas devido à reintegração de suas

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021                                                                    CCM nº    2.968.720-9
C.P.F. nº 077.542.738-10                                                                        INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 108

obrigações, o Emissor e esse Garantidor serão sub-rogados aos direitos dos Titulares de tais Notas para receber tal pagamento do dinheiro ou das Obrigações do Governo dos EUA mantidas pelo Agente Fiduciário ou por esse Agente de Pagamentos.

ARTIGO 9
ADITAMENTOS

Seção 9.01.    *Modificação e Renúncia*. As modificações e aditamentos à Escritura e às Notas podem ser realizadas pelo Emissor, Garantidores e Agente Fiduciário com o consentimento dos Titulares de, pelo menos, a maioria do montante do principal total da Notas em Circulação no momento, afetadas por tal aditamento, mas nenhuma modificação ou aditamento poderá, sem o consentimento do Titular de cada Nota afetada:

(a)    alterar o vencimento, principal ou juros indicados de qualquer uma dessas Notas, reduzir o montante principal de tais Notas, a taxa de juros sobre as mesmas, se houver, ou qualquer prêmio ou principal pagável mediante o resgate da mesma, alterar qualquer local onde, ou a moeda na qual qualquer Nota ou participação, se houver, sobre a mesma for devida, ou prejudicar o direito de instaurar processo para a execução de tal pagamento a partir do vencimento indicado, se houver, do mesmo ou a data em que tal pagamento estiver de outra forma vencido (ou, no caso de resgate, a partir da data do resgate);[17]

(b)    reduzir a porcentagem no montante do principal total dessas Notas em Circulação, cujo consentimento é exigido dos Titulares para qualquer aditamento ou modificação dessas Notas ou desta Escritura, ou o consentimento exigido dos Titulares para qualquer renúncia (em conformidade com certas disposições da Escritura ou certos inadimplementos e suas consequências) prevista nesta Escritura;

(c)    aditar ou modificar certas disposições dessas Notas ou desta Escritura referentes à renúncia pelos Titulares dessas Notas de inadimplementos anteriores, aditamentos ou modificações a essas Notas ou a esta Escritura com o consentimento dos Titulares dessas Notas, e a renúncia pelos Titulares de tais Notas de certas Obrigações, exceto para aumentar qualquer porcentagem especificada no montante do principal total exigido por quaisquer medidas dos Titulares ou para prever que certas outras disposições das Notas ou desta Escritura não possam ser modificadas ou renunciadas sem o consentimento do Titular de tais Notas afetadas em razão disso.

(d)    depois que for realizada uma oferta de compra de Notas, reduzir o montante ou o preço da compra ou prorrogar a data de compra;

---

[17] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 109

(e)      fazer qualquer alteração na porcentagem do montante do principal necessário para aditamentos, renúncias, consentimentos ou objeções, sujeito às cláusulas (b) e (c) acima;

(f)      efetuar qualquer alteração na Garantia que afetaria adversamente os Titulares;

(g)      modificar ou alterar quaisquer disposições desta Escritura que afetem a classificação das Notas.

Não será necessário o consentimento dos Titulares, de acordo com os parágrafos anteriores, para aprovar a forma específica de qualquer aditamento proposto, mas será suficiente se tal consentimento aprovar o conteúdo do mesmo. Após a efetivação do aditamento nos termos do parágrafo anterior, o Emissor enviará para os Titulares uma notificação descrevendo brevemente tal aditamento. A falta de notificação para todos os Titulares, ou qualquer defeito naquela, não prejudicará ou afetará a validade do aditamento nos termos do parágrafo anterior.

Os Titulares da maioria no montante do principal total das Notas em Circulação podem renunciar, em nome dos Titulares de todas as Notas, um Inadimplemento existente ou Evento de Inadimplemento e suas consequências, exceto (i) um Inadimplemento ou Evento de Inadimplemento no pagamento do principal, prêmio, se houver, ou juros sobre uma Nota ou (ii) um Inadimplemento ou Evento de Inadimplemento em relação a uma disposição nos termos desta Seção 9.01, que não possa ser modificada ou aditada sem o consentimento do Titular de cada Nota em Circulação. Quando um Inadimplemento ou Evento de Inadimplemento é renunciado, ele é considerado sanado, mas tal renúncia se estende a qualquer Inadimplemento ou Evento de Inadimplemento subsequente ou outro, ou prejudica qualquer direito resultante.

O Emissor e o Agente Fiduciário podem, sem o voto ou consentimento de qualquer Titular de Notas, modificar ou aditar esta Escritura ou as Notas com a finalidade de:

(a)      complementar as Obrigações do Emissor, da Sociedade ou das Subsidiárias em benefício dos Titulares;

(b)      renunciar a qualquer direito ou poder conferido ao Emissor;

(c)      garantir as Notas de acordo com os requisitos das mesmas ou de outra forma;

(d)      adicionar uma Garantia complementar em relação às Notas;

(e)      comprovar a sucessão de outra empresa ao Emissor e a assunção por qualquer sucessor das Obrigações e obrigações do Emissor nas Notas e nesta Escritura, de acordo com qualquer incorporação, fusão ou venda de ativos, ou qualquer substituição do Emissor de acordo com o Artigo 5º;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 110

(f)      corrigir qualquer ambiguidade, inconsistência ou disposição defeituosa contida nesta Escritura ou nas Notas;

(g)      efetuar qualquer modificação ou conceder qualquer renúncia ou autorização a qualquer violação ou violação proposta de qualquer um dos termos e condições das Notas ou quaisquer outras disposições desta Escritura, de qualquer maneira que o Emissor possa determinar e que não afete adversamente o interesse de quaisquer Titulares em qualquer aspecto relevante;

(h)      efetuar qualquer modificação de caráter limitado ou técnico ou corrigir um erro manifesto; ou

(i)      providenciar a nomeação de um Agente Fiduciário sucessor, de acordo com os termos desta Escritura; *ressalvado*, que o Agente Fiduciário sucessor seja, de outra forma, qualificado e elegível para atuar como tal nos termos desta Escritura.

Qualquer instrumento fornecido por ou em nome de qualquer Titular de uma Nota em conexão com qualquer consentimento para tal modificação, aditamento ou renúncia será irrevogável uma vez concedido e será conclusivo e vinculante para todos os Titulares subsequentes de tal Nota. Quaisquer modificações, aditamentos ou renúncias a esta Escritura ou aos termos e condições de quaisquer Notas serão conclusivas e vinculantes para todos os Titulares dessas Notas, independentemente de terem ou não dado tal consentimento.

Seção 9.02.      *O Agente Fiduciário Assinará Aditamentos.* Mediante solicitação do Emissor acompanhada por uma Deliberação do Conselho autorizando a assinatura de qualquer escritura alterada ou suplementar, e mediante o arquivamento com o Agente Fiduciário de provas satisfatórias para o Agente Fiduciário do consentimento dos Titulares necessários, e após o recebimento pelo Agente Fiduciário dos documentos descrito na Seção 13.03 deste documento (na medida do solicitado), o Agente Fiduciário deverá assinar qualquer alteração autorizada nos termos deste Artigo 9 se o aditamento não afetar adversamente os direitos, deveres, responsabilidades ou imunidades do Agente Fiduciário. Em caso afirmativo, o Agente Fiduciário poderá, mas não será obrigado a assiná-la. Ao assinar tal aditamento, o Agente Fiduciário terá o direito de receber indenização razoavelmente satisfatória para ele e de receber, e (sujeito à Seção 7.01) deverá ser totalmente protegido ao se basear, além dos documentos exigidos pela Seção 13.03, em um Certificado do Diretor e um Parecer do Advogado, cada qual declarando que tal alteração é autorizada ou permitida por esta Escritura.

ARTIGO 10
GARANTIA

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                                    fls. 111

Seção 10.01.   *A Garantia*. Sujeito às disposições deste Artigo, os Garantidores garantem neste ato de forma irrevogável, incondicional, solidária e não segura, o pagamento integral e pontual (seja no Vencimento Indicado, mediante resgate, aceleração ou de outra forma) do principal, prêmio, se houver, e juros e todos os outros montantes a pagar em cada Nota e o pagamento integral e pontual de todos os outros montantes a pagar pelo Emissor os termos desta Escritura. Se o Emissor não pagar pontualmente qualquer montante, os Garantidores pagarão imediatamente mediante solicitação o montante não pago no local e da maneira especificada nesta Escritura[18].

Seção 10.02.   *Garantia Incondicional*. As obrigações dos Garantidores nos termos deste instrumento são incondicionais e absolutas e, sem limitar a generalidade do exposto, não serão liberadas, dispensadas ou afetadas por:

(a)      qualquer extensão, renovação, liquidação, compromisso, renúncia ou liberação em relação a qualquer obrigação do Emissor nos termos desta Escritura ou de qualquer Nota, por força de lei ou de outra forma;

(b)      qualquer modificação ou aditamento ou complemento a esta Escritura ou a qualquer Nota;

(c)      qualquer alteração na existência societária, estrutura ou propriedade do Emissor, ou qualquer insolvência, falência, recuperação ou outro processo semelhante que afete o Emissor ou seus ativos ou qualquer liberação ou quitação resultante de qualquer obrigação do Emissor contida nesta Escritura ou qualquer Nota;

(d)      a existência de qualquer reivindicação, compensação ou outros direitos que os Garantidores possam ter a qualquer momento em relação ao Emissor, o Agente Fiduciário ou qualquer outra Pessoa, seja quanto a esta Escritura ou em operações não relacionadas; desde que nada neste documento impeça a afirmação de qualquer reivindicação por ação separada ou reconvenção compulsória;

(e)      qualquer invalidez ou não aplicabilidade relacionada a ou contra o Emissor por qualquer motivo desta Escritura ou qualquer Nota, ou qualquer disposição da lei ou regulamento aplicável que pretenda proibir o pagamento, pelo Emissor, do principal ou dos juros sobre qualquer Nota ou qualquer outro montante a pagar pelo Emissor nos termos desta Escritura; ou

(f)      qualquer outra ação ou omissão ou atraso de qualquer espécie pelo Emissor, pelo Agente Fiduciário ou por qualquer outra Pessoa ou qualquer outra circunstância que possa, salvo

---

[18] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 112

para as disposições deste parágrafo, constituir uma quitação ou defesa legal ou equitativa das obrigações dos Garantidores nos termos deste instrumento.

Seção 10.03.    *Quitação; Reintegração*. As obrigações dos Garantidores nos termos deste instrumento permanecerão em pleno vigor e efeito até que o principal, o prêmio, se houver, e os juros sobre as Notas e todos os outros montantes a pagar pelo Emissor de acordo com esta Escritura sejam pagos integralmente. Se a qualquer momento qualquer pagamento do principal, prêmio, se houver, ou juros sobre qualquer Nota ou qualquer outro montante a pagar pelo Emissor nos termos desta Escritura for rescindido ou tiver que ser restaurado ou devolvido de outra forma mediante a insolvência, falência ou recuperação Emissor ou não, as obrigações dos Garantidores nos termos deste documento com relação a esse pagamento serão restabelecidas como se esse pagamento tivesse sido devido, mas não efetuado naquele momento.

Seção 10.04.    *Renúncia pelos Garantidores*. Os Garantidores renunciam irrevogavelmente à aceitação, apresentação, demanda, protesto e qualquer notificação não prevista neste documento, bem como a exigência de que a qualquer momento qualquer ação seja adotada por qualquer Pessoa quanto ao Emissor ou qualquer outra Pessoa.

Seção 10.05.    *Sub-rogação e Contribuição*. Ao efetuar qualquer pagamento com relação a qualquer obrigação do Emissor nos termos deste Artigo, qualquer Garantidor que efetuar esse pagamento será sub-rogado aos direitos do beneficiário quanto ao Emissor em relação a essa obrigação; desde que esse Garantidor não possa aplicar qualquer direito de sub-rogação ou direito de receber pagamento na natureza da contribuição, ou de outra forma, de qualquer outro Garantidor, com relação a esse pagamento, desde que qualquer montante a pagar pelo Emissor neste documento ou de acordo com as Notas permaneça sem pagamento.

Seção 10.06.    *Suspensão de Vencimento Antecipado*. Se a aceleração do prazo para pagamento de qualquer montante a pagar pelo Emissor nos termos desta Escritura ou das Notas for mantida por insolvência, falência ou recuperação do Emissor, todos esses montantes sujeitos a aceleração nos termos desta Escritura serão, todavia, pagos pelos Garantidores neste instrumento, mediante solicitação do Agente Fiduciário ou dos Titulares, de acordo com os termos desta Escritura.

Seção 10.07.    *Limitação sobre o Montante da Garantia*. Não obstante qualquer disposição em contrário neste Artigo, os Garantidores e, pela aceitação das Notas, cada Titular, confirma que é intenção de todas as partes que a Garantia não constitua uma fraude contra credores de acordo com as disposições aplicáveis das leis de fraude contra credores do Brasil, o Código de Falências dos Estados Unidos ou qualquer disposição comparável da lei estadual. Para efetivar essa intenção, o Agente Fiduciário, os Titulares e os Garantidores concordam irrevogavelmente que as obrigações dos Garantidores de acordo com sua Garantia são limitadas ao valor máximo que não tornaria as obrigações dos Garantidores sujeitas

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 113

a evasão de acordo com das disposições aplicáveis de fraude contra credores das leis do Brasil, do Código de Falências dos Estados Unidos ou de qualquer disposição comparável da lei estatal.

Seção 10.08.  *Assinatura e Formalização da Garantia*. A celebração por cada Garantidor desta Escritura (ou uma escritura complementar na forma do Anexo B) comprova a Garantia de cada Garantidor, independentemente de a Pessoa que assinar como diretor desse Garantidor ainda exercer esse cargo no momento da autenticação de qualquer Nota. A entrega de qualquer Nota pelo Agente Fiduciário após a autenticação constitui a entrega devida da Garantia estabelecida nesta Escritura em nome dos Garantidores.

Seção 10.09.  *Liberação da Garantia*. A Garantia dos Garantidores terminará mediante:

(a)      uma venda ou outra alienação (inclusive por meio de fusão ou incorporação) de cada Garantidor ou a venda ou alienação de todos ou substancialmente todos os ativos desse Garantidor (em todos os casos, exceto para o Emissor ou uma Subsidiária) de outra forma permitida por esta Escritura;

(b)      caso a Garantia seja requerida nos termos desta Escritura, a cessação das circunstâncias que exigem essa Garantia; ou

(c)      anulação ou quitação das Notas, conforme previsto no Artigo 7.

Após a entrega pelo Emissor ao Agente Fiduciário de um Certificado dos Diretores e o Parecer do Advogado para o efeito acima, o Agente Fiduciário deverá celebrar todos os documentos solicitados por escrito pelo Emissor, a fim de comprovar a liberação dos Garantidores de suas obrigações nos termos da Garantia.

### ARTIGO 11
### SUBSTITUIÇÃO DE NOTAS

Seção 11.01.  *Substituição de Notas*. As Notas que forem mutiladas, destruídas, roubadas ou perdidas serão substituídas mediante entrega da mesma ao Agente Fiduciário, ou entrega ao Emissor ao Agente Fiduciário de prova satisfatória da perda, roubo ou destruição das mesmas para o Emissor e Agente Fiduciário. No caso de uma Nota perdida, roubada ou destruída, pode ser exigida uma indenização satisfatória para o Agente Fiduciário e o Emissor às custas do Titular de tal Nota antes que a Nota substituta seja emitida. Após a emissão de qualquer Nota, o Emissor pode exigir o pagamento de uma quantia suficiente para cobrir qualquer imposto ou outro encargo governamental que possa ser aplicado em relação àquela e quaisquer outras despesas (incluindo os honorários e as despesas do Agente Fiduciário, seus advogados e seus agentes) conectadas com a mesma.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 114

### ARTIGO 12
INEXISTÊNCIA DE RESPONSABILIDADE PESSOAL DE CONSELHEIROS, DIRETORES, FUNCIONÁRIOS E ACIONISTAS

Seção 12.01.   *Inexistência de Responsabilidade Pessoal.* O conselheiro, diretor, funcionário ou acionista, como tal, do Emissor, qualquer Garantidor, e o conselheiro, diretor ou funcionário de qualquer Subsidiária da Sociedade não terá qualquer responsabilidade por ou em relação a quaisquer obrigações do Emissor, dos Garantidores ou qualquer uma de suas respectivas Subsidiárias nos termos das Notas, desta Escritura ou da Garantia. Ao aceitar uma Nota, cada Titular renunciará e liberará toda essa responsabilidade. A renúncia e a liberação fazem parte da contraprestação pela emissão das Notas. A renúncia pode não ser eficaz para renunciar a obrigações nos termos das leis federais de valores mobiliários.

### ARTIGO 13
### DISPOSIÇÕES GERAIS

Seção 13.01.   *Disposições da Escritura e Notas para o Benefício Exclusivo das Partes e Titulares das Notas.* Nada nesta Escritura ou nas Notas, expresso ou implícito, deverá fornecer a qualquer Pessoa, que não seja as partes deste instrumento e seus sucessores e os Titulares, qualquer benefício ou direito, recurso ou reivindicação legal ou equitativa de acordo com esta Escritura ou as Notas.

Seção 13.02.   *Notificações.*  Qualquer  solicitação,  demanda,  autorização,  orientação, notificação, consentimento, renúncia ou outra comunicação ou documento fornecido ou permitido por esta Escritura a ser realizado, entregue, fornecido ou proporcionado a, ou apresentado, ou arquivado perante qualquer parte desta Escritura, exceto como de outra forma expressamente previsto neste documento, será considerado recebido somente após o recebimento efetivo por correio ou telecopiadora de primeira classe, endereçado à parte relevante da seguinte forma:

Ao Emissor:

OEC Finance Limited
a/c Odebrecht Engenharia e Construção S.A
Av. Lemos Monteiro 120, 7º andar, São Paulo – SP Brazil 05501-050
Brasil
Aos cuidados de: CFO; fjens@oec-eng.com

Ao Agente Fiduciário:

The Bank of New York Mellon

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV          fls. 115

240 Greenwich Street – 7E
Nova York, Nova York 10286
Aos cuidados de: Truste Corporativo Internacional - ODEBRECT

Telecópia: 724-540-6330

Notificações ou comunicações a um Garantidor serão considerados entregues se fornecidas ao Emissor.

Qualquer parte, mediante notificação às outras partes, pode designar endereços adicionais ou diferentes para as notificações ou comunicações subsequentes.

Quando esta Escritura prever a notificação aos Titulares, essa notificação será considerada como entregue mediante (i) o envio por correio de primeira classe, com postagem pré-paga, dessa notificação aos Titulares em seus endereços registrados, conforme registrado no Registro.

O Emissor também fará com que todas as outras publicações dessas notificações conforme exigidas periodicamente pela lei aplicável brasileira, incluindo, sem limitação, as exigidas pela regulamentação aplicável emitida pela CVM.

A falta de envio da notificação ou comunicação para o Titular ou qualquer defeito nela não afetará sua suficiência em relação a outros Titulares. Se uma notificação ou comunicação for enviada por correio a um Titular da maneira prevista acima, será devidamente entregue, independentemente de o destinatário a receber ou não.

Todos as notificações ou comunicações a serem fornecidas de acordo com qualquer cláusula desta Escritura devem ser realizadas em inglês ou, quando não fornecidas em inglês, devem ser acompanhadas por uma tradução certificada para o inglês.

Seção 13.03. *Certificado dos Diretores e Parecer do Advogado quanto às Condições Precedentes.* Mediante pedido ou solicitação do Emissor ao Agente Fiduciário para realizar ou abster-se de realizar qualquer ação nos termos desta Escritura, o Emissor deverá fornecer ao Agente Fiduciário

(a)    um Certificado dos Diretores na forma e substância razoavelmente satisfatória ao Agente Fiduciário (que deve incluir as declarações estabelecidas na Seção 13.04) afirmando que na opinião dos signatários, todas as condições precedentes, se houver, previstas nesta Escritura relativa à ação proposta foram cumpridas; e

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021                                                                CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                                     INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01             Livro nº LIV                              fls. 116

    (b)    um Parecer do Advogado na forma e substância razoavelmente satisfatória ao Agente Fiduciário (que deve incluir as declarações estabelecidas na Seção 13.04) afirmando que, na opinião desse advogado, todas essas condições precedentes foram cumpridas.

Seção 13.04.    *Declarações Necessárias no Certificado dos Diretores ou no Parecer do Advogado*. Cada certificado ou parecer com relação ao cumprimento de um acordo ou condição prevista nesta Escritura deverá incluir:

    (a)    uma declaração de que cada Pessoa que elaborou ou prestou o Certificado dos Diretores ou Parecer do Advogado leu esse acordo ou condição e as definições relacionadas;

    (b)    uma breve declaração sobre a natureza e o escopo da analise ou investigação em que se baseiam as declarações ou opiniões contidas no Certificado dos Diretores ou Parecer do Advogado;

    (c)    uma declaração de que, na opinião de cada Pessoa, a análise ou investigação necessária foram realizadas a fim de permitir a expressão de uma opinião informada sobre se esse acordo ou condição foi ou não cumprido; e

    (d)    uma declaração sobre se, na opinião de cada Pessoa, esse acordo ou condição foi cumprido, desde que um Parecer do Advogado possa ter por base um Certificado dos Diretores ou certificados ou funcionários públicos com relação aos assuntos do fato.

Seção 13.05.    *Regras do Agente Fiduciário, Oficial de Registro, Agente de Pagamentos e Agente de Transferência*. O Agente Fiduciário, o Oficial de Registro, os Agentes Pagadores e os Agentes de Transferência podem estabelecer regras razáveis para suas funções.

Seção 13.06.    *Indenização de Câmbio*. Qualquer montante recebido ou recuperado em uma moeda, exceto a moeda (a "**Moeda de Denominação**") na qual a Nota está denominada ou na qual tal quantia é devida, seja como resultado, ou da execução de uma sentença ou decisão de um tribunal de qualquer jurisdição, na dissolução do Emissor ou de outra forma (a "**Moeda da Decisão**"), pelo Titular em relação a qualquer quantia que lhe seja devida pelo Emissor ou pelos Garantidores, constituirá quitação do Emissor somente na medida do montante da Moeda de Denominação que o Titular possa comprar com o montante recebido ou recuperado na Moeda de Decisão na data desse recebimento ou recuperação (ou, se não for possível fazer a compra nessa data, na primeira data possível). O Emissor concorda que indenizará o Titular relevante por qualquer prejuízo decorrente ou resultante de qualquer variação nas taxas de câmbio entre (i) a taxa de câmbio na qual a Moeda de Denominação é convertida na Moeda de Decisão, para fins de tal decisão ou sentença, liquidação, dissolução ou de outra forma e (ii) a taxa de câmbio na qual tal Titular teria comprado a moeda de denominação com o montante da Moeda de Decisão efetivamente recebida por tal Titular, se tal Titular tivesse utilizado tal montante de

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 117

Moeda de Decisão para comprar a moeda de denominação o mais rápido possível após o Titular receber a mesma. Essa indenização constituirá uma obrigação separada e independente das demais obrigações contidas nos termos e condições destas Notas, dará origem a uma causa de pedir separada e independente, será aplicada independentemente de qualquer indulgência concedida de tempos em tempos e continuará em pleno vigor e efeito, independentemente de qualquer decisão, sentença, crédito ou prova de soma ou somas liquidadas em relação aos montantes devidos em relação à Nota relevante ou sob qualquer decisão, sentença, crédito ou prova. O termo "taxa de câmbio" incluirá a provisão para quaisquer prêmios habituais ou razoáveis e custos de câmbio devidos em conexão com a compra ou conversão para a moeda relevante.

Seção 13.07. *Inexistência de Direito de Regresso Contra Outros.* Nenhum conselheiro, diretor, funcionário ou acionista, nessa qualidade, do Emissor ou do Agente Fiduciário terá qualquer responsabilidade por quaisquer obrigações do Emissor ou do Agente Fiduciário, respectivamente, nos termos desta Escritura ou das Notas ou por qualquer reivindicação com base, relação ou em razão dessas obrigações ou de sua criação. Ao aceitar uma Nota, cada Titular renunciará e liberará toda essa responsabilidade. A renúncia e liberação serão parte da contraprestação pela emissão das Notas.

Seção 13.08. *Feriados Legais.* Em qualquer caso em que qualquer Data de Pagamento de Juros ou Data de Resgate ou data de Vencimento de qualquer Nota não for um Dia Útil, então (não obstante qualquer outra disposição desta Escritura ou das Notas), o pagamento de juros ou principal não precisará ser efetuado nessa data, mas pode ser realizado no próximo Dia Útil, com o mesmo vigor e efeito como se tivesse sido realizado na Data de Pagamento de Juros ou Data de Resgate ou data de Vencimento; desde que nenhum juros seja acumulado pelo período a partir e após a Data de Pagamento de Juros, Data de Resgate ou data de Vencimento, conforme o caso.[19]

Seção 13.09. *Lei Aplicável; Renúncia a Julgamento por Júri.* ESTA ESCRITURA, AS NOTAS E AS GARANTIAS SERÃO REGIDAS PELAS LEIS DO ESTADO DE NOVA IORQUE. CADA UMA DAS PARTES NESTE DOCUMENTO RENUNCIA IRREVOGAVELMENTE, NA MEDIDA MÁXIMA PERMITIDA PELA LEI APLICÁVEL, A TODO E QUALQUER DIREITO A JULGAMENTO POR JÚRI EM QUALQUER PROCESSO LEGAL DECORRENTE OU RELACIONADO A ESTA ESCRITURA, AS NOTAS OU AS OPERAÇÕES CONTEMPLADAS NESTE INSTRUMENTO.

Seção 13.10. *Consentimento à Jurisdição; Renúncia de Imunidade.* O Emissor e os Garantidores se submeteram irrevogavelmente à jurisdição não exclusiva de qualquer tribunal estadual ou federal do Distrito de Manhattan, Cidade e Estado de Nova Iorque para fins de qualquer ação ou processo decorrente ou relacionado às Notas, à Garantia ou a esta Escritura. O Emissor e os Garantidores renunciaram irrevogavelmente, dentro dos limites permitidos por lei, a qualquer objeção que possa ter

---

[19] NTD: Seção a ser ajustada para Notas Perpétuas. Ver Anexo G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 118

sobre a eleição do foro de qualquer ação ou processo instaurado em tal tribunal e qualquer reivindicação de que tal ação ou processo ajuizado em tal tribunal foi instaurado em um foro incompetente e qualquer direito a que possa ter em razão do local de residência ou domicílio. O Emissor e os Garantidores concordaram que a decisão transitada em julgado de qualquer ação ou processo instaurado em tal tribunal será conclusiva e vinculante para tal parte e poderá ser aplicada em qualquer tribunal na jurisdição onde essa parte se sujeita a tal decisão; *ressalvado*, *no entanto*, que essa citação seja efetuada sobre tal Pessoa da forma especificada no parágrafo seguinte ou conforme permitido por lei.

Enquanto qualquer Nota permanecer em circulação, o Emissor e os Garantidores sempre terão um representante legal no Distrito de Manhattan, Cidade e Estado de Nova Iorque, para quem será entregue citação em qualquer ação ou processo legal decorrente ou relacionado às Notas. A citação para tal representante e a notificação por escrito de tal citação enviada ou entregue à parte incluída em tal ação ou processo serão, dentro dos limites permitidos por lei, considerados em todos os aspectos como citação da parte em qualquer ação ou processo legal. O Emissor e os Garantidores nomearam [Cogency Global Inc.] como seu agente de citação em qualquer processo no Distrito de Manhattan, Cidade e Estado de Nova Iorque.

A citação entregue pessoalmente aos representantes especificados no parágrafo anterior e a notificação por escrito dessa citação entregue ao Emissor e aos Garantidores serão considerados, sob todos os aspectos, a citação do Emissor e dos Garantidores, *ressalvado*, *no entanto*, que nenhuma notificação por correio do Emissor ou dos Garantidores ou qualquer um de seus representantes será considerada uma citação efetiva.

Seção 13.11.   *Sucessores e Cessionários*. Todas as Obrigações e acordos do Emissor e dos Garantidores nesta Escritura, nas Notas e na Garantia vincularão seus respectivos sucessores e cessionários, ainda se expresso ou não. Todos os acordos do Agente Fiduciário nesta Escritura vincularão seus sucessores.

Seção 13.12.   *Múltiplos Originais*. As partes podem assinar qualquer número de cópias desta Escritura. Cada cópia assinada deve ser um original, mas todas juntas representam o mesmo contrato. Uma cópia assinada é suficiente para comprovar esta Escritura. A entrega de uma via assinada de uma página de assinaturas desta Escritura por fac-símile ou outro meio de imagem eletrônica (por exemplo, "pdf" ou "tif") terá o mesmo efeito que a entrega de uma via desta Escritura assinada manualmente.

Seção 13.13.   *Clausulas Independentes*. No caso de qualquer disposição nesta Escritura ou nas Notas ser inválida, ilegal ou não aplicável, a validade, legalidade e aplicabilidade das demais disposições não serão de forma alguma afetadas ou prejudicadas. Na medida do permitido pela lei aplicável, as partes renunciam a qualquer disposição da lei que torne qualquer termo ou disposição deste instrumento inválido ou não aplicável em qualquer aspecto.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 119

Seção 13.14.  *Força Maior*. Em hipótese alguma, qualquer Agente Fiduciário, Agente de Pagamentos, Agente de Transferência ou Oficial de Registro será responsável por qualquer falha ou atraso no desempenho de suas obrigações decorrentes ou causados, direta ou indiretamente, por forças além de seu controle, incluindo: sem limitação, pandemias, COVID-10, greves, paralisações, acidentes, atos de guerra ou terrorismo, distúrbios civis ou militares, catástrofes nucleares ou naturais ou casos fortuitos, e interrupções, perda ou mau funcionamento de serviços públicos, comunicações ou serviços computacionais (software e hardware); entendendo-se que cada Agente Fiduciário, Agente de Pagamentos, Agente de Transferência ou Oficial de Registro deverá enviar esforços razoáveis que sejam consistentes com as práticas aceitas no setor bancário para retomar o desempenho o mais rápido possível nessas circunstâncias.

Seção 13.15.  *Prescrição*. As reivindicações em face do Emissor ou quaisquer Garantidores para pagamentos nos termos das Notas ou Garantia prescreverão, a menos que sejam realizadas dentro de um período de seis anos a partir da data de pagamento relevante.


EM TESTEMUNHO DO QUE, as partes fizeram com que esta Escritura fosse devidamente assinada a partir da primeira data escrita acima.

OEC FINANCE LTD.
como Emissor

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:

OEC S.A.
Como GARANTIDOR

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 120

CNO S.A.
Como GARANTIDOR

Por:
Nome:
Cargo

Por:
Nome:
Cargo

OECI S.A.
Como GARANTIDOR

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:

OENGER S.A.
Como GARANTIDOR

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:

THE BANK OF NEW YORK MELLON

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 121

Como Agente Fiduciário, Oficial de Registro, Agente de Transferência e Agente de Pagamentos

Por:
Nome:
Cargo:

**ANEXO A**

MODELO DE NOTA

[FRENTE DA NOTA]

A MENOS QUE ESTA NOTA GLOBAL SEJA APRESENTADA POR UM REPRESENTANTE AUTORIZADO DA DEPOSITORY TRUST COMPANY, UMA SOCIEDADE TRUSTE DE OBJETO LIMITADO DE NOVA IORQUE ("**DTC**"), AO EMISSOR NOMEADO NO PRESENTE (A "**SOCIEDADE**") OU SEU AGENTE PARA REGISTRO DE TRANSFERÊNCIA, CÂMBIO OU PAGAMENTO E QUALQUER CERTIFICADO EMITIDO SEJA REGISTRADO EM NOME DA CEDE & CO. OU EM OUTRO NOME, CONFORME SOLICITADO POR UM REPRESENTANTE AUTORIZADO DA DTC (E QUALQUER PAGAMENTO FOR EFETUADO À CEDE & CO. OU A QUALQUER OUTRA INSTITUIÇÃO SOLICITADA POR UM REPRESENTANTE AUTORIZADO DA DTC), QUALQUER TRANSFERÊNCIA, PENHOR OU OUTRO USO DO PRESENTE POR QUALQUER VALOR OU DE OUTRA FORMA POR OU PARA QUALQUER PESSOA É ILÍCITA, DESDE QUE O TITULAR REGISTRADO, CEDE & CO. TENHA PARTICIPAÇÃO NO PREENTE.

AS TRANSFERÊNCIAS DESTA NOTA GLOBAL, NO TODO, SERÃO LIMITADAS A TRANSFERÊNCIAS A UM NOMEADO DA DTC OU POR UM NOMEADO DA DTC À DTC OU OUTRO NOMEADO DA DTC OU PELA DTC OU QUALQUER NOMEADO À UM DEPOSITÁRIO SUCESSOR OU UM NOMEADO DESSE DEPOSITÁRIO SUCESSOR E AS TRANSFERÊNCIAS DESTA NOTA GLOBAL, EM PARTE, SERÃO LIMITADAS ÀS TRANSFERÊNCIAS EFETUADAS DE ACORDO COM AS RESTRIÇÕES ESTABELECIDAS NA ESCRITURA E MENCIONADAS NO VERSO DESTE DOCUMENTO.

[*Inclua se a nota é uma Nota Global Restrita ou uma Nota emitida em troca, conforme exigido nesta Escritura*: ESTA NOTA NÃO FOI REGISTRADA DE ACORDO COM A LEI DE VALORES MOBILIÁRIOS DOS EUA DE 1933, CONFORME ADITADA (A "**LEI DE VALORES MOBILIÁRIOS**") OU QUALQUER OUTRA LEI DE VALORES MOBILIÁRIOS. O TITULAR DESTE INSTRUMENTO, AO ADQUIRIR ESTA NOTA, CONCORDA QUE ESTA NOTA OU QUALQUER INTERESSE OU PARTICIPAÇÃO NELA CONTIDA PODE SER OFERECIDA REVENDIDA, PENHORADA OU TRANSFERIDA DE OUTRA FORMA APENAS (I) AO

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.
Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 122

EMISSOR, (II) DE ACORDO COM UMA DECLARAÇÃO DE REGISTRO EM VIGOR NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS, (III) A UM COMPRADOR INSTITUCIONAL QUALIFICADO EM CONFORMIDADE COM A REGRA 144A NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS, (IV) EM UMA OPERAÇÃO OFFSHORE DE ACORDO COM A REGRA 904 DO REGULAMENTO S CONFORME A LEI DE VALORES MOBILIÁRIOS, OU (V) DE ACORDO COM UMA ISENÇÃO DE REGISTRO FORNECIDA PELA REGRA 144A CONFORME A LEI DE VALORES MOBILIÁRIOS OU QUALQUER OUTRA ISENÇÃO DISPONÍVEL DOS REQUISITOS DE REGISTRO DA LEI DE VALORES MOBILIÁRIOS E, EM CADA UM DESSES CASOS, DE ACORDO COM AS LEIS DE VALORES MOBILIÁRIOS APLICÁVEIS DE QUALQUER ESTADO DOS ESTADOS UNIDOS OU OUTRA JURISDIÇÃO APLICÁVEL. O TITULAR DESTE DOCUMENTO, AO ADQUIRIR ESTA NOTA, DECLARA E CONCORDA QUE DEVERÁ NOTIFICAR QUALQUER COMPRADOR DESTA NOTA SOBRE AS RESTRIÇÕES DE REVENDA MENCIONADAS ACIMA.

A LEGENDA ANTERIOR PODE SER REMOVIDA DESTA NOTA COM A SATISFAÇÃO DAS CONDIÇÕES ESPECIFICADAS NA ESCRITURA MENCIONADA NESTE DOCUMENTO.]

[*Inclua se a Nota é uma Nota Global conforme o Regulamento S ou uma Nota emitida em troca, de acordo com esta Escritura:* ESTA NOTA NÃO FOI REGISTRADA DE ACORDO COM A LEI DE VALORES MOBILIÁRIOS DOS EUA DE 1933, CONFORME ADITADA (A "**LEI DE VALORES MOBILIÁRIOS**") OU QUALQUER OUTRA LEI DE VALORES MOBILIÁRIOS. O TITULAR DESTE INSTRUMENTO, AO ADQUIRIR ESTA NOTA, CONCORDA QUE NEM ESTA NOTA NEM QUALQUER INTERESSE OU PARTICIPAÇÃO CONTIDA NO PRESENTE PODEM SER OFERECIDOS, REVENDIDOS, PENHORADOS OU DE OUTRA FORMA TRANSFERIDOS NA AUSÊNCIA DESSE REGISTRO, A MENOS QUE ESSA OPERAÇÃO ESTEJA ISENTA OU NÃO ESTEJA SUJEITA A ESSE REGISTRO.

A LEGENDA ANTERIOR PODE SER REMOVIDA DESTA NOTA APÓS 40 DIAS CORRIDOS A PARTIR DA (A) DATA EM QUE AS NOTAS FOREM OFERECIDAS A PESSOAS QUE NÃO SEJAM DISTRIBUIDORES (CONFORME DEFINIDO NO REGULAMENTO S NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS) E (B) DATA DE EMISSÃO ORIGINAL DESTA NOTA."]

### OEC FINANCE LTD.
[NOTA GLOBAL RESTRITA]
[NOTA GLOBAL CONFORME O REGULAMENTO S]
[NOTA CERTIFICADA]

Representando
[•]% das Notas Sênior com Vencimento em 20[·]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                                  CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                                           INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                     fls. 123

N° [R-1][S-1]

| | | |
|---|---|---|
| CUSIP N° [•]] [[•]] | | Montante Principal |
| ISIN | N° [[•]] | [[•]] |
| CÓDIGO COMUM. [[•]] [[•]] | | US$ [[•]] [[•]] |

A OEC FINANCE LTD., uma sociedade isenta constituída de acordo com as leis das Ilhas Cayman (o "**Emissor**", cujo termo inclui qualquer sociedade sucessora nos termos da Escritura referida no verso deste documento), pelo valor recebido, neste ato promete pagar à Cede & Co., ou cessionário registrado, US$ [[•]] [[•]], mediante apresentação e entrega desta Nota em [•] de 20[•] ou nessa data ou datas em que a quantia principal relevante possa ser paga de acordo com a disposições deste instrumento e na Escritura.

Os juros sobre o montante principal pendente serão suportados à taxa de [•]% ao ano pagável semestralmente em atraso em cada um dos [•] e [•] (cada uma dessas datas como "**Data de Pagamento de Juros**"), a partir de [•] de 20[•], todos sujeitos e de acordo com os termos e condições estabelecidos neste documento e na Escritura; desde que, no entanto, no caso de o Emissor, a qualquer momento, deixar de efetuar o pagamento de juros ou quaisquer outros montantes que possam ser pagos em relação às Notas, o Emissor deverá pagar os juros sobre principal ou parcelas de juros vencidas, para na medida da lei, à taxa suportada pelas Notas mais 1,5% ao ano.

É realizada referência às disposições restantes da presente Nota estabelecidas em seu verso, as quais, para todos os efeitos, terão o mesmo efeito como se fossem estabelecidas neste local.

A menos que o certificado de autenticação contido neste instrumento tenha sido celebrado pelo Agente Fiduciário ou Agente de Autenticação pela assinatura de um de seus signatários autorizados, esta Nota não terá direito a nenhum benefício nos termos da Escritura ou será válida ou obrigatória para qualquer finalidade.

EM TESTEMUNHO DO QUE, o Emissor fez com que esta Nota fosse devidamente assinada.

Data:

OEC FINANCE LTD.

Por:
Nome:
Cargo:

Por:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 124

---

Nome:
Cargo:

CERTIFICADO DE AUTENTICAÇÃO
DO AGENTE FIDUCIÁRIO

Esta é uma das Notas
referidas na
Escritura mencionada.

THE BANK OF NEW YORK MELLON,
Como Agente Fiduciário

Por:
Diretor Autorizado

[MODELO DO VERSO DA NOTA]

[•]% das Notas Sênior com Vencimento em 20[•]

TERMOS E CONDIÇÕES DAS NOTAS·

*As Notas terão os seguintes termos e condições. Determinados termos em maiúsculas usados nesses Termos e Condições estão definidos na Seção[·].*

**1.      Status**

**ANEXO B**

**ESCRITURA COMPLEMENTAR**

Datada de _____ de ____

entre

OEC FINANCE LTD.,

Os GARANTIDORES parte deste instrumento,

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 125

[Emissor Substituto] parte deste instrumento

e

THE BANK OF NEW YORK MELLON,

Como Agente Fiduciário

[·]% das Notas Sênior com Vencimento em 20[·]

A PRESENTE ESCRITURA COMPLEMENTAR (esta "**Escritura Complementar**"), celebrada a partir de _____ de ____, entre a OEC Finance Limited, uma sociedade isenta constituída de acordo com as leis das Ilhas Cayman (o "**Emissor**"), as partes Garantidoras, incluindo [_____] como Garantidor Adicional([cada um] "**Signatário**") e o The Bank of New York Mellon como agente fiduciário (o "**Agente Fiduciário**").

### CONSIDERANDOS

CONSIDERANDO QUE, o Emissor, os Garantidores e o The Bank of New York Mellon, como Agente Fiduciário, celebraram a Escritura, datada de [·] de 20[·] (a "**Escritura**"), relativa as [☐]% Notas Sênior com Vencimento em 20[·] (as "**Notas**");

CONSIDERANDO QUE, como uma condição para o Agente Fiduciário firmar a Escritura e a compra das Notas pelos Titulares, o Emissor concordou, nos termos da Escritura, em fazer com que determinadas Subsidiárias (conforme definidas na Escritura) forneçam garantias em certas circunstâncias ao se tornarem Subsidiária Significativa (conforme definido na Escritura).

### ACORDO

ASSIM SENDO, em consideração às premissas e acordos mútuos contidos no presente e que pretendem ser legalmente vinculados, as partes desta Escritura Complementar concordam com o seguinte:

Seção 1. Os termos em maiúsculas utilizados neste instrumento e não definidos nele são usados conforme definido na Escritura.

[Seção 2. O Signatário, uma Subsidiária Integral da Sociedade, por sua celebração desta Escritura Complementar, concorda em ser o principal devedor da Escritura e assume todas as obrigações do Emissor na Escritura e nas Notas].

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 126

[Seção 2. [Cada] [O] Signatário, mediante sua celebração desta Escritura Complementar, concorda em ser um Garantidor de acordo com a Escritura e em estar vinculado pelos termos da Escritura aplicável a um Garantidor].

Seção 3. Esta Escritura Complementar será regida e interpretada de acordo com as leis do Estado de Nova Iorque.

Seção 4. Esta Escritura Complementar poderá ser assinada em várias vias, as quais juntas constituirão um e o mesmo instrumento.

Seção 5. Esta Escritura Complementar é um aditamento complementar à Escritura, e a Escritura e esta Escritura Complementar serão, portanto, lidas em conjunto.

Seção 6. O Agente Fiduciário não será responsável de forma alguma por, ou em relação à validade ou suficiência desta Escritura Complementar ou por ou em relação aos considerandos contidos neste instrumento, todos elaborados exclusivamente pelo Emissor e pelo Garantidor.

EM TESTEMUNHO DO QUE, as partes fizeram com que esta Escritura Complementar fosse devidamente assinada a partir da primeira data escrita acima.

OEC FINANCE LTD.
como Emissor

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:

[GARANTIDOR ADICIONAL]
como Garantidor

Por:
Nome:
Cargo:

Por:
Nome:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                                    fls. 127

Cargo:

THE BANK OF NEW YORK MELLON
Como Agente Fiduciário, Oficial de Registro, Agente de Transferência e Agente de Pagamentos

Por:
Nome:
Cargo:

**ANEXO C**

MODELO DE
NOTIFICAÇÃO DE TRANSFERÊNCIA

PELO VALOR RECEBIDO, o Titular abaixo assinado neste ato vende, cede e transfere para

Inserir N° de Identificação de Contribuinte

_____

Imprima ou digite o nome e endereço, incluindo o CEP, do cessionário

_____

esta Nota e todos os direitos estabelecidos no presente, constituindo e nomeando irrevogavelmente

_____ procurador para transferir a referida Nota nos livros da OEC FINANCE LIMITED com pleno poder de substituição nas premissas.

Em relação a qualquer transferência desta Nota que ocorra antes da data [que é um ano após a data de emissão original das Notas,][20] [que ocorre no ou antes do 40° dia após a Data de Fechamento (conforme definido na Escritura que rege as Notas)],[21] o signatário confirma que:

[Assinale uma]

☐    (a)    Esta nota está sendo transferida ao Emissor;

_____
[20] *Incluir na Nota Restrita.*
[21] *Incluir na Nota sobre Regulamento S*

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 128

☐   (b)    Esta Nota está sendo transferida de acordo com uma declaração de registro em vigor de acordo com a Lei de Valores Mobiliários dos EUA de 1933, conforme aditada (a "Lei de Valores Mobiliários");

☐   (c)    Esta Nota está sendo transferida a uma pessoa que o Titular razoavelmente acredita ser um comprador institucional qualificado, conforme definido na Regra 144A nos termos da Lei de Valores Mobiliários em uma operação que atenda aos requisitos da Regra 144A;

☐   (d)    Esta Nota está sendo transferida em uma operação offshore de acordo com a Regra 904, de acordo com a Lei de Valores Mobiliários; ou

☐   (e)    Esta Nota está sendo transferida de acordo com uma isenção de registro nos termos da Lei de Valores Mobiliários, prevista na Regra 144 (se disponível),

em cada um dos casos de (a) a (e) acima, de acordo com as leis de valores mobiliários aplicáveis de qualquer Estado dos Estados Unidos.

Se nenhuma das caixas anteriores estiver assinalada, o Agente de Transferência não será obrigado a registrar esta Nota em nome de qualquer Pessoa que não seja o Titular deste documento, a menos e até que as condições para qualquer transferência de registro estabelecida neste documento e na Seção 2.08 da Escritura tenham sido satisfeitas.

Data:

_____

NOTIFICAÇÃO: A assinatura desta cessão deve corresponder ao nome escrito na frente deste instrumento em todos os aspectos, sem alteração, ampliação ou qualquer outra alteração.

**ANEXO D**

MODELO DE CERTIFICADO
PARA TRANSFERÊNCIA DE NOTA GLOBAL
RESTRITA OU NOTA CERTIFICADA CONSTANDO
LEGENDA DA LEI DE VALORES MOBILIÁRIOS SOBRE REGULAMENTO S
NOTA GLOBAL OU NOTA CERTIFICADA
SEM UMA LEGENDA DA LEI DE VALORES MOBILIÁRIOS

The Bank of New York Mellon
[•]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                              fls. 129

A/c: Finanças Globais das Américas

Re:       [·]% das Notas Sênior com Vencimento em 20[·] (as "**Notas**")

Faz-se referência à Escritura, datada de [·] de 20[·] (a "**Escritura**"), entre a OEC Finance Limited, os Garantidores parte desse instrumento e The Bank of New York Mellon, como Agente Fiduciário. Os termos em maiúscula utilizados, mas não definidos aqui, terão o significado que lhes é atribuído na Escritura.

Esta carta diz respeito a US$ _____ do montante principal das Notas que são detidas na forma de [participação efetiva na Nota Global Restrita com o Depositário em nome do abaixo assinado] [uma Nota Certificada sem Legenda da Lei dos Valores Mobiliários].

O abaixo assinado solicitou a transferência dessa [participação efetiva] [Nota Certificada] a uma Pessoa que a receba na forma de [uma participação efetiva de montante principal igual na Nota Global sobre o Regulamento S (ISIN N° [·]) para ser detida pelo [Euroclear] * [Clearstream Banking]²² (Código Comum N° [·]) através do Depositário] [uma Nota Certificada de montante principal igual sem uma Legenda da Lei de Valores Mobiliários]. Em relação a essa transferência, o abaixo assinado certifica, por este ato, que essa transferência foi efetuada de acordo com as restrições de transferência estabelecidas na Escritura e nas Notas, e conforme a Regra 903 ou 904 do Regulamento S da Lei de Valores Mobiliários dos Estados Unidos de 1933, conforme aditada, (a "**Lei de Valores Mobiliários**") e consequentemente, o abaixo assinado certifica que:

(1)       a oferta das Notas não foi realizada a uma Pessoa dos EUA (conforme definido no Regulamento S);

[(2)       no momento em que o pedido de compra foi originado, o beneficiário estava fora dos Estados Unidos ou o abaixo-assinado e qualquer Pessoa atuando em nome do abaixo-assinado acreditava razoavelmente que o beneficiário estava fora dos Estados Unidos;]²³

[(2)       a operação foi realizada dentro ou através das instalações de um mercado de valores mobiliários no exterior designado e nem o abaixo-assinado nem qualquer Pessoa atuando em nome do abaixo-assinado sabem que a operação foi previamente combinada com um comprador nos Estados Unidos;]²⁴

---

²² *Indicar o sistema de compensação apropriado*.
²³ *Inserir uma das duas disposições*.
²⁴ *Inserir uma das duas disposições*.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                            CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                              INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                          fls. 130

(3)      nenhum esforço de venda direcionada foi realizado em violação dos requisitos da Regra 904 do Regulamento S;

(4)      o abaixo-assinado não é o Emissor, um distribuidor, uma afiliada do Emissor ou de um distribuidor, ou uma Pessoa atuando em nome de qualquer um dos anteriores; e

(5)      a transação não faz parte de um plano ou esquema para evitar os requisitos de registro da Lei de Valores Mobiliários.

Este certificado e as declarações aqui contidas são feitas em seu benefício e em benefício da OEC Finance Limited. Os termos usados neste certificado e não definidos de outra forma nesta Escritura possuem os significados estabelecidos no Regulamento S.

[INSERIR NOME DO CEDENTE]

Por:
Nome:
Cargo:

Data: _____, _____
cc:      OEC Finance Limited

**ANEXO E**

MODELO DE CERTIFICADO DE TRANFERÊNCIA
PARA TRANSFERÊNCIA DA NOTA GLOBAL SOBRE
REGULAMENTO OU NOTA CERTIFICADA SEM
LEGENDA DA LEI DE VALORES MOBILIÁRIOS NOTA GLOBAL
RESTRITA OU NOTA CERTIFICADA COM
LEGENDA DA LEI DE VALORES
(ANTES DO 40º DIA APÓS A DATA DE FECHAMENTO)

The Bank of New York Mellon
101 Barclay Street – 4º andar Leste
Nova Iorque, Nova Iorque 10286
A/c: Finanças Globais das Américas

Re:      [·]% Notas Sênior com Vencimento em 20[·] (as "Notas")

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 131

Faz-se referência à Escritura, datada de [·] de 20[·] (a "**Escritura**"), entre a OEC Finance Limited, os Garantidores parte desse instrumento e The Bank of New York Mellon, como Agente Fiduciário. Os termos em maiúscula utilizados, mas não definidos aqui, terão o significado que lhes é atribuído na Escritura.

Esta carta diz respeito a US$ _____ do montante principal das Notas que são detidas na forma de [participação efetiva na Nota Global conforme o Regulamento S (ISIN N° [·]) com o Depositário em nome do abaixo assinado] [uma Nota Certificada sem Legenda da Lei dos Valores Mobiliários].

O abaixo assinado solicitou uma transferência dessa [participação efetiva] [Nota Certificada] para uma Pessoa que aceitará a entrega da mesma na forma de [uma participação efetiva na Nota Global Restrita (CUSIP N° 675758AC0) a ser detida através do Depositário] [uma Nota Certificada com Legenda da Lei dos Valores Mobiliários]. Em relação a essa transferência, o abaixo assinado confirma, por este ato, que essa transferência foi efetuada de acordo com as restrições de transferência estabelecidas na Escritura e nas Notas, e conforme a Regra 144A da Lei de Valores Mobiliários dos Estados Unidos de 1933, conforme aditada, e consequentemente, o abaixo assinado declara que:

(a) as Notas estão sendo transferidas para um cessionário que o abaixo assinado acredita estar comprando as Notas por sua própria conta, ou mais de uma conta, a respeito das quais o cessionário exerce critérios exclusivos de investimento; e

o cessionário e essa conta são um "comprador institucional qualificado", na acepção da Regra 144A, em uma operação que cumpra com os requisitos da Regra 144A e de acordo com quaisquer leis de valores mobiliários de qualquer estado dos Estados Unidos ou de qualquer outra jurisdição.

Este certificado e as declarações aqui contidas são feitas em seu benefício e em benefício da OEC Finance Limited.

[INSERIR NOME DO CEDENTE]

Por:
Nome:
Cargo:

Data: _____, _____
cc:        OEC Finance Limited

**ANEXO F**

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 132

MODELO DE CERTIFICADO PARA REMOÇÃO
DA LEGENDA DA LEI DE VALORES MOBILIÁRIOS DE UMA NOTA CERTIFICADA

The Bank of New York Mellon
101 Barclay Street – 4º andar Leste
Nova Iorque, Nova Iorque 10286
A/c: Finanças Globais das Américas

    Re:    [•]% das Notas Sênior com Vencimento em 20[•] (as "**Notas**")

    Faz-se referência à Escritura, datada de [] de 20[] (a "**Escritura**"), entre a OEC Finance Limited, os Garantidores parte desse instrumento e The Bank of New York Mellon, como Agente Fiduciário. Os termos em maiúscula utilizados, mas não definidos aqui, terão o significado que lhes é atribuído na Escritura.

    Esta carta refere-se ao montante principal de US$ _____ das Notas que são detidas na forma de [uma participação efetiva na Nota Global Restrita (CUSIP N°[•]) com o Depositário] [[a] Nota(s) Certificada(s) no nome do abaixo-assinado.][25]

    O abaixo-assinado solicitou a remoção da Legenda restritiva na(s) Nota(s) Certificada(s).

    Em relação a essa transferência, o abaixo-assinado neste ato certifica que essa transferência foi realizada apenas (i) em uma operação offshore de acordo com a Regra 904 nos termos da Lei de Valores Mobiliários, (ii) de acordo com uma isenção de registro nos termos da Lei de Valores Mobiliários fornecida pela Regra 144 (se disponível) ou (iii) de acordo com uma declaração de registro em vigor nos termos da Lei de Valores Mobiliários, em cada um dos casos de (i) a (iii) de acordo com as leis de valores mobiliários aplicáveis de qualquer Estado dos Estados Unidos.

    Este certificado e as declarações aqui contidas são feitas em seu beneficio e em beneficio da OEC Finance Limited.

    [NOME DO ABAIXO ASSINADO]

    Por:
    Nome:
    Cargo:

---

[25] *Indicar a forma em que as notas são detidas*.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                                    fls. 133

Data: _____, _____
cc:        OEC Finance Limited

**ANEXO G**

SEÇÕES ESPECÍFICAS DE NOTAS PERPÉTUAS

| Seção | Novas Notas com Data de Vencimento | Notas Perpétuas |
|---|---|---|
| Preâmbulo | "O Emissor autorizou devidamente a emissão de [•] % de Notas Sênior com Vencimento em [•] (as "Notas"), inicialmente no montante principal total de US\$ [•] e autorizou devidamente a celebração e formalização desta Escritura." | "O Emissor autorizou devidamente a emissão de 7.000% de notas perpétuas (as "Notas"), inicialmente no montante principal total de US\$ [•] e autorizou devidamente a celebração e formalização desta Escritura." |
| Seção 1.01. Definições. | **"Ação Desqualificada"** significa, em relação a qualquer Pessoa, qualquer Capital Social que, por seus termos (ou pelos termos de qualquer valor mobiliário em que seja conversível ou para o qual seja permutável ou exercível) ou na ocorrência de qualquer evento:<br><br>(b) vence ou é obrigatoriamente resgatável de acordo com uma obrigação de fundo de amortização ou de outra forma;<br><br>(c) é conversível ou permutável por Endividamento ou Ação Desqualificada; ou<br><br>(d) é resgatável por opção do titular do mesmo, no todo ou em parte,<br><br>conforme o caso, até o 91º dia após o Vencimento Indicado das Notas; *ressalvado*, no entanto, que qualquer Capital Social que não constitua Ação | **"Ação Desqualificada"** significa, em relação a qualquer Pessoa, qualquer Capital Social que, por seus termos (ou pelos termos de qualquer valor mobiliário em que seja conversível ou para o qual seja permutável ou exercível) ou na ocorrência de qualquer evento:<br><br>1.   vence ou é obrigatoriamente resgatável de acordo com uma obrigação de fundo de amortização ou de outra forma;<br><br>2.   é conversível ou permutável por Endividamento ou Ação Desqualificada; ou<br><br>3.   é resgatável por opção do titular do mesmo, no todo ou em parte,<br><br>*ressalvado*, *no entanto*, que qualquer Capital Social que não constitua Ação Desqualificada, mas para as provisões do mesmo, dê aos seus titulares o direito de |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 134

| | | |
|---|---|---|
| | Desqualificada, mas para as provisões do mesmo, dê aos seus titulares o direito de exigir que tal Pessoa recompre ou resgate tal Capital Social mediante a ocorrência de uma "venda de ativos" ou "mudança de controle" antes do 91º dia após o Vencimento Indicado das Notas, não constituirá Ação Desqualificada se tais provisões de "venda de ativos" ou "mudança de controle" não forem mais favoráveis aos titulares de tal Capital Social do que as disposições comparáveis desta Escritura." | exigir que tal Pessoa recompre ou resgate tal Capital Social mediante a ocorrência de uma "venda de ativos" ou "mudança de controle" não constituirá Ação Desqualificada se tais provisões de "venda de ativos" ou "mudança de controle" não forem mais favoráveis aos titulares de tal Capital Social do que as disposições comparáveis desta Escritura." |
| Seção 1.01. Definições. | "**Vencimento**" significa a data na qual o principal e o prêmio, se houver, das Notas vencem integralmente de acordo com esta Escritura, seja na Data de Vencimento Indicado, ou mais cedo no resgate, por declaração de vencimento antecipado ou de outra forma." | Definição excluída. |
| Seção 1.01. Definições. | "**Vencimento Indicado**" significa (i) em relação a qualquer Endividamento, a data especificada como a data fixa na qual a parcela final do principal de tal Endividamento é devida ou (ii) em relação a qualquer parcela programada do principal ou juros sobre qualquer Endividamento, a data especificada como a data fixa na qual tal parcela é devida, conforme estabelecido na documentação que rege tal Endividamento, não incluindo qualquer obrigação contingente de pagar, resgatar ou recomprar antes da data regularmente programada para o pagamento." | Definição excluída. |
| Seção 1.01. Definições. | "**Data de Registro**" significa, quando utilizada em relação aos juros sobre as Notas devidas em qualquer Data de Pagamento de Juros, outubro [•] e abril [•] (seja ou não um Dia Útil), conforme o | "**Data de Registro**" significa, quando utilizada em relação aos juros sobre as Notas devidas em qualquer Data de Pagamento de Juros, o 15º dia (seja ou não um Dia Útil) |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 135

| | | |
|---|---|---|
| | caso, imediatamente anterior a tal Data de Pagamento de Juros. | anterior a qualquer Data de Pagamento de Juros. |
| Seção 1.01. Definições. | "**Data de Vencimento Indicado**" possui o significado especificado na Seção 2.06." | Definição excluída. |
| Seção 2.06. Principal, Vencimento e Juros | "*Seção 2.06. Principal, Vencimento e Juros*.<br><br>*(a) Vencimento e Principal*. As Notas serão emitidas em um montante do principal total inicial de US$ [•] e vencerão em [•] (a "**Data de Vencimento Indicada**"). O então montante do principal em aberto das Notas será devido integralmente no Vencimento."<br><br>(…)<br><br>"O pagamento dos juros ocorrerá [-semestralmente em 21 de abril e 21 de outubro (e para as Notas Perpétuas, trimestralmente)] de cada ano (juntamente com a data de Vencimento, as "**Datas de Pagamento de Juros**" e cada, a "**Data de Pagamento de Juros**"). Se qualquer Data de Pagamento de Juros cair em um dia que não seja Dia Útil, os pagamentos exigidos do principal, prêmio, se houver, e juros, se houver, em relação às Notas serão realizados no próximo Dia Útil seguinte, como se fossem realizados na data em que o pagamento era devido, e nenhum pagamento será acrescido de juros pelo período a partir da Data de Pagamento de Juros, conforme o caso, até a data de tal pagamento no próximo Dia Útil seguinte. | "Seção 2.06. Principal e Juros.<br><br>*(a) Principal*. As Notas serão emitidas em um montante do principal total inicial de US$ [•] e sem data de vencimento final fixada."<br><br>(…)<br><br>"O pagamento dos juros ocorrerá [trimestralmente em março, junho, setembro e 14 de dezembro] de cada ano (as "**Datas de Pagamento de Juros**" e cada, a "**Data de Pagamento de Juros**"). Se qualquer Data de Pagamento de Juros cair em um dia que não seja Dia Útil, os pagamentos exigidos do principal, prêmio, se houver, e juros, se houver, em relação às Notas serão realizados no próximo Dia Útil seguinte, como se fossem realizados na data em que o pagamento era devido, e nenhum pagamento será acrescido de juros pelo período a partir da Data de Pagamento de Juros, conforme o caso, até a data de tal pagamento no próximo Dia Útil seguinte. |
| Seção 2.08. Pagamento do Principal e Juros | Os pagamentos de juros e do principal serão feitos ao Titular no endereço do Titular indicado no Registro (conforme definido nesta Escritura), no encerramento dos negócios no 15º (Dia Útil ou não) antes de qualquer data de vencimento para | Os pagamentos de juros e do principal serão feitos ao Titular no endereço do Titular indicado no Registro (conforme definido nesta Escritura), no encerramento dos negócios no 15º dia (Dia Útil ou não) antes de qualquer data de vencimento para o |

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 136

o pagamento de tal Nota (a "**Data de Registro Regular**"), (i) no caso das Notas Globais, por um Agente Pagador por transferência bancária de fundos imediatamente disponíveis para os Titulares para uma conta em um banco localizado nos Estados Unidos, conforme designado por cada Titular, pelo menos quinze dias corridos antes da data de pagamento aplicável, e (ii) no caso de Notas Certificadas, por um Agente Pagador, enviando um cheque para o Titular no endereço do mesmo; *ressalvado, no entanto*, que (a) os juros devidos em qualquer data de vencimento sejam devidos à Pessoa para quem o principal será devido e (b) o primeiro pagamento dos juros de qualquer Nota originalmente emitida entre uma Data de Registro Regular para tal Nota e a Data de Pagamento de Juros subsequente será feita na Data de Pagamento de Juros após a Data de Registro Regular subsequente para tal Nota do Titular. Para quaisquer Nota Certificada, o Titular de US$ 1.000.000,00 ou mais no montante do principal total pode solicitar o pagamento por transferência bancária, mas somente se instruções de pagamento apropriadas tiverem sido recebidas por escrito por qualquer Agente Pagador em relação a tal Nota, não menos de quinze dias corridos antes da data de pagamento aplicável. Caso o pagamento seja feito de acordo com as instruções do Titular, tal transferência bancária será considerada como constituindo o pagamento integral e completo de tal principal, prêmio e/ou juros das Notas.

O pagamento do principal, prêmio, se houver, e dos juros devidos em relação a qualquer Nota Certificada em qualquer Data de Vencimento será feito em fundos

pagamento de tal Nota (a "**Data de Registro Regular**"), (i) no caso das Notas Globais, por um Agente Pagador por transferência bancária de fundos imediatamente disponíveis para os Titulares para uma conta em um banco localizado nos Estados Unidos, conforme designado por cada Titular, pelo menos quinze dias corridos antes da data de pagamento aplicável, e (ii) no caso de Notas Certificadas, por um Agente Pagador, enviando um cheque para o Titular no endereço do mesmo; *ressalvado, no entanto*, que (a) os juros devidos em qualquer Data de Resgate sejam devidos à Pessoa para quem o principal será devido e (b) o primeiro pagamento dos juros de qualquer Nota originalmente emitida entre uma Data de Registro Regular para tal Nota e a Data de Pagamento de Juros subsequente será feita na Data de Pagamento de Juros após a Data de Registro Regular subsequente para tal Nota do Titular. Para quaisquer Nota Certificada, o Titular de US$ 1.000.000,00 ou mais no montante do principal total pode solicitar o pagamento por transferência bancária, mas somente se instruções de pagamento apropriadas tiverem sido recebidas por escrito por qualquer Agente Pagador em relação a tal Nota, não menos de quinze dias corridos antes da data de pagamento aplicável. Caso o pagamento seja feito de acordo com as instruções do Titular, tal transferência bancária será considerada como constituindo o pagamento integral e completo de tal principal, prêmio e/ou juros das Notas.

O pagamento do principal, prêmio, se houver, e dos juros devidos em relação a qualquer Nota Certificada em qualquer Data de Resgate será feito em fundos imediatamente disponíveis, mediante a entrega de tal Nota no escritório especificado de qualquer Agente Pagador em relação a tal Nota e acompanhado de instruções de transferência bancária;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 137

| | | |
|---|---|---|
| | imediatamente disponíveis, mediante a entrega de tal Nota no escritório especificado de qualquer Agente Pagador em relação a tal Nota e acompanhado de instruções de transferência bancária; *ressalvado*, que a Nota Certificada seja apresentada a tal Agente Pagador em tempo hábil para que tal Agente Pagador efetue tais pagamentos nesses fundos, de acordo com seus procedimentos normais. (…) Se o Emissor ou os Garantidores (x) deixarem de pagar juros sobre as Notas ou (y) deixarem de pagar o principal devido no Vencimento das Notas, o Emissor ou os Garantidores, conforme o caso, pagarão os Juros de Mora (conforme definido abaixo), de acordo com os procedimentos estabelecidos abaixo ou de qualquer maneira legal que não seja inconsistente com os requisitos de qualquer bolsa de valores na qual as Notas possam estar listadas e mediante a notificação exigida por tal bolsa." | *ressalvado*, que a Nota Certificada seja apresentada a tal Agente Pagador em tempo hábil para que tal Agente Pagador efetue tais pagamentos nesses fundos, de acordo com seus procedimentos normais." (…) Se o Emissor ou os Garantidores (x) deixarem de pagar juros sobre as Notas ou (y) deixarem de pagar o principal devido na Data de Resgate das Notas, o Emissor ou os Garantidores, conforme o caso, pagarão os Juros de Mora (conforme definido abaixo), de acordo com os procedimentos estabelecidos abaixo ou de qualquer maneira legal que não seja inconsistente com os requisitos de qualquer bolsa de valores na qual as Notas possam estar listadas e mediante a notificação exigida por tal bolsa." |
| Seção 4.01. Pagamento do Principal e Juros nos termos das Notas | "Seção 4.01. Pagamento do Principal e Juros nos termos das Notas. O Emissor pagará pontualmente o principal e os juros (incluindo os Juros de Mora, se houver) das Notas nas datas e da maneira prevista nos Parágrafos 2 e 3 das Notas. Um Dia Útil antes de qualquer data de Vencimento Indicado (que, para evitar dúvidas, incluirá qualquer Data de Pagamento de Juros), o Emissor depositará irrevogavelmente junto ao Agente Fiduciário ou outros Agentes Pagadores uma quantia suficiente para pagar tal principal e juros. Não serão | "Seção 4.01. Pagamento do Principal e Juros nos termos das Notas. O Emissor pagará pontualmente o principal (se a qualquer momento devido no resgate ou declaração de acordo com os termos desta Escritura) e os juros (incluindo os Juros de Mora, se houver) das Notas nas datas e da maneira prevista nos Parágrafos 2 e 3 das Notas. Um Dia Útil antes de tal data (que, para evitar dúvidas, incluirá qualquer Data de Pagamento de Juros), o Emissor depositará irrevogavelmente junto ao Agente Fiduciário ou outros Agentes Pagadores uma quantia suficiente para pagar tal principal e juros. |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 138

| | | |
|---|---|---|
| | pagos juros acima da taxa máxima permitida pela lei aplicável." | Não serão pagos juros acima da taxa máxima permitida pela lei aplicável." |
| 4.10 Pagamento de Montantes Adicionais | (...)<br><br>"(v)    O Emissor ou os Garantidores irão:<br><br>(1)      pelo menos dez Dias Úteis antes da primeira Data de Pagamento de Juros de quaisquer Notas (e, pelo menos, dez Dias Úteis antes de cada Data de Pagamento de Juros ou de qualquer Data de Resgate ou Data de Vencimento Indicado, caso tenha havido qualquer alteração em relação aos assuntos estabelecidos no Certificado do Diretor abaixo mencionado), entregar ao Agente Fiduciário e a cada Agente Pagador um Certificado do Diretor (i) especificando o montante, se houver, dos impostos descritos nesta Seção 4.10 aplicados ou cobrados por ou em nome de qualquer Jurisdição Tributária (os "Impostos Relevantes Retidos na Fonte") exigidos a serem deduzidos ou retidos no pagamento de principal ou juros sobre as Notas aos Titulares e os Montantes Adicionais, se houver, devidos aos Titulares em relação a tal pagamento, e (ii) certificando que o Emissor ou qualquer Garantidor pagará tal dedução ou retenção;<br><br>(...)<br><br>"(4)     pagar ao Agente Fiduciário quaisquer Montantes Adicionais devidos aos Titulares em qualquer Data de Pagamento de Juros, Data de Resgate ou Data de Vencimento Indicado, de acordo com o disposto nesta Seção 4.10." | (...)<br><br>"(v)    O Emissor ou os Garantidores irão:<br><br>(1)      pelo menos dez Dias Úteis antes da primeira Data de Pagamento de Juros de quaisquer Notas (e, pelo menos, dez Dias Úteis antes de cada Data de Pagamento de Juros ou de qualquer Data de Resgate, caso tenha havido qualquer alteração em relação aos assuntos estabelecidos no Certificado do Diretor abaixo mencionado), entregar ao Agente Fiduciário e a cada Agente Pagador um Certificado do Diretor (i) especificando o montante, se houver, dos impostos descritos nesta Seção 4.10 aplicados ou cobrados por ou em nome de qualquer Jurisdição Tributária (os "Impostos Relevantes Retidos na Fonte") exigidos a serem deduzidos ou retidos no pagamento de principal ou juros sobre as Notas aos Titulares e os Montantes Adicionais, se houver, devidos aos Titulares em relação a tal pagamento, e (ii) certificando que o Emissor ou qualquer Garantidor pagará tal dedução ou retenção;<br><br>(...)<br><br>"(4)     pagar ao Agente Fiduciário quaisquer Montantes Adicionais devidos aos Titulares em qualquer Data de Juros Pagamento ou Data de Resgate, de acordo com o disposto nesta Seção 4.10." |
| Seção 6.01 | "Seção 6.01.    Eventos    de Inadimplemento.    O termo "Evento de Inadimplemento" significa, quando usado | "Seção 6.01.    Eventos de Inadimplemento. O    termo    "Evento    de    Inadimplemento" |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº 2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01      Livro nº LIV      fls. 139

| | | |
|---|---|---|
| | neste documento, qualquer um dos seguintes eventos:<br><br>(a) o Emissor ou os Garantidores não pagarem qualquer montante (i) do principal em relação às Notas quando o mesmo se tornar devido e pagável no resgate, na declaração ou no Vencimento; (ii) dos juros (quando e se forem devidos de acordo com os termos desta Escritura) em relação às Notas e tal falha no pagamento de juros continuar por um período de 30 dias corridos; ou (iii) qualquer Pagamento de Excesso de Caixa (quando e se for devido de acordo com os termos desta Escritura) com relação às Notas e tal falta de Pagamento de Excesso de Caixa continua por um período de dez dias corridos;" | significa, quando usado neste documento, qualquer um dos seguintes eventos:<br><br>(a) o Emissor ou os Garantidores não pagarem qualquer montante (i) do principal em relação às Notas quando o mesmo se tornar devido e pagável no resgate, na declaração ou de outra forma; (ii) dos juros (quando e se forem devidos de acordo com os termos desta Escritura) em relação às Notas e tal falha no pagamento de juros continuar por um período de 30 dias corridos; ou (iii) qualquer Pagamento de Excesso de Caixa (quando e se for devido de acordo com os termos desta Escritura) com relação às Notas e tal falta de Pagamento de Excesso de Caixa continua por um período de dez dias corridos;" |
| Seção 8.01. Quitação de Passivo sobre as Notas. | "Seção 8.01. Quitação de Passivo sobre as Notas.<br><br>(a) Quando (i) o Emissor entrega ao Agente Fiduciário todas as Notas em Aberto (exceto as Notas substituídas de acordo com a Seção 2.11) para cancelamento ou (ii) todas as Notas em Aberto venceram e o Emissor depositou em garantia, em benefício dos Titulares, com os fundos finalmente cobrados do Agente Fiduciário, suficientes para pagar no Vencimento todas as Notas em Aberto e juros sobre as mesmas (exceto as Notas substituídas de acordo com a Seção 2.11), e se, conforme o caso, o Emissor pagar todas as quantias devidas pelo Emissor nos termos deste instrumento, então, esta Escritura e as obrigações do Emissor e de qualquer Garantidor nos termos deste documento, deixarão de ter efeito adicional, sujeito às Seções 8.01(c) e 8.06. O Agente Fiduciário deverá reconhecer a satisfação e quitação desta Escritura mediante solicitação do Emissor, | "Seção 8.01. Quitação de Passivo sobre as Notas.<br><br>(a) Quando (i) o Emissor entrega ao Agente Fiduciário todas as Notas em Aberto (exceto as Notas substituídas de acordo com a Seção 2.11) para cancelamento ou (ii) todas as Notas em Aberto venceram e o Emissor depositou em garantia, em benefício dos Titulares, com os fundos finalmente cobrados do Agente Fiduciário, suficientes para pagar na Data de Resgate, declaração de vencimento antecipado ou de outra forma, todas as Notas em Aberto e juros sobre as mesmas (exceto as Notas substituídas de acordo com a Seção 2.11), e se, conforme o caso, o Emissor pagar todas as outras quantias devidas pelo Emissor nos termos deste instrumento, então, esta Escritura e as obrigações do Emissor e de qualquer Garantidor nos termos deste documento, deixarão de ter efeito adicional, sujeito às Seções 8.01(c) e 8.06. O Agente Fiduciário deverá reconhecer a satisfação e quitação desta Escritura mediante solicitação do |

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Foto documento foi assinado digitalmente por Ieda Maria Monteiro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 140

| | | |
|---|---|---|
| | acompanhada por um Certificado dos Diretores e um Parecer do Advogado (cada um declarando que todas as condições precedentes fornecidas neste documento, relativas à satisfação e quitação desta Escritura foram cumpridas) e às custas e despesas do Emissor. " | Emissor, acompanhada por um Certificado dos Diretores e um Parecer do Advogado (cada um declarando que todas as condições precedentes fornecidas neste documento, relativas à satisfação e quitação desta Escritura foram cumpridas) e às custas e despesas do Emissor. " |
| Seção 8.02. Condições para Nulidade. (a) e (b) | "Seção 8.02.    Condições para Nulidade. O Emissor pode exercer a opção de nulidade legal ou a opção de nulidade de avença apenas se:<br><br>(a)    O    Emissor    deposita irrevogavelmente ou providencia para que seja depositado com o Agente Fiduciário, como fundos fiduciários em garantia, especificamente    penhorados    como garantia e exclusivamente dedicados em benefício dos Titulares (o "fideicomisso de nulidade") de acordo com um fideicomisso irrevogável e contrato de garantia na forma e conteúdo satisfatórios para o Agente Fiduciário, valores ou Obrigações do Governo dos EUA, ou uma combinação dos mesmos, suficiente para o pagamento do principal e dos juros sobre todas as Notas até o Vencimento ou resgate.<br><br>(b)    O    Emissor    entrega ao    Agente Fiduciário o certificado de uma empresa internacionalmente    reconhecida    de contadores independentes expressando seu parecer de que os pagamentos do principal e dos juros sobre as Notas quando vencidos e    sem    reinvestimento    nas Obrigações    do    Governo    dos    EUA depositadas,    mais    qualquer    valor depositado sem investimento e após o pagamento de todos os impostos federais, estaduais e locais ou outros encargos ou lançamentos a respeito dos mesmos, devido pelo Agente Fiduciário, fornecerá quantias nos momentos e nos montantes | "Seção 8.02.    Condições para Nulidade. O Emissor pode exercer a opção de nulidade legal ou a opção de nulidade de avença apenas se:<br><br>(a)    O Emissor deposita irrevogavelmente ou providencia para que seja depositado com o Agente Fiduciário, como fundos fiduciários em garantia, especificamente penhorados como garantia e exclusivamente dedicados em benefício dos Titulares (o "fideicomisso de nulidade") de acordo com um fideicomisso irrevogável e contrato de garantia na forma e conteúdo    satisfatórios    para    o    Agente Fiduciário,    valores    ou    Obrigações    do Governo dos EUA, ou uma combinação dos mesmos, suficiente para o pagamento do principal e dos juros de todas as Notas quando devidas na Data de Resgate.<br><br>(b) O Emissor entrega ao Agente Fiduciário o certificado    de    uma    empresa internacionalmente    reconhecida    de contadores independentes expressando seu parecer de que os pagamentos do principal e dos juros sobre as Notas quando vencidos e sem reinvestimento nas Obrigações do Governo dos    EUA    depositadas,    mais qualquer valor depositado sem investimento e após o pagamento de todos os impostos federais,    estaduais    e locais ou outros encargos ou lançamentos a respeito dos mesmos, devido pelo Agente Fiduciário, fornecerá quantias nos momentos e nos montantes que sejam suficientes para pagar o principal e os juros de todas as Notas quando    devidos    na    Data    de    Resgate, |

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                    fls. 141

| | | |
|---|---|---|
| | que sejam suficientes para pagar o principal e os juros de todas as Notas quando devidos no Vencimento ou no resgate, conforme o caso" | declaração de vencimento antecipado ou conforme o caso" |
| Seção 9.01. Modificação e Renúncia. (a) | "Seção 9.01.    Modificação e Renúncia.<br><br>As modificações e aditamentos à Escritura e às Notas podem ser realizadas pelo Emissor, Garantidores e Agente Fiduciário com o consentimento dos Titulares de, pelo menos, a maioria do montante do principal total das Notas em Aberto no momento em que são afetadas por tal aditamento, mas nenhuma modificação ou aditamento poderá, sem o consentimento do Titular de cada Nota afetada:<br><br>(a)     alterar o vencimento, principal ou juros indicados de qualquer uma dessas Notas, reduzir o montante principal de tais Notas, a taxa de juros sobre as mesmas, se houver, ou qualquer prêmio ou principal pagável mediante o resgate da mesma, alterar qualquer local onde, ou a moeda na qual qualquer Nota ou participação, se houver, sobre a mesma for devida, ou prejudicar o direito de instaurar processo para a execução de tal pagamento a partir do vencimento indicado, se houver, do mesmo ou a data em que tal pagamento estiver de outra forma vencido (ou, no caso de resgate, a partir da Data de Resgate);" | "Seção 9.01.    Modificação e Renúncia.<br><br>As modificações e aditamentos à Escritura e às Notas podem ser realizadas pelo Emissor, Garantidores e Agente Fiduciário com o consentimento dos Titulares de, pelo menos, a maioria do montante do principal total das Notas em Aberto no momento em que são afetadas por tal aditamento, mas nenhuma modificação ou aditamento poderá, sem o consentimento do Titular de cada Nota afetada:<br><br>(a)     alterar o principal ou juros indicados de qualquer uma dessas Notas, reduzir o montante principal de tais Notas, a taxa de juros sobre as mesmas, se houver, ou qualquer prêmio ou principal pagável mediante o resgate da mesma, alterar qualquer local onde, ou a moeda na qual qualquer Nota ou participação, se houver, sobre a mesma for devida, ou prejudicar o direito de instaurar processo para a execução de tal pagamento do mesmo ou a data em que tal pagamento estiver de outra forma vencido (ou, no caso de resgate, a partir da Data de Resgate);" |
| Seção 10.01. A Garantia da Nota | "Seção 10.01.    A Garantia<br><br>Sujeito ao disposto neste Artigo, os Garantidores, irrevogável, incondicional e solidariamente garantem, em uma base não garantida, o pagamento total e pontual (seja no Vencimento Indicado, no resgate, antecipação ou de outra forma) do principal, do prêmio, se houver, dos juros e de todos os outros montantes devidos de acordo com cada Nota, e o pagamento total | "Seção 10.01. A Garantia<br><br>Sujeito ao disposto neste Artigo, os Garantidores, irrevogável, incondicional e solidariamente garantem, em uma base não garantida, o pagamento total e pontual (seja na Data de Resgate, no resgate, antecipação ou de outra forma) do principal, do prêmio, se houver, dos juros e de todos os outros montantes devidos de acordo com cada Nota, e o pagamento total e pontual de todos os |

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.01          Livro nº LIV                         fls. 142

|  |  |  |
|---|---|---|
|  | e pontual de todos os outros montantes devidos pelo Emissor nos termos desta Escritura.  Em caso de falha do Emissor em pagar pontualmente qualquer montante, os Garantidores deverão imediatamente pagar o montante não pago no local e na forma especificada nesta Escritura" | outros montantes devidos pelo Emissor nos termos desta Escritura.  Em caso de falha do Emissor em pagar pontualmente qualquer montante, os Garantidores deverão imediatamente pagar o montante não pago no local e na forma especificada nesta Escritura" |
| Seção 13.08. Feriados Oficiais. | "Seção 13.08.  Feriados Oficiais.  Em qualquer caso no qual, qualquer Data de Pagamento de Juros, Data de Resgate ou data de Vencimento de qualquer Nota não seja um Dia Útil, então (não obstante qualquer disposição em contrário nesta Escritura ou nas Notas) o pagamento dos juros ou principal não precisa ser realizado em tal data, mas pode ser realizado no Dia Útil seguinte com o mesmo vigor e efeito como se realizado na Data de Pagamento de Juros, Data de Resgate ou data de Vencimento; ressalvado que, nenhum juros deva acumular para o período a partir da Data de Pagamento de Juros, Data de Resgate ou data de Vencimento, conforme o caso." | "Seção 13.08.  Feriados Oficiais.  Em qualquer caso no qual, qualquer Data de Pagamento de Juros ou Data de Resgate de qualquer Nota não seja um Dia Útil, então (não obstante qualquer disposição em contrário nesta Escritura ou nas Notas) o pagamento dos juros ou principal não precisa ser realizado em tal data, mas pode ser realizado no Dia Útil seguinte com o mesmo vigor e efeito como se realizado na Data de Pagamento de Juros ou Data de Resgate; ressalvado que, nenhum juros deva acumular para o período a partir da Data de Pagamento de Juros ou Data de Resgate, conforme o caso." |

Nada mais constava do documento acima que devolvo com esta tradução, segundo meu melhor entender e a qual conferi achei conforme e assino.

São Paulo, 18 de agosto de 2020.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

OEC FINANCE LIMITED

as Issuer

the GUARANTORS party hereto

THE BANK OF NEW YORK MELLON,
as Trustee, Paying Agent, Registrar and Transfer Agent

---

**INDENTURE**[1]

Dated as of [·], 2020

---

[·]% Senior Notes Due [·]

G

---

[1] NTD: Indenture form to be adjusted for Perpetual Notes, as applicable. Please see Exhibit EXHIBIT GG.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION..................1

Section 1.01.    Definitions.................................................................1
Section 1.02.    Rules of Construction.....................................................25
Section 1.03.    Table of Contents; Headings..............................................25
Section 1.04.    Form of Documents Delivered to Trustee...................................25
Section 1.05.    Acts of Holders..........................................................26

ARTICLE 2 THE NOTES ........................................................................27

Section 2.01.    General and Guarantee....................................................27
Section 2.02.    Form and Dating..........................................................27
Section 2.03.    Execution, Authentication and Delivery ..................................27
Section 2.04.    Transfer Agent, Registrar and Paying Agent ..............................28
Section 2.05.    Paying Agent to Hold Money in Trust .....................................29
Section 2.06.    Principal, Maturity and Interest.........................................30
Section 2.07.    Excess Cash Sweep Payments...............................................31
Section 2.08.    Payment of Principal and Interest .......................................32
Section 2.09.    Principal and Interest Rights Preserved..................................33
Section 2.10.    Holder Lists.............................................................34
Section 2.11.    Transfer and Exchange ...................................................34
Section 2.12.    Replacement Notes........................................................36
Section 2.13.    Temporary Notes..........................................................37
Section 2.14.    Cancellation.............................................................37
Section 2.15.    Defaulted Interest.......................................................37
Section 2.16.    CUSIP and ISIN Numbers ..................................................37
Section 2.17.    Repurchase...............................................................38

ARTICLE 3 REDEMPTION ......................................................................38

Section 3.01.    Optional Redemption .....................................................38
Section 3.02.    Redemption for Taxation Reasons .........................................38
Section 3.03.    Applicability of Article ................................................38
Section 3.04.    Election to Redeem; Notice to Trustee....................................39
Section 3.05.    Notice of Redemption by the Issuer ......................................39
Section 3.06.    Deposit of Redemption Price .............................................39
Section 3.07.    Effect of Notice of Redemption ..........................................39
Section 3.08.    Selection of Notes to Be Redeemed in Part. ..............................40

ARTICLE 4 COVENANTS .......................................................................40

Section 4.01.    Payment of Principal and Interest Under the Notes .......................40
Section 4.02.    Maintenance of Office or Agency .........................................40
Section 4.03.    Money for Note Payments to Be Held in Trust..............................40
Section 4.04.    Maintenance of Corporate Existence ......................................41
Section 4.05.    Maintenance of Insurance ................................................42
Section 4.06.    Ratings..................................................................42
Section 4.07.    Compliance with Laws.....................................................42
Section 4.08.    Payment of Taxes and Claims .............................................42

- i -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 4.09.      Maintenance of Properties ............................................................. 42
Section 4.10.      Payment of Additional Amounts .................................................... 43
Section 4.11.      Available Information ..................................................................... 45
Section 4.12.      Limitation on Restricted Payments ............................................... 45
Section 4.13.      Limitation on Indebtedness ........................................................... 46
Section 4.14.      Limitation on Liens ....................................................................... 48
Section 4.15.      Limitations on Transactions with Affiliates .................................. 48
Section 4.16.      Limitation on Sale and Lease-Back Transactions .......................... 49
Section 4.17.      Limitation on Agreements Restricting Dividend Payments ........... 49
Section 4.18.      Limitation on Asset Sales .............................................................. 50
Section 4.19.      Limitation on Consolidation, Merger or Transfer of Assets .......... 51
Section 4.20.      Repurchase of Notes upon a Change of Control ............................ 52
Section 4.21.      Reporting Requirements ................................................................ 53
Section 4.22.      Further Assurances ........................................................................ 55
Section 4.23.      Covenant Suspension ..................................................................... 55
Section 4.24.      Limitations and Restrictions on the Issuer .................................... 56
Section 4.25.      Limitations and Restrictions on Qualifying Subsidiaries .............. 57
Section 4.26.      Compliance with the Restructuring Plan ....................................... 58
Section 4.27.      Additional Guarantors ................................................................... 58

ARTICLE 5 SUBSTITUTION OF THE ISSUER .......................................................... 58

ARTICLE 6 EVENTS OF DEFAULT AND REMEDIES ............................................... 59

Section 6.01.      Events of Default ........................................................................... 59
Section 6.02.      Notice of Event of Default; Acceleration ...................................... 61
Section 6.03.      Other Remedies ............................................................................. 63
Section 6.04.      Control by Majority ....................................................................... 63
Section 6.05.      Limitation on Suits ........................................................................ 63
Section 6.06.      Rights of Holders To Receive Payment ......................................... 64
Section 6.07.      Collection Suit by Trustee ............................................................. 64
Section 6.08.      Trustee May File Proofs of Claim .................................................. 64
Section 6.09.      Priorities ........................................................................................ 64

ARTICLE 7 TRUSTEE AND PAYING AGENT ........................................................... 65

Section 7.01.      Duties of Trustee and Paying Agent .............................................. 65
Section 7.02.      Rights of Trustee ........................................................................... 66
Section 7.03.      Individual Rights of Trustee .......................................................... 67
Section 7.04.      Trustee's Disclaimer ...................................................................... 67
Section 7.05.      Notice of Defaults and Events of Default ...................................... 67
Section 7.06.      Compensation and Indemnity ........................................................ 68
Section 7.07.      Replacement of Trustee ................................................................. 69
Section 7.08.      Successor Trustee by Merger ......................................................... 69
Section 7.09.      Eligibility; Disqualification ........................................................... 70

ARTICLE 8 DISCHARGE OF INDENTURE; DEFEASANCE ...................................... 70

Section 8.01.      Discharge of Liability on Notes ..................................................... 70
Section 8.02.      Conditions to Defeasance .............................................................. 71
Section 8.03.      Application of Trust Money ........................................................... 72
Section 8.04.      Repayment to Issuer ...................................................................... 72
Section 8.05.      Indemnity for U.S. Governmental Obligations .............................. 72

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 8.06.          Reinstatement .................................................................................... 72

ARTICLE 9 AMENDMENTS ............................................................................................. 73

Section 9.01.          Modification and Waiver ...................................................................... 73
Section 9.02.          Trustee to Sign Amendments ............................................................... 74

ARTICLE 10 GUARANTEE ............................................................................................... 75

Section 10.01.         The Guarantee ...................................................................................... 75
Section 10.02.         Unconditional Guarantee ..................................................................... 75
Section 10.03.         Discharge; Reinstatement .................................................................... 75
Section 10.04.         Waiver by the Guarantors .................................................................... 76
Section 10.05.         Subrogation and Contribution .............................................................. 76
Section 10.06.         Stay of Acceleration ............................................................................ 76
Section 10.07.         Limitation on Amount of Guarantee .................................................... 76
Section 10.08.         Execution and Delivery of Guarantee .................................................. 76
Section 10.09.         Release of Guarantee ........................................................................... 76

ARTICLE 11 REPLACEMENT OF NOTES ...................................................................... 77

Section 11.01.         Replacement of Notes .......................................................................... 77

ARTICLE 12 NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES AND
          SHAREHOLDERS ................................................................................................ 77

Section 12.01.         No Personal Liability ........................................................................... 77

ARTICLE 13 MISCELLANEOUS ..................................................................................... 77

Section 13.01.         Provisions of Indenture and Notes for the Sole Benefit of Parties and
                       Holders of Notes ................................................................................... 77
Section 13.02.         Notices .................................................................................................. 77
Section 13.03.         Officers' Certificate and Opinion of Counsel as to Conditions
                       Precedent .............................................................................................. 78
Section 13.04.         Statements Required in Officers' Certificate or Opinion of Counsel .......... 78
Section 13.05.         Rules by Trustee, Registrar Paying Agent and Transfer Agents ................. 79
Section 13.06.         Currency Indemnity .............................................................................. 79
Section 13.07.         No Recourse Against Others ................................................................. 79
Section 13.08.         Legal Holidays ..................................................................................... 79
Section 13.09.         Governing Law; Waiver of Jury Trial ................................................... 80
Section 13.10.         Consent to Jurisdiction; Waiver of Immunities .................................... 80
Section 13.11.         Successors and Assigns ........................................................................ 80
Section 13.12.         Multiple Originals ................................................................................ 80
Section 13.13.         Severability Clause ............................................................................... 80
Section 13.14.         Force Majeure ....................................................................................... 81
Section 13.15.         Prescription .......................................................................................... 81

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

EXHIBITS:

EXHIBIT A    —    Form of Note

EXHIBIT B    —    Form of Supplemental Indenture

EXHIBIT C    —    Form of Transfer Notice

EXHIBIT D    —    Form of Certificate for Transfer from Restricted Global Note or Certificated Note Bearing a Securities Act Legend to Regulation S Global Note or Certificated Note Not Bearing a Securities Act Legend

EXHIBIT E    —    Form of Transfer Certificate for Transfer from Regulation S Global Note or Certificated Note Not Bearing a Securities Act Legend to Restricted Global Note or Certificated Note Bearing a Securities Act Legend

EXHIBIT F    —    Form of Certificate for Removal of the Securities Act Legend on a Certificated Note

EXHIBIT G    —    Perpetual Notes Specific Sections

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

INDENTURE, dated as of [·], 2020, among OEC FINANCE LIMITED, an exempted company with limited liability incorporated under the laws of the Cayman Islands, as the Issuer, the GUARANTORS party hereto and THE BANK OF NEW YORK MELLON, as Trustee, Paying Agent, Registrar and Transfer Agent.

## RECITALS[2]

The Issuer has duly authorized the issue of [·]% senior Notes Due [·] (the "Notes"), initially in an aggregate principal amount of U.S.$[·] and has duly authorized the execution and delivery of this Indenture.

All things necessary have been done to make the Notes when executed and authenticated and delivered hereunder and duly issued, the valid obligations of the Issuer, and to make this Indenture a valid agreement of the Issuer.

In addition, the Guarantors party hereto have duly authorized the execution and delivery of this Indenture as guarantors of the Notes.

The Guarantors have done all things necessary to make the Guarantee, when the Notes are executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Guarantors, and to make this Indenture a valid agreement of the Guarantors.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders, as follows:

### ARTICLE 1
#### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.01.    *Definitions*.

"**Act**", when used with respect to any Holder, has the meaning specified in Section 1.05.

"**Additional Amounts**" has the meaning specified in Section 4.10.

"**Additional Guarantors**" has the meaning given to such term in the definition of "Guarantor."

"**Affiliate**" means, with respect to any specified Person, (1) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (2) any other Person who is a director or officer (a) of such specified Person, (b) of any subsidiary of such specified Person or (c) of any Person described in clause (1) above.  For purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing and, for the avoidance of doubt, shall not apply to any financial institution or trust company that, as of the date of the filing of the ODB RJ, is a creditor of any ODB RJ Party and has received or will receive securities in connection with the ODB RJ.

"**Affiliate Transaction**" has the meaning specified in Section 4.15.

---

[2] NTD: Section be adjusted for Perpetual Notes. Please see Exhibit G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

"**Applicable Percentage**" means the percentage of the total outstanding principal amount of all series of the New Notes represented by the outstanding principal amount of the Notes, as of the close of business on the 15th calendar day (whether or not a Business Day) prior the corresponding scheduled Excess Cash Payment Date.

"**Applicable Procedures**" means the applicable procedures of DTC, Euroclear and Clearstream Banking, in each case to the extent applicable.

"**Asset Disposition**" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) of shares of Capital Stock of a Subsidiary (other than executive officers' qualifying shares), property or other assets (each, a "disposition") by a Guarantor or any of its Subsidiaries, including any disposition by means of a merger, consolidation or similar transaction, other than (1) a disposition of property or assets at Fair Market Value in the ordinary course of business, (2) a disposition by the Company or a Subsidiary to another Subsidiary or the Company and (3) a disposition of obsolete assets in the ordinary course of business.

"**Asset Sale**" means any sale, disposition, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer (each, for purposes of this definition, a "disposition"), by the Company or any Subsidiary of (i) any Capital Stock of any Subsidiary (other than executive officers' qualifying shares); or (ii) any property or assets (other than cash, cash equivalents or Capital Stock) of the Company or any Subsidiary.

Notwithstanding the preceding, the following items will not be deemed to be Asset Sales:

(a)      the disposition made in accordance with the Intercompany Agreement;

(b)      the disposition of all or substantially all of the assets of the Company and its Subsidiaries as permitted under this Indenture or any disposition which constitutes a Change of Control;

(c)      the disposition of shares of any Subsidiary of the Company to a Person in order to form a Joint Venture Company;

(d)      any disposition made during the first four years after the Issue Date; *provided* that if, at the end of such period, after giving effect to the application of all or a portion of the total Net Cash Proceeds resulting from all such dispositions during such period to (1) the payment of any Fines, (2) the payments of amounts due under the New Notes and other Permitted Indebtedness, (3) increase the balance of cash and short-term investments of the Company and its Subsidiaries up to the Minimum Cash Threshold, (4) any other use in furtherance of a Permitted Business, and (5) the payment of fees and expenses incurred in connection with the implementation of the Restructuring Plan, there shall be remaining any such Net Cash Proceeds in excess of the Minimum Cash Threshold, then such remaining Net Cash Proceeds shall be deemed to constitute "**Excess Proceeds**" under this Indenture and the Issuer shall cause all such Excess Proceeds to be applied in accordance with the second and third full paragraphs of Section 4.18, except that the Asset Sale Offer described thereunder shall be made not later than the date occurring 10 Business Days after the fourth anniversary of the Issue Date.

(e)      any transaction or series of related transactions involving assets with a Fair Market Value not in excess of U.S.$10,000,000;

(f)      the disposition of real property, capital assets or equipment, inventory, indefeasible right of uses, accounts receivable, services or other assets in the ordinary course of business;

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(g)        any disposition of receivables and related assets (including claims against clients);

(h)        any disposition of assets not required in the Permitted Business of the Company or any Subsidiary or other non-core assets (as determined by the Company in good faith);

(i)        any disposition of receivables and related assets or interests in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings (including pursuant to any Bankruptcy Law) and exclusive of factoring or similar arrangements

(j)        any disposition made during the period commencing immediately after the period set forth in clause (d) above and ending prior to the ten (10) year anniversary of the Issue Date, the entirety of the net proceeds of which shall be used for the payment of any Governmental Authority or as otherwise permitted pursuant to Section 4.18; provided that, since the Restructuring Plan Filing Date, the assets so disposed shall have been, prior to such disposition, located in the same jurisdiction in which such Fines are paid and shall not have been moved to the applicable jurisdiction or disposed of, conveyed, issued, assigned or otherwise transferred, including by the Issuer, the Company, a Subsidiary or Affiliate to the Company or another Subsidiary or Affiliate;

(k)        the sale of property that, in the reasonable determination of the Company, has become worn out, obsolete, uneconomic or damaged or otherwise unsuitable for use in connection with any Permitted Business;

(l)        (i) dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased, (ii) dispositions of property to the extent that the proceeds of such disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased) and (iii) any exchange of like property for use in a Permitted Business;

(m)        the settlement, compromise, release, dismissal or abandonment of any action or claims against any Person;

(n)        any disposition of investments in a Joint Venture Company to the extent required by, or made pursuant to, customary buy-sell arrangements between the joint venture parties set forth in the joint venture agreements and similar binding arrangements;

(o)        the making of a Restricted Payment permitted under Section 4.12 and any Permitted Investment;

(p)        except as otherwise prohibited by clause (j) hereof, a disposition by the Issuer, the Company or a Subsidiary to the Company or another Subsidiary, including a Person that is or will become a Subsidiary immediately after the disposition;

(q)        any issuance of Disqualified Stock otherwise permitted under Section 4.12;

(r)        a Sale and Lease-back Transaction otherwise permitted under Section 4.16; and

(s)        dispositions in connection with a Permitted Lien.

"**Asset Sale Offer**" has the meaning specified in Section 4.18.

[AM-ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Average Life**" means, when applied to any Indebtedness at the time of determination, the number of years obtained by dividing (a) the product obtained by multiplying (i) the total of all then remaining installment or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness.

"**Authenticating Agent**" has the meaning specified in Section 2.03.

"**Authorized Denomination**" has the meaning specified in Section 2.03.

"**Bankruptcy Law**" means (a) Title 11, United States Code or any similar U.S. federal or state law for the relief of debtors, the adjustment of debt or the administration or liquidation of debtors' estates for the benefit of their creditors, and (b) the Brazilian Bankruptcy Law or any similar Cayman Islands, Brazilian or other applicable federal or state law for the relief of debtors, the adjustment of debt or the administration or liquidation of debtors' estates for the benefit of their creditors; and, for the avoidance of doubt, any scheme of arrangement submitted to the court or recuperação extrajudicial or recuperação judicial shall be deemed to have occurred under a Bankruptcy Law for all purposes of this Indenture.

"**Bidding Company**" means a Subsidiary of the Company whose capital is beneficially owned by the Company and any other Person or Persons that are not Affiliates of the Company for the sole purpose of directly or indirectly bidding on construction projects.

"**Board of Directors**" means, as the case may be, the Board of Directors of the Issuer or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the secretary, the assistant secretary or another Officer or legal counsel performing corporate secretarial functions of the Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification and delivered to the Trustee.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazilian Corporate Law**" means Brazilian Federal Law No. 6.404/76, as amended by Brazilian Law No. 9.457/97, Brazilian Law No. 10.303/01, Brazilian Law No. 11,638/07 and by Provisional Measure No. 449/08, in each case as amended.

"**Brazilian Bankruptcy Law**" means Brazilian Federal Law no. 11,101 of February 9, 2005, as amended from time to time.

"**Brazilian GAAP**" means, collectively, the accounting principles prescribed by Brazilian Corporate Law, the rules and regulations issued by applicable regulators, including the CVM, as well as the technical releases issued by the Brazilian Institute of Accountants (*Instituto Brasileiro de Contadores*), in each case as in effect from time to time.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York or São Paulo, Brazil.

"**Business Plan**" means the business plan approved by the Company's board of directors prior to the Issue Date as described in summary form in the Consent Solicitation Statement.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Capital Stock**" means, as applied to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated), including any Preferred Stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cash Interest Rate**" has the meaning specified in Section 2.06

"**Cayman Islands**" means the Cayman Islands, a territory of the United Kingdom of Great Britain and Northern Ireland.

"**Certificated Note**" has the meaning specified in Section 2.02.

"**Change of Control**" means the occurrence of any of the following:

(a)      any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act, other than any Permitted Holders) is or becomes the "beneficial owner" (as such term is used in Rules 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company, including as a result of any merger or consolidation transaction including the Company;

(b)      any "person" or "group" other than a Permitted Holder acquires the ability to elect a majority of the board of directors of the Company;

(c)      any Permitted Holder, directly or indirectly, ceases to have the power to direct or cause the direction of the management and policies of the Company, whether through the ownership of voting securities, by contract or otherwise; or

(d)      more than 50% of the total voting power of the Voting Stock of the Company has been sold or issued as a result of the transaction other than to a Permitted Holder.

"**Clearstream Banking**" means Clearstream Banking, *société anonyme*.

"**Closing Date**" means [·], 20[·], or such later date on which the Notes are issued hereunder.

"**Company**" has the meaning given to such term in the definition of "Guarantor."

"**Company Shareholder**" means the legal and beneficial owner of 100% of the issued share capital of OEC.

"**Consent Solicitation Statement**" means the consent solicitation statement issued on June 15, 2020 by Odebrecht Engenharia e Construção S.A., among others.

"**Contingent Obligation**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (b) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "Contingent Obligations" shall not include endorsements for collection or deposit in the ordinary course of business or any similar transaction

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Corporate Trust Office**" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered (which office as of the date of this Indenture is located at 240 Greenwich Street, Floor 7 East, New York, New York 10286).

"**covenant defeasance option**" has the meaning specified in Section 8.01.

"**Covenant Suspension Event**" has the meaning specified in Section 4.23.

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Debtor**" has the meaning given to such term in the definition of "Indebtedness."

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Default Rate**" has the meaning specified in Section 2.15.

"**Defaulted Interest**" has the meaning specified in Section 2.15.

"**defeasance trust**" has the meaning specified in Section 8.02.

"**Denomination Currency**" has the meaning specified in Section 13.06.

"**Deposit Accounts**" has the meaning given to such term in the definition of "Temporary Cash Investments."

"**Depositary**" means DTC or any successor depositary for the Notes.

"**Development Project**" means any construction, development or infrastructure project, including without limitation greenfield projects and brownfield projects, in which the Company or any of its Subsidiaries participates or holds, directly or indirectly, an interest, or the bidding on any such project.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event:

(a)  matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

(b)  is convertible or exchangeable for Indebtedness or Disqualified Stock; or

(c)  is redeemable at the option of the holder thereof, in whole or in part,

in each case on or prior to the 91st day after the Stated Maturity of the Notes; *provided, however,* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Notes, shall not constitute Disqualified Stock if such "asset sale" or "change of control" provisions are not more favorable to the holders of such Capital Stock than the comparable provisions of this Indenture.[3]

---

[3] NTD: Definition to be adjusted for Perpetual Notes. Please see Exhibit G.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Dollars**" and the symbol "**U.S.$**" shall each mean freely transferable, lawful money of the United States.

"**DTC**" means The Depository Trust Company.

"**EBITDA**" means, for any period, for the Company and its Subsidiaries on a consolidated basis, Net Revenue, *less* (i) cost of sales and services rendered, (ii) general and administrative expenses, *plus* any depreciation or amortization included in cost of sales and services rendered or general and administrative expenses, and (iii) payments made by the Company or its Subsidiaries, taken as a whole in respect of Fines.

"**Enforced Final Judgment**" means (i) a final judgment for the payment of money by any court of Brazil (or any state, federal district, municipality or subdivision thereof) or any other jurisdiction in which the relevant Guarantor or Significant Subsidiary has material assets, or (ii) a *final exequatur*, recognition or domestication decision enforcing a final foreign decision for the payment of money in Brazil pursuant to section 960 et. seq. of the Brazilian Civil Procedure Code (Law n. 13,105/15), or any such decision under similar proceeding in any other jurisdiction in which the relevant Guarantor or Significant Subsidiary has material assets.

"**Equity Interests**" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Indebtedness convertible into equity.

"**Euroclear**" means Euroclear Bank S.A./N.V.

"**Event of Default**" has the meaning specified in Section 6.01.

"*Excess Cash Amount*" means, as of any Excess Cash Measurement Date, (a) the total amount of Unrestricted Cash, *less* (b) the sum of (i) the applicable Minimum Cash Threshold hereto corresponding to such Excess Cash Measurement Date, (ii) the total amount of scheduled payments due by OEC and its Subsidiaries, taken as a whole, under (x) the New Notes and (y) any other Permitted Indebtedness in each case in the subsequent twelve (12) month period, (iii) projected expenses for the Issuer to conduct its operations during the subsequent twelve (12) month period, including any foreign currency conversion expenses and (iv) for any Excess Cash Measurement Date through (and including) December 31, 2024, any Fines due by OEC and its Subsidiaries for the subsequent twelve (12) month period; *less* (c) an amount equal to the Required Gross-Up; *provided* that any items already deducted from cash and short-term investments of OEC and its Subsidiaries for purposes of determining Unrestricted Cash shall not be deducted again for purposes of determining the Excess Cash Amount.

"**Excess Cash Available Amount**" the amount in Dollars by which the Excess Cash Amount, as of any Excess Cash Measurement Date, exceeds zero, if any.

"**Excess Cash Measurement Date**" means the end of each fiscal year while the Notes are outstanding, commencing on December 31, 2020.

"**Excess Cash Payment**" means any payments made to Holders in respect of Excess Cash Available Amounts during the Excess Cash Sweep Period.

"**Excess Cash Payment Date**" means May 15 of each fiscal year in which an Excess Cash Payment is made.

"**Excess Cash Sweep Period**" means, commencing on January 1, 2021, each fiscal year in which the Net Debt to EBITDA Ratio equals or exceeds 3.00 to 1.00 as of the immediately preceding Excess Cash

- 7 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Measurement Date and ended on the Excess Cash Measurement Date that is twelve (12) months prior to an Excess Cash Sweep Termination Event.

"**Excess Cash Sweep Termination Event**" means the first Excess Cash Measurement Date in respect of which the Net Debt to EBITDA Ratio is lower than 3.00 to 1.00.

"**Excess Proceeds**" has the meaning given to such term in the definition of "Asset Sale."

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning specified in Section 4.20.

"**Expropriation Event**" has the meaning specified in Section 6.01.

"**Fair Market Value**" means, with respect to any Person, the value that would be paid by a willing buyer to an unaffiliated willing seller, as determined in good faith at arms'-length by (a) for any transaction amount in excess of U.S.$25,000,000, the board of executive officers or directors, as applicable, or (b) otherwise, an authorized officer, in each case of such Person.

"**Fines**" means any and all amounts due (directly or by means of guarantees) by OEC or any of its Subsidiaries for fines, penalties, awards or settlement payments imposed by, or agreed, with any Governmental Authority or multilateral financial institutions and development banks as a result of any factual or alleged illegal conduct by OEC or any of its Affiliates or any of their respective former or current directors, employees, agents or representatives.

"**Fitch**" means Fitch Rating Service, Inc., and its successors.

"**Global Note**" means a global note representing the Notes substantially in the form attached hereto as Exhibit A.

"**guaranty**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guaranty" shall not include endorsements for collection or deposit in the ordinary course of business. The term "guaranty" used as a verb has a corresponding meaning.

"**Guarantee**" has the meaning given to such term in Section 2.01.

"**Guarantor**" means each of OEC S.A. ("**OEC**" or the "**Company**"), CNO S.A., OECI S.A. and OENGER S.A. (the "**Initial Guarantors**") and any Qualifying Subsidiary that from time to time becomes a Significant Subsidiary ("**Additional Guarantors**" and together with the Initial Guarantors, the "**Guarantors**"); *provided* that at any time that any such Additional Guarantor ceases to be a Significant Subsidiary, such Additional Guarantor shall be automatically released from the Guarantee hereunder.

"**Governmental Authority**" means any government, governmental department, commission, board, bureau, agency, regulatory authority, instrumentality judicial or administrative body, domestic or

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

foreign, federal, state or local, having jurisdiction over the matter or matters in question, including, without limitation, those in Brazil and the United States. For the avoidance of doubt, Petrobras shall not be considered as a Governmental Authority.

"**Hedging Agreement**" means (i) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates, (ii) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (iii) any commodity or raw material futures contract or any other agreement designed to protect against fluctuations in raw material prices.

"**Hedging Obligations**" of any Person means the obligations of such Person pursuant to any interest rate swap agreement, foreign currency exchange agreement, interest rate collar agreement, option or futures contract or other similar agreement or arrangement designed to protect such Person against changes in interest rates or foreign exchange rates.

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register.

"**Holding Vehicle**" means any Subsidiary of the Company that is created solely for the purpose of directly or indirectly owning Equity Interests in one or more Joint Venture Companies, Project Companies, Local Operating Companies, or Bidding Companies.

"**IFRS**" has the meaning specified in Section 4.21.

"**Indebtedness**" means, as applied to any Person (a "**Debtor**") on any date of determination, without duplication:

(a)     the principal in respect of indebtedness of such Person for borrowed money;

(b)     the principal and premium, if any, in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)     all obligations of such Person to pay the deferred and unpaid purchase price of property (except trade payables and Contingent Obligations to pay earn-outs), which purchase price is due more than six months after the date of placing such property in service or taking delivery and title thereto;

(d)     all reimbursement obligations of such Person in respect of the face amount of letters of credit or other similar instruments (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person, such as import tax credits and import transactions, to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the third business day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(e)     all indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such indebtedness is assumed by such Person; *provided*, *however*, that the amount of indebtedness of such Person shall be the lesser of: (a) the Fair Market Value of such asset at such date of determination; and (b) the amount of such indebtedness of such other Persons;

(f)     to the extent not otherwise included in this definition, all Hedging Obligations of such Person;

- 9 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(g)       all capitalized lease obligations of such Person; and

(h)       all obligations of the type referred to in clauses (a) through (g) above of other Persons that is guaranteed by such Person to the extent so guaranteed, in each case, if and to the extent any of the preceding items would appear as a liability upon an unconsolidated balance sheet of the specified Person prepared in accordance with Brazilian GAAP.

Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, Indebtedness shall not include trade payables arising in the ordinary course of business so long as such trade payables are payable within 180 calendar days of the date the respective goods are delivered or the respective services are rendered and are not overdue, nor any obligations to any Person with respect to any tax payment agreement entered into with any Governmental Authority.

"**Indenture**" means this Indenture, as amended or supplemented from time to time in accordance with the provisions hereof.

"**Independent Director Absence Date**" means the date on which any director or executive officer of the Issuer or the Company becomes aware that the board of directors of the Company fails to include the number of independent board members required by, and in accordance with, the Restructuring Plan.

"**Independent Director Absence Period**" means any period from and including an Independent Director Absence Date through but excluding the next date on which the board of directors of the Company again includes the number of independent board members required by, and in accordance with, the Restructuring Plan.

"**Initial Guarantors**" has the meaning given to such term in the definition of "Guarantor."

"**Interest on Capital**" means *juros sobre capital próprio* paid pursuant to Brazilian Law No. 9249/95 as may be amended or replaced.

"**Investment**" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of advances, loans or other extensions of credit including by way of guarantee or similar arrangements, (other than advances), to customers or suppliers, in the ordinary course of business and consistent with past practice, that are recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of a lender) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), capital expenditures, or the incurrence of a guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared on the basis of Brazilian GAAP.  If the Issuer, the Company or any Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Subsidiary such that, after giving effect thereto, such Person is no longer a Subsidiary of the Company or any of its Subsidiaries, any Investment by the Issuer or any Subsidiary in such Person remaining after giving effect thereto shall be deemed to be a new Investment at such time.

"**Investment Grade**" means BBB− or higher by Standard & Poor's, Baa3 or higher by Moody's or BBB− or higher by Fitch, or the equivalent of such global ratings by Standard & Poor's, Moody's or Fitch.

"**Intercompany Agreement**" means the agreement regarding the treatment of certain existing intercompany balances entered into on June 11, 2020 by and among ODBINV S.A. - Em Recuperação Judicial, Odebrecht S.A. - Em Recuperação Judicial and Odebrecht Engenharia e Construção S.A., as

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

generally described and summarized in "The Restructuring – Treatment of Intercompany Claims" of the Consent Solicitation Statement.

"**Interest Payment Date**" **and** "**Interest Payment Dates**" means the Payment Date(s) of an installment of interest on the Notes, see Section 2.06.

"**Interest Period**" means the period commencing on and including an Interest Payment Date and ending on and including the day immediately preceding the next succeeding Interest Payment Date, with the exception that the first Interest Period shall commence on [•] and end the day preceding the first Interest Payment Date.

"**issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Issue Date**" means [·], 2020.

"**Issuer**" means OEC Finance Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands, until replaced by a successor thereof, and, thereafter, includes the successor for purposes of any provision contained herein.

"**Issuer Order**" means a written order signed in the name of the Company by the chief executive officer, the chief financial officer or any other officer of the Issuer.

"**Issuer Substitution Documents**" has the meaning specified in Article 5.

"**Joint Venture Company**" means any Subsidiary of the Company or any other Person of which 50% or less than 50% of the outstanding Voting Stock or participation is held by the Company or its Subsidiaries, whose Equity Interest is held directly or indirectly by the Company and one or more third parties that are not Affiliates of the Company for the purpose of directly or indirectly bidding new projects, including such Subsidiaries or Persons of the Company whose activities are governed by a joint venture agreement with one or more third parties that are not Affiliates of the Company.

"**Judgment Currency**" has the meaning specified in Section 13.06.

"**legal defeasance option**" has the meaning specified in Section 8.01.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (*including any alienação fiduciária, cessão fiduciária, hipoteca, penhor e anticrese*, conditional sale or other title retention agreement or lease in the nature thereof).

"**Local Operating Company**" means a Subsidiary of the Company for the primary purpose of bidding on construction projects or managing and financing any such construction projects.

"**Material Adverse Effect**" means a material adverse effect on (i) the assets, the business or financial condition of the Company and its Subsidiaries (taken as a whole), (ii) the ability of the Issuer and the Guarantors, collectively, to make timely payments of principal and interest on the Notes and otherwise comply with its material obligations under the Notes and this Indenture, or (iii) the legality, validity or enforceability of any payment or other material obligation of the Issuer or any Guarantor under this Indenture or the Notes.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Maturity**" means the date on which the principal of, and premium, if any, on the Notes become due and payable in full in accordance with this Indenture, whether on the Stated Maturity Date, or earlier upon redemption, by declaration of acceleration or otherwise.[4]

"**Minimum Cash Threshold**" means (a) for any Excess Cash Measurement Date occurring on or prior to the date on which the annual audited financial statements of OEC for the fiscal year of 2024 are issued, U.S.$200,000,000 and (b) for any Excess Cash Measurement Date occurring after the date on which the annual audited financial statements of OEC for the fiscal year of 2024 are issued, the amount set forth in column of the table below labeled "Minimum Cash Threshold" corresponding to the applicable amount (as set forth in the column of the table below labeled "Net Revenue") of Net Revenue accrued by OEC and its Subsidiaries on a consolidated basis during such most recently completed fiscal year for which such financial statements have been issued:

| Net Revenue | Minimum Cash Threshold |
|---|---|
| Less than U.S.$5,000,000,000 | U.S.$200,000,000 |
| At least U.S.$5,000,000,000 but less than U.S.$6,000,000,000 | U.S.$225,000,000 |
| At least U.S.$6,000,000,000 but less than U.S.$7,000,000,000 | U.S.$250,000,000 |
| At least U.S.$7,000,000,000 but less than U.S.$8,000,000,000 | U.S.$275,000,000 |
| U.S.$8,000,000,000 or greater | U.S.$300,000,000 |

"**Moody's**" means Moody's Investors Service, Inc., and its successors.

"**Net Cash Proceeds**" means, with respect to any issuance or sale of Capital Stock, or Asset Sale or sale or other disposition of any Investment, as applicable, the cash proceeds received from such issuance or sale (including, as applicable, any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and net proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring person of Indebtedness or other obligations relating to the properties or assets that are the subject of such sale or received in any other non-cash form) therefrom, in each case net of:

(a)     all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses incurred, and all taxes paid, reasonably estimated to be actually payable or accrued as a liability under Brazilian GAAP (including, for the avoidance of doubt, any income, withholding and other taxes payable as a result of the distribution of such proceeds to the Company or its Subsidiaries and after taking into account any available tax credits or deductions and any tax sharing agreements), as a consequence of such issuance or sale; and

(b)     all payments made on any Indebtedness which is secured by any assets subject to such sale in accordance with the terms of any Lien upon such assets, or which by applicable law is being repaid out of the proceeds from such sale.

"**Net Debt**" means, as of any date of determination, the aggregate amount of Indebtedness (except for intercompany Indebtedness as among the Company and its Subsidiaries) of the Company and its

---

[4] NTD: Definition to be adjusted for Perpetual Notes. Please see Exhibit G.

- 12 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Subsidiaries, *plus* any scheduled payments owing by the Company or its Subsidiaries for Fines *less* the sum of cash and cash equivalents, including marketable securities.

"**Net Debt to EBITDA Ratio**" means the ratio of Net Debt to EBITDA for the then most recently concluded fiscal year, subject to adjustments for Asset Dispositions and investments made during the period.

"**Net Revenue**" means for any period, all net revenues and other operating income of the Company and its Subsidiaries on a consolidated basis.

"**New Notes**" means, collectively, each of the following series of new Notes of the Issuer to be issued pursuant to the Restructuring Plan: (a) 7.000% Notes due October 21, 2024 (original maturity date April 21, 2020), (b) 5.125% Notes due December 26, 2026 (original maturity date June 26, 2022), (c) 6.000% Notes due October 5, 2027 (original maturity date April 5, 2023), (d) 4.375% Notes due October 25, 2029 (original maturity date April 25, 2025), (e) 5.250% Notes due December 27, 2033 (original maturity date June 27, 2029), (f) 7.125% Notes due December 26, 2046 (original maturity date June 26, 2042) and (g) 7.000% Perpetual Notes.

"**Non-Recourse Debtor**" has the meaning given to such term in the definition of "Non-Recourse Indebtedness."

"**Non-Recourse Indebtedness**" means Indebtedness (or any portion thereof) of a Subsidiary of the Company (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction, or acquisition of projects, properties or assets and any increases in or extensions, renewals or refinancings of such Indebtedness or (ii) the operations of projects, properties or assets of such Non-Recourse Debtor or its Subsidiaries; *provided* that the recourse of the lender thereof (including any agent, trustee, receiver or other person acting on behalf of such entity) in respect of such Indebtedness is limited (other than in respect of the OEC Recourse Amount (as defined below)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Indebtedness has been incurred; *provided, further*, that if such lender has contractual recourse to the Company or to any Subsidiary of the Company (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Indebtedness (such portion, the "**OEC Recourse Amount**"), then the OEC Recourse Amount will not constitute Non-Recourse Indebtedness and the Company will be deemed to have incurred Indebtedness in an aggregate principal amount equal to the OEC Recourse Amount.

"**Noteholder**" has the meaning given to such term in the definition of "Holder."

"**Notes**" has the meaning specified in the first paragraph of the Recitals in this Indenture and shall be in the form of Note set forth in Exhibit A.

"**ODB RJ**" means the judicial restructuring of Odebrecht S.A. – Em Recuperação Judicial and certain of its Subsidiaries and Affiliates (each, an "**ODB RJ Party**").

"**ODB RJ Party**" has the meaning given to such term in the definition of "ODB RJ."

"**OEC**" has the meaning given to such term in the definition of "Guarantor."

IAM:ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**OEC Recourse Amount**" has the meaning given to such term in the definition of "Non-Recourse Indebtedness."

"**Officer**" means the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Issuer, or any other Person duly appointed by the shareholders of the Issuer or the Board of Directors to perform corporate duties, including, without limitation, any Director of the Issuer.

"**Officers' Certificate**" means with respect to the Issuer, a certificate signed by any two Officers of the Issuer (one of which shall be the chief executive, financial or operating officer of the Issuer) and with respect to any Guarantor, a certificate signed by any two Officers of the applicable Guarantor (one of which shall be the chief executive, financial or operating officer of such Guarantor), and in each case delivered to the Trustee, as applicable.

"**Old Notes**" means, collectively, the 7.00% Senior Notes due 2020; 5.125% Notes due 2022; 6.00% Notes due 2023; 4.375% Notes due 2025; 5.250% Notes due 2029; 7.125% Notes due 2042; 7.500% Perpetual Notes, in each case issued by Odebrecht Finance Ltd. and guaranteed by certain of the Guarantors.

"**Opinion of Counsel**" means a written opinion of legal counsel of recognized standing (who may be an employee of or counsel to the Issuer) and who shall be acceptable to the Trustee, which opinion is reasonably satisfactory to the Trustee.

"**Outstanding**" means, when used with respect to Notes, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(i)      Notes theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)      Notes for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Issuer) in trust or set aside and segregated in trust by the Issuer (if the Issuer shall act as its own Paying Agent) for the Holders of such Notes; *provided* that, if such Notes are to be redeemed pursuant to Section 3.01, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)      Notes, except to the extent *provided* in Section 8.01 and Section 8.02, with respect to which the Issuer has effected legal defeasance and/or covenant defeasance as *provided* in Article 8; and

(iv)      Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser in whose hands such Notes are valid obligations of the Issuer;

*provided*, *however*, that in determining whether the Holders of the requisite principal amount of Outstanding Notes have given any request, demand, authorization, direction, consent, waiver or waiver hereunder, Notes owned by the Issuer or any of its Affiliates shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Notes which a Responsible Officer of the Trustee has received written notice at its address specified herein of being so owned shall be so disregarded.  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such

- 14 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Notes and that the pledgee is not the Issuer, or any other obligor upon the Notes or any of its Affiliates or such other obligor.

"**Paying Agent**" means The Bank of New York Mellon and any other Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer hereunder and includes such meaning specified in Section 2.04.

"**Payment Date**" means the date on which payment of interest on and/or principal of the Notes is due.

"**Permitted Business**" means the engineering, procurement or construction of projects, any other businesses or activities conducted by the Company or any of its Subsidiaries as of the Issue Date, and any businesses or activities that are reasonably related, ancillary or complementary to, any of the foregoing, and reasonable extensions, developments or expansions of such businesses or activities.

"**Permitted Holder**" means Odebrecht S.A. – Em Recuperação Judicial or a successor thereof.

"**Permitted Indebtedness**" has the meaning specified in Section 4.13.

"**Permitted Investment**" means any and all of the following:

(a)     an Investment by the Company or any Subsidiary in the Company or any Subsidiary, in each case for purposes of or relating to engaging in a Permitted Business or in accordance with the Intercompany Agreement;

(b)     an Investment by the Company or any Subsidiary in another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Company or a Subsidiary or becomes a Subsidiary;

(c)     Temporary Cash Investments;

(d)     any Investment acquired from a Person which is merged with or into the Company or any Subsidiary, or any Investment of any Person existing at the time such Person becomes a Subsidiary and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction;

(e)     any Investment existing on, or made pursuant to written agreements existing on, the Issue Date or an Investment consisting of an extension, modification or renewal of any Investment in existence on the Issue Date; *provided* that such Investment does not increase the aggregate amount of the Investment so extended, modified or renewed except by an amount equal to any premium or other reasonable amount paid in respect of the underlying obligations and fees and expenses incurred in connection with such replacement, refinancing or refunding;

(f)     any Investment constituting Permitted Indebtedness;

(g)     any acquisition and holding of (i) Brazilian federal and state tax credits acquired solely to pay amounts owed by the Company or any Subsidiary to tax authorities and (ii) discounted obligations of any Governmental Authority acquired solely to pay tax amounts owed by the Company to such Governmental Authority;

(h)     receivables owing to the Company or any of its Subsidiaries, if created in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided* that

- 15 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

such trade terms may include such trade terms as the Company or such Subsidiary deems reasonable under the circumstances;

(i)     any advance, loan or extension of credit arising in connection with the purchase of inventory, equipment or supplies in the ordinary course of business;

(j)     loans and advances pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business in an aggregate principal amount not to exceed U.S.$1.0 million at one time outstanding; *provided, however,* that any Investment made in connection with any employee compensation or employee profit sharing scheme, in each case, generally applicable to all employees within any category of employees, shall be permitted hereunder and not be counted toward such U.S.$1.0 million cap;

(k)     Investments in connection with pledges, deposits, payments or performance bonds made or given in the ordinary course of business in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations;

(l)     repurchases or redemptions of the Notes;

(m)     Investments in any Joint Venture Company; and

(n)     additional Investments by the Company or any of its Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause during the life of the Notes not to exceed U.S.$20 million at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"**Permitted Liens**" means, with respect to any Person:

(a)     any Lien existing on the Issue Date of the Notes, and any extension, renewal or replacement thereof or of any Lien referred to in clause (b) and (c) below; *provided, however*, that the total amount of Indebtedness so secured is not increased except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(b)     any Lien on any property or assets (including Capital Stock of any Person) (1) that is granted to a purchaser in connection with any sale of property or assets that is permitted or made in accordance with Section 4.18, to the extent such Liens extend solely to property or assets that are subject of such sale; or (2) securing Indebtedness incurred solely for purposes of financing the acquisition, construction, development or improvement of such property or assets including related transaction fees and expenses (or securing Indebtedness incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction, development or improvement of such property or assets including related transaction fees and expenses) after the date of this Indenture and entered into in the ordinary course of business; *provided that* (i) the aggregate principal amount of Indebtedness secured by the Liens shall not exceed (but may be less than) the cost (i.e., purchase price) of the property or assets so acquired, constructed, developed or improved and the Lien is incurred before and in contemplation of such acquisition, construction, development or improvement and does not encumber any other property or assets of the Company or any Subsidiary; and *provided, further, that* to the extent that the property or asset acquired is Capital Stock, the Lien also may encumber other property or assets of the Person so acquired; and (ii) any Lien is permitted to be incurred on the Capital Stock of any Person that is Non-Recourse Indebtedness and incurred for purposes of financing the acquisition, construction or development of any property or assets of such Person;

- 16 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(c)      any Lien (x) securing Indebtedness for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; *provided that* the Liens in respect of such Indebtedness is limited to assets (including Capital Stock of the project entity), rights and/or revenues of such project; and *provided, further,* that the Lien is incurred before, or within 365 calendar days after the completion of, that acquisition, construction or development and does not apply to any other property or assets of the Company or any Subsidiary; or (y) existing on any property or assets of any Person before that Person's acquisition by, merger into or consolidation with the Company or any Subsidiary after the Issue Date; *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation, (ii) the Indebtedness secured by such Lien may not exceed the Indebtedness secured on the date of such acquisition, merger or consolidation, (iii) such Lien shall not apply to any other property or assets of the Company or any of its Subsidiaries and (iv) such Lien shall secure only the Indebtedness that it secures on the date of such acquisition, merger or consolidation;

(d)      any Lien imposed by law that was incurred in the ordinary course of business, including, without limitation, carriers', warehousemen's and mechanics' liens and other similar encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(e)      any pledge or deposit made in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith to which the Guarantors or any Subsidiary is a party, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which the Guarantors or any Subsidiary is a party or deposits for the payment of rent, in each case made in the ordinary course of business;

(f)      any Lien in favor of issuers of surety bonds or letters of credit issued pursuant to the request of and for the account of the Guarantors or any Subsidiary in the ordinary course of business;

(g)      any Lien securing taxes, assessments and other judicial or administrative proceedings or other governmental charges, the payment of which are not yet due (or are being contested in good faith by appropriate proceedings and for which such reserves or other appropriate provisions, if any, have been established as required by Brazilian GAAP);

(h)      any Lien that (x) is granted on any property or assets for the purpose of securing Fine payments to any Governmental Authority, to the extent that such Liens extend solely to property or assets located, and, if applicable, generated, in the same jurisdiction in which such Fines are paid and which shall not, since the Restructuring Plan Filing Date, have been moved to the applicable jurisdiction or disposed of, conveyed, issued, assigned or otherwise transferred, including by the Issuer, the Company, a Subsidiary or Affiliate to the Company or another Subsidiary or Affiliate and (y) is incurred (i) at any time during the first five (5) years following the Issue Date, so long as such Fines are contemplated by the Business Plan and payable in respect of any country in which the Company or any of its Subsidiaries plan to maintain operations during such five (5)-year period under the Business Plan; or (ii) at any time during the first ten years after the Issue Date, so long as such Fines are payable in respect of any country in which the Existing Guarantors plan to re-establish operations under the Business Plan;

(i)      minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of property or assets or minor imperfections in title that do not materially impair the value or use of the property or assets affected thereby, and any leases and subleases of real property that do not interfere with the ordinary conduct of the business of the Guarantors or any Subsidiary, and which are made on customary and usual terms applicable to similar properties;

- 17 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(j)      any rights of set-off of any Person with respect to any deposit account of the Guarantors or any Subsidiary arising in the ordinary course of business;

(k)      any Liens granted to secure borrowings from, directly or indirectly, (i) Banco Nacional de Desenvolvimento Econômico e Social—BNDES (including loans from Financiadora de Estudos e Projectos—FINEP), Banco do Nordeste do Brasil S.A. or any other Brazilian federal, regional or state governmental development bank or credit agency or (ii) any international or multilateral development bank, government-sponsored agency, export-import bank or agency or official export-import credit insurer;

(l)      any Lien securing Hedging Obligations under Hedging Agreements not for speculative purposes;

(m)      any Liens on the inventory or receivables and related assets (including claims against clients) of the Guarantors or any Subsidiary securing the obligations of such Person or its subsidiaries under any lines of credit or any working capital facility or in connection with any structured export or import financing or other trade transaction, solely to the extent such lines of credit, working capital facility, structured export or import financing or other trade transaction is incurred pursuant to clause (c), (h) or (l) of the definition of "Permitted Indebtedness";

(n)      Liens securing obligations owed by any Subsidiary to the Company or any other Subsidiary or by the Company to any such Subsidiary; and

(o)      in addition to the foregoing Liens set forth in clauses (a) through (n) above, Liens securing Indebtedness of the Guarantors (including, without limitation, guarantees of the Guarantors), with an aggregate principal amount outstanding, at any time of determination, not exceeding U.S.$100,000,000.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company trust, unincorporated organization or government or any agency or political subdivision thereof.

"**PIK Interest**" has the meaning specified in Section 2.06.

"**PIK Notes**" has the meaning specified in Section 2.08.

"**PIK Option**" has the meaning specified in Section 2.06.

"**PIK Option Period**" has the meaning specified in Section 2.06.

"**PIK Payment**" has the meaning specified in Section 2.06.

"**Preferred Stock**" means, as applied to the Capital Stock of any corporation, Capital Stock of any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"**principal**" of a Note means the principal amount of such Note (including any Additional Amounts payable by the Issuer in respect of such principal).

"**Project Company**" means any Subsidiary of the Company, substantially all of whose activities involve any construction, development or infrastructure project, including without limitation greenfield projects and brownfield projects, in which the Company or any of its Subsidiaries participates or holds,

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM\_ACTIVE 401906103\_23]

directly or indirectly, an interest, including any Subsidiary that is a member of construction consortia or a qualified bidder in Brazil or other foreign jurisdiction.

"**Purchase Date**" has the meaning specified in Section 4.20.

"**Qualified Investor**" means, with respect to any transaction constituting a Change of Control, any Person or group that (i) has unsecured indebtedness that is, at the time of such Change of Control, rated at or above Investment Grade (or any special purpose entity or entities that is directly controlled by such Person or group and created or used exclusively for the purpose of acquiring control of the Company); or (ii) would result in the corporate rating of the Company immediately after giving effect to the Change of Control to be (A) the same as or higher than the corporate rating immediately prior to the Change of Control and (B) in any event, at least B- by Standard & Poor's or B3 by Moody's or Fitch, confirmed in advance by two Rating Agencies.

"**Qualifying Subsidiary**" means any Subsidiary of the Company that (i) is not the Issuer or an Initial Guarantor, and (ii) at the relevant time of determination, is not a Joint Venture Company, a Project Company, a Local Operating Company, a Bidding Company or a Holding Vehicle.

"**Rating Agency**" means any of (i) Standard & Poor's, (ii) Moody's or (iii) Fitch (in each case, or any successor thereof).

"**Record Date**" means, when used with respect to the interest on the Notes payable on any Interest Payment Date, October 6 and April 6 (whether or not a Business Day), as the case may be, next preceding such Interest Payment Date.

"**Redemption Date**" means, when used with respect to any Note to be redeemed pursuant to Article 3 the date fixed for such redemption by or pursuant to this Indenture.

"**Redemption Price**" means, when used with respect to any Notes to be redeemed pursuant to the Section 3.01, price at which it is to be redeemed pursuant to this Indenture.

"**Register**" has the meaning specified in Section 2.04.

"**Registered Holder**" means, (1) DTC, if the Note is a Global Note deposited with a custodian for, and registered in the name of a nominee of, DTC and (2) Euroclear and/or Clearstream Banking, if the Note is a Global Note deposited with a common depositary for, and registered in the name of a nominee for, Euroclear and/or Clearstream Banking.

"**Registrar**" means The Bank of New York Mellon, until a successor Registrar shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "Registrar" shall mean such successor Registrar, and includes such meaning specified in Section 2.04.

"**Regular Record Date**" has the meaning specified in Section 2.08.

"**Regulation S**" means Regulation S under the Securities Act, as in effect from time to time.

"**Regulation S Global Note**" means one or more permanent Global Notes in definitive fully registered form without interest coupons representing Notes sold outside of the United States pursuant to Regulation S.

"**Relevant Resolution Notice**" has the meaning specified in Section 4.21.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Relevant Withholding Taxes**" has the meaning specified in Section 4.10.

"**Responsible Officer**" means any officer of the Trustee having direct responsibility for the administration of this Indenture.

"**Restricted Global Note**" means one or more permanent Global Notes in definitive fully registered form without interest coupons sold to "qualified institutional buyers" (as such term is defined in Rule 144A) pursuant to Rule 144A.

"**Restricted Payment**" has the meaning specified in Section 4.12.

"**Restructuring Plan**" means the extrajudicial restructuring plan, filed with the Sao Paulo Bankruptcy and Reorganization Court on [●], 2020 (the "**Restructuring Plan Filing Date**"), providing for the issuance of the Securities and of the New Notes in exchange for the restructuring of various financial debts of OEC and certain of its Affiliates, as duly amended from time to time.

"**Restructuring Plan Filing Date**" shall have the meaning set forth in the definition of "Restructuring Plan."

"**Required Gross-Up**" means the sum of (A) any Additional Amounts payable in respect of the applicable payment of Excess Cash Available Amounts under the New Notes and the Securities and (B) any withholding or similar taxes payable by the Company or Securities Issuer in respect of distributions of Excess Cash Available Amounts to Securities Issuer or the Company Shareholder.

"**Requisite New Notes Holders**" has the meaning specified in Section 6.02.

"**Requisite Notes Holders**" has the meaning specified in Section 6.02.

"**Reversion Date**" has the meaning specified in Section 4.23.

"**Rule 144A**" means Rule 144A under the Securities Act, as in effect from time to time.

"**S&P**" means Standard & Poor's Rating Group, a division of McGraw Hill, Inc. and its successors.

"**Sale and Lease-Back Transaction**" means any arrangement with any Person (other than the Company or any of its Subsidiaries), or to which any such Person is a party, providing for the leasing to the Company or its Subsidiaries for a period of more than three (3) years of any property or assets which property or assets have been or are to be sold or transferred by the Company or such Subsidiary to such Person or to any other Person (other than the Company or a Subsidiary) to which funds have been or are to be advanced by such Person on the security of the leased property or assets.

"**Second Measurement Date**" has the meaning specified in Section 2.07.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Act Legend**" means the following legend, printed in capital letters:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

(1) REPRESENTS THAT

(A) IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT OR

(B) IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY

(A) TO THE ISSUER,

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT,

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT,

(D) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH 2(E) ABOVE, THE COMPANY RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.  NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

"**Securities**" means the instrument titles due 2058, issued by the Securities Issuer, pursuant to the Restructuring Plan and under the relevant indenture (the "**Securities Indenture**").

"**Securities Indenture**" has the meaning given to such term in the definition of "Securities."

"**Securities Issuer**" means Odebrecht HoldCo Finance Limited, a Cayman Islands corporation.

"**Settlement Rate**" means the rate that is equal to the Brazilian *real*/U.S. Dollar commercial rate, expressed as the amount of Brazilian *reais* per one U.S. Dollar as reported by *Banco Central do Brasil* (the "Central Bank") on the SISBACEN Data System and on its website (which, at the date of this Indenture, is located at http://bcb.gov.br) under transaction code PTAX800 ("*Consultas de Câmbio*" or "Exchange Rate Enquiry"), Option 5, "*Venda*" ("*Cotações para Contabilidade*" or "Rates for Accounting Purposes") (or any successor screen established by the Central Bank).

[[AM_ACTIVE 401906103_23]]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Significant Subsidiary**" means any Subsidiary of the Company that:

(A) is organized in Brazil and has, at the relevant time of determination, together with its Subsidiaries, either (i) assets which, as of the date of the Company's most recent annual consolidated balance sheet (and after intercompany eliminations), constitute at least 10% of the total assets of the Company on a consolidated basis as of such date, or (ii) revenues for the twelve-month period ending on the date of the Company's most recent annual consolidated statement of income, that constitute at least 10% of the Company's total revenues on a consolidated basis for such period; and

(B) until interest due on all series of New Notes is paid in full in cash (without any PIK Payment) for four consecutive quarters, is organized outside of Brazil, and has, at the relevant time of determination, together with its Subsidiaries, either (i) assets which, as of the date of OEC's most recent annual consolidated balance sheet (and after intercompany eliminations), constitute at least 20% of the total assets of OEC on a consolidated basis as of such date, or (ii) revenues for the twelve-month period ending on the date of OEC's most recent annual consolidated statement of income, that constitute at least 20% of OEC's total revenues on a consolidated basis for such period; or

(C) thereafter, is organized outside of Brazil, and has, at the relevant time of determination, together with its Subsidiaries, either (i) assets which, as of the date of OEC's most recent annual consolidated balance sheet (and after intercompany eliminations), constitute at least 25% of the total assets of OEC on a consolidated basis as of such date, or (ii) revenues for the twelve-month period ending on the date of OEC's most recent annual consolidated statement of income, that constitute at least 25% of OEC's total revenues on a consolidated basis for such period.

"**Special Record Date**" has the meaning specified in Section 2.15.

"**Stated Maturity**" means (i) with respect to any Indebtedness, the date specified as the fixed date on which the final installment of principal of such Indebtedness is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.[5]

"**Stated Maturity Date**" has the meaning specified in Section 2.06.[6]

"**Standard & Poor's**" means Standard & Poor's Rating Group, a division of The McGraw-Hill Companies, Inc., and its successors.

"**Subordinated Indebtedness**" means any Indebtedness of the Company or any Subsidiary which is by its terms subordinated in right of payment to the Notes or Guarantee, as applicable.

"**Subsidiary**" means, with respect to any Person at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more Subsidiaries of such Person (or a combination thereof).

---

[5] NTD: Definition to be removed for Perpetual Notes. Please see Exhibit G.

[6] NTD: Definition to be removed for Perpetual Notes. Please see Exhibit G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

"**Substantially Wholly-Owned**" means, with respect to any Subsidiary, a Subsidiary of at least 90% of the outstanding Capital Stock of which (other than director's qualifying shares) is owned by any Guarantor or one or more Wholly-Owned Subsidiaries (or a combination thereof) of any Guarantor.

"**Substituted Debtor**" has the meaning specified in Article 5.

"**Suspended Covenants**" has the meaning specified in Section 4.23.

"**Suspension Date**" has the meaning specified in Section 4.23.

"**Suspension Period**" has the meaning specified in Section 4.23.

"**Taxing Jurisdiction**" has the meaning specified in Section 4.10.

"**Temporary Cash Investments**" means any of the following:

(a)     any investment in direct obligations of Brazil, the United States or any agency thereof or obligations guaranteed by Brazil, the United States or any agency thereof;

(b)     investments in time deposit accounts, certificates of deposit and money market deposits (collectively, "**Deposit Accounts**") issued by a bank or trust company that is organized under the laws of the United States, any state thereof, Brazil or any foreign country recognized by the United States having capital, surplus and undivided profits aggregating in excess of U.S.$500 million (or the foreign currency equivalent thereof) and whose long-term debt is rated "A" (or such similar equivalent rating, including similar equivalent ratings in foreign countries) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

(c)     repurchase obligations with a term of not more than 30 calendar days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)     investments in commercial paper maturing not more than 90 calendar days after the date of acquisition issued by a corporation (other than an Affiliate of the Company) organized and in existence under the laws of the United States, Brazil or any other foreign country recognized by the United States with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P (or such similar equivalent rating, including similar equivalent ratings in foreign countries);

(e)     investments in securities with maturities of twelve (12) months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's (or such similar equivalent rating);

(f)     certificates of deposit, banker's acceptances and time deposits issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any United States office of any international financial institution in good standing; and

(g)     investments in money market funds substantially all the assets of which are comprised of investments of the types described in clauses (a) through (f) above.

- 23 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

"**Transfer Agent**" means The Bank of New York Mellon and any other Person authorized by the Issuer to effectuate the exchange or transfer of any Note on behalf of the Issuer hereunder and includes such meaning specified in Section 2.04.

"**Triggering Default**" has the meaning specified in Section 6.01.

"**Trustee**" means The Bank of New York Mellon, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture and, thereafter, "Trustee" shall mean such successor Trustee.

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**U.S. Government Obligations**" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and that are not callable or redeemable at the issuer's option.

"**Unrestricted Cash**" means, as of any date of determination, with respect to OEC and its Subsidiaries on a consolidated basis, all cash and short-term investments of such Persons (i) not advanced by a client to OEC or to any of its Subsidiaries or any of their respective Project Companies for purposes of funding construction projects or for the bidding of new construction projects; (ii) not held by OEC or any Subsidiary or any of their respective Project Companies for purposes of funding working capital or operating needs for Development Projects or Bidding Companies as reasonably determined by management on the basis of a process consistent with its past practices and approved by the board of directors of OEC, (iii) not deposited in any debt service reserve account pledged from time to time to any lender for the purpose of covering shortfalls in amounts available to service the debt; (iv) not pledged as performance collateral or bid bond collateral; (v) not deposited in any other account that, as of the date of such determination, is blocked and not accessible to OEC or any of its Subsidiaries following the occurrence of an event of default or other enforcement action under any financing or security document to which OEC or such Subsidiary is a party; (vi) not received in connection with (A) a Specified Distribution Event (as such term is defined in the Securities Indenture), (B) any issuance of shares of OEC or any of its Subsidiaries, including an initial public offering of at least 15% of all outstanding Capital Stock of OEC, (C) the incurrence of Indebtedness permitted hereunder, or (D) any Asset Sale; or (vii) without double counting, that would not qualify, as of the date of such determination, as "restricted" on a consolidated balance sheet. The compliance of the amount of cash and short-term investments held for purposes of funding working capital or operating needs as contemplated in clause (ii) above with the requirements of such clause will be certified annually by the chief financial officer or chief accounting officer of OEC, and a copy of such certification will be made available to Holders, contemporaneously and in accordance with the requirements for distribution of the Company's annual audited consolidated financial statements.

"**Voting Stock**" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"**Wholly-Owned Subsidiary**" means a Subsidiary all of the outstanding Capital Stock of which (other than director's qualifying shares) is owned by the Company or one or more Wholly-Owned Subsidiaries (or a combination thereof) of the Company.

- 24 -

[AM-ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 1.02.    *Rules of Construction*.

(a)    For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(i)    the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(ii)    the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(iii)    "or" is not exclusive; and

(iv)    "including" means including, without limitation;

(v)    any reference to an "Article", a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Indenture.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with Brazilian GAAP.

(c)    For purposes of the definitions set forth in Article 1 and this Indenture generally, all calculations and determinations shall be made in accordance with Brazilian GAAP and shall be based upon the consolidated financial statements of each Guarantor and its Subsidiaries prepared in accordance with Brazilian GAAP.

Section 1.03.    *Table of Contents; Headings*.   The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 1.04.    *Form of Documents Delivered to Trustee*.   In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Issuer stating that the information with respect to such factual matters is in the possession of the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM:ACTIVE 401906103_23]

Section 1.05.    *Acts of Holders*.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in Person or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.05.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee reviewing such instrument or writing deems sufficient.

(c)     The principal amount and serial numbers of Notes held by any Person, and the date of holding the same, shall be proved by the Register.

(d)     If the Issuer solicits from the Holders of Notes any request, demand, authorization, direction, notice, consent, waiver or other Act, the Issuer may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Issuer shall not have any obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date thirty calendar days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(e)     Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

- 26 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

## ARTICLE 2
### THE NOTES

Section 2.01.  *General and Guarantee*.  The Notes constitute a direct, unconditional, unsubordinated and unsecured obligation of the Issuer and rank *pari passu* with all other present and future unsubordinated and unsecured obligations of the Issuer, except as the foregoing may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the enforcement of creditors' rights generally or by general equitable principles (regardless of whether enforcement is considered in a proceeding in equity or at law).

The Notes will be unconditionally and irrevocably guaranteed by the Initial Guarantors and any Additional Guarantors; *provided* that at any time that any such Additional Guarantor ceases to be a Significant Subsidiary, such Additional Guarantor shall be automatically released from the Guarantee hereunder.

The Guarantee will constitute the direct, general and unconditional senior obligation of the Guarantors that will at all times rank at least equally with all other present and future unsecured senior obligations of each of the Guarantors, except as the foregoing may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the enforcement of creditors' rights generally or by general equitable principles (regardless of whether enforcement is considered in a proceeding in equity or at law).

Section 2.02.  *Form and Dating*.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Note set forth in Exhibit A, which is hereby incorporated in and expressly made a part of this Indenture.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any law, stock exchange rule, agreement to which the Issuer is subject, if any, or usage, provided that any such notation, legend or endorsement is in a form acceptable to the Issuer.

Each Global Note shall be dated the Closing Date.  Each definitive certificated Note ("**Certificated Note**") shall be dated the date of its authentication.

The Notes shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any stock exchange on which the Notes may be listed, if any, all as determined by the officers executing such Notes, as evidenced by their execution of such Notes.

Section 2.03.  *Execution, Authentication and Delivery*.

(a)  Two Officers of the Issuer shall sign the Notes for the Issuer by manual or facsimile signature.

(i)  If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(ii)  A Note shall not be valid until an authorized signatory of the Trustee or an authenticating agent signs the certificate of authentication on the Note by manual, facsimile or electronic signature upon Issuer Order.  Such signature shall be conclusive evidence that the Note has been authenticated under this Indenture.  Such Issuer Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of Notes is to be authenticated.

[AM-ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(iii)     The Trustee or an authenticating agent shall initially authenticate and deliver Notes in an aggregate principal amount of up to U.S.$ [·].

(iv)     The Issuer may from time to time, without the consent of the Holders, create and issue additional Notes having the same terms and conditions as the Notes in all respects, except for issue date, issue price and the first payment of interest thereon. Additional Notes issued in this manner shall be consolidated with and shall form a single series with the previously outstanding Notes.

(v)     The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$10,000 and integral multiples of U.S.$1,00 in excess thereof (each, an "**Authorized Denomination**").

(b)     The Trustee may appoint an authenticating agent, with a copy of such appointment to the Issuer, to authenticate the Notes (the "**Authenticating Agent**"). Unless limited by the terms of such appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by an Authenticating Agent. An Authenticating Agent has the same rights as the Registrar or any Transfer Agent or Paying Agent or agent for service of notices and demands.

(i)     Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

(ii)     Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Issuer. Upon receiving such notice of resignation or upon such a termination, the Trustee may appoint a successor Authenticating Agent reasonably acceptable to the Issuer and shall give written notice of such appointment to the Issuer.

(iii)     The Issuer agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services and reimbursement for its reasonable expenses relating thereto.

(c)     The Issuer initially appoints DTC to act as Depositary with respect to the Global Notes. The Trustee, as custodian, will act as custodian of the Global Notes for DTC or appoint a sub-custodian to act in such capacity.

Section 2.04.     *Transfer Agent, Registrar and Paying Agent.*

(a)     Subject to such reasonable regulations as the Issuer may prescribe, the books of the Issuer for the exchange, registration, and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**"). The Issuer shall also cause the Trustee to maintain books for the exchange, registration and registration of transfer of Notes. The Trustee shall notify the Registrar and the Registrar shall notify the Trustee, when necessary, upon any exchange, registration or registration of transfer of any Notes and shall cause their respective books to be amended accordingly. The Issuer may have one or more co-Registrars and one or more additional Transfer Agents or Paying Agents. The terms

[AM-ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

"**Transfer Agent**" and "**Paying Agent**" include any additional Transfer Agent or Paying Agent, as the case may be. The term "**Registrar**" includes any co-Registrar.

The Issuer shall enter into any appropriate agency agreements with any Registrar, Transfer Agent or Paying Agent not a party to this Indenture, which shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee of the name and address of any such agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Issuer initially appoints the Trustee as Paying Agent, Registrar and Transfer Agent in connection with the Notes.

(b)     The Trustee shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the request of the Issuer provided a reasonable amount of time prior to such inspection. Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced. In the case of the replacement of any of the Notes, the Trustee shall keep a record of the Note so replaced, and the Notes issued in replacement thereof. In the case of the cancellation of any of the Notes, the Trustee shall keep a record of the Note so cancelled and the date on which such Note was cancelled. Each Transfer Agent shall notify the Trustee of any transfers or exchanges of Notes effected by it. The Trustee shall not be required to register the transfer of or exchange Certificated Notes for a period of fifteen calendar days preceding any date of selection of Notes for redemption, or register the transfer of or exchange any Certificated Notes previously called for redemption.

(c)     All Notes surrendered for payment, redemption, registration of transfer or exchange shall be cancelled by the relevant Transfer Agent or Paying Agent or the Trustee, as the case may be. Each Registrar and Transfer Agent shall notify the Trustee of the surrender and cancellation of such Notes and shall deliver such Notes to the Trustee. The Trustee may destroy or cause to be destroyed all such Notes surrendered for payment, redemption, registration of transfer or exchange and, if so destroyed, shall promptly deliver a certificate of destruction to the Issuer.

(d)     The Paying Agent shall comply with applicable backup withholding tax and information reporting requirements under the U.S. Internal Revenue Code of 1986, as amended, and the U.S. Treasury Regulations promulgated thereunder with respect to payments made under the Notes (including, to the extent required, the collection of Internal Revenue Service Forms W-8 and W-9 and the filing of U.S. Internal Revenue Service Forms 1099 and 1096).

Section 2.05.     *Paying Agent to Hold Money in Trust*. By 10:00 A.M. New York time, no later than one Business Day prior to each Payment Date on any Note, the Issuer shall deposit with the Paying Agent in immediately available funds a sum sufficient to pay such principal and interest when so becoming due (including any amounts under Section 4.06). The Issuer shall request that the bank through which such payment is to be made agree to supply to the Paying Agent by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by tested telex) of its intention to make such payment. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Trustee, all money held by such Paying Agent for the payment of principal and interest on the Notes and shall notify the Trustee of any default by the Issuer in making any such payment. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.05, the Paying Agent shall have no further liability for the money delivered to the Trustee.

Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable under the Notes and this Indenture in respect of any Note made by or on behalf of the Issuer to or to the

- 29 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

order of the Paying Agent in the manner specified herein or in the Notes on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable hereunder and under the Notes on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders hereunder; and *provided further* that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the terms hereof, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

Section 2.06.     *Principal, Maturity and Interest*.[7]

(a)     *Maturity and Principal*.  The Notes will be issued in an initial aggregate principal amount of U.S.$ [·] and will mature on [·] (the "**Stated Maturity Date**").  The then outstanding principal amount of the Notes will be payable in full at Maturity.

(b)     *Interest*.  The Notes will bear interest at [·]% per annum (the "**Cash Interest Rate**"), subject to the PIK Option as described below, as from the Issue Date until the principal thereof is paid or made available for payment.  Interest (other than PIK Interest as described below) will be payable in arrears in Dollars on each Interest Payment Date (as defined below).

With respect to all or a portion of interest accrued as of as of the date prior to each Interest Payment Date occurring on or prior to the five (5) year anniversary of the Issue Date (the "**PIK Option Period**"), the Notes will bear interest, at the sole discretion of the Issuer and without the consent of the Holders (and without regard to any restrictions or limitations set forth under Article 4), at (i) the per annum Cash Interest Rate payable in cash or (ii) subject to the limitations on amounts set forth below, a rate equal to the sum of the Cash Interest Rate plus the applicable premium set forth in the table below per annum payable by increasing the outstanding principal amount of the Notes or, with respect to Certificated Notes, issuing additional notes ("**PIK Interest**" and such payment of PIK Interest hereinafter referred to as "**PIK Payment**").

Payment of interest shall occur semi-annually on April 21 and October 21 of each year (together with the date of Maturity, the "**Interest Payment Dates**" and each, an "**Interest Payment Date**").  If any Interest Payment Date falls on a day that is not a Business Day, the required payments of principal, premium, if any, and interest, if any, with respect to the Notes will be made on the next succeeding Business Day as if made on the date such payment was due, and no interest will accrue on such payment for the period from and after such Interest Payment Date, as the case may be, to the date of such payment on the next succeeding Business Day.

Interest shall be calculated on the basis of a 360-day year consisting of twelve months of thirty calendar days each and, in the case of an incomplete month, the number of calendar days elapsed.

(c)     *PIK Option*.  The Issuer's ability to make PIK Payments in respect of the Notes in lieu of paying interest in cash as set forth above (the "**PIK Option**") may be exercised solely with respect to any Interest Period during the PIK Option Period, in up to the proportion of the total amount of interest due in such period as set forth in the table below:

---

[7] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

| PIK Option Period | Maximum Portion of Interest as PIK | PIK Premium |
|---|---|---|
| From (and including) the Issue Date through (and including) [*the second-year anniversary of the Issue Date*] | 100.0% | 50% of Cash Interest Rate |
| From (but excluding) [*the second-year anniversary of the Issue Date*] through (and including) [*the third-year anniversary of the Issue Date*] | 92.5% | 50% of Cash Interest Rate |
| From (but excluding) [*the third-year anniversary of the Issue Date*] through (and including) [*the fourth-year anniversary of the Issue Date*] | 65.0% | 50% of Cash Interest Rate |
| From (but excluding) [*the fourth-year anniversary of the Issue Date*] through (and including) [*the fifth-year anniversary of the Issue Date*] | 30.0% | 75% of Cash Interest Rate |

In the event that the Issuer shall determine to pay PIK Interest with respect to any Interest Period, the Issuer shall deliver a notice (a "***PIK Notice***") to the Trustee no later than the 15th calendar day immediately prior to the first day of such Interest Period, which notice shall state the total amount of cash interest to be paid on the Interest Payment Date in respect of such Interest Period and the amount of such interest to be paid as PIK Interest in accordance with the terms of the Notes, *provided*, *however* that with respect and for purposes of the first Interest Period, the Issuer shall deliver a PIK Notice to the Trustee within 15 Business Days after the Issue Date. The Trustee, on behalf of the Issuer, shall promptly upon receipt of the PIK Notice, and in no event later than the 10th calendar day immediately prior to the first day of such Interest Period, deliver a corresponding notice to the Holders. Interest on the Notes in respect of any Interest Period for which a PIK Notice is not delivered in accordance with the first sentence of this paragraph must be paid entirely in cash.

Section 2.07.    *Excess Cash Sweep Payments*.  Until the occurrence of the Excess Cash Sweep Termination Event, at or prior to the Excess Cash Payment Date, if the Excess Cash Amount exceeds zero on an Excess Cash Measurement Date, the Issuer will make payments under the Notes to the Holders equal to a percentage of the applicable Excess Cash Available Amount in accordance with the terms and conditions set forth below.

(a)    Excess Cash Available Amount shall be distributed to the Holders as follows:

(i)    for the first Excess Cash Measurement Date in respect of which there is an Excess Cash Available Amount (the "**Second Measurement Date**"), an amount in Dollars in cash equal to (A) the Applicable Percentage *multiplied by* (B) 90% of the Excess Cash Available Amount;

(ii)    for the second Excess Cash Measurement Date in respect of which there is an Excess Cash Available Amount, an amount in Dollars in cash (A) equal to the Applicable Percentage *multiplied by* (B) 80% of the Excess Cash Available Amount shall be payable in cash to Holders;

(iii)    for each subsequent Excess Cash Measurement Date, in respect of which there is an Excess Cash Available Amount, until 2031:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[LAM_ACTIVE 401906103_23]

(1)      if interest due on all series of New Notes has been paid in full in cash (without any PIK Payment) for twelve (12) consecutive months:  an amount in Dollars in cash equal to the Applicable Percentage of 70% of the Excess Cash Available Amount shall be payable in cash to Holders;

(2)      if interest due on all series of New Notes has not been paid in full in cash for twelve (12) consecutive months:  an amount in Dollars in cash equal to the Applicable Percentage of 80% of the Excess Cash Available Amount shall be payable in cash to Holders;

(iv)      For any Excess Cash Measurement Date subsequent to the Second Measurement Date in respect of which there is an Excess Cash Available Amount, starting with December 31, 2032, an amount in Dollars in cash equal to the Applicable Percentage of 60% of the Excess Cash Available Amount shall be payable in cash to Holders.

(b)      Excess Cash Payments payable to Holders shall apply, on a dollar-for-dollar basis, to reduce the outstanding principal amount of the Notes in accordance with Section 2.08 below.

Excess Cash Payments shall be made in U.S. Dollars.  If any Excess Cash Payment needs to be converted into U.S. Dollars, it shall be converted at the Settlement Rate as of the date occurring two Business Days prior to the Excess Cash Payment Date.

Section 2.08.    *Payment of Principal and Interest*[8]  Payments of interest and principal will be made to the Holder at the address of such Holder appearing on the Register (as defined in this Indenture) at the close of business on the 15th calendar day (whether or not a Business Day) prior to any due date for the payment on such Note (the "**Regular Record Date**"), (i) in the case of Global Notes, by a Paying Agent by wire transfer of immediately available funds to Holders to an account at a bank located within the United States as designated by each Holder not less than fifteen calendar days prior to the applicable payment date, and (ii) in the case of Certificated Notes, by a Paying Agent by mailing a check to the Holder at the address of such Holder; *provided, however*, that (a) interest payable on any date of Maturity shall be payable to the Person to whom principal shall be payable and (b) the first payment of interest on any Note originally issued between a Regular Record Date for such Note and the succeeding Interest Payment Date shall be made on the Interest Payment Date following the next succeeding Regular Record Date for such Note of the Holder. For any Certificated Note, a Holder of U.S.$1,000,000 or more in aggregate principal amount of Notes may request payment by wire transfer but only if appropriate payment instructions have been received in writing by any Paying Agent with respect to such Note not less than fifteen calendar days prior to the applicable payment date.  In the event that payment is so made in accordance with instructions of the Holder, such wire transfer shall be deemed to constitute full and complete payment of such principal, premium and/or interest on the Notes.

Payment of the principal, premium, if any, and interest due with respect to any Certificated Note on any date of Maturity will be made in immediately available funds upon surrender of such Note at the specified office of any Paying Agent with respect to that Note and accompanied by wire transfer instructions; *provided* that the Certificated Note is presented to such Paying Agent in time for such Paying Agent to make such payments in such funds in accordance with its normal procedures.

---

[8] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

The Issuer will pay any administrative costs imposed by banks in connection with making payments by wire transfer, but any tax, assessment or governmental charge imposed upon payments will be borne by the Holders in respect of which such payments are made unless otherwise provided herein.

Notwithstanding anything to the contrary in this Article 2, if the Note is a Global Note deposited with a custodian for, and registered in the name of a nominee of, The Depository Trust Company ("**DTC**"), principal and interest payments on the Note will be made to DTC, as the Registered Holder of the Note in accordance with DTC's applicable procedures. Notes shall be issued in certificated form in exchange for a Global Note only if (i) DTC notifies the Issuer that it is unwilling or unable to continue as depositary for such Global Note, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor depositary is not appointed by the Issuer within ninety calendar days, or (ii) an Event of Default has occurred and is continuing with respect to such Notes and Holders have made a request to DTC for exchange of such Global Note for Certificated Notes, *provided* in each case that such transfer or exchange is made in accordance with the provisions of this Indenture and the applicable procedures of DTC.

PIK Interest will be payable (x) with respect to Notes represented by one or more Global Notes registered in the name of, or held by, DTC or its nominee on the relevant record date, by increasing the principal amount of the outstanding Global Note by an amount equal to the amount of the PIK Payment for the applicable Interest Period (rounded up to the nearest whole Dollar) (it being understood that subsequent interest payments on the Notes shall be calculated based on such increased principal amount) and (y) with respect to Notes represented by Certificated Notes, by issuing additional Certificated Notes ("**PIK Notes**") in certificated form to the Holders of the underlying Notes in an aggregate principal amount equal to the amount of PIK Payment for the applicable Interest Period (rounded up to the nearest whole Dollar). The Trustee will authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders thereof on the relevant record date, as shown by the records of the register of such Holders. Following an increase in the principal amount of the outstanding Global Notes as a result of a PIK Payment, the Global Notes will bear interest on such increased principal amount from and after the Interest Payment Date in respect of which such PIK Payment was made. Any PIK Notes issued in certificated form will be dated as of the applicable Interest Payment Date and will bear interest from and after such date.

Excess Cash Payments made to Holders shall apply, on a dollar-for-dollar basis, to reduce the outstanding principal amount of the Notes in up to an aggregate amount not to exceed the total principal amount of the Notes. Each Global Note shall include a schedule on which decreases in the corresponding principal amount resulting from Excess Cash Payments made in accordance with the terms of this Indenture shall be recorded.

All Notes issued pursuant to a PIK Payment will mature on the Stated Maturity Date and will be governed by, and subject to the terms, provisions and conditions of, this Indenture and shall have the same rights and benefits as the Notes issued on the Issue Date. Any certificated PIK Notes will be issued with the description "PIK" on the face of such PIK Note.

If the Issuer or the Guarantors (x) default in a payment of interest on the Notes or (y) default in a payment of principal owing at Maturity on the Notes, the Issuer or the Guarantors, as applicable, will pay the Defaulted Interest (as defined below) in accordance with the procedures set forth below or in any lawful manner not inconsistent with the requirements of any stock exchange on which the Notes may be listed, and upon such notice as may be required by such exchange.

Section 2.09.    *Principal and Interest Rights Preserved*.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(a)      Except as otherwise provided herein for the redemption of the Notes, the payment of principal of or interest on the Notes shall be allocated on a pro rata basis among all Outstanding Notes, without preference or priority of any kind among the Notes.

(b)      Final payments in respect of any Note (whether upon redemption, declaration of acceleration or otherwise) shall be made only against presentation and surrender of such Note at the Corporate Trust Office, at the offices of the Trustee and, subject to any fiscal or other laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Issuer.

(c)      Payment of the principal of any Note on a relevant Payment Date shall be made to the Person in whose name such Note is registered in the Register at the close of business on the fifteenth day (whether or not a Business Day) immediately preceding such Payment Date, by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register, or by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York, *provided* that such Holder so elects by giving written notice to such effect designating such account, upon application to the Trustee at least fifteen calendar days prior to such Payment Date.

(d)      Payment of interest on each Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Record Date immediately preceding such Interest Payment Date by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register, or by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York, *provided* that the Holder so elects by giving written notice to such effect designating such account, which is received by the Trustee or a Paying Agent no later than the Record Date immediately preceding such Interest Payment Date.  Unless such designation is revoked, any such designation made by such Holder with respect to such Note shall remain in effect with respect to any future payments with respect to such Note payable to such Holder.  The Issuer shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If the Payment Date in respect of any Note is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

Notwithstanding the provisions of this Section 2.09, payments on Notes registered in the name of DTC or its nominee shall be effected in accordance with the Applicable Procedures.

Section 2.10.    *Holder Lists*.  The Trustee shall preserve in as current a form as is reasonably practicable, the most recent list available to it of the names and addresses of Holders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee in writing, at least ten Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.11.    *Transfer and Exchange*.

(a)      Interests in the Regulation S Global Note and the Restricted Global Note shall be exchangeable or transferable, as the case may be, for physical delivery of Certificated Notes if (i) DTC notifies the Issuer that it is unwilling or unable to continue as depositary for such Global Note, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor depositary is not appointed by the Issuer within ninety calendar days, or (ii) an Event of Default has occurred and is

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

continuing with respect to such Notes, *provided* that such transfer or exchange is made in accordance with the provisions of this Indenture and the Applicable Procedures.

Upon receipt of notice by DTC or the Trustee, as the case may be, regarding the occurrence of any of the events described in the preceding paragraph, the Issuer shall use its best efforts to make arrangements with DTC for the exchange of interests in the Global Notes for individual Certificated Notes, and cause the requested individual Certificated Notes to be executed and delivered to the Trustee in sufficient quantities and authenticated by the Trustee for delivery to Holders.  In the case of Certificated Notes issued in exchange for the Restricted Global Note, such Certificated Notes shall bear the Securities Act Legend. Upon the registration of transfer, exchange or replacement of Notes bearing such Securities Act Legend, or upon specific request for removal of the Securities Act Legend on a Note, the Issuer shall deliver only Notes that bear such Securities Act Legend, or shall refuse to remove such Securities Act Legend, as the case may be, unless there is delivered to the Issuer a certificate in the form of Exhibit D or Exhibit F, as the case may be, or such satisfactory evidence as may reasonably be required by the Issuer, which may include an Opinion of Counsel, that neither the Securities Act Legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.  The Trustee shall exchange a Note bearing the Securities Act Legend for a Note not bearing such Securities Act Legend only if it has been directed to do so in writing by the Issuer, upon which direction it may conclusively rely.

(b)      On or prior to the 40th day after the Closing Date, transfers by an owner of a beneficial interest in the Regulation S Global Note to a transferee who takes delivery of such interest through the Restricted Global Note shall be made only in Authorized Denominations in accordance with the Applicable Procedures and upon receipt by the Trustee or Transfer Agent of a written certification from the transferor of the beneficial interest in the form of Exhibit E to the effect that such transfer is being made to a Person who the transferor reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.  After such 40th day, such certification requirement shall no longer apply to such transfers.

(c)      Transfers by an owner of a Certificated Note bearing the Securities Act Legend or of a beneficial interest in the Restricted Global Note to a transferee who takes delivery of such interest through the Regulation S Global Note or in the form of a Certificated Note not bearing the Securities Act Legend shall be made only in Authorized Denominations upon receipt by the Trustee or Transfer Agent of a written certification from the transferor in the form of Exhibit D to the effect that such transfer is being made in accordance with Regulation S.

Beneficial interests in the Global Notes shall be shown on, and transfers thereof shall be effected only through records maintained by DTC and its direct and indirect participants, including Euroclear and Clearstream Banking.

Transfers between participants in DTC shall be effected in the ordinary way in accordance with the Applicable Procedures and shall be settled in DTC's *Same Day Funds Settlement System* and secondary market trading activity in such Notes shall therefore settle in immediately available funds.  There can be no assurance as to the effect, if any, of settlements in immediately available funds on trading activity in the Notes.  Transfers between participants in Euroclear and Clearstream Banking shall be effected in the ordinary way in accordance with Applicable Procedures.

(d)      Certificated Notes may be exchanged or transferred in whole or in part in the principal amount of Authorized Denominations by surrendering such Certificated Notes at the office of the Trustee or any Transfer Agent with a written instrument of transfer as provided in this Indenture in the form attached hereto duly executed by the Holder thereof or his attorney duly authorized in writing.

[[AM_ACTIVE 401906103_23]]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

In exchange for any Certificated Note properly presented for transfer, the Trustee shall promptly authenticate and deliver or cause to be authenticated and delivered at the Corporate Trust Office, to the transferee, or send by mail (at the risk of the transferee) to such address as the transferee may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferee, for the same aggregate principal amount as was transferred. In the case of the transfer of any Certificated Note in part, the Trustee shall also promptly authenticate and deliver or cause to be authenticated and delivered at the Corporate Trust Office, to the transferor, or send by mail (at the risk of the transferor) to such address as the transferor may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferor, for the aggregate principal amount that was not transferred. No transfer of any Notes shall be made unless the request for such transfer is made by the registered Holder or his attorney duly authorized in writing at the Corporate Trust Office and is accompanied by a completed instrument of transfer in the form of Exhibit C attached to the Note presented for transfer.

(e)     Transfer, registration and exchange of any Note or Notes shall be permitted and executed as provided in this Section 2.11 without any charge to the Holder of any such Note or Notes other than any taxes or governmental charges or insurance charges payable on transfers or any expenses of delivery by other than regular mail, but subject to such reasonable regulations as the Issuer, the Registrar and the Trustee may prescribe.

The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except for the payment of a sum sufficient to cover any tax or other governmental charges or insurance charges that may be imposed in relation thereto, shall be borne by the Issuer.

All Certificated Notes issued upon any exchange or registration of transfer of Notes shall be valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits, as the Notes surrendered upon exchange or registration of transfer.

(f)     The Trustee or the Transfer Agent shall effect transfers of Global Notes and Certificated Notes. In addition, the Registrar shall keep the Register for the ownership, exchange and transfer of any Notes. The Transfer Agent shall give prompt notice to the Registrar and the Registrar shall likewise give prompt notice to the Trustee of any exchange or transfer of such Notes. Neither the Trustee nor any Transfer Agent shall register the exchange or the transfer of interests during the period of fifteen calendar days beginning on the Record Date and ending on the Payment Date. The Trustee shall give prompt notice to the Issuer of any replacement, transfer, cancellation or destruction of the Notes.

(g)     Upon any such exchange of all or a portion of any Global Note for a Certificated Note or an interest in either the Restricted Global Note or the Regulation S Global Note, the Global Note to be so exchanged shall be marked to reflect the reduction of its principal amount by the aggregate principal amount of such Certificated Note or the interest to be so exchanged for an interest in a Regulation S Global Note or a Restricted Global Note, as the case may be. Until so exchanged in full, the Note shall in all respects be entitled to the same benefits under this Indenture as the Notes authenticated and delivered hereunder.

Section 2.12.     *Replacement Notes*. Notes that become mutilated, destroyed, stolen or lost will be replaced upon delivery thereof to the Trustee or delivery to the Issuer and the Trustee of evidence of the loss, theft or destruction thereof satisfactory to the Issuer and the Trustee. In the case of a lost, stolen or destroyed Note, an indemnity satisfactory to the Trustee and the Issuer may be required at the expense of the Holder of such Note before a replacement Note will be issued. Upon the issuance of any new Note, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and the expenses of the Trustee, its counsel and its agents) connected therewith.

LAM - ACTIVE 401906103.23

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 2.13.   *Temporary Notes*.  Subject to the provisions of Section 2.11(a) until Certificated Notes are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of Certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes.  As necessary, the Issuer shall prepare and the Trustee shall authenticate Certificated Notes and deliver them in exchange for temporary Notes at the office or agency of the Issuer or the Trustee, without charge to the Holder.  Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as Certificated Notes.

Section 2.14.   *Cancellation*.  The Issuer at any time may deliver Notes to the Trustee for cancellation.  The Transfer Agents and the Paying Agents shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment.  The Trustee or a Paying Agent and no one else shall cancel and the Trustee shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, exchange, payment or cancellation and, if so destroyed, deliver a certificate of such destruction to the Issuer unless the Issuer directs the Trustee in writing to deliver cancelled Notes to the Issuer.  The Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation.

Section 2.15.   *Defaulted Interest*.

(a)       Any interest on any Note which is payable, but is not paid when the same becomes due and payable and such nonpayment continues for a period of thirty calendar days shall forthwith cease to be payable to the Holder on the Regular Record Date, and (i) such defaulted interest, (ii) (to the extent lawful) interest on such defaulted interest at 1.50% in excess of the rate borne by the Notes (such rate the "**Default Rate**") and (iii) (to the extent lawful) additional interest on the then outstanding principal at 1.50% (together with the defaulted interest and interest on such defaulted interest, "**Defaulted Interest**") shall be paid by the Issuer to the Holders in whose names the Notes are registered at the close of business on a special record date for the payment of such Defaulted Interest (a "**Special Record Date**"), which shall be fixed in the following manner.

(b)       The Issuer shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid and the date of the proposed payment, and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Holders entitled to such Defaulted Interest as provided in this Article 2, including Defaulted Interest, shall cease to accrue on the defaulted payment as of the time of such deposit.  Thereupon, the Trustee shall fix, and notify the Issuer of, a Special Record Date for the payment of such Defaulted Interest, which shall be not more than fifteen calendar days and not less than five calendar days prior to the date of the proposed payment.  The Trustee shall notify each Holder of the proposed payment of such Defaulted Interest and the Special Record Date therefore not less than ten calendar days prior to such Special Record Date.  Such Defaulted Interest shall then be paid to the Holders in whose names the Notes are registered at the close of business on such Special Record Date.

Section 2.16.   *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use CUSIP and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and ISIN numbers in notices as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice and that reliance may be placed only on the other identification numbers printed on the Notes, and any such notice shall not be affected by any defect in or omission of such numbers.  The Issuer shall promptly notify the Trustee in writing of any change in CUSIP or ISIN numbers.

- 37 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 2.17.    *Repurchase.*  After the Excess Cash Sweep Termination Event, the Issuer or any of its Subsidiaries may at any time purchase Notes at any price or prices in the open market; *provided* that, both before and after the Excess Cash Sweep Termination Event, the Company and its Subsidiaries may purchase Notes pursuant to a tender offer made available to all Holders, except where it is not possible to do so due to failure to qualify for exemptions from offering restrictions imposed by any jurisdiction in accordance with applicable law, or as otherwise permitted under this Indenture.  Notes so redeemed pursuant to the terms of this Indenture or so purchased shall be surrendered to the Trustee for cancellation. Nothing in this Indenture restricts the ability of Affiliates of the Company (other than the Company and its Subsidiaries, as set forth above) from purchasing Notes in the open market or otherwise at any agreed upon price.  All such Notes so purchased by Affiliates may be resold, or, at the Affiliates' discretion, surrendered to the Trustee for cancellation.

ARTICLE 3
REDEMPTION

Section 3.01.    *Optional Redemption.*  The Issuer will have the right, at its option, to redeem any of the Notes, in whole or in part, at any time and from time to time at a redemption price equal to 100.5% of the principal amount of such Notes; plus any accrued and unpaid interest on the principal amount of such Notes and any Additional Amounts to, but excluding, the date of redemption.  For the avoidance of doubt, the foregoing shall not otherwise affect each Holder's rights, on any relevant Interest Payment Date occurring prior to such date of redemption, to receive interest due on the relevant Interest Payment Date).

Section 3.02.    *Redemption for Taxation Reasons*.  The Notes will be redeemable, at the Issuer's or any Guarantor's option, in whole, but not in part, upon giving not less than thirty nor more than sixty calendar days' notice to the Holders, with a copy to the Trustee (which notice will be irrevocable) at 100% of the principal amount thereof, plus accrued interest and any Additional Amounts payable with respect thereto, only if the Issuer or a Guarantor has or shall become obligated to pay Additional Amounts (x) with respect to such Notes, as a result of any change in, or amendment to, the laws, treaties, or regulations of the Cayman Islands or Brazil or any Governmental Authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws, treaties or regulations, or (y) with respect to the Guarantee, in excess of the Additional Amounts that a Guarantor would pay if payments by it were subject to deduction or withholding at a rate of 15%, or 25% in the case of beneficiaries located in tax haven jurisdictions for purposes of Brazilian tax law, in each case determined without regard to any interest, fees, penalties or other similar additions to tax, as a result of any change in, or amendment to, the laws, treaties or regulations of the Cayman Islands, Brazil or any Governmental Authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws, treaties or regulations, which change or amendment (either in clause (x) or (y)) occurs after the date of issuance of the Notes.

No such notice of redemption will be given earlier than sixty calendar days prior to the earliest date on which the Issuer or a Guarantor would be obligated to pay such Additional Amounts if a payment in respect of such Notes or the Guarantee were then due.  Prior to the publication or mailing of any notice of redemption of the Notes as described above, the Issuer or a Guarantor shall deliver to the Trustee an opinion of an independent legal counsel of recognized standing stating that the Issuer or a Guarantor would be obligated to pay Additional Amounts due to the changes in tax laws, treaties or regulations or in the application or official interpretation thereof.  The Trustee shall accept such opinion as sufficient evidence of the satisfaction of the conditions precedent set forth above, in which event it will be conclusive and binding on the Holders.

Section 3.03.    *Applicability of Article*.  Redemption of Notes at the option of the Issuer, as permitted by Section 3.01 or required by any provision of this Indenture, shall be made in accordance with such provision and this Article 3.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 3.04.    *Election to Redeem; Notice to Trustee*.  The election of the Issuer to redeem the Notes pursuant to Section 3.01 or Section 3.02 shall be evidenced by a Board Resolution.  In case of any redemption of Notes at the election of the Issuer, the Issuer shall, at least seventy calendar days prior to the Redemption Date fixed by the Issuer (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee in writing of such Redemption Date.

Section 3.05.    *Notice of Redemption by the Issuer*.  In the case of redemption of Notes pursuant to Section 3.01 or Section 3.02, notice of redemption shall be mailed at least thirty but not more than sixty calendar days before the Redemption Date to each Holder of any Note to be redeemed by first-class mail at its registered address and such notice shall be irrevocable.  .

The notice shall state:

(a)    the Redemption Date;

(b)    the Redemption Price;

(c)    the name and address of the Paying Agents;

(d)    that Notes called for redemption must be surrendered to a Paying Agent to collect the Redemption Price;

(e)    that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(f)    the paragraph of the Notes pursuant to which the Notes called for redemption are being redeemed;

(g)    the CUSIP or ISIN number, if any; and

(h)    that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes.

At the Issuer's election and at its request, made in writing to the Trustee at least sixty calendar days before a date for redemption of Notes, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall deliver to the Trustee, at least seventy calendar days prior to the Redemption Date, an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.06.    *Deposit of Redemption Price*.  By 10:00 A.M. New York City time, no later than one Business Day prior to the Redemption Date, the Issuer shall deposit with the Paying Agent money sufficient to pay the Redemption Price of and accrued interest on the Notes other than Notes that have been delivered by the Issuer to the Trustee at least fifteen calendar days prior to the Redemption Date for cancellation.  The Issuer shall request that the bank through which such payment is to be made agree to supply to the Paying Agent by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by tested telex) of its intention to make such payment.

Section 3.07.    *Effect of Notice of Redemption*.  Notice of redemption having been given as aforesaid, the Notes shall, on the Redemption Date, become due and payable at the applicable Redemption Price (together with accrued interest, if any, to the Redemption Date), and from and after such date (except

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

in the event of a default in the payment of the Redemption Price and accrued interest) such Notes shall cease to bear interest. Upon surrender of any such Note for redemption in accordance with such notice, such Note shall be paid by the Issuer at the Redemption Price, together with accrued interest, if any, to the Redemption Date; *provided*, *however*, that installments of interest whose Payment Date is on or prior to the Redemption Date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Record Dates according to their terms.

If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's instructions for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes. Upon surrender to the Paying Agent, such Notes shall be paid at the applicable Redemption Price, plus accrued interest to the Redemption Date; *provided*, *however*, that installments of interest payable on or prior to the Redemption Date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Record Date according to their terms.

Section 3.08.    *Selection of Notes to Be Redeemed in Part*. If the Issuer is not redeeming all outstanding Notes, the Trustee shall select the Notes to be redeemed in compliance with the requirements of the principal securities exchange or market, if any, on which the Notes are listed or, if the Notes are not then listed on a securities exchange or market, on a *pro rata* basis, or by any other method as the Trustee shall deem fair and appropriate (subject to the procedures of any applicable clearing systems including DTC).

ARTICLE 4

COVENANTS

Section 4.01.    *Payment of Principal and Interest Under the Notes*. The Issuer will punctually pay the principal of and interest (including Defaulted Interest, if any) on the Notes on the dates and in the manner provided in Paragraphs 2 and 3 of the Notes. One Business Day prior to any date of Stated Maturity (which, for the avoidance of doubt, shall include any Interest Payment Date), the Issuer will irrevocably deposit with the Trustee or the other Paying Agents money sufficient to pay such principal and interest. No interest shall be payable hereunder in excess of the maximum rate permitted by applicable law.[9]

Section 4.02.    *Maintenance of Office or Agency*. The Issuer and each of the Guarantors shall maintain an office or agency in the Borough of Manhattan, The City of New York, where notices to and demands upon the Issuer and each of the Guarantors in respect of this Indenture and the Notes may be served. Initially this office will be at the offices of Cogency Global Inc., located at 22 East 42nd Street, 18th Floor, 115 New York, NY, 10168, and the Issuer and each of the Guarantors will agree not to change the designation of such office without prior notice to the Trustee and designation of a replacement office in the Borough of Manhattan, The City of New York.

Section 4.03.    *Money for Note Payments to Be Held in Trust*. If the Issuer or each of the Guarantors shall at any time act as its own Paying Agent, it shall, on or before each due date of the principal of, premium, if any, on or interest on any of the Notes, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal, premium, if any, or interest so becoming due until such sums will be paid to such Persons or otherwise disposed of as herein provided and will promptly notify the Trustee of its action or failure so to act.

Whenever the Issuer or each of the Guarantors shall have one or more Paying Agents for the Notes, it shall, on or before each due date of the principal of, premium, if any, on or interest on any Notes,

---

[9] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

- 40 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

irrevocably deposit with a Paying Agent a sum sufficient to pay the principal, premium, if any, or interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal of, or interest, and (unless such Paying Agent is the Trustee) the Issuer or each of the Guarantors will promptly notify the Trustee of such action or any failure so to act.

Each Paying Agent, subject to the provisions of this Section 4.03, will:

(a)        hold all sums held by it for the payment of the principal of or interest on Notes in trust for the benefit of the Persons entitled thereto until such sums will be paid to such Persons or otherwise disposed of as herein provided;

(b)        give the Trustee notice of any default by the Issuer or each of the Guarantors (or any other obligor upon the Notes) in the making of any payment of principal or interest; and

(c)        at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Issuer or each of the Guarantors will cause each Paying Agent not party to this Indenture to execute and deliver an instrument in which such Paying Agent shall agree with the Trustee to act as a Paying Agent in accordance with this Section 4.03.

The Issuer or each of the Guarantors may at any time, for the purpose of obtaining the satisfaction and discharge of the Notes or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Issuer or each of the Guarantors or such Paying Agent, such sums to be held in trust by the Issuer or each of the Guarantors or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Issuer or each of the Guarantors or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent will be released from all further liability with respect to such sums.

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer or each of the Guarantors, in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable will be paid to the Issuer or each of the Guarantors at the written request of the Issuer or each of the Guarantors, or (if then held by the Issuer or each of the Guarantors) will be discharged from such trust; and the Holder of such Note will thereafter, as an unsecured general creditor, look only to the Issuer or each of the Guarantors for payment thereof, and all liability of the Trustee with respect to such trust money, and all liability of the Issuer or each of the Guarantors as trustee thereof, will thereupon cease; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any such payment, shall, upon request and at the expense of the Issuer or each of the Guarantors, cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in (i) the Borough of Manhattan, The City of New York and (ii) for so long as such Notes are listed on any stock exchange, upon publication in English in a leading newspaper of general circulation in the country in which such stock exchange is located, notice that such money remains unclaimed and that, after the date specified therein, which will not be less than thirty calendar days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer or each of the Guarantors.

Section 4.04.        *Maintenance of Corporate Existence*.  The Issuer and each of the Guarantors will, and will cause each of their Subsidiaries to, (1) maintain in effect its corporate existence and all registrations necessary therefor; *provided* that these restrictions will not prohibit any transactions permitted by Section 4.14 or the merger of any Subsidiary or Affiliate with or into a Guarantor or with or into any other Subsidiary of each of the Guarantors; and (2) take all reasonable actions to maintain all rights, privileges,

- 41 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

titles to property, franchises and the like necessary or desirable in the normal conduct of its business, activities or operations; *provided*, however, that, in the case of clauses (1) and (2), neither any Guarantor nor its Subsidiaries will be prevented from discontinuing those operations or suspending the maintenance of those properties or the existence of such Subsidiary which, in the reasonable judgment of such Guarantor as evidenced by a resolution of the board of directors of OEC, are no longer necessary in the conduct of the Guarantor's business or that of its Subsidiaries; and provided, *further*, that such discontinuation of operations, maintenance or existence will not have a Material Adverse Effect.

Section 4.05.    *Maintenance of Insurance.*    To the extent permitted under applicable law and available on commercially reasonable terms, the Issuer and the Guarantors shall maintain or cause to be maintained, in each case, to the extent required by the relevant client or counterparty, insurance from financially sound and reputable insurance companies with respect to its properties and businesses against loss or damage of the kinds and in such amounts as customarily insured against by Persons engaged in the same or similar business, generally consistent with the standards applied by multinational construction companies that operate worldwide

Section 4.06.    *Ratings.*    The Company shall use commercially reasonable best efforts to obtain corporate ratings by at least two (2) Rating Agencies by no later than January 1, 2021 and to continue to have corporate ratings by at least two (2) Rating Agencies thereafter.

Section 4.07.    *Compliance with Laws.*    The Company shall and shall cause its Subsidiaries to conduct its business in compliance with all requirements of applicable law, except where any failure to comply would not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect; *provided* that any of the Company or its Subsidiaries may, at its expense, contest by appropriate proceedings conducted in good faith the validity or application of any such requirement of applicable Law, so long as (a) none of the Holders or the Trustee would be subject to any liability for failure to comply therewith and (b) the institution of such proceedings would not reasonably be expected to result in a Material Adverse Effect.

Section 4.08.    *Payment of Taxes and Claims.*    The Issuer and the Company will, and will cause each of their respective Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its property and assets in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums which have become due and payable and which by law have or might become a Lien upon its property and assets; provided, however, that any such payment will not be required to the extent that (i) the failure to make such payment would not have a Material Adverse Effect; or (ii) any of the Issuer, the Company or their respective Subsidiaries may contest in good faith any such tax, assessment, charge, claim or obligation and, in such event, may permit the tax, assessment, charge, claim or obligation to remain unpaid during any period, including appeals, when the Issuer, the Company or such Subsidiary is in good faith contesting the same by proper proceedings, so long as (x) adequate reserves in accordance with Brazilian GAAP shall have been established with respect to any such tax, assessment, charge, claim or obligation, accrued interest thereon and potential penalties or other costs relating thereto, or other adequate provision for payment thereof shall have been made and (y) such contest would not reasonably be expected to result in a Material Adverse Effect.

Section 4.09.    *Maintenance of Properties.*    The Company will, and will cause each of its Subsidiaries to, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its principal business in good order and condition, subject to wear and tear in the ordinary course of business, except to the extent any failure to so maintain or preserve would not reasonably be expected to result individually or in the aggregate in a Material Adverse Effect.

- 42 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 4.10.    *Payment of Additional Amounts.*[10]

(a)      All payments by the Issuer or the Guarantors in respect of the Notes and the Guarantee will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of the Cayman Islands or Brazil or, following any merger, consolidation, transfer, liquidation, winding-up, dissolution or assumption of obligations permitted hereunder, the jurisdiction in which the resulting, surviving or transferee Person is incorporated, resident for tax purposes or treated as engaged in business, or, in each case, any political subdivision thereof or taxing authority therein (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.   In that event, the Issuer or a Guarantor will pay to each Holder such additional amounts ("**Additional Amounts**") as may be necessary in order that every net payment made by the Issuer or a Guarantor on each Note after deduction or withholding for or on account of any present or future tax, penalty, fine, duty, assessment or other governmental charge imposed upon or as a result of such payment by the Taxing Jurisdiction will not be less than the amount then due and payable on such Note.   The foregoing obligation to pay Additional Amounts, however, will not apply to:

(i)      any tax, assessment or other governmental charge which would not have been imposed but for the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation) or beneficial owner, on the one hand, and the Taxing Jurisdiction, on the other hand, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) or beneficial owner being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, but not including the mere receipt of such payment or the ownership or holding of such Note;

(ii)      any tax, assessment or other governmental charge which would not have been so imposed but for the presentation by such Holder for payment (where presentation is required) on a date more than thirty calendar days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)      the extent that the taxes, duties, assessments or other governmental charges would not have been imposed but for the failure of such Holder or beneficial owner to comply with any certification, identification or other reporting requirements concerning the nationality, residence, identity or connection with the Taxing Jurisdiction of the Holder if (a) such compliance is required or imposed by statute, regulation or other applicable law of such Taxing Jurisdiction as a precondition to exemption from all or a part of such tax, assessment or other governmental charge and (b) at least thirty calendar days prior to the date on which the Issuer or each of the Guarantors applies this clause (iii) the Issuer or such Guarantor will have notified all Holders that some or all Holders shall be required to comply with such requirement;

(iv)      any estate, inheritance, gift, sales, transfer or personal property tax or similar tax;

(v)      any tax, assessment or governmental charge payable other than by deduction or withholding from payments of principal or of interest on the Note; or

---

[10] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(vi)     any combination of items (i) through (v) above.

(b)     The Issuer or the Guarantors shall also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any jurisdiction from the execution, delivery, registration or the making of payments in respect of the Notes, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Taxing Jurisdiction other than those resulting from, or required to be paid in connection with, the enforcement of the Notes following the occurrence of any Default or Event of Default (each as defined below).

(c)     No Additional Amounts shall be paid with respect to a payment on a Note or under the Guarantee to a Holder that is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent a beneficiary or settlor with respect to such fiduciary or a member of such partnership or beneficial owner would not have been entitled to receive payment of the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the Holder.

(d)     The Issuer or the Guarantors will provide the Trustee with the official acknowledgment of the relevant taxing authority (or, if such acknowledgment is not available, a certified copy thereof, if available) evidencing the payment of taxes in any Taxing Jurisdiction in respect of which the Issuer or a Guarantor has paid any Additional Amounts.  Copies of such documentation will be made available to the Holders or the Paying Agents, as applicable, upon request therefor.

(e)     The Issuer or the Guarantors will:

(i)     at least ten Business Days prior to the first Interest Payment Date for any Notes (and at least ten Business Days prior to each succeeding Interest Payment Date or any Redemption Date or Stated Maturity Date if there has been any change with respect to the matters set forth in the below-mentioned Officer's Certificate), deliver to the Trustee and each Paying Agent an Officer's Certificate (i) specifying the amount, if any, of taxes described in this Section 4.10 imposed or levied by or on behalf of any Taxing Jurisdiction (the "**Relevant Withholding Taxes**") required to be deducted or withheld on the payment of principal or interest on the Notes to Holders and the Additional Amounts, if any, due to Holders in connection with such payment, and (ii) certifying that the Issuer or any Guarantor will pay such deduction or withholding;

(ii)     prior to the due date for the payment thereof, pay any such Relevant Withholding Taxes, together with any penalties or interest applicable thereto;

(iii)     within thirty calendar days after paying such Relevant Withholding Taxes, deliver to the Trustee and the Paying Agent evidence of such payment and of the remittance thereof to the relevant taxing or other authority as described in this Section 4.10; and

(iv)     pay any Additional Amounts due to Holders on any Interest Payment Date, Redemption Date or Stated Maturity Date to the Trustee in accordance with the provisions of this Section 4.10.

(f)     Any Officer's Certificate required by this Section 4.10 to be provided to the Trustee and each Paying Agent will be deemed to be duly provided if sent by pdf or facsimile to the Trustee and each Paying Agent.

(g)     All references in this Indenture to principal of and interest hereon shall include any Additional Amounts payable by the Issuer or a Guarantor in respect of such principal and such interest.

- 44 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 4.11.   *Available Information*.   For as long as the Notes are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Issuer will, to the extent required, furnish to any Holder holding an interest in a restricted Global Note, or to any prospective purchaser designated by such Holder, upon request of such Holder, financial and other information described in paragraph (d)(4) of Rule 144A with respect to the Issuer to the extent required in order to permit such Holder to comply with Rule 144A with respect to any resale of its Note, unless during that time, the Issuer or each of the Guarantors is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act and no such information about the Issuer is otherwise required pursuant to Rule 144A.

Section 4.12.   *Limitation on Restricted Payments*.

(a)      The Company shall not, and shall not permit any Subsidiary to, directly or indirectly:

(i)      declare or pay any dividend or make any payment or distribution on account of the Company's or such Subsidiary's Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or such Subsidiary) or to the direct or indirect holders of the Company's or such Subsidiary's Equity Interests in their capacity as such, other than, in each case, (i) dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company or such Subsidiary, (ii) dividends or distributions payable to the Company or any Subsidiary or (iii) dividends or distributions payable to holders of Equity Interests of any such Subsidiary, so long as declared or paid pro rata with distributions or dividends payable to the Company or its other Subsidiaries in respect of their Equity Interests in such Subsidiary;

(ii)      purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company or such Subsidiary) any Equity Interests of the Company or such Subsidiary or any of their respective direct or indirect parents, other than to the extent constituting a Permitted Investment;

(iii)      make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness of the Company or such Subsidiary that is contractually subordinated to the Notes or the Guarantee, other than (i) solely with the proceeds from Subordinated Indebtedness and (ii) the retirement for value of Subordinated Indebtedness incurred by the Company or any Subsidiary to set off or reduce the amount of Subordinated Indebtedness to be incurred by the Company or any Subsidiary; or

(iv)      make any Investment other than a Permitted Investment (all such payments and other actions set forth in these clauses (i) through (iv) above being collectively referred to as "**Restricted Payments**").

(b)      The provisions of clause (a) above will not prohibit the declaration or payment of: (1) dividends or other distributions directly to the Securities Issuer or to any purchaser or subscriber of shares of the Company after the Issue Date in a transaction permitted hereunder, under the Securities Indenture and the Restructuring Plan, pro rata with any such dividend or distribution to the Securities Issuer, in each case, (x) in an amount not to exceed Excess Cash Available Amounts (if any, and except as otherwise required to be used for payment under the New Notes) in respect of any Excess Cash Measurement Date or (y) to the extent required, in respect of any specified distribution payment or as otherwise, under the Securities Indenture; (2) dividends or other distributions made for the purpose of the payment of Fines but only to the extent such Fines cannot be paid directly by the Company; or (3) the minimum dividends required by applicable law.

- 45 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 4.13.   *Limitation on Indebtedness*.   The Company will not, and will not permit any Subsidiary to, incur, directly or indirectly, any Indebtedness unless the pro forma Net Debt to EBITDA Ratio at the date of such incurrence is less than 3.00 to 1.00.

Notwithstanding the preceding paragraph, the Company or any Subsidiary may issue the following Indebtedness ("**Permitted Indebtedness**"):

(a)      the Notes and the Guarantee, including any PIK Notes issued in respect of any PIK Payment;

(b)      Indebtedness outstanding on the Issue Date, including under all series of New Notes issued by the Issuer and any notes issued in respect of PIK interest in accordance with the terms thereof;

(c)      Indebtedness, the proceeds of which are used to refinance any Indebtedness permitted by clauses (i) or (ii) above, or clauses (g), (h) or (l) below or permitted under part (i) above; *provided, however*, that (A) the principal amount of the Indebtedness so issued does not exceed the principal amount of the Indebtedness so refinanced, except for any increases reflecting premiums, fees and expenses in connection with such refinancing and (B) the Indebtedness so issued (x) does not mature prior to the stated maturity of the Indebtedness so refinanced, (y) has an Average Life equal to or greater than the remaining Average Life of the Indebtedness so refinanced and (z) is *pari passu* or subordinated in right of payment to the Indebtedness so refinanced;

(d)      Indebtedness owed to and held by:  (i) a Wholly-Owned Subsidiary or a Substantially Wholly-Owned Subsidiary; *provided, however*, that any subsequent issuance or transfer of any Capital Stock that results in such Wholly-Owned Subsidiary or such Substantially Wholly-Owned Subsidiary ceasing to be a Wholly-Owned Subsidiary or a Substantially Wholly-Owned Subsidiary or any transfer of such Indebtedness (other than to a Wholly-Owned Subsidiary or a Substantially Wholly-Owned Subsidiary, as the case may be) shall be deemed, in each case, to constitute the issuance of such Indebtedness by the Company; and (ii) any Subsidiary to the extent that such Indebtedness is Subordinated Indebtedness;

(e)      Indebtedness of the Company or a Subsidiary owed to or held by the Company or a Subsidiary;

(f)      Indebtedness of the Company or any Subsidiary pursuant to (a) interest rate swap or similar agreements designed to protect the Company or such Subsidiary against fluctuations in interest rates or interest rate indices in respect of Indebtedness of the Company or such Subsidiary to the extent the notional principal amount of such obligation does not exceed the aggregate principal amount of the Indebtedness to which such interest rate contracts relate and (b) foreign exchange or commodity hedge, exchange or similar agreements designed to protect the Company or such Subsidiary against fluctuations in foreign currency exchange rates or commodity prices in respect of foreign exchange or commodity exposures incurred by the Company or such Subsidiary, *provided* in each case that such transactions are entered into in the ordinary course of business for non-speculative purposes;

(g)      Indebtedness of the Company or any Subsidiary incurred to pay all or a portion of the purchase price of the acquisition or lease of equipment, vehicles and services used in the ordinary course of the business of the Company or its Subsidiaries; *provided* (A) that such Indebtedness is incurred within 360 calendar days prior to or after any such acquisition or lease and (B) in each case, such Indebtedness is incurred, and the underlying purchase or lease in respect of which such Indebtedness is incurred is entered into, in the ordinary course of business;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

LAM_ACTIVE 401906103_23

(h)      Indebtedness of the Company or any Subsidiary incurred for the purpose of financing all or part of the costs of the acquisition, construction or development of a project, provided that this clause may be used for that portion of such Indebtedness for which the lenders in relation to such Indebtedness agree to limit their recourse in respect of such Indebtedness to assets (including equity interests and contracts) and/or revenues of such project, and any portion of such Indebtedness for which the lenders require recourse to the Company must otherwise be permitted pursuant to one or more of the other clauses under this Section 4.13;

(i)      Indebtedness of the Company or any Subsidiaries in respect of bankers' acceptances, deposits, promissory notes, letters of credit, self-insurance obligations, completion guarantees, performance, surety, appeal or similar bonds and guarantees provided by the Company or any Subsidiary in the ordinary course of its business or Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(j)      Indebtedness of the Company or any Subsidiaries to the extent that the net proceeds thereof are promptly deposited to fully defease or to fully satisfy and discharge the Notes in accordance with this Indenture;

(k)      Indebtedness of the Company or any Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply agreements in the ordinary course of business;

(l)      Indebtedness of the Company or any Subsidiaries incurred on or after the Issue Date under any lines of credit, facilities or other financing agreements entered into with the purpose of financing the working capital needs of the Company or such Subsidiary or their respective subsidiaries, solely to the extent that such Indebtedness is incurred for the purpose of funding working capital for any Development Project or Bidding Companies;

(m)      Indebtedness of the Company or any Subsidiaries owed to any Affiliates thereof (or consortia in which an Affiliate participates) incurred in connection with the restructuring of Indebtedness owed to Affiliates of the Company as of the Issue Date, in each case in accordance with the Intercompany Agreement; and

(n)      in addition to the foregoing Indebtedness under clauses (a) through (l), Indebtedness of the Company or any other Guarantor (but not, for the avoidance of doubt, incurred (including through a guarantee obligation) by any other Subsidiary) that is incurred on or after the Issue Date in the aggregate principal amount of up to U.S.$100,000,000 at any time outstanding, it being understood that, if secured, the Indebtedness incurred pursuant to this item (n) shall only be secured by Liens permitted pursuant to, and such Liens shall be categorized as, for all purposes including determining the amount of Liens outstanding at any given time pursuant to, item (o) of the definition of "Permitted Liens".

For purposes of determining compliance with this covenant:

(a)      in the event that an item of Indebtedness meets the criteria of more than one of the types of Indebtedness described above, including the first paragraph above, the Company, in its sole discretion, may classify, and from time to time may reclassify, such item of Indebtedness, in any manner that complies with this covenant; and

(b)      Indebtedness permitted by this covenant (including the first paragraph above), need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part

- 47 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

by one such provision and in part by one or more other provisions of this covenant permitting such Indebtedness.

For purposes of determining compliance with any Dollar denominated restriction on the incurrence of Indebtedness, the Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate determined on the date of incurrence, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness. Notwithstanding any other provision of this covenant, neither the Company nor any Subsidiary shall, with respect to any outstanding Indebtedness incurred, be deemed to be in violation of this covenant solely as a result of fluctuations in the exchange rates of currencies.

The accrual of interest, the accretion or amortization of original issue discount, or the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument will not be deemed an incurrence of Indebtedness for purposes of this covenant.

Section 4.14.    *Limitation on Liens*.  Each of the Guarantors shall not, and shall not permit any Subsidiary to, create, incur, assume or permit to exist any Lien upon any of the property or assets now owned or hereafter acquired by each such Guarantor or any such Subsidiary (including any Capital Stock or Indebtedness of each Guarantor or any Subsidiary), except for (i) Permitted Liens or (ii) to the extent that, contemporaneously therewith, provision is made to secure the Notes equally and ratably with the obligation that is secured by any such Lien for so long as such obligation is so secured.

Section 4.15.    *Limitations on Transactions with Affiliates*.  The Company shall not, and shall not permit any Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee involving an aggregate amount in excess of U.S.$1,000,000   (or the equivalent in other currencies) per transaction or in excess of U.S.$2,000,000 (or the equivalent in other currencies) within any twelve (12) month period, with, or for the benefit of, any Affiliate (each, an "**Affiliate Transaction**"), unless:

(a)    the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Subsidiary with an unrelated Person (as determined in good faith by a responsible financial or accounting officer of the Company); and

(b)    the Company delivers to the Trustee a resolution of the board of directors of the Company, as applicable, set forth in an Officer's Certificate from an authorized officer of the Company certifying that such Affiliate Transaction complies with this section and that such Affiliate Transaction has been (A) recommended by the compliance and audit committee of the board of directors of the Company (with such compliance and audit committee having, prior to September 10, 2058, independent directors as a majority of its members) and (B) approved by a majority of the members of the board of directors of the Company (which majority shall, prior to September 10, 2058, include a majority of the independent members of the board of directors of the Company).

The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

(i)    Affiliate Transactions entered into in accordance with the Intercompany Agreement;

(ii)    Affiliate Transactions with or among the Issuer, the Company or any Subsidiary;

- 48 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(iii)      the payment of reasonable and customary regular fees to directors of the Company or any Subsidiary;

(iv)      transactions or payments (including loans and advances) pursuant to any employee, officer or director compensation or benefit plans, customary indemnifications or arrangements entered into in the ordinary course of business with or for the benefit of employees, officers or directors of the Company or its Subsidiaries;

(v)      Affiliate Transactions undertaken pursuant to (A) any contractual obligations or rights in existence on the Issue Date, (B) any contractual obligation of any Subsidiary or any Person that is merged into the Company or any Subsidiary on the date such Person becomes a Subsidiary or is merged into the Company or any Subsidiary and (C) any amendment or replacement agreement to the obligations and rights described in clauses (A) and (B), so long as such amendment or replacement agreement is not more disadvantageous to the Holders in any material respect, taken as a whole, than the original agreement.

(vi)      any provision of any administrative services to any Joint Venture Company on substantially the same terms provided to or by the Company or its Subsidiaries; and

(vii)      any (A) Restricted Payments specified under Section 4.12; and (B) Restricted Payments made in compliance with Section 4.12 to the extent such Restricted Payments are made as required by (or pursuant to an election specifically contemplated by) the terms of agreements that are:  deemed not to be "Affiliate Transactions" pursuant to the foregoing clauses (a) through (v) or otherwise permitted in accordance with the terms of the prior paragraph of this Section 4.15(b)(vii).

Section 4.16.      *Limitation on Sale and Lease-Back Transactions.*  The Company will not, and will not permit any of its Subsidiaries to, enter into any Sale and Lease-Back Transaction; *provided, however*, that the Company or any of its Subsidiaries may enter into a Sale and Lease-Back Transaction if:

(a)      the Company or such Subsidiary, as applicable, would have been entitled pursuant to the provisions of the covenant described under Section 4.14 above to incur a Lien to secure Indebtedness in a principal amount equal to or exceeding the Indebtedness incurred in respect of such Sale and Lease-Back Transaction;

(b)      the gross cash proceeds or Fair Market Value of any property received in connection with such Sale and Lease-Back Transaction are at least equal to the Fair Market Value of the property that is the subject of such transaction; and

(c)      such Sale and Lease-Back Transaction is entered into in the ordinary course of business.

Section 4.17.      *Limitation on Agreements Restricting Dividend Payments.*  The Company shall not, and shall not permit any Subsidiary to, directly or indirectly, enter into or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its Capital Stock or to make or repay loans or advances to the Company or any other Subsidiary in accordance with their respective terms; *provided* that the foregoing will not apply to:

(a)      restrictions and conditions contained under this Indenture or under the indenture governing any other series of New Notes issued by the Issuer on the Issue Date;

- 49 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(b)      restrictions and conditions imposed by applicable law;

(c)      restrictions and conditions existing on the date of this Indenture and will apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition;

(d)      customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending that sale; *provided* that those restrictions and conditions apply only to the Subsidiary that is to be sold and that sale is permitted by this Indenture;

(e)      restrictions and conditions imposed on any Subsidiary in loan documentation executed in connection with any Permitted Lien for the purpose of financing all or any part of the cost of the acquisition, construction or development of a project that limits the ability of such Subsidiary to make a Restricted Payment to the Company or any other Subsidiary;

(f)      restrictions existing with respect to any Person, or to the properties or assets of any Person, at the time that the Person is acquired by the Company or any Subsidiary, which encumbrances or restrictions:  (A) are not applicable to any other Person or the properties or assets of any other Person; and (B) were not put in place in anticipation of such event (other than in connection with the financing for the acquisition of such Person), and any extensions, renewals, replacements or refinancings of any of the foregoing;

(g)      restrictions with respect to any Subsidiary and imposed pursuant to a customary provision in a joint venture or other similar agreement with respect to such Subsidiary that was entered into in the ordinary course of business;

(h)      restrictions imposed on any Subsidiary contained in agreements entered into with Governmental Authorities in connection with the payment, compromise or settlement of Fines; and

(i)      restrictions imposed by standard loan documentation in connection with any loans to any Subsidiary in respect of any Development Project from (i) Banco Nacional de Desenvolvimento Economico e Social—BNDES, or any other Brazilian government development bank or credit agency or (ii) any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer.

Section 4.18.      *Limitation on Asset Sales.*  The Company shall not, and shall not permit any Subsidiary to, make any Asset Sale unless:

(a)      the Company or such Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at least equal to the Fair Market Value as determined at the time of the contractual agreement with respect to such Asset Sale, as determined in good faith by a majority of the members of the board of directors of the Company, of the assets subject to such Asset Sale;

(b)      in any such Asset Sale, or series of related Asset Sale, at least 75.0% of the consideration from such Asset Sale is in the form of cash or cash equivalents; and

(c)      an amount equal to 100.0% of the Net Cash Proceeds from such Asset Sale is applied (whether by election or as required by the terms of any Indebtedness) to:  (A) prepay, repay or purchase any Indebtedness of a Subsidiary (in each case, other than Indebtedness owed to the Issuer or the Company); *provided, however*, that, in connection with any such prepayment, repayment or purchase of Indebtedness,

- 50 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

the Issuer or the Company shall retire such Indebtedness and shall cause the related commitment (if any) to be reduced in an amount equal to the principal amount so prepaid, repaid or purchased; (B) pay any amounts due under the New Notes; (C) increase the balance of cash and cash equivalents of the Company up to the Minimum Cash Threshold; or (D) (x) purchase or enter into a binding contract to purchase (provided, that such purchase must be consummated within 365 calendar days of such Asset Sale assets (other than current assets as determined in accordance with Brazilian GAAP or Capital Stock) or (y) make capital expenditures (including expenditures for refurbishments, repair or improvement of existing property or assets), in each case, to be used by the Company or any Subsidiary in a Permitted Business.

On the 366th day after an Asset Sale, if the aggregate amount of Excess Proceeds exceeds US$25 million the Issuer shall within ten Business Days be required to make an offer ("**Asset Sale Offer**") to all holders of New Notes to purchase the maximum principal amount of New Notes that may be purchased out of the Excess Proceeds, at an offer price in respect of the New Notes in an amount equal to 100.0% of the principal amount of the New Notes to be purchased, plus accrued and unpaid interest, if any, to, but not including, the purchase date, in accordance with the procedures set forth in this Indenture in minimum denominations of US$10,000 and in integral multiples of US$1.00 in excess thereof. The Issuer shall deliver notice of such Asset Sale offering to repurchase the New Notes for the specified purchase price on the date specified in the notice, which date shall be no later than five Business Days after the expiration of the applicable offer period pursuant to the procedures required by this Indenture and described in such notice. The Issuer may satisfy the foregoing obligations with respect to any Net Cash Proceeds from an Asset Sale by making an Asset Sale Offer with respect to all Net Cash Proceeds prior to the expiration of the relevant 365 calendar days (or such longer period provided above) or with respect to any unapplied Excess Proceeds.

To the extent that the aggregate principal amount of New Notes so validly tendered and not properly withdrawn pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for any purpose not prohibited in this Indenture (and, for the avoidance of doubt, not in any way limiting any obligation to make Excess Cash Payments). If the aggregate principal amount of the New Notes surrendered in any Asset Sale Offer by Holders exceeds the amount of Excess Proceeds, the Issuer shall allocate the Excess Proceeds among the New Notes to be purchased on a pro rata basis on the basis of the aggregate principal amount of tendered New Notes; *provided* that no Notes shall be selected and purchased in an unauthorized denomination. Upon completion of any Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero. Additionally, the Issuer may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after the consummation of such Asset Sale. To the extent that any portion of Net Cash Proceeds payable in respect of the New Notes is denominated in a currency other than Dollars, the amount thereof payable in respect of the New Notes shall not exceed the net amount of funds in Dollars that is actually received by the Issuer upon converting such portion into Dollars.

Solely for purposes of clause (b) above, the following shall be deemed to be "cash or cash equivalents": (i) the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Company or any Subsidiary (other than subordinated indebtedness) and the release of the Company or such Subsidiary from all liability on such Indebtedness or other liability in connection with such Asset Sale; (ii) securities, notes or other obligations received by the Company or any Subsidiary from the transferee that are converted by the Company or such Subsidiary into cash or cash equivalents within ninety calendar days following the closing of such Asset Sale; and (iii) Indebtedness of any Subsidiary that is no longer a Subsidiary as a result of such Asset Sale, to the extent that the Company and such Subsidiaries are released from any guarantee of payment of such Indebtedness in connection with such Asset Sale.

Section 4.19.    *Limitation on Consolidation, Merger or Transfer of Assets.*

- 51 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(a)    None of the Company nor any Guarantor shall consolidate with, amalgamate or merge with or into, or wind up into (whether or not the Issuer is the surviving Person), or convey, sell, assign, transfer or lease or otherwise dispose of all or substantially all of its properties or assets (on a consolidated basis), in one or more related transactions, to any Person, unless:

(i)    the resulting, surviving or transferee Person (if not the Company) shall be a Person organized and existing under the laws of the Cayman Islands, Brazil or the United States of America, any State thereof or the District of Columbia or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development or any other country whose long-term foreign currency-denominated debt has an Investment Grade rating from either S&P or Moody's as of the effective date of such transaction, and such Person shall expressly assume, by a supplement to this Indenture, executed and delivered to the Trustee, all obligations under the Guarantee and this Indenture;

(ii)    immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the resulting, surviving or transferee Person as a result of such transaction as having been incurred by such Person at the time of such transaction), no Event of Default will have occurred and be continuing; and

(iii)    if requested by the Trustee, the Company shall have delivered an Officer's Certificate of an authorized officer of the Company and an opinion of legal counsel, each stating that such consolidation, merger or transfer and such supplement to this Indenture, if any, comply with the Notes and this Indenture, which the Trustee will be entitled to conclusively rely on and will accept as sufficient evidence of the satisfaction of the foregoing conditions precedent, in which event it shall be conclusive and binding on the Holders.

(b)    Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Guarantors in accordance with clause (i) above in which a Guarantor is not the continuing obligor under the Guarantee and this Indenture, the surviving or transferor Person will succeed to, and be substituted for, and may exercise every right and power of, such Guarantor under the Guarantee and this Indenture with the same effect as if such successor had been named as such Guarantor herein and therein. When a successor assumes all the obligations of its predecessor under the Guarantee and this Indenture, the predecessor will be released from those obligations; *provided* that in the case of a transfer by lease, the predecessor will not be released from the payment of principal and interest on the Guarantee.

If, upon any such consolidation of any Guarantor with or merger of such Guarantor into any other corporation, or upon any conveyance, lease or transfer of the property of such Guarantor substantially as an entirety to any other Person, any property or assets of such Guarantor would thereupon become subject to any Lien, then unless such Lien could be created pursuant to Section 4.14 without equally and ratably securing the Notes, such Guarantor, prior to or simultaneously with such consolidation, merger, conveyance, lease or transfer, will as to such property or assets, secure the outstanding Notes (together with, if such Guarantor will so determine, any other Indebtedness of such Guarantor now existing or hereinafter created which is not subordinate in right of payment to the Notes) equally and ratably with (or prior to) the Indebtedness which upon such consolidation, merger, conveyance, lease or transfer is to become secured as to such property or assets by such Lien.

Section 4.20.    *Repurchase of Notes upon a Change of Control*.    Not later than thirty calendar days following a Change of Control, the Issuer or the Company or any Guarantor will make an Offer to Purchase all outstanding Notes at a purchase price equal to 101% of the principal amount of Notes repurchased plus accrued and unpaid interest on such Notes to but excluding the date of purchase; *provided that*, no such

- 52 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Offer to Purchase shall be required to the extent the Person or group that acquires control in such Change of Control transaction is a Qualified Investor.

An "Offer to Purchase" must be made by written offer (with a copy to the Trustee), which will specify the principal amount of Notes subject to the offer and the purchase price. The offer must specify an expiration date (the "**Expiration Date**") not less than thirty calendar days or more than sixty calendar days after the date of the offer and a settlement date for purchase (the "**Purchase Date**") not more than five Business Days after the expiration date. The offer must include information concerning the business of the Company and its Subsidiaries that would reasonably be expected to enable the Holders to make an informed decision with respect to the Offer to Purchase. The offer will also contain instructions and materials necessary to enable Holders to tender Notes pursuant to the offer. The Issuer or the Company launching the Offer to Purchase will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase, and the above procedures will be deemed modified as necessary to permit such compliance.

A Holder may tender all or any portion of its Notes pursuant to an Offer to Purchase, subject to the requirement that any portion of a Note tendered must be in a multiple of U.S.$1.00 principal amount and that the minimum holding of any Holder must be no less than U.S.$10,000. Holders shall be entitled to withdraw Notes tendered up to the close of business on the Expiration Date. On the Purchase Date the purchase price will become due and payable on each Note accepted for purchase pursuant to the Offer to Purchase, and interest on Notes purchased will cease to accrue on and after the Purchase Date.

Notwithstanding the foregoing, neither the Issuer nor the Company will be required to make an Offer to Purchase upon a Change of Control if (1) a third party makes the Offer to Purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to an Offer to Purchase made by the Issuer or the Company and purchases all Notes properly tendered and not withdrawn under the Offer to Purchase or (2) notice of redemption for all outstanding Notes has been given pursuant to this Indenture as described above under Section 3.05 unless and until there is a default in payment of the applicable redemption price.

In the event that the Holders of not less than 90% of the aggregate principal amount of the outstanding Notes accept an Offer to Purchase and the Issuer, the Company (or one of its Affiliates) or a third party purchases all the Notes held by such Holders, the Issuer and the Company will have the right, on not less than thirty nor more than sixty calendar days' prior notice thereafter (with a copy to the Trustee), given not more than thirty calendar days following the purchase pursuant to the Change of Control offer described above, to redeem all of the Notes that remain outstanding following such purchase at the purchase price equal to that in the Offer to Purchase plus, to the extent not included in the Offer to Purchase payment, accrued and unpaid interest and additional amounts, if any, on the Notes that remain outstanding, to the date of redemption.

Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

The Company agrees to obtain all necessary consents and approvals from the Brazilian Central Bank for any remittance of funds outside of Brazil prior to making any Offer to Purchase, if necessary.

Section 4.21. *Reporting Requirements*.

(a) The Company will provide the Trustee (for distribution to Holders) with the following reports:

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(i)    (A) an English language version of the Company's annual audited consolidated financial statements prepared in accordance with Brazilian GAAP or International Financial Reporting Standards ("IFRS"), promptly upon such statements becoming available but not later than 120 calendar days after the close of its fiscal year; accompanied by an opinion thereon of a firm of independent certified accountants of recognized international standing, which opinion shall state that such financial statements fairly present the financial condition and results of operations of the Company and shall in no event include qualification with respect of deviation from GAAP or inadequacy of disclosure and (B) and, together with such financial statements, a management report discussing (quantitatively and qualitatively), in scope and form consistent with disclosure practices of foreign private issuers and to the extent not already included in the financial statements: (1) Permitted Liens contemplated under clauses (b), (c), (f), (h), (k), (m) or (o) of the definition of "Permitted Liens"; (2) Affiliate Transactions; (3) Investments that are or would be classified as investments on a balance sheet prepared in accordance with Brazilian GAAP; (4) agreements restricting dividend payments by or to any Guarantor; and (5) Indebtedness; in each case, to the extent reasonably expected to be material to an ordinary investor in connection with a decision to invest in the Company, at the relevant time of determination *provided* that nothing herein shall require the Company to disclose any commercially sensitive information, information subject to confidentiality restrictions with third-parties nor any information that could reasonably be expected to harm the Company, if publicly disclosed; and

(ii)    an English language version of the Company's unaudited quarterly consolidated financial statements (including the notes thereto) prepared in accordance with Brazilian GAAP or IFRS, promptly upon such statements becoming available but not later than (i) seventy-five calendar days following the end of each of the first three fiscal quarters of each fiscal year beginning with the first fiscal quarter ending on a date occurring after the Issue Date and prior to (but not including) the first fiscal quarter ending after the second anniversary of the Issue Date, and (ii) beginning with the first fiscal quarter ending after the second anniversary of the Issue Date, sixty calendar days following the end of each of the first three fiscal quarters of each fiscal year.

Simultaneously with the delivery of each set of financial statements referred to in clauses (i) and (ii) above, the Company will deliver to the Trustee an Officer's Certificate stating (a) whether an Event of Default or Default exists on the date of such certificate and, if an Event of Default or Default exists, setting forth the details thereof and the action being taken or proposed to take with respect thereto and (b) if no Excess Cash Sweep Termination Event has occurred, the amount of estimated Fines to be paid by the Company and its Subsidiaries over the 12-month period commencing on the next Excess Cash Measurement Date.

(b)    The Company will deliver to the Trustee, in each case, as soon as is practicable, and in any event:

(i)    within ten calendar days after any director or executive officer of the Issuer or the Company becomes aware of the existence of an Event of Default or Default, an Officer's Certificate setting forth the details thereof and what action the Issuer proposes to take with respect thereto;

(ii)    during any Independent Director Absence Period, within five calendar days after the board of directors of the Company approves, enacts or otherwise authorizes any resolution on a matter covered by subclauses (a) through (f) of Clause 4.1.1.4 of the Restructuring Plan, written notice thereof signed by a director or executive officer of the Company (a "**Relevant Resolution Notice**"), which Relevant Resolution Notice shall state whether such resolution complies with the covenant described under Section 4.26 and shall attach a transcript of what was so approved, enacted or authorized by the board of directors with respect to such matter and certify that such

- 54 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

attached transcript accurately reflects such matter, subject to the proviso below; provided that such attached transcript shall redact, and nothing herein shall otherwise require the Company to disclose, any commercially sensitive information, information subject to confidentially restrictions with third-parties or any information that would result in a violation of applicable law if so disclosed; and

(iii)    within ten calendar days after the end of each fiscal quarter, beginning with the first fiscal quarter ending on a date occurring after the Issue Date, an officer's certificate (the "Independent Director Certificate") (A) setting forth (1) the composition of the board of directors of the Company as of the date of the Independent Director Certificate, including the names of each member of the board of directors and a designation of the independent members, (2) any changes to the composition of the Company's board of directors since the date of the last Independent Director Certificate and the date of such changes, (3) if applicable, the date on which the five (5) month anniversary of the Independent Director Absence Date will occur if not remedied, and (B) representing that, since the date of the last Independent Director Certificate, the Company has provided to the Trustee each Relevant Resolution Notice required in accordance with clause (ii) above.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such reports will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's or the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on officers' certificates).

If the Company makes the reports described in the first paragraph of this Section 4.21 available on its public website freely accessible to all Holders, it will be deemed to have satisfied the reporting requirement set forth in such paragraph with respect to the Holders.

Section 4.22.    *Further Assurances*.    The Issuer will execute and deliver such further instruments and undertake such further reasonable action as may be reasonably required to carry out the purposes of the Notes and this Indenture.    In addition, the Issuer shall use its best efforts to obtain any authorizations required from time to time under applicable law or regulation (including from the Brazilian Central Bank and the CVM with respect to the Notes or this Indenture).

Section 4.23.    *Covenant Suspension*.    During any period of time that (i) the Notes have Investment Grade ratings from at least two (2) Rating Agencies and (ii) no Default has occurred and is continuing under this Indenture (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "**Covenant Suspension Event**" and the date thereof being referred to as the "**Suspension Date**"), the covenants specifically listed in Section 4.12, Section 4.13 ,Section 4.15, Section 4.16 and Section 4.17 will not be applicable to the Notes (collectively, the "**Suspended Covenants**"), provided, however, that in no event with the covenant referenced in Section 4.15 cease to be applicable before January 1, 2030.

In the event that the Company and its Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "**Reversion Date**") the Notes cease to have an Investment Grade rating from any two (2) Rating Agencies, then the Company and its Subsidiaries will thereafter again be subject to the Suspended Covenants.    The period of time between the Suspension Date and the Reversion Date is referred to herein as the "**Suspension Period**".

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]
Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Notwithstanding the foregoing, no action taken or omitted to be taken by the Company or any of its Subsidiaries or events occurring during a Suspension Period covered by the Suspended Covenants will give rise to a Default or Event of Default under this Indenture with respect to the Notes; *provided* that:

(1)    with respect to Restricted Payments made after the applicable Reversion Date, the amount available to be made as Restricted Payments will be calculated as though the covenant described under Section 4.12 had been in effect prior to, but not during, the Suspension Period;

(2)    on the Reversion Date, any Indebtedness incurred during the Suspension Period will be classified to have been incurred pursuant to the first paragraph of Section 4.13 or one of the clauses set forth in items (a) through (n) under Section 4.13 (to the extent such Indebtedness would be permitted to be incurred thereunder as of the Reversion Date and after giving effect to Indebtedness incurred prior to the Suspension Period and outstanding on the Reversion Date), and to the extent such Indebtedness would not be permitted to be incurred pursuant to Section 4.13, such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under clause (2) of Section 4.13; and

(3)    any Affiliate Transaction entered into after the Reversion Date pursuant to an agreement entered into during any Suspension Period shall be deemed to be permitted pursuant to clause (iv) of the second paragraph of the covenant described under Section 4.15.

On and after each Reversion Date, the Company and its Subsidiaries will be permitted to consummate the transactions contemplated by any agreement or commitment entered into during the relevant Suspension Period, so long as such agreement or commitment and such consummation would have been permitted during such Suspension Period.

The Issuer or the Company shall give the Trustee prompt written notice of any occurrence of a covenant suspension and in any event not later than five Business Days after the occurrence of such covenant suspension. In the absence of such notice, the Trustee shall assume the Suspended Covenants apply and are in full force and effect. The Issuer or the Company shall give the Trustee prompt written notice of any occurrence of a Reversion Date not later than five Business Days after such Reversion Date. After any such notice of the occurrence of a Reversion Date, the Trustee shall assume that the Suspended Covenants apply and are in full force and effect.

There can be no assurance that the Notes will ever achieve or maintain Investment Grade ratings. The Trustee shall have no duty to monitor the ratings of the Notes, determine whether a Covenant Suspension Event or Reversion Date has occurred or notify Holders of the same.

Section 4.24.    *Limitations and Restrictions on the Issuer*.

(a)    The Issuer shall not engage in any business or enter into, or be a party to, any transaction or agreement, or make any transfer, other than in connection with (A) the issuance, sale, redemption or repurchase of the Notes and the other New Notes and activities incidentally related thereto; (B) the entering into Hedging Obligations, solely on a non-speculative basis for the purpose of protecting itself and/or the Guarantors against interest rate and currency fluctuations in connection with the New Notes; (C) activities described in its organization documents; (D) the Issuer's ability to make remittances to Brazil; (E) the entering into of any loan, corporate or financial transaction (or series of related transactions) entered into

- 56 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

for the purpose of performing financial or other cash management functions by the Issuer with the Company and its Subsidiaries; and (F) as required by applicable Law;

(b)      The Issuer shall not create, incur, assume or suffer to exist any Indebtedness other than any Indebtedness (A) incurred solely for the purpose of complying with its obligations under the Notes and the other New Notes, or (B) for the issuance of additional notes permitted under this Indenture and the indentures in respect of the other New Notes;

(c)      The Issuer shall not create, assume, incur or suffer to exist any Lien upon or with respect to any of its properties or assets except for Permitted Liens of the type described in clauses (a), (g), (i), (j) and (k) of the definition thereof);

(d)      The Issuer shall not enter into any consolidation, merger, amalgamation, joint venture or other form of combination with any Person, and shall not sell, lease, convey or otherwise dispose of any of its assets or receivables, unless:

(i)      the resulting, surviving or transferee Person (if not the Issuer) shall be a Person organized and existing under the laws of the Cayman Islands or the United States, any State thereof or the District of Columbia or any other country that is a member of the European Union and such Person shall expressly assume, by a supplement to this Indenture, executed and delivered to the Trustee, all obligations under the Notes and this Indenture;

(ii)      immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the resulting, surviving or transferee Person as a result of such transaction as having been incurred by such Person at the time of such transaction), no Default will have occurred and be continuing; and

(iii)      the Issuer shall have delivered to the Trustee an Officers' Certificate and an opinion of independent legal counsel of recognized standing, each stating that such consolidation, merger or transfer and such supplement to this Indenture, if any, comply with the Notes and this Indenture.

The Trustee will accept such certificate and opinion as sufficient evidence of satisfaction of the conditions precedent set forth in clause (iii) above, in which event it shall be conclusive and binding on the Holders; and

(e)      The Issuer shall not amend, supplement, waive or modify, or consent to any amendment, supplement, waiver or modification of organizational documents without the written consent of Holders of a majority in aggregate principal amount of the Notes if such amendment, supplement, waiver or modification would adversely affect the rights of Holders.

Section 4.25.      *Limitations and Restrictions on Qualifying Subsidiaries.*

(a)      No Subsidiary constituting a Joint Venture Company, Project Company, Local Operating Company or Bidding Company shall engage in any business or enter into, or be a party to, any transaction or agreement other than in connection with (A) a Permitted Business and (B) as required by applicable law;

(b)      No Holding Vehicle shall engage in any activity and shall be organized solely for the purpose of directly or indirectly owning Equity Interests in one or more Joint Venture Companies, Project Companies, Local Operating Companies or Bidding Companies.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 4.26.    *Compliance with the Restructuring Plan*.    For any period of time from an Independent Director Absence Date until the date on which the board of directors of the Company again includes at least the number of independent board members required by, and in accordance with, the Restructuring Plan, the board of directors of the Company shall not approve, enact or otherwise authorize any resolution that fails to comply with Clause 4.1.1.4 of the Restructuring Plan.

Section 4.27.    *Additional Guarantors*.    In the event and upon any Qualifying Subsidiary becoming a Significant Subsidiary, the Issuer shall, within forty-five calendar days of such Qualifying Subsidiary becoming a Significant Subsidiary, cause such Subsidiary to become a Guarantor hereunder by executing and delivering to the Trustee a supplemental Indenture in the form of Exhibit B hereto, and take all such actions as provided for therein.    With respect to each such Qualifying Subsidiary, the Issuer shall also promptly deliver or cause to be delivered to the Trustee written notice setting forth the date on which it became a Significant Subsidiary.

### ARTICLE 5
### SUBSTITUTION OF THE ISSUER

Notwithstanding any other provision contained in this Indenture, the Issuer may, without the consent of the Holders, be replaced and substituted by any Wholly-Owned Subsidiary of the Company as principal debtor (in such capacity, the "**Substituted Debtor**") in respect of the Notes*, provided* that:

(i)    such Substituted Debtor shall be a Person organized and existing under the laws of the Cayman Islands or the United States, any State thereof or the District of Columbia or any other country that is a member of the European Union;

(ii)    such documents shall be executed by the Substituted Debtor, the Company and the Trustee as may be necessary to give full effect to the substitution, including a supplemental Indenture in the form of **Exhibit B** hereto whereby the Substituted Debtor assumes all of the Issuer's obligations under this Indenture and Notes (together, the "**Issuer Substitution Documents**")

(iii)    if the Substituted Debtor is organized in a jurisdiction other than the Cayman Islands, the Issuer Substitution Documents will contain covenants (1) to ensure that each Holder of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer in respect of the payment of Additional Amounts and (2) to indemnify each Holder and beneficial owner of Notes against all taxes or duties to the extent such taxes or duties (a) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution (b) are imposed on such Holder or beneficial owner of Notes by any political subdivision or taxing authority of such non-Cayman Islands jurisdiction and (c) would not have been so imposed had the substitution not been made, subject to similar exceptions set forth under Section 4.10(a)(ii) through Section 4.10(a)(vi), *mutatis mutandis*; *provided*, that any holder making a claim with respect to such tax indemnity shall provide the Issuer with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Substituted Debtor as issuer;

(iv)    the Issuer shall have delivered, or procured the delivery to the Trustee of, an opinion of counsel to the effect that the Issuer Substitution Documents constitute valid and binding obligations of the Substituted Debtor; the Substituted Debtor shall have appointed a process agent in the Borough of Manhattan in the City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Issuer Substitution Documents;

- 58 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(v)        no Default or Event of Default will have occurred and be continuing;

(vi)        the substitution will comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Debtor, New York and Brazil; and

(vii)        the Issuer shall have delivered to the Trustee an Officer's Certificate certifying as to the satisfaction of the conditions set forth in this Article 5.

Upon the execution of the Issuer Substitution Documents as referred to in paragraph (i) above, the Substituted Debtor shall be deemed to be named in the Notes as the principal Debtor in place of the Issuer (or of any previous substitute under these provisions) and the Notes shall thereupon be deemed to be amended to give effect to the substitution.  Except as set forth above, the execution of the Issuer Substitution Documents shall operate to release the Issuer (or such previous substitute as aforesaid) from all its obligations in respect of the Notes and its obligation to indemnify the Trustee under this Indenture.  Upon the execution of the Issuer Substitution Documents as referred to in paragraph (i) above, the Issuer and the Substituted Debtor will not be subject to the provisions of the covenant described above under Section 4.24.

## ARTICLE 6
### Events of Default and Remedies

Section 6.01.    *Events of Default*.  The term "**Event of Default**" means, when used herein, any one of the following events:[11]

(a)        the Issuer or the Guarantors fail to pay any amount of (i) principal in respect of the Notes when the same becomes due and payable upon redemption, upon declaration or at Maturity; (ii) interest (when and if due in accordance with the terms of this Indenture) in respect of the Notes and such failure to pay interest continues for a period of 30 calendar days; or (iii) any Excess Cash Payment (when and if due in accordance with the terms of this Indenture) in respect of the Notes and such failure to pay such Excess Cash Payment continues for a period of ten calendar days;

(b)        the Issuer or the Guarantors default in the performance or observance of any of their obligations under (i) Section 4.18, in each case solely as a result of a failure to make an Asset Sale Offer when and if required pursuant to Section 4.18 or pursuant to clause (c) of the definition of Asset Sale, (ii) Section 4.19, (iii) Section 4.20, in each case solely as a result of a failure to make an Offer to Purchase upon the occurrence of a Change of Control or (iv) Section 4.26, solely as a result of the approval, enactment or other authorization of any resolution that fails to comply therewith and such resolution has not been rescinded or otherwise cancelled by the board of directors of the Company prior to the implementation thereof (or any declaration of acceleration of principal by Holders of at least 25% in principal amount of the Outstanding Notes in accordance with this Indenture as a result thereof, if earlier) and in the case of this clause (iv), written notice specifying such Default is given to the Issuer, the Guarantors and the Trustee collectively by (x) the Holders of at least 25% in principal amount of the Outstanding Notes and (y) holders of at least 25% in total outstanding principal amount of all series of the New Notes (such Holders of the Notes (the "**Requisite Notes Holders**") and holders of other series of New Notes in (i) and (ii), together, the "**Requisite New Notes Holders**");

(c)        the Issuer or the Guarantors default in the performance or observance of any of their other obligations under or in respect of the Notes or the Guarantee (other than those referred to in clauses (a) and (b) of this Section 6.01) and such default remains un-remedied for thirty calendar days after written notice

---

[11] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

specifying such default is given to the Company by the Trustee or to the Company and the Trustee by Holders of at least 25% in aggregate principal amount of the Outstanding Notes;

(d)        the Issuer or any Guarantor or Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuer or any such Guarantor or Significant Subsidiary thereof (or the payment of which is guaranteed by the Issuer or any such Guarantor or Subsidiary thereof), whether such Indebtedness (including, for the avoidance of doubt, any guarantee) now exists or is created after the date of this Indenture, which default (i) is caused by failure to pay principal of, premium, if any, or interest on such Indebtedness, after giving effect to any grace period provided in such Indebtedness in respect of such default (a "**Triggering Default**"), or (ii) results in the acceleration of such Indebtedness prior to its expressed maturity and, other than in the case of a Triggering Default or acceleration of maturity of Indebtedness that consists of New Notes, in each case, the outstanding principal amount of any such Indebtedness, together with the outstanding principal amount of any other such Indebtedness under which there has been a Triggering Default or the maturity of which has been so accelerated, totals at least (A) U.S.$25,000,000 (or the equivalent thereof at such time of determination) with respect to each fiscal year until Net Revenues amount to U.S.$6,250,000,000 or above for the immediately preceding fiscal year, whether occurring before or after the Excess Cash Sweep Termination Event, or (B) U.S.$50,000,000 (or the equivalent thereof at such time of determination) with respect to the first fiscal year in which Net Revenues for the immediately preceding fiscal year are at or above U.S.$ 6,250,000,000 and any following fiscal year thereafter; *provided that*, without prejudice to any rights any party might have under this Indenture, in the case of any Event of Default specified in this clause (d), such Event of Default will be automatically rescinded or annulled if the Triggering Default or acceleration of maturity of the Indebtedness referred to therein is remedied, cured or waived by the applicable holders of such Indebtedness;

(e)        one or more final judgments or decrees for the payment of money in excess of U.S.$50,000,000 (or the equivalent thereof at the time of determination) (other than judgments covered by enforceable insurance policies issued by reputable and creditworthy insurance companies) in the aggregate are rendered against Issuer, any of the Guarantors or any Significant Subsidiary thereof and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such final judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed or otherwise stayed within forty-five calendar days following the date on which the Issuer, any Guarantor or any Significant Subsidiary is served with process or otherwise summoned to pay or guarantee the payment of the amounts due under such enforcement proceeding by order of a court with competent jurisdiction or (ii) there is a period of sixty calendar days following such final judgment or decree during which such judgment or decree is not discharged, waived or the execution thereof stayed; *provided that*, any such final judgment or decree resulting from or otherwise relating to a securities claim in respect of any Old Notes will not constitute an Event of Default (nor count toward the Dollar threshold set forth herein) unless such final judgment or decree also constitutes an Enforced Final Judgment.

(f)        any involuntary case, petition, claim or other proceeding is commenced or filed against the Issuer, any Guarantor or any Significant Subsidiary thereof under any Bankruptcy Law or any other bankruptcy, insolvency, *falência*, *recuperação judicial* or *extrajudicial* or other similar law now or hereafter in effect, including, but not limited to, any proceeding seeking the appointment of a trustee, receiver, *administrador judicial*, liquidator, administrator, custodian, assignee, sequestrator or other similar official of it or any substantial part of its assets, or the liquidation of the Issuer, any of the Guarantors or any Significant Subsidiary thereof, and such involuntary case or other proceeding remains undismissed and unstayed for a period of sixty calendar days; or a non-appealable final order for relief is entered against such entity under relevant bankruptcy laws as now or hereafter in effect;

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(g)     the Issuer, any Guarantor or any Significant Subsidiary thereof (i) files a petition or claim and/or commences a voluntary case or other proceeding seeking to be adjudicated bankrupt or insolvent or seeking liquidation, reorganization, *falência*, *recuperação judicial* or *extrajudicial* or other relief under any applicable Bankruptcy Law or any other bankruptcy, insolvency or other similar law now or hereafter in effect; (ii) consents to the institution of bankruptcy, insolvency, liquidation or scheme proceedings against it (including entry of an order against it in an involuntary case) or the filing by it (or against it) of a petition, answer, consent or any other document seeking reorganization or relief under any Bankruptcy Law; (iii) consents to the appointment of or being taking possession by a receiver, administrator judicial, liquidator, administrator, assignee, custodian, trustee, sequestrator or similar official of the Issuer, any Guarantor or any Significant Subsidiary thereof for all or substantially all such entity's assets; (iv) effects any general assignment for the benefit of creditors; or (v) generally is not able to pay its debts as they become due;

(h)     any Guarantee by a Guarantor ceases to be in full force and effect, other than in accordance with the terms of this Indenture, or any Guarantor denies or disaffirms its obligations under the Guarantee;

(i)     all or substantially all of the assets and revenues of any Guarantor or any Significant Subsidiaries are condemned, seized or otherwise appropriated by any Person acting under the authority of any national, regional or local government or any Guarantor or Significant Subsidiary of the Company is prevented by any such Person for a period of 60 calendar days or longer from exercising normal control over all or substantially all of the assets and revenues (an "**Expropriation Event**"), *provided* that, any such Expropriation Event will not constitute an Event of Default unless the assets or revenues subject to such event exceed 20% of the consolidated assets or revenues of the Company and its Subsidiaries, taken as a whole, and *provided*, *further*, for the avoidance of doubt, that an Expropriation Event shall not cover any disputes related to or early cancellation or termination of any construction contracts;

(j)     the board of directors of the Company fails to include the minimum number of independent board members required by, and in accordance with, the Restructuring Plan for a period of at least five consecutive months starting from the Independent Director Absence Date, and such continued failure remains un-remedied for a period of thirty calendar days after written notice specifying such continued failure is given to the Company by the Trustee or to the Company and the Trustee by Holders of at least 25% in aggregate principal amount of the Outstanding Notes;

(k)     one or more enforcement proceedings (*ação de execução*) are commenced, resumed or redirected to or against the Issuer, any Guarantor or any Significant Subsidiary thereof seeking the payment of money in excess of U.S.$50,000,000 (or the equivalent thereof at the time of filing) (other than enforcement proceedings covered by enforceable insurance policies issued by reputable and creditworthy insurance companies) in the aggregate and either the (i) respective amounts are not paid (whether in full or in installments) or otherwise discharged within the period of time established by the order of a court with competent jurisdiction or (ii) the enforcement proceeding(s) is not dismissed or stayed within forty-five calendar days following the date on which the Issuer, any Guarantor or any Significant Subsidiary is served with process or otherwise summoned to pay or guarantee the payment of the amounts due under the applicable enforcement proceeding(s) by order of a court with competent jurisdiction; and

(l)     a final judgment or decree reversing the corporate reorganization contemplated in Clauses 1.1.46 and 7.15 of the Restructuring Plan and such final judgment or decree is not discharged, waived or the execution thereof otherwise stayed within a period of thirty Business Days following such final judgment or decree.

Section 6.02.     *Notice of Event of Default; Acceleration.*

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

If an Event of Default (other than an Event of Default specified in Sections 6.01(b)(iv), (f) and (g) above) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued interest on all Notes to be due and payable immediately, by delivering a notice in writing to the Issuer and the Guarantors, and upon any such declaration such amounts will become due and payable immediately.  If an Event of Default specified in clauses (f) or (g) above occurs, then the principal of and accrued interest on all Notes will become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

If an Event of Default specified in Section 6.01(b)(iv) has occurred and is continuing, the Holders of not less than 25% in principal amount of the Outstanding Notes or the Trustee (acting at the instruction of such Holders) may declare all unpaid principal of and accrued interest on all Notes to be due and payable immediately, by mailing a notice in writing to the Issuer and the Guarantors, and upon any such declaration such amounts will become due and payable immediately; *provided,* that (A) for the avoidance of doubt, the notice given to declare the Event of Default may be provided simultaneously with and in the same document as the notice to declare all unpaid principal of and accrued interest on all Notes due and payable and (B) the notice given to declare the Event of Default and the notice to declare all unpaid principal of and accrued interest on all Notes due and payable must be given no later than nine (9) months after the date of the Relevant Resolution Notice (unless otherwise extended in writing by the Company), or otherwise will be deemed invalid for all purposes.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by any Holder, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer may rescind or annul such declaration if:

(a)      the Issuer has paid or deposited with the Trustee and the other Paying Agents a sum sufficient to pay (i) all overdue interest (including any Additional Amounts) on outstanding Notes; (ii) all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, to the extent that payment of such interest (including any Additional Amounts) is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein; and (iii) all sums paid or advanced by the Trustee and the reasonable and duly-documented compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(b)      all Events of Default have been cured or waived as provided in this Section 6.02, other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission will affect any subsequent Default or Event of Default or impair any right consequent thereto.

Subject to the provisions of this Indenture relating to the duties of the Trustee in case an Event of Default will occur and be continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such holders will have offered to the Trustee indemnity satisfactory to the Trustee.   Subject to such provision for the indemnification of the Trustee and certain other conditions set forth in this Indenture, the holders of a majority in aggregate principal amount of the Outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) an authorized officer or agent of the Trustee with direct responsibility for the administration of this Indenture has actual knowledge of such Default or

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

LAM_ACTIVE 401906103.23

Event of Default or (ii) written notice of such Default or Event of Default has been given to such authorized officer of the Trustee by the Issuer, the Guarantors or any Holder.

Section 6.03.    *Other Remedies.*

(a)    If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(b)    The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  To the fullest extent permitted by applicable law, a delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Default, no remedy is exclusive of any other remedy and all available remedies are cumulative to the fullest extent permitted by applicable law.

Section 6.04.    *Control by Majority.*

(a)    Holders of not less than a majority in principal amount of the Outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.  Subject to Section 7.01, however, the Trustee may refuse to follow any direction that conflicts with any law or this Indenture, that the Trustee determines may be unduly prejudicial to the rights of any other Holder, or that may involve the Trustee in personal liability; *provided* that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

(b)    In the event the Trustee takes any action or follows any direction pursuant to this Indenture, the Trustee shall be entitled to indemnification or security satisfactory to it in its sole discretion against any loss or expense caused by taking or not taking such action or following such direction.

Section 6.05.    *Limitation on Suits.*

(a)    Except to enforce the right to receive payment of principal, premium, if any, or interest not paid when due, no Holder may pursue any remedy with respect to this Indenture or the Notes *unless*:

(i)    such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(ii)    Holders of at least 30% in principal amount of the Outstanding Notes have requested the Trustee in writing to pursue the remedy;

(iii)    such Holders have offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(iv)    the Trustee has not complied with such request within sixty days after the receipt thereof and the offer of security or indemnity; and

(v)    Holders of a majority in principal amount of the Outstanding Notes have not given the Trustee a written direction inconsistent with such request within such sixty-day period.

- 63 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

(b)    A Holder may not use this Indenture to affect, disturb or prejudice the rights of another Holder or to obtain a preference or priority over such other Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

Section 6.06.    *Rights of Holders To Receive Payment*.  Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of and interest on a Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holder.

Section 6.07.    *Collection Suit by Trustee*.  If a Default in payment of principal or interest specified in Section 6.01(a)(i) or Section 6.01(a)(ii) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company or any other obligor on the Notes for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case at the rate *per annum* borne by the Notes and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.08.    *Trustee May File Proofs of Claim*.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relating to the Issuer, the Company, the Guarantors, their creditors or their property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any custodian in any such judicial proceedings is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due the Trustee under Section 7.06. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.  The Trustee shall be entitled to participate in the matters as it deems necessary or advisable, in its sole discretion, including as a member of any official committee of creditors.

Section 6.09.    *Priorities*.  If the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

(i)    *First*: to the Trustee and any Paying Agent and their respective agents and attorneys for amounts due under Section 7.06, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and any Paying Agent and the costs and expenses of collection;

(ii)    *Second*: to Holders for amounts due and unpaid on the Notes for principal, premium, if any, and *interest*, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest, respectively; and

(iii)    *Third*: to the Issuer or to such party as a court of competent jurisdiction shall direct.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this 6.09 and shall promptly notify the Issuer thereof.  At least 15 calendar days before such record date, the Issuer shall mail to each Holder and the Trustee a notice that states the record date, the payment date and amount to be paid.

ARTICLE 7

TRUSTEE AND PAYING AGENT

Section 7.01.    *Duties of Trustee and Paying Agent*.

(a)    If an Event of Default has occurred and is continuing and a Responsible Officer has actual knowledge thereof, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b)    Except during the continuance of an Event of Default, (i) the Trustee and Paying Agent undertake to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee or the Paying Agent; and (ii) in the absence of bad faith on the part of the Trustee or the Paying Agent, the Trustee or the Paying Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee or the Paying Agent and conforming to the requirements of this Indenture.  However, in the case of any certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee or the Paying Agent, the Trustee and the Paying Agent shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of the mathematical calculations or other facts stated therein).

(c)    The Trustee may not be relieved from liability for its own gross negligence, bad faith or willful misconduct, except that:

(i)    this Section 7.01(c) does not limit the effect of Section 7.01(b);

(ii)    the Trustee and the Paying Agent shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee or the Paying Agent was grossly negligent in ascertaining the pertinent facts; and

(iii)    the Trustee and the Paying Agent shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 4.19 or exercising any trust or power conferred upon the Trustee or the Paying Agent under this Indenture.

(d)    The Trustee and the Paying Agent shall not be liable for interest on any money received by it except as the Trustee and the Paying Agent may agree in writing with the Issuer.

(e)    Money held in trust by the Trustee or any Paying Agent need not be segregated from other funds except to the extent required by law.

(f)    No provision of this Indenture shall require the Trustee or the Paying Agent to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

repayment of such funds and/or adequate indemnity against such risk or liability is not satisfactorily assured to it.

(g)      Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and the Paying Agent shall be subject to the provisions of this Section 7.01.

Section 7.02.      *Rights of Trustee*.  (a) The Trustee and the Paying Agent may rely upon, and shall be protected in acting or refraining from acting based upon, any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee and the Paying Agent need not investigate any fact or matter stated in any such document.

(b)      Before the Trustee acts or refrains from acting, it may require an Officers' Certificate, the written advice of a qualified tax expert or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate, the qualified tax expert's written advice or Opinion of Counsel.

(c)      The Trustee may act through agents and shall not be responsible for the willful misconduct or gross negligence of any agent appointed with due care.

(d)      Any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by an Officers' Certificate of the Issuer (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors of the Issuer may be evidenced to the Trustee or the Paying Agent by copies thereof certified by the Secretary or an Assistant Secretary (or equivalent Officer) of the Issuer.

(e)      The Trustee and the Paying Agent shall be under no obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee or the Paying Agent security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred thereby.

(f)      The Trustee and the Paying Agent shall not be liable for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this Indenture.

(g)      The Trustee and the Paying Agent shall not be liable for any action they take or omit to take in good faith which they believe to be authorized or within their rights or powers; *provided* that the conduct of the Trustee or the Paying Agent does not constitute willful misconduct, gross negligence or bad faith.

(h)      The Trustee and the Paying Agent may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(i)      The Trustee and the Paying Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document unless requested in writing by the Holders of not less than a majority in aggregate principal amount of the Outstanding Notes; *provided* that if the payment within a reasonable time to the Trustee of the costs,

- 66 -

[AM-ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not satisfactorily assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require from the Holders indemnity satisfactory to the Trustee against such expenses or liabilities as a condition to proceeding; the reasonable expenses of every such investigation shall be paid by the Issuer or, if paid by the Trustee, shall be reimbursed by the Issuer upon demand.

(j)    Neither the Trustee nor any Paying Agent shall be required to invest, or shall be under any liability for interest, on any moneys at any time received by it pursuant to any of the provisions of this Indenture or the Notes except as the Trustee or any Paying Agent may otherwise agree with the Issuer. Such moneys need not be segregated from other funds except to the extent required by mandatory provisions of law.

(k)    In no event shall the Trustee or the Paying Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(l)    The permissive rights of the Trustee enumerated herein shall not be construed as duties of the Trustee.

(m)    The Trustee may request that the Issuer or any Guarantor deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(n)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(o)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

Section 7.03.    *Individual Rights of Trustee*.  The Trustee and any Paying Agent, Registrar or co-registrar or any other agent of the Issuer or of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

Section 7.04.    *Trustee's Disclaimer*.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

Section 7.05.    *Notice of Defaults and Events of Default*.  If a Default or Event of Default occurs and is continuing, and if it is known to the Responsible Officer, the Trustee shall mail to each Holder notice of the Default or Event of Default within 90 calendar days after a Responsible Officer acquires actual knowledge of such Default or Event of Default.  Except in the case of a Default or Event of Default in payment of principal of or interest on any Note, the Trustee may withhold the notice and shall be protected from withholding the notice if and so long as the Trustee in good faith determines that withholding the

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[[NAM-ACTIVE 401906103_23]]

notice is in the interests of Holders.  For all purposes of this Indenture and the Notes, the Trustee shall not be deemed to have knowledge of a Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof.

Section 7.06.    *Compensation and Indemnity*.    The Issuer and the Guarantors, jointly and severally, agree to pay to the Trustee and the Paying Agent from time to time such compensation as shall be agreed upon in writing for its services.  The Trustee's compensation shall not be limited by any law regarding compensation of a trustee of an express trust.  The Issuer and the Guarantors, jointly and severally, agree to reimburse promptly the Trustee and the Paying Agent upon request for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's and the Paying Agent's agents, counsel, accountants and experts.  Payments of any such expenses by the Issuer to the Trustee or the Paying Agent, as the case may be, shall be made free and clear of and without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of Brazil or any political subdivision or authority thereof or therein having power to tax, unless such withholding or deduction is required by law.  In that event, the Issuer shall pay to the Trustee or the Paying Agent, as the case may be, such additional amounts as may be necessary in order that every net payment made by the Issuer to the Trustee and Paying Agent, as the case may be, after deducting or withholding for or on account of any present or future tax, penalty, fine, duty, assessment or other governmental charge imposed upon or as a result of such payment by Brazil or any political subdivision or taxing authority thereof or therein shall not be less than the amount then due and payable to the Trustee or the Paying Agent, as the case may be.  The Issuer and the Guarantors, jointly and severally shall indemnify each of the Trustee and the Paying Agent against any and all loss, liability or expense (including reasonable attorneys' fees and expenses) incurred by it without gross negligence or bad faith on its part arising out of and in connection with the administration of this Indenture and the performance of its respective duties hereunder, including, without limitation, the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture.  The Issuer and the Guarantors, jointly and severally, undertake to indemnify each of the Paying Agents and their affiliates against all losses, liabilities, including any and all tax liabilities, which, for the avoidance of doubt, shall include both Brazilian taxes and associated penalties, costs, claims, actions, damages, expenses or demands which any of them may incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties by any Paying Agent or its affiliates under this Indenture except as may result from its own default, gross negligence or bad faith or that of its directors, officers or employees or any of them, or breach by it of the terms of this Indenture.  The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer is entitled to participate in the Trustee's defense of the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel.

To secure the payment obligations of the Issuer in this Section 7.06, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee or the Paying Agent, except that held in trust to pay principal of and interest on particular Notes.

The obligations of the Issuer and the Guarantors pursuant to this Section 7.06 shall survive the resignation or removal of the Trustee and the satisfaction and discharge of this Indenture.  When the Trustee or the Paying Agent incurs expenses after the occurrence of a Default or Event of Default specified in Section 6.01(g) the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

The Issuer acknowledges that the Paying Agent makes no representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction. The Issuer represents that it has fully satisfied itself as to any tax impact of this Indenture before agreeing to the terms herein, and is responsible for any and all federal, state, local, income, franchise, withholding, value added, sales, use, transfer, stamp or other taxes imposed by any jurisdiction in respect of this Indenture.

The Issuer agrees to pay any and all stamp and other documentary taxes or duties which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture by the Paying Agents.

Section 7.07.   *Replacement of Trustee*.  The Trustee may resign at any time by so notifying the Issuer in writing.  The Holders of a majority in principal amount of the Notes may remove the Trustee by so notifying the Trustee in writing and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(a)     the Trustee fails to comply with Section 7.09;

(b)     the Trustee is adjudged a bankrupt or insolvent;

(c)     a receiver or other public officer takes charge of the Trustee or its property; or

(d)     the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee) the Issuer shall promptly appoint a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail a notice of its succession to Holders.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.06.

If a successor Trustee does not take office within 60 calendar days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of a majority in principal amount of the Notes may, at the expense of the Issuer, petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.09, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Issuer's obligation under Section 7.06 shall continue for the benefit of the retiring Trustee.

Section 7.08.   *Successor Trustee by Merger*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

- 69 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such adopted certificates shall have the full force of all provisions within the Notes or in this Indenture relating to the certificate of the Trustee.

Section 7.09.    *Eligibility; Disqualification*.    The Trustee hereunder shall at all times be a corporation, bank or trust company organized and doing business under the laws of the United States or any state thereof (i) which is authorized under such laws to exercise corporate trust power, (ii) is subject to supervision or examination by governmental authorities, (iii) shall have at all times a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition and (iv) shall have its Corporate Trust Office in The City of New York.   If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 7.09, it shall resign immediately in the manner and with the effect specified in Section 7.07.

# ARTICLE 8
## DISCHARGE OF INDENTURE; DEFEASANCE

Section 8.01.    *Discharge of Liability on Notes*.[12]

(a)    When (i) the Issuer delivers to the Trustee all Outstanding Notes (other than Notes replaced pursuant to Section 2.11) for cancellation or (ii) all Outstanding Notes have become due and payable and the Issuer deposits in trust, for the benefit of the Holders, with the Trustee finally collected funds sufficient to pay at Maturity all Outstanding Notes and interest thereon (other than Notes replaced pursuant to Section 2.11), and if in any such case the Issuer pays all other sums payable hereunder by the Issuer, then this Indenture, and the obligations of the Issuer and any Guarantor pursuant hereto, shall, subject to Sections 8.01(c) and 8.06, cease to be of further effect.   The Trustee shall acknowledge satisfaction and discharge of this Indenture on demand of the Issuer accompanied by an Officers' Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Issuer.

(b)    Subject to Sections 8.01(c), 8.02 and 8.06, the Issuer at any time may terminate (i) all its obligations under this Indenture and the Notes ("**legal defeasance option**") or (ii) the Guarantors' obligations under Section 4.13 - Section 4.15, Section 4.17 and Section 4.19   toSection 4.23 and the operation of Sections 6.01(a),   6.01(b),   6.01(c),   6.01(d)   6.01(e) and   6.01(h) ("**covenant defeasance option**").   The legal defeasance option may be exercised notwithstanding any prior exercise of the covenant defeasance option.   Upon exercise by the Issuer of the legal defeasance option or the covenant defeasance option, the Guarantors' obligations under the Guarantee shall terminate.

If the legal defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default with respect thereto.   If the covenant defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default specified in Sections 6.01(a), 6.01(b), 6.01(c), 6.01(d), 6.01(e) and 6.01(h).

---

[12] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of the obligations of the Issuer hereunder except those specified in Section 8.01(c).

(c)      Notwithstanding Section 8.01(b), the Issuer's obligations pursuant to Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09 and 4.04 shall survive until the Notes have been paid in full.  Thereafter, the obligations of the Issuer pursuant to Sections 7.06, 7.07, 8.04 and 8.05 shall survive.  Furthermore, the Guarantors' obligations to pay fully and punctually all amounts payable by the Issuer to the Trustee under this Indenture shall survive.

Section 8.02.      *Conditions to Defeasance*.  The Issuer may exercise the legal defeasance option or the covenant defeasance option only if:

(a)      The Issuer irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "**defeasance trust**") pursuant to an irrevocable trust and security agreement in form and substance satisfactory to the Trustee, money or U.S. Government Obligations, or a combination thereof, sufficient for the payment of principal of and interest on all the Notes to Maturity or redemption[13];

(b)      The Issuer delivers to the Trustee a certificate from an internationally recognized firm of independent accountants expressing their opinion that the payments of principal of and interest on the Notes when due and without reinvestment on the deposited U.S. Government Obligations plus any deposited money without investment and after payment of all federal, state and local taxes or other charges or assessments in respect thereof payable by the Trustee shall provide cash at such times and in such amounts as shall be sufficient to pay principal of and interest on all the Notes when due at Maturity or on redemption, as the case may be[14];

(c)      123 calendar days pass after the deposit is made in accordance with the terms of Section 8.02(a) and during such 123-day period no Default or Event of Default specified in Section 6.01(g) occurs which is continuing at the end of the period;

(d)      no Default or Event of Default has occurred and is continuing on the date of such deposit and after giving effect thereto;

(e)      the deposit does not constitute a default or event of default under any other agreement binding on the Issuer;

(f)      The Issuer delivers to the Trustee an Opinion of Counsel to the effect that the trust resulting from the deposit does not constitute, or is not qualified as, a regulated investment company under the U.S. Investment Company Act of 1940, as amended;

(g)      The Issuer delivers to the Trustee Opinions of Counsel stating that, under Brazilian law, Holders (other than Brazilian persons) shall not recognize gain for Brazilian tax purposes and payments from the defeasance trust to any such Holder shall not be subject to withholding payments under Brazilian law;

---

[13] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

[14] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

(h)      in the case of the legal defeasance option, the Issuer delivers to the Trustee an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters stating that (i) the Issuer has received from, or there has been published by, the U.S. Internal Revenue Service a ruling, or (ii) since the date of this Indenture there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(i)      in the case of the covenant defeasance option, the Issuer delivers to the Trustee an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters to the effect that the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such covenant defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred;

(j)      the Issuer delivers to the Trustee an Opinion of Counsel, in form and substance reasonably satisfactory to Trustee, to the effect that, after the passage of 123 calendar days following the deposit, the trust funds shall not be subject to any applicable bankruptcy, insolvency, reorganization or similar law affecting creditors' rights generally; and

(k)      the Issuer delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes as contemplated by this Article 8 have been complied with.

Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of Notes at a future date in accordance with Article 3.

Section 8.03.    *Application of Trust Money*.    The Trustee shall hold in trust money or U.S. Government Obligations deposited with it pursuant to Section 8.02. It shall apply the deposited money and the money from U.S. Government Obligations through the Paying Agent or Paying Agents and in accordance with this Indenture to the payment of principal of and interest on the Notes.

Section 8.04.    *Repayment to Issuer*.    Upon termination of the trust established pursuant to Section 8.02, the Trustee and each Paying Agent shall promptly pay to the Issuer upon request, any excess cash or U.S. Government Obligations held by them.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer, upon request, any money held by them for the payment of principal of or interest on the Notes that remains unclaimed for two (2) years after the due date for such payment of principal or interest, and, thereafter, the Trustee and each Paying Agent, as the case may be, shall not be liable for payment of such amounts hereunder and the Holders shall be entitled to such recovery of such amounts only from the Issuer.

Section 8.05.    *Indemnity for U.S. Governmental Obligations*.    The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

Section 8.06.    *Reinstatement*.    If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article 8 by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Issuer and each Guarantor under this Indenture, the Notes and the Guarantee shall be revived and reinstated as though no deposit had occurred pursuant to this

- 72 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Article 8 until such time as the Trustee or such Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article 8; *provided*, *however*, that, if the Issuer or each such Guarantor has made any payment of principal of or interest on any Notes because of the reinstatement of its obligations, the Issuer and such Guarantor shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or such Paying Agent.

## ARTICLE 9
### AMENDMENTS

Section 9.01.    *Modification and Waiver*.  Modifications and amendments to the Indenture and the Notes may be made by the Issuer, the Guarantors and the Trustee with the consent of the Holders of not less than a majority in aggregate principal amount of the Outstanding Notes at the time that are affected by such amendment, but no such modification or amendment may, without the consent of the Holder of each Note affected thereby:

(a)    change the stated maturity, principal of or interest on any such Note, reduce the principal amount of any such Note, the rate of interest thereon, if any, or any premium or principal payable upon redemption thereof, change any place where or the currency in which any such Note or the interest, if any, thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity, if any, thereof or the date any such payment is otherwise due and payable (or, in the case of redemption, on or after the redemption date);[15]

(b)    reduce the percentage in aggregate principal amount of such Outstanding Notes, the consent of whose Holders is required for any such amendment or modification to such Notes or this Indenture, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain defaults thereunder and their consequences) provided for in this Indenture;

(c)    amend or modify certain provisions of such Notes or this Indenture pertaining to the waiver by Holders of such Notes of past defaults, amendments or modifications to such Notes or this Indenture with the consent of the Holders of such Notes and the waiver by Holders of such Notes of certain covenants, except to increase any specified percentage in aggregate principal amount required for any actions by Holders or to provide that certain other provisions of the Notes or this Indenture cannot be modified or waived without the consent of the Holder of each such Note affected thereby;

(d)    after an offer to purchase Notes has been made, reduce the purchase amount or purchase price or extend the purchase date;

(e)    make any change in the percentage of principal amount required for amendments, waivers, consent or objections, subject to clauses (b) and (c) above;

(f)    make any change in the Guarantee that would adversely affect the Holders;

(g)    modify or change any provisions of this Indenture affecting the ranking of the Notes.

It will not be necessary for the consent of the Holders under the preceding paragraphs to approve the particular form of any proposed amendment, but it will be sufficient if such consent approves the substance thereof.  After an amendment under the preceding paragraph becomes effective, the Issuer will mail to the Holders a notice briefly describing such amendment.  The failure to give such notice to all

---

[15] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Holders, or any defect therein, will not impair or affect the validity of an amendment under the preceding paragraph.

The Holders of a majority in aggregate principal amount of the Outstanding Notes may waive on behalf of the Holders of all Notes an existing Default or Event of Default and its consequences except (i) a Default or Event of Default in the payment of the principal of, premium, if any, on or interest on a Note or (ii) a Default or Event of Default in respect of a provision under this Section 9.01 which cannot be modified or amended without the consent of the Holder of each Outstanding Note.  When a Default or Event of Default is waived, it is deemed cured, but no such waiver will extend to any subsequent or other Default or Event of Default or impair any consequent right.

The Issuer and the Trustee may, without the vote or consent of any Holder of Notes, modify or amend this Indenture or the Notes for the purpose of:

(a)     adding to the covenants of the Issuer, the Company or the Subsidiaries, for the benefit of the Holders;

(b)     surrendering any right or power conferred upon the Issuer;

(c)     securing the Notes pursuant to the requirements thereof or otherwise;

(d)     adding an additional Guarantee with respect to the Notes;

(e)     evidencing the succession of another corporation to the Issuer and the assumption by any such successor of the covenants and obligations of the Issuer in the Notes and in this Indenture pursuant to any merger, consolidation or sale of assets or any substitution of the Issuer pursuant to Article 5;

(f)     correcting any ambiguity, inconsistency or defective provision contained in this Indenture or in the Notes;

(g)     making any modification or granting any waiver or authorization of any breach or proposed breach of any of the terms and conditions of the Notes or any other provisions of this Indenture in any manner which the Issuer may determine and which does not adversely affect the interest of any Holders in any material respect;

(h)     making any modification which is of a minor or technical nature or correcting a manifest error; or

(i)     providing for the appointment of a successor trustee in accordance with the terms of this Indenture; *provided* that the successor trustee is otherwise qualified and eligible to act as such under the terms of this Indenture.

Any instrument given by or on behalf of any Holder of a Note in connection with any consent to any such modification, amendment or waiver will be irrevocable once given and will be conclusive and binding on all subsequent Holders of such Note. Any modifications, amendments or waivers to this Indenture or to the terms and conditions of any Notes will be conclusive and binding on all Holders of such Notes, whether or not they have given such consent.

Section 9.02.     *Trustee to Sign Amendments*. Upon request of the Issuer accompanied by a Board Resolution authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the requisite Holders, and upon

- 74 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

receipt by the Trustee of the documents described in Section 13.03 hereof (to the extent requested), the Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and (subject to Section 7.01) shall be fully protected in relying upon, in addition to the documents required by Section 13.03, an Officer's Certificate and an Opinion of Counsel each stating that such amendment is authorized or permitted by this Indenture.

ARTICLE 10

GUARANTEE

Section 10.01.  *The Guarantee*  Subject to the provisions of this Article, the Guarantors hereby irrevocably, unconditionally, jointly and severally guarantee, on an unsecured basis, the full and punctual payment (whether at Stated Maturity, upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other amounts payable by the Issuer under this Indenture.  Upon failure by the Issuer to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Indenture.[16]

Section 10.02.  *Unconditional Guarantee*.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Note, by operation of law or otherwise;

(b)    any modification or amendment of or supplement to this Indenture or any Note;

(c)    any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Note;

(d)    the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Issuer, the Trustee or any other Person, whether in connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)    any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture or any Note, or any provision of applicable law or regulation purporting to prohibit the payment by the Issuer of the principal of or interest on any Note or any other amount payable by the Issuer under this Indenture; or

(f)    any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder.

Section 10.03.  *Discharge; Reinstatement*.  The Guarantors' obligations hereunder shall remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Issuer under this Indenture have been paid in full.  If at any time any payment of the principal

---

[16] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

- 75 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

of, premium, if any, or interest on any Note or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Issuer or otherwise, the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

Section 10.04.   *Waiver by the Guarantors*.   The Guarantors irrevocably waive acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person.

Section 10.05.   *Subrogation and Contribution*.   Upon making any payment with respect to any obligation of the Issuer under this Article, any Guarantor making such payment shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided* that any such Guarantor may not enforce either any right of subrogation, or any right to receive payment in the nature of contribution, or otherwise, from any other Guarantor, with respect to such payment so long as any amount payable by the Issuer hereunder or under the Notes remains unpaid.

Section 10.06.   *Stay of Acceleration*.   If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors hereunder forthwith on demand by the Trustee or the Holders in accordance with the terms of this Indenture.

Section 10.07.   *Limitation on Amount of Guarantee*.   Notwithstanding anything to the contrary in this Article, the Guarantors, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the laws of Brazil, the United States Bankruptcy Code or any comparable provision of state law.   To effectuate that intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of the Guarantors under their Guarantee are limited to the maximum amount that would not render the Guarantors' obligations subject to avoidance under applicable fraudulent conveyance provisions of the laws of Brazil, the United States Bankruptcy Code or any comparable provision of state law.

Section 10.08.   *Execution and Delivery of Guarantee*.   The execution by each Guarantor of this Indenture (or a supplemental indenture in the form of Exhibit B) evidences the Guarantee of each such Guarantor, whether or not the Person signing as an officer of such Guarantor still holds that office at the time of authentication of any Note.   The delivery of any Note by the Trustee after authentication constitutes due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

Section 10.09.   *Release of Guarantee*.   The Guarantee of the Guarantors shall terminate upon:

(a)      a sale or other disposition (including by way of consolidation or merger) of each such Guarantor or the sale or disposition of all or substantially all the assets of such Guarantor (in each case other than to the Issuer or a Subsidiary) otherwise permitted by this Indenture;

(b)      if the Guarantee were required pursuant to the terms of this Indenture, the cessation of the circumstances requiring such Guarantee; or

(c)      defeasance or discharge of the Notes, as provided in Article 7.

- 76 -

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Upon delivery by the Issuer to the Trustee of an Officers' Certificate and an Opinion of Counsel to the foregoing effect, the Trustee shall execute any documents reasonably requested by the Issuer in writing in order to evidence the release of the Guarantors from their obligations under the Guarantee.

## ARTICLE 11
### REPLACEMENT OF NOTES

Section 11.01.  *Replacement of Notes* .  Notes that become mutilated, destroyed, stolen or lost will be replaced upon delivery thereof to the Trustee or delivery to the Issuer and the Trustee of evidence of the loss, theft or destruction thereof satisfactory to the Issuer and the Trustee.  In the case of a lost, stolen or destroyed Note, an indemnity satisfactory to the Trustee and the Issuer may be required at the expense of the Holder of such Note before a replacement Note will be issued.  Upon the issuance of any Note, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and the expenses of the Trustee, its counsel and its agents) connected therewith.

## ARTICLE 12
### NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES AND SHAREHOLDERS

Section 12.01.  *No Personal Liability* .  A director, officer, employee or shareholder, as such, of the Issuer, any Guarantor, and a director, officer or employee of any Subsidiary of the Company shall not have any liability for or in respect of any obligations of the Issuer, the Guarantors or any of their respective Subsidiaries under the Notes, this Indenture or the Guarantee.  By accepting a Note, each Holder will waive and release all such liability.  The waiver and release are part of the consideration for the issue of the Notes The waiver may not be effective to waive liabilities under federal securities laws.

## ARTICLE 13
### MISCELLANEOUS

Section 13.01.  *Provisions of Indenture and Notes for the Sole Benefit of Parties and Holders of Notes*.  Nothing in this Indenture or the Notes, expressed or implied, shall be given to any Person other than the parties hereto and their successors hereunder and the Holders any benefit or any legal or equitable right, remedy or claim under this Indenture or the Notes.

Section 13.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Indenture to be made upon, given, provided or furnished to, or filed with, any party to this Indenture shall, except as otherwise expressly provided herein, be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier or telecopier, addressed to the relevant party as follows:

To the Issuer:

OEC Finance Limited
c/o Odebrecht Engenharia e Construção S.A.
Av. Lemos Monteiro 120, 7º andar, São Paulo – SP Brazil 05501-050
Brasil
Attention: CFO; fjens@oec-eng.com


To the Trustee:

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
Attention:  International Corporate Trust - ODEBRECT

Telecopy:  724-540-6330

Notices or communications to a Guarantor shall be deemed given if given to the Issuer.

Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Indenture provides for the giving of notice to Holders, such notice shall be deemed to have been given upon (i) the mailing of first class mail, postage prepaid, of such notice to Holders at their registered addresses as recorded in the Register.

The Issuer shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law, including, without limitation, those required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

All notices or communications to be given pursuant to any clause of this Indenture must be given in English or, where not given in English, must be accompanied by a certified English translation.

Section 13.03.  *Officers' Certificate and Opinion of Counsel as to Conditions Precedent*.  Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee:

(a)        an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.04) stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)        an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.04) stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 13.04.  *Statements Required in Officers' Certificate or Opinion of Counsel*.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(a)        a statement that each Person making or rendering such Officers' Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(b)        a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(c)      a statement that, in the opinion of each such Person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)      a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with *provided* that an Opinion of Counsel may rely on an Officer's Certificate or certificates or public officials with respect to matters of fact.

Section 13.05.   *Rules by Trustee, Registrar Paying Agent and Transfer Agents*.   The Trustee, the Registrar, the Paying Agents and the Transfer Agents may make reasonable rules for their functions.

Section 13.06.   *Currency Indemnity*.   Any amount received or recovered in a currency other than the currency (the "**Denomination Currency**") in which such Note is denominated or in which such amount is payable, whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of the Issuer or otherwise (the "**Judgment Currency**"), by the Holder in respect of any sum expressed to be due to it from the Issuer or the Guarantors hereunder shall constitute a discharge of the Issuer only to the extent of the amount of the Denomination Currency that the Holder is able to purchase with the amount so received or recovered in the Judgment Currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).   The Issuer agrees that it will indemnify the relevant Holder against any loss arising or resulting from any variation in rates of exchange between (i) the rate of exchange at which the Denomination Currency is converted into the Judgment Currency for the purpose of such judgment or order, winding up, dissolution or otherwise and (ii) the rate of exchange at which such Holder would have been able to purchase the Denomination Currency with the amount of the Judgment Currency actually received by such Holder if such Holder had utilized such amount of Judgment Currency to purchase the Denomination Currency as promptly as practicable upon such Holder's receipt thereof.   This indemnity will constitute a separate and independent obligation from the other obligations contained in the terms and conditions of the Notes, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted from time to time and will continue in full force and effect notwithstanding any judgment, order, claim or proof for a liquidated sum or sums in respect of amounts due in respect of the relevant Note or under any such judgment, order, claim or proof.   The term "rate of exchange" will include an allowance for any customary or reasonable premiums and costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

Section 13.07.   *No Recourse Against Others*.   No director, officer, employee or shareholder, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, under this Indenture or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.   By accepting a Note, each Holder shall waive and release all such liability.   The waiver and release shall be part of the consideration for the issue of the Notes.

Section 13.08.   *Legal Holidays*.   In any case where any Interest Payment Date or Redemption Date or date of Maturity of any Note shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Redemption Date or date of Maturity; *provided* that no interest shall accrue for the period from and after such Interest Payment Date or Redemption Date or date of Maturity, as the case may be.[17]

---

[17] NTD: Section to be adjusted for Perpetual Notes. Please see Exhibit G.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 13.09.  *Governing Law; Waiver of Jury Trial*.  THIS INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.10.  *Consent to Jurisdiction; Waiver of Immunities*.  The Issuer and the Guarantors have irrevocably submitted to the non-exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, City and State of New York for the purposes of any action or proceeding arising out of or related to the Notes, the Guarantee or this Indenture.  The Issuer and the Guarantors have irrevocably waived, to the fullest extent permitted by law, any objection which it may have to the laying of the venue of any such action or proceeding brought in such a court and any claim that any such action or proceeding brought in such a court has been brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile.  The Issuer and the Guarantors have agreed that final judgment in any such action or proceeding brought in such court shall be conclusive and binding upon such party and may be enforced in any court to the jurisdiction of which such party is subject by a suit upon such judgment; *provided*, *however*, that service of process is effected upon such Person in the manner specified in the following paragraph or as otherwise permitted by law.

As long as any Note remains outstanding, the Issuer and the Guarantors will at all times have an authorized agent in the Borough of Manhattan, City and State of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to the Notes.  Service of process upon such agent and written notice of such service mailed or delivered to the party being joined in such action or proceeding shall, to the extent permitted by law, be deemed in every respect effective service of process upon such party in any such legal action or proceeding.  The Issuer and the Guarantors have each appointed Cogency Global Inc. as their agent for service of process in any proceedings in the Borough of Manhattan, City and State of New York.

Service of process personally delivered upon the agents specified in the preceding paragraph and written notice of such service delivered to the Issuer and the Guarantors shall be deemed in every respect effective service of process upon the Issuer and the Guarantors, *provided*, *however*, that no notice by mail on the Issuer and the Guarantors or any of its agents shall be deemed effective service of process

Section 13.11.  *Successors and Assigns*.  All covenants and agreements of the Issuer and the Guarantors in this Indenture, the Notes and the Guarantee shall bind their respective successors and assigns, whether so expressed or not.  All agreements of the Trustee in this Indenture shall bind its successors.

Section 13.12.  *Multiple Originals*.  The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.  Delivery of an executed counterpart of a signature page of this Indenture by facsimile or other electronic imaging means (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Indenture.

Section 13.13.  *Severability Clause*.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  To the extent permitted by applicable law, the parties hereby waive any provision of law which renders any term or provision hereof invalid or unenforceable in any respect.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Section 13.14. *Force Majeure*. In no event shall any of the Trustee, Paying Agents, Transfer Agents or Registrar be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, pandemics, COVID-19, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that each of the Trustee, Paying Agents, Transfer Agents or Registrar shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 13.15. *Prescription*. Claims against the Issuer or any Guarantors for payments under the Notes or the Guarantee shall be prescribed unless made within a period of six years from the relevant payment date.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

OEC FINANCE LTD.
  as Issuer

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

OEC S.A.
  as GUARANTOR

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

CNO S.A.
  as GUARANTOR

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

OECI S.A.
  as GUARANTOR


By: _____
  Name:
  Title:


By: _____
  Name:
  Title:


OENGER S.A.
  as GUARANTOR


By: _____
  Name:
  Title:


By: _____
  Name:
  Title:


THE BANK OF NEW YORK MELLON
  as Trustee, Registrar, Transfer Agent and Paying Agent


By: _____
  Name:
  Title:

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

**EXHIBIT A**

FORM OF NOTE

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM-ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[FACE OF NOTE]

UNLESS THIS GLOBAL NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("**DTC**"), TO THE ISSUER NAMED HEREIN (THE "**COMPANY**") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

[*Include if Note is a Restricted Global Note, or a Note issued in exchange therefor, as required under this Indenture:*  THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO THE ISSUER, (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (III) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (IV) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (V) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144A UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE ON SATISFACTION OF THE CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN.]

[*Include if Note is Regulation S Global Note, or a Note issued in exchange therefor, in accordance with this Indenture:*  "THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE AFTER 40 CALENDAR DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DATE ON WHICH THE NOTES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND (B) THE ORIGINAL ISSUE DATE OF THIS NOTE."]

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

## OEC FINANCE LTD.

[RESTRICTED GLOBAL NOTE]
[REGULATION S GLOBAL NOTE]
[CERTIFICATED NOTE]

Representing

[•]% Senior Notes Due 20[·]

No. [R-1][S-1]

CUSIP No. [•]] [[•]]                                                    Principal Amount
ISIN                    No.                        [[•]]                              [[•]]
COMMON CODE.  [[•]] [[•]]                                          U.S.$ [[•]] [[•]]

OEC FINANCE LTD., an exempted company incorporated under the laws of the Cayman Islands (the "**Issuer**", which term includes any successor corporation under the Indenture referred to on the reverse hereof), for value received, hereby promises to pay to Cede & Co., or registered assigns, U.S.$ [[·]] [[·]], upon presentment and surrender of this Note on [·], 20[·] or on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

Interest on the outstanding principal amount shall be borne at the rate of [·]% per annum payable semi-annually in arrears on each of [·] and [·] (each such date an "**Interest Payment Date**"), commencing on [·], 20[·], all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; *provided*, *however*, that in the event that the Issuer shall at any time default on the payment of interest or such other amounts as any may be payable in respect of the Notes, the Issuer shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 1.5% per annum.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the signature of one of its authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

Dated: _____

OEC FINANCE LTD.

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

This is one of the Notes
referred to in the within
mentioned Indenture.

THE BANK OF NEW YORK MELLON,
    as Trustee


By: _____
    Authorized Officer

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[FORM OF REVERSE SIDE OF NOTE]

[•]% Senior Notes Due 20[•]

TERMS AND CONDITIONS OF THE NOTES

*The Notes will bear the following terms and conditions.  Certain capitalized terms used in these Terms and Conditions are defined in Section [•] hereof.*

**1.        Status**

[•]

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

**EXHIBIT B**

### SUPPLEMENTAL INDENTURE

dated as of _____, \_\_\_\_

among

OEC FINANCE LTD.,

the GUARANTORS party hereto,

[Substituted Issuer] party hereto

and

THE BANK OF NEW YORK MELLON,
as Trustee

_____

[·]% Senior Notes Due 20[·]

B-1

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

THIS SUPPLEMENTAL INDENTURE (this "**Supplemental Indenture**"), entered into as of _____, \_\_\_\_, among OEC Finance Limited, an exempted company incorporated under the laws of the Cayman Islands (the "**Issuer**"), the Guarantors party hereto, including [\_\_\_\_] as Additional Guarantor ([each an] "**Undersigned**") and The Bank of New York Mellon, as trustee (the "**Trustee**")

## RECITALS

WHEREAS, the Issuer, the Guarantors party thereto and The Bank of New York Mellon, as Trustee, entered into the Indenture, dated as of [•], 20[•] (the "**Indenture**"), relating to the Issuer's [·]% Senior Notes Due 20[•] (the "**Notes**");

WHEREAS, as a condition to the Trustee entering into the Indenture and the purchase of the Notes by the Holders, the Issuer agreed pursuant to the Indenture to cause certain Subsidiaries (as defined in the Indenture)  to provide guarantees in certain circumstances upon becoming a Significant Subsidiary (as defined in the Indenture).

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and intending to be legally bound, the parties to this Supplemental Indenture hereby agree as follows:

Section 1.  Capitalized terms used herein and not otherwise defined herein are used as defined in the Indenture.

[Section 2.  The Undersigned, a Wholly-Owned Subsidiary of the Company, by its execution of this Supplemental Indenture, agrees to be the principal debtor under the Indenture and assumes all of the Issuer's obligations under the Indenture and the Notes].

[Section 2.  [Each][The] Undersigned, by its execution of this Supplemental Indenture, agrees to be a Guarantor under the Indenture and to be bound by the terms of the Indenture applicable to a Guarantor].

Section 3.  This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 4.  This Supplemental Indenture may be signed in various counterparts which together shall constitute one and the same instrument.

Section 5.  This Supplemental Indenture is an amendment supplemental to the Indenture, and the Indenture and this Supplemental Indenture shall henceforth be read together.

Section 6.  The Trustee shall not be responsible in any manner whatsoever for or in respect or the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which are made solely by the Issuer and the Guarantor.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

OEC FINANCE LTD.
  as Issuer


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


[ADDITIONAL GUARANTOR]
  as Guarantor


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


THE BANK OF NEW YORK MELLON
  as Trustee, Registrar, Transfer Agent and Paying Agent


By: _____
    Name:
    Title:

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

**EXHIBIT C**

FORM OF
TRANSFER NOTICE

FOR VALUE RECEIVED, the undersigned Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address, including postal zip code, of assignee

_____

this Note and all rights hereunder, hereby irrevocably constituting and appointing

_____ attorney to transfer said Note on the books of OEC FINANCE LIMITED with full power of substitution in the premises.

_____

In connection with any transfer of this Note occurring prior to the date [which is one year after the original issue date of the Notes,][18] [which is on or prior to the 40th day after the Closing Date (as defined in the Indenture governing the Notes),][19] the undersigned confirms that:

[Check one]

☐   (a)   This Note is being transferred to the Issuer;

☐   (b)   This Note is being transferred pursuant to an effective registration statement under the U.S. Securities Act of 1933, as amended (the "**Securities Act**");

☐   (c)   This Note is being transferred to a person whom the Holder reasonably believes is a qualified institutional buyer as defined in Rule 144A under the Securities Act in a transaction meeting the requirement of Rule 144A;

☐   (d)   This Note is being transferred in an offshore transaction in accordance with Rule 904 under the Securities Act; or

☐   (e)   This Note is being transferred pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available),

in each of cases (a) through (e) above, in accordance with any applicable securities laws of any State of the United States.

_____

[18] *Include in Restricted Note*.

[19] *Include in Regulation S Note*.

C-1

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

If none of the foregoing boxes is checked, the Transfer Agent shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.08 of the Indenture shall have been satisfied.

Date: _____

_____

NOTICE:  The signature to this assignment must correspond with the name as written upon the face of this instrument in every particular, without alteration, enlargement or any other change whatever.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

EXHIBIT D

FORM OF CERTIFICATE
FOR TRANSFER FROM RESTRICTED GLOBAL
NOTE OR CERTIFICATED NOTE BEARING
A SECURITIES ACT LEGEND TO REGULATION S
GLOBAL NOTE OR CERTIFICATED NOTE
NOT BEARING A SECURITIES ACT LEGEND

The Bank of New York Mellon
[•]
Attn:  Global Finance Americas

Re:      [·]% Senior Notes Due 20[·] (the "**Notes**")

Reference is hereby made to the Indenture, dated [·], 20[·] (the "**Indenture**"), among OEC Finance Limited, the Guarantors party thereto and The Bank of New York Mellon, as Trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Global Note with the Depositary in the name of the undersigned] [a Certificated Note bearing a Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest of equal principal amount in the Regulation S Global Note (ISIN No. [•]) to be held with [Euroclear] [Clearstream Banking][20] (Common Code No. [•]) through the Depositary] [a Certificated Note of equal principal amount not bearing a Securities Act Legend].  In connection with such transfer, the undersigned does hereby certify that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 903 or 904 of Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the undersigned further certifies that:

(1)       the offer of the Notes was not made to a U.S. Person (as defined under Regulation S);

[(2)       at the time the buy order was originated, the transferee was outside the United States or the undersigned and any Person acting on behalf of the undersigned reasonably believed that the transferee was outside the United States;][21]

[(2)       the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on behalf of the undersigned knows that the transaction was prearranged with a buyer in the United States;][22]

(3)       no directed selling efforts have been made in contravention of the requirements of Rule 904 of Regulation S;

---

[20] *Indicate appropriate clearing system*.

[21] *Insert one of the two provisions*.

[22] *Insert one of the two provisions*.

D-1

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

(4)    the undersigned is not the Issuer, a distributor, an affiliate of either the Issuer or a distributor, or a Person acting on behalf of any of the foregoing; and

(5)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

This certificate and the statements contained herein are made for your benefit and for the benefit of OEC Finance Limited.  Terms used in this certificate and not otherwise defined in this Indenture have the meanings set forth in Regulation S.

[INSERT NAME OF TRANSFEROR]


By:    _____
       Name:
       Title:


Dated:    _____, _____

cc:    OEC Finance Limited

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

**EXHIBIT E**

FORM OF TRANSFER CERTIFICATE
FOR TRANSFER FROM REGULATION S GLOBAL
NOTE OR CERTIFICATED NOTE NOT BEARING
A SECURITIES ACT LEGEND TO RESTRICTED GLOBAL
NOTE OR CERTIFICATED NOTE BEARING
A SECURITIES ACT LEGEND
(PRIOR TO 40TH DAY AFTER CLOSING DATE)

The Bank of New York Mellon
101 Barclay Street – Floor 4 East
New York, New York  10286
Attn:  Global Finance Americas

Re:    [·]% Senior Notes Due 20[·] (the "**Notes**")

Reference is hereby made to the Indenture, dated [·], 20[·] (the "**Indenture**"), among OEC Finance Limited, the Guarantors party thereto and The Bank of New York Mellon, as Trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Regulation S Global Note (ISIN No. [·]) with the Depositary in the name of the undersigned] [a Certificated Note not bearing the Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. 675758AC0) to be held through the Depositary] [a Certificated Note bearing the Securities Act Legend].  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

(a)    the Notes are being transferred to a transferee that the undersigned reasonably believes is purchasing the Notes for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

the transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

This certificate and the statements contained herein are made for your benefit and for the benefit of OEC Finance Limited.

[INSERT NAME OF TRANSFEROR]

By: _____
    Name:
    Title:

E-1

[AM\_ACTIVE 401906103\_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Dated: _____, _____

cc:      OEC Finance Limited

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

**EXHIBIT F**

FORM OF CERTIFICATE FOR REMOVAL
OF THE SECURITIES ACT LEGEND ON A CERTIFICATED NOTE

The Bank of New York Mellon
101 Barclay Street – Floor 4 East
New York, New York  10286
Attn:  Global Finance Americas

> Re:      [•]% Senior Notes Due 20[•] (the "**Notes**")

Reference is hereby made to the Indenture, dated [·], 20[·] (the "**Indenture**"), among OEC Finance Limited, the Guarantors party thereto and The Bank of New York Mellon, as Trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Global Note (CUSIP No. [•]) with the Depositary] [[a] Certificated Note(s) in the name of the undersigned.][23]

The undersigned has requested for the restrictive legend on the Certificated Note(s) to be removed.

In connection with such transfer, the undersigned does hereby certify that such transfer has been effected only (i) in an offshore transaction in accordance with Rule 904 under the Securities Act, (ii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available) or (iii) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iii) in accordance with any applicable securities laws of any State of the United States.

---

[23] *Indicate form in which Notes are held*.

F-1

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

This certificate and the statements contained herein are made for your benefit and for the benefit of and OEC Finance Limited.

[NAME OF UNDERSIGNED]

By: _____

Name:

Title:

Dated: _____, _____

cc:      OEC Finance Limited

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM ACTIVE 401906103_23]

EXHIBIT G

PERPETUAL NOTES SPECIFIC SECTIONS

| Section | New Notes with Maturity Date | Perpetual Notes |
|---|---|---|
| Recitals | "The Issuer has duly authorized the issue of [•]% senior Notes Due [•] (the "Notes"), initially in an aggregate principal amount of U.S.$[ •] and has duly authorized the execution and delivery of this Indenture." | "The Issuer has duly authorized the issue of 7.000% perpetual notes (the "Notes"), , initially in an aggregate principal amount of U.S.$[ •] and has duly authorized the execution and delivery of this Indenture." |
| Section 1.01. Definitions. | "**Disqualified Stock**" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event:<br><br>(b) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;<br><br>(c) is convertible or exchangeable for Indebtedness or Disqualified Stock; or<br><br>(d) is redeemable at the option of the holder thereof, in whole or in part,<br><br>in each case on or prior to the 91st day after the Stated Maturity of the Notes; *provided,* however, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Notes, shall not constitute Disqualified Stock if such "asset sale" or "change of control" provisions are not more favorable to the holders of such Capital Stock than the comparable provisions of this Indenture." | "**Disqualified Stock**" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event:<br><br>1. matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;<br><br>2. is convertible or exchangeable for Indebtedness or Disqualified Stock; or<br><br>3. is redeemable at the option of the holder thereof, in whole or in part,<br><br>*provided, however,* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control", shall not constitute Disqualified Stock if such "asset sale" or "change of control" provisions are not more favorable to the holders of such Capital Stock than the comparable provisions of this Indenture." |
| Section 1.01. Definitions. | "**Maturity**" means the date on which the principal of, and premium, if any, on the Notes become due and payable in full in | Definition removed. |

F-3

Este documento foi assinado digitalmente por Iolanda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

Este documento foi assinado digitalmente por Iolanda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

| | | |
|---|---|---|
| | accordance with this Indenture, whether on the Stated Maturity Date, or earlier upon redemption, by declaration of acceleration or otherwise" | |
| Section 1.01. Definitions. | "**Stated Maturity**" means (i) with respect to any Indebtedness, the date specified as the fixed date on which the final installment of principal of such Indebtedness is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment." | Definition removed. |
| Section 1.01. Definitions. | "Record Date" means, when used with respect to the interest on the Notes payable on any Interest Payment Date, October 6 and April 6 (whether or not a Business Day), as the case may be, next preceding such Interest Payment Date. | "Record Date" means, when used with respect to the interest on the Notes payable on any Interest Payment Date, the 15th calendar day (whether or not a Business Day) preceding any Interest Payment Date. |
| Section 1.01. Definitions. | "Stated Maturity Date" has the meaning specified in Section 2.06" | Definition removed. |
| Section 2.06. Principal, Maturity and Interest | "*Section 2.06.  Principal, Maturity and Interest*.<br><br>*(a) Maturity and Principal.*  The Notes will be issued in an initial aggregate principal amount of U.S.\$ [•] and will mature on [·](the "**Stated Maturity Date**").  The then outstanding principal amount of the Notes will be payable in full at Maturity."<br><br>(…)<br><br>"Payment of interest shall occur semi-annually on April 21 and October 21 of each year (together with the date of Maturity, the "**Interest Payment Dates**" and each, an "**Interest Payment Date**"). If any Interest Payment Date falls on a day that is not a Business Day, the required payments of principal, premium, if any, and interest, if any, with respect to the Notes will be made on the next succeeding | "Section 2.06. Principal and Interest.<br><br>*(a) Principal.* The Notes will be issued in an initial aggregate principal amount of U.S.\$ [•] and with no fixed final maturity date."<br><br>(…)<br><br>"Payment of interest shall occur quarterly on March, June, September and December 14th of each year (the "**Interest Payment Dates**" and each, an "**Interest Payment Date**").  If any Interest Payment Date falls on a day that is not a Business Day, the required payments of principal, premium, if any, and interest, if any, with respect to the Notes will be made on the next succeeding Business Day as if made on the date such payment was due, and no interest will accrue on such payment for the period from and after such |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

| | | |
|---|---|---|
| | Business Day as if made on the date such payment was due, and no interest will accrue on such payment for the period from and after such Interest Payment Date, as the case may be, to the date of such payment on the next succeeding Business Day." | Interest Payment Date, as the case may be, to the date of such payment on the next succeeding Business Day." |
| Section 2.08. Payment of Principal and Interest | "Payments of interest and principal will be made to the Holder at the address of such Holder appearing on the Register (as defined in this Indenture) at the close of business on the 15th calendar day (whether or not a Business Day) prior to any due date for the payment on such Note (the "**Regular Record Date**"), (i) in the case of Global Notes, by a Paying Agent by wire transfer of immediately available funds to Holders to an account at a bank located within the United States as designated by each Holder not less than fifteen calendar days prior to the applicable payment date, and (ii) in the case of Certificated Notes, by a Paying Agent by mailing a check to the Holder at the address of such Holder; *provided, however*, that (a) interest payable on any date of Maturity shall be payable to the Person to whom principal shall be payable and (b) the first payment of interest on any Note originally issued between a Regular Record Date for such Note and the succeeding Interest Payment Date shall be made on the Interest Payment Date following the next succeeding Regular Record Date for such Note of the Holder. For any Certificated Note, a Holder of U.S.$1,000,000 or more in aggregate principal amount of Notes may request payment by wire transfer but only if appropriate payment instructions have been received in writing by any Paying Agent with respect to such Note not less than fifteen calendar days prior to the applicable payment date. In the event that payment is so made in accordance with instructions of the Holder, such wire transfer shall be deemed to constitute full and complete payment of such principal, premium and/or interest on the Notes. <br><br> Payment of the principal, premium, if any, and interest due with respect to any | "Payments of interest and principal will be made to the Holder at the address of such Holder appearing on the Register (as defined in this Indenture) at the close of business on the 15th calendar day (whether or not a Business Day) prior to any due date for the payment on such Note (the "**Regular Record Date**"), (i) in the case of Global Notes, by a Paying Agent by wire transfer of immediately available funds to Holders to an account at a bank located within the United States as designated by each Holder not less than fifteen calendar days prior to the applicable payment date, and (ii) in the case of Certificated Notes, by a Paying Agent by mailing a check to the Holder at the address of such Holder; *provided, however*, that (a) interest payable on any Redemption Date shall be payable to the Person to whom principal shall be payable and (b) the first payment of interest on any Note originally issued between a Regular Record Date for such Note and the succeeding Interest Payment Date shall be made on the Interest Payment Date following the next succeeding Regular Record Date for such Note of the Holder. For any Certificated Note, a Holder of U.S.$1,000,000 or more in aggregate principal amount of Notes may request payment by wire transfer but only if appropriate payment instructions have been received in writing by any Paying Agent with respect to such Note not less than fifteen calendar days prior to the applicable payment date. In the event that payment is so made in accordance with instructions of the Holder, such wire transfer shall be deemed to constitute full and complete payment of such principal, premium and/or interest on the Notes. <br><br> Payment of the principal, premium, if any, and interest due with respect to any Certificated Note on any Redemption Date will be made in immediately available funds upon surrender of such Note at the specified office of any Paying Agent with respect to that Note and accompanied by wire transfer instructions; *provided* that the Certificated Note is presented to such Paying Agent in time for such Paying Agent to make such payments in such funds in accordance with its normal procedures." |

F-5

Este documento foi assinado eletronicamente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

| | | |
|---|---|---|
| | Certificated Note on any date of Maturity will be made in immediately available funds upon surrender of such Note at the specified office of any Paying Agent with respect to that Note and accompanied by wire transfer instructions; *provided* that the Certificated Note is presented to such Paying Agent in time for such Paying Agent to make such payments in such funds in accordance with its normal procedures.<br><br>(…)<br><br>    If the Issuer or the Guarantors (x) default in a payment of interest on the Notes or (y) default in a payment of principal owing at Maturity on the Notes, the Issuer or the Guarantors, as applicable, will pay the Defaulted Interest (as defined below) in accordance with the procedures set forth below or in any lawful manner not inconsistent with the requirements of any stock exchange on which the Notes may be listed, and upon such notice as may be required by such exchange." | (…)<br><br>    If the Issuer or the Guarantors (x) default in a payment of interest on the Notes or (y) default in a payment of principal owing at the Redemption Date on the Notes, the Issuer or the Guarantors, as applicable, will pay the Defaulted Interest (as defined below) in accordance with the procedures set forth below or in any lawful manner not inconsistent with the requirements of any stock exchange on which the Notes may be listed, and upon such notice as may be required by such exchange." |
| Section 4.01. Payment of Principal and Interest Under the Notes | "Section 4.01. Payment of Principal and Interest Under the Notes.<br><br>    The Issuer will punctually pay the principal of and interest (including Defaulted Interest, if any) on the Notes on the dates and in the manner provided in Paragraphs 2 and 3 of the Notes. One Business Day prior to any date of Stated Maturity (which, for the avoidance of doubt, shall include any Interest Payment Date), the Issuer will irrevocably deposit with the Trustee or the other Paying Agents money sufficient to pay such principal and interest. No interest shall be payable hereunder in excess of the maximum rate permitted by applicable law." | "Section 4.01. Payment of Principal and Interest Under the Notes.<br><br>The Issuer will punctually pay the principal of (if at any time due upon redemption or declaration in accordance with the terms of this Indenture) and interest (including Defaulted Interest, if any) on the Notes on the dates and in the manner provided in Paragraphs 2 and 3 of the Notes. One Business Day prior to such date (which, for the avoidance of doubt, shall include any Interest Payment Date), the Issuer will irrevocably deposit with the Trustee or the other Paying Agents money sufficient to pay such principal and interest. No interest shall be payable hereunder in excess of the maximum rate permitted by applicable law" |
| 4.10 Payment of Additional Amounts | (…)<br><br>"(v)    The Issuer or the Guarantors will:<br><br>(1)    at least ten Business Days prior to the first Interest Payment Date for any Notes (and at least ten Business Days prior | (…)<br><br>"(v)    The Issuer or the Guarantors will:<br><br>(1)    at least ten Business Days prior to the first Interest Payment Date for any Notes (and at least ten Business Days prior to each succeeding Interest |

F-6

Este documento foi assinado digitalmente por Geralda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

| | | |
|---|---|---|
| | to each succeeding Interest Payment Date or any Redemption Date or Stated Maturity Date if there has been any change with respect to the matters set forth in the below mentioned Officer's Certificate), deliver to the Trustee and each Paying Agent an Officer's Certificate (i) specifying the amount, if any, of taxes described in this Section 4.10 imposed or levied by or on behalf of any Taxing Jurisdiction (the "Relevant Withholding Taxes") required to be deducted or withheld on the payment of principal or interest on the Notes to Holders and the Additional Amounts, if any, due to Holders in connection with such payment, and (ii) certifying that the Issuer or any Guarantor will pay such deduction or withholding;"<br><br>(…)<br><br>"(4)    pay any Additional Amounts due to Holders on any Interest Payment Date, Redemption Date or Stated Maturity Date to the Trustee in accordance with the provisions of this Section 4.10." | Payment Date or any Redemption Date if there has been any change with respect to the matters set forth in the below mentioned Officer's Certificate), deliver to the Trustee and each Paying Agent an Officer's Certificate (i) specifying, if any, of taxes described in this Section 4.10 imposed or levied by or on behalf of any Taxing Jurisdiction (the "Relevant Withholding Taxes") required to be deducted or withheld on the payment of principal or interest on the Notes to Holders and the Additional Amounts, if any, due to Holders in connection with such payment, and (ii) certifying that the Issuer or any Guarantor will pay such deduction or withholding;"<br><br>(…)<br><br>"(4)    pay any Additional Amounts due to Holders on any Interest Payment Date or Redemption Date to the Trustee in accordance with the provisions of this Section 4.10." |
| Section 6.01 | "Section 6.01.   Events of Default. The term "Event of Default" means, when used herein, any one of the following events:<br>(a)    the Issuer or the Guarantors fail to pay any amount of (i) principal in respect of the Notes when the same becomes due and payable upon redemption, upon declaration or at Maturity; (ii) interest (when and if due in accordance with the terms of this Indenture) in respect of the Notes and such failure to pay interest continues for a period of 30 calendar days; or (iii) any Excess Cash Payment (when and if due in accordance with the terms of this Indenture) in respect of the Notes and such failure to pay such Excess Cash Payment continues for a period of ten calendar days;" | "Section 6.01.   Events of Default. The term "Event of Default" means, when used herein, any one of the following events:<br><br>(a)    the Issuer or the Guarantors fail to pay any amount of (i) principal in respect of the Notes when the same becomes due and payable upon redemption, upon declaration or otherwise; (ii) interest (when and if due in accordance with the terms of this Indenture) in respect of the Notes and such failure to pay interest continues for a period of 30 calendar days; or (iii) any Excess Cash Payment (when and if due in accordance with the terms of this Indenture) in respect of the Notes and such failure to pay such Excess Cash Payment continues for a period of ten calendar days;" |
| Section 8.01. Discharge of Liability on Notes. | "Section 8.01.   Discharge of Liability on Notes.<br><br>(a)    When (i) the Issuer delivers to the Trustee all Outstanding Notes (other than Notes replaced pursuant to Section 2.11) for cancellation or (ii) all Outstanding | "Section 8.01.   Discharge of Liability on Notes.<br><br>(a)    When (i) the Issuer delivers to the Trustee all Outstanding Notes (other than Notes replaced pursuant to Section 2.11) for cancellation or (ii) all Outstanding Notes have become due and payable and the Issuer deposits in trust, for the benefit of the |

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Igor Bal Almeida Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

| | | |
|---|---|---|
| | Notes have become due and payable and the Issuer deposits in trust, for the benefit of the Holders, with the Trustee finally collected funds sufficient to pay at Maturity all Outstanding Notes and interest thereon (other than Notes replaced pursuant to Section 2.11), and if in any such case the Issuer pays all other sums payable hereunder by the Issuer, then this Indenture, and the obligations of the Issuer and any Guarantor pursuant hereto, shall, subject to Sections 8.01(c) and 8.06, cease to be of further effect.  The Trustee shall acknowledge satisfaction and discharge of this Indenture on demand of the Issuer accompanied by an Officers' Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Issuer." | Holders, with the Trustee finally collected funds sufficient to pay on a Redemption Date, declaration of acceleration or otherwise, all Outstanding Notes and interest thereon (other than Notes replaced pursuant to Section 2.11), and if in any such case the Issuer pays all other sums payable hereunder by the Issuer, then this Indenture, and the obligations of the Issuer and any Guarantor pursuant hereto, shall, subject to Sections 8.01(c) and 8.06, cease to be of further effect.  The Trustee shall acknowledge satisfaction and discharge of this Indenture on demand of the Issuer accompanied by an Officers' Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Issuer." |
| Section 8.02. Conditions to Defeasance. (a) and (b) | "Section 8.02.   Conditions to Defeasance. The Issuer may exercise the legal defeasance option or the covenant defeasance option only if:<br><br>(a)      The Issuer irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "defeasance trust") pursuant to an irrevocable trust and security agreement in form and substance satisfactory to the Trustee, money or U.S. Government Obligations, or a combination thereof, sufficient for the payment of principal of and interest on all the Notes to Maturity or redemption<br><br>(b) The Issuer delivers to the Trustee a certificate from an internationally recognized firm of independent accountants expressing their opinion that the payments of principal of and interest on the Notes when due and without reinvestment on the deposited U.S. Government Obligations plus any deposited money without investment and after payment of all federal, state and local taxes or other charges or assessments in | "Section 8.02.   Conditions to Defeasance. The Issuer may exercise the legal defeasance option or the covenant defeasance option only if:<br><br>(a)      The Issuer irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "defeasance trust") pursuant to an irrevocable trust and security agreement in form and substance satisfactory to the Trustee, money or U.S. Government Obligations, or a combination thereof, sufficient for the payment of principal of and interest on all the Notes when due on a Redemption Date<br><br>(b) The Issuer delivers to the Trustee a certificate from an internationally recognized firm of independent accountants expressing their opinion that the payments of principal of and interest on the Notes when due and without reinvestment on the deposited U.S. Government Obligations plus any deposited money without investment and after payment of all federal, state and local taxes or other charges or assessments in respect thereof payable by the Trustee shall provide cash at such times and in such amounts as shall be sufficient to pay principal of and interest on all the Notes when due on a Redemption Date, declaration of acceleration or otherwise" |

F-8

Este documento foi assinado digitalmente por Ledilaneda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM - ACTIVE 401906103_23]

| | | |
|---|---|---|
| | respect thereof payable by the Trustee shall provide cash at such times and in such amounts as shall be sufficient to pay principal of and interest on all the Notes when due at Maturity or on redemption, as the case may be" | |
| Section 9.01. Modification and Waiver. (a) | "Section 9.01.   Modification and Waiver.<br><br>Modifications and amendments to the Indenture and the Notes may be made by the Issuer, the Guarantors and the Trustee with the consent of the Holders of not less than a majority in aggregate principal amount of the Outstanding Notes at the time that are affected by such amendment, but no such modification or amendment may, without the consent of the Holder of each Note affected thereby:<br><br>(a)      change the stated maturity, principal of or interest on any such Note, reduce the principal amount of any such Note, the rate of interest thereon, if any, or any premium or principal payable upon redemption thereof, change any place where or the currency in which any such Note or the interest, if any, thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity, if any, thereof or the date any such payment is otherwise due and payable (or, in the case of redemption, on or after the Redemption Date);" | "Section 9.01.  Modification and Waiver.<br><br>Modifications and amendments to the Indenture and the Notes may be made by the Issuer, the Guarantors and the Trustee with the consent of the Holders of not less than a majority in aggregate principal amount of the Outstanding Notes at the time  that are affected by such amendment, but no such modification or amendment may, without the consent of the Holder of each Note affected thereby:<br><br>(a)      change the principal of or interest on any such Note, reduce the principal amount of any such Note, the rate of interest thereon, if any, or any premium or principal payable upon redemption thereof, change any place where or the currency in which any such Note or the interest, if any, thereon is payable, or impair the right to institute suit for the enforcement of any such payment thereof or the date any such payment is otherwise due and payable (or, in the case of redemption, on or after the Redemption Date);" |
| Section 10.01.   The Note Guarantee | "Section 10.01. The Guarantee<br><br>Subject to the provisions of this Article, the Guarantors hereby irrevocably, unconditionally, jointly and severally guarantee, on an unsecured basis, the full and punctual payment (whether at Stated Maturity, upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other amounts payable by the Issuer under this Indenture.  Upon failure by the Issuer to pay punctually any such amount, the Guarantors shall forthwith on demand pay | "Section 10.01. The Guarantee<br><br>Subject to the provisions of this Article, the Guarantors hereby irrevocably, unconditionally, jointly and severally guarantee, on an unsecured basis, the full and punctual payment (whether on a Redemption Date upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other amounts payable by the Issuer under this Indenture. Upon failure by the Issuer to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Indenture" |

F-9

Este documento foi assinado digitalmente por Andrea Uchida Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM-ACTIVE 401906103_23]

| | the amount not so paid at the place and in the manner specified in this Indenture" | |
|---|---|---|
| Section 13.08. Legal Holidays. | "Section 13.08. Legal Holidays. In any case where any Interest Payment Date or Redemption Date or date of Maturity of any Note shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Redemption Date or date of Maturity; provided that no interest shall accrue for the period from and after such Interest Payment Date or Redemption Date or date of Maturity, as the case may be." | "Section 13.08. Legal Holidays. In any case where any Interest Payment Date or Redemption Date of any Note shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Redemption Date; provided that no interest shall accrue for the period from and after such Interest Payment Date or Redemption Date, as the case may be." |

F-10

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

[AM_ACTIVE 401906103_23]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código C0BC-A7D3-F402-188B.

# PROTOCOLO DE ASSINATURA(S)

O documento acima foi proposto para assinatura digital na plataforma Portal de Assinaturas Certisign. Para verificar as assinaturas clique no link: https://www.portaldeassinaturas.com.br/Verificar/C0BC-A7D3-F402-188B ou vá até o site https://www.portaldeassinaturas.com.br e utilize o código abaixo para verificar se este documento é válido.

## Código para verificação: C0BC-A7D3-F402-188B



**Hash do Documento**

78AEE81EF79AD6BFC8230FBFE3D89A54018231D01D0054916B1A82878F390C53

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 19/08/2020 é(são) :

☑ Ieda Maria Monteiro (Signatário) - 077.542.738-10  em 19/08/2020
11:14 UTC-03:00
**Tipo:** Certificado Digital



| **Anexo 3.2.3.I** | **Schedule 3.2.3.I** |
|---|---|
| **Condições referentes a Principal, Juros, Pagamentos e Vencimento das Novas Notas | Português** | **Principal, Interest, Payments and Maturity conditions under the New Notes | Portuguese** |

## NOTAS EXISTENTES

| Referência | Juros[3] | Datas de Pagamento de Juros[4] | Valor de Principal em Aberto[5] | Vencimento |
|---|---|---|---|---|
| Notas Seniores 7,00% com vencimento em 2020 | 7,00% | semestralmente, todo dia 21 de abril e de outubro | $82,9 milhões | 21 de abril de 2020 |
| Notas 5,125% com vencimento em 2022 | 5,125% | semestralmente, todo dia 21 de junho e de dezembro | $161,1 milhões | 26 de junho de 2022 |
| Notas 6,00% com vencimento em 2023 | 6,00% | semestralmente todo dia 5 abril e de outubro | $114,3 milhões | 5 de abril de 2023 |
| Notas 4,375% com vencimento em 2025 | 4,375% | semestralmente, todo dia 25 de abril e de outubro | $580,1 milhões | 25 de abril de 2025 |
| Notas 5.250% com vencimento em 2029 | 5,250% | Semestralmente, todo dia 27 de junho e de dezembro | $564,0 milhões | 27 de junho de 2029 |
| Notas 7,125% com vencimento em 2042 | 7,125%, | semestralmente, todo dia 26 de junho e de dezembro | $981,6 milhões | 26 de junho de 2042 |
| Notas 7.500% Perpétuas | 7,500% | pagos trimestralmente, todo dia 14 de março, junho, setembro e dezembro | $870,4 milhões | Perpétuo |

[3] O mesmo que as Notas Existentes.
[4] O mesmo que as Notas Existentes.
[5] Créditos na Data de Assinatura, a serem atualizados até a Data do Protocolo da RE.

## SÉRIE CORRESPONDENTE DE NOVAS NOTAS

| NOTAS EXISTENTES | Juros[6] | Datas de Pagamento de Juros[7] | Valor Inicial de Principal[8] | Vencimento[9] |
|---|---|---|---|---|
| Notas Seniores 7,00% com vencimento em 2020 | 7,00% | semestralmente, todo dia 21 de abril e de outubro | $37,3 milhões | 21 de outubro de 2024 |
| Notas 5,125% com vencimento em 2022 | 5,125% | semestralmente, todo dia 21 junho e de dezembro | $72,5 milhões | 26 de dezembro de 2026 |
| Notas 6,00% com vencimento em 2023 | 6,00%, | semestralmente, todo dia 5 de abril e de outubro | $51,4 milhões | 5 de outubro de 2027 |
| Notas 4,375% com vencimento em 2025 | 4,375%, | semestralmente, todo dia 25 de abril e de outubro | $261,0 milhões | 25 de outubro de 2029 |
| Notas 5.250% com vencimento em 2029 | 5,250% | semestralmente, todo 27 de junho e de dezembro | $253,8 milhões | 27 de dezembro de 2033 |
| Notas 7,125% com vencimento em 2042 | 7,125%, | semestralmente, todo dia 26 de junho e de dezembro | $441,7 milhões | 26 de dezembro de 2046 |
| Notas 7.500% Perpétuas | 7,500%, | pagos trimestralmente, todo dia 14 de março, junho, setembro e dezembro | $391,7 milhões | Perpétuo |

[6] O mesmo que as Notas Existentes.

[7] O mesmo que as Notas Existentes.

[8] Montantes calculados com base no valor de Créditos Data de Assinatura, a serem atualizados até a Data do Protocolo da RE.

[9] A data que cair 4 anos e 6 meses após os vencimentos programados nas Notas Existentes.

## OPÇÕES DE PAGAMENTO DE JUROS

| Período de Opção PIK | Parcela Mínima de Juros em Dinheiro | Parcela Máxima dos Juros como PIK | Adicional PIK |
|---|---|---|---|
| Desde (e incluindo) a Data de Fechamento até (e incluindo) o segundo aniversário da Data de Fechamento | 0,0% | 100,0% | 50% da taxa de juros bancários aplicável |
| Desde (mas excluindo) o segundo aniversário do segundo ano da Data de Fechamento até (e incluindo) o terceiro aniversário da Data de Fechamento | 7,5% | 92,5% | 50% da taxa de juros bancários aplicável |
| Desde (mas excluindo) o terceiro aniversário da Data de Fechamento até (e incluindo) o quarto aniversário da Data de Fechamento | 35,0% | 65,0% | 50% da taxa de juros bancários aplicável |
| Desde (mas excluindo) o quarto aniversário da Data de Fechamento até (e incluindo) o quinto aniversário da Data de Fechamento | 70,0% | 30,0% | 75% da taxa de juros bancários aplicável |

| **Anexo 3.2.3.II** | **Schedule 3.2.3.II** |
|---|---|
| **Condições referentes a Principal, Juros, Pagamentos e Vencimento das Novas Notas \| Inglês** | **Principal, Interest, Payments and Maturity conditions under the New Notes \| English** |

## EXISTING NOTES

| Reference | Interest[10] | Interest Payment Dates[11] | Outstanding Principal Amount[12] | Maturity |
|---|---|---|---|---|
| 7.00% Senior Notes due 2020 | 7.00% | semi-annually, every April and October 21st | $82.9 million | April 21, 2020 |
| 5.125% Notes due 2022 | 5.125% | semi-annually, every June and December 21st | $161.1 million | June 26, 2022 |
| 6.00% Notes due 2023 | 6.00% | semi-annually, every April and October 5th | $114.3 million | April 5, 2023 |
| 4.375% Notes due 2025 | 4.375% | semi-annually, every April and October 25th | $580.1 million | April 25, 2025 |
| 5.250% Notes due 2029 | 5.250% | semi-annually, every June and December 27th | $564.0 million | June 27, 2029 |
| 7.125% Notes due 2042 | 7.125% | semi-annually, every June and December 26th | $981.6 million | June 26, 2042 |
| 7.500% Perpetual Notes | 7.500% | paid quarterly, every March, June, September and December 14th | $870.4 million | Perpetual |

---

[10] *Same as Existing Notes*

[11] *Same as Existing Notes*

[12] *Claims as of the Signature Date, to be updated until the ER Filing Date.*

| EXISTING NOTES | CORRESPONDING SERIES OF NEW NOTES | | | |
| --- | --- | --- | --- | --- |
| | Interest[13] | Interest Payment Dates[14] | Initial Principal Amount[15] | Maturity[16] |
| 7.00% Senior Notes due 2020 | 7.00% | semi-annually, every April and October 21st | $37.3 million | October 21, 2024 |
| 5.125% Notes due 2022 | 5.125% | semi-annually, every June and December 21st | $72.5 million | December 26, 2026 |
| 6.00% Notes due 2023 | 6.00%, | semi-annually, every April and October 5th | $51.4 million | October 5, 2027 |
| 4.375% Notes due 2025 | 4.375% | semi-annually, every April and October 25th | $261.0 million | October 25, 2029 |
| 5.250% Notes due 2029 | 5.250% | semi-annually, every June and December 27th | $253.8 million | December 27, 2033 |
| 7.125% Notes due 2042 | 7.125% | semi-annually, every June and December 26th | $441.7 million | December 26, 2046 |
| 7.500% Perpetual Notes | 7.500% | paid quarterly, every March, June, September and December 14th | $391.7 million | Perpetual |

[13] Same as Existing Notes
[14] Same as Existing Notes
[15] Amounts calculated based on the amount of Claims as of the Signing Date, to be updated until the ER Filing Date.
[16] The date that is 4 years and 6 months after the scheduled maturities in the Existing Notes

## INTEREST PAYMENT OPTIONS

| PIK Option Period | Minimum Share of Interest in Cash | Maximum Share of Interest as PIK | PIK Premium |
|---|---|---|---|
| From (and including) the Closing Date through (and including) the second-year anniversary of the Closing Date | 0.0% | 100.0% | 50% of applicable cash interest rate |
| From (but excluding) the second-year anniversary of the Closing Date through (and including) the third-year anniversary of the Closing Date | 7.5% | 92.5% | 50% of applicable cash interest rate |
| From (but excluding) the third-year anniversary of the Closing Date through (and including) the fourth-year anniversary of the Closing Date | 35.0% | 65.0% | 50% of applicable cash interest rate |
| From (but excluding) the fourth-year anniversary of the Closing Date through (and including) the fifth-year anniversary of the Closing Date | 70.0% | 30.0% | 75% of applicable cash interest rate |

| **Anexo 3.3** | **Schedule 3.3** |
|:---:|:---:|
| **Contrato do Instrumento Holdco \| Português e Inglês** | **Holdco Instrument Agreement \| Portuguese and English** |



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 143

Certifico e dou fé para os devidos fins que, nesta data, me foi apresentado um documento no idioma inglês identificado como "*INDENTURE – ODEBRECHT HOLDCO FINANCE LIMITED*" sendo que traduzo no vernáculo o teor em idioma estrangeiro conforme segue:

## ODEBRECHT HOLDCO FINANCE LIMITED[1]

como Emissor

### THE BANK OF NEW YORK MELLON,
Como Agente Fiduciário, Agente de Pagamentos, Oficial de Registro e Agente de Transferência

### ESCRITURA
Datada de [-] de 2020

Instrumentos com Vencimento em 2058

### ÍNDICE[2]

Página:

ARTIGO 1 DEFINIÇÕES E OUTRAS DISPOSIÇÕES DE APLICAÇÃO GERAL ... 1
    Seção 1.01.    Definições ... 1
    Seção 1.02.    Regras de Interpretação ... 18
    Seção 1.03.    Índice; Títulos ... 19
    Seção 1.04.    Forma dos Documentos Entregues ao Agente Fiduciário ... 19
    Seção 1.05.    Atos dos Titulares ... 19

ARTIGO 2 AS NOTAS ... 20
    Seção 2.01.    Forma e Data ... 20
    Seção 2.02.    Assinatura, Autenticação e Entrega ... 21
    Seção 2.03.    Agente de Transferência, Oficial de Registro e Agente de Pagamentos ... 22
    Seção 2.04.    Agente de Pagamentos para Reter o Dinheiro em Garantia ... 23
    Seção 2.05.    Principal, Vencimento e Juros ... 23

.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 144

| | | |
|---|---|---|
| Seção 2.06. | Distribuições | 23 |
| Seção 2.07. | Distribuição do Montante do Excesso de Caixa Disponível Durante e Após o Período de Excesso de *Cash Sweep* | 24 |
| Seção 2.08. | Eventos de Distribuição Especificados | 25 |
| Seção 2.09. | Pagamento do Principal | 26 |
| Seção 2.10. | Direitos ao Principal Preservados | 27 |
| Seção 2.11. | Listas de Titularidade | 28 |
| Seção 2.12. | Transferência e Troca | 28 |
| Seção 2.13. | Substituição de Valores Mobiliários | 30 |
| Seção 2.14. | Valores Mobiliários Temporários Cancelamento | 31 |
| Seção 2.15. | Cancelamento | 31 |
| Seção 2.16. | Números CUSIP e ISIN | 31 |
| | | |
| **ARTIGO 3 RESGATE E RECOMPRA** | | 31 |
| Seção 3.01. | Vencimento | 31 |
| Seção 3.02. | Resgate Obrigatório | 31 |
| Seção 3.03. | Resgate Opcional | 32 |
| Seção 3.04. | Recompra | 33 |
| Seção 3.05. | Oferta Pública Qualificada da Sociedade | 33 |
| Seção 3.06. | Notificação de Resgate pelo Emissor; Notificação ao Agente Fiduciário | 33 |
| Seção 3.07. | Depósito do Preço de Resgate | 34 |
| | | |
| **ARTIGO 4 OBRIGAÇÕES** | | 34 |
| Seção 4.01. | Pagamentos do Principal e Juros nos termos dos Valores Mobiliários | 34 |
| Seção 4.02. | Manutenção de Escritório ou Agência | 34 |
| Seção 4.03. | Quantia para Pagamentos de Valor Mobiliário a ser Mantido como Garantia | 34 |
| Seção 4.04. | Manutenção da Existência Societária | 36 |
| Seção 4.05. | Cumprimento das Leis | 36 |
| Seção 4.06. | Pagamentos de Montantes Adicionais | 36 |
| Seção 4.07. | Informação Disponível | 38 |
| Seção 4.08. | Demonstrações Financeiras e Requisitos de Relatório | 38 |
| Seção 4.09. | Garantias Adicionais | 39 |
| Seção 4.10. | Limitações e Restrições ao Emissor | 39 |
| Seção 4.11. | Taxas do Agente ou Agente Fiduciário | 40 |
| Seção 4.12. | Cálculos de Pagamento | 40 |
| | | |
| **ARTIGO 5 EVENTOS DE INADIMPLEMENTO E RECURSOS** | | 40 |
| Seção 5.01. | Eventos de Inadimplemento | 40 |

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 145

| Seção 5.02. | Outros Recursos | 42 |
| Seção 5.03 | Controle pela Maioria | 42 |
| Seção 5.04 | Limite de Processos | 43 |
| Seção 5.05 | Direitos dos Titulares de Receber Pagamento | 43 |
| Seção 5.06 | Processo de Cobrança pelo Agente Fiduciário | 43 |
| Seção 5.07 | Agente Fiduciário deve apresentar prova de Pagamento | 44 |
| Seção 5.08 | Prioridades | 44 |

ARTIGO 6 AGENTE FIDUCIÁRIO E AGENTE DE PAGAMENTOS — 45
| Seção 6.01. | Deveres do Agente Fiduciário e Agente de Pagamentos | 45 |
| Seção 6.02. | Direitos do Agente Fiduciário | 46 |
| Seção 6.03. | Direitos Individuais do Agente Fiduciário | 47 |
| Seção 6.04. | Termo de Responsabilidade do Agente Fiduciário | 47 |
| Seção 6.05. | Notificações de Inadimplemento e Eventos de Inadimplemento | 48 |
| Seção 6.06. | Remuneração e Indenização | 48 |
| Seção 6.07. | Substituição do Agente Fiduciário | 49 |
| Seção 6.08. | Agente Fiduciário Sucessor por Incorporação | 50 |
| Seção 6.09. | Elegibilidade; Desqualificação | 50 |

ARTIGO 7 QUITAÇÃO DA ESCRITURA; NULIDADE — 50
| Seção 7.01. | Quitação de Responsabilidade sobre os Valores Mobiliários | 50 |
| Seção 7.02. | Condições para Nulidade | 51 |
| Seção 7.03. | Aplicação do Dinheiro em Garantia | 53 |
| Seção 7.04. | Pagamento para o Emissor | 53 |
| Seção 7.05. | Indenização por Obrigações do Governo dos EUA | 53 |
| Seção 7.06. | Reintegração | |

ARTIGO 8 ADITAMENTOS — 53
| Seção 8.01. | Modificação e Renúncia | 53 |
| Seção 8.02 | Agente Fiduciário para Assinar Aditamentos | 55 |

ARTIGO 09 DISPOSIÇÕES GERAIS — 55
| Seção 9.01. | Disposições de Escritura e Valores Mobiliários para Benefício Exclusivo das Partes e Titulares dos Valores Mobiliários | 55 |
| Seção 9.02. | Notificações | 55 |
| Seção 9.03. | Certificado dos Diretores e Parecer do Advogado quanto às Condições Precedentes | 56 |
| Seção 9.04. | Declarações Necessárias no Certificado dos Diretores ou Parecer do Advogado | 56 |

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 146

Seção 9.05.    Regras do Agente Fiduciário, Oficial de Registro, Agente de    57
Pagamentos e Agente de Transferência
Seção 9.06.    Indenização de Câmbio                                          57
Seção 9.07.    Inexistência de Direito de Regresso Contra Outros             57
Seção 9.08.    Feriados Legais                                               58
Seção 9.09.    Lei Aplicável                                                 58
Seção 9.10.    Consentimento à Jurisdição; Renúncia de Imunidade             58
Seção 9.11.    Sucessores e Cessionários                                     58
Seção 9.12.    Múltiplos Originais                                           58
Seção 9.13.    Cláusulas Independentes                                       59
Seção 9.14.    Força Maior                                                   59

ANEXOS:

ANEXO A - Modelo de Valor Mobiliário

ANEXO B - Modelo de Escritura Complementar

ANEXO C - Modelo de Notificação de Transferência

ANEXO D - Modelo de Certificado para Transferência de Valor Mobiliário Global Restrito ou Valor Mobiliário Certificado com Legenda da Lei de Valores Mobiliários para Valor Mobiliário Global Conforme o Regulamento S ou Valor Mobiliário Certificado sem Legenda da Lei de Valores Mobiliários

ANEXO E - Modelo de Certificado de Transferência para Transferência de Valor Mobiliário Global Conforme o Regulamento S ou Valor Mobiliário Certificado sem Legenda da Lei de Valores Mobiliários para Valor Mobiliário Global Restrito ou Valor Mobiliário Certificado com Legenda da Lei de Valores Mobiliários

ANEXO F - Modelo de Certificado para Remoção da Legenda da Lei de Valores Mobiliários de um Valor Mobiliário Certificado

ESCRITURA, datada de [-] de 2020, entre ODEBRECHT HOLDCO FINANCE LIMITED, uma sociedade isenta de responsabilidade limitada constituída nos termos das leis das Ilhas Cayman, como o Emissor e THE BANK OF NEW YORK, MELLON, como Agente Fiduciário, Agente de Pagamentos, Oficial de Registro e Agente de Transferência.

**CONSIDERANDOS**

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 147

O Emissor autorizou devidamente a emissão de Instrumentos com Vencimento em 2058 (os "Valores Mobiliários"), inicialmente no montante principal total de US$ [-] e autorizou devidamente a formalização desta Escritura.

Efetuou-se tudo que é necessário para fazer dos Valores Mobiliários, quando assinados e autenticados e entregues e devidamente emitidos, as obrigações válidas do Emissor, e fazer desta Escritura um acordo válido do Emissor.

### ASSIM SENDO, PELA PRESENTE ESCRITURA:

Em consideração das premissas e da compra dos Valores Mobiliários pelo seus Titulares, fica acordado o seguinte, em benefício proporcional de todos os Titulares:

ARTIGO 1º
DEFINIÇÕES E OUTRAS DISPOSIÇÕES DE APLICAÇÃO GERAL

Seção 1.01.    *Definições.*

"**Lei**", quando usado a respeito de qualquer Titular, tem o significado especificado na Seção 1.05.

"**Montantes Adicionais**" tem o significado especificado na Seção 4.06.

"**Afiliada**" significa, em relação a qualquer Pessoa especificada, (i) qualquer outra Pessoa que direta ou indiretamente, esteja no controle, seja controlada ou esteja sob controle comum com tal Pessoa especificada ou (ii) qualquer outra Pessoa que seja conselheiro ou diretor (a) da Pessoa especificada, (b) de qualquer Subsidiária da Pessoa especificada ou (c) de qualquer Pessoa descrita na cláusula (i) acima. Para os fins desta definição, "controle" de uma Pessoa significa o poder, direto ou indireto, de dirigir ou causar a direção da administração e políticas de tal Pessoa, seja por contrato ou de outra forma, e os termos "controle" e "controlada" têm significados correlatos ao precedente e, para evitar dúvidas, não se aplica a qualquer instituição financeira ou sociedade fiduciária que, na data de apresentação do ODB RJ, seja um credor de qualquer Parte ODB RJ e tenha recebido ou receberá títulos em relação ao ODB RJ.

"**Rendimentos Líquidos Aplicáveis**" significa o produto de (i) os rendimentos líquidos de uma operação em particular e (ii) a Percentagem de Distribuição do Instrumento.

"**Procedimentos Aplicáveis**" significa os procedimentos aplicáveis da DTC, Euroclear e Clearstream Banking, em cada caso, na medida cabível.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 148

"**Alienação de Ativos**" significa qualquer venda, arrendamento, transferência ou outra alienação (ou uma série de vendas, arrendamentos, transferências ou alienações relacionadas) de ações do Capital Social de uma Subsidiária (exceto as ações qualificadas dos diretores executivos), bens ou outros ativos (cada, a "alienação") pelo garantidor das Novas Notas ou de qualquer de suas Subsidiárias, incluindo qualquer alienação por meio de incorporação, fusão ou operação similar, exceto (1) alienação de bens ou ativos pelo Valor de Mercado no curso normal dos negócios, (2) alienação pela Sociedade ou uma Subsidiária outra Subsidiária da Sociedade e (3) alienação de ativos obsoletos no curso normal dos negócios.

"**Venda de Ativo**" tem o significado especificado na definição nos termos das escrituras das Novas Notas.

"**Agente de Autenticação**" tem o significado especificado na Seção 2.02.

"**Denominação Autorizada**" tem o significado especificado na Seção 2.02.

"**Lei de Falências**" significa (i) o Título 11, do United States Code ou qualquer lei federal ou estadual similar dos EUA para alívio de devedores, ajuste de dívida ou administração ou liquidação dos bens de devedores em benefício de seus credores e (ii) a Lei de Falências brasileira ou qualquer outra lei federal ou outra lei estadual aplicável das Ilhas Cayman ou brasileira similar para alívio de devedores, ajuste de dívida ou administração ou liquidação de bens de devedores em benefício de seus credores e, para evitar dúvidas, qualquer esquema de acordo submetido a juízo ou recuperação extrajudicial ou recuperação judicial será considerado como tendo ocorrido de acordo com a Lei de Falências para todos os fins desta Escritura de Emissão.

"**Evento de Falência ou Insolvência**" significa, aplicado a qualquer Pessoa, a declaração de falência, insolvência, falência declarada, autofalência, recuperação judicial ou extrajudicial ou outra lei semelhante em vigor agora ou posteriormente, incluindo, sem limitação, qualquer processo que busque a nomeação de um depositário judicial, administrador judicial, liquidante, custodiante, cessionário, expropriador ou outro oficial semelhante dela ou de qualquer parte significativa de seus ativos, ou a liquidação dessa Pessoa.

"**Valor de Face Base**" significa, na Data de Emissão e na data de determinação em qualquer momento antes do fechamento de uma Oferta Pública de Aquisição Qualificada, o Valor de Face na Data de Emissão.

Após o fechamento de uma Oferta Pública de Aquisição Qualificada, o Valor de Face Base será igual ao Valor de Face em aberto após o fechamento dessa Oferta Pública de Aquisição Qualificada.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 149

**"Percentual de Distribuição do Instrumento Base"** significa, na Data de Emissão e na data de determinação em qualquer momento antes do fechamento de uma Oferta Pública de Aquisição Qualificada, o produto de (A) 50% e (B) 100% menos a diluição acumulada (expressa em uma percentagem) das ações de propriedade do Emissor na Sociedade desde a Data de Emissão, devida em qualquer venda ou emissão (primária ou secundária) das ações da Sociedade, em cada caso, por contraprestação devida de, no mínimo, US$200 milhões.

Após o fechamento da Oferta Pública de Aquisição Qualificada, o Percentual de Distribuição do Instrumento Base será igual ao produto de:

(a) a razão (expressa como um percentual) de (i) o Percentual Não Ofertado para (ii) a soma de (x) o Percentual Não Ofertado e (y) um valor igual a 100% menos o Percentual de Distribuição do Instrumento então em vigor imediatamente anterior ao fechamento dessa Oferta Pública de Aquisição Qualificada; e

(b) 100% menos a diluição acumulada (expressa como um percentual) das ações de propriedade do Emissor na Sociedade desde o fechamento dessa Oferta Pública de Aquisição Qualificada devido a qualquer venda ou emissão (primária ou secundária) das ações da Sociedade, em cada caso, por contraprestação devida de, no mínimo, US$200 milhões.

**"Sociedade Licitante"** significa uma Subsidiária da Sociedade, cujo capital é propriedade da Sociedade e qualquer outra Pessoa ou Pessoas que não sejam Afiliadas da Sociedade, com o único objetivo de licitar direta ou indiretamente em projetos de construção.

**"Conselho de Administração"** significa, conforme o caso, o Conselho de Administração do Emissor ou qualquer comitê do mesmo devidamente autorizado para atuar em nome desse Conselho de Administração.

**"Deliberação do Conselho"** significa uma cópia de uma deliberação certificada pelo secretário, secretário adjunto ou outro Diretor ou advogado que desempenha funções societárias secretariais do Emissor a ter sido devidamente aprovada pelo Conselho de Administração e a entrar em vigor na data da certificação e de entrega ao Agente Fiduciário.

**"Brasil"** significa a República Federativa do Brasil.

**"Lei Brasileira de Falências"** significa a Lei Federal do Brasil nº 11.101, de 9 de fevereiro de 2005, conforme aditada de tempos em tempos.

**"GAAP Brasileiro"** significa, coletivamente, os princípios contábeis prescritos pela Lei Brasileira de Sociedades, as normas e regulamentos emitidos pelos reguladores aplicáveis, incluindo a

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 150

CVM, bem como as liberações técnicas emitidas pelo Instituto Brasileiro de Contadores, conforme o caso, em vigor de tempos em tempos.

"**Dia Útil**" significa qualquer dia, exceto sábado, domingo ou feriado ou um dia no qual instituições bancárias ou sociedades trustes estejam autorizadas ou obrigadas por lei a fechar na Cidade de Nova Iorque ou São Paulo, Brasil.

"**Capital Social**" significa, conforme aplicado a qualquer Pessoa, todas e quaisquer ações, participações, direito de compra, bônus de subscrição, opções ou outros equivalentes ou participações (independentemente de como sejam designados), incluindo qualquer Ação Preferencial, mas excluindo quaisquer títulos de dívida conversíveis ou permutáveis por tal patrimônio.

"**Ilhas Cayman**" significa as Ilhas Cayman, um território do Reino Unido da Grã-Bretanha e Irlanda do Norte.

"**Valor Mobiliário Certificado**" tem o significado especificado na Seção 2.01.

"**Mudança de Controle**" significa a ocorrência de qualquer dos seguintes:

(a)       qualquer "pessoa" ou "grupo" (conforme tais termos são usados para os fins das Seções 13(d) e 14(d) da Exchange Act, exceto Titulares Autorizados) que é ou se torna o "beneficiário efetivo" (conforme tal termo é usado nas Regras 13d-3 da Exchange Act), direta ou indiretamente, de mais de 50% do poder total de voto das Ações com Direito a Voto da Sociedade ou do Emissor, inclusive como resultado de qualquer operação de incorporação ou fusão, incluindo a Sociedade;

(b)       qualquer "pessoa" ou "grupo", exceto qualquer Titular Autorizado que adquire capacidade de eleger a maioria do conselho de administração da Sociedade ou do Emissor;

(c)       qualquer Titular Autorizado, direta ou indiretamente, que deixa de ter o poder de dirigir ou causar a direção da administração e políticas da Sociedade ou do Emissor, seja através da propriedade de valores mobiliários com direito a voto, por contrato ou de outra forma; ou

(d)       mais de 50% do poder total de voto das Ações com Direito a Voto da Sociedade ou do Emissor que foram vendidos ou emitidos como resultado de uma operação relevante para qualquer "pessoa" ou "grupo", exceto para um Titular Autorizado.

"**Operação de Mudança de Controle**" tem o seu significado especificado na Seção 3.02.

"**Clearstream Banking**" significa a Clearstream Bankin, *société anonyme*.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
#### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 151

"**Data de Fechamento**" significa [-] de 20[-], ou tal data posterior na qual os Valores Mobiliários serão emitidos nos termos deste documento.

"**Sociedade**" ou "**OEC**" significa a OEC S.A.

"**Data de Conclusão**" significa, em conexão com o exercício do Direito de Oferta Pública Qualificada, a data em que o Capital Social foi emitido para os Titulares.

"**Declaração de Solicitação de Consentimento**" significa a declaração de solicitação de consentimento emitida em 15 de junho de 2020 pela Odebrecht Engenharia e Construção S.A., entre outras.

"**Obrigação Contingente**" significa qualquer obrigação, contingente ou não, de qualquer pessoa, direta ou indiretamente, garantindo qualquer Endividamento ou outra obrigação de qualquer pessoa e qualquer obrigação, direta ou indireta, contingente ou não, de tal pessoa (1) de comprar ou pagar (ou adiantar ou fornecer recursos para a compra ou pagamento de) tal Endividamento ou outra obrigação de tal pessoa (decorrente de acordos de parceria ou de acordo, para comprar ativos, bens, valores mobiliários ou serviços, aceitar ou pagar, ou para manter as condições das demonstrações financeiras ou de outra forma) ou (2) celebradas para assegurar de qualquer outra maneira, o credor de tal Endividamento ou outra obrigação do pagamento do mesmo, ou para proteger tal credor contra perdas em relação a mesma (no todo ou em parte); *ressalvado*, *no entanto*, que o termo "Obrigações Contingentes" não inclua endossos para cobrança ou depósito no curso normal dos negócios ou qualquer operação semelhante.

"**Escritório do Truste Corporativo**" significa o escritório do Agente Fiduciário no qual, em qualquer momento em particular, seu truste corporativo será essencialmente administrado (escritório este que, na data desta Escritura, está localizado em 240 Greenwich Street, 7º Andar Leste, Nova York, NY 10286).

"**Opção de Nulidade de Obrigação**" tem o significado especificado na Seção 7.01.

"**CVM**" significa a Comissão de Valores Mobiliários do Brasil.

"**Inadimplemento**" significa qualquer evento que é, ou após notificação ou passagem do tempo ou ambos, seria um Evento de Inadimplemento.

"**Truste de Nulidade**" tem o significado especificado na Seção 7.02.

"**Moeda de Denominação**" tem o seu significado especificado na Seção 9.06.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                     fls. 152

"**Depositário**" significa a DTC ou qualquer depositário sucessor para os Valores Mobiliários.

"**Projeto de Desenvolvimento**" significa qualquer projeto de construção, desenvolvimento ou infraestrutura, incluindo, sem limitação, projetos *greenfield* e *brownfield*, nos quais a Sociedade ou qualquer uma de suas Subsidiárias participa ou detém, direta ou indiretamente, uma participação ou licitação em qualquer um desses projetos.

"**Distribuição**" significa qualquer distribuição feita pela Sociedade ao Emissor, direta ou indiretamente, seja na sua qualidade de acionista ou credor da Sociedade, incluindo, sem limitação, distribuições por meio de dividendos, Juros sobre o Capital, resgate de capital, pagamento de empréstimos entre sociedades ou outro.

"**Dólares**" e o símbolo "**US$**" significam, cada um, dinheiro imediatamente transferível e legal dos Estados Unidos.

"**DTC**" significa Depository Trust Company.

"**EBITDA**" significa, para qualquer período, para a Sociedade e suas Subsidiárias em uma base consolidada, a Receita Líquida, menos (i) custo de vendas e serviços prestados, (ii) despesas gerais e administrativas, mais qualquer depreciação ou amortização incluída no custo de vendas e serviços prestados ou despesas gerais e administrativas e (iii) pagamentos efetuados pela Sociedade ou por suas Subsidiárias, tomadas como um todo em relação à Multas.

"**Participações Societárias**" significa o Capital Social e todos os bônus de subscrição, opções ou outros direitos de adquirir Capital Social (mas excluindo qualquer debênture que seja conversível ou permutável por Capital Social).

"**Valor Patrimonial**" tem seu significado especificado na Seção 3.02.

"**Euroclear**" significa Euroclear Bank S.A./N.V.

"**Evento de Inadimplemento**" tem o significado que lhe é atribuído na Seção 5.01.

"**Montante de Excesso de Caixa**" significa, a partir de qualquer Data de Medição de Excesso de Caixa, (a) o montante total de Caixa Irrestrito, menos (b) a soma (i) do Limite de Caixa Mínimo aplicável correspondente a tal Data de Medição de Excesso de Caixa, (ii) do montante total dos pagamentos programados devidos pela Sociedade e suas Subsidiárias, tomados como um todo, de acordo com (x) as Novas Notas e (y) qualquer outro Endividamento Permitido, conforme o caso, no período subsequente de 12 (doze) meses, (iii) despesas projetadas para o Emissor das Novas Notas para conduzir suas operações durante o período subsequente de 12 (doze) meses, incluindo quaisquer despesas de

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 153

conversão de moeda estrangeira, e (iv) para qualquer Data de Medição de Excedente de Caixa até (e inclusive) 31 de dezembro de 2024, quaisquer Multas devidas pela Sociedade e suas subsidiárias pelo período subsequente de 12 (doze) meses; menos (c) o montante igual ao Ajuste do Valor Bruto Necessário; *ressalvado*, que quaisquer itens já deduzidos do caixa e dos investimentos de curto prazo da Sociedade e de suas Subsidiárias para fins de determinação do Caixa Irrestrito não sejam deduzidos novamente para fins de determinação do Montante de Excesso de Caixa.

"**Montante de Excesso de Caixa Disponível**" o montante em Dólares pelo qual o Montante de Excesso de Caixa, em qualquer Data de Medição de Excesso de Caixa, excede zero, se houver.

"**Data de Medição de Excesso de Caixa**" significa o final de cada ano fiscal, enquanto os Valores Mobiliários estiverem em circulação, com início em 31 de dezembro de 2020.

"**Pagamentos de Excesso de Caixa**" significa quaisquer pagamentos feitos aos Titulares em relação aos Montantes de Excesso de Caixa Disponíveis, independentemente se durante ou após o Período de Excesso de *Cash Sweep*.

"**Data de Pagamento de Excesso de Caixa**" significa 15 de maio de cada ano fiscal no qual é realizado o Pagamento de Excesso de Caixa.

"**Período de Excesso de *Cash Sweep***" significa, a partir de 1º de janeiro de 2021, cada ano fiscal no qual o Índice de Dívida Líquida para EBITDA for igual ou superior a 3,00 para 1,00, a partir da Data de Medição de Excesso de Caixa imediatamente anterior e finalizado na Data de Medição de Excesso de Caixa, doze meses antes de um Evento de Encerramento de Excesso de *Cash Sweep*.

"**Evento de Encerramento de Excesso de *Cash Sweep***" significa a primeira Data de Medição de Excesso de Caixa em relação à qual o Índice de Dívida Líquida para EBITDA é inferior a 3,00 para 1,00.

"**Exchange Act**" significa o U.S. Securities Exchange Act de 1934, conforme aditado.

"**Valor de Face**" significa o valor de face total declarado dos Valores Mobiliários que, na Data de Emissão, é de US$ [-] milhões. Para evitar dúvidas, cada Valor Mobiliário representa uma alocação de US$1,00 no Valor Face dos Valores Mobiliários (conforme tais valores sejam ajustados para baixo de acordo com os termos desta Escritura.

"**Valor Justo de Mercado**" significa, em relação a qualquer Pessoa, o valor que seria pago por um comprador disposto a um vendedor disposto não afiliado, conforme determinado de boa-fé a preços de mercado (i) para qualquer montante da operação superior a US$ 25,000,000, a diretoria ou conselho de administração, conforme o caso, ou (ii) de outra forma, por um diretor autorizado, conforme o caso;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 154

dessa Pessoa (a menos que previsto de outra forma nesta Escritura em relação a contraprestação que não seja em caixa recebida em conexão com um Evento de Distribuição Especificado).

"**Multas**" significa todos e quaisquer valores devidos (diretamente ou por meio de garantias) pela Sociedade ou qualquer de suas Subsidiárias por multas, penalidades, sentenças ou pagamentos de liquidação impostos por, ou acordados, com qualquer Autoridade Governamental ou instituições financeiras multilaterais e bancos de desenvolvimento  como resultado de qualquer conduta factual ou alegada ilegal por parte da Sociedade ou de qualquer uma de suas Afiliadas ou de qualquer de seus respectivos diretores, funcionários, agentes ou representantes anteriores ou atuais.

"**Fitch**" significa a Fitch Rating Service, Inc. e seus sucessores.

"**Totalmente Diluído**" significa todas as ações em circulação do Capital Social, todas as Ações do Capital Social emissível a respeito de todos os valores mobiliários conversíveis ou permutáveis por ações ordinárias e todas as ações do Capital Social emissíveis em relação a todas as opções, bônus de subscrição e outros direitos de adquirir ações ordinárias em circulação; ressalvado que, se qualquer das ações acima do Capital Social estiver sujeita a investidura, essas ações do Capital Social sujeitas à investidura serão inclusas na definição de "Totalmente Diluído" somente após e na medida dessa investidura.

"**Valor Mobiliário Global**" significa uma nota global que representa os Valores Mobiliários substancialmente na forma anexada aqui como ANEXO A.

"**Garantia**" significa qualquer obrigação, contingente ou não, de qualquer Pessoa, direta ou indiretamente, garantindo qualquer Endividamento ou outra obrigação de qualquer Pessoa e qualquer obrigação, direta ou indireta, contingente ou não, de tal Pessoa (i) de comprar ou pagar (ou adiantar ou fornecer recursos para a compra ou pagamento de) tal Endividamento ou outra obrigação de tal Pessoa (decorrente de acordos de parceria ou de acordo, para comprar ativos, bens, valores mobiliários ou serviços, aceitar ou pagar, ou para manter as condições das demonstrações financeiras ou de outra forma) ou (ii) celebradas para assegurar de qualquer outra maneira, o credor de tal Dívida ou outra obrigação do pagamento do mesmo, ou para proteger tal credor contra perdas em relação a mesma (no todo ou em parte); *ressalvado*, no entanto, que o termo "garantia" não inclua endossos para cobrança ou depósito no curso normal dos negócios. O termo "garantir" tem significado correspondente.

"**Autoridade Pública**" significa qualquer governo, departamento governamental, comissão, conselho, escritório, agência, autoridade reguladora, órgão judicial ou administrativo, nacional ou estrangeira, federal, estadual ou local, com jurisdição sobre o assunto ou assuntos em questão, incluindo sem limitação, no Brasil e nos Estados Unidos. Para evitar dúvidas, a Petrobrás não será considerada uma Autoridade Pública.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                          fls. 155

"**Obrigações de Hedge**" de qualquer Pessoa significa as obrigações de tal Pessoa de acordo com qualquer contrato de swap de taxa de juros, contrato de câmbio de moeda estrangeira, contrato do teto da taxa de juros, contrato de opção ou futuros ou outro contrato ou acordo similar elaborado para proteger tal Pessoa contra alterações nas taxas de juros ou taxas de câmbio.

"**Titular**" significa a Pessoa em cujo nome um Valor Mobiliário está registrado nos livros do Oficial de Registro.

"**Endividamento**" significa, com relação a qualquer Pessoa, em qualquer data de determinação (sem duplicação):

(a)      o principal em relação ao endividamento dessa Pessoa por dinheiro emprestado;

(b)      o principal e o prêmio, se houver, em relação às obrigações de tal Pessoa comprovados por títulos, debêntures, notas ou outros instrumentos similares;

(c)      todas as obrigações de tal Pessoa de pagar o preço de compra diferido e não integralizado dos Bens (exceto contas a pagar e obrigações Contingentes de pagamento de *earn-outs*), cujo preço de compra é devido mais de seis meses após a data de colocação dos Bens em serviço ou entrega e seu título;

(d)      todas as obrigações de reembolso de tal Pessoa em relação ao valor nominal de cartas de crédito ou outros instrumentos similares (exceto obrigações relativas a obrigações de garantia de cartas de crédito (exceto as descritas nas cláusulas (a) a (c) acima) celebradas no curso normal dos negócios dessa Pessoa, como créditos tributários de importação e operações de importação, na medida em que tais cartas de crédito não sejam utilizadas ou, se e na medida em que forem utilizadas, esse saque será reembolsado até o terceiro dia útil seguinte ao recebimento por tal Pessoa de uma solicitação de reembolso após o pagamento na carta de crédito);

(e)      todo o endividamento de outras Pessoas garantidas por um Ônus sobre qualquer ativo de tal Pessoa, independentemente de tal endividamento ser assumido ou não por tal Pessoa; *ressalvado, no entanto*, que o montante de endividamento de tal Pessoa seja o menor: (a) do Valor de Mercado de tal ativo na data da determinação; e (b) do montante de tal endividamento dessas outras Pessoas;

(f)      na medida em que não esteja de outra forma incluído nesta definição, todas as Obrigações de Hedge de tal Pessoa;

(g)      todas as obrigações de arrendamento capitalizadas de tal Pessoa; e

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 156

(h)       todas as obrigações do tipo referido nas cláusulas (a) a (g) acima de outras Pessoas que sejam garantidas por tal Pessoa, conforme o caso, se e na medida em que algum dos itens anteriores apareceria como um passivo em um balanço patrimonial não consolidado da Pessoa especificada, elaborado de acordo com o GAAP Brasileiro.

Não obstante qualquer disposição em contrário neste documento, e para evitar dúvidas, o Endividamento não incluirá contas a pagar decorrentes do curso normal dos negócios, desde que tais contas a pagar sejam devidas no prazo de 180 (cento e oitenta) dias corridos a partir da data em que as respectivas mercadorias forem entregues ou os respectivos serviços forem prestados e não vencidos, nem quaisquer obrigações para com qualquer Pessoa em relação a qualquer contrato de pagamento de imposto celebrado com qualquer Autoridade Pública.

"**Escritura**" significa esta Escritura, conforme aditada ou complementada de tempos em tempos de acordo com as disposições deste instrumento.

"**Percentual de Distribuição do Instrumento**" significa, em qualquer data de determinação, 9ª) o Percentual de Distribuição do Instrumento Base multiplicado por (b) o Percentual do Instrumento em Aberto em vigor nessa data de determinação.

"**Acordo Entre Sociedades**" significa o acordo a respeito do tratamento de certos saldos entre sociedades existentes celebrado em 11 de junho de 2020, entre ODBINV S.A. - Em Recuperação Judicial, Odebrecht S.A. - Em Recuperação Judicial e Odebrecht Engenharia e Construção S.A., conforme descrito de forma geral e resumido em "A Restruturação – Tratamento das Reivindicações Entre Sociedades" da Declaração de Solicitação de Consentimento.

"**Juros sobre o Capital**" significa juros sobre o capital próprio pagos conforme a Lei brasileira nº 9249/95, conforme possa ser aditada ou substituída.

"**Investimento**" significa, a respeito de qualquer Pessoa, todos os investimentos diretos ou indiretos por essa Pessoa em outras Pessoas (incluindo Afiliadas) na forma de adiantamentos, empréstimos ou outras extensões de crédito, incluindo a título de garantia ou acordos semelhantes (exceto adiantamentos), a clientes ou fornecedores, no curso normal dos negócios e de acordo com a prática anterior, que são registrados como contas a receber, despesas antecipadas ou depósitos no balanço patrimonial de um credor) ou contribuição de capital para (por meio de qualquer transferência de dinheiro ou outros bens para terceiros ou qualquer pagamento por bens ou serviços por conta ou uso de terceiros), despesas de capital, ou a constituição de uma garantia de qualquer obrigação de, ou qualquer compra ou aquisição de Capital Social, Endividamento ou outros instrumentos semelhantes emitidos por essas outras Pessoas e todos os outros itens que são ou seriam classificados como investimentos em um balanço patrimonial elaborado com base no GAAP Brasileiro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 157

Se o Emissor, a Sociedade ou qualquer Subsidiária emitir, vender ou de outra forma alienar qualquer Capital Social de uma Pessoa que é uma Subsidiária de tal forma que, após dar efeito a isso, essa Pessoa não seja mais uma Subsidiária da Sociedade ou de qualquer de suas Subsidiárias, qualquer Investimento pelo Emissor ou qualquer Subsidiária em tal Pessoa remanescente após a sua entrada em vigor será considerado um novo Investimento em tal momento.

"**Emitir**" significa emitir, assumir, garantir, incorrer ou de outra forma tornar-se responsável; *ressalvado, no entanto*, que qualquer Endividamento ou Capital Social de uma Pessoa existente no momento em que tal Pessoa se torna uma Subsidiária (seja por incorporação, fusão, aquisição ou de outra forma) será considerado emitido por essa Subsidiária no momento em que se tornar Subsidiária; e o termo "emissão" tem significado correspondente.

"**Data de Emissão**" significa [-] de 2020.

"**Ordem do Emissor**" significa uma ordem escrita assinada em nome da Sociedade pelo diretor executivo, pelo diretor financeiro ou por qualquer outro Diretor do Emissor.

"**Emissor**" significa Odebrecht Holdco Finance Limited, uma sociedade isenta com responsabilidade limitada constituída nos termos das leis das Ilhas Cayman, até ser substituída por seu sucessor, e após então, inclui seu sucessor para fins de qualquer disposição contida neste instrumento.

"**Acionista Emissor**" significa o beneficiário final e legal de 100% das ações emitidas no capital da Sociedade.

"**Moeda de Decisão**" tem seu significado especificado na Seção 9.06.

"**Lei**" significa, a respeito de qualquer Pessoa (i) qualquer estatuto, lei, regulamento, portaria, norma, julgamento, decreto, permissão, concessão, franquia, licença, acordo ou outra restrição pública ou qualquer interpretação ou administração de qualquer das anteriores por qualquer Autoridade Pública (incluindo, sem limitação, Aprovações Públicas) e (ii) qualquer diretriz, orientação, política, requisito ou outra forma semelhante de decisão ou determinação por qualquer Autoridade Pública que vincula essa Pessoa, conforme o caso, em vigor agora ou posteriormente.

"**Opção de Nulidade legal**" tem o significado que lhe é atribuído na Seção 7.01.

"**Ônus**" significa qualquer hipoteca, penhor, garantia real, oneração, penhor ou ônus de qualquer espécie (incluindo alienação fiduciária, cessão fiduciária, hipoteca, penhor e anticrese, venda condicional ou outro contrato de retenção de título ou arrendamento na natureza do mesmo).

"**Montante de Resgate Obrigatório**" tem seu significado especificado na Seção 3.02.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 158

"**Notificação de Resgate Obrigatório**" tem seu significado especificado na Seção 3.02.

"**Efeito Adverso Material**" significa um efeito adverso material sobre (i) os ativos, a situação comercial ou financeira da Sociedade e de suas Subsidiárias (tomadas como um todo) ou (ii) a capacidade do Emissor de efetuar pagamentos em tempo hábil do Montante de Resgate e Pagamentos sobre os Valores Mobiliários.

"**Vencimento**" significa a data na qual o principal e o prêmio, se houver, dos Valores Mobiliários vencem integralmente de acordo com esta Escritura, seja na Data de Vencimento Indicado, ou mais cedo no resgate, por declaração de vencimento antecipado ou de outra forma.

"**Limite de Caixa Mínimo**" significa (a) qualquer Data de Medição de Excedente de Caixa que ocorra até a data em que as demonstrações financeiras auditadas da Sociedade para o ano fiscal de 2024 forem emitidas, US$ 200.000.000,00 e (b) para qualquer Data de Medição de Excesso de Caixa ocorrendo após a data em que as demonstrações financeiras auditadas da Sociedade para o ano fiscal de 2024 forem emitidas, o montante estabelecido na coluna da tabela abaixo denominada "Limite Mínimo de Caixa" correspondente ao montante aplicável (conforme estabelecido na coluna na tabela abaixo denominada "Receita Líquida") da Receita Líquida acumulada pela Sociedade e suas Subsidiárias em uma base consolidada durante o último ano fiscal concluído mais recentemente para o qual tais demonstrações financeiras foram emitidas:

| Receita Líquida | Limite de Caixa Mínimo |
|---|---|
| Menos de US$ 5.000.000.000,00 | US$ 200.000.000,00 |
| Pelo menos US$ 5.000.000.000,00, mas menos que US$ 6.000.000.000,00 | US$ 225.000.000,00 |
| Pelo menos US$ 6.000.000.000,00, mas menos que US$ 7.000.000.000,00 | US$ 250.000.000,00 |
| Pelo menos US$ 7.000.000.000,00, mas menos que US$ 7.000.000.000,00 | US$ 275.000.000,00 |
| US$ 8.000.000.000,00 ou mais | US$ 300.000.000,00 |

"**Rendimentos de Caixa Líquido**" significa, em relação a qualquer emissão ou venda de Capital Social, Venda de Ativos ou venda ou outra alienação de qualquer Investimento, conforme aplicável, o rendimento de caixa recebido dessa emissão ou venda (incluindo, conforme aplicável, quaisquer pagamentos em dinheiro recebidos por meio de pagamento diferido do principal de acordo com uma nota promissória ou parcelamento a receber ou de outra forma, e os rendimentos líquidos da venda ou

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.
Este documento foi assinado digitalmente por Ieda Maria Monteiro.



### IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 159

outra alienação de quaisquer valores mobiliários recebidos como contraprestação, mas apenas como e quando recebidos, mas excluindo qualquer outra contraprestação recebida na forma de assunção pela pessoa que adquiriu de Endividamento ou outras obrigações relacionadas aos bens ou ativos que são objeto de tal venda ou recebidas em qualquer outra forma que não seja em dinheiro), conforme o caso, líquido de:

(a)      todas as despesas legais, contábeis, bancárias de investimento, tributárias de títulos e registros, comissões e outras taxas e despesas incorridas e todos os impostos pagos, razoavelmente estimados como sendo efetivamente devidos ou acumulados como passivo de acordo com o GAAP brasileiro (incluindo, para evitar dúvidas, quaisquer rendas, impostos retidos na fonte e outros impostos devidos como resultado da distribuição de tais rendimentos à Sociedade ou suas Subsidiárias, e depois de levar em consideração quaisquer créditos ou deduções tributárias disponíveis e quaisquer acordos de partilha fiscal), como consequência de tal emissão ou venda; e

(b)      todos os pagamentos feitos sobre qualquer Endividamento garantido por quaisquer ativos sujeitos a tal venda, de acordo com os termos de qualquer Ônus sobre tais ativos ou que, pela lei aplicável, esteja sendo pago a partir dos recursos provenientes de tal venda.

"**Dívida Líquida**" significa, a partir de qualquer data de determinação, o montante total de Endividamento (exceto o Endividamento entre companhias, entre a Sociedade e suas Subsidiárias) da Sociedade e suas subsidiárias, mais quaisquer pagamentos programados devidos pela Sociedade ou suas Subsidiárias para Multas, menos a soma de caixa e equivalentes de caixa, incluindo valores mobiliários negociáveis.

"**Índice da Dívida Líquida para EBITDA**" significa o índice de Dívida Líquida para EBITDA referente ao ano fiscal mais recentemente concluído, sujeito a ajustes para Alienações de Ativos investimentos realizados durante o período.

"**Receita Líquida**" significa por qualquer período, todas as receitas líquidas e outras rendas operacionais da Sociedade e de suas Subsidiárias em uma base consolidada.

"**Novas Notas**" significa, em conjunto, cada uma das seguintes séries de as notas sênior não garantidas denominadas em dólares dos Estados Unidos a serem emitidas pelo Emissor das Novas Notas conforme o Plano de Recuperação: (a) 7,000% das notas com vencimento em 21 de outubro de 2020 (vencimento original em 21 de abril de 2020), (b) 5,125% das notas com vencimento em 26 de dezembro de 2026 (vencimento original em 26 de junho de 2020), (c) 6,000% das notas com vencimento em 05 de outubro de 2027 (vencimento original em 05 de abril de 2023), (d) 4,375% das notas com vencimento em 25 de outubro de 2029 (vencimento original em 25 de abril de 2025), (e) 5,250% das notas com vencimento em 27 de dezembro de 2033 (vencimento original em 27 de junho de 2029), (f) 7,125% das

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 160

notas com vencimento em 26 de dezembro de 2046 (vencimento original em 26 de junho de 2042) e (g) 7,000% das notas perpétuas.

"**Emissor das Novas Notas**" significa OEC Finance Limited, uma sociedade isenta de responsabilidade limitada constituída nos termos das leis das Ilhas Cayman, até ser substituída por seu sucessor, e após então, inclui o sucessor para fins de qualquer disposição contida neste instrumento.

"**Percentual Não Ofertado**" significa, a respeito de qualquer oferta pública de aquisição, o produto de (i) o Percentual de Distribuição do Instrumento então em vigor imediatamente antes dessa oferta pública de aquisição multiplicado por (ii) a proporção do Valor de Face dos Valores Mobiliários em circulação que não são efetivamente oferecidos nessa oferta pública de aquisição.

"**ODB RJ**" significa a reestruturação judicial da Odebrecht S.A. - Em Recuperação Judicial e algumas de suas Subsidiárias e Afiliadas (cada uma, uma "Parte ODB RJ").

"**Parte ODB RJ**" tem o significado atribuído a esse termo na definição de "ODB RJ".

"**Diretor**" significa o presidente ou diretor-presidente, qualquer vice-presidente, o diretor financeiro, o tesoureiro ou qualquer tesoureiro adjunto, ou o secretário ou secretário adjunto do Emissor, ou qualquer outra Pessoa devidamente nomeada pelos acionistas do Emissor ou Conselho de Administração para desempenhar funções societárias, incluindo, sem limitação, qualquer Conselheiro do Emissor.

"**Certificado do Diretor**" significa, a respeito do Emissor, um certificado assinado por quaisquer dois Diretores do Emissor, um dos quais será o diretor-presidente, ou diretor financeiro ou diretor de operações) e, a respeito da Sociedade, um certificado assinado pelo diretor financeiro ou, a menos que especificado de outra forma, o diretor contábil da Sociedade e, em cada caso, entregue ao Agente Fiduciário.

"**Parecer do Advogado**" significa um parecer por escrito de advogado de reputação reconhecida (o qual pode ser um funcionário do Emissor ou advogado deste) e que será aceitável para o Agente Fiduciário, cujo parecer seja satisfatório para o Agente Fiduciário.

"**Montante de Resgate Obrigatório**" tem seu significado especificado na Seção 3.03.

"**Notificação de Resgate Obrigatório**" tem seu significado especificado na Seção 3.03.

"**Atos Constitutivos**" significa, a respeito de qualquer Pessoa, o Memorando de Constituição ou ata de constituição ou outro ato constitutivo semelhante, o estatuto social ou outro documento semelhante, e quaisquer outros documentos que regem a constituição e organização dessa Pessoa.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 161

**"Percentual do Instrumento em Aberto"** significa, na data de determinação, a razão (expressa em percentual) de (A) o Valor de Face em aberto nessa data de determinação para (B) o Valor de Face Base.

**"Em Circulação"** significa, quando usada em relação aos Valores Mobiliários, na data de determinação, todos os Valores Mobiliários autenticados e entregues nos termos desta Escritura, exceto:

(a)   Valores Mobiliários cancelados pelo Agente Fiduciário ou entregues ao Agente Fiduciário para cancelamento;

(b)   Valores Mobiliários para os quais o valor de pagamento ou resgate na quantia necessária foi depositado com o Agente Fiduciário ou qualquer Agente de Pagamentos (exceto o Emissor) em truste ou separado em truste pelo Emissor (se um Emissor agir como seu próprio Agente de Pagamentos) para os Titulares desses Valores Mobiliários; ressalvado que, se esses Valores Mobiliários forem resgatados conforme a Seção 3.03, uma notificação desse resgate tenha sido devidamente enviada conforme esta Escritura ou disposição para isso, satisfatória para o Agente Fiduciário tenha sido feita;

(c)   Valores Mobiliários, exceto na medida *prevista* nas Seções 7.01 e 7.02, a respeito das quais o Emissor efetuou nulidade legal e/ou de Obrigações, *conforme previsto* no Artigo 7; e

(d)   Valores Mobiliários em troca dos quais outros Valores Mobiliários foram autenticados e entregues conforme esta Escritura, exceto tais Valores Mobiliários a respeito dos quais terão sido apresentados aos Agente Fiduciário provas satisfatórias para ele de que tais Valores Mobiliários são de propriedade de um comprador protegido nas mãos de quem esses Valores Mobiliários são obrigações válidas do Emissor; *ressalvado, contudo,* que ao determinar se os Titulares do montante principal necessário dos Valores Mobiliários Em Circulação fizeram qualquer solicitação, pedido, autorização, orientação, consentimento, notificação ou renúncia nos termos deste instrumento, os Valores Mobiliários de propriedade do Emissor ou qualquer de suas Afiliadas serão desconsiderados como Em Circulação exceto que, ao determinar se o Agente Fiduciário será protegido ao se basear em tal solicitação, pedido, autorização, orientação, consentimento, notificação ou renúncia, somente os Valores Mobiliários de que um Diretor Responsável do Agente Fiduciário recebeu notificação escrita de serem assim detidos, em seu endereço especificado neste instrumento, serão assim desconsiderados. Valores Mobiliários detidos dessa forma que foram penhoradas de boa-fé poderão ser considerados como Em Circulação se o credor pignoratício estabelecer, para satisfação do Agente Fiduciário, os direitos do credor pignoratício de agir assim a respeito de tais Valores Mobiliários e que o credor pignoratício não é o Emissor, ou qualquer outro devedor sobre os Valores Mobiliários ou qualquer de suas Afiliadas ou tal outro devedor.

**"Agente de Pagamentos"** significa The Bank of New York Mellon ou qualquer outra Pessoa autorizada pelo Emissor a pagar os Montantes de Resgate ou Pagamentos de quaisquer Valores

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 162

Mobiliários em nome do Emissor nos termos deste instrumento e inclui tal significado especificado na Seção 2.03.

"**Data de Pagamento**" significa a data em que qualquer Pagamento é feito.

"**Pagamento**" significa qualquer Pagamento de Excesso de Caixa ou Pagamento de Evento de Distribuição Especificado, conforme aplicável.

"**Titular Autorizado**" significa a Odebrecht S.A. - Em Recuperação Judicial ou um sucessor da mesma.

"**Endividamento Autorizado**" significa o Endividamento da Sociedade ou de qualquer de suas Subsidiárias que pode ser incorrido conforme os termos das escrituras que regem as Novas Notas.

"**Pessoa**" significa qualquer pessoa física, sociedade, parceria, joint venture, sociedade truste de responsabilidade limitada, organização sem personalidade jurídica, governo ou qualquer agência ou subdivisão política do mesmo.

"**Pagamento PIK**" significa o pagamento de juros em espécie, isto é, através de aumento no montante principal das respectivas séries de Novas Notas.

"**Ações Preferenciais**" significa, conforme aplicado ao Capital Social de qualquer sociedade, Capital Social de qualquer classe ou classes (independentemente de como sejam designadas) que seja preferencial quanto ao pagamento de dividendos, ou à distribuição de ativos mediante liquidação voluntária ou involuntária ou dissolução de tal sociedade, sobre ações do Capital Social de qualquer outra classe de tal sociedade.

"**principal**" de um Valor Mobiliário significa o montante do principal desse Valor Mobiliário (incluindo quaisquer Montantes Adicionais a pagar pelo Emissor em relação a esse principal) e, para fins deste termo, será o Valor de Face.

"**Sociedade do Projeto**" significa qualquer Subsidiária da Sociedade, cujas atividades envolvem substancialmente qualquer projeto de construção, desenvolvimento ou infraestrutura, incluindo, sem limitação, projetos *greenfield* e *brownfield*, nos quais a Sociedade ou qualquer uma de suas Subsidiárias participa ou detém, direta ou indiretamente, uma participação, incluindo qualquer Subsidiária que seja membro de consórcios de construção ou licitante qualificado no Brasil ou em outra jurisdição estrangeira.

"**Bens**" significa quaisquer bens ou ativos de qualquer tipo, móveis, imóveis ou mistos e tangíveis ou intangíveis, qualquer direito ou participação neles ou quaisquer contas a receber, direitos creditórios,

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 163

dividendos ou outras distribuições sobre o Capital Social ou direitos de receber dividendos ou outras distribuições sobre o Capital Social.

"**Banco de Investimento Qualificado**" significa um banco de investimento independente de boa reputação com operações globais, nomeado pelo Emissor ou qualquer de suas Afiliadas.

"**Oferta Pública Qualificada**" significa a oferta pública inicial de ações subscrita do Capital Social que resulta na listagem e operação de pelo menos 15% de todo o Capital Social em Circulação da Sociedade.

"**Notificação de Oferta Pública Qualificada**" tem seu significado especificado na Seção 3.05.

"**Direito de Oferta Pública Qualificada**" tem seu significado especificado na Seção 3.05.

"**Oferta Pública de Aquisição Qualificada**" significa uma oferta pública de aquisição para recompra de todos ou parte dos Valores Mobiliários em circulação lançados pelo Emissor ou pela Sociedade ou qualquer de suas respectivas Subsidiárias dentro de 6 (seis) meses de um Evento de Distribuição Especificado nos termos da Seção 2.08.

"**Montante de Resgate**" significa um Montante de Resgate Obrigatório ou Montante de Resgate Opcional, conforme aplicável.

"**Data de Resgate**" significa, quando usada em relação a qualquer Valor Mobiliário a ser resgatado, de acordo com o Artigo 3, a data fixada para tal resgate por ou de acordo com esta Escritura.

"**Preço de Resgate**" significa, quando usada em relação a qualquer Valor Mobiliário a ser resgatado, de acordo com a Seção 3.03, o preço ao qual ele deve ser resgatado conforme esta Escritura.

"**Registro**" tem o significado especificado na Seção 2.03.

"**Titular Registrado**" significa, (1) a DTC, se o Valor Mobiliário for um Valor Mobiliário Global depositado junto ao custodiante e registrado em nome de um nomeado pela DTC e (2) a Euroclear e/ou Clearstream Banking, se o  Valor Mobiliário for um Valor Mobiliário Global depositado junto ao depositário comum e registrado em nome de um nomeado para a Euroclear e/ou Clearstream Banking.

"**Oficial de Registro**" significa The Bank of New York Mellon, até um Oficial de Registro sucessor se tornar tal conforme as disposições aplicáveis desta Escritura e, após isso, "Oficial de Registro" significará esse Oficial de Registro sucessor, e inclui esse significado especificado na Seção 2.03.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                                CCM nº    2.968.720-9
C.P.F. nº 077.542.738-10                                                                      INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                          fls. 164

    **"Data de Registro Regular"** tem o significado especificado na Seção 2.09.

    **"Regulamento S"** significa o Regulamento S nos termos da Lei de Valores Mobiliários, em vigor de tempos em tempos.

    **"Valor Mobiliário Global Conforme o Regulamento S"** significa um ou mais Valores Mobiliários Globais permanentes integralmente em forma registrada sem cupons que representam Valores Mobiliários vendidos fora dos Estados Unidos, conforme o Regulamento S.

    **"Impostos Retidos Relevantes"** tem o significado especificado na Seção 4.06.

    **"Ajuste do Valor Bruto Necessário"** significa a soma de (A) quaisquer Montantes Adicionais devidos em relação ao pagamento aplicável de Montantes de Excesso de Caixa Disponíveis nos termos das Novas Notas e dos Valores Mobiliários e (B) quaisquer impostos retidos na fonte ou similares devidos pela Sociedade ou pelo Emissor em relação às distribuições de Montantes de Excesso de Caixa Disponíveis para o Emissor ou ao Acionista Emissor.

    **"Diretor Responsável"** significa qualquer diretor do Agente Fiduciário com responsabilidade direta pela administração desta Escritura.

    **"Valor Mobiliário Global Restrito"** significa um ou mais Valores Mobiliários Globais permanentes integralmente em forma registrada em cupons vendidos para "compradores institucionais qualificados" (tal termo é definido na Regra 144a) conforme a Regra 144A.

    **"Plano de Recuperação"** significa o plano de recuperação extrajudicial, instaurado nas Varas de Falência e Recuperação de São Paulo em [•] (a "**Data de Ajuizamento do Plano de Recuperação**") determinando a emissão dos Valores Mobiliários e das Novas Notas em troca da recuperação de várias dívidas financeiras da Sociedade e de algumas de suas Afiliadas, conforme aditado de tempos em tempos.

    **"Data de Ajuizamento do Plano de Recuperação"** terá o significado estabelecido na definição de "Plano de Recuperação".

    **"Regra 144A"** significa a Regra 144A nos termos da Lei de Valores Mobiliários, em vigor de tempos em tempos.

    **"S&P"** significa o Grupo de Classificação Standard & Poor's, uma divisão de The McGraw-Hill, Inc., e seus sucessores.

    **"Segunda Data de Medição"** tem o significado especificado na Seção 2.06.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº 2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02     Livro nº LIV     fls. 165

"**Valores Mobiliários**" tem o significado especificado nos Considerandos.

"**Lei de Valores Mobiliários**" significa o U.S. Lei de Valores Mobiliários de 1933, conforme aditado.

"**Legenda da Lei de Valores Mobiliários**" significa a seguinte Legenda, impressa em letras maiúsculas:

ESTE VALOR MOBILIÁRIO NÃO FOI REGISTRADO NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS DE 1933, CONFORME ADITADA (A "LEI DE VALORES MOBILIÁRIOS") E NÃO PODE SER OFERECIDO, VENDIDO, PENHORADO OU ENTÃO TRANSFERIDO, EXCETO DE ACORDO COM A FRASE A SEGUIR. PELA SUA AQUISIÇÃO OU DE UMA PARTICIPAÇÃO BENÉFICA NESTE INSTRUMENTO, O ADQUIRENTE

(1) DECLARA QUE

(A) ELE E POR CONTA DE QUEM ELE AGE É UM "COMPRADOR INSTITUCIONAL QUALIFICADO" (NA ACEPÇÃO DA REGRA 144A NA LEI DE VALORES MOBILIÁRIOS) E QUE EXERCE CRITÉRIOS EXCLUSIVOS DE INVESTIMENTO A RESPEITO DE CADA CONTA OU

(B) ELE NÃO É UM CIDADÃO NORTE-AMERICANO (NA ACEPÇÃO DO REGULAMENTO S DA LEI DE VALORES MOBILIÁRIOS) E

(2) CONCORDA, EM BENEFÍCIO DA SOCIEDADE, QUE NÃO IRÁ OFERECER, VENDER, PENHORAR OU ENTÃO TRANSFERIR ESTE VALOR MOBILIÁRIO OU QUALQUER PARTICIPAÇÃO BENÉFICA NELE, EXCETO DE ACORDO COM A LEI DE VALORES MOBILIÁRIOS E LEIS APLICÁVEIS DE VALORES MOBILIÁRIOS DE QUALQUER ESTADO DOS ESTADOS UNIDOS E APENAS

(A) PARA O EMISSOR,

(B) CONFORME UMA DECLARAÇÃO DE REGISTRO QUE ENTROU EM VIGOR NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS,

(C) PARA UM COMPRADOR INSTITUCIONAL QUALIFICADO EM CONFORMIDADE COM REGRA 144A DA LEI DE VALORES MOBILIÁRIOS,

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02            Livro nº LIV                                fls. 166

(D) EM UMA OPERAÇÃO NO EXTERIOR EM CONFORMIDADE COM A REGRA 904 DO REGULAMENTO S DA LEI DE VALORES MOBILIÁRIOS, OU

(E) CONFORME UMA ISENÇÃO DE REGISTRO PREVISTA PELA REGRA 144 DA LEI DE VALORES MOBILIÁRIOS OU QUALQUER OUTRA ISENÇÃO DISPONÍVEL DOS REQUISITOS DE REGISTRO DA LEI DE VALORES MOBILIÁRIOS.

ANTES DO REGISTRO DE QUALQUER TRANSFERÊNCIA DE ACORDO COM 2(E) ACIMA, A SOCIEDADE SE RESERVA O DIREITO DE EXIGIR A ENTREGA DE PARECERES LEGAIS, CERTIFICAÇÕES OU OUTRAS PROVAS QUE POSSAM SER SOLICITADAS PARA DETERMINAR QUE A TRANSFERÊNCIA PROPOSTA É FEITA EM CONFORMIDADE COM A LEI DE VALORES MOBILIÁRIOS E LEIS DE VALORES MOBILIÁRIOS ESTADUAIS APLICÁVEIS. NÃO SE FAZ NENHUMA DECLARAÇÃO QUANTO À DISPONIBILIDADE DE QUALQUER ISENÇÃO DOS REQUISITOS DE REGISTRO NOS TERMOS DA REGRA 144 DA LEI DE VALORES MOBILIÁRIOS.

"**Valores Mobiliários**" tem o significado especificado no primeiro parágrafo do Preâmbulo nesta Escritura e será na forma de Valor Mobiliário prevista no ANEXO A.

"**Séries de Novas Notas**" significa cada série de Novas Notas emitidas conforme o Plano de Recuperação.

"**Taxa de Liquidação**" significa a taxa que é igual à taxa comercial em reais/dólar dos EUA, expressa como o montante em reais por um dólar dos EUA, como divulgado pelo Banco Central do Brasil (o "Banco Central") no Sistema de Dados do SISBACEN e em seu site (que, na presente data, está localizado em http://bcb.gov.br) sob o código de operação PTAX800 ("Consultas de Câmbio") Opção 5, "Venda" ("Cotações para Contabilidade") (ou qualquer tela substituta estabelecida pelo Banco Central).

"**Evento de Distribuição Específico**" tem seu significado especificado na Seção 2.08.

"**Pagamento de Evento de Distribuição Específico**" tem seu significado especificado na Seção 2.08.

"**Standard & Poor's**" significa o Grupo de Classificação Standard & Poor's, uma divisão de The McGraw-Hill Companies, Inc., e seus sucessores.

"**Data de Vencimento Indicada**" tem seu significado especificado na Seção 2.05.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 167

"**Subsidiária**" significa, em relação a qualquer Pessoa a qualquer momento, qualquer sociedade, sociedade de responsabilidade limitada, parceria, associação ou outras instituições comerciais das quais as contas com mais de 50% das Ações com Direito a Voto em circulação pertença, direta ou indiretamente, a tal Pessoa ou a uma ou mais Subsidiárias de tal Pessoa (ou uma combinação da mesma).

"**Impostos**" tem seu significado especificado na Seção 4.06.

"**Jurisdição Tributária**" tem seu significado especificado na Seção 4.06.

"**Transferência**" significa, a respeito de qualquer Capital Social, (i) quando usado como verbo, vender, ceder, alienar, trocar, penhorar, gravar, hipotecar ou então transferir esse Capital Social ou qualquer participação nele, direta ou indiretamente (incluindo conforme uma operação derivativa), ou concordar ou se comprometer com qualquer dos anteriores e (ii) quando usado como substantivo, uma venda, cessão, alienação, troca, penhor, gravame, hipoteca ou outra transferência direta ou indireta desse Capital Social ou qualquer participação nele ou qualquer acordo ou compromisso de assim fazer qualquer dos anteriores.

"**Agente de Transferência**" significa The Bank of New York Mellon, conforme o caso, ou qualquer outra Pessoa autorizada pelo Emissor a pagar o principal ou juros de quaisquer Valores Mobiliários em nome do Emissor nos termos deste instrumento, e inclui esse significado especificado na Seção 2.03.

"**Agente Fiduciário**" significa The Bank of New York Mellon, até um Agente Fiduciário sucessor se tornar tal conforme as disposições aplicáveis desta Escritura e, após isso, "Agente Fiduciário significará esse Agente Fiduciário sucessor.

"**Estados Unidos**" e "**EUA**" significam os Estados Unidos da América (incluindo os Estados e o Distrito de Colúmbia) e seus territórios, possessões e outras áreas sujeitas à sua jurisdição.

"**Dólares dos EUA**" e "**US$**" significam a moeda corrente dos Estados Unidos.

"**Obrigações do Governo dos EUA**" significa obrigações diretas (ou certificados que representam uma participação nessas obrigações) dos Estados Unidos (inclusive qualquer agência ou órgão governamental dos mesmos) pelo pagamento das quais a fé integral e o crédito dos Estados Unidos sejam garantidos e não sejam passíveis de chamadas ou resgatáveis, a critério do emissor.

"**Caixa Irrestrito**" significa, a partir de qualquer data de determinação, em relação à Sociedade e suas Subsidiárias em uma base consolidada, todo o caixa e investimentos de curto prazo de tais Pessoas (i) não adiantados por um cliente à Sociedade ou para qualquer uma de suas Subsidiárias ou qualquer uma de suas respectivas Sociedades de Projeto para fins de financiamento de projetos de construção ou

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 168

para a licitação de novos projetos de construção; (ii) não detidos pela Sociedade ou por qualquer Subsidiária, ou qualquer de suas respectivas Sociedades de Projeto para fins de financiamento de capital de giro ou necessidades operacionais para Projetos de Desenvolvimento ou Sociedades Licitantes, conforme razoavelmente determinado pela administração, com base em um processo consistente com suas práticas anteriores e aprovado pelo conselho de administração da Sociedade; (iii) não depositados em nenhuma conta de reserva de serviço de dívida penhorada, de tempos em tempos, a qualquer credor para cobrir déficits nos montantes disponíveis para o serviço de dívida; (iv) não penhorados como garantia de desempenho ou garantia de oferta pública; (v) não depositados em nenhuma outra conta que, na data de tal determinação, esteja bloqueada e não seja acessível à Sociedade ou a qualquer uma de suas Subsidiárias, após a ocorrência de um evento de inadimplemento ou outra ação de execução, nos termos de qualquer documento de financiamento ou garantia na qual a Sociedade ou tal Subsidiária seja parte; (vi) não recebidos em conexão com (A) um Evento de Distribuição Específica, (B) qualquer emissão de ações da Sociedade ou qualquer de suas Subsidiárias, incluindo Ofertas Públicas Qualificadas (C) a ocorrência de Endividamento Permitido nos termos do presente, ou (D) qualquer Venda de Ativos; ou (vii) sem contagem dupla, que não se qualificariam, na data de tal determinação, como "restrito" em um balanço patrimonial consolidado. A conformidade do montante de caixa e investimentos de curto prazo mantidos para fins de financiamento de capital de giro ou necessidades operacionais, conforme contemplado na cláusula (ii) acima, com os requisitos de tal cláusula será certificada anualmente pelo diretor financeiro ou pelo diretor contábil da Sociedade, e uma cópia de tal certificação será disponibilizada aos Titulares, simultaneamente e de acordo com os requisitos para distribuição das demonstrações financeiras consolidadas auditadas anuais da Sociedade.

"**Ações com Direito a Voto**" significa, em relação a qualquer Pessoa, o Capital Social de qualquer classe ou espécie normalmente com poder para votar na eleição de conselheiros, gerentes ou outros membros votantes do órgão dirigente da Pessoa.

Seção 1.02.     *Regras de Interpretação*. Para todos os efeitos dessa Escritura, exceto conforme previsto expressamente ou a menos que o contexto exija o contrário:

(i)       os termos definidos neste Artigo têm os significados que lhes são atribuídos neste Artigo e inclui o plural, bem como o singular;

(ii)      as palavras "aqui", "deste instrumento", "nos termos deste instrumento" e outras palavras de significado semelhante se referem a esta Escritura como um todo e não a qualquer Artigo, Seção ou outra subdivisão específica;

(iii)     "ou" não é exclusivo; e

(iv)     "incluindo" significa incluindo, sem limitação;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                   CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                          fls. 169

(v)        qualquer referência a um "Artigo", uma "Seção" ou um "Anexo" se refere a um Artigo, uma Seção ou um Anexo, conforme o caso, dessa Escritura.

(b)        Todos os termos contábeis não definidos de outra forma neste documento terão os significados atribuídos a eles de acordo com o GAAP brasileiro.

(c)        Para fins das definições estabelecidas no Artigo 1 e nesta Escritura em geral, todos os cálculos e determinações devem ser feitos de acordo com o GAAP brasileiro e devem ser baseados nas demonstrações financeiras consolidadas preparadas de acordo com o GAAP brasileiro.

Seção 1.03.    *Índice; Títulos*. O índice e os títulos dos Artigos e Seções dessa Escritura foram inseridos somente para conveniência de referência, não são destinados a serem considerados como parte deste instrumento e não modificarão ou restringirão quaisquer termos ou disposições deste instrumento.

Seção 1.04. *Forma dos Documentos Entregues ao Agente Fiduciário*. Em qualquer caso em que vários assuntos devam ser certificados por, ou cobertos por um parecer de qualquer Pessoa específica, não é necessário que todos esses assuntos sejam certificados por, ou cobertos pelo parecer de, apenas uma dessas Pessoas, ou que sejam certificados ou cobertos por apenas um documento, mas uma dessas Pessoas pode certificar ou dar um parecer em relação a alguns assuntos e uma ou mais dessas Pessoas a respeito de outros assuntos, e qualquer uma dessas Pessoas pode certificar ou dar uma opinião a respeito de tais assuntos em um ou mais documentos.

Qualquer certificado ou parecer de um Diretor do Emissor poderá ser baseado, na medida em que estiver relacionado a assuntos jurídicos, mediante um certificado ou parecer ou declarações pelo advogado, a menos que esse Diretor saiba, ou no exercício do cuidado razoável deveria saber, que o certificado ou o parecer ou as declarações em relação aos assuntos nos quais seu certificado ou parecer é baseado sejam errôneos. Qualquer certificado ou Parecer do Advogado poderá ser baseado, na medida em que estiver relacionado aos assuntos, de fato, mediante um certificado ou parecer ou declarações por um Diretor ou Diretores Do Emissor declarando que as informações em relação aos assuntos, de fato, estejam na posse do Emissor, a menos que esse advogado saiba, ou no exercício do cuidado razoável deveria saber, que o certificado ou o parecer ou as declarações em relação aos assuntos que são errôneos.

Se qualquer Pessoa for obrigada a fazer, dar ou assinar dois ou mais pedidos, solicitações, consentimentos, certificados, declarações, pareceres ou outros instrumentos nos termos dessa Escritura, podem, mas não precisam, ser consolidados e formar um instrumento.

Seção 1.05.    *Atos dos Titulares*.

(a)        Qualquer solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outra medida prevista nesta Escritura a ser entregue ou tomada pelos Titulares poderá ser

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 170

incorporada e comprovada por um ou mais instrumentos de conteúdo substancialmente semelhante assinado por esses Titulares em Pessoa ou pelos agentes devidamente nomeados por escrito; e, exceto conforme previsto, de outra forma, expressamente aqui, essa medida entrará em vigor quando esse instrumento ou instrumentos for(em) entregue(s) para o Agente Fiduciário e, se for expressamente necessário, para o Emissor. Esse instrumento ou instrumentos (e a medida incorporada ali e comprovada lá) são denominados aqui como "**Ato**" dos Titulares que assinam esse instrumento ou instrumentos. A prova de assinatura de qualquer instrumento ou de um documento que nomear qualquer agente será suficiente para qualquer efeito dessa Escritura e conclusivo em favor do Agente Fiduciário e do Emissor, se for feito na forma prevista nessa Seção 1.05.

(b)      O fato e a data da assinatura por qualquer Pessoa de tal instrumento ou documento pode ser provado pela declaração legal de uma testemunha de tal assinatura ou por um certificado de um notário público ou outro diretor autorizado por lei a tomar conhecimento de escrituras, certificando que o indivíduo que assina tal instrumento ou documento lhe reconheceu a assinatura do mesmo. Quando tal assinatura for feita por um signatário atuando em uma qualidade diferente de sua qualidade individual, tal certificado ou declaração legal também constituirá prova suficiente de sua autoridade. O fato e a data da assinatura de qualquer instrumento ou documento, ou a autoridade da Pessoa que o assina, também podem ser provados de qualquer outra forma que o Agente Fiduciário que revisar tal instrumento ou documento considerar suficiente.

(c)      A quantia principal e os números de série dos Valores Mobiliários mantidos por qualquer Pessoa, e a data de posse dos mesmos, deverão ser comprovados pelo Registro.

(d)      Se o Emissor solicitar aos Titulares qualquer solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato, o Emissor poderá, a seu critério, por ou conforme uma Deliberação do Conselho, fixar antecipadamente uma data de registro para a determinação dos Titulares habilitados a dar tal solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato, mas o Emissor não terá qualquer obrigação de fazê-lo. Tal data de registro será a data de registro especificada nessa Deliberação do Conselho ou conforme a mesma, que será uma data não anterior à data de trinta dias corridos antes da primeira solicitação dos Titulares, em geral, em relação à mesma e não posterior à data em que tal solicitação for concluída. Se tal data de registro for fixada, tal solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato pode ser dado antes ou depois de tal data de registro, mas somente os Titulares de registro no fechamento do negócio em tal data de registro serão considerados como Titulares para fins de determinar se os Titulares da proporção necessária de Valores Mobiliários em Circulação autorizaram ou concordaram ou consentiram com tal solicitação, demanda, autorização, direção, notificação, consentimento, renúncia ou outro Ato, e para esse fim os Valores Mobiliários em Circulação serão calculados a partir de tal data de registro; *desde* que tal autorização, acordo ou consentimento por parte dos Titulares em tal data de registro não seja considerado em vigor a menos que entre em vigor de acordo com as disposições desta Escritura o mais tardar onze meses após a data de registro.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 171

(e)    Qualquer solicitação, exigência, autorização, direção, notificação, consentimento, renúncia ou outro ato do Titular de qualquer Valor Mobiliário deverá vincular todo futuro Titular do mesmo Valor Mobiliário e o Titular de cada Valor Mobiliário emitido no registro da transferência do mesmo ou em troca ou em lugar dele, com relação a qualquer coisa feita, omitida ou sofrida a ser feita pelo Agente Fiduciário ou pelo Emissor se baseando na mesma, seja ou não feita a anotação de tal ação sobre tal Valor Mobiliário.

### ARTIGO 2
### OS VALORES MOBILIÁRIOS

Seção 2.01.    *Forma e Data. O*s Valores Mobiliários e o certificado de autenticação do Agente Fiduciário deverão ser substancialmente na forma do Valor Mobiliário estabelecida no ANEXO A, que é aqui integrado e expressamente feito como parte desta Escritura. Os Valores Mobiliários podem ter inserções, omissões, substituições e outras variações apropriadas conforme exigido ou permitido por esta Escritura e podem ter letras, números ou outras marcas de identificação e notações, legendas ou endossos que possam ser necessários para cumprir qualquer lei, regra da bolsa de valores, acordo ao qual o Emissor está sujeito, se houver, ou uso, desde que qualquer notação, legenda ou endosso esteja em uma forma aceitável para o Emissor.

Cada Valor Mobiliário Global será datado como a Data de Encerramento. Cada Valor Mobiliário certificado definitivo ("**Valor Mobiliário Certificado**") será datado com a data de sua autenticação.

Os Valores Mobiliários serão impressos, litografados ou gravados ou produzidos por qualquer combinação destes métodos ou podem ser produzidas de qualquer outra forma permitida pelas regras de qualquer bolsa de valores na qual os Valores Mobiliários possam ser listados, se houver, tudo conforme determinado pelos diretores que assinam tais Valores Mobiliários, conforme comprovado por sua assinatura de tais Valores Mobiliários.

Seção 2.02.    *Assinatura, Autenticação e Entrega.*

(a)    Dois Diretores do Emissor deverão assinar os Valores Mobiliários para o Emissor através de assinatura manual ou por facsimile:

(i)    Se um Diretor cuja assinatura estiver em um Valor Mobiliário não mais ocupar esse cargo no momento em que o Agente Fiduciário autenticar o Valor Mobiliário, o Valor Mobiliário será válido mesmo assim.

(ii)    Um Valor Mobiliário não será válido até que um signatário autorizado do Agente Fiduciário ou um agente de autenticação assine manualmente o certificado de autenticação no Valor Mobiliário por assinatura manual, por fac-símile ou eletrônica por ordem do Emissor. Tal assinatura deverá ser prova conclusiva de que o Valor Mobiliário foi autenticado nos termos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 172

desta Escritura. Tal Ordem do Emissor deverá especificar a quantidade dos Valores Mobiliários a serem autenticados e a data na qual a emissão original dos Valores Mobiliários deverá ser autenticada.

(iii)    O Agente Fiduciário ou um agente de autenticação deverá inicialmente autenticar e entregar os Valores Mobiliários em um montante principal total de até US$ [·].

(iv)    Os Valores Mobiliários deverão ser emitidos na forma totalmente registrada sem cupons anexados em denominações mínimas de US$ 100.000,00 e em múltiplos integrais de US$ 1.000 excedente (cada uma, uma **Denominação Autorizada**").

(b)    [O Agente Fiduciário pode nomear um agente de autenticação, com uma cópia de tal nomeação ao Emissor, para autenticar os Valores Mobiliários (o "**Agente de Autenticação**"). A menos que limitado pelos termos de tal nomeação, um Agente de Autenticação pode autenticar os Valores Mobiliários sempre que o Agente Fiduciário o fizer. Cada referência nesta Escritura à autenticação pelo Agente Fiduciário inclui a autenticação por um Agente de Autenticação. Um Agente de Autenticação tem os mesmos direitos que o Oficial de Registro ou qualquer Agente de Transferência ou Agente de Pagamentos ou agente de citações e demandas.

(i)    Qualquer sociedade anônima na qual qualquer Agente de Autenticação possa ser incorporado ou convertido ou com a qual possa ser fundido, ou qualquer sociedade anônima resultante de qualquer incorporação, fusão ou conversão na qual qualquer Agente de Autenticação deva ser parte, ou qualquer sociedade anônima que suceder todos ou substancialmente todos os negócios de truste corporativos de qualquer Agente de Autenticação deverá ser a sucessora de tal Agente de Autenticação nos termos deste documento, sem a assinatura ou arquivamento de qualquer ato adicional por parte das partes aqui presentes ou tal Agente de Autenticação ou tal sociedade anônima sucessora.

(ii)    Qualquer Agente de Autenticação poderá, a qualquer momento, renunciar, notificando por escrito a renúncia ao Agente Fiduciário e ao Emissor. O Agente Fiduciário pode a qualquer momento, encerrar a agência de qualquer Agente de Autenticação, notificando por escrito o encerramento de tal Agente de Autenticação e o Emissor. Ao receber tal notificação de renúncia ou de encerramento, o Agente Fiduciário poderá nomear um Agente de Autenticação sucessor razoavelmente aceitável para o Emissor e deverá notificar por escrito tal nomeação ao Emissor.

(iii)    O Emissor concorda em pagar a cada Agente de Autenticação, de tempos em tempos, uma remuneração razoável por seus serviços e reembolso de suas despesas razoáveis relacionadas a eles[3].

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 173

(c)      O Emissor nomeia inicialmente a DTC para atuar como Depositário a respeito dos Valores Mobiliários Globais. O Agente Fiduciário, como custodiante, atuará como custodiante dos Valores Mobiliários Globais para a DTC ou nomeará um sub-custodiante para atuar como tal.

Seção 2.03.    *Agente de Transferência, Oficial de Registro e Agente de Pagamentos.*

(a)      Sujeitos aos regulamentos razoáveis que o Emissor possa estabelecer, os livros do Emissor para a troca, registro e registro de transferência dos Valores Mobiliários serão mantidos no escritório do Oficial de Registro (tais livros mantidos nesse escritório e em qualquer outro escritório ou agência designada para esse efeito, sendo aqui denominados como o "**Registro**"). O Emissor também providenciará para que o Agente Fiduciário mantenha livros para a troca, registro e registro de transferência dos Valores Mobiliários. O Agente Fiduciário deverá notificar o Oficial de Registro e o Oficial de Registro deverá notificar o Oficial de Registro, quando necessário, em qualquer troca, registro ou registro de transferência de quaisquer Valores Mobiliários e deverá providenciar para que seus respectivos livros sejam alterados de acordo. O Emissor poderá ter um ou mais Oficiais de Registro conjuntos e um ou mais Agentes de Transferência ou Agentes Pagadores adicionais. Os termos "**Agente de Transferência**" e "**Agente de Pagamentos**" incluem qualquer Agente de Transferência ou Agente de Pagamentos adicional, conforme o caso. O termo "**Oficial de Registro**" inclui qualquer Oficial de Registro conjunto.

O Emissor deverá celebrar quaisquer contratos de agência apropriados com qualquer Oficial de Registro, Agente de Transferência ou Agente de Pagamentos que não seja parte desta Escritura, os quais deverão implementar as disposições desta Escritura que se relacionam a tal agente. O Emissor deverá notificar o Agente Fiduciário sobre o nome e endereço de qualquer um desses agentes. Se o Emissor deixar de manter um Oficial de Registro ou o Agente de Pagamentos, o Agente Fiduciário agirá como tal e terá direito a uma remuneração apropriada de acordo com a Seção 6.06. O Emissor inicialmente nomeia o Agente Fiduciário como Agente de Pagamentos, Oficial de Registro e Agente de Transferência em relação aos Valores Mobiliários.

(b)      O Agente Fiduciário manterá um registro de todas os Valores Mobiliários e disponibilizará tal registro durante o horário comercial regular para inspeção mediante solicitação do Emissor, desde que haja um tempo razoável antes de tal inspeção. Tais livros e registros deverão incluir anotações sobre se tais Valores Mobiliários foram resgatados, ou pagas ou canceladas e, no caso de Valores Mobiliários mutiladas, destruídas, deformadas, roubadas ou perdidas, se tais Valores Mobiliários foram substituídas. No caso de substituição de qualquer uma das Valores Mobiliários, o Agente Fiduciário deverá manter um registro do Valor Mobiliário assim substituída e dos Valores Mobiliários emitidos em substituição às mesmas. No caso do cancelamento de qualquer uma das Valores Mobiliários, o Agente Fiduciário deverá manter um registro do Valor Mobiliário assim cancelado e a

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 174

data em que tal Valor Mobiliário foi cancelado. Cada Agente de Transferência deverá notificar o Agente Fiduciário sobre quaisquer transferências ou trocas de Valores Mobiliários efetuadas por ele. O Agente Fiduciário não será obrigado a registrar a transferência ou troca de Valores Mobiliários Certificados por um período de quinze dias corridos antes de qualquer data de seleção de Valores Mobiliários para resgate, ou registrar a transferência ou troca de quaisquer Valores Mobiliários Certificados previamente convocadas para resgate.

(c)       Todas os Valores Mobiliários entregues para pagamento, resgate, registro de transferência ou troca serão cancelados pelo Agente de Transferência ou ao Agente de Pagamentos ou ao Agente Fiduciário relevante, conforme o caso. Cada Oficial de Registro e Agente de Transferência deverá notificar o Agente Fiduciário sobre a entrega e cancelamento de tais Valores Mobiliários e deverá entregar tais Valores Mobiliários ao Agente Fiduciário. O Agente Fiduciário poderá destruir ou causar a destruição de todas esses Valores Mobiliários entregues para pagamento, resgate, registro de transferência ou troca e, se assim forem destruídas, deverá entregar prontamente um certificado de destruição ao Emissor.

(d)       O Agente de Pagamentos deverá cumprir os requisitos aplicáveis de retenção de imposto na fonte e de relatório de informações segundo o Código da Receita Federal dos Estados Unidos de 1986, conforme alterado, e os Regulamentos do Tesouro dos Estados Unidos promulgados, nos termos daquele instrumento, em relação aos pagamentos efetuados nos termos dos Valores Mobiliários (incluindo, na medida do necessário, a cobrança dos Formulários W-8 e W-9 da Receita Federal dos Estados Unidos e a apresentação dos Formulários 1099 e 1096 da Receita Federal dos Estados Unidos).

Seção 2.04.      *Agente de Pagamentos para Reter o Dinheiro em Garantia*

(a)       Até às 10h00, horário de Nova Iorque, no máximo um dia útil antes de cada data de pagamento em qualquer nota, o Emissor deverá depositar junto ao Agente de Pagamentos, em fundos imediatamente disponíveis, uma quantia suficiente para pagar tal principal quando assim for devido (incluindo, para evitar dúvidas, quaisquer Pagamentos, Montantes de Resgate ou quantias nos termos da Seção 4.06, conforme aplicável). O Emissor deverá solicitar que o banco através do qual tal pagamento deverá ser feito concorde em fornecer ao Agente de Pagamentos até às 10h00 (horário de Nova Iorque) dois Dias Úteis antes da data de vencimento de qualquer um desses pagamentos uma confirmação irrevogável (por telex testado) de sua intenção de efetuar tal pagamento. O Emissor exigirá que cada Agente de Pagamentos (que não seja o Agente Fiduciário) concorde por escrito que tal Agente de Pagamentos deverá reter em garantia, em benefício dos Titulares ou do Agente Fiduciário, todo o dinheiro detido por tal Agente de Pagamentos para o pagamento de principal sobre os Valores Mobiliários e deverá notificar o Agente Fiduciário de qualquer inadimplemento do Emissor ao efetuar tal pagamento. O Emissor, a qualquer momento, poderá exigir que um Agente de Pagamentos pague todo o dinheiro detido por ele ao Agente Fiduciário e contabilize quaisquer fundos por ele

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                                CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                                   INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02            Livro nº LIV                        fls. 175

desembolsados. Ao cumprir esta Seção 2.04, o Agente de Pagamentos não terá mais nenhuma responsabilidade pelo dinheiro entregue ao Agente Fiduciário.

(b)      Cada pagamento completo de principal, Montante de Resgate, Montantes Adicionais a pagar nos termos dos Valores Mobiliários e esta Escritura em relação a qualquer Obrigação feita pelo Emissor ou em nome do Emissor para ou à ordem do Agente de Pagamentos na forma aqui especificada ou nas Obrigações na data de vencimento será válida e eficaz para satisfazer e cumprir a obrigação do Emissor de efetuar o pagamento do principal, Valor de Resgate, Montantes Adicionais a pagar nos termos do presente instrumento e dos Valores Mobiliários em tal data, *desde que, entretanto,* a responsabilidade do Agente de Pagamentos, nos termos deste instrumento, não exceda quaisquer valores pagos a ele pelo Emissor, ou detidos por ele, em nome dos Titulares nos termos deste instrumento; e *desde que,* no caso de haver um inadimplemento por parte do Agente de Pagamentos em qualquer pagamento de principal, Valor de Resgate, Montantes Adicionais em relação a qualquer Valor Mobiliário de acordo com os termos aqui estabelecidos, o Emissor pagará, sob demanda, os Montantes Adicionais que resultarão no recebimento pelo Titular dos valores que teria recebido se não tivesse ocorrido tal inadimplemento.

Seção 2.05.      *Principal, Vencimento e Juros.* Os Valores Mobiliários serão emitidos a um montante total inicial principal de US$ [-] e vencerão em 10 de setembro de 2058 (a "Data de Vencimento Indicada"). O montante principal restante Em Circulação dos Valores Mobiliários será devido integralmente no Vencimento. Os Valores Mobiliários não importarão juros.

Seção 2.06      Distribuições.

Durante o Período de Excesso de *Cash Sweep*, se o Montante de Excesso de Caixa exceder zero em uma Data de Medição de Excesso de Caixa, o Emissor efetuará pagamentos nos termos dos Valores Mobiliários aos Titulares iguais a uma porcentagem Montante de Excesso de Caixa Disponível aplicável de acordo com os termos e condições estabelecidos abaixo (ficando entendido que certos percentuais do Montante Disponível do Excesso de Caixa também estarão disponíveis para distribuição aos titulares das Novas Notas e para o Acionista Emissor, conforme aplicável). Para evitar dúvidas, Titulares não terão reivindicação contra o Emissor ou qualquer Afiliada dele a respeito das distribuições a serem feitas a titulares das Novas Notas.

(a)      O Montante Disponível de Excesso de Caixa será distribuído conforme segue:

(i)      para a primeira Data de Medição de Excedente de Caixa, para a qual exista um Montante de Excesso de Caixa Disponível, 10% do Montante de Excesso de Caixa Disponível serão distribuídos aos Titulares (com 90% desse Montante de Excesso de Caixa Disponível a ser distribuído a titulares das Novas Notas);

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 176

(ii)      para a segunda Data de Medição de Excedente de Caixa, para a qual exista um Montante de Excesso de Caixa Disponível (a "**Segunda Data de Medição**"), 10% do Montante de Excesso de Caixa Disponível serão distribuídos aos Titulares (com 80% e 10% desse Montante de Excesso de Caixa Disponível a ser distribuído a titulares das Novas Notas e ao Acionista Emissor, respectivamente);

(iii)     para cada Data de Medição de Excesso de Caixa subsequente, em relação à qual exista um Montante de Excesso de Caixa Disponível, até dezembro de 2031:

(1)      se os juros com vencimento em todas as séries das Novas Notas tiverem sido pagos integralmente, em espécie (sem qualquer Pagamento PIK) dos 12 (doze) meses anteriores consecutivos: 10% do Montante de Excesso de Caixa Disponível serão distribuídos aos Titulares (com 70% e 20% desse Montante de Excesso de Caixa Disponível a ser distribuído a titulares das Novas Notas e ao Acionista Emissor, respectivamente);

(2)      Se os juros com vencimento em todas as séries das Novas Notas não tiverem sido pagos integralmente, em espécie dos 12 (doze) meses anteriores consecutivos: 10% do Montante de Excesso de Caixa Disponível serão distribuídos aos Titulares de (com 80% e 10% desse Montante de Excesso de Caixa Disponível a ser distribuído a titulares das Novas Notas e ao Acionista Emissor, respectivamente); e

(iv)     Para cada Data de Medição de Excedente de Caixa subsequente à Segunda Data de Medição em relação à qual exista um Montante de Excesso de Caixa Disponível, começando em 31 de dezembro de 2032, 10% do Montante de Excesso de Caixa Disponível serão distribuídos aos Titulares (com 60% e 30% desse Montante de Excesso de Caixa Disponível a ser distribuído a titulares das Novas Notas e ao Acionista Emissor, respectivamente);

Seção 2.07 Distribuições do Montante de Excesso de Caixa Disponível Durante e Após o Período de Excesso de *Cash Sweep*.

Durante o Período de Excesso de *Cash Sweep*, Pagamentos de Excesso de Caixa serão devidos a Titulares de forma anual, em 15 de maio, após cada Data de Medição de Excesso de Caixa. Após o Período de Excesso de *Cash Sweep*, o Emissor fará Pagamentos de Excesso de Caixa para os Titulares de tempos em tempos na mesma data que qualquer distribuição é feita ao Acionista Emissor em montante igual ao Percentual de Distribuição do Instrumento do Montante de Excesso de Caixa Disponível nos termos e sujeitos aos termos e condições previstos abaixo. Para evitar dúvida, distribuições correspondentes da parte aplicável de qualquer Montante de Excesso de Caixa Disponível devido ao Acionista Emissor serão feitas nessa Data de Pagamento ou após a mesma.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 177

Pagamentos de Excesso de Caixa devido aos Titulares serão aplicados, com base no dólar por dólar, para reduzir o montante do principal em aberto dos Valores Mobiliários, de acordo com a 0 abaixo.

Os Pagamentos de Excesso de Caixa serão efetuados em Dólares dos EUA. Se qualquer Pagamento de Excesso de Caixa precisar ser convertido em Dólares dos EUA, ele será convertido na Taxa de Liquidação na data que ocorrer dois Dias Úteis antes da Data de Pagamento de Excesso de Caixa.

Seção 2.08.     *Eventos de Distribuição Específica.*

Além de Pagamentos de Excesso de Caixa efetuados no curso normal de acordo com a Seção 2.06 acima, o Emissor não será obrigado a fazer, e os Titulares não terão direito a receber nenhum pagamento sob os Valores Mobiliários, exceto na ocorrência de um evento descrito nesta Seção 2.08 (cada um, um "**Evento de Distribuição Específica**" e cada pagamento sob os Valores Mobiliários efetuados, um "**Pagamento de Evento de Distribuição Específica**"):

(a) *Venda de Ações que Não Resultam em Mudança de Controle*

No caso de o Emissor Transferir ações da Sociedade para terceiros em uma operação que não resulte em Mudança de Controle, o Emissor, dentro de noventa dias corridos a partir do seu recebimento, aplicará o valor agregado em dólares norte-americanos desses Rendimentos Líquidos Aplicáveis recebidos por ele em conexão com essa operação para, separadamente ou em combinação, (i) efetuar um pagamento sob os Valores Mobiliários aos seus Titulares, ou (ii) recomprar Valores Mobiliários de acordo com uma Oferta Pública Qualificada.

Após a aplicação de tais Rendimentos Líquidos Aplicáveis de acordo com este documento, o Valor de Face dos Valores Mobiliários em circulação será reduzido em (1) na medida aplicada para efetuar pagamentos sob os Valores Mobiliários, o maior de (i) um valor igual ao produto de (x) o Valor de Face dos Valores Mobiliários em circulação imediatamente antes dessa distribuição e (y) a redução percentual no número de ações da Sociedade detidas pelo Emissor como resultado da consumação de tal operação e (ii) um valor igual ao valor em Dólares dos Estados Unidos dessa distribuição; e (2) na medida aplicada para efetuar recompras de acordo com uma Oferta Pública Qualificada, a redução percentual no Valor de Face dos Valores Mobiliários assim recomprados como resultado de tal Oferta Pública Qualificada.

Para evitar dúvidas, esta seção não se aplica a qualquer emissão de ações pela Sociedade.

(b) *Venda de Todos ou Substancialmente Todos os Ativos*

No caso de a Sociedade vender todos ou substancialmente todos os seus ativos a terceiros em uma operação que não resulte em Mudança de Controle, o Emissor usará os Rendimentos Líquidos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 178

Aplicáveis recebidos por ele em conexão com essa operação para efetuar um pagamento de acordo com os Valores Mobiliários aos Titulares dentro de (i) sessenta dias corridos a partir do recebimento, se o Rendimento Líquido Aplicável for pago integralmente em dinheiro e (ii) noventa dias corridos a partir do recebimento, se o Rendimento Líquido Aplicável incluir, no todo ou em parte, contraprestação sem dinheiro.

Com a aplicação dos Rendimentos Líquidos Aplicáveis, conforme esta disposição (b), o Valor de Face em Circulação dos Valores Mobiliários será reduzido em um valor igual ao valor em dólares dessa distribuição.

(c)       O Emissor entregará ao Agente Fiduciário notificação por escrito de qualquer Evento de Distribuição Especificado, no mínimo, vinte dias corridos antes da data proposta para esse Evento de Distribuição Especificado, aviso que especificará o valor e estabelecerá o cálculo do Pagamento de Evento de Distribuição Especificado correspondente Data de Pagamento agendada em relação a isso.

(d)       *Contraprestação Não Monetária*

No caso de um Evento de Distribuição Especificado incluir contraprestação não monetária, as distribuições correspondentes aos Titulares serão calculadas com base em (i) o Valor Justo de Mercado dessa contraprestação (líquido de impostos e outras despesas), conforme determinado por um Banco de Investimento Qualificado ou (ii) no caso de quaisquer valores mobiliários negociáveis, os Rendimentos Líquidos de Caixa realizados pela venda desses valores negociáveis a um comprador terceiro; *desde que*, apesar da forma de contraprestação não monetária recebida pelo emissor, pela Sociedade ou pelo Acionista Emissor, conforme o caso, em conexão com essa operação, o Emissor faça o correspondente pagamento de Evento de Distribuição Especificado aos Titulares em dinheiro.

*Seção 2.09      Pagamento do Principal.*

(a)       O pagamento do principal (que, para evitar dúvidas, incluirá quaisquer Pagamentos ou Montantes de Resgate, conforme aplicável) será feito a cada Titular no endereço do Titular indicado no Registro no encerramento dos negócios no 15º dia (Dia Útil ou não) antes de qualquer data de vencimento para o pagamento de tal Valor Mobiliário (a "**Data de Registro Regular**"), (i) no caso dos Valores Mobiliários Globais, por um Agente de Pagamentos por transferência bancária de fundos imediatamente disponíveis para os Titulares para uma conta em um banco localizado nos Estados Unidos, conforme designado por cada Titular, pelo menos, quinze dias corridos antes da Data de Pagamento aplicável, e (ii) no caso de Valores Mobiliários Certificados, por um Agente de Pagamentos enviando um cheque para o Titular no endereço do mesmo. Para quaisquer Valor Mobiliário Certificado o Titular de US$ 1.000.000,00 ou mais no montante do principal total pode solicitar o pagamento por transferência bancária, mas somente se instruções de pagamento apropriadas tiverem sido recebidas por escrito por qualquer Agente de Pagamentos em relação a tal Valor Mobiliário, não menos de quinze dias corridos antes da Data de Pagamento aplicável. Caso o pagamento seja feito de acordo com as instruções

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 179

do Titular, tal transferência bancária será considerada como constituindo o pagamento integral e completo de tal principal, prêmio, se houver, dos Valores Mobiliários.

(b)        O pagamento do principal devido em relação a qualquer Valor Mobiliário Certificado na Data de Vencimento será feito em fundos imediatamente disponíveis, mediante a entrega de tal Valor Mobiliário no escritório especificado de qualquer Agente de Pagamentos em relação a tal Valor Mobiliário e acompanhado de instruções de transferência bancária; *ressalvado*, que a Valor Mobiliário Certificado seja apresentada a tal Agente de Pagamentos em tempo hábil para que tal Agente de Pagamentos efetue tais pagamentos nesses fundos, de acordo com seus procedimentos normais.

(c)        O Emissor pagará quaisquer custos administrativos impostos pelos bancos, em conexão com pagamentos por transferência bancária, mas qualquer imposto, taxa ou encargo governamental aplicado sobre pagamentos será suportado pelos Titulares, a respeito dos quais tais pagamentos são feitos, salvo disposição em contrário neste documento.

(d)        Não obstante qualquer disposição em contrário neste Artigo 2, se o Valor Mobiliário for um Valor Mobiliário Global depositada junto ao custodiante e registrada em nome de um nomeado da DTC, os pagamentos sobre o Valor Mobiliário serão entregues à DTC, como Titular Registrado, de acordo com os procedimentos aplicáveis da DTC. Os Valores Mobiliários serão emitidas na forma de certificado em troca de um Valor Mobiliário Global somente se (i) a DTC notificar o Emissor que não está disposto ou incapaz de continuar como depositário de tal Valor Mobiliário Global, ou a DTC deixar de ser uma "agência de compensação" inscrita nos termos da Lei da Bolsa de Valores e um depositário sucessor não ser nomeado pelo Emissor em até noventa dias corridos, ou (ii) um Evento de Inadimplemento ocorreu e continua em relação a tais Valores Mobiliários e os Titulares fizeram um pedido à DTC para troca de tal Valor Mobiliário Global para Valores Mobiliários Certificados, *ressalvado* que cada transferência ou troca seja feita de acordo com as disposições desta Escritura e com os procedimentos aplicáveis da DTC.

(e)        Distribuições efetuadas aos Titulares conforme a Seção 2.06 e Seção 2.07 serão aplicadas com base no dólar por dólar, para reduzir o montante do principal em aberto (que será o Valor de Face para os fins desse termo) dos Valores Mobiliários em um montante total que não exceda o montante do principal total dos Valores Mobiliários. Distribuições efetuadas aos Titulares conforme a Seção 2.08 serão aplicáveis conforme previsto nessa seção para reduzir o montante principal em circulação (que será o Valor de Face para fins desse termo) dos Valores Mobiliários.

(f)        Cada Valor Mobiliário Global deverá incluir um cronograma no qual reduza no Valor de Face dos Valores Mobiliários resultante dos Pagamentos de Excesso de Caixa e outras Distribuições efetuados, de acordo com os termos dessa Escritura que serão registrados.

Seção 2.10.        *Direitos do Principal Preservados* Salvo disposição em contrário aqui prevista para o resgate dos Valores Mobiliários, o pagamento do principal dos Valores Mobiliários (que, para

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 180

evitar dúvidas, incluirá quaisquer Pagamentos ou Montantes de Resgate, conforme aplicável) será alocado proporcionalmente entre todas os Valores Mobiliários em Circulação, sem preferência ou prioridade de qualquer tipo entre os Valores Mobiliários.

(b)      Os pagamentos finais referentes a qualquer Valor Mobiliário (seja no resgate, declaração de vencimento antecipado ou de outra forma) serão feitos somente contra a apresentação e entrega de tal Valor Mobiliário no Corporate Trust Office, nos escritórios do Agente Fiduciário e, sujeitos a quaisquer leis e regulamentos fiscais ou outros aplicáveis, nos escritórios especificados de qualquer outro Agente de Pagamentos nomeado pelo Emissor.

(c)      O pagamento de qualquer principal de qualquer Valor Mobiliário em uma Data de Pagamento relevante será efetuado para a Pessoa cujo nome esse Valor Mobiliário está registrada no Registro no encerramento dos negócios no décimo quinto dia (seja ou não um Dia Útil) imediatamente anterior a tal Data de Pagamento, por um cheque sacado em Dólares dos EUA em um banco na Cidade de Nova Iorque e enviado por correio à Pessoa com direito a tal, em seu endereço constante do Registro, ou por transferência bancária para uma conta em Dólares dos EUA mantida pelo beneficiário em um banco na Cidade de Nova Iorque, *desde que* tal Titular assim o escolha, mediante notificação por escrito para tal efeito designando tal conta, mediante solicitação ao Agente Fiduciário, pelo menos, quinze dias corridos antes dessa Data de Pagamento.

Se a Data de Pagamento em relação a qualquer Valor Mobiliário não for um Dia Útil no local em que for apresentada para pagamento, o Titular da mesma não terá direito ao pagamento da quantia devida até o próximo Dia Útil no local e não terá direito a qualquer pagamento em relação a qualquer atraso.

Não obstante as disposições dessa Seção 2.10, os pagamentos sobre os Valores Mobiliários registradas em nome da DTC ou de sua nomeada serão efetuados de acordo com os Procedimentos Aplicáveis.

Seção 2.11.      *Listas de Titularidade*. O Agente Fiduciário deverá preservar de forma tão atual quanto for razoavelmente possível, a lista mais recente disponível dos nomes e endereços dos Titulares. Se o Agente Fiduciário não for o Oficial de Registro, o Emissor deverá fornecer ao Agente Fiduciário por escrito nos momentos em que o Agente Fiduciário poderá solicitar por escrito, uma lista nessa forma e a partir de tal data, conforme o Agente Fiduciário poderá solicitar razoavelmente os nomes e endereços dos Titulares.

Seção 2.12.      *Transferência e Troca.* (a) As participações na Valor Mobiliário Global conforme o Regulamento S e a Valor Mobiliário Global Restrita serão somente passíveis de troca ou transferíveis conforme o caso, para a entrega física de Valores Mobiliários Certificados se (i) a DTC notificar o Emissor que não está disposto ou incapaz de continuar como depositário dessa Valor Mobiliário Global

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 181

ou a DTC deixar de ser uma "agência de compensação" inscrita nos termos da Lei da Bolsa de Valores e um depositário sucessor não ser nomeado pelo Emissor em até noventa dias corridos, ou (ii) um Evento de Inadimplemento ter ocorrido e persistir em relação a esses Valores Mobiliários e o Emissor recebeu uma solicitação escrita de um titular para emitir sua participação proporcional nos Valores Mobiliários na forma de Valores Mobiliários certificados, *desde que* essa transferência ou troca seja feita de acordo com o disposto dessa Escritura e dos Procedimentos Aplicáveis. Valores Mobiliários Certificados emitidos de forma certificada serão registrados em nome das Pessoas e pelo Valor de Face que o Emissor venha a solicitar.

Ao receber a notificação da DTC ou do Agente Fiduciário, conforme o caso, em relação à ocorrência de qualquer um dos eventos descritos no parágrafo anterior, o Emissor envidará seus melhores esforços para fazer acordos com a DTC para a troca de participações nos Valores Mobiliários Globais por Valores Mobiliários Certificados individuais, e providenciar para que os Valores Mobiliários Certificados individuais solicitadas sejam assinadas e entregues ao Agente Fiduciário em quantidades suficientes e autenticadas pelo Agente Fiduciário para entrega aos Titulares. No caso de Valores Mobiliários Certificados emitidas em troca do Valor Mobiliário Global Restrita, tais Valores Mobiliários Certificados devem conter a Legenda da Lei de Valores Mobiliários. Após o registro da transferência, troca ou substituição de Valores Mobiliários com tal Legenda da Lei de Valores Mobiliários, ou mediante solicitação específica de remoção da Legenda da Lei de Valores Mobiliários em um Valor Mobiliário, o Emissor deverá entregar apenas Valores Mobiliários com tal Legenda da Lei de Valores Mobiliários, ou deverá recusar-se a remover tal Legenda da Lei de Valores Mobiliários, conforme o caso, a menos que seja entregue ao Emissor um certificado na forma do ANEXO D ou do ANEXO F, conforme o caso, ou provas satisfatórias que possam ser razoavelmente exigidas pelo Emissor, que podem incluir um Parecer de Advogado, de que nem a Lenda da Lei de Valores Mobiliários nem as restrições de transferência estabelecidas nela são necessárias para garantir o cumprimento das disposições da Lei de Valores Mobiliários. O Agente Fiduciário trocará um Valor Mobiliário contendo a Legenda da Lei de Valores Mobiliários por um Valor Mobiliário que não contém tal Legenda da Lei de Valores Mobiliários somente se tiver sido instruído por escrito pelo Emissor, em cuja orientação poderá se basear de forma conclusiva.

(b)     Em ou antes do 40º dia após a Data de Encerramento, transferências por um proprietário de uma participação benéfica na Valor Mobiliário Global conforme o Regulamento S para um cessionário que receber tal participação através da Valor Mobiliário Global Restrita serão feitas somente em Denominações Autorizadas de acordo com os Procedimentos Aplicáveis e após o recebimento pelo Agente Fiduciário ou pelo Agente de Transferência de um certificado escrito do cedente da participação benéfica na forma do ANEXO E ou que tal transferência está sendo feita a uma Pessoa que o cedente razoavelmente acredita ser um "comprador institucional qualificado" no sentido da Regra 144A em uma operação que atende aos requisitos da Regra 144A e de acordo com quaisquer leis de valores mobiliários aplicáveis de qualquer estado dos Estados Unidos ou de qualquer outra jurisdição. Após esse 40º dia, tal exigência de certificação não se aplicará mais a tais transferências.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 182

(c)      As transferências por um proprietário de um Valor Mobiliário Certificado contendo a Legenda da Lei de Valores Mobiliários ou de uma participação benéfica na Valor Mobiliário Global Restrita para um cessionário que receber tal participação através da Valor Mobiliário Global conforme o Regulamento S ou na forma de um Valor Mobiliário Certificado não contendo a Legenda da Lei de Valores Mobiliários deverão ser feitas somente em Denominações Autorizadas após o recebimento pelo Agente Fiduciário ou pelo Agente de Transferência de uma certificação escrita do cedente na forma do ANEXO D, no sentido de que tal transferência está sendo feita de acordo com o Regulamento S.

As participações benéficas nos Valores Mobiliários Globais serão apresentadas e as transferências das mesmas serão feitas somente por meio dos registros mantidos pela DTC e seus participantes, diretos e indiretos, inclusive a Euroclear e a Clearstream Banking.

As transferências entre participantes na DTC serão efetuadas de acordo com os Procedimentos Aplicáveis e serão liquidadas no *Sistema de Liquidação de Fundos do Mesmo Dia* da DTC e a atividade de negociação no mercado secundário de tais Valores Mobiliários deverá, portanto, ser liquidada em fundos imediatamente disponíveis. Não pode haver garantia quanto ao efeito, se houver, de liquidações em fundos imediatamente disponíveis na atividade de negociação dos Valores Mobiliários. As transferências entre participantes da Euroclear e da Clearstream Banking serão efetuadas de acordo com os Procedimentos Aplicáveis.

(d)      Os Valores Mobiliários Certificados podem ser trocadas ou transferidas, no todo ou em parte, no montante principal das Denominações Autorizadas mediante a entrega de tais Valores Mobiliários Certificados no escritório do Agente Fiduciário ou de qualquer Agente de Transferência com um instrumento escrito de transferência conforme previsto nesta Escritura na forma do ANEXO B ao presente documento, devidamente assinado pelo seu Titular ou seu advogado devidamente autorizado por escrito.

Em troca de qualquer Valor Mobiliário Certificado devidamente apresentada para transferência, o Agente Fiduciário deverá imediatamente autenticar e entregar ou providenciar para que seja autenticada e entregue no Corporate Trust Office, ao cessionário, ou enviar pelo correio (por conta e risco do cessionário) ao endereço que o cessionário possa solicitar, um Valor Mobiliário ou Valores Mobiliários Certificados, conforme o caso, registradas em nome de tal cessionário, pelo mesmo valor principal total que foi transferido. No caso da transferência de qualquer Valor Mobiliário Certificado em parte, o Agente Fiduciário também deverá imediatamente autenticar e entregar ou providenciar para que seja autenticada e entregue no Corporate Trust Office, ao cedente, ou enviar pelo correio (por risco do cedente) para o endereço que o cedente possa solicitar, um Valor Mobiliário ou Valores Mobiliários Certificados, conforme o caso, registradas em nome de tal cedente, pelo valor principal total que não foi transferido. Nenhuma transferência de qualquer Valor Mobiliário deverá ser feita a menos que a solicitação de tal transferência seja feita pelo Titular registrado ou seu advogado devidamente autorizado

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº 2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 183

por escrito no Corporate Trust Office e seja acompanhada de um instrumento de transferência preenchido na forma do ANEXO C anexado à Nota apresentada para transferência.

(e)      A transferência, registro e troca de qualquer Nota ou Valores Mobiliários será permitida e assinada conforme previsto nesta Seção 2.12 sem qualquer custo para o Titular de qualquer Nota ou Valores Mobiliários que não sejam impostos ou encargos governamentais ou encargos de seguro pagáveis em transferências ou quaisquer despesas de entrega por outro meio que não o correio normal, mas sujeito a regulamentos razoáveis conforme o Emissor, o Oficial de Registro e o Agente Fiduciário podem estabelecer.

Os custos e despesas de efetuar qualquer troca ou registro de transferência de acordo com as disposições acima, exceto as despesas de entrega por outro meio que não o correio comum (se houver) e exceto o pagamento de uma quantia suficiente para cobrir quaisquer impostos ou outros encargos governamentais ou encargos de seguro que possam ser impostos em relação a eles, serão arcados pelo Emissor.

Todas os Valores Mobiliários Certificados emitidas em qualquer troca ou registro de transferência de Valores Mobiliários serão obrigações válidas do Emissor, evidenciando a mesma dívida, e com direito aos mesmos benefícios, que os Valores Mobiliários entregues em troca ou registro de transferência.

(f)      O Agente Fiduciário ou o Agente de Transferência deverá efetuar transferências de Valores Mobiliários Globais e Valores Mobiliários Certificados. Além disso, o Oficial de Registro deverá manter o Registro para a propriedade, troca e transferência de quaisquer Valores Mobiliários. O Agente de Transferência deverá notificar imediatamente o Oficial de Registro e o Oficial de Registro deverá igualmente notificar imediatamente o Agente Fiduciário sobre qualquer troca ou transferência de tais Valores Mobiliários. Nem o Agente Fiduciário nem qualquer Agente de Transferência deverá registrar a troca ou a transferência de participações durante o período de quinze dias corridos, começando na Data de Registro e encerrando na Data de Pagamento. O Agente Fiduciário deverá notificar imediatamente o Emissor sobre qualquer substituição, transferência, cancelamento ou destruição dos Valores Mobiliários.

(g)      Em qualquer troca de toda ou parte de qualquer Valor Mobiliário Global por um Valor Mobiliário Certificado ou uma participação em um Valor Mobiliário Global Restrita ou um Valor Mobiliário Global conforme o Regulamento S, a Valor Mobiliário Global a ser trocada deverá ser marcada para refletir a redução de seu valor principal pelo valor principal total de tal Valor Mobiliário Certificado ou a participação a ser trocada por uma participação em um Valor Mobiliário Global conforme o Regulamento S ou um Valor Mobiliário Global Restrita, conforme o caso. Até que seja trocada na íntegra, o Valor Mobiliário terá, em todos os aspectos, os mesmos benefícios nos termos desta Escritura que os Valores Mobiliários autenticadas e entregues de acordo com o presente documento.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 184

Seção 2.13.    *Substituição de Valores Mobiliários*. Os Valores Mobiliários que forem mutilados, destruídas, roubadas ou perdidas serão substituídas mediante entrega da mesma ao Agente Fiduciário, ou entrega ao Emissor e ao Agente Fiduciário de prova satisfatória da perda, roubo ou destruição das mesmas para o Emissor e Agente Fiduciário. No caso de um Valor Mobiliário perdida, roubada ou destruída, pode ser exigida uma indenização satisfatória para o Agente Fiduciário e o Emissor às custas do Titular de tal Valor Mobiliário antes que o Valor Mobiliário substituto seja emitido. Após a emissão de qualquer Valor Mobiliário, o Emissor pode exigir o pagamento de uma quantia suficiente para cobrir qualquer imposto ou outro encargo governamental que possa ser aplicado em relação àquela e quaisquer outras despesas (incluindo os honorários e as despesas do Agente Fiduciário, seus advogados e seus agentes) conectadas com a mesma.

Seção 2.14.    *Valores Mobiliários Temporários*. Sujeito às disposições da Seção 2.12(a) até que os Valores Mobiliários Certificados estejam prontas para entrega, o Emissor poderá elaborar e o Agente Fiduciário deverá autenticar os Valores Mobiliários temporárias. Os Valores Mobiliários Temporárias deverão ser substancialmente na forma de Valores Mobiliários Certificados, mas podem ter variações que o Emissor considerar apropriadas para Valores Mobiliários temporárias. Conforme necessário, o Emissor deverá elaborar e o Agente Fiduciário deverá autenticar os Valores Mobiliários Certificados e entregá-las em troca de Valores Mobiliários temporárias no escritório ou agência do Emissor ou do Agente Fiduciário, sem cobranças para o Titular. Até que sejam trocadas, os Valores Mobiliários temporárias terão direito aos mesmos benefícios, nos termos desta Escritura, que os Valores Mobiliários Certificados.

Seção 2.15.    *Cancelamento*. O Emissor pode, a qualquer momento, entregar Valores Mobiliários ao Agente Fiduciário para cancelamento. Os Agentes de Transferência e os Agentes Pagadores deverão encaminhar ao Agente Fiduciário quaisquer Valores Mobiliários entregues a eles para transferência, troca ou pagamento. O Agente Fiduciário ou um Agente de Pagamentos e ninguém mais poderá cancelar e o Agente Fiduciário destruirá, de acordo com seus procedimentos habituais (sujeito aos requisitos de conservação de registros da Lei da Bolsa de Valores), todas as Obrigações entregues para transferência, troca, pagamento ou cancelamento e, se assim for destruído, entregará um certificado de tal destruição ao Emissor, a menos que o Emissor instrua o Agente Fiduciário por escrito a entregar os Valores Mobiliários canceladas ao Emissor. O Emissor não poderá emitir novos Valores Mobiliários para substituir os Valores Mobiliários que resgatou, pagou ou entregou ao Agente Fiduciário para cancelamento.

Seção 2.16.    [*Números CUSIP e ISIN*O Emissor ao emitir os Valores Mobiliários poderá utilizar números CUSIP e ISIN (se então geralmente em uso) e, se assim for, o Agente Fiduciário deverá utilizar números CUSIP e ISIN em notificações como uma conveniência para os Titulares; *desde que*, *no entanto*, qualquer notificação possa declarar que nenhuma declaração seja feita quanto à exatidão de tais números, seja como impresso nos Valores Mobiliários ou como contido em qualquer notificação, e que o fundamento poderá ser colocado somente nos outros números de identificação impressos nos

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 185

Valores Mobiliários, e qualquer notificação não será afetada por qualquer defeito ou omissão de tais números. O Emissor deverá notificar imediatamente o Agente Fiduciário por escrito sobre qualquer alteração nos números CUSIP ou ISIN[4]].

### Artigo 3
### Resgate e Recompra

Seção 3.01. *Vencimento*. A menos que resgatados, comprados ou cancelados anteriormente, os Valores Mobiliários serão reembolsados em Dólares pelo valor do principal em aberto na Data de Vencimento Indicada.

Seção 3.02. *Resgate Obrigatório*.

(a)    Em caso de uma Transferência de ações da Sociedade ou do Emissor para terceiros que resultem em uma Mudança de Controle (efetuada, de acordo com os termos acordados em tal Transferência, através de um única ou uma série de operações relacionadas) ou qualquer outra operação (ou série de operações relacionadas) que resulte em uma Mudança de Controle (cada uma "**Transação de Mudança de Controle**"), o Emissor resgatará, sem prêmio ou penalidade, todos os Valores Mobiliários em circulação, para pagamento de resgate, pagáveis em dinheiro, em valor igual ao produto de (i) Percentual de Distribuição de Instrumentos multiplicada por (ii) Valor do Patrimônio Líquido, conforme determinado por um Banco de Investimento Qualificado (tal valor, após dedução de qualquer troca de moeda) taxas e despesas, o "**Montante de Resgate Obrigatório**"); desde que, em nenhum caso, o Montante de Resgate Obrigatório exceda, no total, o Valor de face do Valor Mobiliário então em circulação.

Para esse fim, "**Valor Patrimonial**" significa o valor (líquido de qualquer parcela proporcional de quaisquer impostos e despesas de operação aplicáveis a pagar em relação à parcela respectiva do produto dessa operação ou a sua distribuição para os Titulares de acordo com esta Escritura.), a partir de qualquer data de determinação, de todos os ações da Sociedade de propriedade do Emissor nessa data, implícitas apenas por referência aos termos de tal Transação de Mudança de Controle (e não a quaisquer outros critérios de avaliação possíveis determinados pelo Banco de Investimento Qualificado).

(b)    O Emissor entregará ao Agente Fiduciário uma notificação por escrito sobre esse resgate pelo menos vinte dias corridos antes do pagamento do Montante de Resgate Obrigatório (o "Aviso de Resgate Obrigatório"). O pagamento do Montante de Resgate Obrigatório deve ser efetuado até (i) sessenta dias após a consumação da Transação de Mudança de Controle, se o Montante de Resgate Obrigatório for pago integralmente em dinheiro e (ii) noventa dias corridos após a consumação da Mudança de Transação de controle se o Montante de Resgate Obrigatório incluir, no todo ou em parte

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                      fls. 186

contraprestação que não em dinheiro. O Aviso de Resgate Obrigatório será irrevogável e deverá especificar, entre outros, a Data de Resgate proposta e o cálculo do Montante do Resgate Obrigatório.

(c)       O pagamento do Montante de Resgate Obrigatório será efetuado em Dólares dos Estados Unidos e, se o Montante de Resgate Obrigatório for convertido em Dólares dos Estados Unidos, será convertido à Taxa de Liquidação na data que ocorrer dois Dias Úteis anteriores à Data de Pagamento.

Seção 3.03. *Resgate opcional.*

(a)       Os Valores Mobiliários serão resgatáveis, por opção do Emissor ou de qualquer de suas Afiliadas, no todo ou em parte, a qualquer momento, sem prêmio ou penalidade, mediante aviso prévio de pelo menos 20 dias corridos ao Agente Fiduciário, mediante entrega de um aviso (cada um "Aviso de Resgate Opcional"), a um preço igual a 100% do Valor Nominal então em circulação dos Valores Mobiliários a serem resgatados na Data do Resgate (o "Montante do Resgate Opcional"). O Aviso de Resgate Opcional será irrevogável e especificará a Data de Resgate proposta e o cálculo do Valor do Resgate.

(b)       No caso de menos de todos os Valores Mobiliários serem resgatados a qualquer momento, a seleção de Valores Mobiliários para resgate será feita proporcionalmente, de acordo com os procedimentos aplicáveis da DTC, ou se os procedimentos da DTC não se aplicarem , proporcionalmente ou por outro método que o Agente Fiduciário considere justo e razoável.[5]

(c)       Após a entrega de um Valor mobiliário que é resgatado em parte, o Emissor emitirá e, mediante solicitação por escrito do Emissor, o Agente Fiduciário autenticará e entregará ao Titular, às custas do Emissor, um novo Valor mobiliário igual em Valor de Face ao da parcela não resgatada do Valor Mobiliário entregue.

(d)       Todos os Valores Mobiliários entregues para resgate serão cancelados pelo Agente de Transferência ou pelo Agente Pagador ou pelo Agente Fiduciário, conforme o caso, na Data de Resgate aplicável.

Seção 3.04. *Recompra*. O Emissor ou qualquer de suas Afiliadas poderá, a qualquer momento adquirir Valores Mobiliários a qualquer preço ou preço por meio de uma oferta pública de aquisição aberta a todos os Titulares, exceto quando não for possível fazê-lo devido à falta de qualificação para isenções da oferta de restrições impostas por qualquer jurisdição de acordo com a lei aplicável ou conforme permitido de outra forma sob esta Escritura. Nenhum Emissor ou qualquer de suas Afiliadas comprará os Valores Mobiliários (incluindo, sem limitação, no mercado aberto ou em operações privadas), exceto por meio de uma oferta pública aberta a todos os seus Titulares. Todos os Valores mobiliários entregues para compra em conexão com qualquer oferta pública de aquisição serão

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 187

cancelados pelo Agente de Transferência ou pelo Agente de Pagamentos ou pelo Agente Fiduciário, conforme o caso, na data da compra aplicável.

Seção 3.05. *Oferta Pública Qualificada da OEC*.

(a)      Se a Sociedade consumar uma Oferta Pública Qualificada, o Emissor, no máximo, dez dias úteis após o início dessa Oferta Pública Qualificada, fará com que a Sociedade notifique os Titulares (o "**Aviso de Oferta Pública Qualificada**"). Caso os Titulares que constituam pelo menos a maioria do Valor de face de todos os Valores Mobiliários notifiquem o Emissor por escrito dentro de vinte dias úteis após a entrega do Aviso de Oferta Pública Qualificada de sua intenção de trocar os Valores Mobiliários por Capital Social da Sociedade, todos os Valores Mobiliários serão trocados por Capital Social da Sociedade na proporção correspondente de valores mobiliários aplicáveis imediatamente antes do início da Oferta Pública Qualificada da OEC, de acordo com os procedimentos estabelecidos abaixo e nesta Escritura (o "**Direito de Oferta Pública Qualificada**" )

(b)      A quantidade de Capital Social a ser trocado pelos Valores Mobiliários será igual ao produto de (A) Percentual de Distribuição de Instrumentos e (B) a quantidade total de Capital Social Totalmente Diluído da Sociedade existente após a consumação da Oferta Pública Qualificada menos qualquer Capital Social primário emitido em tal Oferta Pública Qualificada.

(c)      O Edital de Oferta Pública Qualificada especificará a documentação e os procedimentos relevantes pelos quais o Capital Social será entregue aos Titulares, e qualquer outra informação exigida pela lei aplicável para permitir a entrega do Capital Social. O Emissor fará com que a Sociedade envide seus esforços comerciais razoáveis para entregar o Capital Social da Sociedade aos Titulares, sujeito às leis de valores mobiliários aplicáveis na forma de American Depositary Receipts, de acordo com esses procedimentos.

(d)      Após a emissão aos Titulares do Capital Social aplicável, em um valor agregado correspondente ao Valor de Face dos Valores Mobiliários, o Emissor cancelará e fará com que a Sociedade cancele todos os Valores Mobiliários em circulação com o Agente Fiduciário e o DTC na Data de Conclusão, de acordo com as disposições estabelecidas. adiante nesta Escritura.

Seção 3.06. *Aviso de Resgate pelo Emissor; Aviso ao Agente Fiduciário*.

(a)      No caso de resgate de Valores Mobiliários nos termos da Seção 3.02 e da Seção 3.03, o aviso de resgate deverá ser enviado pelo menos trinta, mas não mais de sessenta dias antes da Data de Resgate, a cada Titular de qualquer Valor Mobiliário a ser resgatado. por correio de primeira classe em seu endereço registrado e esse aviso será irrevogável. Em caso de resgate de Valores Mobiliários, a critério do Emissor, o Emissor deverá, pelo menos, setenta dias corridos antes da Data de Resgate fixada pelo Emissor (a menos que uma notificação mais curta seja satisfatória para o Agente Fiduciário) notificar o Agente Fiduciário por escrito de tal Data de Resgate.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 188

(b)      A notificação deverá indicar: (i) a Data de Resgate; (ii) o Preço de Resgate; (iii) o nome e endereço dos Agentes Pagadores; (iv) que os Valores Mobiliários chamados para resgate devem ser entregues a um Agente de Pagamentos para cobrar o Preço de Resgate; (v) o parágrafo dos Valores Mobiliários de acordo com o qual os Valores Mobiliários pediram resgate estão sendo resgatados; (vi) o número CUSIP ou ISIN, se houver; e (vii) que nenhuma declaração é feita quanto à exatidão ou precisão do número CUSIP ou ISIN, se houver, listado em tal notificação ou impresso nos Valores Mobiliários[6].

(c)      A critério do Emissor e a seu pedido, feito por escrito ao Agente Fiduciário, pelo menos, sessenta dias corridos antes da data de resgate das Obrigações, o Agente Fiduciário deverá enviar a notificação de resgate em nome do Emissor e às custas do Emissor; *desde* que o Emissor entregue ao Agente Fiduciário, pelo menos, setenta dias corridos antes da Data de Resgate, um Certificado dos Diretores solicitando que o Agente Fiduciário envie tal notificação e estabelecendo as informações a serem declaradas em tal notificação, conforme previsto no parágrafo anterior.

Seção 3.07.      *Depósito do Preço de Resgate*. Até às 10h00, horário da Cidade de Nova Iorque, no máximo, um Dia Útil antes da Data de Resgate, o Emissor deverá depositar junto ao Agente de Pagamentos a quantia suficiente para pagar o Preço de Resgate dos Valores Mobiliários, exceto os que tenham sido entregues pelo Emissor ao Agente Fiduciário, pelo menos, quinze dias corridos antes da Data de Resgate para cancelamento. O Emissor deverá solicitar que o banco através do qual tal pagamento deverá ser feito concorde em fornecer ao Agente de Pagamentos até às 10h00 (horário de Nova Iorque) [dois] Dias Úteis antes da data de vencimento de qualquer um desses pagamentos uma confirmação irrevogável de sua intenção de efetuar tal pagamento.

### ARTIGO 4
### OBRIGAÇÕES

Seção 4.01.      *Pagamento do Principal nos termos dos Valores Mobiliários*. O Emissor pagará em dinheiro pontualmente o principal dos Valores Mobiliários nas datas e da maneira prevista no Artigo 2 acima e conforme previsto nos Parágrafos 2 e 3 dos Valores Mobiliários. Um Dia Útil antes dessa data o Emissor depositará irrevogavelmente junto ao Agente Fiduciário ou aos outros Agentes Pagadores a quantia suficiente para fazer esse pagamento principal.

Seção 4.02.      *Manutenção de Escritório ou Agência*. O Emissor deverá manter um escritório ou agência no bairro de Manhattan, na Cidade de Nova York, onde notificações e exigências sobre o Emissor em relação a essa Escritura e as Notas possam ser entregues. Inicialmente, este escritório será nos escritórios da Cogency Global Inc., localizado na 22 East 42nd Street, 18th Floor, 115 New York, NY, 10168, e o Emissor concordará em não alterar a indicação de tal escritório sem aviso prévio ao

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº    2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 189

Agente fiduciário e indicação de um escritório substituto no bairro de Manhattan, na cidade de Nova York.

Seção 4.03.    *Quantia para Pagamentos dos Valores Mobiliários a ser Mantida como Garantia*.

(a)    Caso o Emissor, a qualquer momento, for agir como seu próprio Agente de Pagamentos, ele deverá, na ou antes de cada data de vencimento do principal de (incluindo, para evitar dúvidas, quaisquer Pagamentos ou Montantes de Resgate, conforme aplicável) prêmio, se houver, sobre ou juros sobre quaisquer Valores Mobiliários, segregar e manter como garantia em benefício das Pessoas com direito aos mesmos uma quantia suficiente para pagar o principal, o prêmio, se houver, ou juros que se tornem devidos até que essas quantias sejam pagas para essas Pessoas ou, de outra forma, alienados conforme previsto aqui e notificará o Agente Fiduciário de sua ação ou impossibilidade de agir dessa forma.

(b)    Sempre que o Emissor tiver um ou mais Agentes Pagadores dos Valores Mobiliários, ele deverá, na ou antes de cada data de vencimento do principal, prêmio, se houver, sobre ou juros sobre quaisquer Valores Mobiliários, depositar irrevogavelmente junto a um Agente de Pagamentos uma quantia suficiente para pagar o principal, prêmio, se houver, ou juros que se tornem devidos, tal quantia deve ser mantida em garantia em benefício das Pessoas com direito a tal principal ou juros e (a menos que tal Agente de Pagamentos seja o Agente Fiduciário) o Emissor notificará imediatamente o Agente Fiduciário de tal ação ou de qualquer impossibilidade de agir dessa forma.

(c)    Cada Agente de Pagamentos, sujeito às disposições dessa Seção 4.03, irá:

(i)    manter todas as quantias mantidas por ele para o pagamento do principal de ou juros sobre os Valores Mobiliários em garantia, em benefício das Pessoas com direito às mesmas até que todas as quantias sejam pagas para essas Pessoas ou, alienadas, de outra forma, conforme previsto aqui;

(ii)    entregar ao Agente Fiduciário uma notificação de qualquer inadimplemento por parte do Emissor (ou qualquer outro devedor mediante os Valores Mobiliários) na realização de qualquer pagamento do principal ou dos juros; e

(iii)    a qualquer momento, durante a continuação de qualquer inadimplemento mediante a solicitação por escrito do Agente Fiduciário, pagar imediatamente ao Agente Fiduciário todas as quantias assim mantidas em garantia por esse Agente de Pagamentos.

(d)    O Emissor providenciará para que cada Agente de Pagamentos assine e entregue um instrumento no qual esse Agente de Pagamentos deverá concordar com o Agente Fiduciário para atuar como Agente de Pagamentos de acordo com essa Seção 4.03.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 190

(e)      O Emissor pode, a qualquer momento, com o propósito de obter a satisfação e quitação dos Valores Mobiliários ou para qualquer outro propósito, pagar, ou por Ordem do Emissor direcionar qualquer Agente de Pagamentos a pagar, ao Agente Fiduciário todas as quantias mantidas em garantia pelo Emissor ou tal Agente de Pagamentos, tais quantias a serem mantidas em garantia pelo Emissor ou Agente de Pagamentos, tais quantias a serem mantidas pelo Agente Fiduciário nas mesmas garantias que aquelas sobre as quais tais quantias foram mantidas pelo Emissor ou tal Agente de Pagamentos; e, após tal pagamento por qualquer Agente de Pagamentos ao Agente Fiduciário, tal Agente de Pagamentos será liberado de qualquer outra responsabilidade com relação a tais quantias.

(f)      Qualquer quantia depositada junto ao Agente Fiduciário ou qualquer Agente de Pagamentos, ou então mantida pelo Emissor, em garantia para o pagamento do principal ou juros sobre qualquer Valor Mobiliário e que permanecer não reivindicada por dois anos após esse principal ou juros ter se tornado vencido e a pagar será pago para o Emissor, a pedido por escrito do ou (se, então, mantido em garantia pelo Emissor ou por cada um dos Garantidores) será quitado dessa garantia; e o Titular desse Valor Mobiliário, a partir de então, como um credor geral sem garantia, somente irá procurar o Emissor como Agente Fiduciário do mesmo, deixará de suspender; *desde que*, *entretanto*, o Agente Fiduciário ou esse Agente de Pagamentos, antes de ser solicitado a fazer qualquer pagamento, deverá, mediante solicitação e às custas do Emissor, providenciar para que seja publicada uma vez, em um jornal publicado na língua inglesa, publicada normalmente em cada Dia Útil e de circulação geral (i) no Distrito de Manhattan, Cidade de Nova Iorque e (ii) contanto que esses Valores Mobiliários estejam listadas em qualquer bolsa de valores, mediante a publicação em inglês em um jornal líder de circulação geral no país em que essa bolsa de valores está localizada, observe que tal quantia permanece não reivindicada e que, após a data especificada, que não será inferior a trinta dias corridos a partir da data de tal publicação, qualquer saldo não reivindicado de tal quantia então remanescente será reembolsado ao Emissor.

Seção 4.04.      *Manutenção da Existência Societária*. O Emissor (a) manterá sua existência legal sob as Leis aplicáveis de sua jurisdição da organização e todas as suas licenças, direitos, privilégios e franquias relevantes necessários para a manutenção de sua existência corporativa, (b) cumprirá, em todos os respeita, com seus Documentos Organizacionais, e (c) se abstém de fazer emendas a seus Documentos Organizacionais que não sejam aqueles que não seria razoavelmente esperado (i) resultar em um efeito adverso relevante na capacidade do Emissor, coletivamente, de fazer pagamentos pontuais devidos aos Valores Mobiliários ou (ii) aumentar o risco de o Emissor ser consolidado com outra Pessoa no caso de um Evento de Falência ou Insolvência do Emissor (incluindo, para evitar dúvidas, alterações necessárias em conexão com uma fusão ou consolidação do Emissor).

Seção 4.05.      *Cumprimento das Leis*. O Emissor deverá conduzir seus negócios em conformidade com todos os requisitos da lei aplicável, exceto se qualquer falha em cumprir não fosse esperada, individualmente ou no total, resultar em um Efeito Adverso Material e exceto que o Emissor poderá, às suas custas, debater, por processos apropriados conduzidos de boa-fé, a validade ou aplicação

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                     fls. 191

de qualquer requisito da Lei aplicável, contanto que a instituição desses processos não fosse esperada resultar em um Efeito Adverso Material.

Seção 4.06.    *Pagamentos de Montantes Adicionais.*

(a)      Todos os pagamentos pelo Emissor em relação às Valores Mobiliários serão feitos sem retenção ou dedução para ou por conta de quaisquer impostos, tributos, contribuições, taxas ou outros encargos governamentais presentes ou futuros de qualquer natureza e quaisquer multas ou juros relacionados aos mesmos (em conjunto, "**Impostos**") impostos ou cobrados por ou em nome das Ilhas Cayman ou do Brasil ou, após qualquer incorporação, fusão, transferência, dissolução ou assunção de obrigações aqui permitidas, a jurisdição na qual a Pessoa resultante, sobrevivente ou cessionária é constituída, residente para fins tributários ou tratada como tendo negócios, ou, em cada caso, qualquer subdivisão política da mesma ou autoridade tributária (cada uma, uma "**Jurisdição Tributária**"), a menos que tal retenção ou dedução seja exigida por lei. Nesse caso, o Emissor pagará a cada Titular os montantes adicionais ("**Montantes Adicionais**") que forem necessários para que cada pagamento líquido feito pelo Emissor sobre cada Valor Mobiliário após dedução ou retenção para ou por conta de qualquer Importo presente ou futuro que teria sido aplicado ou como resultado de tal pagamento pela Jurisdição Tributária não seja inferior ao montante então devido e a pagar sobre tais Valores Mobiliários sem essa retenção ou dedução. A obrigação supramencionada de pagar Montantes Adicionais, no entanto, não se aplica a:

(i)      qualquer Imposto que não teria sido aplicado, mas pela existência de qualquer ligação presente ou anterior entre esse Titular (ou entre um fiduciário, um instituidor, um beneficiário, um sócio ou um acionista de tal Titular, se tal Titular for um patrimônio, um truste, uma parceria ou uma sociedade) ou um beneficiário efetivo, por um lado, e a Jurisdição Tributária, por outro lado, incluindo, sem limitação, tal Titular (ou tal fiduciário, instituidor, beneficiário, sócio ou acionista) ou beneficiário efetivo sendo ou tendo sido cidadão ou residente da mesma ou estando ou tendo estado envolvido em um comércio ou negócio na mesma ou presente na mesma ou tendo, ou tendo tido, um estabelecimento permanente na mesma, mas não incluindo o simples recebimento de tal pagamento ou a titularidade ou detenção de tais Valores Mobiliários;

(ii)      qualquer Imposto que não teria sido aplicado, mas para a apresentação por tal Titular para pagamento (quando a apresentação for exigida) em data superior a trinta dias corridos após a data em que tal pagamento vencido e a pagar ou a data em que o pagamento estiver devidamente previsto, o que ocorrer mais tarde;

(iii)      à medida em que os Impostos não teriam sido aplicados, mas pelo não cumprimento pontual por parte do Titular ou do beneficiário efetivo de qualquer certificação, identificação ou outros requisitos de declaração relativos à nacionalidade,



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 192

residência, identidade ou conexão com a Jurisdição Tributária do Titular se (a) tal cumprimento for exigido ou imposto por lei, regulamento ou outra lei aplicável de tal Jurisdição Tributária como condição prévia à isenção total ou parcial desse Imposto e (b) pelo menos trinta) dias corridos antes da data em que o Emissor aplicar esta cláusula (iii) o Emissor tiver notificado a todos os Titulares que alguns ou todos os Titulares serão obrigados a cumprir tal requisito;

(iv)      Qualquer imposto sobre patrimônio, herança, doação, venda, transferência ou bens móveis ou Imposto semelhante;

(v)       qualquer Imposto a pagar a não ser por dedução ou retenção de pagamentos de principal ou de juros sobre os Valores Mobiliários; ou

(vi)      qualquer combinação dos itens (i) até (v) acima.

(b)      O Emissor também pagarão quaisquer impostos sobre carimbos, judiciais ou documentais presentes ou futuros ou quaisquer outros impostos sobre a produção, venda ou consumo de bens, encargos ou tributos semelhantes que surgirem em qualquer jurisdição da realização, entrega, registro ou realização de pagamentos em relação às Valores Mobiliários, excluindo quaisquer impostos, encargos ou tributos semelhantes aplicados por qualquer jurisdição fora de qualquer Jurisdição Tributária, exceto aqueles resultantes da, ou necessários para que sejam pagos em relação à, exequibilidade dos Valores Mobiliários após a ocorrência de qualquer Inadimplemento ou Evento de Inadimplemento (cada um, conforme definido abaixo).

(c)      Nenhum Montante Adicional será pago em relação a um pagamento sobre um Valor Mobiliário a um Titular que for um fiduciário ou parceria ou além do beneficiário efetivo único desse pagamento na medida em que um beneficiário ou instituidor em relação a esse fiduciário ou sócio dessa parceria ou beneficiário efetivo não teria direito de receber pagamentos dos Montantes Adicionais se o beneficiário, instituidor, sócio ou beneficiário efetivo fosse o Titular.

(d)      O Emissor fornecerá ao Agente Fiduciário o reconhecimento oficial da autoridade fiscal competente (ou, se tal reconhecimento não estiver disponível, uma cópia autenticada do mesmo, se disponível) comprovando o pagamento de impostos em qualquer Jurisdição Tributária em relação à qual o Emissor pagou quaisquer Montantes Adicionais. Cópias de tal documentação serão disponibilizadas aos Titulares ou aos Agentes Pagadores, conforme o caso, mediante solicitação dos mesmos.

(e)      O Emissor irá:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02            Livro nº LIV            fls. 193

(i)      pelo menos dez Dias Úteis antes da primeira Data de Pagamento de quaisquer Valores Mobiliários (e, pelo menos, dez Dias Úteis antes de cada Data de Pagamento seguinte ou de qualquer Data de Resgate, caso tenha havido qualquer alteração com relação aos assuntos estabelecidos no Certificado do Diretor abaixo mencionado), entregar ao Agente Fiduciário e a cada Agente de Pagamentos um Certificado do Diretor (i) especificando (x) o montante, se houver, dos Impostos descritos nesta Seção 4.06(e) aplicados ou cobrados por ou em nome de qualquer Jurisdição Tributária (os "**Impostos Relevantes Retidos na Fonte**") exigidos a serem deduzidos ou retidos no pagamento de principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate) ou juros sobre os Valores Mobiliários aos Titulares e (y) os Montantes Adicionais, se houver, devidos aos Titulares em relação a tal pagamento, e (ii) certificando que o Emissor pagará tal dedução ou retenção;

(ii)      antes da data de vencimento para o seu pagamento, pagará qualquer Imposto Relevante Retido na Fonte, juntamente com quaisquer multas ou juros aplicáveis;

(iii)      dentro de trinta dias corridos após o pagamento do Imposto Relevante Retido na Fonte, entregar ao Agente Fiduciário e ao Agente de Pagamentos o comprovante de tal pagamento e do envio do mesmo à autoridade tributária relevante ou outra autoridade, conforme descrito nesta Seção 4.06(e); e

(iv)      pagar ao Agente Fiduciário quaisquer Montantes Adicionais devidos aos Titulares em qualquer Data de Pagamento de Juros, Data de Resgate ou Data de Vencimento Indicado, de acordo com o disposto nesta Seção 4.06(e).

(v)      Qualquer Certificado de Diretor necessário por essa Seção 4.06(e) a ser fornecido pelo Agente Fiduciário e cada Agente de Pagamentos será considerado ser devidamente fornecido se for enviado por fac-símile ao Agente Fiduciário e a cada Agente de Pagamentos.

(vi)      Todas as referências nessa Escritura aos Pagamentos sobre Valores Mobiliários incluirão quaisquer Montantes Adicionais a pagar pelo Emissor em relação a esses Pagamentos ou suas Distribuições para os Titulares de acordo com esta Escritura.

Seção 4.07.    *Informação Disponível*. Enquanto os Valores Mobiliários forem "valores mobiliários restritos" na acepção da Regra 144(a)(3) da Lei de Valores Mobiliários, o Emissor, na medida do necessário, fornecerá a qualquer Titular com participação na Valor Mobiliário Global Restrita, ou a qualquer potencial comprador designado por tal Titular, mediante solicitação desse Titular, informações financeiras e outras descritas no parágrafo (d)(4) da Regra 144A em relação ao Emissor, na

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 194

medida do necessário, para permitir que tal Titular cumpra a Regra 144A em relação a qualquer revenda de suo Valor Mobiliário, a menos que, durante esse período, o Emissor esteja sujeito aos requisitos de comunicação da Seção 14 ou 16(d) da Lei da Bolsa de Valores, ou esteja isento de comunicar de acordo com a Regra 12g3-2(b) de acordo com a Lei da Bolsa de Valores e nenhuma outra informação sobre o Emissor é de outra forma exigida nos termos da Regra 144A.

Seção 4.08.     *Demonstrações Financeiras e Requisitos de Relatório.*  O Emissor irá fornecer aos Titulares e ao Agente Fiduciário uma versão em inglês de (1) demonstrações financeiras auditadas do Emissor elaboradas de acordo com o GAAP Brasileiro no máximo cento e vinte dias corridos após o fechamento do exercício social e (2) demonstrações financeiras anuais auditadas e trimestrais não auditadas consolidadas da Sociedade e suas Subsidiárias, bem como relatórios da administração e certificados que são entregues aos titulares das Novas Notas de acordo com os temos da escritura das Novas Notas. Simultaneamente à entrega das demonstrações financeiras do Emissor, o Emissor entregará ao Agente Fiduciário um Certificado do Diretor financeiro ou diretor contábil da Sociedade declarando se existe um Evento de Inadimplemento ou Inadimplemento na data de tal certificado e, se existe um Evento de Inadimplemento ou Inadimplemento, dispondo os detalhes dele e a medida sendo tomada ou proposta a ser tomada a esse respeito. Dentro de dez dias corridos após um conselheiro ou Diretor do Emissor tomar conhecimento da existência de um Evento de Inadimplemento ou Inadimplemento, o Emissor fará com que seja entregue aos Titulares e ao Agente Fiduciário um Certificado do Diretor ou do diretor financeiro da Sociedade dispondo os detalhes do mesmo e a medida sendo tomada ou proposta a ser tomada a esse respeito.

Se a Sociedade disponibilizar os relatórios descritos no primeiro parágrafo desta Seção 4.08 em seu site público livremente acessível a todos os Titulares, será considerado que a Sociedade e o Emissor terão cumprido com os requisitos de relatório previstos nesse parágrafo a respeito dos Titulares.

Seção 4.09.     *Garantias Adicionais.* O Emissor irá assinar e formalizar esses instrumentos adicionais e tomar outra medida razoável, conforme possa ser razoavelmente necessária para realizar os objetivos dos Valores Mobiliários e desta Escritura. Além disso, o Emissor envidará seus melhores esforços para obter quaisquer autorizações necessárias, de tempos em tempos, nos termos da lei ou do regulamento aplicável (inclusive do Banco Central do Brasil e da CVM em relação às Valores Mobiliários ou a esta Escritura).

Seção 4.10.     *Limitações e Restrições ao Emissor.*

(a)     O Emissor não (i) se envolverá em qualquer negócio ou conduzirá qualquer operação exceto para financiar as operações da Sociedade e atividades que são auxiliares a ela (incluindo, sem limitação, a emissão, venda, resgate ou recompra ou nulidade dos Valores Mobiliários ou Valores Mobiliários adicionais autorizados nos termos desta Escritura e quaisquer atividades incidentalmente

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 195

relacionadas a eles, ou emprestar recursos ou recomprar Endividamentos não proibidos por esta Escritura) ou conforme exigido por lei; ou (ii) manterá ativos relevantes além de (x) caixa ou equivalentes de caixa mantidos temporariamente de acordo com os termos deste instrumento e (y) 100% das participações Societárias da Sociedade;

(b) o emissor não incorrerá em nenhum outro endividamento que não seja (i) os valores mobiliários e (ii) qualquer endividamento entre empresas subordinado aos valores mobiliários;

(c) o Emissor não incorrerá em Ônus em qualquer de seus Bens (incluindo o Capital Social), exceto os Ônus impostos por operação da lei;

(d) o Emissor não tomará nenhuma ação societária em relação a, fundir-se ou consolidar-se com qualquer outra Pessoa ou celebrar qualquer acordo para vender todos ou substancialmente todos os seus ativos (exceto em conexão com a venda das ações da Sociedade permitido sob esta Escritura) ou firmar qualquer joint venture ou acordo semelhante com qualquer outra Pessoa;

(e) o emissor não tomará nenhuma ação societária com relação à liquidação voluntária, dissolução ou dissolução do emissor enquanto o emissor for o emissor dos valores mobiliários; e

(f) o Emissor manterá registros escritos atualizados, que disponibilizará ao Agente Fiduciário, de todos os pagamentos, resgates e recompras efetuados com relação aos Valores Mobiliários e estabelecerão o atual (i) Valor de Face dos Valores mobiliários e (ii) Porcentagem de Distribuição de Instrumentos.

Para evitar dúvidas, o Emissor, a Companhia ou suas Subsidiárias não serão impedidos pelas Seções 4.01 até 4.12 desta Escritura de se envolver em qualquer operação contemplada especificamente e realizada de acordo com os termos do Contrato Entre Sociedades

Para evitar dúvidas, não haverá restrição ao número de Distribuições, exceto conforme especificamente contemplado acima, e o Emissor poderá usar os recursos de quaisquer Distribuições exceto conforme necessário para pagamentos aos Titulares, de acordo com os termos desta Escritura, fazer distribuições ou empréstimos ao Acionista Emissor, lançar ofertas públicas para a compra dos Valores Mobiliários de acordo com os termos desta Escritura ou para financiar as atividades de suas Subsidiárias.

Seção 4.11.    *Taxas do Agente ou Agente Fiduciário*. O Emissor será responsável pelo pagamento de todas as taxas, custos e outras despesas documentadas relacionadas aos membros[7] do Agente Fiduciário e seus agentes em conexão com os Valores Mobiliários.

---
.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 196

Seção 4.12    *Cálculos de Pagamento.* O Emissor deve calcular de boa-fé o valor de cada Pagamento aplicável em relação aos Valores Mobiliários. O mais tardar três dias úteis antes de cada Data de pagamento, o Emissor entregará ao Agente Fiduciário (x) um certificado do diretor financeiro ou diretor contábil da Sociedade estabelecendo o cálculo com relação ao pagamento aplicável a ser feito em Data de Pagamento e a certificação de que o Pagamento a ser efetuado foi calculado de acordo com esta Escritura, e (y) informações de backup relacionadas para esse cálculo. Cada cálculo de pagamento deve ser um erro de manifesto final ausente.

### ARTIGO 5
#### EVENTOS DE INADIMPLEMENTO E RECURSOS

Seção 5.01.    *Eventos de Inadimplemento.* O termo "**Evento de Inadimplemento**" significa, quando usado neste documento, qualquer um dos seguintes eventos que ocorreu e persiste:

(a) o Emissor deixar de pagar ou fazer com que terceiros paguem, e essa falha continue por um período de dez dias corridos, qualquer quantia de Pagamento ou Valor de Resgate referente aos Valores Mobiliários quando o mesmo se tornar devido e a pagar;

(b) o Emissor deixar de cumprir o cumprimento ou cumprir quaisquer de suas outras obrigações sob ou em relação aos Valores Mobiliários e essa inadimplência permanecer sem solução por sessenta dias corridos após a notificação por escrito especificada abaixo;

(c) um Evento de Falência ou Insolvência do Emissor;

(d) um Evento de Falência ou Insolvência de qualquer garante ao abrigo da escritura que rege qualquer Série de Novas Notas;

(e) qualquer (i) endividamento por dinheiro emprestado do emissor ou de qualquer dos garantidores das Novas Notas em um valor total pendente de pelo menos US $ 50.000.000 (ou o equivalente no momento da determinação), ou (ii) qualquer Série de Novas Notas, torna-se devida e pagável integralmente antes do vencimento programado em razão de inadimplência e aceleração dos mesmos; *desde que*, sem prejuízo de quaisquer direitos que qualquer parte possa ter sob esta Escritura no caso de um Evento de Inadimplência especificado nesta cláusula Seção 5.01 (e), esse Evento de Inadimplência será automaticamente rescindido ou anulado se a antecipação do vencimento do endividamento aplicável é remediado, curado ou renunciado pelos detentores aplicáveis desse endividamento; e

(f)    uma ou mais decisões ou sentenças transitadas em julgado para o pagamento em dinheiro superior a US$ 50.000.000,00 (ou o equivalente no momento da determinação) (exceto decisões cobertas

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 197

por apólices de seguro exequíveis, emitidas por seguradoras respeitáveis e solventes) no total forem proferidas contra o Emissor e não forem pagas (integralmente ou em parcelas, de acordo com os termos da decisão) ou de outra forma forem extintas e, no caso de tal decisão ou sentença transitada em julgado, (i) um processo de execução foi iniciado por qualquer credor mediante tal decisão ou sentença, e não for indeferido ou de outra forma suspenso no prazo de quarenta e cinco dias corridos após a data em que o Emissor tiver sido citada ou, de outra forma, intimada a pagar ou garantir o pagamento dos montantes devidos sob tal processo de execução por decisão do tribunal com jurisdição competente ou (ii) houver um período de sessenta dias corridos após a decisão ou sentença transitada em julgado durante o qual tal decisão ou sentença não seja extinta, renunciada ou suspensa sua execução;

Se um Evento de Inadimplemento (exceto o Evento de Inadimplemento especificado na cláusula (c) acima) ocorrer e continuar, o Agente Fiduciário ou os Titulares de, pelo menos, 25% dos Valor de Face dos Valores Mobiliários em aberto poderão declarar todo o Valor de face dos Valores Mobiliários a vencer imediatamente, enviando uma notificação por escrito ao Emissor e, mediante tal declaração, tais montantes vencerão imediatamente. Se um Evento de Inadimplemento especificado na cláusula (c) acima ocorrer e persistir, então todo o Valor de Face dos Valores Mobiliários em aberto vencerá imediatamente sem nenhuma declaração ou outra medida pelo Agente Fiduciário ou qualquer Titular.

A qualquer momento após uma declaração de adiantamento ter sido feita e antes de uma decisão ou sentença para pagamento do valor devido ter sido obtida por qualquer Titular, os Titulares de pelo menos 50% do Valor de Face dos Valores Mobiliários então em circulação mediante notificação por escrito ao Emissor poderão rescindir ou anular tal declaração se:

(i)      o Emissor pagou ou depositou junto ao Agente Fiduciário e aos outros Agentes Pagadores uma quantia suficiente para pagar (a) todos os Pagamentos devidos sobre Valores Mobiliários em circulação, (b) todas as quantias pagas ou adiantadas pelo Agente Fiduciário e a indenização, despesas, desembolsos e adiantamentos razoáveis e devidamente documentados do Agente Fiduciário, seus agentes e advogados; e

(ii)      todos os Eventos de Inadimplemento foram sanados ou renunciados, conforme previsto no Artigo 8, exceto o não pagamento do principal que venceu apenas devido ao adiantamento.

Nenhuma rescisão afetará qualquer Inadimplemento ou Evento de Inadimplemento subsequente ou prejudicará qualquer direito consequente daquele.

Sujeito às disposições desta Escritura relativa aos deveres do Agente Fiduciário, no caso de um Evento de Inadimplemento ocorrer e continuar, o Agente Fiduciário não terá nenhuma obrigação de exercer quaisquer de seus direitos ou poderes nos termos desta Escritura, a pedido ou orientação de qualquer um dos Titulares, a menos que tais titulares tenham oferecido indenização satisfatória para o

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 198

Agente Fiduciário Sujeito a tal disposição para a indenização do Agente Fiduciário e certas outras condições estabelecidas nesta Escritura, os titulares da maioria no montante do principal total dos Valores Mobiliários em circulação terão o direito de determinar o tempo, o método e o local da realização de qualquer processo para qualquer solução disponível para o Agente Fiduciário ou exercer qualquer fideicomisso ou poder conferido ao Agente Fiduciário.

O Agente Fiduciário não deve ser responsabilizado pelo conhecimento de qualquer Evento de Inadimplemento, ou pelo conhecimento de qualquer solução de qualquer Inadimplemento ou Evento de Inadimplemento, salvo se (i) o diretor autorizado ou agente do Agente Fiduciário com responsabilidade direta pela administração da Escritura tiver conhecimento real de tal Inadimplemento ou Evento de Inadimplemento ou (ii) a notificação por escrito desse Inadimplemento ou Evento de Inadimplemento tiver sido entregue por este Emissor ou por qualquer Titular a tal diretor autorizado do Agente Fiduciário.

Sujeito às disposições desta Escritura relacionadas às funções do Agente Fiduciário em caso de Evento de Inadimplemento ocorrer e persistir, o Agente Fiduciário não terá obrigação de exercer qualquer de seus direitos ou poderes nos termos desta Escritura a pedido ou orientação de qualquer dos Titulares, a menos que esses Titulares tenham oferecido ao Agente Fiduciário uma indenização satisfatória ao Agente Fiduciário. Sujeito a tais disposições de indenização do Agente Fiduciário e certas outras condições previstas nesta Escritura, os Titulares da maioria do Valor de Face dos Valores Mobiliários então em circulação terão o direito de orientar o momento, método e local de condução de procedimentos para qualquer recurso disponível ao Agente Fiduciário ou exercendo qualquer truste ou poder conferido ao Agente Fiduciário.

Em caso de um Evento de Falência ou Insolvência a respeito exclusivamente do Emissor, os Titulares terão uma reivindicação nesse procedimento igual ao Valor de Face dos Valores Mobiliários em circulação correspondentes.

Seção 5.02.    Outros Recursos.

(a)    Se um Evento de Inadimplemento ocorrer e continuar, o Agente Fiduciário pode buscar qualquer recurso disponível por meio de um processo legal ou em equidade para cobrar o pagamento do principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate) ou outros montantes nas Notas, ou para executar o cumprimento de qualquer disposição dos Valores Mobiliários ou desta Escritura.

(b)    O Agente Fiduciário pode manter um processo mesmo que não possua nenhum dos Valores Mobiliários ou não apresente qualquer um deles no processo. Dentro dos limites permitidos pela lei aplicável, um atraso ou omissão do Agente Fiduciário ou qualquer Titular no exercício de qualquer direito ou recurso decorrente de um Evento de Inadimplemento não deve prejudicar o direito ou recurso ou constituir uma renúncia ou consentimento no Inadimplemento, nenhum recurso é exclusivo de

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 199

qualquer outro recurso e todos os recurso disponíveis são cumulativos dentro dos limites permitidos pela lei aplicável.

Seção 5.03.     Controle pela Maioria.

(a)     Os titulares da maioria do montante do principal dos Valores Mobiliários em circulação podem determinar a hora, o método e o local de condução de qualquer processo para qualquer recurso disponível ao Agente Fiduciário ou exercer qualquer fideicomisso ou poder conferido ao Agente Fiduciário. Sujeito a Seção 6.01, entretanto, o Agente Fiduciário pode se recusar a seguir qualquer orientação que entre em conflito com qualquer lei ou esta Escritura, e que o Agente Fiduciário determine poder ser excessivamente prejudicial aos direitos de qualquer outro Titular, ou que possa envolver o Agente Fiduciário em responsabilidade pessoal; ressalvado, que o Agente Fiduciário pode tomar qualquer outra medida considerada adequada pelo Agente Fiduciário que não seja inconsistente com tal orientação.

(b)     Se o Agente Fiduciário tomar qualquer medida ou seguir qualquer orientação nos termos desta Escritura, o Agente Fiduciário terá direito a uma indenização ou garantia que lhe seja satisfatória, a seu exclusivo critério, contra qualquer prejuízo ou despesa causada por tomar ou não tal medida ou seguir tal orientação.

Seção 5.04.     *Limitação de Ações*.

(a)     Exceto para fazer cumprir o direito de receber o pagamento do principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate), prêmio, se houver, ou outros montantes não pagos no vencimento, nenhum Titular pode buscar qualquer recurso em relação a esta Escritura ou os Valores Mobiliários, a menos que:

(i)     tal Titular encaminhou ao Agente Fiduciário uma notificação por escrito de que um Evento de Inadimplemento continua;

(ii)     os Titulares de pelo menos 30% do montante do principal dos Valores Mobiliários em circulação solicitaram ao Agente Fiduciário por escrito que busque um recurso;

(iii)     tais Titulares ofereceram ao Agente Fiduciário garantia ou indenização satisfatória contra qualquer prejuízo, passivo ou despesa;

(iv)     o Agente Fiduciário não cumpriu com tal solicitação nos prazos de sessenta dias após o recebimento da mesma e a oferta de garantia ou indenização; e

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                                    fls. 200

(v)      os Titulares da maioria no montante do principal dos Valores Mobiliários em circulação não deram ao Agente Fiduciário uma orientação por escrito inconsistente com tal solicitação, no prazo de sessenta dias.

(b)      O Titular não pode usar esta Escritura para afetar, atrapalhar ou prejudicar os direitos de outro Titular, ou para obter uma preferência ou prioridade sobre outro Titular (entendendo-se que o Agente Fiduciário não tem o dever explícito de verificar se tais medidas ou liberalidade são excessivamente prejudiciais a tais Titulares).

Seção 5.05.      *Direitos dos Titulares de Receber o Pagamento*. Não obstante qualquer disposição em contrário nesta Escritura, o direito de qualquer Titular de receber o pagamento do principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate) ou outros montantes sobre Valores Mobiliários, a partir das respectivas datas de vencimento expressas em tais Valores Mobiliários, ou para interpor uma ação para execução de qualquer pagamento a partir das respectivas datas, não será prejudicado ou afetado sem o consentimento do Titular.

Seção 5.06.      *Ação de Cobrança pelo Agente Fiduciário*.  Se um Inadimplemento no pagamento do principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate) ou outros montantes especificados na Seção 5.01(a)(i) ou Seção 5.01(a)(ii) ocorrer e continuar, o Agente Fiduciário pode sentença favorável em nome próprio e como administrador de um fideicomisso expresso contra o Emissor ou qualquer outro devedor dos Valores Mobiliários para o montante total do principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate) ou outros montantes não pagos, juntamente com juros sobre o principal vencido (incluindo, para evitar de dúvida, Pagamentos ou Montantes de Resgate) ou outros montantes, na medida em que o pagamento seja legal, à taxa anual suportada pelos Valores Mobiliários e qualquer outro montante que seja suficiente para cobrir os custos e despesas de cobrança, incluindo a indenização, despesas, desembolsos e adiantamentos razoáveis do Agente Fiduciário, seus agentes e advogado.

Seção 5.07.      *O Agente Fiduciário Pode Apresentar Declarações de Crédito*.  O Agente Fiduciário pode apresentar as declarações de crédito e outros papéis ou documentos que possam ser necessários ou aconselháveis, a fim de ter os créditos do Agente Fiduciário (incluindo qualquer crédito de indenização, despesas, desembolsos e adiantamentos do Agente Fiduciário, seus agentes e advogado) e os Titulares permitidos em quaisquer processos judiciais relativos ao Emissor, à Sociedade, seus credores ou seus bens, e terão o direito e o poder de cobrar e receber quaisquer valores ou outros bens devidos ou produtos de tais créditos e distribuí-los, e qualquer custodiante em qualquer processo judicial está autorizado por cada Titular a realizar tais pagamentos ao Agente Fiduciário e, no caso de o Agente Fiduciário consentir com a realização de tais pagamentos diretamente aos Titulares, a pagar ao Agente Fiduciário qualquer montante devido pela indenização, despesas, desembolsos e adiantamentos do Agente Fiduciário, seu agente e advogado, e quaisquer outros montantes devidos ao Agente Fiduciário de acordo com a Seção 6.06. Nada neste documento deve ser entendido como uma permissão para que

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº 2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02      Livro nº LIV      fls. 201

o Agente Fiduciário possa autorizar, consentir, aceitar ou aprovar em nome de qualquer Titular, qualquer plano de recuperação, entendimento, ajuste ou acordo que afete os Valores Mobiliários ou os direitos de qualquer titular dos mesmos, [ou autorizar o Agente Fiduciário a votar em relação ao crédito de qualquer Titular em qualquer processo][8]. O Agente Fiduciário terá o direito de participar dos assuntos que julgar necessários ou convenientes, a seu exclusivo critério, inclusive como membro de qualquer comitê oficial de credores.

Seção 5.08. *Prioridades*. Se o Agente Fiduciário cobrar qualquer valor ou bens de acordo com esta Seção 5, deverá pagar o valor ou bens na seguinte ordem:

(i) *Primeiro*: ao Agente Fiduciário e a qualquer Agente Pagador e seus respectivos agentes e advogados pelos montantes devidos nos termos da Seção 6.06, incluindo o pagamento de todas as indenizações, despesas e passivos incorridos, e todos os adiantamentos feitos pelo Agente Fiduciário e qualquer Agente Pagador e os custos e despesas de cobrança;

(ii) *Segundo:* aos Titulares pelos montantes devidos e não pagos dos Valores Mobiliários para o principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate), prêmio, se houver, ou outros montantes, proporcionalmente, sem preferência ou prioridade de qualquer tipo, de acordo com os montantes vencidos dos Valores Mobiliários para o principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate), prêmio, se houver, ou outros montantes, respectivamente; e

(iii) *Terceiro*: ao Emissor ou à parte que o tribunal de jurisdição competente determinar.

O Agente Fiduciário pode fixar uma data de registro e data de pagamento para qualquer pagamento aos Titulares, de acordo com esta Seção 5.08 e deve notificar imediatamente o Emissor. Pelo menos 15 dias corridos antes da data de registro, o Emissor enviará a cada Titular e ao Agente Fiduciário uma notificação indicando a data de registro, a data de pagamento e o montante a ser pago.

## ARTIGO 6
### AGENTE FIDUCIÁRIO E AGENTE DE PAGAMENTOS

Seção 6.01. *Deveres do Agente Fiduciário e do Agente de Pagamentos*.

(a) Se um Evento de Inadimplemento ocorreu e continua, e um Diretor Responsável tem conhecimento concreto do mesmo, o Agente Fiduciário deve exercer os direitos e poderes que lhe são conferidos por esta Escritura e usar o mesmo grau de cuidado e habilidade em seu exercício como uma Pessoa prudente exerceria ou usaria sob tais circunstâncias na condução de seus próprios assuntos.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 202

(b)      Exceto durante a continuação de um Evento de Inadimplemento, (i) o Agente Fiduciário e o Agente de Pagamentos comprometem-se em cumprir tais obrigações e somente as obrigações especificamente estabelecidas nesta Escritura, e nenhuma Obrigação ou obrigação implícita será interpretada nesta Escritura contra o Agente Fiduciário ou o Agente de Pagamentos; e (ii) na ausência de má-fé por parte do Agente Fiduciário ou do Agente de Pagamentos, o Agente Fiduciário ou o Agente de Pagamentos pode confiar, quanto à verdade das declarações e à exatidão dos pareceres expressos na mesma, sobre os certificados ou pareceres fornecidos ao Agente Fiduciário ou ao Agente de Pagamentos e em conformidade com os requisitos desta Escritura. No entanto, se quaisquer certificados ou pareceres que, por qualquer disposição deste documento, forem especificamente exigidos pelo Agente Fiduciário ou Agente de Pagamentos, o Agente Fiduciário e o Agente de Pagamentos examinarão os certificados e pareceres para determinar se estão ou não em conformidade com o requisitos desta Escritura (mas não precisam confirmar ou investigar a precisão dos cálculos matemáticos ou outros fatos declarados naqueles documentos).

(c)      O Agente Fiduciário não pode ser exonerado de sua responsabilidade por negligência grave, má-fé ou dolo, exceto que:

(i)      esta Seção 6.01(c) não limite o efeito da Seção 7.01(b); e

(ii)      o Agente Fiduciário e o Agente de Pagamentos não forem responsáveis por qualquer erro de julgamento cometido de boa-fé por um Diretor Responsável, a menos que seja provado que o Agente Fiduciário ou o Agente de Pagamentos foi totalmente negligente na apuração dos fatos pertinentes; e

(d)      O Agente Fiduciário e o Agente de Pagamentos não serão responsáveis pelos juros de qualquer valor recebido por eles, exceto se o Agente Fiduciário e o Agente de Pagamentos concordarem por escrito com o Emissor.

(e)      O valor depositado em garantia pelo Agente Fiduciário ou por qualquer Agente de Pagamentos não precisa ser segregado de outros recursos, exceto dentro dos limites exigidos por lei.

(f)      Nenhuma disposição desta Escritura exigirá que o Agente Fiduciário ou o Agente de Pagamentos gaste ou arrisque seus próprios recursos ou incorra em responsabilidade financeira pessoal no desempenho de qualquer de seus deveres ou no exercício de qualquer de seus direitos ou poderes, se tiver motivos razoáveis para acreditar que o pagamento de tais recursos e/ou indenização adequada em face de tal risco ou responsabilidade não lhe sejam satisfatoriamente garantidos.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                           CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                             INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 203

(g)    Toda disposição desta Escritura relacionada à conduta ou que afete a responsabilidade ou garantia de proteção do Agente Fiduciário e do Agente de Pagamentos estará sujeita às disposições desta Seção 6.01.

Seção 6.02.    *Direitos do Agente Fiduciário*[9]. (a) O Agente Fiduciário e o Agente de Pagamentos podem confiar e devem ser protegidos ao agir ou abster-se de agir com base em qualquer documento que acreditem ser autêntico e que tenha sido assinado ou apresentado pela Pessoa adequada. O Agente Fiduciário e o Agente de Pagamentos não precisam investigar nenhum fato ou assunto declarado em tal documento.

(a)    O Agente Fiduciário pode agir através de agentes e não será responsável pelo dolo ou negligência grave de qualquer agente nomeado com a diligência necessária.

(b)    Antes que o Agente Fiduciário aja ou se abstenha de agir, pode ser necessário um Certificado dos Diretores, um assessoramento por escrito de um especialista fiscal qualificado ou um Parecer Legal. O Agente Fiduciário não será responsável por qualquer ação que tome ou deixe de tomar de boa fé com base no Certificado dos Diretores, no assessoramento por escrito do especialista fiscal ou Parecer Legal.

(c)    O Agente Fiduciário poderá agir por meio de agentes e não será responsável pela conduta dolosa ou negligência grave de qualquer agente nomeado com o devido cuidado.

(d)    Qualquer solicitação, orientação, ordem ou demanda do Emissor mencionada neste documento deve ser suficientemente comprovada por um Certificado dos Diretores do Emissor (a menos que outras provas a respeito sejam especificamente previstas neste documento); e qualquer deliberação do Conselho de Administração do Emissor pode ser comprovada para o Agente Fiduciário ou Agente de Pagamentos através de cópias das mesmas, certificadas pelo Secretário ou por um Secretário Adjunto (ou Diretor equivalente) do Emissor.

(e)    O Agente Fiduciário e o Agente de Pagamentos não terão nenhuma obrigação de exercer quaisquer dos fideicomissos ou poderes que lhe são conferidos por esta Escritura, a pedido, ordem ou orientação de qualquer dos Titulares, de acordo com as disposições desta Escritura, a menos que tais Titulares tenham oferecido ao Agente Fiduciário ou ao Agente de Pagamentos garantia ou indenização satisfatória para o Agente Fiduciário em face dos custos, despesas e passivos que possam ser incorridos por meio disso.

---
.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 204

(f)     O Agente Fiduciário e o Agente de Pagamentos não serão responsáveis por nenhuma ação adotada ou omitida de boa-fé por eles com a orientação recebida por qualquer um deles conforme esta Escritura ou exercendo qualquer fideicomisso ou poderes conferidos por esta Escritura.

(g)     O Agente Fiduciário e o Agente de Pagamentos não serão responsáveis por qualquer ação que adotarem ou omitirem em boa-fé a qual acreditem estar autorizada ou dentro de seus direitos ou poderes; desde que a conduta do Agente Fiduciário ou do Agente de Pagamentos não constitua conduta dolosa, negligência grave ou má-fé.

(h)     O Agente Fiduciário e o Agente de Pagamentos podem consultar um advogado, e o conselho ou opinião do advogado quanto à questões legais relacionadas a esta Escritura e os Valores Mobiliários deverão ter plena e completa autorização e proteção contra responsabilidade em relação a qualquer ação adotada, omitida ou sofrida de boa-fé e de acordo com o conselho ou opinião desse advogado.

(i)     O Agente Fiduciário e o Agente de Pagamentos não serão obrigados a realizar qualquer investigação sobre os fatos ou assuntos declarados em qualquer resolução, certificado, declaração, instrumento, opinião, relatório, notificação, solicitação, orientação, consentimento, pedido, título, debênture, nota, outros comprovantes de endividamento ou outro papel ou documento, a menos que solicitado por escrito pelos Titulares com pelo menos uma maioria do montante total do principal dos Valores Mobiliários em Aberto; desde que, caso o pagamento dentro de um prazo razoável ao Agente Fiduciário dos custos, despesas ou passivos que pode incorrer na realização dessa investigação não seja, na opinião do Agente Fiduciário, assegurado satisfatoriamente pela garantia oferecida nos termos desta Escritura, o Agente Fiduciário possa exigir dos Titulares sua indenização satisfatória quanto a essas despesas ou responsabilidades como condição para o processo; as despesas razoáveis de cada investigação serão pagas pelo Emissor ou, se pagas pelo Agente Fiduciário, serão reembolsadas pelo Emissor mediante solicitação.

(j)     Nem o Agente Fiduciário nem qualquer Agente de Pagamentos deverão investir, ou terão qualquer responsabilidade quanto aos juros, em quaisquer valores, a qualquer momento recebidos de acordo com qualquer uma das disposições desta Escritura ou dos Valores Mobiliários, exceto conforme acordado de outra forma pelo Agente Fiduciário ou qualquer Agente de Pagamentos com o Emissor. Esses valores não precisam ser segregados de outros fundos, exceto na extensão exigida pelas disposições legais.

(k)     Em nenhum caso o Agente Fiduciário ou o Agente de Pagamentos será responsável por perdas ou danos especiais, indiretos ou consequenciais de qualquer espécie (incluindo

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 205

entre outros, perdas de lucros), ainda que o Agente Fiduciário tenha sido avisado da probabilidade dessas perdas ou danos e independentemente da forma de ação.

(l)      Os direitos permissivos do Agente Fiduciário enumerados neste documento não devem ser interpretados como seus deveres.

(m)      O Agente Fiduciário pode solicitar que o Emissor entregue um Certificado dos Diretores estabelecendo os nomes de indivíduos e/ou cargos de diretores autorizados nesse momento a realizar as ações especificadas de acordo com esta Escritura, que Certificado dos Diretores pode ser assinado por qualquer pessoa autorizada a assinar um Certificado dos Diretores, incluindo qualquer pessoa especificada como assim autorizada em qualquer certificado entregue anteriormente e não substituído.

(n)      O Agente Fiduciário não deverá ser considerado como tendo notificação de qualquer Inadimplemento ou Evento de Inadimplemento, a menos que um Diretor Responsável do Agente Fiduciário tenha conhecimento real ou a menos que uma notificação por escrito de qualquer evento, sendo de fato um inadimplemento, seja recebida por um Diretor Responsável do Agente Fiduciário em seu Escritório de Truste Corporativo, e essa notificação refira-se aos Valores Mobiliários e esta Escritura.

(o)      Os direitos, privilégios, proteções, imunidades e benefícios concedidos ao Agente Fiduciário, incluindo, sem limitação, o seu direito a ser indenizado, são estendidos e devem ser aplicados pelo Agente Fiduciário em cada uma de suas capacidades no presente e a cada agente, custodiante e outra Pessoa empregada para atuar nos termos deste instrumento.

Seção 6.03.      *Direitos Individuais do Agente Fiduciário*. O Agente Fiduciário e qualquer Agente de Pagamentos, Oficial de Registro ou substituto ou qualquer outro agente do Emissor ou do Agente Fiduciário, em sua capacidade individual ou qualquer outra, podem se tornar o titular ou credor pignoratício dos Valores Mobiliários e, de outra forma, lidar com o Emissor ou suas Afiliadas com os mesmos direitos que teria se não fosse Agente Fiduciário, Agente de Pagamentos, Oficial de Registro ou outro agente.

Seção 6.04.      *Isenção de Responsabilidade do Agente Fiduciário*. O Agente Fiduciário não será responsável e não fará qualquer declaração quanto à validade ou adequação desta Escritura ou dos Valores Mobiliários, não será responsável pelo uso do Emissor dos rendimentos provenientes dos Valores Mobiliários e não será responsável por qualquer declaração do Emissor nesta Escritura ou em qualquer documento emitido em relação à venda dos Valores Mobiliários ou nos Valores Mobiliários que não sejam o certificado de autenticação do Agente Fiduciário.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 206

Seção 6.05.    *Notificação de Inadimplemento e Eventos de Inadimplemento.* Se um Inadimplemento ou Evento de Inadimplemento ocorrer e continuar, e se for conhecido pelo Diretor Responsável, o Agente Fiduciário enviará a cada Titular uma notificação do Inadimplemento ou Evento de Inadimplemento dentro de 90 dias após o Diretor Responsável adquirir conhecimento real do Inadimplemento ou Evento de Inadimplemento. Exceto no caso de Inadimplemento ou Evento de Inadimplemento no pagamento do principal de (incluindo, para evitar dúvidas, quaisquer Pagamentos ou Montantes de Resgate, conforme aplicável) qualquer Valor Mobiliário, o Agente Fiduciário poderá reter a notificação e estará protegido quanto à retenção da notificação se e enquanto um comitê de seus Diretores Responsáveis de boa-fé determinar que a retenção da notificação é do interesse dos Titulares. Para todos os fins desta Escritura e dos Valores Mobiliários, o Agente Fiduciário não será considerado como tendo conhecimento de um Inadimplemento ou Evento de Inadimplemento, a menos que (i) o Agente Fiduciário tenha conhecimento real do mesmo ou (ii) uma notificação escrita desse Inadimplemento ou Evento de Inadimplemento tenha sido enviada a esse Diretor Responsável pelo Emissor ou qualquer Titular.

Seção 6.06.    *Remuneração e Indenização.* O Emissor concorda, e fará com que Sociedade, conjunta e solidariamente, pague ao Agente Fiduciário e ao Agente de Pagamentos periodicamente a remuneração que será acordada por escrito por seus serviços. A remuneração do Agente Fiduciário não deve ser limitada por qualquer lei referente à remuneração de um Agente Fiduciário de um truste. O Emissor deve, e fará com que a Sociedade, conjunta e solidariamente, reembolse prontamente o Agente Fiduciário e o Agente de Pagamentos, mediante solicitação, por todas as despesas razoáveis incorridas ou efetuadas, incluindo custos de cobrança, além da remuneração por seus serviços. Essas despesas incluirão remunerações e despesas razoáveis, desembolsos e adiantamentos dos agentes, advogados, contadores e especialistas do Agente Fiduciário e do Agente de Pagamentos. Os pagamentos dessas despesas pelo Emissor ou pela Sociedade ao Agente Fiduciário ou ao Agente de Pagamentos, conforme o caso, serão efetuados livres e desembaraçados e sem retenções ou deduções, por ou devido a quaisquer impostos, incumbências, avaliações, taxas presentes ou futuras ou outras cobranças governamentais de qualquer natureza (e multas, sanções ou juros relacionados) impostas ou cobradas por ou em nome do Brasil ou qualquer subdivisão política ou autoridade destes com poder para tributar, a menos que essa retenção ou dedução seja exigida por lei. Nesse caso, o Emissor deve, e fará com que a Sociedade pague ao Agente Fiduciário ou ao Agente de Pagamentos, conforme o caso, os montantes adicionais que forem necessários para que todo pagamento líquido efetuado pelo Emissor ou a Sociedade ao Agente Fiduciário e ao Agente de Pagamentos, conforme o caso, após dedução ou retenção por ou devido a qualquer imposto, penalidade, multa, incumbência, avaliação ou outro encargo governamental presente ou futuro imposto sobre ou como resultado desse pagamento pelo Brasil ou qualquer subdivisão política ou autoridade tributária do mesmo ou não deve ser inferior ao montante devido e à pagar ao Agente Fiduciário ou ao Agente de Pagamentos, conforme o caso. O Emissor se compromete, e fará com que a Sociedade, conjunta e solidariamente, indenize o Agente Fiduciário e o Agente de Pagamentos contra todo e qualquer prejuízo, passivo ou despesa (incluindo honorários e despesas advocatícias razoáveis) incorrida por eles, sem negligência grave ou má-fé de sua parte e em conexão com a administração desta

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 207

Escritura e com o desempenho de suas respectivas funções nos termos deste instrumento, incluindo, sem limitação, os custos e despesas de defesa contra qualquer reivindicação ou responsabilidade, e de cumprir com qualquer citação entregue a eles ou qualquer de seus diretores em conexão com o exercício ou desempenho de qualquer de seus poderes ou funções nos termos desta Escritura. O Emissor e a Sociedade comprometem-se a indenizar cada um dos Agentes Pagadores e suas afiliadas por todos os prejuízos, passivos, incluindo toda e qualquer obrigação tributária, que, para evitar dúvidas, incluirão impostos brasileiros e multas, custos, reivindicações, ações, danos, despesas ou demandas associadas a qualquer um deles ou que possam ser feitas contra qualquer um deles como resultado ou em conexão com a nomeação ou o exercício dos poderes e funções por qualquer Agente de Pagamentos ou suas afiliadas de acordo com esta Escritura, exceto como resultado de seu próprio inadimplemento, negligência grave ou má-fé ou de seus conselheiros, diretores ou funcionários ou qualquer um deles, ou sua violação dos termos desta Escritura. O Agente Fiduciário notificará imediatamente o Emissor de qualquer reivindicação pela qual possa solicitar indenização. A falha do Agente Fiduciário em notificar o Emissor ou a Sociedade não isenta o Emissor ou a Sociedade de suas obrigações nos termos deste documento. O Emissor tem o direito de participar na defesa da reivindicação do Agente Fiduciário e o Agente Fiduciário pode ter um advogado separado e o Emissor e a Sociedade pagarão solidariamente os honorários e despesas de tal advogado.

Para garantir as obrigações de pagamento do Emissor dessa Seção 6.06, o Agente Fiduciário deve ter uma garantia prioritária nos Valores Mobiliários sobre todo o dinheiro ou propriedade detido ou recolhido pelo Agente Fiduciário ou Agente de Pagamento, exceto aquele mantido em fideicomisso para pagar o principal de Valores Mobiliários específicos.

As obrigações do Emissor e da Sociedade de acordo com esta Seção 6.06 sobreviverão à renúncia ou destituição do Agente Fiduciário e à satisfação e quitação desta Escritura. Quando o Agente Fiduciário ou o Agente de Pagamentos incorre em despesas após a ocorrência de um Inadimplemento ou Evento de Inadimplemento especificado na Seção 5.01(c), as despesas destinam-se a constituir despesas de administração de acordo com a Lei de Falências.

O Emissor reconhece que o Agente de Pagamentos não faz declarações quanto à interpretação ou qualificação das operações assumidas neste documento para efeitos tributários ou qualquer outro propósito, em qualquer jurisdição. O Emissor declara que ele próprio cumpriu plenamente qualquer impacto tributário desta Escritura antes de concordar com os termos deste documento, e é responsável por toda e qualquer imposto federal, estadual, local, renda, franquia, retenção, valor agregado, vendas, uso, transferência, carimbo ou outros em qualquer jurisdição em relação a esta Escritura.

O Emissor e a Sociedade, conjunta e solidariamente, concordam em pagar todo e qualquer imposto de selo e outros impostos ou taxas documentais que possam ser devidos em conexão com a celebração, formalização, desempenho e execução desta Escritura pelos Agentes Pagadores.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                      fls. 208

Seção 6.07.    *Substituição do Agente Fiduciário.* O Agente Fiduciário pode renunciar a qualquer momento, notificando o Emissor por escrito. Os Titulares da maioria no montante do principal dos Valores Mobiliários podem destituir o Agente Fiduciário, notificando-o por escrito e podem nomear um Agente Fiduciário sucessor. O Emissor destituirá o Agente Fiduciário se:

(a)      o Agente Fiduciário não cumprir a Seção 6.09;

(b)      o Agente Fiduciário for declarado falido ou insolvente;

(c)      o depositário judicial ou outro funcionário público se encarrega do Agente Fiduciário ou de seus bens; ou

(d)      o Agente Fiduciário se torna incapaz de agir.

Se o Agente Fiduciário se demitir ou for destituído, ou se existir uma vaga no cargo de Agente Fiduciário por qualquer motivo (o Agente Fiduciário, nesse caso, referido neste documento como o Agente Fiduciário que se retira), o Emissor imediatamente nomeará um Agente Fiduciário sucessor.

O Agente Fiduciário sucessor deve entregar uma aceitação por escrito de sua nomeação ao Agente Fiduciário que se retira e ao Emissor. Assim, a renúncia ou destituição do Agente Fiduciário que se retira entrará em vigor, e o Agente Fiduciário sucessor terá todos os direitos, poderes e deveres do Agente Fiduciário de acordo com esta Escritura. O Agente Fiduciário sucessor deve enviar uma notificação de sua sucessão aos Titulares. O Agente Fiduciário que se retira deve transferir imediatamente todos os bens em sua posse como Agente Fiduciário para o Agente Fiduciário sucessor, sujeito à garantia prevista na Seção 6.06.

Se o Agente Fiduciário sucessor não tomar posse no prazo de sessenta dias corridos após a renúncia ou destituição do Agente Fiduciário que se retira, o Agente Fiduciário que se retira, o Emissor ou os Titulares da maioria no montante do principal dos Valores Mobiliários poderão, às custas do Emissor, requerer para qualquer tribunal de jurisdição competente a nomeação de um Agente Fiduciário sucessor.

Se o Agente Fiduciário não cumprir a Seção 6.09, qualquer Titular poderá requerer a qualquer tribunal de jurisdição competente a destituição do Agente Fiduciário e a nomeação de um Agente Fiduciário sucessor.

Não obstante a substituição do Agente Fiduciário de acordo com esta Seção 6.07, a obrigação do Emissor nos termos da Seção 6.06 continuará em benefício do Agente Fiduciário que se retira.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02         Livro nº LIV                    fls. 209

Seção 6.08.    *Agente Fiduciário Sucessor por Incorporação.* Se o Agente Fiduciário se fundir, incorporar ou transformar, ou transferir todos ou substancialmente todos os seus negócios ou ativos de truste corporativa para outra sociedade ou associação bancária, a sociedade resultante, sobrevivente ou aceitante sem nenhum outro ato será o Agente Fiduciário sucessor.

Se, no momento em que tal sucessor ou sucessores por incorporação, transformação ou fusão no Agente Fiduciário suceder aos fideicomissos criados por esta Escritura qualquer uma dos Valores Mobiliários tenha sido autenticada, mas não formalizada, qualquer tal sucessor ao Agente Fiduciário poderá aprovar o certificado de autenticação de qualquer Agente Fiduciário antecessor e entregar tais Valores Mobiliários autenticados; e se, naquele momento, qualquer uma dos Valores Mobiliários não tenha sido autenticada, qualquer sucessor do Agente Fiduciário poderá autenticá-las, quer em nome de qualquer antecessor nos termos deste documento ou em nome do sucessor do Agente Fiduciário; e em todos esses casos, tais certificados aprovados terão o pleno vigor de todas as disposições contidas nos Valores Mobiliários ou nesta Escritura relacionadas ao certificado do Agente Fiduciário.

Seção 6.09.    *Elegibilidade; Desqualificação.* O Agente Fiduciário nos termos deste instrumento deve sempre ser uma sociedade, banco ou sociedade truste constituída e negociando de acordo com as leis dos Estados Unidos ou qualquer outro estado do mesmo (i) autorizado por tais leis a exercer o poder de truste corporativa, (ii) está sujeito a supervisão ou exame das autoridades públicas, (iii) terá sempre um capital e um excedente combinados de pelo menos US$ 50.000.000,00, conforme estabelecido em seu mais recente relatório anual de situação publicado e (iv) terá seu Escritório de Truste Corporativa no Cidade de Nova Iorque. Se a qualquer momento o Agente Fiduciário deixar de ser elegível de acordo com as disposições desta Seção 6.09, deverá renunciar imediatamente da maneira e com o efeito especificado na Seção 6.07.

### ARTIGO 7
### QUITAÇÃO DA ESCRITURA; NULIDADE

Seção 7.01.    *Quitação de Responsabilidade sobre os Valores Mobiliários.*

(a)    Quando (i) o Emissor entregar para o Agente Fiduciário todas os Valores Mobiliários em circulação (exceto os Valores Mobiliários substituídas nos termos da Seção 2.13) para cancelamento ou (ii) todas os Valores Mobiliários em circulação tiverem vencido e o Emissor depositar em garantia, em benefício dos Titulares, com o Agente Fiduciário, finalmente arrecadaram recursos suficientes para pagar no Vencimento todas os Valores Mobiliários em circulação (exceto os Valores Mobiliários substituídos de acordo com a Seção 2.13), Seção 2.09, e se, em qualquer caso, o Emissor pagar todos os outros valores devidos nos termos deste instrumento pelo Emissor, então esta Escritura, e as obrigações do Emissor nos termos deste instrumento, deixarão de produzir efeitos adicionais, de acordo com as Seções 7.01(c) e 7.06. O Agente Fiduciário reconhecerá a satisfação e a quitação desta Escritura mediante solicitação do Emissor, acompanhada de um Certificado de Diretores e um Parecer do

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                          CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                           INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 210

Advogado (cada um declarando que todas as condições precedentes fornecidas neste documento relacionadas à satisfação e quitação desta Escritura foram cumpridas) e às custas e despesas do Emissor.

(b)     Sujeito às Seções [7.01(c), 7.02 e 7.06][10], o Emissor poderá, a qualquer momento, rescindir (i) todas as suas obrigações nos termos desta Escritura e os Valores Mobiliários ("**Opção de Nulidade Legal**") ou (ii)[11] a operação das Seções [5.01(a), 5.01(b), 5.01(e) e 5.01(f)][12] ("**Opção de Nulidade de Obrigação**"). A opção de nulidade legal pode ser exercida, não obstante qualquer exercício prévio da opção de nulidade de Obrigação.

Se a opção de nulidade legal for exercida, o pagamento dos Valores Mobiliários não poderá ser adiantado devido a um Evento de Inadimplemento em relação as mesmas. Se a opção de nulidade de Obrigação for exercida, o pagamento dos Valores Mobiliários não poderá ser adiantado devido a um Evento de Inadimplemento especificado nas [Seções 5.01(a), 5.01(b), 5.01(e) e 5.01 (f)][13].

Mediante o cumprimento das condições estabelecidas neste documento e mediante solicitação do Emissor, o Agente Fiduciário deverá reconhecer por escrito a quitação das obrigações do Emissor neste documento, exceto as especificadas na Seção 7.01(c).

(c)     Não obstante a Seção 7.01(b), as obrigações do Emissor de acordo com as Seções [2.03, 2.04, 2.05, 2.06, 2.11, 2.12, 2.12, 4.02 e 4.04] sobreviverão até que os Valores Mobiliários sejam pagos integralmente. Posteriormente, as obrigações do Emissor de acordo com as Seções 6.06, 6.07, 7.04 e 7.05 deverão sobreviver.

Seção 7.02.     *Condições para Nulidade.* O Emissor poderá exercer a opção de nulidade legal ou a opção de nulidade de Obrigação somente se:

(a)     O Emissor, irrevogavelmente, depositar ou fazer com que seja depositado junto ao Agente Fiduciário como fundos em fideicomisso, especificamente penhorados como garantia, e exclusivamente em beneficio dos Titulares (o "**fideicomisso de nulidade**") de acordo com um fundo irrevogável e contrato de garantia em forma e conteúdo satisfatório para o Agente Fiduciário, dinheiro ou Obrigações do Governo dos EUA, ou uma combinação dos mesmos, suficiente para o pagamento do principal de todas os Valores Mobiliários até o Vencimento ou resgate;

(b)     O Emissor entrega ao Agente Fiduciário o certificado de uma empresa internacionalmente reconhecida de contadores independentes, expressando seu parecer de que os pagamentos do principal dos Valores Mobiliários quando vencidos e sem reinvestimento nas Obrigações

.
.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



IEDA MARIA MONTEIRO
Tradutora Pública e Intérprete Comercial
- Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 211

depositadas do Governo dos EUA, mais qualquer valor depositado sem investimento e após pagamento de todos os impostos federais, estaduais e locais ou outros encargos ou apurações em relação aos mesmos devidos pelo Agente Fiduciário, fornecerão dinheiro nos momentos e nos montantes que forem suficientes para pagar o principal de todas os Valores Mobiliários no Vencimento ou no resgate, conforme o caso;

(c)       123 dias após o depósito ser realizado de acordo com os termos da Seção 7.02(a) e durante esse período de 123 dias, não ocorrer o Inadimplemento ou o Evento de Inadimplemento especificado na Seção 5.01(d) que continua no final do período;

(d)       nenhum Inadimplemento ou Evento de Inadimplemento ocorreu e continua na data de tal depósito e após a sua efetivação;

(e)       o depósito não constituir um inadimplemento ou evento de inadimplemento nos termos de qualquer outro contrato vinculante para o Emissor;

(f)       O Emissor entregar ao Agente Fiduciário um Parecer do Advogado no sentido de que o truste resultante do depósito não constitui ou não é qualificado como uma sociedade de investimento regulamentada nos termos da Lei de Sociedades de Investimento dos EUA de 1940, conforme aditada;

(g)       O Emissor entregar ao Agente Fiduciário Pareceres de Advogados declarando que, de acordo com a lei brasileira, os Titulares (exceto brasileiros) não reconhecerão ganhos para fins tributários brasileiros e os pagamentos do fideicomisso de nulidade a qualquer um desses Titulares não estarão sujeitos a pagamentos retidos de acordo com as leis brasileiras;

(h)       no caso da opção de nulidade legal, o Emissor entregar ao Agente Fiduciário um Parecer de Advogado de reputação reconhecida em relação a questões de imposto de renda federal dos EUA declarando que (i) o Emissor recebeu ou teve disponibilizado pela Receita Federal dos EUA uma decisão, ou (ii) desde a data desta Escritura houve uma alteração na lei federal de imposto de renda aplicável nos EUA, em ambos os casos no sentido de que, e com base na mesma, o Parecer do Advogado confirmará que, os Titulares não reconhecerão receita, ganho ou prejuízo para fins de imposto de renda federal dos EUA como resultado de tal depósito e nulidade e estarão sujeitos ao imposto de renda federal dos EUA sobre os mesmos montantes, da mesma maneira e nos mesmos períodos como teria sido o caso se tal depósito e nulidade não tivessem ocorrido;

(i)       no caso da opção de nulidade de Obrigação, o Emissor entregar ao Agente Fiduciário um Parecer de Advogado de reputação reconhecida em relação a questões de imposto de renda federal dos EUA, no sentido de que os Titulares não reconheçam receita, ganho ou prejuízo para fins de imposto de renda federal dos EUA como resultado de tal nulidade de Obrigação e estará sujeito ao imposto de renda

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



### IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                          fls. 212

federal dos EUA sobre os mesmos valores, da mesma maneira e nos mesmos períodos como teria sido caso tal nulidade de Obrigação não tivesse ocorrido;

(j)      o Emissor entregar ao Agente Fiduciário um Parecer de Advogado, na forma e conteúdo razoavelmente satisfatório para o Agente Fiduciário, no sentido de que, após a passagem de 123 dias após o depósito, os fundos em fideicomisso não estiverem sujeitos a qualquer falência, insolvência, recuperação ou lei similar aplicável, incluindo qualquer Lei de Falência que afete os direitos dos credores em geral; e

(k)      o Emissor entrega ao Agente Fiduciário um Certificado de Diretores e um Parecer de Advogado, cada um declarando que foram cumpridas todas as condições precedentes à nulidade e quitação dos Valores Mobiliários conforme contemplado por este Artigo 7.

Antes ou depois de um depósito, o Emissor pode fazer acordos satisfatórios para o Agente Fiduciário para o resgate de Valores Mobiliários em uma data futura, de acordo com o Artigo 3.

Seção 7.03.    *Aplicação do Dinheiro em Garantia.* O Agente Fiduciário manterá dinheiro ou Obrigações depositadas do Governo dos EUA em garantia de acordo com a Seção 7.02. Ele aplicará o dinheiro depositado e o dinheiro das Obrigações do Governo dos EUA através do Agente de Pagamentos ou dos Agentes Pagadores e de acordo com esta Escritura para o pagamento do principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate, conforme aplicável) dos Valores Mobiliários.

Seção 7.04.    *Pagamento para o Emissor.* Após o término do fideicomisso estabelecido de acordo com a Seção 7.02, o Agente Fiduciário e cada Agente de Pagamentos pagarão imediatamente ao Emissor, mediante solicitação, qualquer excedente em dinheiro ou Obrigações do Governo dos EUA por eles detidas.

Sujeito a qualquer direito de bens abandonados aplicável, o Agente Fiduciário e cada Agente de Pagamentos pagarão ao Emissor, mediante solicitação, qualquer dinheiro retido por eles para pagamento do principal dos Valores Mobiliários que permanecerem não reclamados por dois anos após a data de vencimento do pagamento do principal ou dos juros e, a partir de então, o Agente Fiduciário e cada Agente de Pagamentos, conforme o caso, não serão responsáveis pelo pagamento de tais montantes nos termos deste Contrato, e os Titulares terão direito a recuperação de tais quantias apenas do Emissor.

Seção 7.05.    *Indenização por Obrigações do Governo dos EUA.* O Emissor pagará e indenizará o Agente Fiduciário por qualquer imposto, taxa ou outro encargo incidente ou cobrado sobre as Obrigações do Governo dos EUA depositadas ou o principal e os juros recebidos por tais Obrigações do Governo dos EUA.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                                    fls. 213

Seção 7.06.   *Reintegração*. Se o Agente Fiduciário ou qualquer Agente de Pagamentos for incapaz de aplicar dinheiro ou Obrigações do Governo dos EUA de acordo com este Artigo 7, em razão de qualquer processo legal ou de qualquer decisão ou sentença de qualquer tribunal ou Autoridade Pública que exija, restrinja ou proíba de outra forma tal aplicação, as obrigações do Emissor nos termos desta Escritura, os Valores Mobiliários e a Garantia serão revividas e reintegradas como se nenhum depósito tivesse ocorrido nos termos deste Artigo 7 até o momento em que o Agente Fiduciário ou o Agente de Pagamentos tiver permissão para aplicar todo esse dinheiro ou Obrigações do Governo dos EUA de acordo com este artigo 7; *ressalvado, no entanto*, que se o Emissor tiver efetuado qualquer pagamento de principal (incluindo, para evitar dúvidas, Pagamentos ou Montantes de Resgate, conforme aplicável) ou juros sobre quaisquer Valores Mobiliários devido à reintegração de suas obrigações, o Emissor será sub-rogado aos direitos dos Titulares de tais Valores Mobiliários para receber tal pagamento do dinheiro ou das Obrigações do Governo dos EUA mantidas pelo Agente Fiduciário ou por esse Agente de Pagamentos.

### ARTIGO 8
#### ADITAMENTOS

Seção 8.01.   *Modificação e Renúncia*. As modificações e aditamentos a esta Escritura e às Valores Mobiliários podem ser realizadas pelo Emissor e Agente Fiduciário com o consentimento dos Titulares de, pelo menos, 50% do Valor de Face dos Valores Mobiliários no momento em circulação, afetadas por tal aditamento, mas nenhuma modificação ou aditamento poderá, sem o consentimento do Titular de pelo menos 75% do Valor de Face dos Valores Mobiliários em circulação no momento que são afetados por esse aditamento:

(a)   reduzir o Valor de Face ou o vencimento indicado de qualquer um desses Valores Mobiliários ou a base de cálculo dos Pagamentos feitos sobre eles em cada Data de Pagamento, se houver, ou o Montante de Resgate devido sobre o resgate ou recompra dos mesmos (incluindo, sem limitação, mudanças na base de cálculo do Percentual de Distribuição do Instrumento) ou alterar de qualquer local onde, ou alterar a moeda na qual qualquer Montante de Resgate sobre esse Valor Mobiliário ou Pagamento, se houver, sobre a mesma for devida, ou prejudicar o direito de instaurar processo para a execução de tal pagamento a partir do vencimento indicado, se houver, do mesmo ou a data em que tal pagamento estiver de outra forma vencido (no caso de resgate, a partir da data do resgate);

(b)   reduzir a porcentagem no montante do Valor de Face desses Valores Mobiliários em circulação, cujo consentimento é exigido dos Titulares para qualquer aditamento ou modificação desses Valores Mobiliários ou desta Escritura, ou o consentimento exigido dos Titulares para qualquer renúncia (em conformidade com certas disposições desta Escritura ou certos inadimplementos e suas consequências) previstas nesta Escritura;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                    CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                       INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                          fls. 214

(c)      aditar ou modificar qualquer disposição que afete a classificação ou lei aplicável dos Valores Mobiliários;

(d)      aditar ou modificar certas disposições desses Valores Mobiliários ou desta Escritura referentes à renúncia pelos Titulares desses Valores Mobiliários de inadimplementos anteriores, aditamentos ou modificações a esses Valores Mobiliários ou esta Escritura com o consentimento dos Titulares desses Valores Mobiliários, e a renúncia pelos Titulares de tais Valores Mobiliários de certas Obrigações, exceto para aumentar qualquer porcentagem especificada no Valor de Face exigido por quaisquer medidas dos Titulares ou para prever que certas outras disposições dos Valores Mobiliários ou desta Escritura não possam ser modificadas ou renunciadas sem o consentimento do Titular de tais Valores Mobiliários afetadas em razão disso.

Não será necessário o consentimento dos Titulares, de acordo com o parágrafo anterior para aprovar a forma específica de qualquer aditamento proposto, mas será suficiente se tal consentimento aprovar o conteúdo do mesmo. Após a efetivação do aditamento nos termos do parágrafo anterior, o Emissor enviará para os Titulares uma notificação descrevendo brevemente tal aditamento. A falta de notificação para todos os Titulares, ou qualquer defeito naquela, não prejudicará ou afetará a validade do aditamento nos termos do parágrafo anterior. O Emissor e o Agente Fiduciário poderão, sem o voto ou consentimento de qualquer Titular, modificar ou aditar esta Escritura ou os Valores Mobiliários com a finalidade de:

(a)      complementar as Obrigações do Emissor em benefício dos Titulares;

(b)      renunciar a qualquer direito ou poder conferido ao Emissor;

(c)      garantir os Valores Mobiliários de acordo com os requisitos das mesmas ou de outra forma;

(d)      comprovar a sucessão de outra empresa ao Emissor e a assunção por qualquer sucessor das Obrigações e obrigações do Emissor nos Valores Mobiliários e nesta Escritura, de acordo com qualquer incorporação, fusão ou venda de ativos;

(e)      corrigir qualquer ambiguidade, inconsistência ou disposição defeituosa contida nesta Escritura ou nos Valores Mobiliários;

(f)      efetuar qualquer modificação ou conceder qualquer renúncia ou autorização a qualquer violação ou violação proposta de qualquer um dos termos e condições dos Valores Mobiliários ou quaisquer outras disposições desta Escritura, de qualquer maneira que o Emissor possa determinar e que não afete adversamente o interesse de quaisquer Titulares em qualquer aspecto relevante;

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 215

(g)    efetuar qualquer modificação de caráter limitado ou técnico ou corrigir um erro manifesto; ou

(h)    adequar esta Escritura às disposições previstas na Descrição dos Valores Mobiliários contida na Declaração de Solicitação de Consentimento.

Qualquer instrumento fornecido por ou em nome de qualquer Titular em conexão com qualquer consentimento para tal modificação, aditamento ou renúncia será irrevogável uma vez concedido e será conclusivo e vinculante para todos os Titulares subsequentes de tal Valor Mobiliário. Quaisquer modificações, aditamentos ou renúncias a esta Escritura ou aos termos e condições de quaisquer Valores Mobiliários serão conclusivas e vinculantes para todos os Titulares desses Valores Mobiliários, independentemente de terem ou não dado tal consentimento.

Seção 8.02. *Agente fiduciário para assinar aditamentos*. Mediante solicitação do Emissor acompanhada por uma Deliberação do Conselho autorizando a celebração de qualquer escritura aditada ou suplementar, e mediante o arquivamento perante o Agente Fiduciário de evidências satisfatórias para o Agente Fiduciário do consentimento dos Titulares necessários, e após o recebimento pelo Agente Fiduciário do documentos descritos na Seção 9.03 deste documento (na medida do solicitado), o Agente Fiduciário deverá assinar qualquer aditamento autorizado nos termos deste Artigo 8 se o aditamento não afetar adversamente os direitos, deveres, responsabilidades ou imunidades do Agente Fiduciário. Em caso afirmativo, o Agente Fiduciário pode, mas não precisa, assiná-lo. Ao assinar tal aditamento, o Agente Fiduciário terá o direito de receber indenização razoavelmente satisfatória e de receber, e (sujeito à Seção 6.01) deverá ser totalmente protegido ao contar, além dos documentos exigidos pela Seção 9.03, um Certificado de Diretor e um Parecer Legal, cada qual declarando que tal aditamento é autorizado ou permitido por essa Escritura de Emissão.

### ARTIGO 9
### DISPOSIÇÕES GERAIS

Seção 9.01.    *Disposições da Escritura e Valores Mobiliários para o Benefício Exclusivo das Partes e Titulares*. Nada nesta Escritura ou nos Valores Mobiliários, expresso ou implícito, deverá fornecer a qualquer Pessoa, que não seja as partes deste instrumento e seus sucessores e os Titulares, qualquer benefício ou direito, recurso ou reivindicação legal ou equitativa de acordo com esta Escritura ou os Valores Mobiliários.

Seção 9.02.    *Notificações*. Qualquer solicitação, demanda, autorização, orientação, notificação, consentimento, renúncia ou outra comunicação ou documento fornecido ou permitido por esta Escritura a ser realizado, entregue, fornecido ou proporcionado a, ou apresentado, ou arquivado perante qualquer parte desta Escritura, exceto como de outra forma expressamente previsto neste

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 216

documento, será considerado recebido somente após o recebimento efetivo por correio ou telecopiadora de primeira classe, endereçado à parte relevante da seguinte forma:

Ao Emissor:

Odebrecht Holdco Finance Limited
c/o Odebrecht Engenharia e Construção S.A.
Av. Lemos Monteiro 120, 7º andar, São Paulo – SP Brazil 05501-050
Brasil
Aos cuidados: CFO; fjens@oec-eng.com

Ao Agente Fiduciário:

The Bank of New York Mellon
240 Greenwich Street, 7º andar Leste
Nova York, NY 10286
Aos cuidados de: International Corporate Trust - ODEBRECHT
Telecópia: 724-540-6330

Qualquer parte, mediante notificação às outras partes, pode designar endereços adicionais ou diferentes para as notificações ou comunicações subsequentes.

Quando esta Escritura prever a notificação aos Titulares, essa notificação será considerada como entregue mediante o envio por correio de primeira classe, com postagem pré-paga, dessa notificação aos Titulares em seus endereços registrados, conforme registrado no Registro. O Emissor também fará com que todas as outras publicações dessas notificações conforme exigidas periodicamente pela lei aplicável brasileira, incluindo, sem limitação, as exigidas pela regulamentação aplicável emitida pela CVM.

A falta de envio da notificação ou comunicação para o Titular ou qualquer defeito nela não afetará sua suficiência em relação a outros Titulares. Se uma notificação ou comunicação for enviada por correio a um Titular da maneira prevista acima, será devidamente entregue, independentemente de o destinatário a receber ou não.

Todos as notificações ou comunicações a serem fornecidas de acordo com qualquer cláusula desta Escritura devem ser realizadas em inglês ou, quando não fornecidas em inglês, devem ser acompanhadas por uma tradução certificada para o inglês.

Seção 9.03.    *Certificado dos Diretores e Parecer do Advogado quanto às Condições Precedentes*. Mediante pedido ou solicitação do Emissor ao Agente Fiduciário para realizar ou abster-se de realizar qualquer ação nos termos desta Escritura, o Emissor deverá fornecer ao Agente Fiduciário:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 217

(a)      um Certificado dos Diretores na forma e substância razoavelmente satisfatória ao Agente Fiduciário (que deve incluir as declarações estabelecidas na Seção 9.04) afirmando que, na opinião dos signatários, todas as condições precedentes, se houver, previstas nesta Escritura relativa à ação proposta foram cumpridas; e

(b)      um Parecer do Advogado na forma e substância razoavelmente satisfatória ao Agente Fiduciário (que deve incluir as declarações estabelecidas na Seção 9.04) afirmando que, na opinião desse advogado, todas essas condições precedentes foram cumpridas.

Seção 9.04.      *Declarações Necessárias no Certificado dos Diretores ou no Parecer do Advogado.* Cada certificado ou parecer com relação ao cumprimento de um acordo ou condição prevista nesta Escritura deverá incluir:

(a)      uma declaração de que cada Pessoa que elaborou ou prestou o Certificado dos Diretores ou Parecer do Advogado leu esse acordo ou condição e as definições relacionadas;

(b)      uma breve declaração sobre a natureza e o escopo da analise ou investigação em que se baseiam as declarações ou opiniões contidas no Certificado dos Diretores ou Parecer do Advogado;

(c)      uma declaração de que, na opinião de cada Pessoa, a análise ou investigação necessária foram realizadas a fim de permitir a expressão de uma opinião informada sobre se esse acordo ou condição foi ou não cumprido; e

(d)      uma declaração sobre se, na opinião de cada Pessoa, esse acordo ou condição foi cumprido, desde que um Parecer do Advogado possa ter por base um ou mais Certificados dos Diretores ou certificados ou funcionários públicos com relação aos assuntos do fato.

Seção 9.05.      *Regras do Agente Fiduciário, Oficial de Registro, Agente de Pagamentos e Agente de Transferência.* O Agente Fiduciário poderá elaborar regras para ação dos Titulares. O Oficial de Registro, os Agentes Pagadores e os Agentes de Transferência podem estabelecer regras razoáveis para suas funções.

Seção 9.06.      *Indenização de Câmbio.* Qualquer montante recebido ou recuperado em uma moeda, exceto a moeda (a "**Moeda de Denominação**") na qual o Valor Mobiliário está denominada ou na qual tal quantia é devida, seja como resultado, ou da execução de uma sentença ou decisão de um tribunal de qualquer jurisdição, na dissolução do Emissor ou de outra forma (a "**Moeda da Decisão**") pelo Titular em relação a qualquer quantia que lhe seja devida pelo Emissor, constituirá quitação do Emissor somente na medida do montante da Moeda de Denominação que o Titular possa comprar com

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 218

o montante recebido ou recuperado na Moeda de Decisão na data desse recebimento ou recuperação (ou, se não for possível fazer a compra nessa data, na primeira data possível). O Emissor concorda que indenizará o Titular relevante por qualquer prejuízo decorrente ou resultante de qualquer variação nas taxas de câmbio entre (i) a taxa de câmbio na qual a Moeda de Denominação é convertida na Moeda de Decisão, para fins de tal decisão ou sentença, liquidação, dissolução ou de outra forma e (ii) a taxa de câmbio na qual tal Titular teria comprado a moeda de denominação com o montante da Moeda de Decisão efetivamente recebida por tal Titular, se tal Titular tivesse utilizado tal montante de Moeda de Decisão para comprar a moeda de denominação o mais rápido possível após o Titular receber a mesma. Essa indenização constituirá uma obrigação separada e independente das demais obrigações contidas nos termos e condições dos Valores Mobiliários, dará origem a uma causa de pedir separada e independente, será aplicada independentemente de qualquer indulgência concedida de tempos em tempos e continuará em pleno vigor e efeito, independentemente de qualquer decisão, sentença, crédito ou prova de soma ou somas liquidadas em relação aos montantes devidos em relação ao Valor Mobiliário relevante ou sob qualquer decisão, sentença, crédito ou prova. O termo "taxa de câmbio" incluirá a provisão para quaisquer prêmios habituais ou razoáveis e custos de câmbio devidos em conexão com a compra ou conversão para a moeda relevante.

Seção 9.07.     *Inexistência de Direito de Regresso Contra Outros*. Nenhum conselheiro, diretor, funcionário ou acionista, nessa qualidade, do Emissor ou do Agente Fiduciário terá qualquer responsabilidade por quaisquer obrigações do Emissor ou do Agente Fiduciário, respectivamente, nos termos desta Escritura ou dos Valores Mobiliários ou por qualquer reivindicação com base, relação ou em razão dessas obrigações ou de sua criação. Ao aceitar um Valor Mobiliário, cada Titular renunciará e liberará toda essa responsabilidade. A renúncia e liberação serão parte da contraprestação pela emissão dos Valores Mobiliários.

Seção 9.08.     *Feriados Legais*. Em qualquer caso em que qualquer Data de Resgate ou data de Vencimento ou outra data de Pagamento de qualquer Valor Mobiliário não for um Dia Útil, então (não obstante qualquer outra disposição desta Escritura ou dos Valores Mobiliários), o pagamento do principal não precisará ser efetuado nessa data, mas pode ser realizado no próximo Dia Útil, com o mesmo vigor e efeito como se tivesse sido realizado na Data de Resgate ou data de Vencimento ou outra data de Pagamento.

Seção 9.09.     *Lei Aplicável*. ESTA ESCRITURA E OS VALORES MOBILIÁRIOS SERÃO REGIDOS PELAS LEIS DO ESTADO DE NOVA IORQUE. CADA UMA DAS PARTES DESTE INSTRUMENTO RENUNCIA IRREVOGAVELMENTE, NA MÁXIMA MEDIDA PERMITIDA PELA LEI APLICÁVEL, TODO E QUALQUER DIREITO A UM JULGAMENTO POR JÚRI EM QUALQUER PROCESSO JUDICIAL DECORRENTE OU RELACIONADO A ESTA ESCRITURA, AOS VALORES MOBILIÁRIOS OU ÀS OPERAÇÕES CONTEMPLADAS POR ESTE INSTRUMENTO.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 219

Seção 9.10.      *Consentimento à Jurisdição; Renúncia de Imunidade*. O Emissor se submeteu irrevogavelmente à jurisdição não exclusiva de qualquer tribunal estadual ou federal do Distrito de Manhattan, Cidade e Estado de Nova Iorque para fins de qualquer ação ou processo decorrente ou relacionado às Valores Mobiliários ou a esta Escritura. O Emissor renunciou irrevogavelmente, dentro dos limites permitidos por lei, a qualquer objeção que possa ter sobre a eleição do foro de qualquer ação ou processo instaurado em tal tribunal e qualquer reivindicação de que tal ação ou processo ajuizado em tal tribunal foi instaurado em um foro incompetente e qualquer direito a que possa ter em razão do local de residência ou domicílio. O Emissor concordou que a decisão transitada em julgado de qualquer ação ou processo instaurado em tal tribunal será conclusiva e vinculante para tal parte e poderá ser aplicada em qualquer tribunal na jurisdição onde essa parte se sujeita a tal decisão; *ressalvado*, *no entanto*, que essa citação seja efetuada sobre tal Pessoa da forma especificada no parágrafo seguinte ou conforme permitido por lei.

Enquanto qualquer Valor Mobiliário permanecer em circulação, o Emissor sempre terá um representante legal no Distrito de Manhattan, Cidade e Estado de Nova Iorque, para quem será entregue citação em qualquer ação ou processo legal decorrente ou relacionado às Valores Mobiliários. A citação para tal representante e a notificação por escrito de tal citação enviada ou entregue a parte incluída em tal ação ou processo serão, dentro dos limites permitidos por lei, considerados em todos os aspectos como citação da parte em qualquer ação ou processo legal. O Emissor nomeou Cogency Global Inc., localizada em 122 East 42nd Street, 18º andar, Nova York, NY 10168 [-] como seu agente de citação em qualquer processo no Distrito de Manhattan, Cidade e Estado de Nova Iorque. A citação entregue pessoalmente aos representantes especificados no parágrafo anterior e a notificação por escrito dessa citação entregue ao Emissor serão considerados, sob todos os aspectos, a citação do Emissor, *ressalvado*, *no entanto*, que nenhuma notificação por correio do Emissor ou qualquer um de seus representantes será considerada uma citação efetiva.

Seção 9.11.      *Sucessores e Cessionários*. Todas as Obrigações e acordos do Emissor nesta Escritura e nos Valores Mobiliários vincularão seus respectivos sucessores e cessionários, ainda se expresso ou não. Todos os acordos do Agente Fiduciário nesta Escritura vincularão seus sucessores.

Seção 9.12.      *Múltiplos Originais*. As partes podem assinar qualquer número de cópias desta Escritura. Cada cópia assinada deve ser um original, mas todas juntas representam o mesmo acordo. Uma cópia assinada é suficiente para comprovar esta Escritura. A entrega de uma via executada de uma página de assinatura desta Escritura por fax ou outro meio de imagem eletrônico (por exemplo, "pdf" ou "tif") será eficaz como a entrega de uma via assinada manualmente desta Escritura.

Seção 9.13.      *Clausulas Independentes*. No caso de qualquer disposição nesta Escritura ou nos Valores Mobiliários ser inválida, ilegal ou não aplicável, a validade, legalidade e aplicabilidade das demais disposições não serão de forma alguma afetadas ou prejudicadas. Na medida do permitido pela

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                        CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                          INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 220

lei aplicável, as partes renunciam a qualquer disposição da lei que torne qualquer termo ou disposição deste instrumento inválido ou não aplicável em qualquer aspecto.

Seção 9.14.    *Força Maior*. Em hipótese alguma, qualquer Agente Fiduciário, Agente de Pagamentos, Agente de Transferência ou Oficial de Registro será responsável por qualquer falha ou atraso no desempenho de suas obrigações decorrentes ou causados, direta ou indiretamente, por forças além de seu controle, incluindo: sem limitação, pandemias, COVID-19, greves, paralisações, acidentes, atos de guerra ou terrorismo, distúrbios civis ou militares, catástrofes nucleares ou naturais ou casos fortuitos, e interrupções, perda ou mau funcionamento de serviços públicos, comunicações ou serviços computacionais (software e hardware); entendendo-se que cada Agente Fiduciário, Agente de Pagamentos, Agente de Transferência ou Oficial de Registro deverá enviar esforços razoáveis que sejam consistentes com as práticas aceitas no setor bancário para retomar o desempenho o mais rápido possível nessas circunstâncias.

EM TESTEMUNHO DO QUE, as partes fizeram com que esta Escritura fosse devidamente assinada a partir da primeira data escrita acima.

ODEBRECHT HOLDCO FINANCE LTD.
como Emissor

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:

THE BANK OF NEW YORK MELLON
Como Agente Fiduciário, Oficial de Registro e Agente de Transferência

Por:
Nome:
Cargo:

:

**ANEXO A**

MODELO DE VALOR MOBILIÁRIO

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 221

[FRENTE DO VALOR MOBILIÁRIO]
      A MENOS QUE ESTE VALOR MOBILIÁRIO GLOBAL SEJA APRESENTADO POR UM REPRESENTANTE AUTORIZADO DA DEPOSITORY TRUST COMPANY, UMA SOCIEDADE TRUSTE DE OBJETO LIMITADO DE NOVA IORQUE ("**DTC**"), AO EMISSOR NOMEADO NO PRESENTE (A **SOCIEDADE**") OU SEU AGENTE PARA REGISTRO DE TRANSFERÊNCIA, CÂMBIO OU PAGAMENTO E QUALQUER CERTIFICADO EMITIDO SEJA REGISTRADO EM NOME DA CEDE & CO. OU EM OUTRO NOME, CONFORME SOLICITADO POR UM REPRESENTANTE AUTORIZADO DA DTC (E QUALQUER PAGAMENTO FOR EFETUADO À CEDE & CO. OU A QUALQUER OUTRA INSTITUIÇÃO SOLICITADA POR UM REPRESENTANTE AUTORIZADO DA DTC), QUALQUER TRANSFERÊNCIA, PENHOR OU OUTRO USO DO PRESENTE POR QUALQUER VALOR OU DE OUTRA FORMA POR OU PARA QUALQUER PESSOA É ILÍCITA, DESDE QUE O TITULAR REGISTRADO, CEDE & CO., TENHA PARTICIPAÇÃO NO PRESENTE.

      AS TRANSFERÊNCIAS DESTE VALOR MOBILIÁRIO GLOBAL, NO TODO, SERÃO LIMITADAS A TRANSFERÊNCIAS A UM NOMEADO DA DTC OU POR UM NOMEADO DA DTC À DTC OU OUTRO NOMEADO DA DTC OU PELA DTC OU QUALQUER NOMEADO À UM DEPOSITÁRIO SUCESSOR OU UM NOMEADO DESSE DEPOSITÁRIO SUCESSOR E AS TRANSFERÊNCIAS DESTE VALOR MOBILIÁRIO GLOBAL, EM PARTE, SERÃO LIMITADAS ÀS TRANSFERÊNCIAS EFETUADAS DE ACORDO COM AS RESTRIÇÕES ESTABELECIDAS NA ESCRITURA E MENCIONADAS NO VERSO DESTE DOCUMENTO.

      [***Inclua se o Valor Mobiliário é um Valor Mobiliário Global Restrito ou um Valor Mobiliário emitida em troca, conforme exigido na Escritura***: ESTE VALOR MOBILIÁRIO NÃO FOI REGISTRADO DE ACORDO COM A LEI DE VALORES MOBILIÁRIOS DOS EUA DE 1933, CONFORME ADITADA (A "**LEI DE VALORES MOBILIÁRIOS**") OU QUALQUER OUTRA LEI DE VALORES MOBILIÁRIOS. O TITULAR DESTE INSTRUMENTO, AO ADQUIRIR ESTE VALOR MOBILIÁRIO, CONCORDA QUE ESTE VALOR MOBILIÁRIO OU QUALQUER PARTICIPAÇÃO NELE CONTIDA PODE SER OFERECIDO, REVENDIDO, PENHORADO OU TRANSFERIDO DE OUTRA FORMA APENAS (I) AO EMISSOR, (II) DE ACORDO COM UMA DECLARAÇÃO DE REGISTRO EM VIGOR NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS, (III) A UM COMPRADOR INSTITUCIONAL QUALIFICADO EM CONFORMIDADE COM A REGRA 144A NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS, (IV) EM UMA OPERAÇÃO OFFSHORE DE ACORDO COM A REGRA 904 DO REGULAMENTO S CONFORME A LEI DE VALORES MOBILIÁRIOS, OU (V) DE ACORDO COM UMA ISENÇÃO DE REGISTRO FORNECIDA PELA REGRA 144A CONFORME A LEI DE VALORES MOBILIÁRIOS OU QUALQUER OUTRA ISENÇÃO DISPONÍVEL DOS REQUISITOS DE REGISTRO DA LEI DE VALORES MOBILIÁRIOS E, EM CADA UM DESSES CASOS, DE ACORDO COM AS LEIS DE VALORES MOBILIÁRIOS APLICÁVEIS DE QUALQUER ESTADO DOS ESTADOS UNIDOS OU OUTRA JURISDIÇÃO APLICÁVEL. O TITULAR DESTE

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 222

DOCUMENTO, AO ADQUIRIR ESTE VALOR MOBILIÁRIO, DECLARA E CONCORDA QUE DEVERÁ NOTIFICAR QUALQUER COMPRADOR DESTE VALOR MOBILIÁRIO SOBRE AS RESTRIÇÕES DE REVENDA MENCIONADAS ACIMA.

A LEGENDA ANTERIOR PODE SER REMOVIDA DESTE VALOR MOBILIÁRIO COM A SATISFAÇÃO DAS CONDIÇÕES ESPECIFICADAS NA ESCRITURA MENCIONADA NESTE DOCUMENTO.]

[*Inclua se o Valor Mobiliário é um Valor Mobiliário Global conforme o Regulamento S ou um Valor Mobiliário emitido em troca deste, de acordo com a Escritura:*

"ESTE VALOR MOBILIÁRIO NÃO FOI REGISTRADO DE ACORDO COM A LEI DE VALORES MOBILIÁRIOS DOS EUA DE 1933, CONFORME ADITADA (A "**LEI DE VALORES MOBILIÁRIOS**") OU QUALQUER OUTRA LEI DE VALORES MOBILIÁRIOS. O TITULAR DESTE INSTRUMENTO, AO ADQUIRIR ESTE VALOR MOBILIÁRIO, CONCORDA QUE NEM ESTE VALOR MOBILIÁRIO NEM QUALQUER PARTICIPAÇÃO CONTIDA NO PRESENTE PODEM SER OFERECIDOS, REVENDIDOS, PENHORADOS OU DE OUTRA FORMA TRANSFERIDOS NA AUSÊNCIA DESSE REGISTRO, A MENOS QUE ESSA OPERAÇÃO ESTEJA ISENTA OU NÃO ESTEJA SUJEITA A ESSE REGISTRO.

A LEGENDA ANTERIOR PODE SER REMOVIDA DESTE VALOR MOBILIÁRIO APÓS QUARENTA DIAS CORRIDOS A PARTIR DA (A) DATA EM QUE OS VALORES MOBILIÁRIOS FOREM OFERECIDOS A PESSOAS QUE NÃO SEJAM DISTRIBUIDORES (CONFORME DEFINIDO NO REGULAMENTO S NOS TERMOS DA LEI DE VALORES MOBILIÁRIOS) E (B) DATA DE EMISSÃO ORIGINAL DESTE VALOR MOBILIÁRIO."]

### ODEBRECHT HOLDCO FINANCE LTD.
[VALOR MOBILIÁRIO GLOBAL RESTRITO]
[VALOR MOBILIÁRIO GLOBAL CONFORME O REGULAMENTO S]
[VALOR MOBILIÁRIO CERTIFICADO]

Representando
Instrumentos com Vencimento em 2058

N° [R-1][S-1]

CUSIP N° [•]] [[•]]                                                    Montante Principal
ISIN N° [[•]] [[•]]
CÓDIGO COMUM. [[•]] [[•]]                                                US$ [[•]] [[•]]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 223

A Odebrecht Holdco Finance Limited, uma sociedade isenta constituída de acordo com as leis das Ilhas Cayman (o "**Emissor**", cujo termo inclui qualquer sociedade sucessora nos termos da Escritura referida no verso deste documento), pelo valor recebido, neste ato promete pagar à Cede & Co., ou cessionário registrado, US$ [[•]] [[•]], mediante apresentação e entrega deste Valor Mobiliário em [•] de 20[•] ou nessa data ou datas em que a quantia principal relevante possa ser paga de acordo com a disposições deste instrumento e na Escritura.

É realizada referência às disposições restantes deste Valor Mobiliário estabelecidas em seu verso, as quais, para todos os efeitos, terão o mesmo efeito como se fossem estabelecidas neste local.

A menos que o certificado de autenticação contido neste instrumento tenha sido celebrado pelo Agente Fiduciário ou Agente de Autenticação pela assinatura de um de seus signatários autorizados, este Valor Mobiliário não terá direito a nenhum benefício nos termos da Escritura ou será válida ou obrigatória para qualquer finalidade.

EM TESTEMUNHO DO QUE, o Emissor fez com que este Valor Mobiliário fosse devidamente assinada.

Data:

ODEBRECHT HOLDCO FINANCE LTD.

Por:
Nome:
Cargo:

Por:
Nome:
Cargo:

CERTIFICADO DE AUTENTICAÇÃO
DO AGENTE FIDUCIÁRIO

Esta é uma dos Valores Mobiliários
referidas na
Escritura mencionada.

THE BANK OF NEW YORK MELLON,
Como Agente Fiduciário

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº  2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 224

---

Por:
Diretor Autorizado

[MODELO DO VERSO DO VALOR MOBILIÁRIO]

Instrumentos com Vencimento em 2058

TERMOS E CONDIÇÕES DOS VALORES MOBILIÁRIOS

*Os Valores Mobiliários terão os seguintes termos e condições. Determinados termos em maiúsculas usados nessa Termos e Condições estão definidos na Seção[•].*

**1.      Status**

[--]

**ANEXO B**

**ESCRITURA COMPLEMENTAR**

Datada de _____ de _____

entre

ODEBRECHT HOLDCO FINANCE LIMITED.,

e

THE BANK OF NEW YORK MELLON,

Como Agente Fiduciário, Agente de Pagamento, Oficial de Registro e Agente de Transferência

Instrumentos com Vencimento em 2058

A PRESENTE ESCRITURA COMPLEMENTAR (esta "**Escritura Complementar**") celebrada a partir de _____ de _____, entre a Odebrecht Holdco Finance Limited, uma sociedade isenta constituída de acordo com as leis das Ilhas Cayman (o "**Emissor**"), e o The Bank of New York Mellon, como Agente Fiduciário (o "**Agente Fiduciário**").

**CONSIDERANDOS**

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 225

CONSIDERANDO QUE, o Emissor e o The Bank of New York Mellon, como Agente Fiduciário, Agente de Pagamento, Oficial de Registro e Agente de Transferência celebraram a Escritura, datada de [•] de 20[•] (a "**Escritura**"), relativa aos Instrumentos com Vencimento em 2058 (os "**Valores Mobiliários**");

[CONSIDERANDO QUE, como uma condição para o Agente Fiduciário firmar a Escritura e a compra dos Valores Mobiliários pelos Titulares, o Emissor concordou, nos termos da Escritura, em fazer com que algumas Subsidiárias recém-adquiridas ou criadas forneçam garantias em certas circunstâncias.]

### ACORDO

ASSIM SENDO, em consideração às premissas e acordos mútuos contidos no presente e que pretendem ser legalmente vinculados, as partes desta Escritura Complementar concordam com o seguinte:

Seção 1. Os termos em maiúsculas utilizados neste instrumento e não definidos nele são usados conforme definido na Escritura.

Seção 2. Esta Escritura Complementar será regida e interpretada de acordo com as leis do Estado de Nova Iorque.

Seção 3. Esta Escritura Complementar poderá ser assinada em várias vias, as quais juntas constituirão um e o mesmo instrumento.

Seção 4. Esta Escritura Complementar é um aditamento complementar à Escritura, e a Escritura e esta Escritura Complementar serão, portanto, lidas em conjunto.

Seção 5. O Agente Fiduciário não será responsável de forma alguma por, ou em relação à validade ou suficiência desta Escritura Complementar ou por ou em relação aos considerandos contidos neste instrumento, todos elaborados exclusivamente pelo Emissor.

EM TESTEMUNHO DO QUE, as partes fizeram com que esta Escritura Complementar fosse devidamente assinada a partir da primeira data escrita acima.

ODEBRECHT HOLDCO FINANCE LIMITED.
como Emissor

Por:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021                                                                CCM nº   2.968.720-9
C.P.F. nº 077.542.738-10                                                                     INSS nº 11393830140
R.G nº 11.604.191

Nº da tradução/versão: 20.08.54.02            Livro nº LIV                    fls. 226

---

Nome:
Cargo:

Por:
Nome:
Cargo:

THE BANK OF NEW YORK MELLON
Como Agente Fiduciário, Oficial de Registro e Agente de Transferência

Por:
Nome:
Cargo:

**ANEXO C**

MODELO DE
NOTIFICAÇÃO DE TRANSFERÊNCIA

PELO VALOR RECEBIDO, o Titular abaixo assinado neste ato vende, cede e transfere para

Inserir Nº de Identificação de Contribuinte

_____

Imprima ou digite o nome e endereço, incluindo o CEP, do cessionário

_____

este Valor Mobiliário e todos os direitos estabelecidos no presente, constituindo e nomeando irrevogavelmente

_____ procurador para transferir a referido Valor Mobiliário nos livros da ODEBRECHT HOLDCO FINANCE LIMITED com pleno poder de substituição nas premissas.

Em relação a qualquer transferência deste Valor Mobiliário que ocorra antes da data [que é um ano após a data de emissão original dos Valores Mobiliários,][14] [que ocorre no ou antes do 40° dia após a Data de Fechamento (conforme definido na Escritura que rege os Valores Mobiliários)],[15] o signatário confirma que:

---

[14] Incluir na Nota Restrita.
[15] Incluir na Nota sobre Regulamento S

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 227

---

[Assinale uma]

☐   (a)   Este Valor Mobiliário está sendo transferida ao Emissor;

☐   (b)   Este Valor Mobiliário está sendo transferida de acordo com uma declaração de registro em vigor de acordo com a Lei de Valores Mobiliários dos EUA de 1933, conforme aditada (a "Lei de Valores Mobiliários");

☐   (c)   Este Valor Mobiliário está sendo transferida a uma pessoa que o Titular razoavelmente acredita ser um comprador institucional qualificado, conforme definido na Regra 144A nos termos da Lei de Valores Mobiliários em uma operação que atenda aos requisitos da Regra 144A;

☐   (d)   Este Valor Mobiliário está sendo transferida em uma operação offshore de acordo com a Regra 904, de acordo com a Lei de Valores Mobiliários; ou

☐   (e)   Este Valor Mobiliário está sendo transferida de acordo com uma isenção de registro nos termos da Lei de Valores Mobiliários, prevista na Regra 144 (se disponível),

em cada um dos casos de (a) a (e) acima, de acordo com as leis de valores mobiliários aplicáveis de qualquer Estado dos Estados Unidos.

Se nenhuma das caixas anteriores estiver assinalada, o Agente de Transferência não será obrigado a registrar este Valor Mobiliário em nome de qualquer Pessoa que não seja o Titular deste documento, a menos e até que as condições para qualquer transferência de registro estabelecida neste documento e na Seção 2.12 da Escritura tenham sido satisfeitas.

Data:

NOTIFICAÇÃO: A assinatura desta cessão deve corresponder ao nome escrito na frente deste instrumento em todos os aspectos, sem alteração, ampliação ou qualquer outra alteração.

**ANEXO D**

MODELO DE CERTIFICADO
PARA TRANSFERÊNCIA DE VALOR MOBILIÁRIO GLOBAL
RESTRITO OU VALOR MOBILIÁRIO CERTIFICADO CONSTANDO
LEGENDA DA LEI DE VALORES MOBILIÁRIOS SOBRE

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 228

---

**VALOR MOBILIÁRIO GLOBAL CONFORME O
REGULAMENTO S OU VALOR MOBILIÁRIO CERTIFICADO
SEM UMA LEGENDA DA LEI DE VALORES MOBILIÁRIOS**

The Bank of New York Mellon
101 Barclay Street – Floor 4 East
Nova York, Nova York 10286
A/c: Finanças Globais das Américas

Re:       Instrumentos com Vencimento em 2058 (os "**Valores Mobiliários**")

Faz-se referência à Escritura, datada de [·] de 20[·] (a "**Escritura**"), entre a Odebrecht Holdco Finance Limited e The Bank of New York Mellon, como Agente Fiduciário, Agente de Pagamento, Oficial de Registro e Agente de Transferência. Os termos em maiúscula utilizados, mas não definidos aqui, terão o significado que lhes é atribuído na Escritura.

Esta carta diz respeito a US$ _____ do montante principal dos Valores Mobiliários que são detidas na forma de [participação efetiva na Valor Mobiliário Global Restrita com o Depositário em nome do abaixo assinado] [um Valor Mobiliário Certificado sem Legenda da Lei dos Valores Mobiliários].

O abaixo assinado solicitou a transferência dessa [participação efetiva] [Valor Mobiliário Certificado] a uma Pessoa que a receba na forma de [uma participação efetiva de montante principal igual na Valor Mobiliário Global sobre o Regulamento S (ISIN N° [·]) para ser detida pelo [Euroclear] * [Clearstream Banking][16] (Código Comum N° [·]) através do Depositário] [um Valor Mobiliário Certificado de montante principal igual sem uma Legenda da Lei de Valores Mobiliários]. Em relação a essa transferência, o abaixo assinado certifica, por este ato, que essa transferência foi efetuada de acordo com as restrições de transferência estabelecidas na Escritura e nos Valores Mobiliários, e conforme a Regra 903 ou 904 do Regulamento S da Lei de Valores Mobiliários dos Estados Unidos de 1933, conforme aditada, (a "**Lei de Valores Mobiliários**") e consequentemente, o abaixo assinado certifica que:

(1)       a oferta dos Valores Mobiliários não foi realizada a uma Pessoa dos EUA (conforme definido no Regulamento S);

---

[16] **Indicar o sistema de compensação apropriado.**

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                              fls. 229

[(2)     no momento em que o pedido de compra foi originado, o beneficiário estava fora dos Estados Unidos ou o abaixo-assinado e qualquer Pessoa atuando em nome do abaixo-assinado acreditava razoavelmente que o beneficiário estava fora dos Estados Unidos;][17]

[(3)     a operação foi realizada dentro ou através das instalações de um mercado de valores mobiliários no exterior designado e nem o abaixo-assinado nem qualquer Pessoa atuando em nome do abaixo-assinado sabem que a operação foi previamente combinada com um comprador nos Estados Unidos;][18]

(4)     nenhum esforço de venda direcionada foi realizado em violação dos requisitos da Regra 904 do Regulamento S;

(5)     o abaixo-assinado não é o Emissor, um distribuidor, uma afiliada do Emissor ou de um distribuidor, ou uma Pessoa atuando em nome de qualquer um dos anteriores; e

(6)     a operação não faz parte de um plano ou esquema para evitar os requisitos de registro da Lei de Valores Mobiliários.

Este certificado e as declarações aqui contidas são feitas em seu benefício e em benefício da Odebrecht Holdco Finance Limited. Os termos usados neste certificado e não definidos de outra forma na Escritura possuem os significados estabelecidos no Regulamento S.

[INSERIR NOME DO CEDENTE]

Por:
Nome:
Cargo:

Data: _____, _____
cc:        Odebrecht Holdco Finance Limited

**ANEXO E**

MODELO DE CERTIFICADO DE TRANFERÊNCIA
PARA TRANSFERÊNCIA DO VALOR MOBILIÁRIO GLOBAL CONFORME O
REGULAMENTO S OU VALOR MOBILIÁRIO CERTIFICADO SEM
LEGENDA DA LEI DE VALORES MOBILIÁRIOS

---

[17] **Inserir uma das duas disposições.**
[18] **Inserir uma das duas disposições.**



## IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
## - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV          fls. 230

PARA VALOR MOBILIÁRIO GLOBAL
RESTRITO OU VALOR MOBILIÁRIO CERTIFICADO COM
LEGENDA DA LEI DE VALORES MOBILIÁRIOS
(ANTES DO 40º DIA APÓS A DATA DE EMISSÃO)

The Bank of New York Mellon
101 Barclay Street – 4º andar Leste
Nova Iorque, Nova Iorque 10286
A/c: Finanças Globais das Américas

Re:          Instrumentos com Vencimento em 2058 (os "**Valores Mobiliários**")

Faz-se referência à Escritura, datada de [·] de 20[·] (a "**Escritura**"), entre a Odebrecht Holdco Finance Limited e The Bank of New York Mellon, como Agente Fiduciário, Agente de Pagamento, Oficial de Registro e Agente de Transferência. Os termos em maiúscula utilizados, mas não definidos aqui, terão o significado que lhes é atribuído na Escritura.

Esta carta diz respeito a US$ _____ do montante principal dos Valores Mobiliários que são detidas na forma de [participação efetiva na Valor Mobiliário Global conforme o Regulamento S (ISIN N° [•]) com o Depositário em nome do abaixo assinado] [um Valor Mobiliário Certificado sem Legenda da Lei dos Valores Mobiliários].

O abaixo assinado solicitou uma transferência dessa [participação efetiva] [Valor Mobiliário Certificado] para uma Pessoa que aceitará a entrega da mesma na forma de [uma participação efetiva na Valor Mobiliário Global Restrita (CUSIP N° [-]) a ser detida através do Depositário] [um Valor Mobiliário Certificado com Legenda da Lei dos Valores Mobiliários]. Em relação a essa transferência, o abaixo assinado confirma, por este ato, que essa transferência foi efetuada de acordo com as restrições de transferência estabelecidas na Escritura e nos Valores Mobiliários, e conforme a Regra 144A da Lei de Valores Mobiliários dos Estados Unidos de 1933, conforme aditada, e consequentemente, o abaixo assinado declara que:

(1)     Os Valores Mobiliários estão sendo transferidas para um cessionário que o abaixo assinado acredita estar comprando os Valores Mobiliários por sua própria conta, ou mais de uma conta a respeito das quais o cessionário exerce critérios exclusivos de investimento; e

(2)     O cessionário e essa conta são um "comprador institucional qualificado", na acepção da Regra 144A, em uma operação que cumpra com os requisitos da Regra 144A e de acordo com quaisquer leis de valores mobiliários de qualquer estado dos Estados Unidos ou de qualquer outra jurisdição.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



## IEDA MARIA MONTEIRO
### Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                          fls. 231

Este certificado e as declarações aqui contidas são feitas em seu benefício e em benefício da Odebrecht Holdco Finance Limited.

[INSERIR NOME DO CEDENTE]

Por:
Nome:
Cargo:

Data: _____, _____

cc:

**ANEXO F**

### MODELO DE CERTIFICADO PARA REMOÇÃO DA LEGENDA DA LEI DE VALORES MOBILIÁRIOS DE UM VALOR MOBILIÁRIO CERTIFICADO

The Bank of New York Mellon
101 Barclay Street – 4º andar Leste
Nova Iorque, Nova Iorque 10286
A/c: Finanças Globais das Américas

Re:    Instrumentos com Vencimento em 2058 (os "**Valores Mobiliários**")

Faz-se referência à Escritura, datada de [-] de 20[-] (a "**Escritura**"), entre a Odebrecht Holdco Finance Limited e The Bank of New York Mellon, como Agente Fiduciário, Agente de Pagamento, Oficial de Registro e Agente de Transferência. Os termos em maiúscula utilizados, mas não definidos aqui, terão o significado que lhes é atribuído na Escritura.

Esta carta refere-se ao montante principal de US$ _____ dos Valores Mobiliários que são detidas na forma de [uma participação efetiva na Valor Mobiliário Global Restrita (CUSIP N°[•]) com o Depositário] [[o] Valor(es) Mobiliário(s) Certificado(s) no nome do abaixo-assinado.][19]

O abaixo-assinado solicitou a remoção da Legenda restritiva no(s) Valor(es) Mobiliário(s) Certificado(s).

---

[19] **Indicar a forma em que as notas são detidas**.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.



# IEDA MARIA MONTEIRO
## Tradutora Pública e Intérprete Comercial
### - Inglês –

Matr. na Jucesp sob nº 1021
C.P.F. nº 077.542.738-10
R.G nº 11.604.191

CCM nº   2.968.720-9
INSS nº 11393830140

Nº da tradução/versão: 20.08.54.02          Livro nº LIV                    fls. 232

Em relação a essa transferência, o abaixo-assinado neste ato certifica que essa transferência foi realizada apenas (i) em uma operação offshore de acordo com a Regra 904 nos termos da Lei de Valores Mobiliários, (ii) de acordo com uma isenção de registro nos termos da Lei de Valores Mobiliários fornecida pela Regra 144 (se disponível) ou (iii) de acordo com uma declaração de registro em vigor nos termos da Lei de Valores Mobiliários, em cada um dos casos de (i) a (iii) de acordo com as leis de valores mobiliários aplicáveis de qualquer Estado dos Estados Unidos.

Este certificado e as declarações aqui contidas são feitas em seu benefício e em benefício da Odebrecht Holdco Finance Limited.

[NOME DO ABAIXO ASSINADO]

Por:
Nome:
Cargo:

Data: _____, _____
cc:          [-]

Nada mais constava do documento acima que devolvo com esta tradução, segundo meu melhor entender, a qual conferi achei conforme e assino.

São Paulo, 18 de agosto de 2020.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

# ODEBRECHT HOLDCO FINANCE LIMITED

as Issuer

THE BANK OF NEW YORK MELLON,
as Trustee, Paying Agent, Registrar and Transfer Agent

_____

## INDENTURE

Dated as of [·], 2020

_____

Instrument Titles Due 2058

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_14]

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION .... 1

Section 1.01.    Definitions ............................................................................. 1
Section 1.02.    Rules of Construction .......................................................... 18
Section 1.03.    Table of Contents; Headings ............................................... 19
Section 1.04.    Form of Documents Delivered to Trustee ........................... 19
Section 1.05.    Acts of Holders ................................................................... 19

ARTICLE 2 THE SECURITIES .................................................................................... 20

Section 2.01.    Form and Dating .................................................................. 20
Section 2.02.    Execution, Authentication and Delivery ............................. 21
Section 2.03.    Transfer Agent, Registrar and Paying Agent ...................... 22
Section 2.04.    Paying Agent to Hold Money in Trust ................................ 23
Section 2.05.    Principal, Maturity and Interest .......................................... 23
Section 2.06.    Distributions ........................................................................ 23
Section 2.07.    Distributions of Excess Cash Available Amount During and After the Excess Cash Sweep Period ................................. 24
Section 2.08.    Specified Distribution Events .............................................. 25
Section 2.09.    Payment of Principal ........................................................... 26
Section 2.10.    Principal Rights Preserved .................................................. 27
Section 2.11.    Holder Lists .......................................................................... 28
Section 2.12.    Transfer and Exchange ........................................................ 28
Section 2.13.    Replacement Securities ....................................................... 30
Section 2.14.    Temporary Securities ........................................................... 31
Section 2.15.    Cancellation ......................................................................... 31
Section 2.16.    CUSIP and ISIN Numbers .................................................. 31

ARTICLE 3 REDEMPTION AND REPURCHASE ..................................................... 31

Section 3.01.    Maturity ................................................................................ 31
Section 3.02.    Mandatory Redemption ....................................................... 31
Section 3.03.    Optional Redemption ........................................................... 32
Section 3.04.    Repurchase ........................................................................... 33
Section 3.05.    Qualified Public Offering of the Company .......................... 33
Section 3.06.    Notice of Redemption by the Issuer; Notice to Trustee ...... 33
Section 3.07.    Deposit of Redemption Price ............................................... 34

ARTICLE 4 COVENANTS ............................................................................................ 34

Section 4.01.    Payment of Principal Under the Securities .......................... 34
Section 4.02.    Maintenance of Office or Agency ........................................ 34
Section 4.03.    Money for Security Payments to Be Held in Trust .............. 34
Section 4.04.    Maintenance of Corporate Existence ................................... 36
Section 4.05.    Compliance with Law .......................................................... 36
Section 4.06.    Payment of Additional Amounts .......................................... 36

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 4.07.    Available Information ....................................................... 38
Section 4.08.    Financial Statements and Reporting Requirements ...................... 38
Section 4.09.    Further Assurances ........................................................... 39
Section 4.10.    Limitations and Restrictions on the Issuer ............................... 39
Section 4.11.    Agent or Trustee Fees ....................................................... 40
Section 4.12.    Calculations of Payment .................................................... 40

ARTICLE 5 EVENTS OF DEFAULT AND REMEDIES ................................. 40

Section 5.01.    Events of Default ............................................................. 40
Section 5.02.    Other Remedies ............................................................... 42
Section 5.03.    Control by Majority. .......................................................... 42
Section 5.04.    Limitation on Suits ........................................................... 43
Section 5.05.    Rights of Holders To Receive Payment ................................... 43
Section 5.06.    Collection Suit by Trustee .................................................. 43
Section 5.07.    Trustee May File Proofs of Claim .......................................... 44
Section 5.08.    Priorities ...................................................................... 44

ARTICLE 6 TRUSTEE AND PAYING AGENT .......................................... 45

Section 6.01.    Duties of Trustee and Paying Agent ...................................... 45
Section 6.02.    Rights of Trustee ............................................................. 46
Section 6.03.    Individual Rights of Trustee ............................................... 47
Section 6.04.    Trustee's Disclaimer ......................................................... 47
Section 6.05.    Notice of Defaults and Events of Default ................................ 48
Section 6.06.    Compensation and Indemnity .............................................. 48
Section 6.07.    Replacement of Trustee ..................................................... 49
Section 6.08.    Successor Trustee by Merger ............................................... 50
Section 6.09.    Eligibility; Disqualification ................................................ 50

ARTICLE 7 DISCHARGE OF INDENTURE; DEFEASANCE ......................... 50

Section 7.01.    Discharge of Liability on Securities ...................................... 50
Section 7.02.    Conditions to Defeasance .................................................. 51
Section 7.03.    Application of Trust Money ................................................. 53
Section 7.04.    Repayment to Issuer ......................................................... 53
Section 7.05.    Indemnity for U.S. Governmental Obligations ......................... 53
Section 7.06.    Reinstatement ................................................................ 53

ARTICLE 8 AMENDMENTS ............................................................... 53

Section 8.01.    Modification and Waiver .................................................... 53
Section 8.02.    Trustee to Sign Amendments .............................................. 55

ARTICLE 9 MISCELLANEOUS ........................................................... 55

Section 9.01.    Provisions of Indenture and Securities for the Sole Benefit of Parties and Holders ........................................................... 55
Section 9.02.    Notices ........................................................................ 55

- ii -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 9.03.    Officers' Certificate and Opinion of Counsel as to Conditions Precedent .................................................................................. 56
Section 9.04.    Statements Required in Officers' Certificate or Opinion of Counsel ........................................................................................ 56
Section 9.05.    Rules by Trustee, Registrar Paying Agent and Transfer Agents ....... 57
Section 9.06.    Currency Indemnity ............................................................................ 57
Section 9.07.    No Recourse Against Others................................................................ 57
Section 9.08.    Legal Holidays .................................................................................... 58
Section 9.09.    Governing Law .................................................................................... 58
Section 9.10.    Consent to Jurisdiction; Waiver of Immunities ................................. 58
Section 9.11.    Successors and Assigns....................................................................... 58
Section 9.12.    Multiple Originals............................................................................... 58
Section 9.13.    Severability Clause ............................................................................. 59
Section 9.14.    Force Majeure ..................................................................................... 59

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

EXHIBITS:

EXHIBIT A   —   Form of Security

EXHIBIT B   —   Form of Supplemental Indenture

EXHIBIT C   —   Form of Transfer Notice

EXHIBIT D   —   Form of Certificate for Transfer from Restricted Global Security or Certificated Security Bearing a Securities Act Legend to Regulation S Global Security or Certificated Security Not Bearing a Securities Act Legend

EXHIBIT E   —   Form of Transfer Certificate for Transfer from Regulation S Global Security or Certificated Security Not Bearing a Securities Act Legend to Restricted Global Security or Certificated Security Bearing a Securities Act Legend

EXHIBIT F   —   Form of Certificate for Removal of the Securities Act Legend on a Certificated Security

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

INDENTURE, dated as of [•], 2020, among ODEBRECHT HOLDCO FINANCE LIMITED, an exempted company with limited liability incorporated under the laws of the Cayman Islands, as the Issuer, and THE BANK OF NEW YORK MELLON, as Trustee, Paying Agent, Registrar and Transfer Agent.

## RECITALS

The Issuer has duly authorized the issue of Instrument Titles Due 2058 (the "**Securities**"), initially in an aggregate principal amount of U.S.$[•] and has duly authorized the execution and delivery of this Indenture.

All things necessary have been done to make the Securities when executed and authenticated and delivered hereunder and duly issued, the valid obligations of the Issuer, and to make this Indenture a valid agreement of the Issuer.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Securities by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.01.   *Definitions*.

"**Act**", when used with respect to any Holder, has the meaning specified in Section 1.05.

"**Additional Amounts**" has the meaning specified in Section 4.06.

"**Affiliate**" means, with respect to any specified Person, (i) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (ii) any other Person who is a director or officer (a) of such specified Person, (b) of any Subsidiary of such specified Person or (c) of any Person described in clause (i) above. For purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing and, for the avoidance of doubt, shall not apply to any financial institution or trust company that, as of the date of the filing of the ODB RJ, is a creditor of any ODB RJ Party and has received or will receive securities in connection with the ODB RJ.

"**Applicable Net Proceeds**" means the product of (i) the net proceeds from a particular transaction and (ii) the applicable Instrument Distribution Percentage.

"**Applicable Procedures**" means the applicable procedures of DTC, Euroclear and Clearstream Banking, in each case to the extent applicable.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_4]

"**Asset Disposition**" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) of shares of Capital Stock of a Subsidiary (other than executive officers' qualifying shares), property or other assets (each, a "disposition") by the New Notes guarantor or any of its Subsidiaries, including any disposition by means of a merger, consolidation or similar transaction, other than (1) a disposition of property or assets at Fair Market Value in the ordinary course of business, (2) a disposition by the Company or a Subsidiary to another Subsidiary of the Company and (3) a disposition of obsolete assets in the ordinary course of business.

"**Asset Sale**" has the meaning specified in the definition under the indentures of the New Notes.

"**Authenticating Agent**" has the meaning specified in Section 2.02.

"**Authorized Denomination**" has the meaning specified in Section 2.02.

"**Bankruptcy Law**" means (i) Title 11, United States Code or any similar U.S. federal or state law for the relief of debtors, the adjustment of debt, or the administration or liquidation of debtors' estates for the benefit of their creditors, and (ii) the Brazilian Bankruptcy Law or any similar Cayman Islands, Brazilian federal or other applicable or state law for the relief of debtors, the adjustment of debt, or the administration or liquidation of debtors' estates for the benefit of their creditors and, for the avoidance of doubt, any scheme of arrangement submitted to the court or recuperação extrajudicial or recuperação judicial shall be deemed to have occurred under a Bankruptcy Law for all purposes of this Indenture.

"**Bankruptcy or Insolvency Event**" means, as applied to any Person, the declaration of bankruptcy, insolvency, falência declarada, autofalência, recuperação judicial or extrajudicial or other similar law now or hereafter in effect, including, but not limited to, any proceeding seeking the appointment of a trustee, receiver, administrador judicial, liquidator, administrator, custodian, assignee, sequestrator or other similar official of it or any substantial part of its assets, or the liquidation of such Person.

"**Base Face Amount**" means, as of the Issue Date and as of a date of determination at any time prior to the closing of a Qualified Tender Offer, the Face Amount on the Issue Date.

Upon the closing of a Qualified Tender Offer, the Base Face Amount shall be set equal to the Face Amount outstanding upon the closing of such Qualified Tender Offer.

"**Base Instrument Distribution Percentage**" means, as of the Issue Date and as of a date of determination at any time prior to the closing of a Qualified Tender Offer, the product of (A) 50% and (B) 100% minus the cumulative dilution (expressed as a percentage) of the Issuer's share ownership in the Company since the Issue Date due to any sale or issuance (primary or secondary) of the Company shares, in each case, for consideration payable of not less than U.S.$200 million.

Upon the closing of a Qualified Tender Offer, the Base Instrument Distribution Percentage shall be set equal to the product of:

- 2 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_14]

(a) the ratio (expressed as a percentage) of (i) the Non-Tendering Percentage to (ii) the sum of (x) the Non-Tendering Percentage and (y) an amount equal to 100% minus the Instrument Distribution Percentage then in effect immediately preceding the closing of such Qualified Tender Offer; and

(b) 100% *minus* the cumulative dilution (expressed as a percentage) of the Issuer's share ownership in the Company since the closing of such Qualified Tender Offer due to any sale or issuance (primary or secondary) of the Company shares, in each case, for consideration of not less than U.S.$200 million.

"**Bidding Company**" means a Subsidiary of the Company whose capital is beneficially owned by the Company and any other Person or Persons that are not Affiliates of the Company for the sole purpose of directly or indirectly bidding on construction projects.

"**Board of Directors**" means, as the case may be, the Board of Directors of the Issuer or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the secretary, the assistant secretary or another Officer or legal counsel performing corporate secretarial functions of the Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification and delivered to the Trustee.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazilian Bankruptcy Law**" means Brazilian Federal Law No. 11,101 of February 9, 2005, as amended from time to time.

"**Brazilian GAAP**" means, collectively, the accounting principles prescribed by Brazilian Corporate Law, the rules and regulations issued by applicable regulators, including the CVM, as well as the technical releases issued by the Brazilian Institute of Accountants (*Instituto Brasileiro de Contadores*), in each case as in effect from time to time.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York or São Paulo, Brazil.

"**Capital Stock**" means, as applied to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated), including any Preferred Stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cayman Islands**" means the Cayman Islands, a territory of the United Kingdom of Great Britain and Northern Ireland.

"**Certificated Security**" has the meaning specified in Section 2.01.

"**Change of Control**" means the occurrence of any of the following:

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417.3]

(a) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act, other than any Permitted Holders) is or becomes the "beneficial owner" (as such term is used in Rules 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company or the Issuer, including as a result of any merger or consolidation transaction including the Company;

(b) any "person" or "group" other than any Permitted Holder acquires the ability to elect a majority of the board of directors of the Company or the Issuer;

(c) any Permitted Holder, directly or indirectly, ceases to have the power to direct or cause the direction of the management and policies of the Company or the Issuer, whether through the ownership of voting securities, by contract or otherwise; or

(d) more than 50% of the total voting power of the Voting Stock of the Company or the Issuer has been sold or issued as a result of the relevant transaction to any "person" or "group" other than a Permitted Holder.

"**Change of Control Transaction**" has the meaning specified in Section 3.02.

"**Clearstream Banking**" means Clearstream Banking, *société anonyme*.

"**Closing Date**" means [•], 20[•], or such later date on which the Securities are issued hereunder.

"**Company**" or "**OEC**" means OEC S.A.

"**Completion Date**" means, in connection with the exercise of the Qualified Public Offering Right, the date on which the Capital Stock have been issued to the Holders.

"**Consent Solicitation Statement**" means the consent solicitation statement issued on June 15, 2020 by Odebrecht Engenharia e Construção S.A., among others.

"**Contingent Obligation**" means any obligation, contingent or otherwise, of any person directly or indirectly guaranteeing any Indebtedness or other obligation of any person and any obligation, direct or indirect, contingent or otherwise, of such person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such person (whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "Contingent Obligations" shall not include endorsements for collection or deposit in the ordinary course of business or any similar transaction.

"**Corporate Trust Office**" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered (which office as of the date of this Indenture is located at 240 Greenwich Street, Floor 7 East, New York, NY 10286).

- 4 -

"**covenant defeasance option**" has the meaning specified in Section 7.01.

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**defeasance trust**" has the meaning specified in Section 7.02.

"**Denomination Currency**" has the meaning specified in Section 9.06.

"**Depositary**" means DTC or any successor depositary for the Securities.

"**Development Project**" means any construction, development or infrastructure project, including without limitation greenfield projects and brownfield projects, in which the Company or any of its Subsidiaries participates or holds, directly or indirectly, an interest, or the bidding on any such project.

"**Distribution**" means any distribution made by the Company to the Issuer, directly or indirectly, whether in its capacity as shareholder or creditor of the Company, including, without limitation, distributions by means of dividends, Interest on Capital, capital redemption, repayment of intercompany loans, or otherwise.

"**Dollars**" and the symbol "**U.S.$**" shall each mean freely transferable, lawful money of the United States.

"**DTC**" means The Depository Trust Company.

"**EBITDA**" means, for any period, for the Company and its Subsidiaries on a consolidated basis, Net Revenue, *less* (i) cost of sales and services rendered, (ii) general and administrative expenses, *plus* any depreciation or amortization included in cost of sales and services rendered or general and administrative expenses, and (iii) payments made by the Company or its Subsidiaries, taken as a whole in respect of Fines.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Equity Value**" has the meaning specified in Section 3.02.

"**Euroclear**" means Euroclear Bank S.A./N.V.

"**Event of Default**" has the meaning specified in Section 5.01.

"**Excess Cash Amount**" means, as of any Excess Cash Measurement Date, (a) the total amount of Unrestricted Cash, *less* (b) the sum of (i) the applicable Minimum Cash Threshold hereto corresponding to such Excess Cash Measurement Date, (ii) the total amount of scheduled payments due by the Company and its Subsidiaries, taken as a whole, under (x) the New Notes

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

and (y) any other Permitted Indebtedness in each case in the subsequent twelve (12) month period, (iii) projected expenses for the New Notes Issuer to conduct its operations during the subsequent twelve (12) month period, including any foreign currency conversion expenses and (iv) for any Excess Cash Measurement Date through (and including) December 31, 2024, any Fines due by the Company and its Subsidiaries for the subsequent twelve (12) month period; *less* (c) an amount equal to the Required Gross-Up; *provided* that any items already deducted from cash and short-term investments of the Company and its Subsidiaries for purposes of determining Unrestricted Cash shall not be deducted again for purposes of determining the Excess Cash Amount.

"**Excess Cash Available Amount**" the amount in Dollars by which the Excess Cash Amount, as of any Excess Cash Measurement Date, exceeds zero, if any.

"**Excess Cash Measurement Date**" means the end of each fiscal year while the Securities are outstanding, commencing on December 31, 2020.

"**Excess Cash Payment**" means any payments made to Holders in respect of Excess Cash Available Amounts, regardless of whether during or after the Excess Cash Sweep Period.

"**Excess Cash Payment Date**" means May 15 of each fiscal year in which an Excess Cash Payment is made.

"**Excess Cash Sweep Period**" means, commencing on January 1, 2021, each fiscal year in which the Net Debt to EBITDA Ratio equals or exceeds 3.00 to 1.00 as of the immediately preceding Excess Cash Measurement Date and ended on the Excess Cash Measurement Date that is twelve months prior to an Excess Cash Sweep Termination Event.

"**Excess Cash Sweep Termination Event**" means the first Excess Cash Measurement Date in respect of which the Net Debt to EBITDA Ratio is lower than 3.00 to 1.00.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Face Amount**" means the aggregate stated face amount of the Securities, which on the Issue Date is U.S.$[●] million.  For the avoidance of doubt, each Security represents an allocation of U.S.$1.00 in Face Amount of the Securities (as such amounts are adjusted downwards in accordance with the terms of this Indenture).

"**Fair Market Value**" means, with respect to any Person, the value that would be paid by a willing buyer to an unaffiliated willing seller as determined in good faith at arms' length by (i) for any transaction amount in excess of U.S.$25,000,000, the board of executive officers or directors, as applicable, or (ii) otherwise, an authorized officer, in each case of such Person (unless otherwise provided in this Indenture in connection with non-cash consideration received in connection with a Specified Distribution Event).

"**Fines**" means any and all amounts due (directly or by means of guarantees) by the Company or any of its Subsidiaries for fines, penalties, awards or settlement payments imposed by, or agreed, with any Governmental Authority or multilateral financial institutions and development banks as a result of any factual or alleged illegal conduct by the Company or any of

- 6 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

its Affiliates or any of their respective former or current directors, employees, agents or representatives.

"**Fitch**" means Fitch Rating Service, Inc., and its successors.

"**Fully-Diluted**" means all outstanding shares of Capital Stock, all shares of Capital Stock issuable in respect of all outstanding securities convertible into or exchangeable for common shares and all shares of Capital Stock issuable in respect of all outstanding options, warrants and other rights to acquire common shares; provided that, if any of the foregoing shares of Capital Stock are subject to vesting, such shares of Capital Stock subject to vesting shall be included in the definition of "Fully-Diluted" only upon and to the extent of such vesting.

"**Global Security**" means a global note representing the Securities substantially in the form attached hereto as EXHIBIT A.

"**Guaranty**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guaranty" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "guaranty" used as a verb has a corresponding meaning.

"**Governmental Authority**" means any government, governmental department, commission, board, bureau, agency, regulatory authority, instrumentality judicial or administrative body, domestic or foreign, federal, state or local, having jurisdiction over the matter or matters in question, including, without limitation, those in Brazil and the United States.  For the avoidance of doubt, Petrobras shall not be considered as a Governmental Authority.

"**Hedging Obligations**" of any Person means the obligations of such Person pursuant to any interest rate swap agreement, foreign currency exchange agreement, interest rate collar agreement, option or futures contract or other similar agreement or arrangement designed to protect such Person against changes in interest rates or foreign exchange rates.

"**Holder**" means the Person in whose name a Security is registered in the Register.

"**Indebtedness**" means, with respect to any Person on any date of determination, without duplication:

(a)  the principal in respect of indebtedness of such Person for borrowed money;

(b)  the principal and premium, if any, in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

- 7 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(c) all obligations of such Person to pay the deferred and unpaid purchase price of Property (except trade payables and Contingent Obligations to pay earn-outs), which purchase price is due more than six months after the date of placing such Property in service or taking delivery and title thereto;

(d) all reimbursement obligations of such Person in respect of the face amount of letters of credit or other similar instruments (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person, such as import tax credits and import transactions, to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the third business day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(e) all indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such indebtedness is assumed by such Person; *provided*, *however*, that the amount of indebtedness of such Person shall be the lesser of: (a) the Fair Market Value of such asset at such date of determination; and (b) the amount of such indebtedness of such other Persons;

(f) to the extent not otherwise included in this definition, all Hedging Obligations of such Person;

(g) all capitalized lease obligations of such Person; and

(h) all obligations of the type referred to in clauses (a) through (g) above of other Persons that is guaranteed by such Person to the extent so guaranteed, in each case, if and to the extent any of the preceding items would appear as a liability upon an unconsolidated balance sheet of the specified Person prepared in accordance with Brazilian GAAP.

Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, Indebtedness shall not include trade payables arising in the ordinary course of business so long as such trade payables are payable within 180 calendar days of the date the respective goods are delivered or the respective services are rendered and are not overdue, nor any obligations to any Person with respect to any tax payment agreement entered into with any Governmental Authority.

"**Indenture**" means this Indenture, as amended or supplemented from time to time in accordance with the provisions hereof.

"**Instrument Distribution Percentage**" means, as of any date of determination, (a) the Base Instrument Distribution Percentage multiplied by (b) the Outstanding Instrument Percentage in effect as of such date of determination.

"**Intercompany Agreement**" means the agreement regarding the treatment of certain existing intercompany balances entered into on June 11, 2020 by and among ODBINV S.A. - Em Recuperação Judicial, Odebrecht S.A. - Em Recuperação Judicial and Odebrecht Engenharia e Construção S.A., as generally described and summarized in "The Restructuring – Treatment of Intercompany Claims" of the Consent Solicitation Statement.

[AM_ACTIVE 402114427_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

"**Interest on Capital**" means *juros sobre capital próprio* paid pursuant to Brazilian Law No. 9249/95 as may be amended or replaced.

"**Investment**" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the form of advances, loans or other extensions of credit including by way of guarantee or similar arrangements, (other than advances), to customers or suppliers, in the ordinary course of business and consistent with past practice, that are recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of a lender) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), capital expenditures, or the incurrence of a guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared on the basis of Brazilian GAAP. If the Issuer, the Company or any Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Subsidiary such that, after giving effect thereto, such Person is no longer a Subsidiary of the Company or any of its Subsidiaries, any Investment by the Issuer or any Subsidiary in such Person remaining after giving effect thereto shall be deemed to be a new Investment at such time.

"**Issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Issue Date**" means [•], 2020.

"**Issuer Order**" means a written order signed in the name of the Company by the chief executive officer, the chief financial officer or any other Officer of the Issuer.

"**Issuer**" means Odebrecht Holdco Finance Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands, until replaced by a successor thereof, and, thereafter, includes the successor for purposes of any provision contained herein.

"**Issuer Shareholder**" means the legal and beneficial owner of 100% of the issued share capital of the Company.

"**Judgment Currency**" has the meaning specified in Section 9.06. "*Law*" means, with respect to any Person (i) any statute, law, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement or other governmental restriction or any interpretation or administration of any of the foregoing by any Governmental Authority (including, without limitation, Governmental Approvals) and (ii) any directive, guideline, policy, requirement or any similar form of decision of or determination by any Governmental Authority which is binding on such Person, in each case, whether now or hereafter in effect.

"**Legal defeasance option**" has the meaning specified in Section 7.01.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (*including any alienação fiduciária, cessão fiduciária, hipoteca, penhor e anticrese*, conditional sale or other title retention agreement or lease in the nature thereof).

"**Mandatory Redemption Amount**" has the meaning specified in Section 3.02.

"**Mandatory Redemption Notice**" has the meaning specified in Section 3.02.

"**Material Adverse Effect**" means a material adverse effect on (i) the assets, the business or financial condition of the Company and its Subsidiaries (taken as a whole), or (ii) the ability of the Issuer to make timely payments of Redemption Amounts and Payments on the Securities.

"**Maturity**" means the date on which the principal of, and premium, if any, on the Securities become due and payable in full in accordance with this Indenture, whether on the Stated Maturity Date, or earlier upon redemption, by declaration of acceleration or otherwise.

"**Minimum Cash Threshold**" means (a) for any Excess Cash Measurement Date occurring on or prior to the date on which the annual audited financial statements of the Company for the fiscal year of 2024 are issued, U.S.$200,000,000 and (b) for any Excess Cash Measurement Date occurring after the date on which the annual audited financial statements of the Company for the fiscal year of 2024 are issued, the amount set forth in column of the table below labeled "Minimum Cash Threshold" corresponding to the applicable amount (as set forth in the column of the table below labeled "Net Revenue") of Net Revenue accrued by the Company and its Subsidiaries on a consolidated basis during such most recently completed fiscal year for which such financial statements have been issued:

| Net Revenue | Minimum Cash Threshold |
| --- | --- |
| Less than U.S.$5,000,000,000 | U.S.$200,000,000 |
| At least U.S.$5,000,000,000 but less than U.S.$6,000,000,000 | U.S.$225,000,000 |
| At least U.S.$6,000,000,000 but less than U.S.$7,000,000,000 | U.S.$250,000,000 |
| At least U.S.$7,000,000,000 but less than U.S.$8,000,000,000 | U.S.$275,000,000 |
| U.S.$8,000,000,000 or greater | U.S.$300,000,000 |

"**Net Cash Proceeds**" means, with respect to any issuance or sale of Capital Stock, or Asset Sale or sale or other disposition of any Investment, as applicable, the cash proceeds received from such issuance or sale (including, as applicable, any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and net proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring person of Indebtedness or other obligations relating to the properties or assets that are the subject of such sale or received in any other non-cash form) therefrom, in each case net of:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417.4]

(a) all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses incurred, and all taxes paid, reasonably estimated to be actually payable or accrued as a liability under Brazilian GAAP (including, for the avoidance of doubt, any income, withholding and other taxes payable as a result of the distribution of such proceeds to the Company or its Subsidiaries and after taking into account any available tax credits or deductions and any tax sharing agreements), as a consequence of such issuance or sale; and

(b) all payments made on any Indebtedness which is secured by any assets subject to such sale in accordance with the terms of any Lien upon such assets, or which by applicable law is being repaid out of the proceeds from such sale.

"**Net Debt**" means, as of any date of determination, the aggregate amount of Indebtedness (except for intercompany Indebtedness as among the Company and its Subsidiaries) of the Company and its Subsidiaries, *plus* any scheduled payments owing by the Company or its Subsidiaries for Fines *less* the sum of cash and cash equivalents, including marketable securities.

"**Net Debt to EBITDA Ratio**" means the ratio of Net Debt to EBITDA for the then most recently concluded fiscal year, subject to adjustments for Asset Dispositions and investments made during the period.

"**Net Revenue**" means for any period, all net revenues and other operating income of the Company and its Subsidiaries on a consolidated basis.

"**New Notes**" means, collectively, each of the following series of United States dollar denominated senior unsecured notes to be issued by the New Notes Issuer pursuant to the Restructuring Plan: (a) 7.000% notes due October 21, 2024 (original maturity date April 21, 2020), (b) 5.125% notes due December 26, 2026 (original maturity date June 26, 2022), (c) 6.000% notes due October 5, 2027 (original maturity date April 5, 2023), (d) 4.375% notes due October 25, 2029 (original maturity date April 25, 2025), (e) 5.250% notes due December 27, 2033 (original maturity date June 27, 2029), (f) 7.125% notes due December 26, 2046 (original maturity date June 26, 2042) and (g) 7.000% perpetual notes.

"**New Notes Issuer**" means OEC Finance Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands, until replaced by a successor thereof, and, thereafter, includes the successor for purposes of any provision contained herein.

"**Non-Tendering Percentage**" means, with respect to any tender offer, the product of (i) the Instrument Distribution Percentage then in effect immediately preceding such tender offer multiplied by (ii) the proportion of the Face Amount of the outstanding Securities that are not effectively tendered in such tender offer.

"**ODB RJ**" means the judicial restructuring of Odebrecht S.A. – Em Recuperação Judicial and certain of its Subsidiaries and Affiliates (each, an "**ODB RJ Party**").

"**ODB RJ Party**" has the meaning given to such term in the definition of "ODB RJ."

- 11 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

"**Officer**" means the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Issuer, or any other Person duly appointed by the shareholders of the Issuer or the Board of Directors to perform corporate duties, including, without limitation, any Director of the Issuer.

"**Officer's Certificate**" means with respect to the Issuer, a certificate signed by any two Officers of the Issuer (one of which shall be the chief executive, financial or operating officer) and, with respect to the Company, a certificate signed by the chief financial officer or, unless otherwise specified, chief accounting officer of the Company and in each case delivered to the Trustee.

"**Opinion of Counsel**" means a written opinion of legal counsel of recognized standing (who may be an employee of or counsel to the Issuer) and who shall be acceptable to the Trustee, which opinion is reasonably satisfactory to the Trustee.

"**Optional Redemption Amount**" has the meaning specified in Section 3.03.

"**Optional Redemption Notice**" has the meaning specified in Section 3.03.

"**Organizational Documents**" means, with respect to any Person, the Memorandum or Articles of Association, *ata de constituição* or other similar organizational document, the by-laws, *estatutos* or other similar document and any other documents governing the formation and organization of such Person.

"**Outstanding Instrument Percentage**" means, as of a date of determination, the ratio (expressed as a percentage) of (A) the outstanding Face Amount on such date of determination to (B) the Base Face Amount.

"**Outstanding**" means, when used with respect to Securities, as of the date of determination, all Securities theretofore authenticated and delivered under this Indenture, except:

(a) Securities theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(b) Securities for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Issuer) in trust or set aside and segregated in trust by the Issuer (if the Issuer shall act as its own Paying Agent) for the Holders of such Securities; *provided* that, if such Securities are to be redeemed pursuant to Section 3.03, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(c) Securities, except to the extent *provided* in Section 7.01 and Section 7.026.02 , with respect to which the Issuer has effected legal defeasance and/or covenant defeasance as *provided* in Article 6; and

(d) Securities in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to this Indenture, other than any such Securities in respect of

- 12 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

which there shall have been presented to the Trustee proof satisfactory to it that such Securities are held by a protected purchaser in whose hands such Securities are valid obligations of the Issuer; *provided*, *however*, that in determining whether the Holders of the requisite principal amount of Outstanding Securities have given any request, demand, authorization, direction, consent, notice or waiver hereunder, Securities owned by the Issuer or any of its Affiliates shall be disregarded and deemed not to be outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Securities which a Responsible Officer of the Trustee has received written notice at its address specified herein of being so owned shall be so disregarded. Securities so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the Issuer, or any other obligor upon the Securities or any of its Affiliates or such other obligor.

"**Paying Agent**" means The Bank of New York Mellon and any other Person authorized by the Issuer to pay the Redemption Amounts or Payments on any Securities on behalf of the Issuer hereunder and includes such meaning specified in Section 2.03.

"**Payment Date**" means the date on which any Payment is made.

"**Payments**" means any Excess Cash Payments or Specified Distribution Event Payments, as applicable.

"**Permitted Holder**" means Odebrecht S.A. – Em Recuperação Judicial or a successor thereof.

"**Permitted Indebtedness**" means Indebtedness of the Company or any of its Subsidiaries permitted to be incurred pursuant to the terms of the indentures governing the New Notes.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company trust, unincorporated organization or government or any agency or political subdivision thereof.

"**PIK Payment**" mean payment of interest in kind, *i.e.*, through an increase in the principal amount of the respective series of New Notes.

"**Preferred Stock**" means, as applied to the Capital Stock of any corporation, Capital Stock of any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"**principal**" of a Security means the principal amount of such Security (including any Additional Amounts payable by the Issuer in respect of such principal) and, for purposes of such term, shall be the Face Amount.

"**Project Company**" means any Subsidiary of the Company, substantially all of whose activities involve any construction, development or infrastructure project, including without

[AM_ACTIVE 402114417_7 v4]
Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

limitation greenfield projects and brownfield projects, in which the Company or any of its Subsidiaries participates or holds, directly or indirectly, an interest, including any Subsidiary that is a member of construction consortia or a qualified bidder in Brazil or other foreign jurisdiction.

"**Property**" means any property or assets of any kind whatsoever, whether movable, immovable, real, personal or mixed and whether tangible or intangible, any right or interest therein or any receivables, credit rights (*direitos creditorios*), dividends or other distributions on Capital Stock or rights to receive dividends or other distributions on Capital Stock.

"**Qualified Investment Bank**" means an independent investment bank of recognized standing with global operations, appointed by the Issuer or any of its Affiliates.

"**Qualified Public Offering**" means the initial underwritten public offering of shares of Capital Stock that results in the listing and trading of at least 15 % of all outstanding Capital Stock of the Company.

"**Qualified Public Offering Notice**" has the meaning specified in Section 3.05.

"**Qualified Public Offering Right**" has the meaning specified in Section 3.05.

"**Qualified Tender Offer**" means a tender offer for the repurchase all or a part of the outstanding Securities launched by the Issuer or the Company or any of their respective Subsidiaries within six (6) months of a Specified Distribution Event under Section 2.08.

"**Redemption Amount**" means, a Mandatory Redemption Amount or Optional Redemption Amount, as applicable.

"**Redemption Date**" means, when used with respect to any Security to be redeemed pursuant to Article 3 the date fixed for such redemption by or pursuant to this Indenture.

"**Redemption Price**" means, when used with respect to any Securities to be redeemed pursuant to the Section 3.03, price at which it is to be redeemed pursuant to this Indenture.

"**Register**" has the meaning specified in Section 2.03.

"**Registered Holder**" means, (1) DTC, if the Security is a Global Security deposited with a custodian for, and registered in the name of a nominee of, DTC and (2) Euroclear and/or Clearstream Banking, if the Security is a Global Security deposited with a common depositary for, and registered in the name of a nominee for, Euroclear and/or Clearstream Banking.

"**Registrar**" means The Bank of New York Mellon, until a successor Registrar shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "Registrar" shall mean such successor Registrar, and includes such meaning specified in Section 2.03.

"**Regular Record Date**" has the meaning specified in Section 2.09.

"**Regulation S**" means Regulation S under the Securities Act, as in effect from time to time.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM-ACTIVE 492114817.14]

"**Regulation S Global Security**" means one or more permanent Global Securities in definitive fully registered form without interest coupons representing Securities sold outside of the United States pursuant to Regulation S.

"**Relevant Withholding Taxes**" has the meaning specified in Section 4.06.

"**Required Gross-Up**" means the sum of (A) any Additional Amounts payable in respect of the applicable payment of Excess Cash Available Amounts under the New Notes and the Securities and (B) any withholding or similar taxes payable by the Company or the Issuer in respect of distributions of Excess Cash Available Amounts to the Issuer or the Issuer Shareholder.

"**Responsible Officer**" means any officer of the Trustee having direct responsibility for the administration of this Indenture.

"**Restricted Global Security**" means one or more permanent Global Securities in definitive fully registered form without interest coupons sold to "qualified institutional buyers" (as such term is defined in Rule 144A) pursuant to Rule 144A.

"**Restructuring Plan**" means the extrajudicial restructuring plan, filed with the Sao Paulo Bankruptcy and Reorganization Court on [●] (the "**Restructuring Plan Filing Date**"), providing for the issuance of the Securities and of the New Notes in exchange for the restructuring of various financial debts of the Company and certain of its Affiliates, as duly amended from time to time.

"**Restructuring Plan Filing Date**" shall have the meaning set forth in the definition of "Restructuring Plan."

"**Rule 144A**" means Rule 144A under the Securities Act, as in effect from time to time.

"**S&P**" means Standard & Poor's Rating Group, a division of McGraw Hill, Inc. and its successors.

"**Second Measurement Date**" has the meaning specified in Section 2.06.

"**Securities**" has the meaning specified in the Recitals.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Act Legend**" means the following legend, printed in capital letters:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE.  BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER

(1) REPRESENTS THAT

- 15 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417.14]

(A) IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT OR

(B) IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY (A) TO THE ISSUER,

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT,

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT,

(D) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH 2(E) ABOVE, THE COMPANY RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.  NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

"**Securities**" has the meaning specified in the first paragraph of the Recitals in this Indenture and shall be in the form of Security set forth in EXHIBIT A.

"**Series of New Notes**" means each and any series of New Notes issued pursuant to the Restructuring Plan.

"**Settlement Rate**" mean the rate that is equal to the Brazilian *real*/U.S. Dollar commercial rate, expressed as the amount of Brazilian *reais* per one U.S. Dollar as reported by *Banco Central do Brasil* (the "Central Bank") on the SISBACEN Data System and on its website (which, at the date hereof, is located at http://bcb.gov.br) under transaction code PTAX800 ("*Consultas de Câmbio*" or "Exchange Rate Enquiry"), Option 5, "*Venda*" ("*Cotações para Contabilidade*" or "Rates for Accounting Purposes") (or any successor screen established by the Central Bank).

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

"**Specified Distribution Event**" has the meaning specified in Section 2.08.

"**Specified Distribution Event Payment**" has the meaning specified in Section 2.08.

"**Standard & Poor's**" means Standard & Poor's Rating Group, a division of The McGraw-Hill Companies, Inc., and its successors.

"**Stated Maturity Date**" has the meaning specified in Section 2.05.

"**Subsidiary**" means, with respect to any Person at any date, any corporation, limited liability company, partnership, association or other business entity the accounts of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by such Person or one or more Subsidiaries of such Person (or a combination thereof).

"**Taxes**" has the meaning specified in Section 4.06.

"**Taxing Jurisdiction**" has the meaning specified in Section 4.06.

"**Transfer**" means, with respect to any Capital Stock, (i) when used as a verb, to sell, assign, dispose of, exchange, pledge, encumber, hypothecate or otherwise transfer such Capital Stock or any participation or interest therein, whether directly or indirectly (including pursuant to a derivative transaction), or agree or commit to do any of the foregoing and (ii) when used as a noun, a direct or indirect sale, assignment, disposition, exchange, pledge, encumbrance, hypothecation, or other transfer of such Capital Stock or any participation or interest therein or any agreement or commitment to do any of the foregoing.

"**Transfer Agent**" means The Bank of New York Mellon, as the case may be, and any other Person authorized by the Issuer to effectuate the exchange or transfer of any Security on behalf of the Issuer hereunder and includes such meaning specified in Section 2.03.

"**Trustee**" means The Bank of New York Mellon, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture and, thereafter, "Trustee" shall mean such successor Trustee.

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**U.S. Government Obligations**" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and that are not callable or redeemable at the issuer's option.

"**Unrestricted Cash**" means, as of any date of determination, with respect to the Company and its Subsidiaries on a consolidated basis, all cash and short-term investments of such Persons (i) not advanced by a client to the Company or to any of its Subsidiaries or any of their respective

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Project Companies for purposes of funding construction projects or for the bidding of new construction projects; (ii) not held by the Company or any Subsidiary or any of their respective Project Companies for purposes of funding working capital or operating needs for Development Projects or Bidding Companies as reasonably determined by management on the basis of a process consistent with its past practices and approved by the board of directors of the Company; (iii) not deposited in any debt service reserve account pledged from time to time to any lender for the purpose of covering shortfalls in amounts available to service the debt; (iv) not pledged as performance collateral or bid bond collateral; (v) not deposited in any other account that, as of the date of such determination, is blocked and not accessible to the Company or any of its Subsidiaries following the occurrence of an event of default or other enforcement action under any financing or security document to which the Company or such Subsidiary is a party; (vi) not received in connection with (A) a Specified Distribution Event, (B) any issuance of shares of the Company or any of its Subsidiaries, including Qualified Public Offerings, (C) the incurrence of Permitted Indebtedness , or (D) any Asset Sale; or (vii) without double counting, that would not qualify, as of the date of such determination, as "restricted" on a consolidated balance sheet.  The compliance of the amount of cash and short-term investments held for purposes of funding working capital or operating needs as contemplated in clause (ii) above with the requirements of such clause will be certified annually by the chief financial officer or chief accounting officer of the Company, and a copy of such certification will be made available to Holders, contemporaneously and in accordance with the requirements for distribution of the Company's annual audited consolidated financial statements.

"**Voting Stock**" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

Section 1.02.  *Rules of Construction*.

(a)      For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(i)      the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(ii)      the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(iii)      "or" is not exclusive; and

(iv)      "including" means including, without limitation;

(v)      any reference to an "Article", a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Indenture.

(b)      All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with Brazilian GAAP.

- 18 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(c)      For purposes of the definitions set forth in Article 1 and this Indenture generally, all calculations and determinations shall be made in accordance with Brazilian GAAP and shall be based upon the consolidated financial statements prepared in accordance with Brazilian GAAP.

Section 1.03.   *Table of Contents; Headings*.   The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 1.04.   *Form of Documents Delivered to Trustee*.   In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous.  Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Issuer stating that the information with respect to such factual matters is in the possession of the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 1.05.   *Acts of Holders*.

(a)      Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in Person or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.05.

(b)      The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual

- 19 -

[AM_ACTIVE 402114417_14]
Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee reviewing such instrument or writing deems sufficient.

(c)      The principal amount and serial numbers of Securities held by any Person, and the date of holding the same, shall be proved by the Register.

(d)      If the Issuer solicits from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Issuer may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Issuer shall not have any obligation to do so. Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date thirty calendar days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Securities shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(e)      Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Security shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Security.

## ARTICLE 2
## THE SECURITIES

Section 2.01. *Form and Dating*. The Securities and the Trustee's certificate of authentication shall be substantially in the form of Security set forth in EXHIBIT A, which is hereby incorporated in and expressly made a part of this Indenture. The Securities may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any law, stock exchange rule, agreement to which the Issuer is subject, if any, or usage, *provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer.

Each Global Security shall be dated the Closing Date. Each definitive certificated Security ("**Certificated Security**") shall be dated the date of its authentication.

[AM_ACTIVE 402114417.4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

The Securities shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any stock exchange on which the Securities may be listed, if any, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

Section 2.02.   *Execution, Authentication and Delivery*.

(a)      Two Officers of the Issuer shall sign the Securities for the Issuer by manual or facsimile signature:

(i)      If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless.

(ii)      A Security shall not be valid until an authorized signatory of the Trustee or an authenticating agent signs the certificate of authentication on the Security by manual, facsimile or electronic signature upon Issuer Order.  Such signature shall be conclusive evidence that the Security has been authenticated under this Indenture.  Such Issuer Order shall specify the amount of the Securities to be authenticated and the date on which the original issue of Securities is to be authenticated.

(iii)      The Trustee or an authenticating agent shall initially authenticate and deliver Securities in an aggregate principal amount of up to U.S.$ [•].

(iv)      The Securities shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "**Authorized Denomination**").

(b)      The Trustee may appoint an authenticating agent, with a copy of such appointment to the Issuer, to authenticate the Securities (the "**Authenticating Agent**").  Unless limited by the terms of such appointment, an Authenticating Agent may authenticate Securities whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by an Authenticating Agent.  An Authenticating Agent has the same rights as the Registrar or any Transfer Agent or Paying Agent or agent for service of notices and demands.

(i)      Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

(ii)      Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Issuer.  Upon receiving such notice of resignation or upon such a termination, the Trustee may appoint a successor Authenticating Agent reasonably acceptable to the Issuer and shall give written notice of such appointment to the Issuer.

- 21 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(iii)    The Issuer agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services and reimbursement for its reasonable expenses relating thereto.

(c)    The Issuer initially appoints DTC to act as Depositary with respect to the Global Securities. The Trustee, as custodian, will act as custodian of the Global Securities for DTC or appoint a sub-custodian to act in such capacity.

Section 2.03.    *Transfer Agent, Registrar and Paying Agent.*

(a)    Subject to such reasonable regulations as the Issuer may prescribe, the books of the Issuer for the exchange, registration, and registration of transfer of Securities shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**"). The Issuer shall also cause the Trustee to maintain books for the exchange, registration and registration of transfer of Securities. The Trustee shall notify the Registrar and the Registrar shall notify the Trustee, when necessary, upon any exchange, registration or registration of transfer of any Securities and shall cause their respective books to be amended accordingly. The Issuer may have one or more co-Registrars and one or more additional Transfer Agents or Paying Agents. The terms "**Transfer Agent**" and "**Paying Agent**" include any additional Transfer Agent or Paying Agent, as the case may be. The term "**Registrar**" includes any co-Registrar.

The Issuer shall enter into any appropriate agency agreements with any Registrar, Transfer Agent or Paying Agent not a party to this Indenture, which shall implement the provisions of this Indenture that relate to such agent. The Issuer shall notify the Trustee of the name and address of any such agent. If the Issuer fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 6.06. The Issuer initially appoints the Trustee as Paying Agent, Registrar and Transfer Agent in connection with the Securities.

(b)    The Trustee shall keep a record of all the Securities and shall make such record available during regular business hours for inspection upon the request of the Issuer provided a reasonable amount of time prior to such inspection. Such books and records shall include notations as to whether such Securities have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Securities, whether such Securities have been replaced. In the case of the replacement of any of the Securities, the Trustee shall keep a record of the Security so replaced, and the Securities issued in replacement thereof. In the case of the cancellation of any of the Securities, the Trustee shall keep a record of the Security so cancelled and the date on which such Security was cancelled. Each Transfer Agent shall notify the Trustee of any transfers or exchanges of Securities effected by it. The Trustee shall not be required to register the transfer of or exchange Certificated Securities for a period of fifteen calendar days preceding any date of selection of Securities for redemption, or register the transfer of or exchange any Certificated Securities previously called for redemption.

(c)    All Securities surrendered for payment, redemption, registration of transfer or exchange shall be cancelled by the relevant Transfer Agent or Paying Agent or the Trustee, as the case may be. Each Registrar and Transfer Agent shall notify the Trustee of the surrender and

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

cancellation of such Securities and shall deliver such Securities to the Trustee. The Trustee may destroy or cause to be destroyed all such Securities surrendered for payment, redemption, registration of transfer or exchange and, if so destroyed, shall promptly deliver a certificate of destruction to the Issuer.

(d)    The Paying Agent shall comply with applicable backup withholding tax and information reporting requirements under the U.S. Internal Revenue Code of 1986, as amended, and the U.S. Treasury regulations promulgated thereunder with respect to payments made under the Securities (including, to the extent required, the collection of Internal Revenue Service Forms W-8 and W-9 and the filing of U.S. Internal Revenue Service Forms 1099 and 1096).

Section 2.04.    *Paying Agent to Hold Money in Trust*.

(a)    By 10:00 A.M. New York time, no later than one Business Day prior to each Payment Date on any Security, the Issuer shall deposit with the  Paying Agent in immediately available funds a sum sufficient to pay such principal when so becoming due (including, for the avoidance of doubt, any Payments, Redemption Amounts or amounts under Section 4.06 as applicable). The Issuer shall request that the bank through which such payment is to be made agree to supply to the Paying Agent by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by tested telex) of its intention to make such payment. The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Trustee, all money held by such Paying Agent for the payment of principal on the Securities and shall notify the Trustee of any default by the Issuer in making any such payment. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it. Upon complying with this Section 2.04, the Paying Agent shall have no further liability for the money delivered to the Trustee.

(b)    Each payment in full of principal, Redemption Amount, Additional Amounts payable under the Securities and this Indenture in respect of any Security made by or on behalf of the Issuer to or to the order of the Paying Agent in the manner specified herein or in the Securities on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, Redemption Amount, Additional Amounts payable hereunder and under the Securities on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders hereunder; and *provided further* that, in the event that there is a default by the Paying Agent in any payment of principal, Redemption Amount, Additional Amounts in respect of any Security in accordance with the terms hereof, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

Section 2.05.    *Principal, Maturity and Interest*.  The Securities will be issued in an initial aggregate principal amount of U.S.$ [●] and will mature on September 10, 2058 (the "**Stated Maturity Date**").  The remaining Outstanding principal amount of the Securities will be payable in full at Maturity.  The Securities will not bear interest.

Section 2.06.    *Distributions*.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_14]

During the Excess Cash Sweep Period, if the Excess Cash Amount exceeds zero on an Excess Cash Measurement Date, the Issuer will make payments under the Securities to the Holders equal to a percentage of the applicable Excess Cash Available Amount in accordance with the terms and conditions set forth below (it being understood that certain percentages of the Excess Cash Available Amount will also be available for distributions to holders of the New Notes and to the Issuer Shareholder, as applicable). For the avoidance of doubt, Holders shall have no claim against the Issuer or any Affiliate thereof with respect to distributions to be made to holders of the New Notes.

(a)    The Excess Cash Available Amount shall be distributed as follows:

(i)    for the first Excess Cash Measurement Date in respect of which there is an Excess Cash Available Amount, 10% of the Excess Cash Available Amount shall be distributed to Holders (with 90% of such Excess Cash Available Amount to be distributed to holders of the New Notes);

(ii)    for the second Excess Cash Measurement Date in respect of which there is an Excess Cash Available Amount (the "Second Measurement Date"), 10% of the Excess Cash Available Amount shall be distributed to Holders (with 80% and 10% of such Excess Cash Available Amount to be distributed to holders of the New Notes and the Issuer Shareholder, respectively);

(iii)    for each subsequent Excess Cash Measurement Date, in respect of which there is an Excess Cash Available Amount, until December 31, 2031:

(1)    if interest due on all series of New Notes has been paid in full, in cash (without any PIK Payment) for the preceding twelve (12) consecutive months: 10% of the Excess Cash Available Amount shall be distributed to Holders (with 70% and 20% of such Excess Cash Available Amount to be distributed to holders of the New Notes and the Issuer Shareholder, respectively); and

(2)    if interest due on all series of New Notes has not been paid in full, in cash for the preceding twelve (12) consecutive months: 10% of the Excess Cash Available Amount shall be distributed to Holders (with 80% and 10% of such Excess Cash Available Amount to be distributed to holders of the New Notes and the Issuer Shareholder, respectively); and

(iv)    for each Excess Cash Measurement Date subsequent to the Second Measurement Date in respect of which there is an Excess Cash Available Amount, starting with December 31, 2032, 10% of the Excess Cash Available Amount shall be distributed to Holders (with 60% and 30% of such Excess Cash Available Amount to be distributed to the holders of the New Notes and the Issuer Shareholder, respectively).

Section 2.07.    *Distributions of Excess Cash Available Amount During and After the Excess Cash Sweep Period*.

During the Excess Cash Sweep Period, Excess Cash Payments shall be payable to Holders on an annual basis, on May 15 following each relevant Excess Cash Measurement Date. Following the Excess Cash Sweep Period, the Issuer will make Excess Cash Payments to Holders from time

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

- 24 -

to time on the same date that any distribution is made to the Issuer Shareholder in an amount equal to the Instrument Distribution Percentage of the applicable Excess Cash Available Amount on the terms and subject to the terms and conditions set forth below.  For the avoidance of doubt, corresponding distributions of the applicable portion of any Excess Cash Available Amounts payable to the Issuer Shareholder shall be made on or following such Payment Date.

Excess Cash Payments payable to Holders shall apply, on a dollar-for-dollar basis, to reduce the outstanding principal amount of the Securities in accordance with Section 2.09 below.

Excess Cash Payments shall be made in U.S. Dollars.  If any Excess Cash Payment needs to be converted into U.S. Dollars, it shall be converted at the Settlement Rate on the date occurring two Business Days prior to the Excess Cash Payment Date.

Section 2.08.   *Specified Distribution Events*.

Other than Excess Cash Payments made in the ordinary course in accordance with Section 2.06 above, the Issuer shall not be required to make, and the Holders shall not be entitled to receive, any payment under the Securities, except upon the occurrence of an event described in this Section 2.08 (each, a "**Specified Distribution Event**" and each payment under the Securities made thereunder, a "**Specified Distribution Event Payment**"):

(a)      *Sale of Shares Not Resulting in a Change of Control*

In the event the Issuer Transfers shares of the Company to a third-party in a transaction that does not result in a Change of Control, the Issuer shall, within ninety calendar days of its receipt thereof, apply the aggregate U.S. Dollar amount of such Applicable Net Proceeds received by it in connection with such transaction to either, separately or in combination, (i) make a payment under the Securities to the Holders thereof, or (ii) repurchase Securities pursuant to a Qualified Tender Offer.

Upon the application of such Applicable Net Proceeds in accordance herewith, the outstanding Face Amount of the Securities will be reduced by (1) to the extent applied to make payments under the Securities, the greater of (i) an amount equal to the product of (x) the Face Amount of the Securities outstanding immediately prior to such distribution and (y) the percentage reduction in the number of shares of the Company held by the Issuer as a result of the consummation of such transaction, and (ii) an amount equal to the U.S. Dollar amount of such distribution; and (2) to the extent applied to make repurchases pursuant to a Qualified Tender Offer, the percentage reduction in the Face Amount of the Securities so repurchased as a result of such Qualified Tender Offer.

For the avoidance of doubt, this section is not applicable for any issuance of shares by the Company.

(b)      *Sale of All or Substantially All Assets*

In the event the Company sells all or substantially all of its assets to a third-party in a transaction that does not result in a Change of Control, the Issuer shall use the Applicable Net Proceeds received by it in connection with such transaction to make a payment under the Securities

- 25 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

to the Holders thereof within (i) sixty calendar days of receipt thereof if the Applicable Net Proceeds are paid entirely in cash and (ii) ninety calendar days of receipt thereof if the Applicable Net Proceeds include, in whole or in part, non-cash consideration.

Upon the application of such Applicable Net Proceeds as per this provision (b), the outstanding Face Amount of the Securities will be reduced by an amount equal to the dollar amount of such distribution.

(c)     The Issuer shall deliver to the Trustee written notice of any Specified Distribution Event not less than twenty calendar days prior to the proposed date of such Specified Distribution Event, which notice shall specify the amount and set forth the calculation of the corresponding Specified Distribution Event Payment and the Payment Date scheduled in respect thereof.

(d)     *Non-Cash Consideration*

In the event that a Specified Distribution Event includes non-cash consideration, corresponding distributions to the Holders will be calculated based on either (i) the Fair Market Value of such consideration (net of taxes and other expenses) as determined by a Qualified Investment Bank or (ii) in the case of any marketable securities, the Net Cash Proceeds realized by the sale of such marketable securities to a third party purchaser; *provided that*, notwithstanding the form of non-cash consideration received by the Issuer, the Company or the Issuer Shareholder, as the case may be, in connection with such transaction, the Issuer must make the corresponding Specified Distribution Event Payment to the Holders in cash.

Section 2.09.   *Payment of Principal*.

(a)     Payment of principal (which, for the avoidance of doubt, shall include any Payments or Redemption Amounts, as applicable) will be made to each Holder at the address of such Holder appearing on the Register at the close of business on the 15th calendar day (whether or not a Business Day) prior to any due date for the payment on such Security (the "**Regular Record Date**"), (i) in the case of Global Securities, by a Paying Agent by wire transfer of immediately available funds to Holders to an account at a bank located within the United States as designated by each Holder not less than fifteen calendar days prior to the applicable Payment Date, and (ii) in the case of Certificated Securities, by a Paying Agent by mailing a check to the Holder at the address of such Holder.  For any Certificated Security, a Holder of U.S.$1,000,000 or more in aggregate principal amount of Securities may request payment by wire transfer but only if appropriate payment instructions have been received in writing by any Paying Agent with respect to such Security not less than fifteen calendar days prior to the applicable Payment Date.  In the event that payment is so made in accordance with instructions of the Holder, such wire transfer shall be deemed to constitute full and complete payment of such principal, premium, if any, on the Securities.

(b)     Payment of the principal due with respect to any Certificated Security on the date of Maturity will be made in immediately available funds upon surrender of such Security at the specified office of any Paying Agent with respect to that Security and accompanied by wire transfer instructions; *provided that* the Certificated Security is presented to such Paying Agent in

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

time for such Paying Agent to make such payments in such funds in accordance with its normal procedures.

(c)     The Issuer will pay any administrative costs imposed by banks in connection with making payments by wire transfer, but any tax, assessment or governmental charge imposed upon payments will be borne by the Holders in respect of which such payments are made unless otherwise provided herein.

(d)     Notwithstanding anything to the contrary in this Article 2, if the Security is a Global Security deposited with a custodian for, and registered in the name of a nominee of, DTC, payments on the Security will be made to DTC, as the Registered Holder in accordance with DTC's applicable procedures. Securities shall be issued in certificated form in exchange for a Global Security only if (i) DTC notifies the Issuer that it is unwilling or unable to continue as depositary for such Global Security, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor depositary is not appointed by the Issuer within ninety calendar days, or (ii) an Event of Default has occurred and is continuing with respect to such Securities and Holders have made a request to DTC for exchange of such Global Security for Certificated Securities, *provided* in each case that such transfer or exchange is made in accordance with the provisions of this Indenture and the applicable procedures of DTC.

(e)     Distributions made to Holders pursuant to Section 2.06Section 2.07 and Section 2.07Section 2.07 shall apply, on a dollar-for-dollar basis, to reduce the outstanding principal amount (which shall be the Face Amount for purposes of such term) of the Securities in up to an aggregate amount not to exceed the total principal amount of the Securities. Distributions made to Holders pursuant to Section 2.08 shall apply as set forth in such section to reduce the outstanding principal amount (which shall be the Face Amount for purposes of such term) of the Securities.

(f)     Each Global Security shall include a schedule on which decreases in the Face Amount of the Securities resulting from Excess Cash Payments and other Distributions or Payments made in accordance with the terms of this Indenture shall be recorded.

Section 2.10.    *Principal Rights Preserved*.

(a)     Except as otherwise provided herein for the redemption of the Securities, the payment of principal of the Securities (which, for the avoidance of doubt, shall include any Payments or Redemption Amounts, as applicable) shall be allocated on a pro rata basis among all outstanding Securities, without preference or priority of any kind among the Securities.

(b)     Final payments in respect of any Security (whether upon redemption, declaration of acceleration or otherwise) shall be made only against presentation and surrender of such Security at the Corporate Trust Office, at the offices of the Trustee and, subject to any fiscal or other laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Issuer.

(c)     Payment of the principal of any Security on a relevant Payment Date shall be made to the Person in whose name such Security is registered in the Register at the close of business on the fifteenth day (whether or not a Business Day) immediately preceding such Payment Date, by

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register, or by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York, *provided* that such Holder so elects by giving written notice to such effect designating such account, upon application to the Trustee at least fifteen calendar days prior to such Payment Date.

If the Payment Date in respect of any Security is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further payment in respect of any such delay.

Notwithstanding the provisions of this Section 2.10, payments on Securities registered in the name of DTC or its nominee shall be effected in accordance with the Applicable Procedures.

Section 2.11. *Holder Lists*.   The Trustee shall preserve in as current a form as is reasonably practicable, the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee in writing at such times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

Section 2.12. *Transfer and Exchange*.   (a) Interests in the Regulation S Global Security and the Restricted Global Security shall be exchangeable or transferable, as the case may be, for physical delivery of Certificated Securities if (i) DTC notifies the Issuer that it is unwilling or unable to continue as depositary for such Global Security, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor depositary is not appointed by the Issuer within ninety calendar days, or (ii) an Event of Default has occurred and is continuing with respect to such Securities and the Issuer has received a written request from a holder to issue its proportionate interest in the Securities in the form of Certificated Securities, *provided* that such transfer or exchange is made in accordance with the provisions of this Indenture and the Applicable Procedures. Certificated Securities issued in certificated form shall be registered in the name or names of such Persons and for the Face Amount as the Issuer may request.

Upon receipt of notice by DTC or the Trustee, as the case may be, regarding the occurrence of any of the events described in the preceding paragraph, the Issuer shall use its best efforts to make arrangements with DTC for the exchange of interests in the Global Securities for individual Certificated Securities, and cause the requested individual Certificated Securities to be executed and delivered to the Trustee in sufficient quantities and authenticated by the Trustee for delivery to Holders.   In the case of Certificated Securities issued in exchange for the Restricted Global Security, such Certificated Securities shall bear the Securities Act Legend.   Upon the registration of transfer, exchange or replacement of Securities bearing such Securities Act Legend, or upon specific request for removal of the Securities Act Legend on a Security, the Issuer shall deliver only Securities that bear such Securities Act Legend, or shall refuse to remove such Securities Act Legend, as the case may be, unless there is delivered to the Issuer a certificate in the form of EXHIBIT D or EXHIBIT F, as the case may be, or such satisfactory evidence as may reasonably be required by the Issuer, which may include an Opinion of Counsel, that neither the Securities Act Legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.   The Trustee shall exchange a Security bearing the Securities

- 28 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Act Legend for a Security not bearing such Securities Act Legend only if it has been directed to do so in writing by the Issuer, upon which direction it may conclusively rely.

(b)      On or prior to the 40th day after the Closing Date, transfers by an owner of a beneficial interest in the Regulation S Global Security to a transferee who takes delivery of such interest through the Restricted Global Security shall be made only in Authorized Denominations in accordance with the Applicable Procedures and upon receipt by the Trustee or Transfer Agent of a written certification from the transferor of the beneficial interest in the form of EXHIBIT E to the effect that such transfer is being made to a Person who the transferor reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. After such 40th day, such certification requirement shall no longer apply to such transfers.

(c)      Transfers by an owner of a Certificated Security bearing the Securities Act Legend or of a beneficial interest in the Restricted Global Security to a transferee who takes delivery of such interest through the Regulation S Global Security or in the form of a Certificated Security not bearing the Securities Act Legend shall be made only in Authorized Denominations upon receipt by the Trustee or Transfer Agent of a written certification from the transferor in the form of EXHIBIT D to the effect that such transfer is being made in accordance with Regulation S.

Beneficial interests in the Global Securities shall be shown on, and transfers thereof shall be effected only through records maintained by DTC and its direct and indirect participants, including Euroclear and Clearstream Banking.

Transfers between participants in DTC shall be effected in the ordinary way in accordance with the Applicable Procedures and shall be settled in DTC's Same Day Funds Settlement System and secondary market trading activity in such Securities shall therefore settle in immediately available funds.  There can be no assurance as to the effect, if any, of settlements in immediately available funds on trading activity in the Securities.  Transfers between participants in Euroclear and Clearstream Banking shall be effected in the ordinary way in accordance with Applicable Procedures.

(d)      Certificated Securities may be exchanged or transferred in whole or in part in the principal amount of Authorized Denominations by surrendering such Certificated Securities at the office of the Trustee or any Transfer Agent with a written instrument of transfer as provided in this Indenture in the form of EXHIBIT B hereto duly executed by the Holder thereof or his attorney duly authorized in writing.

In exchange for any Certificated Security properly presented for transfer, the Trustee shall promptly authenticate and deliver or cause to be authenticated and delivered at the Corporate Trust Office, to the transferee, or send by mail (at the risk of the transferee) to such address as the transferee may request, a Certificated Security or Securities, as the case may require, registered in the name of such transferee, for the same aggregate principal amount as was transferred.  In the case of the transfer of any Certificated Security in part, the Trustee shall also promptly authenticate and deliver or cause to be authenticated and delivered at the Corporate Trust Office, to the transferor, or send by mail (at the risk of the transferor) to such address as the transferor may

- 29 -

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

request, a Certificated Security or Securities, as the case may require, registered in the name of such transferor, for the aggregate principal amount that was not transferred. No transfer of any Securities shall be made unless the request for such transfer is made by the registered Holder or his attorney duly authorized in writing at the Corporate Trust Office and is accompanied by a completed instrument of transfer in the form of EXHIBIT C attached to the Security presented for transfer.

(e)    Transfer, registration and exchange of any Security or Securities shall be permitted and executed as provided in this Section 2.12 without any charge to the Holder of any such Security or Securities other than any taxes or governmental charges or insurance charges payable on transfers or any expenses of delivery by other than regular mail, but subject to such reasonable regulations as the Issuer, the Registrar and the Trustee may prescribe.

The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except for the payment of a sum sufficient to cover any tax or other governmental charges or insurance charges that may be imposed in relation thereto, shall be borne by the Issuer.

All Certificated Securities issued upon any exchange or registration of transfer of Securities shall be valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits, as the Securities surrendered upon exchange or registration of transfer.

(f)    The Trustee or the Transfer Agent shall effect transfers of Global Securities and Certificated Securities. In addition, the Registrar shall keep the Register for the ownership, exchange and transfer of any Securities. The Transfer Agent shall give prompt notice to the Registrar and the Registrar shall likewise give prompt notice to the Trustee of any exchange or transfer of such Securities. Neither the Trustee nor any Transfer Agent shall register the exchange or the transfer of interests during the period of fifteen calendar days beginning on the Regular Record Date and ending on the Payment Date. The Trustee shall give prompt notice to the Issuer of any replacement, transfer, cancellation or destruction of the Securities.

(g)    Upon any such exchange of all or a portion of any Global Security for a Certificated Security or an interest in either the Restricted Global Security or the Regulation S Global Security, the Global Security to be so exchanged shall be marked to reflect the reduction of its principal amount by the aggregate principal amount of such Certificated Security or the interest to be so exchanged for an interest in a Regulation S Global Security or a Restricted Global Security, as the case may be. Until so exchanged in full, the Security shall in all respects be entitled to the same benefits under this Indenture as the Securities authenticated and delivered hereunder.

Section 2.13.    *Replacement Securities*. Securities that become mutilated, destroyed, stolen or lost will be replaced upon delivery thereof to the Trustee or delivery to the Issuer and the Trustee of evidence of the loss, theft or destruction thereof satisfactory to the Issuer and the Trustee. In the case of a lost, stolen or destroyed Security, an indemnity satisfactory to the Trustee and the Issuer may be required at the expense of the Holder of such Security before a replacement Security will be issued. Upon the issuance of any Security, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417v4]

and any other expenses (including the fees and the expenses of the Trustee, its counsel and its agents) connected therewith.

Section 2.14.  *Temporary Securities*.  Subject to the provisions of Section 2.12(a) until Certificated Securities are ready for delivery, the Issuer may prepare and the Trustee shall authenticate temporary Securities.  Temporary Securities shall be substantially in the form of Certificated Securities but may have variations that the Issuer considers appropriate for temporary Securities.  As necessary, the Issuer shall prepare and the Trustee shall authenticate Certificated Securities and deliver them in exchange for temporary Securities at the office or agency of the Issuer or the Trustee, without charge to the Holder.  Until so exchanged, the temporary Securities shall be entitled to the same benefits under this Indenture as Certificated Securities.

Section 2.15.  *Cancellation*.  The Issuer at any time may deliver Securities to the Trustee for cancellation. The Transfer Agents and the Paying Agents shall forward to the Trustee any Securities surrendered to them for transfer, exchange or payment.  The Trustee or a Paying Agent and no one else shall cancel and the Trustee shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Securities surrendered for transfer, exchange, payment or cancellation and, if so destroyed, deliver a certificate of such destruction to the Issuer unless the Issuer directs the Trustee in writing to deliver cancelled Securities to the Issuer.  The Issuer may not issue new Securities to replace Securities it has redeemed, paid or delivered to the Trustee for cancellation.

Section 2.16.  *CUSIP and ISIN Numbers*.  The Issuer in issuing the Securities may use CUSIP and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and ISIN numbers in notices as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice and that reliance may be placed only on the other identification numbers printed on the Securities, and any such notice shall not be affected by any defect in or omission of such numbers.  The Issuer shall promptly notify the Trustee in writing of any change in CUSIP or ISIN numbers.

## ARTICLE 3
## REDEMPTION AND REPURCHASE

Section 3.01.  *Maturity*.  Unless previously redeemed, purchased or canceled, the Securities shall be repaid in Dollars at their outstanding principal amount on the Stated Maturity Date.

Section 3.02.  *Mandatory Redemption*.

(a)      In the event of a Transfer of shares of the Company or of the Issuer to a third party that results in a Change of Control (effected, pursuant to the agreed to terms of such Transfer, through either a single or a series of related transactions), or any other transaction (or series of related transactions) that results in a Change of Control (each a "**Change of Control Transaction**"), the Issuer shall redeem, without premium or penalty, all outstanding Securities, for a redemption payment, payable in cash, in an amount equal to the product of (i) Instrument Distribution Percentage multiplied by (ii) the Equity Value as determined by a Qualified

- 31 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Investment Bank (such amount, after deduction of any currency exchange fees and expenses, the "**Mandatory Redemption Amount**"); provided that, in no event shall the Mandatory Redemption Amount exceed, in the aggregate, the then outstanding Face Amount of the Securities.

For this purpose, "**Equity Value**" means the value (net of any proportional share of any applicable taxes and transaction expenses payable in respect of the respective portion of the proceeds of such transaction or the distribution thereof to the Holders in accordance with this Indenture), as of any date of determination, of all of the shares of the Company owned by the Issuer on such date, implied solely by reference to the terms of such Change of Control Transaction (and not to any other possible valuation criteria determined by the Qualified Investment Bank).

(b)     The Issuer shall deliver to the Trustee written notice of such redemption not less than twenty calendar days prior to paying the Mandatory Redemption Amount (the "Mandatory Redemption Notice"). The payment of the Mandatory Redemption Amount must be made no later than (i) sixty calendar days following consummation of the Change of Control Transaction if the Mandatory Redemption Amount is paid entirely in cash and (ii) ninety calendar days following consummation of the Change of Control Transaction if the Mandatory Redemption Amount includes, in whole or in part, non-cash consideration. The Mandatory Redemption Notice shall be irrevocable and shall specify, among others, the proposed Redemption Date and the calculation of the Mandatory Redemption Amount.

(c)     Payment of the Mandatory Redemption Amount shall be made in U.S. Dollars, and if the Mandatory Redemption Amount must be converted into U.S. Dollars, shall be converted at the Settlement Rate on the date occurring two Business Days prior to the Payment Date.

Section 3.03.    *Optional Redemption.*

(a)     The Securities will be redeemable, at the Issuer's or any of its Affiliates' option, in whole or in part, at any time without premium or penalty, upon giving not less than twenty calendar days' notice to the Trustee by delivery of a notice (each an "**Optional Redemption Notice**"), at a price equal to 100% of the then outstanding Face Amount of the Securities to be redeemed on the Redemption Date (the "Optional Redemption Amount"). The Optional Redemption Notice shall be irrevocable and shall specify the proposed Redemption Date and the calculation of the Redemption Amount.

(b)     In the event that less than all of the Securities are to be redeemed at any time, selection of Securities for redemption will be made on a pro rata basis in accordance with the applicable procedures of DTC, or if DTC's procedures do not apply, on a pro rata basis or by such other method the Trustee deems fair and reasonable.

(c)     Upon surrender of a Security that is redeemed in part, the Issuer will issue and, upon the Issuer's written request, the Trustee will authenticate and deliver to the Holder at the expense of the Issuer a new Security equal in Face Amount to the unredeemed portion of the Security surrendered.

(d)     All Securities surrendered for redemption shall be cancelled by the relevant Transfer Agent or Paying Agent or the Trustee, as the case may be, on the applicable Redemption Date.

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 3.04.   *Repurchase.*  The Issuer or any of its Affiliates may at any time purchase Securities at any price or prices by means of a tender offer open to all Holders, except where it is not possible to do so due to failure to qualify for exemptions from offering restrictions imposed by any jurisdiction in accordance with applicable law, or as otherwise permitted under this Indenture.  None of the Issuer nor any of its Affiliates shall purchase the Securities (including, without limitation, in the open market or in private transactions) other than by a tender offer open to all Holders thereof.  All Securities surrendered for purchase in connection with any such tender offer shall be cancelled by the relevant Transfer Agent or Paying Agent or the Trustee, as the case may be, on the applicable purchase date.

Section 3.05.   *Qualified Public Offering of the Company.*

(a)     If the Company consummates a Qualified Public Offering, the Issuer will, no later than ten Business Days after the commencement of such Qualified Public Offering, cause the Company to give notice thereof to the Holders (the "**Qualified Public Offering Notice**").  In the event Holders constituting not less than a majority of the Face Amount of all Securities notify the Issuer in writing within twenty Business Days following delivery of the Qualified Public Offering Notice of their intention to exchange the Securities for Capital Stock of the Company, then <u>all</u> Securities will be exchanged for Capital Stock of the Company in the respective proportion of Security holdings applicable immediately prior to the commencement of the Company's Qualified Public Offering, in accordance with the procedures set forth below and in this Indenture (the "**Qualified Public Offering Right**").

(b)     The amount of Capital Stock to be exchanged for the Securities shall equal the product of (A) the Instrument Distribution Percentage and (B) the total amount of Fully-Diluted Capital Stock of the Company in existence upon consummation of the Qualified Public Offering *less* any primary Capital Stock issued in such Qualified Public Offering.

(c)     The Qualified Public Offering Notice shall specify the relevant documentation and procedures by which the Capital Stock shall be delivered to the Holders, and any other information required under applicable law to permit such delivery of Capital Stock.  The Issuer shall cause the Company to use its reasonable commercial efforts to deliver the Capital Stock of the Company to the Holders, subject to applicable securities laws in the form of American Depositary Receipts, in accordance with such procedures.

(d)     Upon the issuance to the Holders of the applicable Capital Stock in an aggregate amount corresponding to the Face Amount of the Securities, the Issuer shall, and shall cause the Company to cancel all outstanding Securities with the Trustee and DTC on the Completion Date according to the provisions set forth in this Indenture.

Section 3.06.   *Notice of Redemption by the Issuer; Notice to Trustee.*

(a)     In the case of redemption of Securities pursuant to Section 3.02 and Section 3.03, notice of redemption shall be mailed at least thirty but not more than sixty calendar days before the Redemption Date to each Holder of any Security to be redeemed by first-class mail at its registered address and such notice shall be irrevocable.  In case of any redemption of Securities at the election of the Issuer, the Issuer shall, at least seventy calendar days prior to the Redemption

[[AM_ACTIVE 402114412 4]]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Date fixed by the Issuer (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee in writing of such Redemption Date.

(b)    The notice shall state: (i) the Redemption Date; (ii) the Redemption Price; (iii) the name and address of the Paying Agents; (iv) that Securities called for redemption must be surrendered to a Paying Agent to collect the Redemption Price; (v) the paragraph of the Securities pursuant to which the Securities called for redemption are being redeemed; (vi) the CUSIP or ISIN number, if any; and (vii) that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Securities.

(c)    At the Issuer's election and at its request, made in writing to the Trustee at least sixty calendar days before a date for redemption of Securities, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall deliver to the Trustee, at least seventy calendar days prior to the Redemption Date, an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.07.    *Deposit of Redemption Price*.  By 10:00 A.M. New York City time, no later than one Business Day prior to the Redemption Date, the Issuer shall deposit with the Paying Agent money sufficient to pay the Redemption Price of the Securities other than Securities that have been delivered by the Issuer to the Trustee at least fifteen calendar days prior to the Redemption Date for cancellation.  The Issuer shall request that the bank through which such payment is to be made agree to supply to the Paying Agent by 10:00 A.M.  (New York time) two Business Days prior to the due date for any such payment an irrevocable confirmation of its intention to make such payment.

# ARTICLE 4
## COVENANTS

Section 4.01.    *Payment of Principal Under the Securities*.  The Issuer shall punctually pay in cash the principal on the Securities on the dates and in the manner set forth in Article 2 above and as provided in Paragraphs 2 and 3 of the Securities.  One Business Day prior to each such date, the Issuer shall irrevocably deposit with the Trustee or the other Paying Agents money sufficient to make any such principal payment.

Section 4.02.    *Maintenance of Office or Agency*.  The Issuer shall maintain an office or agency in the Borough of Manhattan, The City of New York, where notices to and demands upon the Issuer in respect of this Indenture and the Securities may be served.  Initially this office will be at the offices of Cogency Global Inc., located at 22 East 42nd Street, 18th Floor, 115 New York, NY, 10168, and the Issuer will agree not to change the designation of such office without prior notice to the Trustee and designation of a replacement office in the Borough of Manhattan, The City of New York.

Section 4.03.    *Money for Security Payments to Be Held in Trust*.

(a)    If the Issuer shall at any time act as its own Paying Agent, it shall, on or before each due date of the principal of (including, for the avoidance of doubt, any Payments or Redemption Amounts, as applicable), premium, if any, on or interest on any of the Securities, segregate and

- 34 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal, premium, if any, or interest so becoming due until such sums will be paid to such Persons or otherwise disposed of as herein provided and will promptly notify the Trustee of its action or failure so to act.

(b)     Whenever the Issuer shall have one or more Paying Agents for the Securities, it shall, on or before each due date of the principal of, premium, if any, on or interest on any Securities, irrevocably deposit with a Paying Agent a sum sufficient to pay the principal, premium, if any, or interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal of, or interest, and (unless such Paying Agent is the Trustee) the Issuer will promptly notify the Trustee of such action or any failure so to act.

(c)     Each Paying Agent, subject to the provisions of this Section 4.03, will:

(i)     hold all sums held by it for the payment of the principal of or interest on Securities in trust for the benefit of the Persons entitled thereto until such sums will be paid to such Persons or otherwise disposed of as herein provided;

(ii)     give the Trustee notice of any default by the Issuer (or any other obligor upon the Securities) in the making of any payment of principal or interest; and

(iii)     at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

(d)     The Issuer will cause each Paying Agent to execute and deliver an instrument in which such Paying Agent shall agree with the Trustee to act as a Paying Agent in accordance with this Section 4.03.

(e)     The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of the Securities or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Issuer or such Paying Agent, such sums to be held in trust by the Issuer or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Issuer or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent will be released from all further liability with respect to such sums.

(f)     Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of or interest on any Security and remaining unclaimed for two years after such principal or interest has become due and payable will be paid to the Issuer at the request of the Issuer, or (if then held by the Issuer) will be discharged from such trust; and the Holder of such Security will thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof, and all liability of the Trustee with respect to such trust money, and all liability of the Issuer as trustee thereof, will thereupon cease; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any such payment, shall, upon request and at the expense of the Issuer, cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in (i) the Borough of Manhattan, The City of New York and (ii) for so long as such Securities are listed on any stock exchange, upon publication in English in a leading newspaper of general circulation in

- 35 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

the country in which such stock exchange is located, notice that such money remains unclaimed and that, after the date specified therein, which will not be less than thirty calendar days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer.

Section 4.04. *Maintenance of Corporate Existence*. The Issuer shall (a) preserve and maintain its legal existence under the applicable Laws of its jurisdiction of organization and all of its material licenses, rights, privileges and franchises necessary for the maintenance of its corporate existence, (b) comply, in all material respects, with its Organizational Documents, and (c) refrain from making any amendments to its Organizational Documents other than those that would not reasonably be expected to (i) result in a material adverse effect on the ability of the Issuer, collectively, to make timely payments owing on the Securities or (ii) increase the risk of the Issuer being consolidated with another Person in the event of a Bankruptcy or Insolvency Event of the Issuer (including, for the avoidance of doubt, amendments necessary in connection with a merger or consolidation of the Issuer).

Section 4.05. *Compliance with Laws*. The Issuer shall conduct its business in compliance with all requirements of applicable Law, except where any failure to comply would not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect, and except that any of the Issuer may, at its expense, contest by appropriate proceedings conducted in good faith the validity or application of any such requirement of applicable Law, so long as the institution of such proceedings would not reasonably be expected to result in a Material Adverse Effect.

Section 4.06. *Payment of Additional Amounts*.

(a)      All payments by the Issuer in respect of the Securities will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature and any fines, penalties or interest related thereto (collectively, "**Taxes**") imposed or levied by or on behalf of the Cayman Islands or Brazil or, following any merger, consolidation, transfer, liquidation, winding-up, dissolution or assumption of obligations permitted hereunder, the jurisdiction in which the resulting, surviving or transferee Person is incorporated, resident for tax purposes or treated as engaged in business, or, in each case, any political subdivision thereof or taxing authority therein (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Issuer will pay to each holder such additional amounts ("**Additional Amounts**") as may be necessary in order that every net payment made by the Issuer on the Securities after deduction or withholding for or on account of any present or future Tax that would have been imposed upon or as a result of such payment by the Taxing Jurisdiction will not be less than the amount then due and payable on such Securities without withholding or deduction.  The foregoing obligation to pay Additional Amounts, however, will not apply to:

(i)      any Tax which would not have been imposed but for the existence of any present or former connection between a Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership or a corporation) or beneficial owner, on the one hand, and the Taxing Jurisdiction, on the other hand, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or

- 36 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

shareholder) or beneficial owner being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, but not including the mere receipt of such payment or the ownership or holding of such Securities;

(ii)     any Tax which would not have been so imposed but for the presentation by such Holder for payment (where presentation is required) on a date more than thirty calendar days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)     the extent that the Taxes would not have been imposed but for the failure of such Holder or beneficial owner to timely comply with any certification, identification or other reporting requirements concerning the nationality, residence, identity or connection with the Taxing Jurisdiction of the Holder if (a) such compliance is required or imposed by statute, regulation or other applicable law of such Taxing Jurisdiction as a precondition to exemption from all or a part of such Tax and (b) at least thirty calendar days prior to the date on which the Issuer applies this clause (iii) the Issuer will have notified all Holders that some or all Holders shall be required to comply with such requirement;

(iv)     any estate, inheritance, gift, sales, transfer or personal property Tax or similar Tax;

(v)     any Tax payable other than by deduction or withholding from payments of principal or of interest on the Securities; or

(vi)     any combination of items (i) through (v) above.

(b)     The Issuer shall also pay any present or future stamp, court or documentary taxes or any other excise taxes, charges or similar levies which arise in any jurisdiction from the execution, delivery, registration or the making of payments in respect of the Securities, excluding any such taxes, charges or similar levies imposed by any jurisdiction outside of any Taxing Jurisdiction other than those resulting from, or required to be paid in connection with, the enforcement of the Securities following the occurrence of any Default or Event of Default (each as defined below).

(c)     No Additional Amounts shall be paid with respect to a payment on Securities to a Holder that is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent a beneficiary or settlor with respect to such fiduciary or a member of such partnership or beneficial owner would not have been entitled to receive payment of the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the Holder.

(d)     The Issuer will provide the Trustee with the official acknowledgment of the relevant taxing authority (or, if such acknowledgment is not available, a certified copy thereof, if available) evidencing the payment of taxes in any Taxing Jurisdiction in respect of which the Issuer has paid any Additional Amounts.  Copies of such documentation will be made available to the Holders or the Paying Agents, as applicable, upon request therefor.

(e)     The Issuer will:

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(i)       at least ten Business Days prior to the first Payment Date for the Securities (and at least ten Business Days prior to each succeeding Payment Date or any Redemption Date if there has been any change with respect to the matters set forth in the below-mentioned Officer's Certificate), deliver to the Trustee and each Paying Agent an Officer's Certificate (i) specifying (x) the amount, if any, of Taxes described in this Section 4.06(e) imposed or levied by or on behalf of any Taxing Jurisdiction (the "**Relevant Withholding Taxes**") required to be deducted or withheld on the payment of principal (including, for the avoidance of doubt, any Payments or Redemption Amounts) or interest on the Securities to Holders and (y) the Additional Amounts, if any, due to Holders in connection with such payment, and (ii) certifying that the Issuer will pay such deduction or withholding;

(ii)      prior to the due date for the payment thereof, pay any such Relevant Withholding Taxes, together with any penalties or interest applicable thereto;

(iii)     within thirty calendar days after paying such Relevant Withholding Taxes, deliver to the Trustee and the Paying Agent evidence of such payment and of the remittance thereof to the relevant taxing or other authority as described in this Section 4.06(e); and

(iv)     pay any Additional Amounts due to Holders on any Payment Date or Redemption Date to the Trustee in accordance with the provisions of this Section 4.06(e).

(v)      Any Officer's Certificate required by this Section 4.06(e) to be provided to the Trustee and each Paying Agent will be deemed to be duly provided if sent by facsimile to the Trustee and each Paying Agent.

(vi)     All references in this Indenture to Payments on the Securities shall include any Additional Amounts payable by the Issuer in respect of such Payments or Distribution thereof to the Holders in accordance with this Indenture.

Section 4.07.  *Available Information*.   For as long as the Securities are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Issuer will, to the extent required, furnish to any Holder holding an interest in a Restricted Global Security, or to any prospective purchaser designated by such Holder, upon request of such Holder, financial and other information described in paragraph (d)(4) of Rule 144A with respect to the Issuer to the extent required in order to permit such Holder to comply with Rule 144A with respect to any resale of its Security, unless during that time, the Issuer is subject to the reporting requirements of Section 14 or 16(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act and no such information about the Issuer is otherwise required pursuant to Rule 144A.

Section 4.08.  *Financial Statements and Reporting Requirements*.   The Issuer shall provide the Holders and the Trustee with an English language version of (1) the annual audited financial statements of the Issuer prepared in accordance with Brazilian GAAP, not later than one hundred and twenty calendar days after the close of the Issuer's fiscal year and (2) annual audited and quarterly unaudited consolidated financial statements of the Company and its Subsidiaries as well as all management reports and certificates that are delivered to the holders of the New Notes in accordance with the terms of the indentures of the New Notes. Simultaneously with the delivery

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

of the financial statements of the Issuer, the Issuer shall cause to be delivered to the Holders and the Trustee an Officer's Certificate of the chief financial officer or chief accounting officer of the Company stating whether an Event of Default or Default exists on the date of such certificate and, if an Event of Default or Default exists, setting forth the details thereof and the action being taken or proposed to take with respect thereto.  Within ten calendar days after any director or Officer of the Issuer becomes aware of the existence of an Event of Default or Default, the Issuer will cause to be delivered to the Holders and the Trustee an Officer's Certificate of the chief financial officer of the Company setting forth the details thereof and the action being taken or proposed to be taken with respect thereto.

If the Company makes the reports described in the first paragraph of this Section 4.08 available on its public website freely accessible to all Holders, the Company and the Issuer will be deemed to have satisfied the reporting requirement set forth in such paragraph with respect to the Holders.

Section 4.09.  *Further Assurances*.  The Issuer will execute and deliver such further instruments and undertake such further reasonable action as may be reasonably required to carry out the purposes of the Securities and this Indenture.  In addition, the Issuer shall use its best efforts to obtain any authorizations required from time to time under applicable law or regulation (including from the Brazilian Central Bank and the CVM with respect to the Securities or this Indenture).

Section 4.10.  *Limitations and Restrictions on the Issuer*

(a)       The Issuer will not (i) engage in any business, or conduct any operations, other than to finance the operations of the Company and activities that are reasonably ancillary thereto (including, without limitation, the issuance, sale, redemption, repurchase or defeasance of the Securities or additional Securities permitted by this Indenture and any activities incidentally related thereto, or lending of funds or repurchases of Indebtedness not prohibited by this Indenture) or as required by law; or (ii) hold any material assets other than (x) cash or cash equivalents held on a temporary basis in accordance with the terms hereof and (y) 100% of the Equity Interests of the Company;

(b)       the Issuer will not incur any Indebtedness other than (i) the Securities and (ii) any intercompany Indebtedness that is subordinated to the Securities;

(c)       the Issuer will not incur any Liens on any of its Property (including Capital Stock), except for Liens imposed by operation of law;

(d)       the Issuer will not take any corporate action with respect to or merge with or consolidate into any other Person or enter into any agreement to sell all or substantially all of its assets (other than in connection with a sale of the shares of the Company permitted under this Indenture), or enter into any joint venture or similar arrangement with any other Person;

(e)       the Issuer will not take any corporate action with respect to the voluntary liquidation, wind-up or dissolution of the Issuer while the Issuer is the issuer of the Securities; and

- 39 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(f)      the Issuer will keep updated written records, which it shall make available to the Trustee, of all payments, redemptions and repurchases made in respect of the Securities and setting forth the current (i) Face Amount of the Securities and (ii) Instrument Distribution Percentage.

For the avoidance of doubt, the Issuer, the Company or their Subsidiaries will not be restricted by Sections Section 4.01 through Section 4.12 of this Indenture from engaging in any transaction specifically contemplated by and carried out in accordance with the terms of the Intercompany Agreement.

For the avoidance of doubt, there will be no restriction on the number of Distributions except as specifically contemplated above and the Issuer may use the proceeds from any Distributions, except as may be required for payments to the Holders in accordance with the terms of this Indenture, to make distributions or loans to the Issuer Shareholder, to launch tenders offers for the purchase of the Securities in accordance with the terms of this Indenture or to finance the activities of its Subsidiaries.

Section 4.11.  *Agent or Trustee Fees*.  The Issuer shall be responsible for the payment of all reasonable and documented fees, costs and other expenses in relation of the Trustee and its agents in connection with the Securities.

Section 4.12.  *Calculations of Payment*.  The Issuer shall calculate the amount of each applicable Payment in respect of the Securities in good faith.  By no later than three Business Days prior to each Payment Date, the Issuer shall deliver to the Trustee (x) a certificate of the chief financial officer or chief accounting officer of the Company setting forth the calculation with respect to the applicable Payment to be made on such Payment Date and certifying that such Payment to be made has been calculated in accordance with this Indenture, and (y) related back-up information for such calculation.  Each such Payment calculation shall be final, absent manifest error.

# ARTICLE 5
# EVENTS OF DEFAULT AND REMEDIES

Section 5.01.  *Events of Default*.  The term "**Event of Default**" means, when used herein, any one of the following events which has occurred and is continuing:

(a)      the Issuer fails to pay or cause a third party to pay, and such failure continues for a period of ten calendar days, any amount of a Payment or a Redemption Amount in respect of the Securities when the same becomes due and payable;

(b)      the Issuer defaults in the performance or observance of any of its other obligations under or in respect of the Securities and such default remains unremedied for sixty calendar days after the written notice specified below;

(c)      a Bankruptcy or Insolvency Event of the Issuer;

(d)      a Bankruptcy or Insolvency Event of any guarantor under the indenture governing any Series of New Notes;

- 40 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417.4]

(e)     any (i) indebtedness for money borrowed of the issuer or any of the guarantors of the New Notes in an aggregate outstanding amount of at least U.S.$50,000,000 (or the equivalent thereof at the time of determination), or (ii) any Series of New Notes, becomes due and payable in full prior to its scheduled maturity by reason of default and acceleration thereunder; *provided that*, without prejudice to any rights any party might have under this Indenture, in the case of any Event of Default specified in this clause Section 5.01(e), such Event of Default will be automatically rescinded or annulled if the acceleration of maturity of the applicable indebtedness is remedied, cured or waived by the applicable holders of such indebtedness; and

(f)     one or more final judgments or decrees for the payment of money in excess of U.S.$50,000,000 (or the equivalent thereof at the time of determination) (other than judgments covered by enforceable insurance policies issued by reputable and creditworthy insurance companies) in the aggregate are rendered against the Issuer and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such final judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed or otherwise stayed within forty-five calendar days following the date on which the Issuer, is served with process or otherwise summoned to pay or guarantee the payment of the amounts due under such enforcement proceeding by order of a court with competent jurisdiction or (ii) there is a period of sixty calendar days following such final judgment or decree during which such judgment or decree is not discharged, waived or the execution thereof stayed.

If an Event of Default (other than an Event of Default specified in clause (c) above) occurs and is continuing, the Trustee or the Holders of not less than 25% of the Face Amount of the Securities then outstanding may declare all then outstanding Face Amount of the Securities to be due and payable immediately, by mailing a notice in writing to the Issuer, and upon any such declaration such amounts will become due and payable immediately.  If an Event of Default specified in clause (c) above occurs and is continuing, all then outstanding Face Amount of the Securities will become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by any Holder, the Holders of at least 50% of the Face Amount of the Securities then outstanding by written notice to the Issuer may rescind or annul such declaration if:

(i)     the Issuer has paid or deposited with the Trustee and the other Paying Agents a sum sufficient to pay (a) all overdue Payments on outstanding Securities, (b) all sums paid or advanced by the Trustee and the reasonable and duly-documented compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(ii)     all Events of Default have been cured or waived as provided in Article 8 other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission will affect any subsequent Default or Event of Default or impair any right consequent thereto.

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Subject to the provisions of this Indenture relating to the duties of the Trustee in case an Event of Default will occur and be continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such holders will have offered to the Trustee indemnity satisfactory to the Trustee.  Subject to such provision for the indemnification of the Trustee and certain other conditions set forth in this Indenture, the holders of a majority in aggregate principal amount of the outstanding Securities will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

The Trustee is not to be charged with knowledge of any Event of Default or knowledge of any cure of any Default or Event of Default unless either (i) an authorized officer or agent of the Trustee with direct responsibility for the administration of the Indenture has actual knowledge of such Default or Event of Default or (ii) written notice of such Default or Event of Default has been given to such authorized officer of the Trustee by this Issuer or any Holder.

Subject to the provisions of this Indenture relating to the duties of the Trustee in case an Event of Default will occur and be continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such Holders will have offered to the Trustee indemnity satisfactory to the Trustee.  Subject to such provision for the indemnification of the Trustee and certain other conditions set forth in this Indenture, the Holders of a majority of the Face Amount of the outstanding Securities will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

In the event of a Bankruptcy or Insolvency Event with respect solely to the Issuer, Holders shall have a claim in such proceeding equal to each Holder`s Face Amount of the corresponding outstanding Securities.

Section 5.02.   Other Remedies.

(a)      If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal (including, for the avoidance of doubt, Payments or Redemption Amounts) or other amounts on the Notes or to enforce the performance of any provision of the Securities or this Indenture.

(b)      The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding. To the fullest extent permitted by applicable law, a delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Default, no remedy is exclusive of any other remedy and all available remedies are cumulative to the fullest extent permitted by applicable law.

Section 5.03.   Control by Majority.

(a)      Holders of not less than a majority in principal amount of the outstanding Securities may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. Subject to Section 6.01, however, the Trustee may refuse to follow any direction that conflicts with any law or this

- 42 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM - ACTIVE 402114417.7v4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Indenture, that the Trustee determines may be unduly prejudicial to the rights of any other Holder, or that may involve the Trustee in personal liability; provided that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

(b)      In the event the Trustee takes any action or follows any direction pursuant to this Indenture, the Trustee shall be entitled to indemnification or security satisfactory to it in its sole discretion against any loss or expense caused by taking or not taking such action or following such direction.

Section 5.04.   *Limitation on Suits.*

(a)      Except to enforce the right to receive payment of principal (including, for the avoidance of doubt, Payments or Redemption Amounts), premium, if any, or other amounts not paid when due, no Holder may pursue any remedy with respect to this Indenture or the Securities *unless*:

(i)      such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(ii)      Holders of at least 30% in principal amount of the outstanding Securities have requested the Trustee in writing to pursue the remedy;

(iii)      such Holders have offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(iv)      the Trustee has not complied with such request within sixty days after the receipt thereof and the offer of security or indemnity; and

(v)      Holders of a majority in principal amount of the outstanding Securities have not given the Trustee a written direction inconsistent with such request within such sixty-day period.

(b)      A Holder may not use this Indenture to affect, disturb or prejudice the rights of another Holder or to obtain a preference or priority over such other Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

Section 5.05.   *Rights of Holders To Receive Payment*.   Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal (including, for the avoidance of doubt, Payments or Redemption Amounts) or other amounts on a Security, on or after the respective due dates expressed in such Security, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holder.

Section 5.06.   *Collection Suit by Trustee*.   If a Default in payment of principal (including, for the avoidance of doubt, Payments or Redemption Amounts) or other amounts specified in Section 5.01(a)Section 5.01(a)(i) or Section 5.01(a)(ii) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other

[AM_ACTIVE 402114417.14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

obligor on the Securities for the whole amount of principal (including, for the avoidance of doubt, Payments or Redemption Amounts) or other amounts remaining unpaid, together with interest on overdue principal (including, for the avoidance of doubt, Payments or Redemption Amounts) or other amounts, to the extent that payment is lawful, at the rate *per annum* borne by the Securities and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 5.07.   *Trustee May File Proofs of Claim*.   The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relating to the Issuer, the Company, their creditors or their property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any custodian in any such judicial proceedings is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other amounts due the Trustee under Section 6.06. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.   The Trustee shall be entitled to participate in the matters as it deems necessary or advisable, in its sole discretion, including as a member of any official committee of creditors.

Section 5.08.   *Priorities*.   If the Trustee collects any money or property pursuant to this Article 5, it shall pay out the money or property in the following order:

(i)      *First*: to the Trustee and any Paying Agent and their respective agents and attorneys for amounts due underSection 6.06, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and any Paying Agent and the costs and expenses of collection;

(ii)      *Second*: to Holders for amounts due and unpaid on the Securities for principal (including, for the avoidance of doubt, Payments or Redemption Amounts), premium, if any, or other amounts, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal (including, for the avoidance of doubt, Payments or Redemption Amounts), premium, if any, or other amounts, respectively; and

(iii)      *Third*: to the Issuer or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 5.08Section 5.08 and shall promptly notify the Issuer thereof.   At least 15 calendar days before such record date, the Issuer shall mail to each Holder and the Trustee a notice that states the record date, the payment date and amount to be paid.

- 44 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

## ARTICLE 6
## TRUSTEE AND PAYING AGENT

Section 6.01.  *Duties of Trustee and Paying Agent*.

(a)     If an Event of Default has occurred and is continuing and a Responsible Officer has actual knowledge thereof, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b)     Except during the continuance of an Event of Default, (i) the Trustee and Paying Agent undertake to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee or the Paying Agent; and (ii) in the absence of bad faith on the part of the Trustee or the Paying Agent, the Trustee or the Paying Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee or the Paying Agent and conforming to the requirements of this Indenture. However, in the case of any certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee or the Paying Agent, the Trustee and the Paying Agent shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of the mathematical calculations or other facts stated therein).

(c)     The Trustee may not be relieved from liability for its own gross negligence, bad faith or willful misconduct, except that:

(i)     this Section 6.01(c) does not limit the effect of Section 6.01(b); and

(ii)     the Trustee and the Paying Agent shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee or the Paying Agent was grossly negligent in ascertaining the pertinent facts.

(d)     The Trustee and the Paying Agent shall not be liable for interest on any money received by it except as the Trustee and the Paying Agent may agree in writing with the Issuer.

(e)     Money held in trust by the Trustee or any Paying Agent need not be segregated from other funds except to the extent required by law.

(f)     No provision of this Indenture shall require the Trustee or the Paying Agent to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds and/or adequate indemnity against such risk or liability is not satisfactorily assured to it.

(g)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and the Paying Agent shall be subject to the provisions of this Section 6.01.

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 6.02.   *Rights of Trustee*.

(a)      The Trustee and the Paying Agent may rely upon, and shall be protected in acting or refraining from acting based upon, any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee and the Paying Agent need not investigate any fact or matter stated in any such document.

(b)      Before the Trustee acts or refrains from acting, it may require an Officers' Certificate, the written advice of a qualified tax expert or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate, the qualified tax expert's written advice or Opinion of Counsel.

(c)      The Trustee may act through agents and shall not be responsible for the willful misconduct or gross negligence of any agent appointed with due care.

(d)      Any request, direction, order or demand of the Issuer mentioned herein shall be sufficiently evidenced by an Officers' Certificate of the Issuer (unless other evidence in respect thereof be herein specifically prescribed); and any resolution of the Board of Directors may be evidenced to the Trustee or the Paying Agent by copies thereof certified by the Secretary or an Assistant Secretary (or equivalent Officer) of the Issuer.

(e)      The Trustee and the Paying Agent shall be under no obligation to exercise any of the trusts or powers vested in them by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee or the Paying Agent security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred thereby.

(f)      The Trustee and the Paying Agent shall not be liable for any action taken or omitted by them in good faith with a direction received by either of them pursuant to this Indenture or exercising any trust or power conferred upon them under this Indenture.

(g)      The Trustee and the Paying Agent shall not be liable for any action they take or omit to take in good faith which they believe to be authorized or within their rights or powers; *provided* that the conduct of the Trustee or the Paying Agent does not constitute willful misconduct, gross negligence or bad faith.

(h)      The Trustee and the Paying Agent may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Securities shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(i)      The Trustee and the Paying Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document unless requested in writing by the Holders of not less than a majority in aggregate principal amount of the Securities Outstanding; *provided* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the

- 46 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

making of such investigation is, in the opinion of the Trustee, not satisfactorily assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require from the Holders indemnity satisfactory to the Trustee against such expenses or liabilities as a condition to proceeding; the reasonable expenses of every such investigation shall be paid by the Issuer or, if paid by the Trustee, shall be reimbursed by the Issuer upon demand.

(j)    Neither the Trustee nor any Paying Agent shall be required to invest, or shall be under any liability for interest, on any moneys at any time received by it pursuant to any of the provisions of this Indenture or the Securities except as the Trustee or any Paying Agent may otherwise agree with the Issuer.  Such moneys need not be segregated from other funds except to the extent required by mandatory provisions of law.

(k)    In no event shall the Trustee or the Paying Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(l)    The permissive rights of the Trustee enumerated herein shall not be construed as duties of the Trustee.

(m)    The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(n)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(o)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

Section 6.03.   *Individual Rights of Trustee*.  The Trustee and any Paying Agent, Registrar or co-registrar or any other agent of the Issuer or of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

Section 6.04.   *Trustee's Disclaimer*.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Securities, it shall not be accountable for the Issuer's use of the proceeds from the Securities, and it shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Securities or in the Securities other than the Trustee's certificate of authentication.

- 47 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 6.05.  *Notice of Defaults and Events of Default*.  If a Default or Event of Default occurs and is continuing, and if it is known to the Responsible Officer, the Trustee shall mail to each Holder notice of the Default or Event of Default within ninety calendar days after a Responsible Officer acquires actual knowledge of such Default or Event of Default.  Except in the case of a Default or Event of Default in payment of principal of (including, for the avoidance of doubt, any Payments or Redemption Amounts, as applicable) any Security, the Trustee may withhold the notice and shall be protected from withholding the notice if and so long as a committee of its Responsible Officers of the Trustee in good faith determines that withholding the notice is in the interests of Holders.  For all purposes of this Indenture and the Securities, the Trustee shall not be deemed to have knowledge of a Default or Event of Default unless (i) the Trustee has actual knowledge thereof or (ii) written notice of such Default or Event of Default has been given to such Responsible Officer by the Issuer or any Holder.

Section 6.06.  *Compensation and Indemnity*.   The Issuer agrees, and shall cause the Company to, jointly and severally, pay to the Trustee and the Paying Agent from time to time such compensation as shall be agreed upon in writing for their services.  The Trustee's compensation shall not be limited by any law regarding compensation of a trustee of an express trust.  The Issuer shall, and shall cause the Company to, jointly and severally, reimburse promptly the Trustee and the Paying Agent upon request for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's and the Paying Agent's agents, counsel, accountants and experts.  Payments of any such expenses by the Issuer or the Company to the Trustee or the Paying Agent, as the case may be, shall be made free and clear of and without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of Brazil or any political subdivision or authority thereof or therein having power to tax, unless such withholding or deduction is required by law.  In that event, the Issuer shall, and shall cause the Company to pay to the Trustee or the Paying Agent, as the case may be, such additional amounts as may be necessary in order that every net payment made by the Issuer or the Company to the Trustee and Paying Agent, as the case may be, after deducting or withholding for or on account of any present or future tax, penalty, fine, duty, assessment or other governmental charge imposed upon or as a result of such payment by Brazil or any political subdivision or taxing authority thereof or therein shall not be less than the amount then due and payable to the Trustee or the Paying Agent, as the case may be.  The Issuer shall, and shall cause the Company to, jointly and severally, indemnify each of the Trustee and the Paying Agent against any and all loss, liability or expense (including reasonable attorneys' fees and expenses) incurred by them without gross negligence or bad faith on their part arising out of and in connection with the administration of this Indenture and the performance of its respective duties hereunder, including, without limitation, the costs and expenses of defending themselves against any claim or liability and of complying with any process served upon them or any of their officers in connection with the exercise or performance of any of their powers or duties under this Indenture.  The Issuer undertakes, and shall cause the Company to, jointly and severally, indemnify each of the Paying Agents and their affiliates against all losses, liabilities, including any and all tax liabilities, which, for the avoidance of doubt, shall include Brazilian taxes and associated penalties, costs, claims, actions, damages, expenses or demands which any of them may incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties by any Paying Agent

- 48 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

or its affiliates under this Indenture, except as may result from their own default, gross negligence or bad faith or that of their directors, officers or employees or any of them, or breach by them of the terms of this Indenture.  The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Issuer or the Company shall not relieve the Issuer or the Company of its obligations hereunder.  The Issuer is entitled to participate in the Trustee's defense of the claim and the Trustee may have separate counsel and the Issuer and the Company, jointly and severally, shall pay the fees and expenses of such counsel.

To secure the payment obligations of the Issuer in this Section 6.06, the Trustee shall have a lien prior to the Securities on all money or property held or collected by the Trustee or the Paying Agent, except that held in trust to pay principal of particular Securities.

The obligations of the Issuer and the Company pursuant to this Section 6.06 shall survive the resignation or removal of the Trustee and the satisfaction and discharge of this Indenture. When the Trustee or the Paying Agent incurs expenses after the occurrence of a Default or Event of Default specified in Section 5.01(d) the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

The Issuer acknowledges that the Paying Agent makes no representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction.  The Issuer represents that it has fully satisfied itself as to any tax impact of this Indenture before agreeing to the terms herein and is responsible for any and all federal, state, local, income, franchise, withholding, value added, sales, use, transfer, stamp or other taxes imposed by any jurisdiction in respect of this Indenture.

The Issuer and the Company, jointly and severally, agree to pay any and all stamp and other documentary taxes or duties which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture by the Paying Agents.

Section 6.07.   *Replacement of Trustee*.  The Trustee may resign at any time by so notifying the Issuer in writing.  The Holders of a majority in principal amount of the Securities may remove the Trustee by so notifying the Trustee in writing and may appoint a successor Trustee.  The Issuer shall remove the Trustee if:

(a)      the Trustee fails to comply with Section 6.09;

(b) the Trustee is adjudged a bankrupt or insolvent;

(c) a receiver or other public officer takes charge of the Trustee or its property; or

(d) the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee) the Issuer shall promptly appoint a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 6.06.

If a successor Trustee does not take office within sixty calendar days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of a majority in principal amount of the Securities may, at the expense of the Issuer, petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 6.09, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the Issuer's obligation under Section 6.06 shall continue for the benefit of the retiring Trustee.

Section 6.08. *Successor Trustee by Merger*. If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Securities shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such adopted certificates shall have the full force of all provisions within the Securities or in this Indenture relating to the certificate of the Trustee.

Section 6.09. *Eligibility; Disqualification*. The Trustee hereunder shall at all times be a corporation, bank or trust company organized and doing business under the laws of the United States or any state thereof (i) which is authorized under such laws to exercise corporate trust power, (ii) is subject to supervision or examination by governmental authorities, (iii) shall have at all times a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition and (iv) shall have its Corporate Trust Office in The City of New York. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.09, it shall resign immediately in the manner and with the effect specified in Section 6.07.

# ARTICLE 7
# DISCHARGE OF INDENTURE; DEFEASANCE

Section 7.01. *Discharge of Liability on Securities*.

(a)     When (i) the Issuer delivers to the Trustee all outstanding Securities (other than Securities replaced pursuant to Section 2.13) for cancellation or (ii) all outstanding Securities have

[AM_ACTIVE 402114417 _4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

become due and payable and the Issuer deposits in trust, for the benefit of the Holders, with the Trustee finally collected funds sufficient to pay at Maturity all outstanding Securities (other than Securities replaced pursuant to Section 2.13), and if in any such case the Issuer pays all other sums payable hereunder by the Issuer, then this Indenture, and the obligations of the Issuer pursuant hereto, shall, subject to Section 7.01(c) and 7.06, cease to be of further effect.  The Trustee shall acknowledge satisfaction and discharge of this Indenture on demand of the Issuer accompanied by an Officers' Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Issuer.

(b)      Subject to Sections 7.01(c), 7.02 and 7.06, the Issuer at any time may terminate (i) all its obligations under this Indenture and the Securities ("**legal defeasance option**") or (ii) the operation of Sections 5.01(a), 5.01(b), 5.01(e) and 5.01(f) ("**covenant defeasance option**").  The legal defeasance option may be exercised notwithstanding any prior exercise of the covenant defeasance option.

If the legal defeasance option is exercised, payment of the Securities may not be accelerated because of an Event of Default with respect thereto.  If the covenant defeasance option is exercised, payment of the Securities may not be accelerated because of an Event of Default specified in Sections 5.01(a), 5.01(b), 5.01(e), and 5.01(f).

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of the obligations of the Issuer hereunder except those specified in Section 7.01(c).

(c)      Notwithstanding Section 7.01(b), the Issuer's obligations pursuant to Sections 2.03, 2.04, 2.05, 2.06, Section 2.11, Section 2.12, Section 2.13, Section 4.02 and 4.04 shall survive until the Securities have been paid in full.  Thereafter, the obligations of the Issuer pursuant to SectionsSection 6.06, Section 6.07, 7.04 and 7.05 shall survive.

Section 7.02.  *Conditions to Defeasance*.  The Issuer may exercise the legal defeasance option or the covenant defeasance option only if:

(a)      the Issuer irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "**defeasance trust**") pursuant to an irrevocable trust and security agreement in form and substance satisfactory to the Trustee, money or U.S. Government Obligations, or a combination thereof, sufficient for the payment of principal of all the Securities to Maturity or redemption;

(b)      the Issuer delivers to the Trustee a certificate from an internationally recognized firm of independent accountants expressing their opinion that the payments of principal of the Securities when due and without reinvestment on the deposited U.S. Government Obligations plus any deposited money without investment and after payment of all federal, state and local taxes or other charges or assessments in respect thereof payable by the Trustee shall provide cash at such times and in such amounts as shall be sufficient to pay principal of all the Securities when due at Maturity or on redemption, as the case may be;

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(c)      123 days pass after the deposit is made in accordance with the terms of Section 7.02(a) and during such 123-day period no Default or Event of Default specified in Section 5.01(d) occurs which is continuing at the end of the period;

(d)      no Default or Event of Default has occurred and is continuing on the date of such deposit and after giving effect thereto;

(e)      the deposit does not constitute a default or event of default under any other agreement binding on the Issuer;

(f)      the Issuer delivers to the Trustee an Opinion of Counsel to the effect that the trust resulting from the deposit does not constitute, or is not qualified as, a regulated investment company under the U.S. Investment Company Act of 1940, as amended;

(g)      the Issuer delivers to the Trustee Opinions of Counsel stating that, under Brazilian law, Holders (other than Brazilian persons) shall not recognize gain for Brazilian tax purposes and payments from the defeasance trust to any such Holder shall not be subject to withholding payments under Brazilian law;

(h)      in the case of the legal defeasance option, the Issuer delivers to the Trustee an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters stating that (i) the Issuer has received from, or there has been published by, the U.S. Internal Revenue Service a ruling, or (ii) since the date of this Indenture there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit and defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred;

(i)      in the case of the covenant defeasance option, the Issuer delivers to the Trustee an Opinion of Counsel of recognized standing with respect to U.S. federal income tax matters to the effect that the Holders shall not recognize income, gain or loss for U.S. federal income tax purposes as a result of such covenant defeasance and shall be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred;

(j)      the Issuer delivers to the Trustee an Opinion of Counsel, in form and substance reasonably satisfactory to Trustee, to the effect that, after the passage of 123 days following the deposit, the trust funds shall not be subject to any applicable bankruptcy, insolvency, reorganization or similar law, including any Bankruptcy Law, affecting creditors' rights generally; and

(k)      the Issuer delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Securities as contemplated by this Article 7 have been complied with.

Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of Securities at a future date in accordance with Article 3.

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 7.03.  *Application of Trust Money*.  The Trustee shall hold in trust money or U.S. Government Obligations deposited with it pursuant to Section 7.02.  It shall apply the deposited money and the money from U.S. Government Obligations through the Paying Agent or Paying Agents and in accordance with this Indenture to the payment of principal (including, for the avoidance of doubt, Payments or Redemption Amounts, as applicable) of the Securities.

Section 7.04.  *Repayment to Issuer*.  Upon termination of the trust established pursuant to Section 7.02, the Trustee and each Paying Agent shall promptly pay to the Issuer upon request, any excess cash or U.S. Government Obligations held by them.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer, upon request, any money held by them for the payment of principal of the Securities that remains unclaimed for two years after the due date for such payment of principal or interest, and, thereafter, the Trustee and each Paying Agent, as the case may be, shall not be liable for payment of such amounts hereunder and the Holders shall be entitled to such recovery of such amounts only from the Issuer.

Section 7.05.  *Indemnity for U.S. Governmental Obligations*.  The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

Section 7.06.  *Reinstatement*.  If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article 7 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Issuer under this Indenture, the Securities shall be revived and reinstated as though no deposit had occurred pursuant to this Article 7 until such time as the Trustee or such Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article 7; *provided*, *however*, that, if the Issuer has made any payment of principal of (including, for the avoidance of doubt, Payments or Redemption Amounts, as applicable) or interest on any Securities because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Securities to receive such payment from the money or U.S. Government Obligations held by the Trustee or such Paying Agent.

## ARTICLE 8
## AMENDMENTS

Section 8.01.  *Modification and Waiver*.  Modifications and amendments to this Indenture and the Securities may be made by the Issuer and the Trustee with the consent of the Holders of at least 50.1% of the Face Amount of the Securities at the time outstanding that are affected by such amendment, but no such modification or amendment may, without the consent of the Holders of at least 75% of the Face Amount of the Securities at the time outstanding that are affected by such amendment:

(a)    reduce the Face Amount or the stated maturity of any such Security or the basis for calculation of Payments made thereon on each Payment Date, if any, or Redemption Amount

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_14]

payable upon redemption or repurchase thereof (including, without limitation, changes to the basis for calculation of the Instrument Distribution Percentage), or change any place where, or change the currency in which, any Redemption Amount on such Security or the Payment, if any, thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity, if any, thereof or the date any such payment is otherwise due and payable (in the case of redemption, on or after the Redemption Date);

(b)    reduce the percentage in Face Amount of such outstanding Securities, the consent of whose Holders is required for any such amendment or modification to such Securities or this Indenture, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain defaults thereunder and their consequences) provided for in this Indenture;

(c)    amend or modify any provision affecting the ranking or governing law of the Securities;

(d)    amend or modify certain provisions of such Securities or this Indenture pertaining to the waiver by Holders of such Securities of past defaults, amendments or modifications to such Securities or this Indenture with the consent of the Holders of such Securities and the waiver by Holders of such Securities of certain covenants, except to increase any specified percentage in Face Amount required for any actions by Holders or to provide that certain other provisions of the Securities or this Indenture cannot be modified or waived without the consent of the Holder of each such Security affected thereby.

It will not be necessary for the consent of the Holders under the preceding paragraph to approve the particular form of any proposed amendment, but it will be sufficient if such consent approves the substance thereof.   After an amendment under the preceding paragraph becomes effective, the Issuer will deliver to the Holders a notice briefly describing such amendment.   The failure to give such notice to all Holders, or any defect therein, will not impair or affect the validity of an amendment under the preceding paragraph.   The Issuer and the Trustee may, without the vote or consent of any Holder, modify or amend this Indenture or the Securities for the purpose of:

(a) adding to the covenants of the Issuer for the benefit of the Holders;

(b) surrendering any right or power conferred upon the Issuer;

(c) securing the Securities pursuant to the requirements thereof or otherwise;

(d) evidencing the succession of another corporation to the Issuer and the assumption by any such successor of the covenants and obligations of the Issuer in the Securities and in this Indenture pursuant to any merger, consolidation or sale of assets;

(e) correcting any ambiguity, inconsistency or defective provision contained in this Indenture or in the Securities;

(f) making any modification, or granting any waiver or authorization of any breach or proposed breach of any of the terms and conditions of the Securities or any other

- 54 -

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

provisions of this Indenture in any manner which the Issuer may determine and which does not adversely affect the interest of any Holders in any material respect;

(g) making any modification which is of a minor or technical nature or correcting a manifest error; or

(h) conforming this Indenture to the provisions of set forth in the Description of the Securities contained in the Consent Solicitation Statement.

Any instrument given by or on behalf of any Holder in connection with any consent to any such modification, amendment or waiver will be irrevocable once given and will be conclusive and binding on all subsequent Holders of such Security. Any modifications, amendments or waivers to this Indenture or to the terms and conditions of any Securities will be conclusive and binding on all Holders of such Securities, whether or not they have given such consent.

Section 8.02.  *Trustee to Sign Amendments*. Upon request of the Issuer accompanied by a Board Resolution authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the requisite Holders, and upon receipt by the Trustee of the documents described in **Erro! Fonte de referência não encontrada.**Section 9.03 hereof (to the extent requested), the Trustee shall sign any amendment authorized pursuant to this Article 8 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and to receive, and (subject to Section 6.01) shall be fully protected in relying upon, in addition to the documents required by Section 9.03, an Officer's Certificate and an Opinion of Counsel each stating that such amendment is authorized or permitted by this Indenture.

## ARTICLE 9
## MISCELLANEOUS

Section 9.01.  *Provisions of Indenture and Securities for the Sole Benefit of Parties and Holders*.  Nothing in this Indenture or the Securities, expressed or implied, shall be given to any Person other than the parties hereto and their successors hereunder and the Holders any benefit or any legal or equitable right, remedy or claim under this Indenture or the Securities.

Section 9.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Indenture to be made upon, given, provided or furnished to, or filed with, any party to this Indenture shall, except as otherwise expressly provided herein, be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier or telecopier, addressed to the relevant party as follows:

To the Issuer:

Odebrecht Holdco Finance Limited
c/o Odebrecht Engenharia e Construção S.A.
Av. Lemos Monteiro 120, 7° andar, São Paulo – SP Brazil 05501-050
Brasil

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM-ACTIVE 402114417.4]

Attention: CFO; fjens@oec-eng.com

To the Trustee:

The Bank of New York Mellon
240 Greenwich Street, Floor 7 East
New York, NY 10286
Attention:  International Corporate Trust - ODEBRECHT
Telecopy:  724-540-6330

Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Indenture provides for the giving of notice to Holders, such notice shall be deemed to have been given upon the mailing of first class mail, postage prepaid, of such notice to Holders at their registered addresses as recorded in the Register. The Issuer shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law, including, without limitation, those required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

All notices or communications to be given pursuant to any clause of this Indenture must be given in English or, where not given in English, must be accompanied by a certified English translation.

Section 9.03.  *Officers' Certificate and Opinion of Counsel as to Conditions Precedent*. Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee:

(a)      an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 9.04) stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 9.04) stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 9.04.  *Statements Required in Officers' Certificate or Opinion of Counsel*.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(a)      a statement that each Person making or rendering such Officers' Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

- 56 -

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

(c)      a statement that, in the opinion of each such Person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)      a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with *provided* that an Opinion of Counsel may rely on one or more Officers' Certificates or public officials with respect to matters of fact.

Section 9.05.   *Rules by Trustee, Registrar Paying Agent and Transfer Agents*.   The Trustee may make reasonable rules for action by Holders.   The Registrar, the Paying Agents and the Transfer Agents may make reasonable rules for their functions.

Section 9.06.   *Currency Indemnity*.   Any amount received or recovered in a currency other than the currency (the "**Denomination Currency**") in which such Security is denominated or in which such amount is payable, whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of the Issuer or otherwise (the "**Judgment Currency**"), by the Holder in respect of any sum expressed to be due to it from the Issuer hereunder shall constitute a discharge of the Issuer only to the extent of the amount of the Denomination Currency that the Holder is able to purchase with the amount so received or recovered in the Judgment Currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). The Issuer agrees that it will indemnify the relevant Holder against any loss arising or resulting from any variation in rates of exchange between (i) the rate of exchange at which the Denomination Currency is converted into the Judgment Currency for the purpose of such judgment or order, winding up, dissolution or otherwise and (ii) the rate of exchange at which such Holder would have been able to purchase the Denomination Currency with the amount of the Judgment Currency actually received by such Holder if such Holder had utilized such amount of Judgment Currency to purchase the Denomination Currency as promptly as practicable upon such Holder's receipt thereof.   This indemnity will constitute a separate and independent obligation from the other obligations contained in the terms and conditions of the Securities, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted from time to time and will continue in full force and effect notwithstanding any judgment, order, claim or proof for a liquidated sum or sums in respect of amounts due in respect of the relevant Security or under any such judgment, order, claim or proof.   The term "rate of exchange" will include an allowance for any customary or reasonable premiums and costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

Section 9.07.   *No Recourse Against Others*.   No director, officer, employee or shareholder, as such, of the Issuer or the Trustee shall have any liability for any obligations of the Issuer or the Trustee, respectively, under this Indenture or the Securities or for any claim based on, in respect of or by reason of such obligations or their creation.   By accepting a Security, each Holder shall waive and release all such liability.   The waiver and release shall be part of the consideration for the issue of the Securities.

- 57 -

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Section 9.08. *Legal Holidays*.   In any case where any Redemption Date or date of Maturity or other Payment date of any Security shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Securities) payment or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Redemption Date or date of Maturity or other Payment date.

Section 9.09. *Governing Law*. THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE SECURITIES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.10. *Consent to Jurisdiction; Waiver of Immunities*.   The Issuer has irrevocably submitted to the non-exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, City and State of New York for the purposes of any action or proceeding arising out of or related to the Securities or this Indenture.   The Issuer has irrevocably waived, to the fullest extent permitted by law, any objection which it may have to the laying of the venue of any such action or proceeding brought in such a court and any claim that any such action or proceeding brought in such a court has been brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile.   The Issuer has agreed that final judgment in any such action or proceeding brought in such court shall be conclusive and binding upon such party and may be enforced in any court to the jurisdiction of which such party is subject by a suit upon such judgment; *provided*, *however*, that service of process is effected upon such Person in the manner specified in the following paragraph or as otherwise permitted by law.

As long as any Security remains outstanding, the Issuer will at all times have an authorized agent in the Borough of Manhattan, City and State of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to the Securities. Service of process upon such agent and written notice of such service mailed or delivered to the party being joined in such action or proceeding shall, to the extent permitted by law, be deemed in every respect effective service of process upon such party in any such legal action or proceeding.   The Issuer has appointed Cogency Global Inc., located at 122 East 42nd Street, 18th Floor, New York, NY 10168 as its agent for service of process in any proceedings in the Borough of Manhattan, City and State of New York. Service of process personally delivered upon the agents specified in the preceding paragraph and written notice of such service delivered to the Issuer shall be deemed in every respect effective service of process upon the Issuer, *provided*, *however*, that no notice by mail on the Issuer or any of its agents shall be deemed effective service of process

Section 9.11. *Successors and Assigns*.   All covenants and agreements of the Issuer in this Indenture and the Securities shall bind their respective successors and assigns, whether so expressed or not.   All agreements of the Trustee in this Indenture shall bind its successors.

Section 9.12. *Multiple Originals*.   The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.   One signed copy is enough to prove this Indenture. Delivery of an executed counterpart of a signature page of this Indenture by facsimile or other electronic imaging means

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá no site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

(e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Indenture.

Section 9.13.   *Severability Clause*.   In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.   To the extent permitted by applicable law, the parties hereby waive any provision of law which renders any term or provision hereof invalid or unenforceable in any respect.

Section 9.14.   *Force Majeure*.   In no event shall any of the Trustee, Paying Agents, Transfer Agents or Registrar be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, pandemics, COVID-19, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that each of the Trustee, Paying Agents, Transfer Agents or Registrar shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

ODEBRECHT HOLDCO FINANCE LIMITED
as Issuer


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


THE BANK OF NEW YORK MELLON
   as Trustee, Registrar and Transfer Agent


By: _____
     Name:
     Title:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

**EXHIBIT A**

FORM OF SECURITY

[AM-ACTIVE 402114417 14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

## FACE OF SECURITY

UNLESS THIS GLOBAL SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("**DTC**"), TO THE ISSUER NAMED HEREIN (THE "**COMPANY**") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS GLOBAL SECURITY IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

***Include if Security is a Restricted Global Security, or a Security issued in exchange therefor, as required under the Indenture:*** THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, AGREES THAT THIS SECURITY OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) TO THE ISSUER, (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (III) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (IV) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (V) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144A UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS SECURITY FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS SECURITY ON SATISFACTION OF THE CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN.

***Include if Security is Regulation S Global Security, or a Security issued in exchange therefor, in accordance with the Indenture:***

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM-ACTIVE 492114417.4]

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS.  THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, AGREES THAT NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS SECURITY AFTER FORTY CALENDAR DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DATE ON WHICH THE SECURITIES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND (B) THE ORIGINAL ISSUE DATE OF THIS SECURITY."

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

# ODEBRECHT HOLDCO FINANCE LIMITED

[RESTRICTED GLOBAL SECURITY]
[REGULATION S GLOBAL SECURITY]
[CERTIFICATED SECURITY]

Representing

Instrument Titles Due 2058

No.  [R-1][S-1]

CUSIP No.  [•]] [[•]]                                              Principal Amount
ISIN No.  [[•]] [[•]]
COMMON CODE.  [[•]] [[•]]                                    U.S.$ [[•]] [[•]]

Odebrecht Holdco Finance Limited, an exempted company incorporated under the laws of the Cayman Islands (the "**Issuer**", which term includes any successor corporation under the Indenture referred to on the reverse hereof), for value received, hereby promises to pay to Cede & Co., or registered assigns, U.S.$ [[•]] [[•]], upon presentment and surrender of this Security on [•], 20[•] or on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

Reference is hereby made to the further provisions of this Security set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-4

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_4]

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the signature of one of its authorized signatories, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, the Issuer has caused this Security to be duly executed.

Dated: _____

ODEBRECHT HOLDCO FINANCE LIMITED

By: _____

Name:

Title:

By: _____

Name:

Title:

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

_____

_____

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

A-6

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Securities referred to in the within mentioned Indenture.

THE BANK OF NEW YORK MELLON, as Trustee

By: _____
       Authorized Officer

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

FORM OF REVERSE SIDE OF SECURITY

Instrument Titles Due 2058

TERMS AND CONDITIONS OF THE SECURITIES

*The Securities will bear the following terms and conditions.  Certain capitalized terms used in these Terms and Conditions are defined in Section [•] hereof.*

**1.     Status**

[•]

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

A-1

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

**EXHIBIT B**

## SUPPLEMENTAL INDENTURE

dated as of _____, _____

among

ODEBRECHT HOLDCO FINANCE LIMITED.

and

THE BANK OF NEW YORK MELLON,

as Trustee, Paying Agent, Registrar and Transfer Agent

Instrument Titles Due 2058

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

THIS SUPPLEMENTAL INDENTURE (this "**Supplemental Indenture**"), entered into as of _____, ____, among Odebrecht Holdco Finance Limited, an exempted company incorporated under the laws of the Cayman Islands (the "**Issuer**") and The Bank of New York Mellon, as trustee (the "**Trustee**").

## RECITALS

WHEREAS, the Issuer and The Bank of New York Mellon, as Trustee, Paying Agent, Registrar and Transfer Agent  entered into the Indenture, dated as of [•], 20[•] (the "**Indenture**"), relating to the Issuer's Instrument Titles Due 2058 (the "**Securities**");

WHEREAS, as a condition to the Trustee entering into the Indenture and the purchase of the Securities by the Holders, the Issuer agreed pursuant to the Indenture to cause any newly acquired or created Subsidiaries to provide guarantees in certain circumstances.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and intending to be legally bound, the parties to this Supplemental Indenture hereby agree as follows:

Section 1.  Capitalized terms used herein and not otherwise defined herein are used as defined in the Indenture.

Section 2.  This Supplemental Indenture shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 3.  This Supplemental Indenture may be signed in various counterparts which together shall constitute one and the same instrument.

Section 4.  This Supplemental Indenture is an amendment supplemental to the Indenture, and the Indenture and this Supplemental Indenture shall henceforth be read together.

Section 5.  The Trustee shall not be responsible in any manner whatsoever for or in respect or the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which are made solely by the Issuer.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417_4]

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

ODEBRECHT HOLDCO FINANCE LIMITED
as Issuer


By: _____
         Name:
         Title:


By: _____
         Name:
         Title:


THE BANK OF NEW YORK MELLON
    as Trustee, Registrar and Transfer Agent


By: _____
         Name:
         Title:

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

_____

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

B-4

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[AM_ACTIVE 402114417 2.4]

**EXHIBIT C**

FORM OF
TRANSFER NOTICE

FOR VALUE RECEIVED, the undersigned Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

Please print or typewrite name and address, including postal zip code, of assignee

_____

this Security and all rights hereunder, hereby irrevocably constituting and appointing

_____ attorney to transfer said Security on the books of ODEBRECHT HOLDCO FINANCE LIMITED with full power of substitution in the premises.

_____

In connection with any transfer of this Security occurring prior to the date [which is one year after the original issue date of the Securities,][1] [which is on or prior to the 40th day after the Closing Date (as defined in the Indenture governing the Securities),][2] the undersigned confirms that:

[Check one]

☐ (a)   This Security is being transferred to the Issuer;

☐ (b)   This Security is being transferred pursuant to an effective registration statement under the U.S. Securities Act of 1933, as amended (the "**Securities Act**");

☐ (c)   This Security is being transferred to a person whom the Holder reasonably believes is a qualified institutional buyer as defined in Rule 144A under the Securities Act in a transaction meeting the requirement of Rule 144A;

☐ (d)   This Security is being transferred in an offshore transaction in accordance with Rule 904 under the Securities Act; or

☐ (e)   This Security is being transferred pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available),

_____

[1]     *Include in Restricted Note.*

[2]     *Include in Regulation S Note.*

[AM_ACTIVE 402114417_4]

in each of cases (a) through (e) above, in accordance with any applicable securities laws of any State of the United States.

C-2

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

If none of the foregoing boxes is checked, the Transfer Agent shall not be obligated to register this Security in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.12of the Indenture shall have been satisfied.

Date: _____

_____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of this instrument in every particular, without alteration, enlargement or any other change whatever.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

**EXHIBIT D**

FORM OF CERTIFICATE
FOR TRANSFER FROM RESTRICTED GLOBAL
SECURITY OR CERTIFICATED SECURITY BEARING
A SECURITIES ACT LEGEND TO REGULATION S
GLOBAL SECURITY OR CERTIFICATED SECURITY
NOT BEARING A SECURITIES ACT LEGEND

The Bank of New York Mellon
101 Barclay Street – Floor 4 East
New York, New York 10286
Attn: Global Finance Americas

Re:    Instrument Titles Due 2058 (the "**Securities**")

Reference is hereby made to the Indenture, dated [•], 20[•] (the "**Indenture**"), among Odebrecht Holdco Finance Limited and The Bank of New York Mellon, as Trustee, Paying Agent, Registrar and Transfer Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Securities which are held in the form of [a beneficial interest in the Restricted Global Security with the Depositary in the name of the undersigned] [a Certificated Security bearing a Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Security] to a Person who shall take delivery thereof in the form of [a beneficial interest of equal principal amount in the Regulation S Global Security (ISIN No. [•]) to be held with [Euroclear] [Clearstream Banking][3] (Common Code No. [•]) through the Depositary] [a Certificated Security of equal principal amount not bearing a Securities Act Legend]. In connection with such transfer, the undersigned does hereby certify that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Securities and pursuant to and in accordance with Rule 903 or 904 of Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the undersigned further certifies that:

(1)    the offer of the Securities was not made to a U.S. Person (as defined under Regulation S);

[(2)    at the time the buy order was originated, the transferee was outside the United States or the undersigned and any Person acting on behalf of the undersigned reasonably believed that the transferee was outside the United States;][4]

---

[3]**Indicate appropriate clearing system.**
[4]**Insert one of the two provisions.**

[AM_ACTIVE 402114417_4]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verifique as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[(3)     the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on behalf of the undersigned knows that the transaction was prearranged with a buyer in the United States;][5]

(4)     no directed selling efforts have been made in contravention of the requirements of Rule 904 of Regulation S;

(5)     the undersigned is not the Issuer, a distributor, an affiliate of either the Issuer or a distributor, or a Person acting on behalf of any of the foregoing; and

(6)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

This certificate and the statements contained herein are made for your benefit and for the benefit of Odebrecht Holdco Finance Limited.  Terms used in this certificate and not otherwise defined in thie Indenture have the meanings set forth in Regulation S.

[INSERT NAME OF TRANSFEROR]

By:     _____
        Name:
        Title:

Dated: _____, _____

cc:     Odebrecht Holdco Finance Limited

---

[5]**Insert one of the two provisions.**

[AM_ACTIVE 402114417_14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro. Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

**EXHIBIT E**

FORM OF TRANSFER CERTIFICATE
FOR TRANSFER FROM REGULATION S GLOBAL
SECURITY OR CERTIFICATED SECURITY NOT BEARING
A SECURITIES ACT LEGEND TO RESTRICTED GLOBAL
SECURITY OR CERTIFICATED SECURITY BEARING
A SECURITIES ACT LEGEND
(PRIOR TO 40TH DAY AFTER ISSUE DATE)

The Bank of New York Mellon
101 Barclay Street – Floor 4 East
New York, New York 10286
Attn: Global Finance Americas

Re:    Instrument Titles Due 2058 (the "**Securities**")

Reference is hereby made to the Indenture, dated [•], 20[•] (the "**Indenture**"), among Odebrecht Holdco Finance Limited and The Bank of New York Mellon, as Trustee, Paying Agent, Registrar and Transfer Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Securities which are held in the form of [a beneficial interest in the Regulation S Global Security (ISIN No. [•]) with the Depositary in the name of the undersigned] [a Certificated Security not bearing the Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Security] to a Person who shall take delivery thereof in the form of [a beneficial interest in the Restricted Global Security (CUSIP No. [•]) to be held through the Depositary] [a Certificated Security bearing the Securities Act Legend].  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Securities and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

(1)    the Securities are being transferred to a transferee that the undersigned reasonably believes is purchasing the Securities for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

(2)    the transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

This certificate and the statements contained herein are made for your benefit and for the benefit of Odebrecht Holdco Finance Limited.

E-1

[[AM_ACTIVE 402114417_14]]
Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

[INSERT NAME OF TRANSFEROR]

By: _____
       Name:
       Title:

Dated: _____, _____

cc:    [•]

[AM_ACTIVE 402114417_1 14]

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

**EXHIBIT F**

FORM OF CERTIFICATE FOR REMOVAL
OF THE SECURITIES ACT LEGEND ON A CERTIFICATED SECURITY

The Bank of New York Mellon
101 Barclay Street – Floor 4 East
New York, New York 10286
Attn: Global Finance Americas

Re:   Instrument Titles Due 2058 (the "**Securities**")

Reference is hereby made to the Indenture, dated [•], 20[•] (the "**Indenture**"), among Odebrecht Holdco Finance Limited and The Bank of New York Mellon, as Trustee, Paying Agent, Registrar and Transfer Agent . Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Securities which are held in the form of [a beneficial interest in the Restricted Global Security (CUSIP No. [•]) with the Depositary] [[a] Certificated Security(s) in the name of the undersigned.][6]

The undersigned has requested for the restrictive Legend on the Certificated Security(s) to be removed.

In connection with such transfer, the undersigned does hereby certify that such transfer has been effected only (i) in an offshore transaction in accordance with Rule 904 under the Securities Act, (ii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available) or (iii) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iii) in accordance with any applicable securities laws of any State of the United States.

---

[6]**Indicate form in which Notes are held.**

E-1

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

This certificate and the statements contained herein are made for your benefit and for the benefit of and Odebrecht Holdco Finance Limited.

[NAME OF UNDERSIGNED]

By: _____

Name:

Title:

Dated: _____, _____

cc:      [•]

E-2

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

Este documento foi assinado digitalmente por Ieda Maria Monteiro.
Para verificar as assinaturas vá ao site https://www.portaldeassinaturas.com.br e utilize o código 4E5B-E366-BD0C-21A7.

# PROTOCOLO DE ASSINATURA(S)

O documento acima foi proposto para assinatura digital na plataforma Portal de Assinaturas Certisign. Para verificar as assinaturas clique no link: https://www.portaldeassinaturas.com.br/Verificar/4E5B-E366-BD0C-21A7 ou vá até o site https://www.portaldeassinaturas.com.br e utilize o código abaixo para verificar se este documento é válido.

## Código para verificação: 4E5B-E366-BD0C-21A7



**Hash do Documento**

BB57460578BDCC21E3DF7463609F33A1DACCF236E975C3E2D532A0F96177B194

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 19/08/2020 é(são) :

☑ Ieda Maria Monteiro (Signatário) - 077.542.738-10  em 19/08/2020 11:26 UTC-03:00
**Tipo:** Certificado Digital



| **Anexo 4.1** | **Schedule 4.1** |
|---|---|
| **Documentos Societários da Nova OEC** | **Corporate Documents of New OEC** |

## ESTATUTO SOCIAL DA OEC S.A.

## CAPÍTULO I – DENOMINAÇÃO, PRAZO DE DURAÇÃO, SEDE E OBJETO SOCIAL

**Art. 1º** - A **OEC S.A.** é uma companhia que se rege por este Estatuto e pelas disposições legais aplicáveis, com prazo de duração por tempo indeterminado.

**Art. 2º** - A Companhia tem sua sede e foro na Cidade de São Paulo, no Estado de São Paulo, podendo, onde e quando convier, instalar, transferir e encerrar filiais, sucursais, agências, escritórios, representações e dependências similares em qualquer parte do território nacional ou no exterior, mediante deliberação da Diretoria.

**Art. 3º** - A Companhia tem por objeto social a participação em outras sociedades que explorem negócios relacionados a Engenharia e Construção, no território nacional e no exterior, em atividades tais como: **a)** consultoria, pesquisa, assessoria, estudo técnico e/ou econômico, planejamento, execução, gestão, gerenciamento, operação, exploração, explotação, lavra, manutenção, conservação, conversão, reparação, ampliação e modernização, em projetos e obras de engenharia e imobiliário urbano e rural, arquitetura e urbanismo, construção civil, montagem industrial, eletromecânica, naval e mineração, em todos os seus ramos e especialidades, sob qualquer regime de contratação; **b)** prestação de serviços de limpeza pública, incluindo a remoção, transporte e beneficiamento de lixo; **c)** exploração de serviços públicos, precedidos ou não da execução de obras públicas, sob regime de concessão, permissão ou outro qualquer; **d)** outras atividades econômicas relacionadas ou decorrentes das atividades referidas nas alíneas anteriores, inclusive as de locação e compra e venda de equipamentos, transporte e importação e exportação de bens e serviços; e **e)** participação em licenças de exploração ou concessão de exploração ou em associações para os fins previstos neste artigo.

**Parágrafo Único** – A Companhia poderá exercer as atividades de seu objeto social no país ou no exterior, seja diretamente ou através de subsidiárias, ou através de participação no capital de outras sociedades.

## CAPÍTULO II - CAPITAL SOCIAL E AÇÕES

**Art. 4º** - O capital social é de R$ 1.000,00 (um mil reais), dividido em 1.000 (mil) ações ordinárias, nominativas e sem valor nominal, totalmente subscritas e integralizadas.

**Parágrafo Único** – A Companhia poderá, mediante autorização do Conselho de Administração, adquirir as próprias ações para fins de cancelamento ou permanência em tesouraria, para posterior alienação, respeitadas as disposições legais e regulamentares aplicáveis.

**Art. 5º** - Cada ação ordinária dá direito a 01 (um) voto nas Assembleias Gerais.

**§ 1º** - As ações preferenciais, caso emitidas pela Companhia, não terão direito a voto nas Assembleias Gerais, salvo nos casos previstos em lei, mas serão de participação integral, sendo a elas assegurada prioridade no reembolso do capital em caso de liquidação da Companhia, bem como participação, em igualdade de condições com as ações ordinárias, na distribuição de dividendos pela Companhia ou na subscrição de novas ações resultantes da incorporação de quaisquer reservas ou lucros ao capital.

**§ 2º** - A Companhia poderá cobrar do acionista o custo de transferência da propriedade de suas ações.

**§ 3º** - A integralização de ações mediante bens ou direitos, exceto créditos, dependerá de aprovação da Assembleia Geral.

**§ 4º** - As despesas de desdobramento, grupamento ou substituição de certificados de ações, quando solicitado pelo acionista, correrão por sua conta, por preço não superior ao custo.

**Art. 6º** - Os acionistas têm preferência para a subscrição de novas ações, na proporção das ações já anteriormente possuídas. Caso algum acionista desista, por escrito, do seu direito de preferência, ou não se manifeste dentro de 30 (trinta) dias contados da

data da Assembleia Geral que aprovar o aumento do Capital Social, caberá aos demais acionistas, na proporção das ações possuídas, o direito à subscrição dessas ações.

**Parágrafo Único** – A integralização de ações mediante conferência de bens e direitos, dependerá de avaliação prévia e aprovação da Assembleia Geral, na forma prevista em lei.

## CAPÍTULO III - ÓRGÃOS PERMANENTES DA COMPANHIA

**Art. 7º** - São órgãos permanentes da Companhia:
**a)**   a Assembleia Geral;
**b)**   o Conselho de Administração; e
**c)**   a Diretoria.

## SEÇÃO I - ASSEMBLEIA GERAL

**Art. 8º** - A Assembleia Geral reunir-se-á, ordinariamente, uma vez por ano, dentro dos 04 (quatro) primeiros meses após o término de cada exercício social, competindo-lhe tomar as deliberações previstas em lei e, extraordinariamente, sempre que os interesses sociais, este Estatuto ou a legislação em vigor exigir o pronunciamento dos acionistas.

**§ 1º** – A Assembleia Geral será convocada pelo Presidente do Conselho de Administração, e na sua ausência pelo Vice- Presidente do Conselho de Administração, ou na forma da lei e presidida pelo representante do acionista indicado entre os presentes, que, por sua vez, deverá indicar o Secretário.

**§ 2º** – A convocação para a Assembleia Geral será realizada de acordo com as disposições legais, mas, independentemente das formalidades de convocação, será considerada regular a Assembleia Geral a que comparecerem todos os acionistas.

**§ 3º** – Somente poderão tomar parte na Assembleia Geral os acionistas titulares de ações que estiverem registradas em seu nome, no livro próprio, até 48 (quarenta e oito) horas antes da data marcada para a realização da Assembleia.

**Art. 9º** - Compete à Assembleia Geral deliberar sobre:

a) abertura de capital da Companhia e/ou oferta pública inicial de ações (IPO) da Companhia;

b) início ou término de dissolução, falência, liquidação, recuperação judicial ou extrajudicial da Companhia;

c) fusão, transformação, cisão, incorporação ou incorporação de ações envolvendo a Companhia;

d) aprovação da política de dividendos e suas alterações;

e) emissão de debêntures conversíveis em ações ou de quaisquer outros títulos conversíveis em ações da Companhia;

f) eleição e destituição de membros do Conselho de Administração da Companhia;

g) fixação do montante anual global da remuneração dos administradores da Companhia, cabendo ao Conselho de Administração deliberar sobre a sua individualização, conforme previsto no regimento de funcionamento do Conselho de Administração da Companhia;

h) os planos de incentivo de longo prazo da Companhia, bem como os programas neles contidos a serem destinados aos membros do Conselho de Administração da Companhia; e

i) aprovação das Práticas Especiais de Governança Independente e suas alterações, observado o quanto disposto no Art. 12, parágrafo único deste Estatuto Social.

## SEÇÃO II - CONSELHO DE ADMINISTRAÇÃO

**Art. 10** - O Conselho de Administração será composto por, no mínimo 05 (cinco) e no máximo 09 (nove) membros, eleitos pela Assembleia Geral, com mandato unificado de 02 (dois) anos, podendo ser reeleitos.

**§1º** - Todos os membros do Conselho de Administração serão investidos em seus cargos mediante a assinatura dos respectivos termos de posse lavrados no Livro de Atas de Reuniões do Conselho de Administração e permanecerão no exercício do cargo até a investidura de seus sucessores, salvo em caso de renúncia ou destituição durante o prazo de mandato.

**§2º** A composição do Conselho de Administração da Companhia deverá observar, de forma contínua, um número de conselheiros independentes equivalente ao maior entre **(i)** 20% (vinte por cento) dos membros ou **(ii)** o mínimo de 2 (dois) membros que satisfaçam, a todo o tempo, os requisitos de independência definidos no §3º do presente artigo.

**§3º** - Será considerado "Conselheiro Independente" qualquer conselheiro que seja independente de acordo com as regras emitidas ao longo do tempo pela Comissão de Valores Mobiliários (CVM), ou as regras de listagem do Novo Mercado da B3 S.A. - Brasil, Bolsa Balcão, conforme alteradas de tempos a tempos, ou que declare cumprir ao menos os seguintes critérios:

a) não ter vínculo relevante com quaisquer sociedades sob controle e gestão estratégica da Odebrecht S.A., exceto participação acionária em nível que não comprometa sua independência;

b) não ser acionista controlador da Companhia, cônjuge ou parente até o segundo grau do acionista controlador da Companhia, ou, nos últimos 3 (três) anos, não ter tido relação com sociedade ou entidade vinculada ao acionista controlador da Companhia;

c) não ter sido, nos últimos 3 (três) anos, funcionário ou diretor da Companhia, da Odebrecht Engenharia e Construção S.A., do acionista controlador de quaisquer sociedades sob controle e gestão estratégica da Odebrecht Engenharia e Construção S.A. ou de quaisquer afiliadas de tais sociedades;

d) não ser fornecedor ou comprador direto ou indireto de serviços e/ou produtos da Companhia em nível que possa comprometer a sua independência;

e) não ser funcionário ou membro de um órgão de administração de uma sociedade ou entidade que ofereça ou demande os serviços e/ou produtos da Companhia, em nível que possa comprometer a sua independência;

f) não ser cônjuge ou parente até segundo grau de qualquer membro dos órgãos da administração da Companhia;

g) não receber qualquer remuneração da Companhia além da remuneração paga em relação (g.i) à sua posição como conselheiro da companhia, ou (g.ii) à participação acionária detida em nível que não comprometa a sua independência; e

h) não possuir conflito de interesses com quaisquer sociedades sob controle e gestão estratégica da Odebrecht Engenharia e Construção S.A.

§4º - Em caso de morte, renúncia ou destituição de qualquer Conselheiro Independente, um Conselheiro Independente substituto, que atenda aos requisitos de independência definidos no §3º desse art. 10, deverá ser nomeado pelos demais membros do Conselho de Administração com a maior brevidade possível, nos termos do art. 150 da Lei 6.404/1976, até a nomeação definitiva em Assembleia Geral de Acionistas.

Art. 11 - O Conselho de Administração terá 1 (um) Presidente e 1 (um) Vice-Presidente, eleitos pela Assembleia Geral. No caso de ausência ou impedimento temporário do Presidente do Conselho de Administração, as funções do Presidente serão exercidas pelo Vice-Presidente, e no caso de ausência ou impedimento deste último, por outro membro do Conselho de Administração indicado pelo Presidente.

Art. 12 – Os membros do Conselho de Administração da Companhia deverão observar, durante todo o tempo, especialmente durante qualquer período em que o número de Conselheiros Independentes da OEC seja inferior ao previsto no Art. 10, §2º deste Estatuto Social, as Práticas Especiais de Governança Independente, cujos termos integram este Estatuto Social para todos os fins e efeitos e são vinculantes a todos os órgãos societários e administrativos da Companhia, inclusive aos comitês de assessoramento do Conselho de Administração, previstos no Art. 17 deste Estatuto Social.

Parágrafo Único - As Práticas Especiais de Governança Independente somente poderão ser alteradas por meio de deliberação da Assembleia Geral de Acionistas, nos termos da Seção I deste Estatuto Social, desde que a maioria do Conselho de Administração da OEC e a maioria dos Conselheiros Independentes da OEC também

recomendem tal alteração, e observado o quanto disposto no item 1 das Práticas Especiais de Governança Independente.

**Art. 13** - O Conselho de Administração reunir-se-á sempre que convocado por seu Presidente, Vice-Presidente ou por quaisquer 02 (dois) de seus membros, mediante notificação escrita à Companhia, devendo a Companhia providenciar a convocação com antecedência mínima de 05 (cinco) dias, salvo quando de caráter urgente, com apresentação da pauta dos assuntos a serem tratados.

**Parágrafo Único** - Independentemente das formalidades previstas neste Artigo, será considerada regular a reunião a que comparecerem todos os Conselheiros.

**Art. 14** - As reuniões do Conselho de Administração, ordinárias e extraordinárias, somente se instalarão com a presença da maioria dos seus membros em exercício.

**§ 1º** - As reuniões do Conselho de Administração serão presididas pelo Presidente do Conselho de Administração e secretariadas por quem ele indicar. No caso de ausência do Presidente do Conselho de Administração em qualquer reunião, a presidência dos trabalhos será assumida pelo Vice-Presidente, ou na sua ausência, por qualquer outro membro do Conselho de Administração indicado pelo Presidente ou pelo Vice-Presidente.

**§ 2º** - No caso de ausência ou impedimentos temporários, os membros do Conselho de Administração poderão:

**a)** encaminhar o voto, e respectiva justificação, ao Secretário do Conselho de Administração da Companhia por escrito, via e- mail ou outro meio eletrônico do próprio membro ausente; ou

**b)** participar à distância por telefone, videoconferência ou outro meio que possa assegurar a participação efetiva e a autenticidade do voto.

**§ 3º** - As deliberações do Conselho de Administração serão tomadas por maioria de votos dos presentes em cada reunião, admitida a participação nas formas previstas no §2º do art. 14, valendo tal participação para a apuração do quórum de instalação e deliberação.

**Art. 15** - As reuniões do Conselho de Administração serão realizadas, preferencialmente, na sede da Companhia, mas poderão ser realizadas em outra localidade, e/ou ainda, por meio de vídeo e/ou teleconferência, devendo tal fato constar expressamente da convocação e da ata de reunião.

**Art. 16** – Compete ao Conselho de Administração da Companhia:

I)    aprovar o direcionamento estratégico para o planejamento anual da Companhia;

II)   aprovar as políticas empresariais e corporativas contendo princípios relativos à determinada matéria de aplicação à Companhia e suas controladas;

III)  aprovar e acompanhar a execução do programa de ação do Diretor-Presidente da Companhia;

IV)   eleger e destituir o Diretor-Presidente e os demais Diretores da Companhia, podendo ser definidas responsabilidades e/ou funções específicas para os Diretores;

V)    manifestar-se sobre o relatório da administração, as demonstrações financeiras, a proposta de distribuição de dividendos, juros sobre capital próprio e outras destinações dos resultados da Companhia ao final de cada exercício social e deliberar sobre sua submissão à Assembleia Geral Ordinária;

VI)   deliberar sobre a individualização da remuneração dos administradores, incluindo a distribuição de participação nos lucros ou resultados anuais da Companhia e os programas contidos nos planos de incentivo de longo prazo da Companhia a serem destinados a elegíveis que não sejam membros do Conselho de Administração da Companhia;

VII)  aprovar a aquisição, alienação ou transferência  para empresas não controladas pela Companhia, de ativos operacionais e não operacionais da Companhia e/ou de suas controladas em valor superior a R$ 50.000.000,00 (cinquenta milhões de reais) por operação ou em conjunto, por exercício social;

VIII) fixar, anualmente, os limites, por operação, dentro dos quais o Diretor-Presidente poderá, no âmbito da Companhia e de suas controladas, sem a prévia autorização do Conselho de Administração, autorizar os Diretores da Companhia ou das suas controladas, conforme o caso, a:

    **a)** contratar empréstimos ou financiamentos e quaisquer outros instrumentos de crédito para captação de recursos, disponível no mercado no país ou no exterior, com exceção de contratação de empréstimos, mútuos e quaisquer outros instrumentos de crédito com empresas controladas pela Companhia, que estejam no âmbito de competência da Diretoria; e

    **b)** contratar ou conceder quaisquer garantias que impliquem obrigação de fazer e/ou obrigação de natureza creditícia pela Companhia e/ou suas controladas;

**IX)** aprovar propostas sobre a aquisição ou alienação, constituição, fusão, cisão, incorporação, dissolução ou liquidação de sociedade na qual participe a Companhia ou suas controladas;

**X)** aprovar a constituição de ônus reais;

**XI)** deliberar sobre a contratação de quaisquer operações financeiras acima dos limites delegados pelo Conselho de Administração ao Diretor-Presidente da Companhia, conforme previsto no inciso VIII deste artigo;

**XII)** aprovar a concessão de garantias pela Companhia e/ou pelas sociedades controladas pela Companhia em favor de quaisquer terceiros que não sejam empresas controladas, direta ou indiretamente, pela Companhia;

**XIII)** deliberar sobre a contratação de operações financeiras pela Companhia e/ou suas controladas que:

    **a)** imponham restrições à distribuição de dividendos pela Companhia; e/ou

    **b)** contenham cláusulas que acarretem vencimento antecipado em outras obrigações contraídas pela Companhia e/ou por suas controladas (*cross default*);

**XIV)** autorizar a celebração de acordos com autoridades dos Poderes Executivo, Legislativo, Judiciário ou equivalentes no Brasil ou no exterior, a serem celebrados pela Companhia e/ou suas controladas diretas ou indiretas, envolvendo valores superiores a R$ 100.000.000,00 (cem milhões de reais);

**XV)** escolher e destituir os auditores independentes da Companhia e de suas controladas;

**XVI)** deliberar sobre a convocação da Assembleia Geral, quando julgar conveniente ou no caso do artigo 132 da Lei das S.A.;

**XVII)** aprovar a criação, alteração ou extinção de logomarcas;

**XVIII)** aprovar ou alterar o Regimento de Funcionamento do Conselho de Administração, para instituir comitês de assessoramento e estabelecer das suas respectivas competências;

**XIX)** deliberar sobre qualquer transação, de qualquer valor, entre a Companhia e/ou suas controladas de um lado; e do outro lado **(i)** acionistas, diretos ou indiretos, da Companhia; e/ou **(ii)** empresas nas quais os acionistas, diretos ou indiretos da Companhia exerçam o controle ou tenham poder de influência nas decisões;

**XX)** deliberar sobre a transferência de recursos pela Companhia para suas controladas a título de aportes de capital ou adiantamento para futuro aumento de capital em valor superior a R$ 300.000.000,00 (trezentos milhões de reais), considerando-se uma ou mais transações num período de 12 (doze) meses;

**XXI)** recomendar o início ou término de falência, recuperação judicial ou extrajudicial da Companhia e/ou de suas controladas;

**XXII)** decidir sobre a contratação de seguros em benefício de seus administradores na modalidade D&O;

**XXIII)** deliberar sobre a declaração de distribuição de dividendos intermediários, conforme definido em lei;

**XXIV)** deliberar sobre negociação com ações de emissão da Companhia para efeito de cancelamento ou permanência em tesouraria e respectiva alienação;

**XXV)** analisar e manifestar-se sobre quaisquer operações de aquisição ou alienação, fusão, cisão ou incorporação envolvendo a Companhia, cuja deliberação caberá à Assembleia de Acionistas, conforme previsto na alínea "c" do art. 9º deste Estatuto Social; e

**XXVI)** analisar e recomendar a aprovação das Práticas de Governança Independente e suas alterações, observado o quanto disposto no Art. 12, Parágrafo Único deste Estatuto Social.

**Parágrafo Único** - Ao Presidente do Conselho de Administração, e na sua ausência ou impedimento, ao Vice-Presidente, observado o disposto no Regimento de Funcionamento do Conselho compete:

**a)** convocar e dirigir as reuniões do Conselho de Administração; e

**b)** convocar a Assembleia Geral, desde que autorizado pelo Conselho de Administração.

**Art. 17** – O Conselho de Administração será assessorado, ao menos:

**a)** por um Comitê de Finanças e Risco, que incluirá, de forma contínua, ao menos um Conselheiro Independente; e

**b)** por um Comitê de Integridade e Auditoria, que será composto, de forma contínua, por maioria de Conselheiros Independentes.

**Parágrafo Único** – O Conselho de Administração e Assembleia Geral de Acionistas da Companhia poderão alterar o presente Estatuto Social para fundir o Comitê de Finanças e Risco e o Comitê de Integridade e Auditoria, caso em que o comitê resultante será constituído, de forma contínua, por maioria de Conselheiros Independentes.

## SECÃO III – DIRETORIA

**Art. 18** - A Diretoria será constituída por no mínimo 03 (três) e no máximo 09 (nove) Diretores, incluindo-se dentre estes o Diretor-Presidente, sendo os demais Diretores sem designação específica, todos eleitos pelo Conselho de Administração, com prazo de mandato unificado de 02 (dois) anos, podendo ser reeleitos.

**Parágrafo Único** - Todos os membros da Diretoria serão investidos em seus cargos mediante a assinatura dos respectivos termos de posse, devendo permanecer no exercício do cargo até a investidura de seus sucessores, salvo em caso de renúncia durante o prazo de mandato.

**Art. 19** - Em caso de impedimento ou de ausência de qualquer dos membros da Diretoria, o Diretor ausente poderá indicar, por escrito, seu substituto dentre os demais Diretores.

**Parágrafo Único** - Ocorrendo a hipótese prevista no *"caput"* deste Artigo, o Diretor substituto terá direito ao seu voto e ao do Diretor substituído nas reuniões da Diretoria.

**Art. 20** - Em caso de vacância na Diretoria, deve ser convocada Reunião do Conselho

de Administração para tomar conhecimento da renúncia e deliberar sobre a substituição, se for o caso.

**Art. 21** - Compete aos Diretores a representação da Companhia e a prática dos atos regulares de gestão que lhes são atribuídos por lei e por este Estatuto.

**Art. 22** - Compete a qualquer dos Diretores da Companhia, dentre outras atividades próprias de sua função:

**a)** a prática de todos os atos necessários ao funcionamento da Companhia, exceto os que, por lei ou por este Estatuto, seja atribuição de outros órgãos;

**b)** providenciar a elaboração do relatório anual da administração e das demonstrações financeiras da Companhia a serem submetidas ao Conselho de Administração e à Assembleia Geral; e

**c)** promover a execução das deliberações do Conselho de Administração e da Assembleia Geral.

**Art. 23** - Serão deliberadas em reunião da Diretoria as seguintes matérias:

**a)** participação em consórcios e associações da Companhia e de suas controladas com outras sociedades; e

**b)** instalação, transferência ou encerramento de filiais, sucursais, agências, escritórios, representações, dependências similares e qualquer outro estabelecimento da Companhia, no território nacional ou no exterior.

**§ 1º** - As reuniões da Diretoria serão convocadas pelo Diretor Presidente, salvo quando de caráter urgente, com 05 (cinco) dias de antecedência, no mínimo, realizando-se, normalmente, na sede da Companhia e, excepcionalmente, em qualquer outro local previamente estabelecido na convocação, podendo ainda ser realizada por meio de vídeo e/ou teleconferência.

**§ 2º** - As reuniões da Diretoria realizar-se-ão com a presença da maioria de seus membros, sendo as deliberações tomadas por maioria de votos dos Diretores presentes, considerando-se como presente aquele que estiver, na ocasião, representado por outro Diretor.

**Art. 24** - É obrigatória a assinatura de 02 (dois) Diretores em conjunto para que a Companhia possa:

a) conceder avais, fianças ou outras garantias;

b) assinar e endossar cheques, duplicatas, letras de câmbio, notas promissórias, debêntures e outros títulos;

c) constituir procuradores;

d) contrair obrigações e firmar compromissos, inclusive apresentar propostas, celebrar e rescindir contratos e seus aditivos;

e) transigir, desistir e renunciar a direitos;

f) alienar bens do ativo permanente; e

g) participar de consórcios, associações com outras sociedades e de acordos de acionistas.

**§1º** - As procurações emitidas para a prática de quaisquer atos, mesmo os previstos neste Artigo ou aquelas outorgadas a um dos membros da Diretoria, sempre deverão ser assinadas por dois Diretores e conter fim específico e prazo de validade limitado ao máximo de 01 (um) ano, exceto as procurações para fins judiciais, para atuação em processo administrativo ou arbitral, e as procurações outorgadas para representação da Companhia no exterior, quando for exigência expressa de lei, que poderão viger por prazo indeterminado.

**§2º** - Excepcionalmente, mediante aprovação em Reunião de Diretoria de proposta devidamente justificada, poderão ser outorgadas procurações com vigência superior a 01 (um) ano, mas sempre com prazo determinado.

## **CAPÍTULO IV – CONSELHO FISCAL**

**Art. 25** - O Conselho Fiscal somente funcionará nos exercícios sociais em que for instalado, a pedido de acionistas que preencham os requisitos exigidos por lei.

**Art. 26** - O Conselho Fiscal, quando em funcionamento, será constituído no mínimo por 03 (três) e no máximo por 05 (cinco) membros efetivos e igual número de

suplentes, acionistas ou não, eleitos pela Assembleia Geral, podendo ser reeleitos, com as atribuições previstas em lei.

**Parágrafo Único** - A remuneração dos membros do Conselho Fiscal será fixada pela Assembleia Geral que os eleger.

## CAPÍTULO V - EXERCÍCIO SOCIAL

**Art. 27** - O exercício social termina em 31 de dezembro de cada ano, quando será levantado o balanço patrimonial e demais demonstrações financeiras.

**§ 1º** - Do resultado do exercício, após as deduções de prejuízos acumulados e da provisão para o Imposto de Renda, serão deduzidas as participações dos administradores e empregados da Companhia, se e quando deliberado pela Assembleia Geral, nos limites e formas previstos em lei.

**§ 2º** - Apurado o lucro líquido do exercício, dele deduzir-se-ão inicialmente 5% (cinco por cento) para constituição da reserva legal, até esta alcançar 20% (vinte por cento) do capital social, observado o disposto no parágrafo 1º do Art. 193 da Lei nº 6.404/76.

**§ 3º** - O lucro líquido ajustado, na forma do parágrafo 2º acima, terá a seguinte destinação:
a) aos acionistas será pago um dividendo anual obrigatório, na forma do Art. 202, da Lei nº 6.404/76, de 25% (vinte e cinco por cento) sem prejuízo das destinações facultadas nos termos dos Arts. 195 e 197 da Lei nº 6.404/76; e
b) o saldo remanescente será destinado à Reserva de Realização de Investimentos, que somada à Reserva Legal, será limitada ao valor do capital social e terá como finalidade a realização ou reforço de investimentos da Companhia dentro do seu objeto social.

**§ 4º** - A Assembleia Geral poderá decidir, em um dado exercício social, reduzir a destinação à reserva estatutária prevista na alínea "b" do Parágrafo 3º do art. 27, aplicando o saldo não destinado, com observância ao disposto na Lei.

**§ 5º** - A Companhia poderá levantar balanços intermediários, a qualquer tempo, para atender exigências legais ou conveniências sociais, inclusive para distribuição de dividendos intermediários ou de outras formas de remuneração previstas na política de dividendos da Companhia, por deliberação prévia do Conselho de Administração.

**§6º** - Os dividendos atribuídos aos acionistas não renderão juros, e se não reclamados no prazo de 03 (três) anos a contar da data da publicação do ato que autorizar sua distribuição, prescreverão em favor da Companhia.

## CAPÍTULO VI - LIQUIDAÇÃO

**Art. 28** - A Companhia entrará em liquidação nos casos previstos em lei, competindo à Assembleia Geral estabelecer o modo de liquidação, eleger o liquidante e o Conselho Fiscal, se for o caso, para tal finalidade.

****

## <u>PRÁTICAS ESPECIAIS DE GOVERNANÇA INDEPENDENTE</u>

1.    <u>Manutenção das Disposições das Práticas Especiais de Governança Independente</u>. As disposições relativas às Práticas Especiais de Governança Independente aqui previstas permanecerão consistentes, de forma contínua, com o Plano de Recuperação Extrajudicial da OEC sob todos os aspectos até (i) 10 de setembro de 2058, ou (ii) quando deixar de haver Novas Notas em aberto, o que ocorrer primeiro, a menos e até que sejam alterados pelos respectivos acionistas nos termos do artigo 12 do Estatuto Social da OEC, desde que a maioria do Conselho de Administração da OEC e a maioria dos Conselheiros Independentes da OEC também recomendem tal alteração, sendo certo que nenhuma alteração poderá modificar as obrigações assumidas, ou violar os termos e condições do Plano de Recuperação Extrajudicial da OEC.

2.    <u>Definições</u>. Os termos e definições utilizados nestas Práticas Especiais de Governança Independente iniciados em letras maiúsculas, no singular ou no plural, masculino ou feminino, terão os significados a eles atribuídos no <u>Anexo I</u>. Os demais termos e definições utilizados nestas Práticas Especiais de Governança Independente iniciados em letras maiúsculas, no singular ou no plural, masculino ou feminino, e não definidos no Anexo I serão interpretados conforme os significados e eles atribuídos no Estatuto Social da OEC.

3.    <u>Conselho de Administração</u>. Durante qualquer período em que o número de Conselheiros Independentes da OEC seja inferior ao quanto previsto no Art. 10, §2º do Estatuto Social da OEC, o Conselho de Administração somente poderá deliberar ou autorizar, a qualquer título, resoluções envolvendo matérias relacionadas ao curso normal dos negócios da OEC e suas Subsidiárias, e, ademais, que sejam necessárias para evitar a ocorrência de um efeito negativo nas atividades e nos negócios da OEC ou de suas Subsidiárias.

3.1. Durante o período em que o número de Conselheiros Independentes esteja inferior ao quanto previsto no Art. 10, §2º do Estatuto Social da OEC, o Conselho de Administração não poderá deliberar, aprovar, proferir ou autorizar, a qualquer título, qualquer resolução relacionada a:

(a) qualquer Transação com Partes Relacionadas, entendida como qualquer operação com partes relacionadas (i) em um valor que exceda US$ 1.000.000,00 (um milhão de Dólares) por operação ou (ii) que faça com que o valor total das Transações com Partes Relacionadas em um período de 12 (doze) meses consecutivos exceda US$2.000.000,00 (dois milhões de Dólares);

(b) qualquer alienação de ativos feita pela OEC e suas Subsidiárias, (b.1) de forma

1

agregada, em montante superior a US$ 30.000.000,00 (trinta milhões de Dólares) para as vendas de ativos que sejam necessárias ao pagamento de Multas e sejam permitidas nos termos das Novas Notas; (b.2) de forma agregada, em montante superior a US$ 20.000.000,00 (vinte milhões de Dólares), e individualmente, em montante superior a US$ 10.000.000,00 (dez milhões de Dólares), para quaisquer outras vendas de ativos, sendo certo que tais recursos também poderão ser aplicados no pagamento de Multas;

**(c)** qualquer venda de ações existentes da OEC ou de qualquer de suas Subsidiárias, emissão de novas ações e/ou aumento de capital no valor de pelo menos US$ 200.000.000,00 (duzentos milhões de Dólares) em valor considerado de forma agregada, exceto para emissões ou transferências de ações de qualquer Subsidiária à OEC ou a qualquer outra Subsidiária exclusivamente para fins de gestão e necessidade de caixa do Grupo OEC;

**(d)** pagamento, reembolso e/ou recompra de dívidas contraídas e/ou garantidas pela OEC ou por qualquer uma de suas Subsidiárias acima de US$ 10.000.000,00 (dez milhões de Dólares) de forma agregada em qualquer momento antes dos vencimentos dos respectivos instrumentos de dívida, exceto por pagamentos, reembolsos e/ou recompras que façam parte de transações de refinanciamento permitidas nos termos das Novas Notas;

**(e)** qualquer acordo celebrado no contexto de qualquer processo judicial, arbitral ou administrativo com valor de liquidação superior a (e.1) US$ 25.000.000,00 (vinte e cinco milhões de Dólares) exclusivamente no que diz respeito a acordos referentes a demandas de clientes ou tributárias nos termos da Lei local aplicável, sendo certo que a OEC ou suas Subsidiárias poderão participar e/ou aderir, a qualquer tempo, a qualquer programa de reperfilamento ou anistia de créditos tributários que possa ser promovido de tempos em tempos por autoridades Federais, Estaduais e/ou Municipais no Brasil (tais como o REFIS ou qualquer outro programa semelhante); e (e.2) US$ 5.000.000,00 (cinco milhões de Dólares) no que diz respeito a quaisquer outros acordos; ou

**(f)** qualquer novo acordo de leniência (ou acordo semelhante com o objetivo de sanar matérias criminais regulatórias, impedimentos de contratação ou que impliquem na aplicação de penalidades ou Multas a respeito das matérias acima descritas) e/ou aditamentos ou suplementos celebrados em relação a qualquer acordo de leniência ou acordo similar que tenham sido firmados previamente pela Odebrecht Engenharia e Construção S.A., OEC ou suas Subsidiárias em montante superior a US$ 10.000.000,00 (dez milhões de Dólares). As limitações de valores estabelecidas nos subitens (b) e (d) neste item 3.1 se aplicam de forma consolidada a uma ou mais transações aprovadas durante todos os períodos de vacância que ocorreram nos 12 (doze) meses anteriores.

4.   Comitê de Finanças e Risco. O Comitê de Finanças e Risco do Conselho de Administração da OEC incluirá, de forma contínua, ao menos um Conselheiro Independente.

4.1. Durante qualquer período em que o número de Conselheiros Independentes no Comitê de Finanças e Risco do Conselho de Administração da OEC seja inferior ao mínimo previsto neste item 4, e observado o item 3.1 destas Práticas Especiais de Governança Independente, o Comitê de Finanças e Risco do Conselho de Administração da OEC (a) somente poderá recomendar assuntos relacionados ao curso normal dos negócios da OEC ou de suas Subsidiárias e, ademais, que sejam necessários para evitar a ocorrência de efeito negativo nas atividades ou negócios da OEC ou suas Subsidiárias; e (b) não poderá recomendar, a qualquer título, qualquer matéria que se enquadre nas restrições previstas no item 3.1. acima.

5.    Comitê de Integridade e Auditoria. O Comitê de Integridade e Auditoria do Conselho de Administração da OEC será composto, de forma contínua, por uma maioria de Conselheiros Independentes.

5.1. Durante qualquer período em que o Comitê de Integridade e Auditoria do Conselho de Administração da OEC não seja composto por uma maioria de Conselheiros Independentes, conforme previsto neste item 5, e observado o item 3.1. destas Práticas Especiais de Governança Independente, o Comitê de Integridade e Auditoria do Conselho de Administração da OEC (a) somente poderá recomendar, a qualquer título, assuntos relacionados ao curso normal dos negócios da OEC ou de suas Subsidiárias e, ademais, que sejam necessários para evitar a ocorrência de efeito negativo nas atividades ou negócios da OEC ou suas Subsidiárias, de acordo com o item 3 acima; e (b) não poderá recomendar, a qualquer título, qualquer matéria que se enquadre nas restrições previstas no item 3.1. acima.

6.    Hipótese de Unificação dos Comitês de Assessoramento do Conselho de Administração. O Conselho de Administração da OEC e os acionistas da OEC poderão alterar o Estatuto Social da OEC para fundir o Comitê Financeiro e de Risco e o Comitê de Integridade e Auditoria, sendo que o comitê resultante desta fusão deverá ser constituído, de forma contínua, por maioria de Conselheiros Independentes. Durante qualquer período em que o comitê resultante desta fusão não seja composto por maioria de Conselheiros Independentes, e observado o item 3.1. destas Práticas Especiais de Governança Independente, o comitê resultante desta fusão (a) somente poderá recomendar assuntos relacionados ao curso normal dos negócios da OEC ou de suas Subsidiárias e, ademais, que sejam necessários para evitar a ocorrência de efeito negativo nas atividades ou negócios da OEC ou suas Subsidiárias; e (b) não poderá recomendar, a qualquer título, qualquer matéria que se enquadre nas restrições previstas no item 3.1 acima.

7.    Operações com Partes Relacionadas. Para que qualquer Transação com Partes Relacionadas (i) em um valor que exceda US$ 1.000.000,00 (um milhão de Dólares) por operação ou (ii) que faça com que o valor total das Transações com Partes Relacionadas em um período de 12 (doze) meses consecutivos exceda US$ 2.000.000,00 (dois milhões de Dólares) seja concluída,

3

tal Transação com Partes Relacionadas deverá ser recomendada para aprovação pelo Comitê de Integridade e Auditoria do Conselho de Administração da OEC e aprovada pela maioria dos membros do Conselho de Administração da OEC, e desde que a maioria de todos os Conselheiros Independentes votantes também aprove tal Operação com Partes Relacionadas.

8.    Observância dos Deveres Fiduciários. O disposto nos itens 2 a 7 acima não afeta, limita ou restringe, de qualquer maneira, as obrigações fiduciárias dos membros do Conselho de Administração de acordo com os termos da Lei das S.A., os quais devem permanecer deliberando, aplicando e implementando as melhores práticas de governança corporativa e as matérias que entendam ser no melhor interesse social da OEC e de suas Subsidiárias e necessárias para cumprir com suas obrigações fiduciárias nos termos da Lei das S.A..

**Anexo I**

### DEFINIÇÕES

"Estatuto Social da OEC" significa o estatuto social de OEC S.A.;

"Lei" significa qualquer lei federal, estadual ou municipal brasileira ou qualquer lei estrangeira (neste caso, lei escrita, a *common law* ou qualquer outra lei), constituição, tratado, convenção, portaria, código, regra, estatuto, decreto, regulamento, decisão, deliberação, instrução ou qualquer outra exigência editada, emitida, adotada, promulgada, posta em vigor ou aplicada por uma autoridade governamental brasileira ou estrangeira;

"Lei das S.A." significa a Lei nº 6.404, de 15 de dezembro de 1976, conforme alterada de tempos em tempos;

"Multas" tem o significado atribuído nas Novas Notas[1];

---

[1] Conforme tradução livre das Novas Notas:

(i) "Multas" significa todo e qualquer valor devido (diretamente ou por meio de garantias) pela OEC ou por qualquer uma de suas Subsidiárias por multas, penalidades, prêmios ou acordos impostos por, ou acordados com, qualquer Autoridade Governamental ou instituição financeira multilateral e bancos de desenvolvimento como resultado de qualquer conduta ilegal, factual ou suposta, da OEC ou de qualquer de suas Afiliadas ou de seus respectivos diretores, funcionários, agentes ou representantes anteriores ou atuais;

(ii) "Afiliada" significa, com relação a qualquer Pessoa especificada, (1) qualquer outra Pessoa que, direta ou indiretamente, esteja sob controle, seja controlada ou esteja sob controle comum com essa Pessoa especificada ou (2) qualquer outra Pessoa que seja um diretor ou administrador (a) da Pessoa especificada, (b) de qualquer subsidiária da Pessoa especificada ou (c) de qualquer Pessoa descrita na cláusula (1) acima. Para os fins desta definição, "controle" de uma Pessoa significa o poder, direto ou indireto, de dirigir ou causar a direção da administração e políticas dessa Pessoa, seja por contrato ou não, e os termos "controlando" e "controlada" têm significados correlatos ao exposto e, para evitar dúvidas, não se aplicarão a nenhuma instituição financeira ou sociedade fiduciária que, na data do protocolo da ODB RJ, seja um credor de qualquer Parte da ODB RJ e tenha recebido ou receberá valores mobiliários em conexão com a ODB RJ.

(iii) "Subsidiária" significa, com relação a qualquer Pessoa em qualquer data, qualquer corporação, sociedade de responsabilidade limitada, parceria, associação ou outra entidade das quais mais de 50% do capital votante em circulação seja detida, direta ou indiretamente, por essa Pessoa e uma ou mais Subsidiárias dessa Pessoa (ou uma combinação delas).

(iv) "Autoridade Governamental" significa qualquer governo, departamento governamental, comissão, conselho, agência, autoridade reguladora, órgão judicial ou administrativo de instrumentalidade, nacional ou estrangeira, federal, estadual ou local, com jurisdição sobre o assunto ou assuntos em questão, incluindo, sem limitação, aqueles no Brasil e nos Estados Unidos. Para evitar dúvidas, a Petrobras não será considerada uma Autoridade Governamental.

(v) "Pessoa" significa qualquer pessoa física, pessoa jurídica, corporação, parceria, joint venture, empresa de responsabilidade limitada, organização não governamental ou governo ou qualquer agência ou subdivisão governamental do mesmo.

"Novas Notas" tem o significado atribuído na cláusula 3.1 do Plano de Recuperação Extrajudicial[2];

"Pessoa" significa qualquer pessoa física, pessoa jurídica, corporação, parceria, joint venture, empresa de responsabilidade limitada, organização não governamental ou governo ou qualquer agência ou subdivisão governamental do mesmo;

"Plano de Recuperação Extrajudicial" significa o plano de recuperação extrajudicial de CNO S.A., Odebrecht Engenharia e Construção S.A. e OECI S.A., nos termos dos artigos 161 e seguintes da Lei nº 11.101, de 9 de fevereiro de 2005, a ser ajuizado para reestruturar a garantia outorgada aos títulos emitidos pela Odebrecht Finance Ltd. no mercado internacional;

"Subsidiárias" significam, com relação a qualquer Pessoa em qualquer data, qualquer corporação, sociedade de responsabilidade limitada, parceria, associação ou outra entidade das quais mais de 50% do capital votante em circulação seja detida, direta ou indiretamente, por essa Pessoa e uma ou mais Subsidiárias dessa Pessoa (ou uma combinação delas);

"Transação com Partes Relacionadas" tem o significado estabelecido nas Novas Notas.[3]

---

[2] De acordo com Plano de Recuperação Extrajudicial "Novas Notas" significa cada uma das séries de notas denominadas em Dólares, seniores e quirografárias, as quais serão elegíveis para compensação por meio da Depository Trust Company e sujeitas às restrições de transferência aplicáveis a instrumentos de dívida emitidos no âmbito das isenções de registro previstas na Regra 144A do Regulamento S do U.S. Securities Act de 1933 que substituirão integralmente, para os fins dos Artigos 283 e 356 do Código Civil Brasileiro e da Lei de Nova York aplicável, todos os créditos contra a CNO S.A., a Odebrecht Engenharia e Construção S.A. e a OECI S.A. relacionados ou resultantes das (i) Notas seniores de 7,00% com vencimento em 2020 emitidas nos termos de escritura de emissão datada de 21 de outubro de 2009; (ii) Notas de 5,125% com vencimento em 2022 emitidas nos termos de escritura de emissão datada de 26 de junho de 2012; (iii) Notas de 6,00% com vencimento em 2023 emitidas nos termos de escritura de emissão datada de 5 de abril de 2011; (iv) Notas de 4,375% com vencimento em 2025 emitidas nos termos de escritura de emissão datada de 25 de abril de 2013; (v) Notas de 5,250% com vencimento em 2029 emitidas nos termos de escritura de emissão datada de 27 de junho de 2014; (vi) Notas de 7,125% com vencimento em 2042 emitidas nos termos de escritura de emissão datada de 26 de junho de 2012; e (vii) Notas Perpétuas de 7,500% emitidas nos termos de escritura de emissão datada de 14 de setembro de 2010, incluindo principal, juros, juros de mora, bem como quaisquer outros créditos derivados ou resultantes da sua emissão, oferta e subscrição, que não sejam montantes devidos ao The Bank of New York Mellon, na qualidade de agente fiduciário, conforme ajustados na forma prevista no Anexo 3.1 do Plano de Recuperação Extrajudicial.

[3] Conforme tradução livre das Novas Notas "Transação com Partes Relacionadas" significa qualquer pagamento, venda, arrendamento, transferência ou alienação de qualquer de suas propriedades ou ativos por parte da Companhia ou qualquer Subsidiária para, ou compra pela Companhia ou qualquer Subsidiária de quaisquer bens ou ativos de, ou celebração ou aditamento de qualquer transação, contrato, acordo, entendimento, empréstimo, adiantamento ou garantia pela Companhia ou qualquer Subsidiária que envolva um valor agregado superior a US$1.000.000,00 (ou o equivalente em outras moedas) por transação ou superior a US$2.000.000,00 (ou o equivalente em outras moedas) dentro de qualquer período de 12 (doze) meses, com ou para o benefício de qualquer Afiliada (cada uma, uma "Transação com Parte Relacionada").

| **Anexo 5.1** | **Schedule 5.1** |
|---|---|
| **Instrumento de Mandato outorgado ao Representante dos Credores** | **Power of Attorney granted to the Creditor Representative** |

| PNA POWER OF ATTORNEY | PNA PROCURAÇÃO |
|---|---|
| By this private Power-of-Attorney, **Epiq Corporate Restructuring, LLC** ("Epiq") a limited liability corporation duly organized and in existence in accordance with the laws of the State of New York (hereinafter referred to as "Grantor"), hereby figuring as attorney-in-fact of the notes holders listed in Exhibit I (the "Holders") and acting through the underwritten, who is duly empowered and authorized on behalf of the Grantor to appoint and remove attorneys and to delegate to such attorneys such of the powers and authority of the Grantor as it considers expedient, on Grantor's and Holders' behalf, hereby appoints, jointly or severally, the attorneys listed in Exhibit II, all members of **PINHEIRO NETO ADVOGADOS** ("PN-A"), as its attorneys in fact, granting them the powers of "*ad judicia et extra*" clause, including the power to delegate all or any portion of the powers granted, and take all other actions necessary for fulfillment of all the purposes of this power of attorney, including those necessary to file any measures, petitions, motions, appeals or lawsuits on behalf of the Grantor and Holders, represent and defend its interests in any measures and/or judicial or extrajudicial actions or proceedings, in connection with the Extrajudicial Reorganization Proceedings of **CNO S.A., Odebrecht Engenharia e Construção S.A** and **OECI S.A.,** ("Debtors") including specific powers to (i) act as a Creditor Representative under Debtor's Extrajudicial Reorganization Plan according to its discretion and judgment and for the benefit of the Holders, which include, among other matters, the ability to approve the final form of Debtor's Extrajudicial Reorganization Plan, documents necessary for the implementation of Debtor's Extrajudicial Reorganization Plan, appoint replacement independent directors for the first term, waive conditions precedents to closing or call and waive early termination events and approve extensions of specific deadlines in accordance with the provisions of the Extrajudicial Reorganization Plan, and (ii) represent such Grantor and the Holders in any meetings of creditors conducted in the course of the Extrajudicial Reorganization Proceedings, as applicable. | Por este instrumento particular de Procuração, **Epiq Corporate Restructuring, LLC** ("Epiq"), devidamente constituído e existente de acordo com as leis do Estado de Nova Iorque (doravante denominado "Outorgante"), neste ato figurando como procurador dos detentores de títulos listados no Apêndice I (os "Holders") e representado pelo abaixo assinado, que tem os poderes e autorizações necessários para, em nome do Outorgante, nomear e destituir procuradores e substabelecer para tais procuradores os poderes a autoridade do Outorgante nos casos que ele entender oportunos, em nome do Outorgante e dos Holders, neste ato constitui, conjunta ou separadamente, os advogados listados no Apêndice II, todos integrantes de **PINHEIRO NETO ADVOGADOS** ("PN-A"), outorgando-lhes os poderes da cláusula "*ad judicia et extra*", incluindo o poder de substabelecer no todo ou em parte os poderes conferidos, e tudo o mais que for necessário ao bom e fiel cumprimento do presente mandato, inclusive os necessários para ajuizar quaisquer medidas, petições, manifestações, recursos ou ações em nome do Outorgante e dos Holders e/ou representar o Outorgante e os Holders em quaisquer medidas judiciais ou extrajudiciais, relacionadas ao Procedimento de Recuperação Extrajudicial de **CNO S.A., Odebrecht Engenharia e Construção S.A** e **OECI S.A.** ("Devedoras"), incluindo poderes específicos para (i) agir como Representante dos Credores no âmbito da Recuperação Extrajudicial das Devedoras de acordo com seu critério e julgamento e em benefício dos Holders, o que inclui, entre outros assuntos, a faculdade de aprovar a forma final do Plano de Recuperação Extrajudicial das Devedoras, documentos necessários para a implementação do Plano de Recuperação Extrajudicial das Devedoras, indicar conselheiros independentes para o primeiro mandato, dispensar condições precedentes ao fechamento ou declarar e dispensar eventos de rescisão antecipada do plano e aprovar extensões de prazos específicos de acordo com as regras do Plano de Recuperação Extrajudicial; e (ii) representar o Outorgante e os Holders em quaisquer reuniões de credores conduzidas no transcurso do Procedimento de Recuperação Extrajudicial, conforme aplicável. |
| Unless earlier revoked by the Grantor in a signed writing delivered to PN-A, this Power of Attorney will expire within 30 (thirty) days counted from the occurrence of an Early Termination Event of the Plan | A não ser que seja anteriormente revogada pelo Outorgante, por meio de documento escrito entregue a PNA, esta Procuração expirará dentro de 30 (trinta) dias contados da ocorrência de um Evento de Rescisão do |

1

| | |
|---|---|
| or the Drop Dead Date, as defined in the Extrajudicial Reorganization Plan. | Plano ou do Termo de Resilição, conforme definidos no Plano de Recuperação Extrajudicial. |
| IN WITNESS WHEREOF THE GRANTOR HAS CAUSED THIS POWER OF ATTORNEY TO BE SIGNED BY JANE SULLIVAN IN HIS CAPACITY AS EXECUTIVE VICE PRESIDENT OF THE GRANTOR AS HEREBY CERTIFIED BY THE NOTARY AGENT AS OF THIS _18th_ DAY OF AUGUST, 2020 IN _WESTCHESTER_ _COUNTY_, NEW YORK. | EM TESTEMUNHO DO AQUI EXPOSTO O OUTORGANTE FEZ COM QUE ESTA PROCURAÇÃO FOSSE ASSINADA POR JANE SULLIVAN, EM SUA FUNÇÃO DE VICE PRESIDENTE EXECUTIVA DO OUTORGANTE CONFORME CERTIFICADO PELO *NOTÁRIO*, NESTE _18th_ DIA DO MÊS DE AGOSTO DE 2020, EM _WESTCHESTER_ _COUNTY_, NOVA IORQUE. |
| _[signature]_ <br> **Epiq Corporate Restructuring, LLC** <br> Name: Jane Sullivan <br> Title: Executive Vice President | _[signature]_ <br> **Epiq Corporate Restructuring, LLC** <br> Nome: Jane Sullivan <br> Cargo: Vice Presidente Executiva |

_[signature]_

DIANE M. STREANY
Notary Public, State of New York
No. 01ST5003825
Qualified in Westchester County
Commission Expires November 2, 20 _22_

**EXHIBIT I/ ANEXO I**

**Lista de Credores Signatários/ Signatory Creditors' List – ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A. (OEC), CNO S.A. (CNO) AND OECI S.A. (OECI)**

| Número de Registro do Participante do DTC/ DTC Participant Number | Nome do Participante do DTC/ DTC Participant Name | Valor do Principal/ Principal Amount | Valor Total dos Créditos (Principal + Juros)/ Total Amount of Claims (Principal + Interest) | Moeda Original/ Original Currency | Valor em R$/ Amount in R$[1] | % do Total/ % of Total | Emissão Original das Notas/ Original Bond Issuance | No. do Registro Contábil/ Accounting Register no. | Data Original de Vencimento/ Original Maturity Date |
|---|---|---|---|---|---|---|---|---|---|
| 158 | APEX CLEARING CORPORATION | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 4057 | BETA CAPITAL SECURITIES LLC | $1,850,000.00 | 2,161,545.14 | USD | R$11,779,772.54 | 0.06% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 2510 | BNYMELLON/BK THE PRUDENTIAL INVESTMENT | $1,850,000.00 | 2,161,545.14 | USD | R$11,779,772.54 | 0.06% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,690,000.00 | 1,926,883.67 | USD | R$10,500,927.02 | 0.06% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $3,505,000.00 | 4,067,649.86 | USD | R$22,167,471.45 | 0.12% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,550,000.00 | 1,743,793.06 | USD | R$9,503,149.01 | 0.05% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,325,000.00 | 1,548,133.68 | USD | R$8,436,864.12 | 0.05% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $1,365,000.00 | 1,524,567.56 | USD | R$8,308,435.83 | 0.05% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 725 | BOFA SECURITIES, INC./FIXED INCOME | $3,050,000.00 | 3,440,463.54 | USD | R$18,749,494.16 | 0.10% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $6,405,000.00 | 7,433,180.42 | USD | R$40,508,603.32 | 0.22% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $68,502,000.00 | 80,037,927.08 | USD | R$436,182,691.23 | 2.39% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $18,768,000.00 | 20,992,734.83 | USD | R$114,404,052.52 | 0.63% | 4.375% Notes due 2025 | 67575BA10 | 4/25/2025 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $12,265,000.00 | 13,835,175.52 | USD | R$75,397,556.04 | 0.41% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $2,900,000.00 | 3,365,530.56 | USD | R$18,341,131.87 | 0.05% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $892,000.00 | 1,003,524.78 | USD | R$5,468,908.98 | 0.03% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $5,450,000.00 | 6,367,795.14 | USD | R$34,702,573.17 | 0.19% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $1,835,000.00 | 2,052,517.59 | USD | R$11,185,605.09 | 0.06% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 10 | BROWN BROTHERS HARRIMAN & CO. | $14,305,000.00 | 16,136,358.02 | USD | R$87,958,201.31 | 0.48% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 794 | CF SECURED, LLC | $4,699,000.00 | 5,357,643.17 | USD | R$29,197,547.97 | 0.16% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 794 | CF SECURED, LLC | $25,599,000.00 | 28,799,586.08 | USD | R$156,949,104.28 | 0.86% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 794 | CF SECURED, LLC | $49,486,000.00 | 55,739,277.77 | USD | R$303,762,342.07 | 1.66% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 794 | CF SECURED, LLC | $107,591,000.00 | 125,709,623.26 | USD | R$685,079,733.90 | 3.75% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 794 | CF SECURED, LLC | $175,312,000.00 | 196,093,167.94 | USD | R$1,068,648,937.35 | 5.85% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 794 | CF SECURED, LLC | $115,298,000.00 | 130,058,546.04 | USD | R$708,780,058.36 | 3.88% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 908 | CITIBANK, N.A. | $4,365,000.00 | 5,065,703.75 | USD | R$27,606,565.73 | 0.15% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 908 | CITIBANK, N.A. | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | 67575BAH9 | 6/26/2022 |
| 908 | CITIBANK, N.A. | $3,310,000.00 | 3,867,413.19 | USD | R$21,076,241.69 | 0.05% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 908 | CITIBANK, N.A. | $7,474,000.00 | 8,359,954.47 | USD | R$45,559,243.85 | 0.25% | 4.375% Notes due 2025 | 67575BA10 | 4/25/2025 |
| 908 | CITIBANK, N.A. | $6,800,000.00 | 7,670,541.67 | USD | R$41,802,150.92 | 0.23% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 908 | CITIBANK, N.A. | $4,907,000.00 | 5,594,797.83 | USD | R$30,489,969.75 | 0.17% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 908 | CITIBANK, N.A. | $98,568,000.00 | 114,390,902.00 | USD | R$623,596,098.63 | 3.41% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 908 | CITIBANK, N.A. | $1,750,000.00 | 1,968,798.63 | USD | R$10,729,561.79 | 0.06% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 908 | CITIBANK, N.A. | $16,205,000.00 | 18,252,738.07 | USD | R$99,471,946.68 | 0.54% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 908 | CITIBANK, N.A. | $129,860,000.00 | 151,728,784.72 | USD | R$826,876,358.10 | 4.52% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 908 | CITIBANK, N.A. | $77,983,000.00 | 87,226,964.02 | USD | R$475,360,785.81 | 2.60% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 908 | CITIBANK, N.A. | $101,843,000.00 | 114,881,025.73 | USD | R$626,067,125.92 | 3.42% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 1970 | EUROCLEAR BANK SA/NV | $725,000.00 | 841,382.64 | USD | R$4,585,282.97 | 0.03% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 1970 | EUROCLEAR BANK SA/NV | $9,990,000.00 | 11,390,265.00 | USD | R$62,073,527.17 | 0.34% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 1970 | EUROCLEAR BANK SA/NV | $177,433,000.00 | 205,915,925.19 | USD | R$1,122,180,017.53 | 6.14% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 1970 | EUROCLEAR BANK SA/NV | $2,926,000.00 | 3,291,831.28 | USD | R$17,939,492.91 | 0.10% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 1970 | EUROCLEAR BANK SA/NV | $9,545,000.00 | 10,751,149.95 | USD | R$58,590,541.87 | 0.32% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 1970 | EUROCLEAR BANK SA/NV | $171,986,000.00 | 200,948,920.14 | USD | R$1,095,111,330.08 | 5.99% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 1970 | EUROCLEAR BANK SA/NV | $58,097,000.00 | 64,985,713.48 | USD | R$354,141,743.37 | 1.94% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 1970 | EUROCLEAR BANK SA/NV | $80,123,000.00 | 90,380,413.23 | USD | R$492,546,137.97 | 2.69% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 4818 | FIDUCIE DESJARDINS INC.™ | $5,180,000.00 | 6,052,326.39 | USD | R$32,983,363.12 | 0.18% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 5 | GOLDMAN SACHS & CO. LLC | $6,400,000.00 | 7,158,644.44 | USD | R$39,012,464.63 | 0.21% | 4.375% Notes due 2025 | 67575BA10 | 4/25/2025 |
| 8396 | HSBC BANK USA, NA/CLEARING | $1,365,000.00 | 1,578,317.78 | USD | R$8,603,358.39 | 0.05% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 534 | INTERACTIVE BROKERS RETAIL EQUITY CLEARING | $91,000.00 | 103,755.17 | USD | R$565,434.53 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 534 | INTERACTIVE BROKERS RETAIL EQUITY CLEARING | $3,200,000.00 | 1,402,083.33 | USD | R$7,640,933.54 | 0.04% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 534 | INTERACTIVE BROKERS RETAIL EQUITY CLEARING | $1,300,000.00 | 1,466,427.08 | USD | R$7,991,587.68 | 0.04% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 750 | INTL FCSTONE FINANCIAL INC. | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 750 | INTL FCSTONE FINANCIAL INC. | $1,215,000.00 | 1,410,041.25 | USD | R$7,684,301.80 | 0.04% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 750 | INTL FCSTONE FINANCIAL INC. | $915,000.00 | 1,069,088.54 | USD | R$5,826,231.83 | 0.03% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 750 | INTL FCSTONE FINANCIAL INC. | $100,000.00 | 111,853.82 | USD | R$609,569.76 | 0.00% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 750 | INTL FCSTONE FINANCIAL INC. | $150,000.00 | 169,203.13 | USD | R$922,106.27 | 0.05% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $672,000.00 | 766,192.00 | USD | R$4,175,534.54 | 0.02% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $590,000.00 | 116,052.78 | USD | R$632,452.82 | 0.00% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $1,083,000.00 | 1,218,405.08 | USD | R$6,639,942.18 | 0.04% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 352 | J.P. MORGAN SECURITIES LLC/JPMC | $200,000.00 | 223,707.64 | USD | R$1,219,139.52 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $42,705,000.00 | 49,560,338.75 | USD | R$270,088,978.09 | 1.48% | 7.500% Perpetual Notes | 67575BAF3 | N/A |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $39,593,000.00 | 46,026,890.63 | USD | R$250,832,745.04 | 1.37% | 7.125% Notes due 2042 | 67575BAJ5 | 6/26/2042 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $25,670,000.00 | 28,712,875.45 | USD | R$156,476,557.35 | 0.86% | 4.375% Notes due 2025 | 67575BA10 | 4/25/2025 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $11,391,000.00 | 12,849,285.31 | USD | R$70,024,750.17 | 0.38% | 5.250% Notes due 2029 | 67575BAM8 | 6/27/2029 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $200,000.00 | 225,272.92 | USD | R$1,227,669.81 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 903 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $11,538,000.00 | 13,481,031.25 | USD | R$73,467,576.00 | 0.40% | 7.125% Notes due 2042 | G6710EAA4 | 6/26/2042 |
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $6,215,000.00 | 6,951,714.88 | USD | R$37,884,760.57 | 0.21% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |

| Número de Registro do Participante do DTC/ DTC Participant Number | Nome do Participante do DTC/ DTC Participant Name | Valor do Principal/ Principal Amount | Valor Total dos Créditos (Principal + Juros)/ Total Amount of Claims (Principal + Interest) | Moeda Original/ Original Currency | Valor em R$/ Amount in R$[1] | % do Total/ % of Total | Emissão Original das Notas/ Original Bond Issuance | No. do Registro Contábil/ Accounting Register no. | Data Original de Vencimento/ Original Maturity Date |
|---|---|---|---|---|---|---|---|---|---|
| 902 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | $400,000.00 | 451,238.33 | USD | R$2,458,950.05 | 0.01% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $11,660,000.00 | 13,531,753.89 | USD | R$73,743,999.17 | 0.40% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $5,845,000.00 | 6,829,314.24 | USD | R$37,217,715.79 | 0.20% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 8862 | MERRILL LYNCH, PIERCE, FENNER & SMITH | $2,200,000.00 | 2,460,784.03 | USD | R$13,410,534.72 | 0.07% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $1,575,000.00 | 1,795,762.50 | USD | R$9,786,366.90 | 0.05% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $15,468,000.00 | 17,951,043.67 | USD | R$97,827,802.61 | 0.54% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $600,000.00 | 675,016.67 | USD | R$3,678,638.33 | 0.02% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $2,790,000.00 | 3,142,557.19 | USD | R$17,125,993.90 | 0.09% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $8,045,000.00 | 9,399,800.55 | USD | R$51,226,091.95 | 0.28% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $4,615,000.00 | 5,162,053.77 | USD | R$28,131,644.42 | 0.15% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 15 | MORGAN STANLEY SMITH BARNEY LLC | $2,280,000.00 | 2,571,887.50 | USD | R$14,016,035.31 | 0.08% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 226 | NATIONAL FINANCIAL SERVICES LLC | $300,000.00 | 350,520.83 | USD | R$1,910,233.39 | 0.01% | 7.125% Notes due 2042 | 67578EAJ5 | 6/26/2042 |
| 226 | NATIONAL FINANCIAL SERVICES LLC | $3,100,000.00 | 3,597,636.11 | USD | R$19,606,037.51 | 0.11% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 226 | NATIONAL FINANCIAL SERVICES LLC | $5,199,000.00 | 6,074,526.04 | USD | R$33,104,344.57 | 0.18% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 571 | OPPENHEIMER & CO. INC. | $200,000.00 | 233,680.56 | USD | R$1,273,488.92 | 0.01% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 443 | PERSHING LLC | $10,750,000.00 | 12,256,791.67 | USD | R$66,795,837.55 | 0.37% | 7.00% Senior Notes due 2020 | 67578EAC0 | 10/21/2020 |
| 443 | PERSHING LLC | $720,000.00 | 820,920.00 | USD | R$4,473,767.72 | 0.02% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 443 | PERSHING LLC | $3,680,000.00 | 4,270,742.22 | USD | R$23,274,263.89 | 0.13% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 443 | PERSHING LLC | $8,125,000.00 | 9,145,350.83 | USD | R$49,839,418.29 | 0.27% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 443 | PERSHING LLC | $5,470,000.00 | 6,161,214.27 | USD | R$33,576,769.41 | 0.18% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 443 | PERSHING LLC | $20,797,000.00 | 24,299,272.57 | USD | R$132,423,745.72 | 0.72% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 443 | PERSHING LLC | $12,348,999.58 | 13,812,827.69 | USD | R$75,275,767.08 | 0.41% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 443 | PERSHING LLC | $33,478,000.00 | 37,763,881.46 | USD | R$205,801,824.78 | 1.13% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 725 | RAYMOND JAMES & ASSOCIATES, INC. | $1,385,000.00 | 1,607,330.97 | USD | R$8,759,471.60 | 0.05% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 725 | RAYMOND JAMES & ASSOCIATES, INC. | $500,000.00 | 563,182.29 | USD | R$3,069,174.53 | 0.02% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 725 | RAYMOND JAMES & ASSOCIATES, INC. | $1,225,000.00 | 1,431,293.40 | USD | R$7,800,119.66 | 0.04% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 4801 | RBC DOMINION SECURITIES INC./CDS** | $250,000.00 | 290,131.94 | USD | R$1,581,332.06 | 0.01% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 8457 | SAFRA SECURITIES LLC | $200,000.00 | 228,033.33 | USD | R$1,242,713.26 | 0.01% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 8457 | SAFRA SECURITIES LLC | $9,938,000.00 | 11,533,325.06 | USD | R$62,853,161.56 | 0.34% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 8457 | SAFRA SECURITIES LLC | $400,000.00 | 450,011.11 | USD | R$2,452,425.55 | 0.01% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 8457 | SAFRA SECURITIES LLC | $400,000.00 | 450,545.83 | USD | R$2,455,339.63 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 8457 | SAFRA SECURITIES LLC | $750,000.00 | 876,502.08 | USD | R$4,775,583.46 | 0.03% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 8457 | SAFRA SECURITIES LLC | $250,000.00 | 279,634.55 | USD | R$1,523,924.40 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 8457 | SAFRA SECURITIES LLC | $1,850,000.00 | 2,086,858.54 | USD | R$11,372,644.00 | 0.06% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 5011 | SCOTIA CAPITAL INC./CDS** | $92,000.00 | 106,768.56 | USD | R$581,856.60 | 0.00% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 5011 | SCOTIA CAPITAL INC./CDS** | $8,600,000.00 | 10,048,263.89 | USD | R$54,740,023.72 | 0.30% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 5011 | SCOTIA CAPITAL INC./CDS** | $200,000.00 | 223,707.64 | USD | R$1,219,139.52 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 2663 | SEI PRIVATE TRUST COMPANY/C/O GWP | $400,000.00 | 464,211.11 | USD | R$2,529,831.29 | 0.01% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 2663 | SEI PRIVATE TRUST COMPANY/C/O GWP | $200,000.00 | 233,680.56 | USD | R$1,273,488.92 | 0.01% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 2663 | SEI PRIVATE TRUST COMPANY/C/O GWP | $200,000.00 | 223,707.64 | USD | R$1,219,139.52 | 0.01% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 2663 | SEI PRIVATE TRUST COMPANY/C/O GWP | $200,000.00 | 225,404.17 | USD | R$1,229,475.03 | 0.01% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $740,000.00 | 773,640.00 | USD | R$1,491,255.91 | 0.01% | 7.00% Senior Notes due 2020 | 67578EAC0 | 10/21/2020 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $7,055,000.00 | 8,187,523.47 | USD | R$44,619,546.67 | 0.24% | 7.500% Perpetual Notes | 67578EAF3 | N/A |
| 997 | STATE STREET BANK AND TRUST COMPANY | $14,873,000.00 | 16,732,538.14 | USD | R$91,187,313.10 | 0.50% | 6.00% Notes due 2023 | 67578EAG1 | 4/5/2023 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $5,000,000.00 | 5,631,822.92 | USD | R$30,691,745.35 | 0.17% | 5.125% Notes due 2022 | 67578EAH9 | 6/26/2022 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $16,988,000.00 | 19,848,826.39 | USD | R$108,170,149.17 | 0.59% | 7.125% Notes due 2042 | 67578EAJ5 | 6/26/2042 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $8,290,000.00 | 9,272,681.63 | USD | R$50,533,333.09 | 0.28% | 4.375% Notes due 2025 | 67578EAL0 | 4/25/2025 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $9,592,000.00 | 10,594,371.67 | USD | R$57,736,147.27 | 0.32% | 5.250% Notes due 2029 | 67578EAM8 | 6/27/2029 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $500,000.00 | 570,083.33 | USD | R$3,106,783.14 | 0.02% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $325,000.00 | 377,171.53 | USD | R$2,055,471.67 | 0.01% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 997 | STATE STREET BANK AND TRUST COMPANY | $11,672,000.00 | 13,131,324.22 | USD | R$71,563,777.61 | 0.39% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $5,730,000.00 | 6,454,069.06 | USD | R$35,172,740.17 | 0.19% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $20,961,000.00 | 24,499,890.63 | USD | R$133,468,006.64 | 0.73% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $14,724,000.00 | 16,469,356.38 | USD | R$89,753,051.44 | 0.49% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 997 | STATE STREET BANK AND TRUST COMPANY | $11,659,000.00 | 13,151,594.90 | USD | R$71,672,246.70 | 0.39% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 2399 | THE BANK OF NEW YORK TRUST | $40,000.00 | 46,421.11 | USD | R$252,981.13 | 0.00% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 901 | THE BANK OF NEW YORK MELLON | $2,000,000.00 | 2,252,729.17 | USD | R$12,276,698.14 | 0.07% | 5.125% Notes due 2022 | 67578EAH9 | 6/26/2022 |
| 901 | THE BANK OF NEW YORK MELLON | $1,063,000.00 | 1,242,012.15 | USD | R$6,768,593.63 | 0.04% | 7.125% Notes due 2042 | 67578EAJ5 | 6/26/2042 |
| 901 | THE BANK OF NEW YORK MELLON | $232,000.00 | 259,500.86 | USD | R$1,414,201.84 | 0.01% | 4.375% Notes due 2025 | 67578EAL0 | 4/25/2025 |
| 901 | THE BANK OF NEW YORK MELLON | $586,000.00 | 661,020.21 | USD | R$3,602,361.83 | 0.02% | 5.250% Notes due 2029 | 67578EAM8 | 6/27/2029 |
| 901 | THE BANK OF NEW YORK MELLON | $800,000.00 | 901,091.67 | USD | R$4,910,679.26 | 0.03% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 901 | THE BANK OF NEW YORK MELLON | $8,285,000.00 | 9,680,217.01 | USD | R$52,754,278.66 | 0.29% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 901 | THE BANK OF NEW YORK MELLON | $11,275,000.00 | 12,611,518.14 | USD | R$68,728,990.42 | 0.38% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 954 | THE BANK OF NEW YORK MELLON/MELLON TRUST OF | $920,000.00 | 1,037,779.31 | USD | R$5,655,585.32 | 0.03% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 954 | THE BANK OF NEW YORK MELLON/MELLON TRUST OF | $1,253,000.00 | 1,464,008.68 | USD | R$7,978,408.31 | 0.04% | 7.125% Notes due 2042 | 67578EAJ5 | 6/26/2042 |
| 2669 | THE NORTHERN TRUST COMPANY | $4,030,000.00 | 4,676,926.94 | USD | R$25,487,848.77 | 0.14% | 7.500% Perpetual Notes | 67578EAF3 | N/A |
| 2669 | THE NORTHERN TRUST COMPANY | $1,765,000.00 | 1,985,674.03 | USD | R$10,821,327.35 | 0.06% | 6.00% Notes due 2023 | 67578EAG1 | 4/5/2023 |
| 2669 | THE NORTHERN TRUST COMPANY | $4,151,000.00 | 4,850,030.93 | USD | R$26,431,262.61 | 0.14% | 7.125% Notes due 2042 | 67578EAJ5 | 6/26/2042 |

| Número de Registro do Participante do DTC/ DTC Participant Number | Nome do Participante do DTC/ DTC Participant Name | Valor do Principal/ Principal Amount | Valor Total dos Créditos (Principal + Juros)/ Total Amount of Claims (Principal + Interest) | Moeda Original/ Original Currency | Valor em R$/ Amount in R$[1] | % do Total/ % of Total | Emissão Original das Notas/ Original Bond Issuance | No. do Registro Contábil/ Accounting Register no. | Data Original de Vencimento/ Original Maturity Date |
|---|---|---|---|---|---|---|---|---|---|
| 2669 | THE NORTHERN TRUST COMPANY | $2,500,000.00 | 2,796,345.49 | USD | R$15,239,244.00 | 0.08% | 4.375% Notes due 2025 | 67575BA10 | 4/25/2025 |
| 2669 | THE NORTHERN TRUST COMPANY | $2,000,000.00 | 2,256,043.67 | USD | R$12,294,750.27 | 0.07% | 5.250% Notes due 2029 | 67575BAN8 | 6/27/2029 |
| 2669 | THE NORTHERN TRUST COMPANY | $100,000.00 | 114,016.67 | USD | R$621,356.63 | 0.00% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 2669 | THE NORTHERN TRUST COMPANY | $420,000.00 | 472,531.67 | USD | R$2,575,046.83 | 0.01% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 2669 | THE NORTHERN TRUST COMPANY | $645,000.00 | 726,505.16 | USD | R$3,959,235.15 | 0.02% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 2669 | THE NORTHERN TRUST COMPANY | $12,311,000.00 | 14,384,206.60 | USD | R$78,389,610.69 | 0.43% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 2669 | THE NORTHERN TRUST COMPANY | $3,578,000.00 | 4,002,129.66 | USD | R$21,810,406.01 | 0.12% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 2669 | THE NORTHERN TRUST COMPANY | $3,194,000.00 | 3,602,898.54 | USD | R$19,634,716.18 | 0.11% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 2803 | IZX BANK N.A. | $5,000,000.00 | 5,842,031.89 | USD | R$31,837,223.09 | 0.17% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 221 | UBS FINANCIAL SERVICES INC. | $1,285,000.00 | 1,465,114.17 | USD | R$7,984,432.67 | 0.04% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 221 | UBS FINANCIAL SERVICES INC. | $12,615,000.00 | 14,640,057.92 | USD | R$79,783,923.63 | 0.44% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 221 | UBS FINANCIAL SERVICES INC. | $445,000.00 | 500,637.36 | USD | R$2,728,323.43 | 0.01% | 6.00% Notes due 2023 | G6710EAG5 | 4/5/2023 |
| 221 | UBS FINANCIAL SERVICES INC. | $14,875,000.00 | 17,379,991.32 | USD | R$94,715,738.69 | 0.52% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 221 | UBS FINANCIAL SERVICES INC. | $1,200,000.00 | 1,342,245.83 | USD | R$7,314,837.12 | 0.04% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| 221 | UBS FINANCIAL SERVICES INC. | $3,260,000.00 | 3,677,347.92 | USD | R$20,040,442.94 | 0.11% | 5.250% Notes due 2029 | G6710EAQ3 | 6/27/2029 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $200,000.00 | 228,033.31 | USD | R$1,242,733.26 | 0.01% | 7.00% Senior Notes due 2020 | G6710EAD2 | 10/21/2020 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $3,953,000.00 | 4,587,566.31 | USD | R$25,000,860.10 | 0.14% | 7.500% Perpetual Notes | G6710EAF7 | N/A |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $400,000.00 | 450,545.83 | USD | R$2,455,339.63 | 0.01% | 5.125% Notes due 2022 | G6710EAK6 | 6/26/2022 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $500,000.00 | 550,520.83 | USD | R$91,910,233.39 | 0.01% | 7.125% Notes due 2042 | G6710EAL4 | 6/26/2042 |
| 141 | WELLS FARGO CLEARING SERVICES, LLC | $500,000.00 | 559,269.10 | USD | R$3,047,848.80 | 0.02% | 4.375% Notes due 2025 | G6710EAP5 | 4/25/2025 |
| | | **$2,166,637,999.58** | **$2,481,053,690.78** | | **$13,520,998,298.66** | **73.96%** | | | |

(1) Taxa de Câmbio utilizada para conversão de R$5.4497/US$ (Câmbio de 17/08/2020) /Exchange rate utilized for conversion of BRL 5.4497 /USD (PTAX from 08/17/2020)

**EXHIBIT II/ ANEXO II**

**EXHIBIT II/ ANEXO II**

**CELSO CINTRA MORI**, brasileiro, advogado, inscrito no C.P.F. sob nº 224.295.228-53 e na OAB/SP sob nº 23.639, e-mail: cmori@pn.com.br, **ANTONIO JOSÉ LOUREIRO CERQUEIRA MONTEIRO**, brasileiro, advogado, inscrito no C.P.F. sob nº 065.989.018-63 e na OAB/SP sob nº 70.574, e-mail: amonteiro@pn.com.br, **GILBERTO GIUSTI**, brasileiro, advogado, inscrito no C.P.F. sob nº 046.888.338-06 e na OAB/SP sob nº 83.943, e-mail: ggiusti@pn.com.br, **RODRIGO M. CARNEIRO DE OLIVEIRA**, brasileiro, advogado, inscrito no C.P.F. sob nº 055.455.118-73 e na OAB/SP sob nº 87.817, e-mail: rcarneiro@pn.com.br, **SÉRGIO PINHEIRO MARÇAL**, brasileiro, advogado, inscrito no C.P.F. sob nº 069.062.448-41 e na OAB/SP sob nº 91.370, e-mail: smarcal@pn.com.br, **FLÁVIO LEMOS BELLIBONI**, brasileiro, advogado, inscrito no C.P.F. sob nº 674.109.368-00 e na OAB/SP sob nº 88.210, e-mail: fbelliboni@pn.com.br, **JÚLIO CÉSAR BUENO**, brasileiro, advogado, inscrito no C.P.F. sob nº 612.433.706-10 e na OAB/SP sob nº 116.667, e-mail: jbueno@pn.com.br, **WERNER GRAU NETO**, brasileiro, advogado, inscrito no C.P.F. sob nº 148.415.998-51 e na OAB/SP nº 120.564, e-mail: wgrau@pn.com.br, **ANGELA FAN CHI KUNG**, brasileira, advogada, inscrita no C.P.F. sob nº 125.524.188-80 e na OAB/SP sob nº 126.378, e-mail: akung@pn.com.br, **LUIZ FERNANDO VALENTE DE PAIVA**, brasileiro, advogado, inscrito no C.P.F. sob nº 132.497.278-57 e na OAB/SP sob nº 118.594, e-mail: lpaiva@pn.com.br, **MAXIMILIAN FIERRO PASCHOAL**, brasileiro, advogado, inscrito no C.P.F. sob nº 146.936.358-55 e na OAB/SP sob nº 131.209, e-mail: mpaschoal@pn.com.br, **CRISTIANNE SACCAB ZARZUR**, brasileira, advogada, inscrita no C.P.F. sob nº 105.458.478-85 e na OAB/SP sob nº 138.331, e-mail: czarzur@pn.com.br, **THÉRA VAN SWAAY DE MARCHI**, brasileira, advogada, inscrita no C.P.F. sob nº 118.979.808-50 e na OAB/SP sob nº 124.527, e-mail: tdemarchi@pn.com.br, **FERNANDO BOTELHO PENTEADO DE CASTRO**, brasileiro, advogado, inscrito no C.P.F. sob nº 125.724.968-10 e na OAB/SP sob nº 138.343, e-mail: fcastro@pn.com.br, **ANDRÉ ZONARO GIACCHETTA**, brasileiro, advogado, inscrito no C.P.F. sob nº 178.805.378-80 e na OAB/SP sob nº 147.702, e-mail: azgiacchetta@pn.com.br, **DIÓGENES MENDES GONÇALVES NETO**, brasileiro, advogado, inscrito no C.P.F. sob nº 183.515.128-00 e na OAB/SP sob nº 139.120, e-mail: dgoncalves@pn.com.br, **MÁRIO PANSERI FERREIRA**, brasileiro, advogado, inscrito no C.P.F. sob nº 150.951.998-07 e na OAB/SP sob nº 159.530, e-mail: mpanseri@pn.com.br, **RENÊ GUILHERME DA SILVA MEDRADO**, brasileiro, advogado, inscrito no C.P.F. sob nº 263.196.028-99 e na OAB/SP sob nº 154.648, e-mail: rmedrado@pn.com.br, **RICARDO PAGLIARI LEVY**, brasileiro, advogado, inscrito no C.P.F. sob nº 177.906.228-11 e na OAB/SP sob nº 155.566, e-mail: rlevy@pn.com.br, **RODRIGO PERSONE P. CAMARGO**, brasileiro, advogado, inscrito no C.P.F. sob nº 265.167.198-37 e na OAB/SP sob nº 163.667, e-mail: rcamargo@pn.com.br, **JOSÉ MAURO DECOUSSAU MACHADO**,

brasileiro, advogado, inscrito no C.P.F. sob nº 296.254.588-24 e na OAB/SP sob nº 173.194, e-mail: jmachado@pn.com.br, **GIULIANO COLOMBO**, brasileiro, advogado, inscrito no C.P.F. sob nº 276.926.648-97 e na OAB/SP sob nº 184.987, e-mail: gcolombo@pn.com.br, **ALEXANDRE OUTEDA JORGE**, brasileiro, advogado, inscrito no C.P.F. sob nº 250.356.338-45 e na OAB/SP sob nº 176.530, e-mail: ajorge@pn.com.br, **RENATO STEPHAN GRION**, brasileiro, advogado, inscrito no C.P.F. sob nº 132.457.108-01 e na OAB/SP sob nº 163.326, e-mail: rgrion@pn.com.br, **LUIS CELSO CECILIO LEITE RIBEIRO**, brasileiro, advogado, inscrito no C.P.F. sob nº 270.226.498-04 e na OAB/SP sob nº 173.318, e-mail: lcribeiro@pn.com.br, **ANDRÉ MORAES MARQUES**, brasileiro, advogado, inscrito no C.P.F. sob nº 294.811.118-81 e na OAB/SP sob nº 234.938, e-mail: amarques@pn.com.br, **PEDRO PAULO BARRADAS BARATA**, brasileiro, advogado, inscrito no C.P.F. sob nº 220.295.378-70 e na OAB/SP sob nº 221.727, e-mail: pbarata@pn.com.br, **ANDRÉ VIVAN DE SOUZA**, brasileiro, advogado, inscrito no C.P.F. sob nº 294.419.238-85 e na OAB/SP sob nº 220.995, e-mail: avivan@pn.com.br, **CIRO TORRES FREITAS**, brasileiro, advogado, inscrito no C.P.F. sob nº 290.855.898-00 e na OAB/SP sob nº 208.205, e-mail: cfreitas@pn.com.br, **EIDER AVELINO SILVA**, brasileiro, advogado, inscrito no C.P.F. sob nº 065.308.926-05 e na OAB/SP sob nº 256.647, e-mail: eavelino@pn.com.br, **THIAGO BRAGA JUNQUEIRA**, brasileiro, advogado, inscrito no C.P.F. sob nº 069.137.676-09 e na OAB/SP sob nº 286.786, e-mail: tjunqueira@pn.com.br, **ALESSANDRO PEZZOLO GIACAGLIA**, brasileiro, advogado, inscrito no C.P.F. sob nº 351.369.848-80 e na OAB/SP sob nº. 300.036, e-mail: agiacaglia@pn.com.br, **CAROLINA KIYOMI IWAMOTO**, brasileira, advogada, inscrita no C.P.F. sob nº 358.785.128-07 e na OAB/SP sob nº 305.287, e-mail: ciwamoto@pn.com.br, **FERNANDA NEVES PIVA**, brasileira, advogada, inscrita no C.P.F. sob nº 370.750.848-01 e na OAB/SP sob nº 356.170, e-mail:fpiva@pn.com.br, **GIANVITO ARDITO**, brasileiro, advogado, inscrito no C.P.F sob nº 227.847.778-12 e na OAB/SP sob nº 305.319, e-mail: gardito@pn.com.br, **RAÍSSA LILAVATI BARBOSA ABBAS CAMPELO**, brasileira, advogada, inscrita no C.P.F. sob nº 370.493.288-47 e na OAB/SP sob nº 329.843, e-mail: rcampelo@pn.com.br, **ANA BEATRIZ ARAUJO RIBEIRO DO VALLE**, brasileira, advogada, inscrita no C.P.F. sob nº 092.759.766-78 e na OAB/SP sob nº 345.693, e-mail: avalle@pn.com.br, **ANDRÉ ROSSETTO DAUDT**, brasileiro, advogado, inscrito no CPF/MF sob nº 026.934.030.06 e na OAB/SP sob n° 343.222, e-mail: adaudt@pn.com.br, **BRUNA ANITA TERUCHKIN FELBERG**, brasileira, advogada, inscrita no C.P.F. sob nº 393.194.578-24, e na OAB/SP sob o nº 337.758, e-mail: bfelberg@pn.com.br, **RAFAEL CURI SAVASTANO**, brasileiro, advogado, inscrito no C.P.F. sob nº 403.083.938-05 e na OAB/SP sob nº 346.046, e-mail: rsavastano@pn.com.br, **LUÍS HENRIQUE PERRONI FERNANDES,** brasileiro, advogado, inscrito no C.P.F. sob nº 409.409.048-70 e na OAB/SP sob n° 358.773, e-mail: lfernandes@pn.com.br, **GUILHERME PICCARDI DE ANDRADE SILVA**,

brasileiro, advogado, inscrito no C.P.F. sob nº 383.104.028-13 e na OAB/SP sob nº 331.828, e-mail: gpsilva@pn.com.br, **PEDRO IVO GIL ZANETTI**, brasileiro, advogado, inscrito no C.P.F. sob nº 393.659.258-60 e na OAB/SP sob nº. 342.843, e-mail: pzanetti@pn.com.br, **GUSTAVO ROSSETTO MENDES BATISTA**, brasileiro, advogado, inscrito no C.P.F. sob nº 398.338.778-00 e na OAB/SP sob nº 361.043, e-mail: gbatista@pn.com.br, **RAFAEL NICOLETTI ZENEDIN**, brasileiro, advogado, inscrito no C.P.F. sob nº 409.947.068-71 e na OAB/SP sob n° 373.885, e-mail: rzenedin@pn.com.br, **CAROL SAYEG**, brasileira, advogada, inscrita no C.P.F. sob nº 378.124.798-89, e na OAB/SP sob nº 391.006, e-mail: csayeg@pn.com.br, **THIAGO DEL POZZO ZANELATO**, brasileiro, advogado, inscrito no C.P.F. sob nº 425.163.088-25e na OAB/SP sob nº 390.827, e-mail: tzanelato@pn.com.br, **FERNANDA PASINATO NAUFAL** brasileira, advogada, inscrita no C.P.F. sob nº 342.761.328-35 e na OAB/SP sob nº 401.884, e-mail: fnaufal@pn.com.br, **JOÃO GUILHERME THIESI DA SILVA**, brasileiro, advogado, inscrito no CPF/MF sob nº 408.501.778-04 e na OAB/SP sob nº 410.293, e-mail: jgsilva@pn.com.br, **LUCAS MOREIRA JIMENEZ,** brasileiro, advogado, inscrito no C.P.F. sob nº 419.931.948-43 e na OAB/SP sob nº 401.343, e-mail: ljimenez@pn.com.br, **VICTORIA BEATRIZ ROSSI AMATO**, brasileira, advogada, inscrita no C.P.F. sob nº 441.440.618-84 e na OAB/SP sob nº 408.161, e-mail: vamato@pn.com.br, **ADRIELLE FREGATE DA SILVA**, brasileira, advogada, inscrita no C.P.F. sob nº 447.060.158-63 e na OAB/SP sob nº 422.896, e-mail: afsilva@pn.com.br, **MATHEUS DRUMMOND PEREIRA**, brasileiro, advogado, inscrito no C.P.F. sob nº 129.125.787-01 e na OAB/SP sob nº 416.859, e-mail: mdrummond@pn.com.br, **OCTAVIO FERRAZ PEDROSO**, brasileiro, advogado, inscrito no C.P.F. sob nº 355.981.358-17 e na OAB/SP sob nº 443.683, **MANUELA DE CARVALHO VALENTE DE LIMA**, brasileira, advogada, inscrita no C.P.F. sob nº 056.712.684-60 e na OAB/SP sob nº 443.614, **LEONARDO PERES DA ROCHA E SILVA**, brasileiro, advogado, inscrito no C.P.F. sob nº 578.696.421-34 e na OAB/DF nº 12.002, e-mail: lrochaesilva@pn.com.br, **JOSÉ ALEXANDRE BUAIZ NETO** brasileiro, advogado**,** inscrito no C.P.F. sob nº 645.583.201-91 e na OAB/DF nº 14.346, e-mail jabuaizneto@pn.com.br e **VICENTE COELHO ARAÚJO,** brasileiro, advogado, inscrito no C.P.F. sob nº 620.485.621-91 e na OAB/DF sob nº13.134, e-mail: vcaraujo@pn.com.br, todos integrantes de **PINHEIRO NETO ADVOGADOS**, sociedade com inscrições na OAB/SP sob nº 11/65, com escritório na Capital do Estado de São Paulo, na Rua Hungria, nº 1.100, Jardim Europa, CEP 01455-906; na OAB/RJ sob nº 103/71 com escritório na Capital do Estado do Rio de Janeiro, na Rua Humaitá, nº 275, 16º andar, CEP 22261-005 e  na OAB/BR sob nº 46/79, com escritório em Brasília/DF, SAFS, Quadra 2, Bloco B, 3º andar, Edifício Via Office, CEP 70070-600.

| | |
|---|---|
| **Anexo 6.2.A**<br><br>**Termo de Adesão** | **Schedule 6.2.A**<br><br>**Adhesion Form** |
| TERMO DE ADESÃO A PLANO DE RECUPERAÇÃO EXTRAJUDICIAL<br><br>[**Credor Aderente**], com sede em [*endereço*], CEP: [•], na cidade de [•], [*Estado*], [registrado / inscrito no CNPJ/MF sob o nº [•]], neste ato representado de acordo com o seu [estatuto / contrato social] ("Credor Aderente") firma este termo de adesão ("Termo de Adesão") ao plano de recuperação extrajudicial ("Plano") da **CNO S.A.**, sociedade anônima de capital fechado com sede na Rua Lemos Monteiro nº. 120, 7º andar, Parte 'E', Butantã, CEP 05501-050 na cidade de São Paulo, Estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº. 15.102.288/0001-82; **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**, sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro nº. 120, 14º andar, Parte 'J', Butantã, CEP 05501-050 na cidade de São Paulo, Estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº. 19.821.234/0001-28; **OECI S.A.**, sociedade anônima de capital fechado, com sede na Rua Lemos Monteiro nº. 120, 12º andar, Parte 'H', Butantã, CEP 05501-050 na cidade de São Paulo, Estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº. 10.220.039/0001-78, nos seguintes termos: | ADHESION FORM TO EXTRAJUDICIAL RESTRUCTURING PLAN<br><br>[**Adhering Creditor**], with its registered office in [*address*], Zip Code No. [•], in the city of [•], [*State*], [registered / enrolled before the CNPJ/MF under No. [•]], herein represented in accordance with its [articles of incorporation / bylaws] ("Adhering Creditor") signs the term of adhesion ("Adhesion Form") to the extrajudicial restructuring plan ("Plan") of **CNO S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 7th floor, Part 'E', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 15.102.288/0001-82; **ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 14th floor, Part 'J', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 19.821.234/0001-28; **OECI S.A.**, a privately held corporation with registered office at Rua Lemos Monteiro no. 120, 12th floor, Part 'H', Butantã, Zip Code 05501-050 in the city of São Paulo, State of São Paulo, Brazil, enrolled in the CNPJ/ME under the no. 10.220.039/0001-78, in the following terms: |
| O Credor Aderente declara ter ciência e concorda com todas as cláusulas e condições previstas no Plano e seus anexos. O Credor Aderente outorga poderes ao Representante dos Credores para representá-lo para fins deste Plano, nos termos e condições previstos na Cláusula 5. | The Adhering Creditor declares to be aware and agrees with all the clauses and conditions set out in the Plan and its schedules. The Adhering Creditor grants powers to the Creditor Representative to represent its interests in this Plan, pursuant to the terms and conditions provided on Clause 5. |
| O Credor Aderente renuncia a qualquer direito a arrependimento e de desistência de sua anuência, de modo que a assinatura no Termo de Adesão importa aceite irrevogável e irretratável do Credor Aderente a todos os | The Adhering Creditor waives any right to retraction and withdrawal of its consent, so that the signature in the Adhesion Form results in the irrevocable and irreversible acceptance of the Adhering Creditor to all the |

| | |
|---|---|
| termos do Plano, inclusive para efeito do art. 161, §5º da Lei Federal Brasileira nº 11.101, de 9 de fevereiro de 2005, desde que o Plano protocolado judicialmente corresponda integralmente às condições dispostas no Plano ora aderido.<br><br>Todos os termos iniciados em letras maiúsculas deverão ter o significado atribuído a elas no Plano. | terms of the Plan, including for the effect of art. 161, paragraph 5 of the Brazilian Federal Law no. 11.101, of February 9, 2005, provided that the Plan filed by the Court complies fully with the conditions set out in the Plan adhered herein.<br><br>All the terms initiated in capitalized words shall have the meaning ascribed to them in the Plan. |
| São Paulo, [•] de [•] de 2020.<br><br>_____<br><br>*[Credor Aderente]* | São Paulo, [•] [•], 2020.<br><br>_____<br><br>*[Adhering Creditor]* |

| | |
|---|---|
| **Anexo 6.2.B**<br><br>**Modelo de Declaração de Propriedade** | **Schedule 6.2.B**<br><br>**Form of Certificate of Holder** |
| CERTIFICADO DE DETENTOR DE TÍTULOS | CERTIFICATION OF HOLDER |
| A. ASSINATURA POR PROPRIETÁRIO BENEFICIÁRIO | A. EXECUTION BY BENEFICIAL OWNER |
| O proprietário beneficiário abaixo assinado das Notas Existentes pelo presente declara e garante que é o proprietário beneficiário das Notas Existentes descritas abaixo de acordo com a tela anexa do website do corretor/custodiante abaixo assinado, refletindo a propriedade das Notas Existentes, e está devidamente autorizado a entregar este Certificado e que esse poder não foi conferido nem atribuído a nenhuma outra Pessoa. | The undersigned beneficial owner of the Existing Notes hereby represents and warrants that it is the beneficial owner of the Existing Notes described below in accordance with the attached screen shot from the undersigned's broker/custodian website showing ownership of the Existing Notes and is duly authorized to deliver this Certificate and that such power has not been granted or assigned to any other Person. |
| Nome do Credor/Proprietário Beneficiário (Detentor das Notas Existentes): _____<br>Endereço: _____<br>Telefone: _____<br>Fax: _____<br>E-mail:_____ | Name of Creditor/Beneficial Owner (Noteholder): _____<br>Address:_____<br>Phone: _____<br>Fax: _____<br>E-mail:_____ |
| Valor Total de Principal das Notas 2020 detidas em [•]: _____<br>ISIN Nº do Título: _____<br>Nome do Participante: _____<br>Nº do Participante: _____ | Total Current Principal Amount of 2020 Notes owned as of [•]: _____<br>ISIN Nº: _____<br>Participant Name: _____<br>Participant No.: _____ |
| Valor Total de Principal das Notas 2022 detidas em [•]: _____<br>ISIN Nº do Título: _____<br>Nome do Participante: _____<br>Nº do Participante: _____ | Total Current Principal Amount of 2022 Notes owned as of [•]: _____<br>ISIN Nº: _____<br>Participant Name: _____<br>Participant No.: _____ |

| | |
|---|---|
| Valor Total de Principal das Notas 2023 detidas em [•]: _____ <br> ISIN N° do Título: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2023 Notes owned as of [•]: _____ <br> ISIN N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2025 detidas em [•]: _____ <br> ISIN N° do Título: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2025 Notes owned as of [•]: _____ <br> ISIN N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2029 detidas em [•]: _____ <br> ISIN N° do Título: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2029 Notes owned as of [•]: _____ <br> ISIN N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2042 detidas em [•]: _____ <br> ISIN N° do Título: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2042 Notes owned as of [•]: _____ <br> ISIN N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas Perpétuas detidas em [•]: _____ <br> ISIN N° do Título: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of the Perpetual Notes owned as of [•]: _____ <br> ISIN N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| **B. ASSINATURA POR GESTOR, CORRETOR, AGENTE OU CONSULTOR** | **B. EXECUTION BY NOMINEE OR ADVISOR** |
| O abaixo assinado pelo presente declara e garante que é o gestor, agente, corretor, representante ou consultor do proprietário beneficiário indicado, e que o Credor/Proprietário Beneficiário conferiu ao abaixo assinado o poder e a autoridade para entregar este Certificado em nome desse Credor/Proprietário Beneficiário, e que esse poder não foi conferido nem atribuído a nenhuma outra Pessoa. | The undersigned hereby represents and warrants that it is the fund manager, agent, nominee or advisor for the beneficial owner indicated, and that the Creditor/Beneficial Owner has granted to the undersigned the power and authority to deliver this Certification on behalf of such Creditor/Beneficial Owner, and that such power has not been granted or assigned to any other Person. |

| | |
|---|---|
| Nome do Gestor, Agente, Corretor, Representante ou Consultor: _____ <br> Endereço: _____ <br> Telefone: _____ <br> Fax: _____ <br> E-mail: _____ <br> Nome do Credor/Proprietário(s) Beneficiário(s): _____ | Name of Manager, Agent, Broker, Nominee or Advisor: _____ <br> Address: _____ <br> Phone: _____ <br> Fax: _____ <br> E-mail: _____ |
| Valor Total de Principal das Notas 2020 detidas em [•]: _____ <br> Cusip N°: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2020 Notes owned as of [•]: _____ <br> Cusip N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2022 detidas em [•]: _____ <br> Cusip N°: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2022 Notes owned as of [•]: _____ <br> Cusip N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2023 detidas em [•]: _____ <br> Cusip N°: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2023 Notes owned as of [•]: _____ <br> Cusip N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2025 detidas em [•]: _____ <br> Cusip N°: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2025 Notes owned as of [•]: _____ <br> Cusip N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2029 detidas em [•]: _____ <br> Cusip N°: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2029 Notes owned as of [•]: _____ <br> Cusip N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |
| Valor Total de Principal das Notas 2042 detidas em [•]: _____ <br> Cusip N°: _____ <br> Nome do Participante: _____ <br> N° do Participante: _____ | Total Current Principal Amount of 2042 Notes owned as of [•]: _____ <br> Cusip N°: _____ <br> Participant Name: _____ <br> Participant No.: _____ |

| | |
|---|---|
| Valor Total de Principal das Notas Perpétuas detidas em [•]: _____<br>Cusip Nº: _____<br>Nome do Participante: _____<br>Nº do Participante: _____ | Total Current Principal Amount of the Perpetual Notes owned as of [•]: _____<br>Cusip Nº: _____<br>Participant Name: _____<br>Participant No.: _____ |
| Todos os termos iniciados em letras maiúsculas deverão ter o significado atribuído a elas no Plano. | All the terms initiated in capitalized words shall have the meaning ascribed to them in the Plan. |
| | |
| Assinatura: _____<br>(Nome do Representante Legal)<br>Cargo: _____<br>Data: _____ | Signature: _____<br>(Print Name of Authorized Signatory):<br>Title: _____<br>Date: _____ |